**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENE SOULE, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, AND POWER COALITION FOR EQUITY AND JUSTICE, *Plaintiffs*, | Civil Action No. |
| v. | **COMPLAINT** |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana. *Defendant*. | |

## INTRODUCTION

1.      Louisiana's 2022 congressional map, passed by the legislature as H.B. 1 and S.B. 5 and

adopted into Louisiana law over the veto of Governor John Bel Edwards, continues the State of

Louisiana's long history of maximizing political power for white citizens by disenfranchising

and discriminating against Black Louisianans.  The 2022 congressional map dilutes Black voting

strength in violation of the Voting Rights Act of 1965 ("VRA") by "packing" large numbers of

Black voters into a single majority-Black congressional district, and "cracking" the State's

remaining Black voters among the five remaining districts, where they constitute an ineffective

minority unable to participate equally in the electoral process. Even though Louisianans who

identify as any part Black constitute 31.2% of the state's voting age population, Black voters'

control only around 17% of the state's congressional districts. At the same time, the plan gives

disproportionate electoral power to white voters, who form a majority in five out of six, or 83%,

1

of the State's congressional districts, despite making up only 58% of the population. The State's denial to Black Louisianans of an equal opportunity to have their voices heard is illustrated by the fact that, whereas approximately one out of three voting age residents of Louisiana is Black, Black voters have an opportunity to elect the candidate of their choice in just one out of six congressional districts.  This Court must step in and remedy this clear violation of the Voting Rights Act of 1965.

2.      Plaintiffs—Black Louisiana voters and Louisiana nonprofit organizations promoting civic engagement and social equality—seek a judgment (i) declaring that the 2022 congressional map violates the Voting Rights Act, (ii) enjoining Defendant Secretary of State from conducting congressional elections the enacted 2022 congressional map; and (iii)  ordering Defendant to adopt a lawful congressional redistricting plan that complies with the Voting Rights Act, including by providing for two congressional districts in which Black Louisianans have an opportunity to elect candidates of their choice ("opportunity districts").

3.      Louisiana's congressional map has denied Black voters equal electoral opportunity to participate in the political process for decades.  Louisiana has long had the second largest Black population by percentage of any State in the United States.  Yet, except for a two-year period in the 1990s, it has never had more than one majority-Black congressional district.  The State's sole majority-Black district, congressional district 2 ("CD 2"), exists as a result of a court order finding that the State's prior congressional map violated the VRA and requiring the state to adopt a new congressional map.  *Major* v. *Treen*, 574 F. Supp. 325, 339-40 (E.D. La. 1983).   In the forty years since *Major* v. *Treen*, there have been important changes in the geography of where Black voter reside across the state, including but not limited to higher numbers of Black voters now living in Baton Rouge.

2

4.      H.B. 1 and S.B. 5 illegally and artificially limit Black voters' influence by "packing" Black voters into CD 2.  CD 2, as drawn by the Louisiana State Legislature (the "Legislature"), includes a majority of Black voters residing in New Orleans and a large number of Black voters residing in Baton Rouge—each of which is home to a majority-Black population—as well as other areas along the Mississippi River with large Black populations.  These areas, along with neighboring communities of Black voters that are placed in other congressional districts, are comprised of enough Black voters to form the core of two distinct majority-Black congressional districts.   In contrast to CD 2, smaller numbers of Black voters in contiguous areas are dispersed, or cracked, among the State's remaining congressional districts, principally CD 5 and CD 6. Under the current congressional configuration, less than one-third of Louisiana's Black voting age population resides in the state's sole majority-Black district, while 91 percent of Louisiana's white voters reside in majority-white districts.

5.      It is beyond dispute that Black voters in Louisiana are politically cohesive, while the white majority in Louisiana routinely votes as a bloc to defeat Black voters' candidates of choice.  Courts have repeatedly found—most recently in 2020—that racially polarized voting is a persistent feature of Louisiana's political landscape. *See Louisiana State Conference of NAACP v. Louisiana*, 490 F. Supp. 3d 982, 1019 (M.D. La. 2020).

6.      Louisiana's stark pattern of racially polarized voting, and the lack of support among white voters for Black candidates, has resulted in Black candidates being chronically underrepresented in public office in the state.  No Louisiana congressional district other than CD 2 has elected a Black representative.  Louisiana has never had a Black U.S. Senator.  The state of Louisiana has not had a Black governor since Reconstruction and has never had a Black Secretary of State or Attorney General.  Black public officials are dramatically underrepresented

in both houses of the Legislature, in the judiciary, and every other level of public office in the state.

7.      These realities exist against the backdrop of the State's well documented history of institutionalizing white supremacy through, among other techniques, disenfranchising Black voters.  Poll taxes, all-white primaries, grandfather clauses, voter roll purges, and state-sanctioned violence have been followed by countless attempts to dilute the minority vote at the state and local level.  Even in recent years, explicit or thinly veiled racial appeals have been a common feature of state and local political campaigns.  The pernicious effects of segregation have also resulted in deep and ongoing disparities between white and Black Louisianans on virtually every measure of human well-being, including infant mortality, health outcomes, incarceration rates, educational opportunities, and economic security.

8.      Since the VRA was passed into law in 1965, courts have repeatedly struck down efforts by the State of Louisiana to dilute, limit, or otherwise adversely affect minority voting access and strength by a wide variety of means, including redistricting for both federal and state elections.  Between 1965 and 2013 (when the Supreme Court decided *Shelby County v. Holder*, which invalidated the coverage formula for preclearance under the VRA), the Department of Justice blocked or demanded alterations to nearly 150 voting-related changes in Louisiana.  Over two-thirds of Louisiana's parishes likewise received objections from the Department of Justice, most frequently related to redistricting.

9.      The Legislature was given ample time and numerous options for remedying the long-standing dilution of Black voting strength.  In public meetings and throughout the Special Legislative Session leading to the adoption of the 2022 Congressional Map, members of the public, including Plaintiffs, told the Legislature that a congressional map with only a single

majority-Black district would violate the VRA, and proposed multiple alternative maps that featured two majority-Black districts while respecting traditional districting principles (such as contiguity, compactness, and respect for political subdivisions) at least as well—if not better— than H.B. 5 and S.B.1.  Numerous members of the Louisiana Legislative Black Caucus even introduced various proposed congressional maps with two majority-Black districts during the Special Legislative Session, each of which were rejected.

10.    Because the legislature failed to adopt a VRA compliant congressional map creating two majority-Black congressional districts, the Governor of Louisiana vetoed H.B. 1 and S.B. 5 saying that they were "not fair to the people of Louisiana and does not meet the standards set forth in the federal Voting Rights Act."   Governor Edwards' veto statement explained that in failing to enact a congressional map that complies with the Voting Rights Act, the Legislature "disregarded the shifting demographics of the state."  On March 29, 2022, the Legislature entered into a veto session and, in a vote that broke down along racial lines, each house voted to override the Governor's veto.

11.    The VRA entitles Black voters in Louisiana to participate in the political process under an electoral map that does not unlawfully dilute their voting strength and deprive them of a meaningful opportunity to participate in the political process.  H.B. 1 and S.B. 5 violate those rights.  The 2022 congressional map passed by the Louisiana legislature must be enjoined, and the State must be compelled to adopt a map that complies with Section 2 of the VRA ("Section 2") by creating two congressional districts where Black voters have an equal opportunity to elect candidates of their choice.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1357.

13.     This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14.     Venue is proper under 28 U.S.C. § 1391(b).

### PARTIES

15.     Plaintiff Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc.  It is one of the oldest and most significant civil rights organizations in Louisiana.  Since its founding in 1943, the Louisiana NAACP has worked toward its mission to ensure the political, educational, social, and economic equality of all persons and to eliminate race-based discrimination.  Among the Louisiana NAACP's central objectives and mission are eliminating racial discrimination in the democratic process and ensuring the protection of voting rights and equitable political representation.  Its work includes efforts to register, educate, and advocate on behalf of Black voters throughout Louisiana.

16.     The Louisiana NAACP has approximately 5,000 members through-out Louisiana, including Black Louisianians who are registered voters. The Louisiana NAACP has over 40 branches comprised of adult members and 16 youth and college chapters across the state. Members live in nearly every parish in Louisiana.

17.     The Louisiana NAACP has members who are registered voters and live in each of the six congressional districts in the congressional redistricting plan.  In particular, members of the Louisiana NAACP include Black voters whose votes are unlawfully diluted by the packing of Black voters into CD 2 and the cracking of Black voters residing in CDs 4, 5 and 6 in violation of the VRA.  Members of the Louisiana NAACP also include Black voters who would reside in a remedial second majority-Black district.  These members suffer harm because they are denied the opportunity to elect candidates of their choice.

18.    Louisiana's unfair and discriminatory redistricting frustrates and impedes the Louisiana NAACP organizational priorities by diminishing the voices and diluting the voting strength of Black Louisianans, who the Louisiana NAACP works to empower and engage in greater civic and political participation. If the enacted plan is not enjoined, the Louisiana NAACP will be forced to divert resources from its broader voter registration and community empowerment initiatives to the affected districts in order to protect the representation and interests of its members and to try to counteract the negative effects of vote dilution.

19.    Plaintiff Power Coalition for Equity and Justice is a coalition of groups from across Louisiana whose mission is to organize, educate, and turn out voters, and fight for policies that create a more equitable and just system in Louisiana.  The Power Coalition brings together various community-based organizations that work together to educate and empower voters across Louisiana through community organization and voter engagement initiatives.

20.    In 2016, the Power Coalition mobilized a statewide campaign to reach more than 30,000 infrequent voters of color in Jefferson, Orleans, Calcasieu, Terrebonne, East Baton Rouge, Ouachita, Caddo, and Bossier parishes.  In 2018, the Power Coalition played a leading role in the Unanimous Jury Coalition, a successful statewide campaign to pass an amendment ending the use of non-unanimous juries in Louisiana.  In 2019, the Power Coalition made over 1.3 million voter contact attempts to over 465,000 infrequent and semi-frequent voters of color across Louisiana, approximately 60 percent of whom turned out to vote in the statewide elections.  If the enacted plan is not enjoined, the Power Coalition will be required to divert resources away from these essential efforts to combat the impacts of discriminatory districts.

21.    Plaintiff Dr. Dorothy Nairne resides in Assumption Parish, Louisiana.  She is a Black U.S. citizen, and is lawfully registered to vote. Dr. Nairne is a regular voter, and a dues-paying

member of the Assumption Parish Branch of the NAACP. Under the enacted plan, Dr. Nairne resides in CD 6, but would reside in a new majority-Black district under alternative plans introduced during the Legislature's 2022 First Extraordinary Session devoted to redistricting (the "Special Session"). The enacted plan cracks Black voters like Dr. Nairne to prevent the creation of a second majority-Black district and, thus, dilutes her vote in violation of the VRA. She will suffer irreparable harm because she will be denied the opportunity to elect candidates of her choice in violation of the VRA if the enacted plan is not enjoined.

22.    Plaintiff Bishop Edwin René Soulé resides in Hammond, Louisiana. He is a Black a U.S. citizen, and is lawfully registered to vote. Soulé is a regular voter.  He resides in CD 1 under the enacted plan, which cracks Black voters like Soulé to prevent the creation of a second majority-Black district and, thus, dilutes his vote in violation of the VRA. He will suffer irreparable harm because he will be denied the opportunity to elect candidates of his choice in violation of the VRA if the enacted plan is not enjoined.

23.    Plaintiff Dr. Alice Washington resides in Baton Rouge, Louisiana. She is a Black U.S. citizen, and is lawfully registered to vote. Washington is a regular voter. She resides in CD 6. H.B. 1/S.B. 5 cracks Black voters like Dr. Washington to prevent the creation of a second majority-Black district and, thus, dilutes her vote in violation of the VRA.  She will suffer irreparable harm because she will be denied the opportunity to elect candidates of her choice in violation of the VRA under H.B. 1/S.B. 5.

24.    Plaintiff Rev. Clee Earnest Lowe resides in Baton Rouge, Louisiana. He is a Black U.S. citizen, and lawfully registered to vote.  Lowe is a regular voter.  He resides in CD 6. H.B. 1/S.B. 5 cracks Black voters like Lowe to prevent the creation of a second majority-Black district and, thus, dilutes his vote in violation of the VRA.  Lowe would reside in a cracked district under

H.B. 1/S.B. 5.  He will suffer irreparable harm because he will be denied the opportunity to elect candidates of his choice in violation of the VRA under H.B. 1/S.B. 5.

25.    Plaintiff Edgar Cage resides in Baker, Louisiana.  He is a Black U.S. citizen and lawfully registered to vote.  He is a leader of Together Baton Rouge.  Under the enacted plan, Mr. Cage resides in CD 2.  The enacted plan packs Black voters like Mr. Cage to prevent the creation of a second majority-Black district and, thus, dilutes his vote in violation of the VRA.  If the enacted plan is not enjoined, he will suffer irreparable harm in the form of vote dilution.

26.    Plaintiff Dr. Press Robinson resides in Baton Rouge, Louisiana.  He is a Black U.S. citizen and is lawfully registered to vote.  He resides in CD 2 under the enacted plan.  The enacted plan packs Black voters like Dr. Robinson to prevent the creation of a second majority-Black district and, thus, dilutes his vote in violation of the VRA.  Dr. Robinson would reside in a packed district under the enacted plan and will suffer irreparable harm if the plan is not enjoined.

27.    Plaintiff Davante Lewis resides in Baton Rouge, Louisiana.  He is a Black U.S. citizen and is lawfully registered to vote.  He resides in CD 2 under the enacted plan. The enacted plan cracks Black voters like Mr. Lewis to prevent the creation of a second majority-Black district and, thus, dilutes his vote in violation of the VRA.  If the enacted plan is not enjoined, he will suffer irreparable harm because he will be denied the opportunity to elect candidates of his choice.

28.    Plaintiff Martha Davis resides in Baton Rouge, Louisiana.  She is a Black U.S. citizen and is lawfully registered to vote.  Under the enacted plan, Ms. Davis resides in CD 2. The enacted plan packs Black voters like Ms. Davis into CD 2 to prevent the creation of a second majority-Black district and, thus, dilutes her vote in violation of the VRA.  If the enacted plan is not enjoined, she will suffer irreparable harm because she will be denied an equal opportunity to

elect candidates of her choice.

29.     Plaintiff Ambrose Sims resides in West Feliciana, Louisiana. He is a Black U.S. citizen and lawfully registered to vote. He is President of the West Feliciana NAACP and Chairperson of the West Louisiana Democratic Party. Under the enacted plan, Mr. Sims resides in CD 5.  The enacted plan cracks Black voters like Mr. Sims to prevent the creation of a second majority-Black opportunity district and, thus, dilutes his vote in violation of the VRA.  If the enacted plan is not enjoined, he will suffer irreparable harm because he would be denied the opportunity to elect candidates of his choice.

30.     Defendant Kyle Ardoin is the Secretary of State for Louisiana and is sued in his official capacity.  The Secretary of State is the State's chief election officer.  LA Const. art. 4, § 7; La. R.S. § 18:421.  In that capacity, he is responsible for preparing and certifying the ballots for all elections, including elections for the U.S. House of Representatives, promulgating all election returns, and administering the election laws.  *Id.*  As part of his duties, the Secretary of State also qualifies candidates for the U.S. House of Representatives.  La. R.S. §§ 18:452, 18:462; *Johnson* v. *Ardoin*, 2019 WL 2329319, at *3 (M.D. La. May 31, 2019).

## LEGAL BACKGROUND

31.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A Section 2 violation is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *Id.*  § 10301(b).

32.     The dilution of Black voting strength in violation of the Act "may be caused by the

dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Thornburg* v. *Gingles*, 478 U.S. 30, 46 n.11 (1986).  These means of diluting Black voting strength are referred to respectively as "cracking" and "packing."

33.   The Supreme Court has identified three necessary preconditions for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) members of the minority group must be "politically cohesive" in their support of particular candidates; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 50-51.

34.   Once these preconditions are established, the court must consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  52 U.S.C. § 10301(b).  The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors, referred to as the "Senate Factors," that courts should consider when determining if, under the totality of the circumstances, the operation of the districting plan results in vote dilution in violation of Section 2.

35.   The Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from

candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. *Gingles*, 478 U.S. at 37. Additional factors which may be probative include (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Id.* While Section 2 does not establish a right to have members of a protected class elected in numbers equal to their proportion in the population, the Supreme Court has held that "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration" in assessing whether Section 2 has been violated. *League of United Latin Am. Citizens* v. *Perry*, 548 U.S. 399, 426 (2006); *see also Johnson* v. *De Grandy*, 512 U.S. 997, 1000 (1994).

36.     The Supreme Court has identified factor 2 (the existence of racially polarized voting) and factor 7 (the extent to which members of the minority group have been elected to public office) as the most important factors in the totality of the circumstances analysis. *N.A.A.C.P.* v. *Fordice*, 252 F.3d 361 (5th Cir. 2001) (*citing id.* at. 48 n. 15).

37.     "There is no requirement that any particular number of [Senate] factors be proved, or that a majority of them point one way or the other." *United States* v. *Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report

indicates that no particular factor is an indispensable element of a dilution claim.").

38.     The Fifth Circuit has held that it will be "only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Clark* v. *Calhoun Cty.*, 21 F.3d 92, 97 (5th Cir. 1994).

## FACTUAL BACKGROUND

39.     The 2020 U.S. Decennial Census of Population and Housing confirmed that Louisiana is home to the second highest percentage of Black citizens in the country.  According to the 2020 Census, people of color represent nearly 40 percent of Louisiana's voting age population. Louisiana has a voting-age population of 3,570,548, with an any part Black voting age population of 1,115,769 (31.2%), a Hispanic/Latino voting age population of 223,662 (6.3%), and a non-Hispanic Asian American voting-age population of 80,672 (2.3%). Louisiana's population of individuals who identify as any part Black, the population has increased by 3.78% over the last decade, and the total number of Black Louisiana voting age population increased by 7.22%. Indeed, Louisiana's population growth over the last decade was driven entirely by growth in minority populations. The State's white population decreased by 6.3%.

40.     Every ten years, following the Census, the Legislature must redraw district boundaries for the congressional districts.  La. Stat. Ann. § 18:1276.1; U.S. Const. art. I § 2.  Under federal law, congressional districts must have nearly equal populations and must not discriminate on the basis of race or ethnicity. *Wesberry* v. *Sanders*, 376 U.S. 1 (1964).

41.     The U.S. Census Bureau delivered apportionment counts for the 2020 Census on April 26, 2021.  Louisiana was apportioned six seats in the U.S. House of Representatives, the same number it was apportioned following the 2010 census.

42.     Between the 2010 and 2020 censuses, Louisiana's population grew by 124,385, or 2.7

percent, according to Census Bureau data.  Louisiana's Black population grew by 56,234 (3.8 percent) from 2010-2020.  The non-Hispanic white population decreased by 138,182 (5.1 percent) in the same period.

43.    In Louisiana, congressional districts are drawn by the Legislature, passed through the Legislature as ordinary legislation, and subject to veto by the governor.  The Legislature may override a gubernatorial veto by two-thirds of the elected membership of each house.

44.    Pursuant to Joint Rule 21 of the Legislature, each redistricting plan submitted for consideration by the Legislature must comply with the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the U.S. Constitution; Section 2 of the Voting Rights Act of 1965, as amended; and all other applicable federal and state laws.  Each congressional redistricting plan must also (1) provide for single-member districts; (2) be comprised of districts that have a population as nearly equal to the ideal district population as practicable; and (3) be a whole plan which assigns all of the geography of the state to a district. And further "all redistricting plans shall respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to *the extent practicable*."

45.    Legislators were alerted early in the redistricting process of the importance of creating maps that protected the ability of Black Louisianans to elect candidates of their choice.  On October 18, 2021, a coalition of 17 civil and human rights organizations submitted a letter to the House and Senate Governmental Affairs Committees providing an overview of Section 2 and the preconditions set out by the Supreme Court in *Thornburg* v. *Gingles*.  The letter explained in detail why a congressional map with only one majority-Black opportunity district likely violates Section 2.  The letter also attached seven illustrative maps (the "Coalition maps"), each of which

provided for two opportunity districts comprised of a majority of Black voters and accorded with the State's traditional redistricting principles. The two opportunity districts included in the Coalition maps were based around Louisiana's two predominantly Black population centers, New Orleans and Baton Rouge.

46.    Legislators were also alerted to the importance of complying with Section 2 by their own staff, who provided members of the Senate and House Governmental Affairs Committees with extensive training and education on Section 2 compliance and the need to draw majority-minority districts where facts and circumstances were present. The staff presentation, delivered at the outset of each roadshow at which the Committees solicited public participation, included a slide devoted to Section 2 of the Voting Rights Act, including the *Gingles* preconditions. The presentation stated that Section 2 "prohibits any state or political subdivision from imposing a voting qualification, standard, practice, or procedure that results in the denial or abridgment of any U.S. citizen's right to vote on account of race, color, or status as a member of a language minority group." During this section of the presentation, staff also read out the Senate factors, explained the totality of the circumstances analysis, and stated that, to avoid violations of Section 2, the Legislature "must take care to avoid a racial gerrymander." *See, e.g.*, Staff Presentation at Baton Rouge Roadshow at 0:31.

47.    From late October 2021 through January 2022, the Louisiana House Committee on House and Governmental Affairs and the Senate Committee on Senate and Governmental Affairs held a series of joint public meetings (commonly called "roadshows") across the state during which Louisianans could make suggestions and recommendations regarding the redistricting process and the new maps. These roadshows took place on October 20, 2021 in Monroe; October 21, 2021 in Shreveport; October 26, 2021 in Lafayette; November 9, 2021 in

Alexandria; November 16, 2021 in Capitol Area/Baton Rouge; November 30, 2021 in

Northshore/Covington; December 15, 2021 in Southwest Louisiana/ Lake Charles; January 5,

2022 in Orleans Metro/New Orleans; January 11, 2022 in Bayou Region/Thibodaux; and January

20, 2022 in Baton Rouge. The Legislature represented that it intended to provide, through the

redistricting roadshows, a "full opportunity for citizens to make suggestions and

recommendations to the legislature."

48.     The 2022 roadshows demonstrated broad public support for a second opportunity district

comprised of a majority of Black voters. Out of 174 written comments received, spanning not

only the congressional map, but also redistricting of the State Senate, State House, Public

Service Commission, Board of Elementary and Secondary Education, and State Supreme Court,

64 comments explicitly expressed support for the creation of a second majority-Black district.

*See, e.g.*, Email Testimony of Barbara Kaplinsky submitted to Orleans Metro Region Roadshow

("I back the creation of a second majority-minority U.S. House district among Louisiana's six

congressional districts, when drawing this year's redistricting maps. One-third of Louisiana's

more than 4.6 million residents are Black. It would only be fair to ensure one-third of the U.S.

House districts reflect that reality."); Email Testimony of Catherine Gray submitted to Baton

Rouge Roadshow ("I support creating a minority-majority district fir [sic] US Congressional

District 5. With hopes that my voice can be heard through the efforts of representation for

people who look like me and have the same concerns for issues of gun control, healthcare,

policing, homelessness, etc."); Email Testimony of Lynette R. Bech submitted to Bayou

Region/Thibodaux Roadshow ("We want our elected representatives who are to represent us to

live in our community, so they understand the problems. We want and deserve at least 2

minority districts."); Email Testimony of Susan Weishar submitted to Orleans Metro Region

Roadshow ("Because over 1/3 of Louisiana's population is minority- at least 2 of the 6 districts should have a fair chance of electing a member of a minority.").

49.      Commenters supporting the creation of a second majority Black congressional district emphasized, among other factors, the extent to which combining voters in New Orleans and Baton Rouge in a single congressional district defies logic, dilutes Black voting power, and makes effective representation of both regions less likely.  *See, e.g.*, Email Testimony of Alice Elizabeth Stark submitted to Bayou Region/Thibodaux Roadshow ("I strongly believe that New Orleans and Baton rouge should not share any districts as they are two of the most populous cities in our state and are located over an hour from each other."); Email Testimony of Samuel Smith submitted to Baton Rouge Roadshow (arguing that Baton Rouge needs its "own representative solely focused on the everyday needs of the district, such as drainage, funding for potential infrastructure projects such as a potential new Mississippi Bridge or interstate improvements" and urging the Legislature to "ensure[] that the Capital Region has a unified voice in the halls of Congress.").

50.      Voters also consistently expressed a desire for congressional district maps that more closely resemble the state's natural geographic and community group breakdowns and not, as expressed by one voter, "a drawing of an alligator's head by my four year old (see District 6)." Email Testimony of Julie Becnel submitted to Bayou Region/Thibodaux Roadshow.  *See also* Email Testimony of Danny Wilson submitted to Baton Rouge Roadshow ("all congressional/legislative districts should follow county/parish lines and natural boundaries as much as possible… Congressional districts 2 and 6 are utterly unacceptable and the obvious result of political shenanigans."); Email Testimony of Emily Hargis submitted to Baton Rouge Roadshow ("I want to communicate clearly the importance of fair and equitable districts.  These

districts should be drawn geographically to reflect populations with similar regional interests. Minority voices must not be diluted.").

51.    Only 34 of the 174 public comments expressed opposition to creation of a second majority-Black congressional district.  Most of these appeared to be form emails not drafted by the individual voter submitting the comment.  For example, at least 19 of these comments were nearly identical, and including the following formulaic language: "Please keep the Congressional boundaries as they are.  They were already approved by the Justice Department as being compliant with voter representation guidelines.  Boundaries are to be redrawn only if the Census shows a greater than 5% change.  Only two out of six districts meet that criteria, and they are only slightly greater than 5%."  In contrast, comments in favor of a second majority-Black district showed no such similarity.  Instead, they consisted of personal appeals and anecdotes focusing on the distinct needs of Black community groups in Louisiana.

52.    In addition to written submissions, voters from across the state attended the redistricting roadshows in person to offer testimony in support of equity and fairness in the redistricting process in general and a second majority-Black opportunity district in particular.  As early as the first roadshow on October 20, 2021, Legislators heard live testimony speaking to the need for equitable representation in Louisiana's congressional maps.  *See, e.g*., Testimony of Adarian Williams at Monroe Roadshow ("In regards to congressional districts, our state lacks equal representation and competitiveness, which has consequences for our politics, our policies, communities, our economy and society as a whole. The districts we draw in 2022 will shape our lives and communities for the next decade."); Testimony of Brenda Shepard Nelson at Monroe Roadshow at 1:48-49 ("My parents understood the importance of voting. For you see they lived at a time where they could not vote. During my mother's last days she insisted in going to the

polls and voting for the person she felt would best represent our community… I have never missed an opportunity to vote, and I do not want my options to vote to be hampered by unfair drawing of district lines.").

53.    Throughout the roadshow process, voters consistently and passionately spoke to the need for equitable representation.  *See, e.g.*, Testimony of Maggie Boccinelli at New Orleans Roadshow at 1:23-24 ("If we really stand for the ideals we espouse in the Constitution, Black people in this state need to have a fair chance at electing representatives who have walked in their shoes, representatives who know what it's like to exist as an African American person in Louisiana, the birthplace of separate but equal and once home to the largest slave port in the country…I ask you to pass fair maps based on the population shifts in the state and to add a second majority-minority district in Louisiana"); Testimony of Angelle Bradford at Baton Rouge Roadshow at 2:24-26 ("I'm just asking you to listen to everyone tonight and really invest your time in racial proportionality and competitiveness."); Testimony of Sharon Smith LeHost at New Orleans Roadshow at 2:15-16 ("Minorities have a community of interest in that the state's past practices have resulted in the problems they disproportionately face every day . . . but for far too long minorities have been deprived of a fair opportunity to participate in developing the laws and policies that affect their own futures."); Testimony of Dustin Granger at Lake Charles Roadshow at 0:56-57 ("African American and democratic voters only have 17 percent of the representation in Congress when we consistently have 40-50 percent of the voting population… So I recommend, for the congressional districts, to please divide up Baton Rouge and New Orleans.").

54.    At the Baton Rouge Roadshow on November 16, 2021, Legislators heard personal testimony from members of the community who explained that they do not feel adequately

represented by the current CD 2, which packs their communities in with New Orleans voters. *See, e.g.*, Testimony of Albert Samuels at Baton Rouge Roadshow at 1:19-22 ("I don't feel represented when I have a congressman who, given all the infrastructure needs in our community, who voted against billions of dollars for roads, highways, bridges, broadband, things that our community needs… This is why representation matters. Fairness begs the question of why, since we have had these population shifts, why can't we have a second majority-minority district… The numbers are there."); Testimony of Gary Chambers at Baton Rouge Roadshow at 2:31-33 ("If you live in Baton Rouge and you're Black, you have to negotiate with people who grew up in New Orleans. And New Orleans wants this seat [CD 2]. It has been beneficial for New Orleans and I understand it. But… what that means is that little kids who live in the Second Congressional District don't have someone in D.C. that looks like them, that understands them.")

55.     In addition to the Coalition maps sent to the Legislature on October 18, individual voters proposed more congressional maps featuring two majority-Black opportunity districts. *See, e.g.*, Email Testimony of Jordan K. Landry submitted to Lafayette Roadshow; Plan Submission by Jordan Landry Scenario 2; Plan Submission entitled jchmap6block-assignments.

56.     Concerns raised by those who doubted the need for or viability of a second majority-Black opportunity district were also addressed during the roadshow period. For example, on November 22, Chairman of the House and Governmental Affairs Committee Representative John Stefanski gave a press conference at the Baton Rouge Press Club opposing the creation of a second majority-Black district. Among other things, Representative Stefanski claimed that (i) he did not believe that CD 2 would remain majority-Black without Black voters in Baton Rouge; (ii) he doubted whether majority-Black districts, including those proposed in the seven Coalition maps, would effectively "perform" to allow candidates preferred by Black voters to prevail; and

(iii) because the maps drawn after the 2010 Census had been "precleared" by the Department of Justice (DOJ) under Section 5 of the VRA, "we know that this configuration [of only one majority-Black district] is legal."

57.    On December 14, organizational Plaintiffs in this case—together with a smaller group of organizations that sent the October 18 letter—issued a substantive response to each of Chairman Stefanski's stated concerns.  The letter referred Chairman Stefanski to the seven Coalition maps, all of which demonstrated that CD 2 could indeed remain majority-Black without the inclusion of Black voters from Baton Rouge.  The letter included a preliminary analysis of recompiled election results that demonstrated that candidates preferred by Black voters would have an opportunity to prevail in both proposed majority-Black districts in the Coalition maps.  With respect to the Chairman's contention about Section 5 of the Voting Rights Act, the letter noted that preclearance under that section uses a different legal standard than Section 2.  Section 5 preclearance does not guarantee Section 2 compliance, and courts have expressly refused to equate the two.  Finally, the letter again reminded the House and Senate Governmental Committees that a new congressional map with only one majority-Black district likely would violate Section 2, and that the illustrative Coalition maps demonstrated that there were numerous ways to draw a congressional map with a second majority-Black district that was compact and adhered to traditional redistricting principles.  *See* Letter from LDF et. al. to La. House and Senate Governmental Affairs Committees (Dec. 14, 2021).

58.    The Legislature held the final roadshow on January 20, 2022, in Baton Rouge.  The Baton Rouge roadshow marked the first time that individual legislators asked questions about maps submitted during the roadshows.

59.    Following the conclusion of the roadshows, the Legislature convened the 2022 First

Extraordinary Session (the "Special Session") to consider and enact plans.  The first

congressional maps were pre-filed by legislators on January 31, 2022, in advance of the Special

Session.

60.      During the Special Session, members of the House and Senate Governmental Affairs

introduced thirty bills or amendments to bills proposing various configurations of congressional

maps.  Twenty of the bills and amendments included two majority-Black opportunity districts.

*See* H.B. 4, 1st Spec. Sess. (La. 2022); H.B. 5, 1st Spec. Sess. (La. 2022); H.B. 7, 1st Spec. Sess.

(La. 2022); H.B. 8, 1st Spec. Sess. (La. 2022); H.B. 9, 1st Spec. Sess. (La. 2022); H.B. 12, 1st

Spec. Sess. (La. 2022); S.B. 2, 1st Spec. Sess. (La. 2022); S.B. 4, 1st Spec. Sess. (La. 2022); S.B.

6, 1st Spec. Sess. (La. 2022); S.B. 9, 1st Spec. Sess. (La. 2022); S.B. 10, 1st Spec. Sess. (La.

2022); S.B. 11, 1st Spec. Sess. (La. 2022); S.B. 16, 1st Spec. Sess. (La. 2022); S.B. 18, 1st Spec.

Sess. (La. 2022) ; ; Amendment #88 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #99 to

H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #153 to H.B. 1, 1st Spec. Sess. (La. 2022);

Amendment #62 to S.B. 2, 1st Spec. Sess. (La. 2022); Amendment #116 to S.B. 5, 1st Spec.

Sess. (La. 2022); Amendment #91 to S.B. 5, 1st Spec. Sess. (La. 2022).  Just four of the

proposed bills contained one majority-Black district. *See* H.B. 1, 1st Spec. Sess. (La. 2022); H.B.

19, 1st Spec. Sess. (La. 2022); S.B. 5, 1st Spec. Sess. (La. 2022); S.B. 20, 1st Spec. Sess. (La.

2022); S.B. 22, 1st Spec. Sess. (La. 2022).

61.      The Senate Governmental Affairs Committee convened for the first time on February 2,

2022.  Although congressional maps were not on the agenda, several individuals gave public

testimony that echoed the comments of voters who spoke and submitted written testimony during

the roadshows.  They called for a second majority-Black district and demanded maps that would

provide Black Louisianans an opportunity to elect candidates of their choice at all levels of

government.

62.    The Senate Governmental Affairs Committee held its first hearing to discuss proposed congressional maps on February 3, 2022.  The Committee discussed six congressional bills, five of which included two majority-Black opportunity districts and adopted similar configurations to the Coalition maps: S.B. 2, S.B. 4, and S.B. 9 introduced by Senator Cleo Fields (D-Baton Rouge); S.B. 11 introduced by Senator Gary L. Smith Jr. (D-Baton Rouge); and S.B. 16 introduced by Senator W. Jay Luneau (D-Baton Rouge).  Only one bill proposed a map containing a single majority-Black district, S.B. 5 introduced by Senator Sharon Hewitt (R-Slidell).  Senator Hewitt's map bore no resemblance to any of the maps proposed during the roadshow period.

63.    All of the Senators who introduced bills with two second majority-Black opportunity districts testified that their maps were more compact than the current map on at least two of three widely recognized statistical measures of compactness, Reock, Polsby-Popper, and Convex Hull. Senator Fields' testimony in particular also touched upon the communities of interest that were considered in creation of the map proposed by his bill S.B. 2.

64.    During the discussion of her bill S.B. 5, Senator Hewitt claimed (without evidence) that creating a second majority-Black district would prevent a candidate preferred by Black voters from prevailing in CD 2, the sole majority-Black district, and that 58% Black voting-age population was the "functioning number" required to give candidates preferred by Black voters an opportunity to prevail in that district.

65.    Senator Hewitt touted her bill for minimizing deviation from the ideal population size required in each congressional district by the Equal Protection Clause.  She also raised concerns that other proposals did not have districts with equal population.

66.    Yet, the Coalition maps submitted on October 18 had no population deviation and complied with the Equal Protection Clause.

67.    The Senate Governmental Affairs Committee voted on congressional plans on February 4, 2022.  The Committee voted 6-3 to reject every bill that included a second majority-Black opportunity district and to send S.B. 5, Senator Hewitt's bill, to the Senate for a floor vote.

68.    That same day, Senator Hewitt spoke about redistricting during a webinar held by the Public Affairs Research Council of Louisiana.  Senator Hewitt raised questions, again without evidence, about whether another majority-Black district would allow candidates preferred by Black voters to prevail.  She also disclosed that the Legislature had retained a law firm and an expert on racially polarized voting to conduct that analysis.

69.    On February 7, during a Senate Governmental Affairs Committee hearing concerning other maps, Senator Hewitt indicated that the firm had provided her with a preliminary performance analysis.  When questioned by another Senator about whether that analysis would be shared, Senator Hewitt did not commit to doing so.

70.    The Senate voted on S.B. 5 on February 8.  Prior to the vote, Senator Fields introduced an amendment to replace Senator Hewitt's map with a map with two majority-Black opportunity districts.  Senator Fields' map performed better on all three objective measures of compactness, split fewer parishes, did not split any precincts, and had less population deviation than S.B. 5.  The Senate voted to reject Senator Fields' amendment by a 12-27 vote.  The Senate subsequently passed S.B. 5 by a vote of 27-12.  Every Black Senator voted against S.B. 5.

71.    The House and Governmental Affairs Committee convened its first meeting to discuss proposed congressional plans on February 4, 2022.  The Committee discussed only one congressional bill, H.B. 1, which was introduced by Speaker of the House Representative Clay

Schexnayder.

72.    H.B. 1 contained only one majority-Black district.  As with Senator Hewitt's map, Speaker Schexnayder's proposal did not resemble any of the maps submitted during the roadshows.  During discussion of H.B. 1, several Black Representatives asked Representative Schexnayder if he had considered or attempted drawing a second majority-Black opportunity district, and if he had consulted any members of the Black Legislative Caucus when developing his map. Representative Schexnayder refused to confirm or deny whether he had.

73.    Representative Schexnayder asserted that his proposed map was his best effort to achieve population equality.  However, the population deviation in H.B. 1 ranges from 29 voters to -17 voters, whereas the population in the Coalition maps, as submitted to the Legislature, deviated by no more than one voter.  Speaker Pro Tempore, Representative Magee (R-Lafourche), a co-author of the H.B. 1, also claimed, "of all the maps that is [sic] going to be filed, [H.B. 1] has the lowest standard of deviation.  I don't think anybody can beat it on that point."  Yet Representative Gaines introduced an amendment to H.B. 1 that deviated less from the ideal population for each district.  *See* H.B. 1, Amendment #88, 1st Spec. Sess. (La. 2022).

74.    After Chairman Representative John Stefanski informed Committee members that a vote would be held on the congressional bill that day, one Committee member, Representative Royce Duplessis (D-New Orleans) raised concerns that holding the vote the same day it was introduced did not give the Committee sufficient time to discuss and debate the proposed congressional plan.

75.    After less than three hours of discussion, the House and Governmental Affairs Committee voted by 13-5 to send H.B. 1 to the House of Representatives for a floor vote.

76.    The House and Governmental Affairs Committee heard five bills on February 10, 2022,

each with a second majority-Black district.  The Committee rejected each bill.  *See* H.B. 4, 1st Spec. Sess. (La. 2022); H.B. 7, 1st Spec. Sess. (La. 2022); H.B. 8, 1st Spec. Sess. (La. 2022) ; H.B. 9, 1st Spec. Sess. (La. 2022). H.B. 12, 1st Spec. Sess. (La. 2022).

77.     Testimony from the Representatives sponsoring those five bills focused on the fact that these maps created a second majority-Black opportunity district centered around Baton Rouge, were more compact than H.B. 1 on at least two or all three of the widely recognized statistical measures of compactness, preserved communities of interest, and adhered to traditional redistricting principles.  For example, Representative Denise Marcelle spoke at length about how her map reflected the different communities of interest in Baton Rouge and New Orleans as well as the public support voiced during the roadshow for a second majority-Black district that incorporated Black voters in Baton Rouge.

78.     The House voted on H.B. 1 on February 10, 2022.  Prior to the vote, Representatives Marcelle and Gaines introduced two amendments to H.B. 1. Both maps provided two majority-Black districts and were more compact than H.B. 1 on two of the three widely recognized statistical measures of compactness. The map proposed by Rep. Gaines, in particular, was more compact than H.B. 1 on all three widely recognized statistical measures of compactness (Reock, Polsby-Popper, and Convex Hull), split fewer parishes, did not split any precincts, and had a smaller population deviation.  The House rejected the Marcelle and Gaines amendments by a margin of 30-71 and 33-70, respectively.  Several Black Representatives also noted that H.B. 1 was not as compact and split more parishes and precincts than the amendments and other maps introduced in the House and Governmental Affairs Committee.   Undeterred, the House ultimately passed H.B. 1 by a margin of 70–33.

79.     On February 14, the House and Governmental Affairs Committee voted in favor of a bill

introduced by Representative Barry Ivey, redrawing the map for Louisiana's Supreme Court that contained a majority-Black district with a Black voting age population of 51.23%.  Unlike the congressional maps introduced by other members of the Committee, this map passed out of committee with bipartisan support, including Representative Magee.  Representative Ivey's bill was ultimately rejected by the House on February 16, 2022.

80.    On February 15, the House and Governmental Affairs Committee voted in favor of S.B. 5.  Representative Duplessis introduced Amendment #116, which was more compact on all three widely recognized statistical measures of compactness, split fewer parishes than S.B. 5 (and H.B. 1), split no precincts, and had less population deviation.  Representative Duplessis pointed out that on equal population, S.B. 5 [had] a deviation of 128 people," whereas his "amendment had an absolute range of 44 people."  The House and Governmental Affairs Committee rejected the amendment by a margin of 5-9.

81.    Senate Governmental Affairs Committee voted in favor of H.B. 1 on February 15, 2022.  When Representative Schexnayder introduced his bill to the Committee, he claimed that he developed his map, "trying [his] best, not to split parishes and precincts."  Turning to population deviation, Representative Schexnayder also boasted, "if you look at the overall range and the relative deviation . . . puts [H.B. 1] at a 0.00%."  Senator Hewitt reiterated that it was "hard to argue with 0.000%, whatever the number was."  Senator Price introduced Amendment #153 with two majority-Black districts, which was rejected, sending H.B. 1 to the House for a floor vote by a margin of 6-2.

82.    On February 18, 2022, the Legislature passed both H.B. 1 and S.B. 5, reconciling the bills with identical compromise amendments.  Each bill contained identical congressional configurations.



83.    The Senate voted 27-10 to approve H.B. 1 and 26-9 to approve S.B. 5.  The House voted

in favor of H.B. 1 by a margin of 62-27 and S.B. 5 by a margin of 64-31.  Neither bill passed

with more than 70 votes, the number of votes required for the Legislature to override a

gubernatorial veto.  La. Const. art. III, §§ 18.  Both H.B. 1 and S.B. 5 were thereafter sent to the

Governor on February 21, 2022.

84.    On March 9, Governor John Bel Edwards vetoed both H.B. 1 and S.B. 5, stating that the

map "is not fair to the people of Louisiana and does not meet the standards set forth in the

federal Voting Rights Act."   Governor Edwards' veto statement explained that in failing to enact

a congressional map that complies with the Voting Rights Act, the Legislature "disregarded the shifting demographics of the state" particularly the increase in the Black voting age population by 4.4% since the 2010 census, resulting in a 2020 Black voting age population of 31.2%, almost one third of the state of Louisiana. The Governor made clear that he will veto proposed maps that do not comply with Section 2, telling Louisiana legislators that "[t]his injustice cannot continue."

85.    The 2022 Regular Legislative Session convened on March 14, 2022.

86.    On March 29, the Legislature entered into a veto session and, in a vote broke down along racial and party lines, each house voted to override the Governor's veto.

## The *Thornburg* v. *Gingles* Preconditions Are Satisfied Here

87.    As applied here, the three preconditions outlined by the Supreme Court in *Thornburg v. Gingles*—the size and geographic compactness of Black voters in Louisiana; their political cohesiveness; and bloc voting by the white majority sufficient to usually defeat Black voters' preferred candidates—are readily satisfied, and strongly support the finding that Louisiana's 2022 congressional map violates Section 2.

## *Gingles* Precondition One: Size and Compactness of Black Voting Age Population

88.    Louisiana's Black voters are sufficiently numerous and geographically compact to form a majority in two properly apportioned congressional districts in a six-district plan. Black voters make up over 50 percent of Louisiana's two largest metro areas, Baton Rouge and New Orleans, and constitute more than enough voters to support the creation of two majority-Black districts that would allow Black voters to elect candidates of their choice.

89.    This is evidenced by, among other things, the multiple congressional maps either proposed during the redistricting roadshows or introduced as alternative bills or amendments during the Special Session that contain two such districts. For example, on February 8, 2022,

State Senator Cleo Fields introduced as an amendment to S.B. 5, a map proposal containing two Black opportunity districts comprised of majorities of Black voters.  That map is reproduced below.

90.    Under this map, Demonstrative CD 5 can be redrawn as a second majority-Black district. Demonstrative CD 5 would have a Black voting-age population (BVAP) percentage of 51.4 percent, which is sufficient for Black voters to elect a representative of their choice despite persistent racially polarized voting.

91.    Demonstrative CD 5 comports with traditional redistricting principles and is narrowly tailored to comply with the Voting Rights Act.  When comparing compactness at the district level, the majority-Black districts in the Demonstrative map, Demonstrative CD 2 and Demonstrative CD 5, are more compact on all three widely recognized statistical measures of compactness than the majority-Black district in H.B. 1 and S.B. 5.

92.    Demonstrative CDs 2 and 5 would therefore each constitute districts in which the BVAP is sufficiently large and geographically compact to constitute a majority containing majorities of Black voters.  Compared to H.B. 1/S.B. 5, this map is more compact on all three widely recognized statistical measures of compactness, splits fewer parishes, and contains no precinct splits.



93.     Senator Field's map represents just one of many ways to draw two majority-Black

districts.  In total, nine map proposals were submitted to the Legislature by members of the

public, and at least eighteen map proposals were introduced by individual legislators during the

Special Session, demonstrating that Louisiana's Black voting-age population is sufficiently

numerous and geographically compact to form a majority in two congressional districts.

### *Gingles* Precondition Two: Political Cohesiveness of Black Voters

94.     Black voters in Louisiana are politically cohesive.  Black voters overwhelmingly vote for

different candidates than the candidates preferred and supported by white voters.  *See, e.g.*, *St.*

*Bernard Citizens For Better Gov't* v. *St. Bernard Par. Sch. Bd.*, 2002 WL 2022589, at *7-8 (E.D. La. Aug. 26, 2002) (finding that Black voters "act[ed] as a politically cohesive unit" in state and local elections).

95.     This pattern has extended to election after election in the state.  In the 2017 general run-off election for State Treasurer, Derrick Edwards ran against John Schroder, and lost.  Edwards received approximately 96 percent of the Black vote, while Schroder received approximately 79.3 percent of the white vote.

96.     In the 2018 election to fill the remainder of the term for the position of Secretary of State after the sitting Secretary of State resigned, Gwen Collins-Greenup ran against Kyle Ardoin and lost.  Collins-Greenup received approximately 95% of the Black vote, while Ardoin received approximately 84.1% of the white vote.  Ardoin ran again in 2019, this time for a full term as Secretary of State.  Again, Collins-Greenup ran against Ardoin and lost.  She received approximately 96% of the Black vote, while Ardoin received approximately 86.4% of the white vote.

97.     Also in 2018, Ike Jackson Jr. ran against Jeff Landry for the position of Attorney General and lost.  Jackson Jr. received approximately 91.3% of the Black vote, while Landry received approximately 89.9% of the white vote.

***Gingles* Precondition Three: Bloc Voting by White Voters**

98.     In districts with a white majority, white voters vote as a bloc to usually defeat Black voters' preferred candidates.  In the 2020 congressional elections, voters in four out of Louisiana's five majority-white districts had a choice between Black and white congressional candidates. The white candidates prevailed in all four races.

99.     Multiple courts have recognized that such stark patterns of racially polarized voting—referring to both the political cohesiveness of Black voters and bloc voting by white voters—has

been a consistent feature of Louisiana's political landscape, and that it continues to pervade statewide and local elections today.  A federal district court recently found that there was sufficient preliminary evidence of racially polarized voting statewide to support a Section 2 challenge to Louisiana's Supreme Court district map. *Louisiana State Conference of NAACP* v. *Louisiana*, 490 F. Supp. 3d 982, 1019 (M.D. La. 2020).  Similarly, in *St. Bernard Citizens For Better Government*, a federal district court found racially polarized voting patterns in statewide gubernatorial elections, as well as local parish elections.  *St. Bernard Citizens For Better Gov't*, 2002 WL 2022589, at *7 (E.D. La. Aug. 26, 2002).  In *Terrebonne Par. Branch NAACP* v. *Jindal*, 274 F. Supp. 3d 395, 436-37 (M.D. La. 2017), *rev'd sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020), the district court found that stark patterns of racially polarized voting existed in the parish's judicial elections.  And, although the Fifth Circuit reversed the district court's decision, it held that the district court did not err in its finding of racially polarized voting.

100.    Most recently, in 2021, the DOJ sued the City of West Monroe under Section 2 over its at-large alderman elections.  The DOJ contended that there was racially polarized voting sufficient to satisfy *Gingles* because "[i]n contests between Black candidates and [w]hite candidates for West Monroe Board of Alderman and other parish, state, and federal positions, White voters cast their ballots sufficiently as a bloc to defeat the minority's preferred candidate." The court agreed and entered a consent decree between the parties.  *United States* v. *City of West Monroe*, No. 21-cv-0988 (W.D. La. Apr. 14, 2021); *see also United States v. City of Morgan*, No. 00-cv-1541 (W.D. La. Aug. 17, 2000) (holding that "[r]acially polarized voting patterns prevail in elections for the City Council of Morgan City. In contests between [B]lack and white candidates for City Council, [B]lack voters consistently vote for [B]lack candidates and white

voters vote sufficiently as a bloc to usually defeat the [B]lack voters' candidates of choice.").

### Under the Totality of the Circumstances, H.B. 1/S.B. 5 Violate Section 2 of the VRA

101.    The factors enumerated in the Senate Judiciary Committee Report to the 1982 amendments to the VRA ("Senate Factors")—including, but not limited to, Louisiana's history of official voting-related discrimination, the extent to which Black residents bear the effects of discrimination, the use of racial appeals in political campaigns, and the underrepresentation of Black elected officials in the state—likewise weigh in favor of finding that the 2022 congressional map violates Section 2.

### Factor 1: History of Official Voting-Related Discrimination

#### a.  Suppression Targeting Black Voters Before the Voting Rights Act

102.    Louisiana has a long, deeply entrenched history of voting-related discrimination. Throughout its long history of chattel slavery, only white people possessed the right to vote. "Disenfranchisement of blacks as an acknowledged state policy pre-dates the Civil War.  Even free blacks who were property owners were denied the right to vote.  Most blacks, consequently, even while ostensibly 'free,' remained enslaved, bereft of one of the most basic of human rights—the right to vote." *Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir. 1987).

103.    Even after the Civil War and Reconstruction, Black people were systematically denied the right to vote in the decades that followed.  Although the emancipation of slaves and the post-Civil Reconstruction period brought change—including the first Black people elected to state office—that initial progress was swiftly reversed after the federal government ceased to monitor state government starting in 1877.  Black people's efforts to vote in the nineteenth and twentieth centuries were suppressed through extreme racial violence and targeted state actions, such as frequent public lynching, the enactment of a grandfather clause, a poll tax, literacy tests, voter

roll purges, and discriminatory changes to state and local maps during redistricting.

104.    In 1898, Louisiana lawmakers convened a constitutional convention to update the state constitution, with the explicit goal of enforcing white supremacy and disenfranchising Black people.  At that convention, the state established the "grandfather clause," a constitutional provision, common to post-Reconstruction states in the former Confederacy, imposing onerous property and education requirements on prospective voters, but waiving those requirements for registrants whose fathers or grandfathers had been registered to vote before 1867—all of whom, of course, were white.  The president of the Constitutional Convention at which the clause was adopted openly acknowledged that its purpose was to "let the white man vote" and to "stop the negro from voting."

105.    These and other state-sanctioned voting restrictions were frequently supplemented by systemic violence against Black Louisianans to intimidate and prevent them from exercising the franchise and to entrench white supremacy.  In 1868 alone, more than 1,000 people—most of them Black—were killed in massacres and lynchings.  This widespread violence took place with the implicit and explicit approval of State officials.  Louisiana parishes comprised four out of five local jurisdictions in the United States that had the most lynchings between 1877 and 1950, including 549 documented lynchings in that time period.  In the 1873 "Colfax Massacre," a white mob massacred approximately 150 Black residents in Colfax, Louisiana after a close gubernatorial race.  Anti-Black violence was almost never punished by law enforcement or the courts.

106.    In the twentieth century, the State continued to develop ways to discourage Black Louisianans' participation in the political process and to suppress their effective voting power.  It implemented an "understanding" clause requiring citizens to "give a reasonable interpretation of

any section of the federal or state constitution in order to vote." *Bossier Par. Sch. Bd.* v. *Reno*, 907 F. Supp. 434, 455 (D.D.C. 1995) (Kessler, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted), *vacated on other grounds*, 520 U.S. 471 (1997). It levied poll taxes and purged Black voters from registration rolls.  In 1923, the State authorized an all-white Democratic Primary, which "functioned to deny [Black voters] access to the determinative elections." *Major*, 574 F. Supp. at 339-40.  In the 1950s, Louisiana implemented citizenship and "morals" tests, and anti-single shot voting provisions (the latter designed to minimize the ability of minority voters to effectively marshal their voting power in multimember districts).  In 1959, the Legislature established a majority-vote requirement for election to party committees that impeded minorities from obtaining fair representation on those committees.

107.    Louisiana's voting restrictions achieved their intended effect.  The restrictions imposed in the late nineteenth century, including the grandfather clause, "reduce[d] black voter registration [in the state] from approximately 135,000 in 1896 to less than 1,000 in 1907." *Major*, 574 F. Supp. at 340.  From 1910 until 1944, less than 1 percent of Louisiana's voting-age Black population was registered to vote.  By 1948, the percentage of Black registered voters stood at 5 percent.  By 1964—nearly a century after Black people received the right to vote—only about a third of Louisiana's Black voting-age population was registered to vote, compared with the overwhelming majority of the white voting-age population.

### b.  Continued Efforts After the Voting Rights Act to Minimize Black Voting Power

108.    In 1965, Congress passed the VRA, and Louisiana, as a result of its history of disenfranchising Black voters, was declared a "covered" jurisdiction under Section 4(b) of the Voting Rights Act. *See South Carolina* v. *Katzenbach*, 383 U.S. 301, 312-13 (1966).  As a covered jurisdiction, Louisiana was required under Section 5 of the Act to have any changes to

its election practices or procedures precleared by the U.S. Department of Justice or a federal court.

109.    Even after the passage of the VRA, Louisiana continued its efforts to discourage Black voting by diluting Black voting strength.  These efforts are reflected in the large number of instances in which changes it sought were blocked or altered by the DOJ and many judicial decisions finding the state and local jurisdictions violated Section 2.

110.    Between 1965 and 2013, when the Supreme Court invalidated the preclearance formula under Section 5, the DOJ blocked or altered nearly 150 voting related changes in Louisiana, with many of those objections preventing attempts to dilute minority voting strength.  Indeed, in every redistricting cycle after the passage of the VRA through 2000, at least one of Louisiana's maps was blocked as discriminatory.

111.    Courts have also repeatedly struck down efforts in Louisiana to dilute, limit, or otherwise adversely impact minority voting access and strength, including as recently as 2021.  These efforts have included attempts to discriminate against Black voters through at-large voting schemes.  *See, e.g.*, *United States* v. *City of West Monroe*, No. 21-cv-0988 (W.D. La. Apr. 14, 2021); *Citizens for a Better Gretna* v. *City of Gretna*, 834 F.2d 496, 504 (5th Cir. 1987); *Ausberry* v. *City of Monroe*, 456 F. Supp. 460, 467 (W.D. La. 1978); *Wallace* v. *House*, 538 F.2d 1138, 1141 (5th Cir. 1976).

112.    Louisiana's statewide district maps—including those governing congressional elections—have been successfully challenged under the VRA in numerous redistricting cycles since 1965.  In 1981, the state implemented a congressional redistricting plan that "cracked" the Black majority in Orleans Parish between two congressional districts.  Plaintiffs alleged—and a federal court agreed—that the proposed map improperly diluted Black voting power.  The court

required that a new map be drawn, which resulted in what is today Louisiana's only majority-minority district. *Major* v. *Treen*, 574 F. Supp. 325, 339-40 (E.D. La. 1983). In the 40 years since that case, Louisiana's Black population has become sufficiently large and geographically compact as to necessitate two majority-minority congressional districts.

113.    That same year, the Legislature also attempted to limit Black influence at the state level by approving a plan to reduce the number of majority-minority State House of Representatives districts throughout the state, including Orleans Parish and East Baton Rouge Parish. The DOJ objected to the plan, noting that it "impact[ed] adversely upon black voting strength." As a result of the DOJ's objection, the plan did not become effective.

114.    In 1991, the DOJ objected to a subsequent State House redistricting plan, noting that in at least seven areas the proposed plan minimized Black voting strength.

115.    In 2001, the Legislature sought to eliminate an opportunity district in Orleans. The Legislature sought preclearance in the D.C. District Court. *Louisiana House of Representatives* v. *Ashcroft*, No. 1:02-cv-00062 (D.D.C. Jan. 14, 2002). Both the DOJ and the NAACP Legal Defense Fund opposed Louisiana's preclearance submission. The case settled on the eve of trial, with the state withdrawing the plan and restoring the opportunity district.

116.    In 2018, nine Black voters in Louisiana sued the Secretary of State, alleging that Louisiana's 2011 congressional redistricting plan violated Section 2. Plaintiffs argued that the legislature packed Black voters into CD 2 and split them among three other congressional districts rather than unifying them to create a second majority-minority district, thereby diluting their voting strength and political influence. On March 12, 2019, a federal district court denied the state's motion to dismiss on the grounds that plaintiff had failed to state a claim of vote dilution. *Johnson* v. *Ardoin*, No. 3:18-cv-00625, ECF No. 51. Plaintiffs amended their

complaint and, on May 31, 2019, the court denied a second motion to dismiss. *Johnson* v. *Ardoin*, No. 3:18-cv-00625, ECF No. 72. The district court stayed the action pending the outcome of the Fifth Circuit's *en banc* decision in another action, *Thomas* v. *Reeves*, 961 F.3d 800 (5th Cir. 2020). After the stay was lifted, the *Johnson* parties ultimately stipulated to a dismissal.

117. The State has similarly faced successful challenges to proposed changes to other election positions, such as state court judges and school boards, that would discriminate against Black voters. No fewer than six times between 1969 and 1994, Louisiana attempted to add at-large or multimember judicial seats, over the objections of the DOJ. *See, e.g.*, *Clark* v. *Roemer*, 777 F. Supp. 445 (M.D. La. 1990). The consent decree in the line of VRA cases stemming from *Clark* v. *Roemer* ultimately established majority-minority subdistricts in nine district courts, a family court, and a court of appeal circuit, and required the Legislature to create such subdistricts in another court of appeal circuit and several other district courts. A separate line of cases challenging the election system for the Louisiana Supreme Court under the VRA resulted in the *Chisom* decree, which allowed the first Black justice to be elected to the Louisiana Supreme Court. *See In re Off. of Chief Just., Louisiana Supreme Ct.*, 2012-1342, 101 So. 3d 9, 21 (La. Oct. 16, 2012). In December 2021, the State moved to dissolve the consent decree in the Chisom case, arguing "the Consent Decree has accomplished its objectives." *Chisom, et al* v. *Jindal et al*, No. 2:86−cv−04075, ECF No. 257 (E.D. La. 2021).

118. The State currently faces a separate Section 2 challenge to its single-member districts for state supreme court elections. *See Allen* v. *Louisiana*, No. 3:19-CV-00479. Last year, a federal district court denied the state's motion to dismiss for lack of subject matter jurisdiction and the Fifth Circuit affirmed. *Louisiana State Conf. of NAACP* v. *Louisiana*, 490 F. Supp. 3d 982

(M.D. La. 2020), *aff'd sub nom. Allen* v. *Louisiana*, 14 F.4th 366 (5th Cir. 2021).  The case is currently proceeding through the discovery process.

119.    In 2001, the Legislature approved a plan for St. Bernard Parish to reduce the size of the school board from eleven single-member districts to five single member districts and two at-large seats, eliminating the sole majority-minority voting district in the parish.  A federal court later found that this new plan violated Section 2.  *St. Bernard Citizens For Better Gov't* v. *St. Bernard Par. Sch. Bd.*, 2002 WL 2022589, at *10 (E.D. La. Aug. 26, 2002).  Lynn Dean, a white state senator who was involved in restructuring the St. Bernard school board and was the highest-ranking public official in the Parish, testified at the trial that he had used the "n-word" and "ha[d] done so recently."  *Id.* Louisiana localities have also repeatedly discriminated against Black voters through changes to their voting rules.  Over 67% of Louisiana's parishes received objections from the DOJ during the time that Louisiana was a covered jurisdiction, and the majority of the objections have been for redistricting changes.

120.    Louisiana has also failed in recent years to comply with public assistance agency voter registration requirements under the National Voter Registration Act (NVRA), a failure that disproportionately impacts Black residents of the state.  *See Scott* v. *Schedler*, 2013 WL 264603, at *18 (E.D. La. Jan. 23, 2013) *aff'd in part, vacated in part on other grounds*, 2014 WL 5801354 (5th Cir. Nov. 5, 2014).

**Factor 2: The Extent of Racial Polarization**

121.    As described in detail in paragraphs 92-104 regarding the *Gingles* preconditions, the state's elections evince stark patterns of racial polarization.  In 2020, Louisiana's most recent congressional elections, voters in four of the five white majority districts had a choice between Black and white candidates and in each of these instances, the white candidate prevailed.  Moreover, the consistent gap between Black and white support for Black-preferred candidates is

significant and consistent across elections at every level of government.

**Factor 5: Effects of Louisiana's History of Discrimination**

122.    Louisiana's history of discrimination has not been limited to the obstacles it has deliberately placed in the way of Black citizens attempting to exercise their right to vote. As in many other states, Louisiana enacted "Black Codes" and Jim Crow laws starting in the late nineteenth century. These laws enforced a regime of state-sanctioned segregation in nearly every sphere of life including transportation, housing, education, business ownership, contracting, criminal justice, and public accommodations.

123.    Today, Black Louisianans still bear the effects of the state's long history of racial discrimination. These disadvantages continue to hinder their ability to participate effectively in the political process. "The courts have recognized that disproportionate educational[,] employment, income level[,] and living conditions arising from past discrimination tend to depress minority political participation." *St. Bernard Citizens For Better Gov't* v. *St. Bernard Par. Sch. Bd.*, 2002 WL 2022589 (E.D. La. Aug. 26, 2002) (quoting 1982 Senate Report at 29 n. 114).

124.    Black residents of Louisiana badly trail white residents across multiple economic metrics. In 2019, 29.4% of Black people in Louisiana lived below the poverty line, compared to 12.5% of white people. Nearly half of Louisiana's Black children live in poverty. Unemployment data from early 2021 shows that Black people were unemployed at more than twice the rate of whites—12% compared to 5.3%. As of 2010, white citizens in Louisiana were also more than three times more likely than Black citizens to own a home.

125.    Severe racial discrimination in employment also persists. According to the U.S. Equal Employment Opportunity Commission, for the 2011 fiscal year, Louisiana accounted for 3% of all U.S. race-based employment discrimination charges filed in the United States and 6.1% of all

charges of discrimination based on color, even though according to the 2010 U.S. Census, Louisiana comprises only 1.5% of the U.S. population and 1.6% of the U.S. minority population.

126.    Health disparities also persist among Black as compared to white Louisianans. According to the Louisiana Department of Health and Hospitals, "[f]rom 2000–2005, Black or African American Louisiana residents had the highest death rate from all causes, approximately 1-2 times higher than White residents."  In 2016-2018, the infant mortality rate in Louisiana was 10.9 per 1,000 live births for black infants and 5.4 per 1,000 live births for white infants.

127.    De facto racial segregation remains the rule in the state's educational system.  As of 2018, 23 of Louisiana's 69 traditional school districts remain under a desegregation order, meaning that no court has found that they have achieved unitary status.  56 of Louisiana's 69 traditional school districts (81%) are rated high or medium on the "dissimilarity index," a formula used to evaluate school district segregation, while just four districts were rated low.  In highly segregated districts, Black students were nearly four times more likely to be suspended or expelled than their white counterparts.  Meanwhile, white students in highly segregated districts are slightly over three times more likely to be enrolled in at least one Advanced Placement course.

128.    The incarceration rate in Louisiana, as elsewhere, has expanded greatly over the last few decades.  Since 1970, the total jail population in Louisiana has increased 665%.  As of December 2019, Louisiana has the highest rate of individuals in jails and the second highest rate of individuals in prison in the country.  Black Louisianans are dramatically overrepresented in Louisiana's incarcerated population.  Despite constituting 33% of state residents, Black Louisianans represent 52% of the jail population and 67% of the prison population in the state.

**Factor 6: Presence of Racial Campaign Appeals**

129.    Louisiana political campaigns have consistently been characterized by both overt and

implicit racial appeals. The political career of long-time neo-Nazi and former Ku Klux Klan leader David Duke is sadly illustrative. In 1989, Duke was elected to the Louisiana State House of Representatives.

130.    Duke would go on to run for higher public office in the state multiple times over the course of the next few years, in each case receiving tens or hundreds of thousands of votes. For example, in his 1990 race for U.S. Senate, Duke received approximately 43% of the total vote (including 60% of the white Republican vote), raised $2.4 million, and ultimately came in second place in the open primary. As recently as 2016, Duke ran again for Senate to, in his words, "defend the heritage of European American people," and received 58,000 votes.

131.    Other candidates in Louisiana have followed a similar playbook for racial appeals. During his successful 1995 race for Governor against a Black opponent, Mike Foster did not repudiate an endorsement he received from a white nationalist group associated with Duke. He stated publicly Jefferson Parish was "right next to the jungle in New Orleans and has a very low crime rate." Foster received 63.5% of the total vote share, including 84% of the white vote, in that election. Foster's opponent, Black Louisiana state senator Cleo Fields, won 96% of the Black vote.

132.    In 2002, current U.S. Representative for Louisiana's first congressional district Steve Scalise spoke to a white supremacist group while serving as a Louisiana state legislator. Scalise confirmed that he spoke at the event, but claimed that he didn't know at the time about the group's affiliation with neo-Nazi activists.

133.    In 2012, a candidate for Louisiana Supreme Court District 5, Justice Jeff Hughes, darkened the image of his Black opponent John Guidry in certain of his campaign materials, and referred to Guidry as an "affirmative action Democrat."

134.    In 2018, a white Tangipahoa School Board Member and candidate for reelection posted a picture on Facebook of a noose.  The picture carried the caption "IF WE WANT TO MAKE AMERICA GREAT AGAIN WE WILL HAVE TO MAKE EVIL PEOPLE FEAR PUNISHMENT."

135.    In 2019, Eddie Rispone, the Republican gubernatorial candidate opposite Governor John Bel Edwards, ran a number of ads that contained implicit racial appeals.  One ad mentioned "welfare for illegal immigrants," while another claimed that Edwards released "hundreds" of "dangerous criminals" from prison.

**Factor 7: Extent to Which Black Louisianans Have Been Elected to Public Office**

136.    Despite constituting approximately one-third of the state's population, Black Louisianans remain chronically underrepresented in public office in the state.

137.    Louisiana has never had a Black U.S. Senator.

138.    None of the majority white congressional districts in Louisiana has ever elected a Black representative.  Indeed, the only current Black congressional representative is from CD 2, a majority-minority district created in the 1980s as a result of a Section 2 challenge to Louisiana's congressional scheme.  In total, the state has elected only five Black Congresspeople since Reconstruction.  The lack of representation extends beyond seats in the federal government. Louisiana never had a Black Secretary of State or Attorney General, and has not had a Black governor since Reconstruction.

139.    Only 26 of the current 105 members of the Louisiana State House and 10 of the 39 members of the State Senate are Black.

140.    Only three of the current 11 members of  Louisiana Board of Elementary and Secondary Education are people of color. Under the previous administration, that number was two out of 11 members (18%).

141.    Black judges have also been "underrepresented in the trial and appellate courts.  While the black population comprises about 30.5 percent of the voting age population in Louisiana, black people only account for about 17.5 percent of the judges in Louisiana."  *Terrebonne Par. Branch NAACP*, 274 F. Supp. 3d at 445.  This includes the state's highest court, which did not seat a Black justice until 1992.  Only one of the seven justices of the Louisiana Supreme Court today is Black.

142.    Of the 42 district courts in the state, Black women judges serve or have served on only six district courts and Black men serve or have served on 13 district courts.

**Factor 8: Lack of Responsiveness to the Particularized Needs of Black Voters**

143.    The lack of representation of Black Louisianans in public office has contributed to the failure of elected officials to respond to the particularized needs of the Black community.

144.    As discussed above, Black Louisianans suffer from the effects of discrimination across many areas, including education, employment, and health.  *See supra* ¶¶ 126-132. In each of these areas, the continued existence of severe racial disparities is indicative of a failure on the part of elected officials to address the needs of Black residents.

145.    For example, a 2009 study on the occupants of top-level city administrative positions in East Baton Rouge Parish found that white employees in the parish are disproportionately appointed, hired, and maintained in the highest paying jobs.

146.    The lack of responsiveness to the needs of Black voters has been thrown into sharp relief by the devastating effects that the COVID-19 pandemic has wrought upon the state.  Black residents have the highest rates of COVID-19 cases and deaths in Louisiana.  Although only one-third of the state's population, Black Louisianans accounted for more than 70% of the Louisianans who died of COVID-19.

147.     Racial disparities have also been observed in the distribution of COVID-19 vaccines across the state.  Compared with white neighborhoods, parts of the state with high concentrations of Black residents (such as North Baton Rouge) have suffered from fewer vaccination sites.

148.      Disparities in access to healthcare and COVID-19 death rates are not the only examples of areas in which Louisiana's Black community face a lack of responsiveness from their elected officials.  Black Louisianans experience a higher burden of exposure to air pollution than white Louisianans.

149.     Congressional Bill H.R. 5376 Build Back Better contained provisions specifically aimed at reducing such health disparities, including measures to reduce the existing Medicare coverage gap and to expand home and community-based care for Louisiana's senior and disabled citizens. The bill also contained provisions to address existing disparities in education, housing, and the economy.  Despite its benefits, all but one of Louisiana's congressional representatives, the only Black congressional representative from the state, Representative Troy Carter, voted against the bill.

**Factor 9: Tenuousness of Justifications for Restricting Black Voters to One Majority-Black District**

150.     Throughout the redistricting roadshow and Special Session, opponents of a second majority-Black district in the Legislature provided shifting and tenuous justifications for their opposition to a second majority-Black district. Each of the purported justifications were refuted extensively throughout the process.  After justifications were refuted, opponents of a second majority-Black district often shifted to other, new justifications for their opposition.

151.     During a November 22, 2021 press conference, Representative Stefanski claimed that there was interest from some members in preserving the existing congressional configuration by simply "tweaking around the edges" because the existing map had been precleared by the DOJ

under Section 5 of the VRA and would therefore be "legal."  As the Plaintiffs and their now

counsel explained in a December 14, 2021, letter sent to the House and Senate Governmental

Affairs Committees, this claim is wrong as a matter of law.  DOJ preclearance determinations are

based on compliance with Section 5 of the VRA, not compliance with Section 2, and the

Supreme Court has expressly "refuse[d] to equate a Section 2 vote dilution inquiry with the

Section 5 retrogression standard."  *See Georgia v. Ashcroft*, 539 U.S. 461 (2003).

152.    Even after this was pointed out to members of the House and Senate Governmental

Affairs Committees, Representative Farnum nevertheless repeated this justification, weeks later,

on February 4, 2022, claiming that the current map with only one majority-Black district

"obviously" did not violate Section 2 "because it was approved and that's the one we live by

today."

153.    Representative Stefanski also falsely argued that it was not mathematically possible to

maintain District 2 as a majority-Black district without including Baton Rouge in that district.

154.    During his November 22 press conference, Representative Stefanski also expressed doubt

about whether CD 2 would remain majority-Black without including Black voters in Baton

Rouge.  On December 14, the Coalition responded to Representative Stefanski's concerns by

referring the Chairman to the seven illustrative Coalition maps, each of which demonstrated that

CD2 could indeed remain majority-Black without the inclusion of Black voters from Baton

Rouge.  Indeed, each of the maps with two majority-Black districts introduced by legislators

contained a second majority-Black district without including substantial portions of the Black

community in Baton Rouge.

155.    Legislators who opposed maps with a second majority-Black district largely ignored that

the maps submitted with two majority-Black districts were generally more compact than H.B. 1

or S.B. 5.  These legislators failed to provide any justification for rejecting maps that were objectively more compact than H.B. 1 or S.B. 5.  After this fact was pointed out, opponents of a second majority-Black district generally shifted to other justifications for their opposition.

156.    Numerous legislators repeatedly claimed that they wished to prioritize keeping parishes and precincts whole. Senator Hewitt claimed that S.B. 5 did "the best job of the maps presented in this committee in keeping . . . parishes and precincts together."  She asserted that her map respected "established boundaries of political subdivision and contain[ed] whole precincts to the extent practicable" and "[kept] 49 of 64 parishes whole."  While presenting H.B. 1, Representative Schexnayder testified on two occasions that his map was developed "using whole precincts" to avoid precinct splits, and that he tried "his best not to split parishes and precincts." Representative Stefanski attempted to distinguish H.B. 1 by asking if there were "split precincts in those [proposed Coalition] maps." But, as noted above, opponents of a second majority-Black district largely ignored the fact that there had been multiple proposals submitted that split fewer parishes than H.B. 1 or S.B. 5 while achieving two majority-Black districts. And Senator Fields', Representative Gaines', and Representative Duplessis' amendments to H.B. 1 and S.B. 5 split fewer parishes, only 14 parishes compared to 15 parishes in S.B. 5/H.B. 1, and split no precincts when compared to S.B. 5/H.B. 1.  After this fact was pointed out, legislative opponents of two majority-Black districts shifted to other justifications for their opposition.

157.    Representative Schexnayder, Representative Magee, and Representative Stefanski then contended that reducing the population deviation as much as possible should be a top priority, and boasted that H.B. 1, sponsored by Speaker Schexnayder, had the lowest population deviation of any proposal because the difference between the largest and smallest districts was only 46 people as originally introduced.  Representative Magee claimed that "of all the maps that is [sic]

going to be filed, [H.B. 1] has the lowest standard of deviation. I don't think anybody can beat it on that point." Representative Stefanski, a co-author of H.B. 1, contended, "[o]ur duty to make sure that these populations are equal is an overriding duty, especially on this map. We have to try to get down to as close to the nearest person. I think, the numbers speak for themselves on that." Representative Schexnayder responded, "[i]f you look at [the numbers], I think we've done a great job at that."

158.    But the maps that achieved the best population equality were in fact the seven Coalition maps, which deviated from the ideal population by no more than one person. And, among the maps that maintained whole precincts, the proposals that achieved the best population equality were actually maps that included two majority-Black districts, including Amendment #91 to S.B. 5 introduced by Senator Fields, Amendment #116 to S.B. 5, introduced by Representative Duplessis, and Amendment #88 to H.B. 1 introduced by Representative Gaines – in which the difference between the largest and smallest districts was only 44 people.   After this fact was pointed out, opponents shifted to other justifications for their opposition. For instance, when introducing his amendment to S.B. 5, Representative Duplessis pointed out that S.B. 5 [had] a deviation of 128 people," whereas his "amendment had an absolute range of 44 people." The House and Governmental Affairs Committee nevertheless rejected his amendment by a margin of 5-9.

159.    Senator Hewitt claimed —without providing support—that in all of the proposed maps with two majority-Black districts, the Black voting age population in the two majority-Black districts was too low and would result in Black voters being unable to elect candidates of their choice in either district. On February 3, she testified, "if we did 50% plus one, you would not . . . be giving the minority population an equal opportunity to elect a candidate of their choice. She

claimed that in her map, the majority-Black district "is the same as it . . . currently is around 58% . . . because we know that is a functioning number."  However, when pressed by Senator Price about how she derived this conclusion, she admitted that her statements were unfounded as she was still "working on getting that data" to "do a better job of . . . assessing that."

160.    On February 4, while speaking during a webinar held by the Public Affairs Research Council of Louisiana, Senator Hewitt again claimed that she doubted whether another minority district would perform, because "technically by law, a minority district is one that is 50%+1 minority, but I don't think there is anybody in the building that would necessarily believe that a minority district like that, that there's a very high probability that the minority would elect a candidate of their choice, with only 50%+1 in their district." When asked how she reached that conclusion, she admitted that she had not received any substantive analysis supporting her assertion from the law firm retained to evaluate the Legislature's maps.

161.    Again, on February 8, during the debate on S.B. 5 on the Senate floor, Senator Hewitt conceded that her statements were based on "some of the preliminary information [she had] been given and [she did not] have any documentation in [her] hand that [she] could share with anybody." Representative Stefanski made similar statements on November 22, during a press conference, about whether a second majority-Black district could perform to allow the Black-preferred candidate to elect the candidate of choice.

162.    All of these concerns, however, are belied by the fact that the House and Governmental Affairs Committee voted in favor of a bill redrawing the map for Louisiana's Supreme Court that contained a majority-Black district with a Black voting age population of 51.23%.  Unlike the congressional maps introduced by other members of the Committee, this map, introduced by Representative Ivey, passed out of committee with bipartisan support, including Representative

Magee.  Representative Ivey's bill was ultimately rejected by the House on February 16, 2022.

163.    Finally, the argument (advanced by Senator Hewitt and others) that the VRA does not establish a right to two majority-Black districts simply because one-third of the state's population is Black is a red herring.  Cases acknowledge that underrepresentation of Black voters is a relevant equitable consideration in a Section 2 analysis. There is no contention—and the VRA does not guarantee—that a violation is proven by lack of proportionality alone.  Instead, there must be a showing of the preconditions set out by the Supreme Court in *Thornburg* v. *Gingles*, and courts are guided by the Senate Factors when determining if, under the totality of the circumstances, the districting plan results in vote dilution in violation of Section 2. These circumstances are present in Louisiana today, and compel the conclusion that the H.B. 1/S.B. 5 dilute the voting strength of Black Louisianans in violation of the VRA.

## CAUSE OF ACTION

### Count One

**H.B. 1/S.B. 5 violate Section 2 of the Voting Rights Act of 1965**
**52 U.S.C. § 10301; 42 U.S.C. § 1983**
**(Vote Dilution)**

164.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

165.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group.  52 U.S.C. § 10301(a).

166.    The current district boundaries of Louisiana's 2022 congressional map results in the dilution of the electoral strength of those voters in violation of Section 2 of the Voting Rights Act.

167.    Black Louisianians are sufficiently numerous and geographically compact to constitute a

majority of eligible voters in two of Louisiana's six U.S. congressional districts.

Black voters in Louisiana are politically cohesive, and recent elections reveal a stark pattern of

racially polarized voting that nearly always results in the defeat of Black voters' preferred

candidates in statewide elections and in districts in which the majority of voters are white.

168.    Moreover, considering the totality of the circumstances in Louisiana, Plaintiffs, Black

Louisianians and organizations of which they are a part, have less opportunity than other

members of the Louisiana electorate to participate in the political process and to elect

representatives of their choice to Congress.

169.    By engaging in the acts and omissions alleged herein, Defendant has acted and continues

to act to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act.

Defendant will continue to violate those rights absent relief granted by this Court.

170.    Plaintiffs will be irreparably harmed if this Court fails to temporarily and permanently

enjoin Defendant from conducting congressional elections under the enacted plan, in that, among

other things, they would be subject to racial vote dilution.  Plaintiffs have no adequate remedy at

law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that the 2022 congressional map violates Section 2 of the Voting Rights

Act;

B.    Issue a preliminary and permanent injunction enjoining Defendants from

enforcing or giving any effect to the boundaries of the congressional districts as adopted in the

2022 congressional map, including barring Defendant from conducting congressional elections

in accordance with that plan;

C.      Order the adoption of a valid congressional redistricting plan for Louisiana that includes two districts in which Black voters have an opportunity to elect candidates of their choice;

D.      Award Plaintiffs' their costs, expenses, and disbursements, and reasonable attorneys' fees incurred in bring this pursuant to in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. 1988;

E. Retain jurisdiction over this matter until the Defendant has complied with all orders and mandates of this Court; and

F. Grant such additional further relief as the Court considers just.


Dated: March 30, 2022

By: */s/John Adcock*

> John Adcock
> Adcock Law LLC
> L.A. Bar No. 30372
> 3110 Canal Street
> New Orleans, LA 70119
> Tel: (504) 233-3125
> Fax: (504) 308-1266
> jnadcock@gmail.com

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan*
Victoria Wenger*
NAACP Legal Defense and Educational Fund,
Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
laden@naacplef.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
vwenger@naacpldf.org

Nora Ahmed*
Megan E. Snider
LA. Bar No. 33382
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org
msnider@laaclu.org

Tracie Washington
LA. Bar No. 25925
Louisiana Justice Institute
Suite 132
3157 Gentilly Blvd
New Orleans LA, 70122
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

Robert A. Atkins*
Yahonnes Cleary *
Jonathan H. Hurwitz*
Daniel S. Sinnreich*
Amitav Chakraborty*
Adam P. Savitt*
Nicholas Butto*
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue Of The Americas, New York,
NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
ratkins@paulweiss.com
ycleary@paulweiss.com
jhurwitz@paulweiss.com
dsinnreich@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com

T. Alora Thomas*
Sophia Lin Lakin*
Samantha Osaki*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
athomas@aclu.org
slakin@aclu.org
sosaki@aclu.org

Sarah Brannon*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

*Pro hac vice* applications forthcoming

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of

Court using the CM/ECF system which provides electronic notice of filing to all counsel of record.

This the 30 day of March 2022.


*/s/ John Adcock*
COUNSEL FOR PLAINTIFFS