# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENE SOULE, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, AND POWER COALITION FOR EQUITY AND JUSTICE,<br>*Plaintiffs*,<br><br>v.<br><br>KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana.<br><br>*Defendant*. | Civil Action No. 3:22-cv-00211-SDD-RLB |
| EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, TRAMELLE HOWARD,<br>*Plaintiffs*,<br><br>v.<br><br>KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana.<br><br>*Defendant*. | Civil Action No. 3:22-cv-00214-SDD-RLB |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 4

ARGUMENT ............................................................................................................................. 7

I.    Plaintiffs are substantially likely to prove that the Legislature's congressional
      district map violates Section 2 of the Voting Rights Act ....................................... 7

      A.    *Gingles* One: An additional, compact, majority-Black district can be
            drawn in Louisiana ........................................................................................... 8

      B.    *Gingles* Two and Three: Black Louisianans are politically cohesive and
            white Louisianans vote as a bloc to defeat candidates preferred by Black
            Louisianans ....................................................................................................... 9

II.   The totality of the circumstances indicates that the Legislature's map denied
      Black voters a meaningful opportunity to elect their preferred candidates ..................... 13

      1.    Senate Factor 1: Louisiana has an ongoing history of official,
            voting-related discrimination ................................................................... 14

      2.    Senate Factor 2: Louisiana voters are highly racially polarized ............... 15

      3.    Senate Factor 5: Discrimination in Louisiana has produced severe
            socioeconomic disparities impairing the ability of Black
            Louisianans to participate in the political process ................................... 16

      4.    Senate Factor 6: Louisiana political campaigns are marked by
            overt and subtle racial appeals ................................................................ 18

      5.    Senate Factor 7: Black candidates in Louisiana are
            underrepresented in office and rarely win elections outside
            majority-minority districts ....................................................................... 19

      6.    Senate Factor 8: Louisiana is not responsive to Black residents ............. 20

      7.    Senate Factor 9: The justification for the new congressional map is
            tenuous ..................................................................................................... 21

III.  Plaintiffs will suffer irreparable injury absent an injunction ........................................... 21

IV.   The balance of equities and the public interest weigh in favor of an injunction ............. 22

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bossier Parish School Board* v. *Reno*,
907 F. Supp. 434 (D.D.C. 1995) ........................................................................................14

*Casarez* v. *Val Verde Cty.*,
957 F. Supp. 847 (W.D. Tex. 1997)........................................................................21, 22, 23

*Charles H. Wesley Educ. Found., Inc.* v. *Cox*,
408 F.3d 1349 (11th Cir. 2005) .........................................................................................23

*Citizens for a Better Gretna* v. *City of Gretna, La.*,
834 F.2d 496 (5th Cir. 1987) ...............................................................................................7

*Clark* v. *Calhoun Cnty.*,
88 F.3d 1393 (5th Cir. 1996) .............................................................................................11

*Dunn* v. *Blumstein*,
405 U.S. 330 (1972)............................................................................................................23

*Fairley* v. *Hattiesburg, Miss.*,
584 F.3d 660 (5th Cir. 2009) ...............................................................................................8

*Fusilier* v. *Landry*,
963 F.3d 447 (5th Cir. 2020) .............................................................................................11

*Giovani Carandola Ltd.* v. *Bason*,
303 F.3d 507 (4th Cir. 2002) .............................................................................................23

*Harding* v. *Edwards*,
487 F. Supp. 3d 498 (M.D. La. 2020).................................................................................7

*Houston* v. *Lafayette Cnty., Miss.*,
56 F.3d 606 (5th Cir. 1995) .................................................................................................8

*Janvey* v. *Alguire*,
647 F.3d 585 (5th Cir. 2011) ...............................................................................................7

*Johnson* v. *De Grandy*,
512 U.S. 997 (1994)............................................................................................................12

*La. State Conference of NAACP* v. *Louisiana*,
490 F. Supp. 3d 982 (M.D. La. 2020)..........................................................................10, 19

*League of United Latin Am. Citizens, Council No. 4434* v. *Clements*,
  999 F.2d 831 (5th Cir. 1993) ........................................................................10

*League of Women Voters of N.C.* v. *North Carolina*,
  769 F.3d 224 (4th Cir. 2014) .......................................................................22

*LULAC* v. *Perry*,
  548 U.S. 399 (2006).................................................................................7, 8, 9

*Major* v. *Treen*,
  574 F. Supp. 325 (E.D. La. 1983) ..........................................................14, 15

*Merrill* v. *Milligan*,
  142 S. Ct. 879 (2022) ...................................................................................24

*Mi Familia Vota* v. *Abbott*,
  497 F. Supp. 3d 195 (W.D. Tex. 2020)..........................................................24

*Michigan State A. Philip Randolph Inst.* v. *Johnson*,
  833 F.3d 656 (6th Cir. 2016) .......................................................................22

*NAACP* v. *Fordice*,
  252 F.3d 361 ................................................................................................11

*Nken* v. *Holder*,
  556 U.S. 418 (2009)................................................................................7, 22

*Obama for Am.* v. *Husted*,
  697 F.3d 423 (6th Cir. 2012) .......................................................................23

*In re Off. of Chief Just., Louisiana Supreme Ct.*,
  2012-1342, 101 So. 3d 9 (La. Oct. 16, 2012) ...............................................20

*Patino* v. *City of Pasadena*,
  229 F. Supp. 3d 582 (S.D. Tex. 2017) .....................................................21, 22

*Purcell* v. *Gonzalez*,
  549 U.S. 1 (2006).........................................................................................24

*Republican Nat'l Comm.* v. *Dem. Nat'l Comm.*,
  140 S. Ct. 1205 (2020)................................................................................23

*Rodriguez* v. *Bexar Cnty.*,
  385 F.3d 853 (5th Cir. 2004) .......................................................................11

*Self Advocacy Sols. N.D.* v. *Jaeger*,
  464 F. Supp. 3d 1039 (D.N.D. 2020).............................................................24

*Shelby County* v. *Holder*,
  570 U.S. 529 (2013) .................................................................................14

*Smith* v. *Allwright*,
  321 U.S. 649 (1944) .................................................................................14

*St. Bernard Citizens For Better Gov't*,
  2002 WL 2022589 (E.D. La. Aug. 26, 2002) .........................................10

*Terrebonne Par. Branch NAACP* v. *Jindal*,
  274 F. Supp. 3d 395 (M.D. La. 2017) ..............................................10, 20

*Tex. Democratic Party* v. *Abbott*,
  978 F. 3d 168 (5th Cir. 2020) ..................................................................23

*Thornburg* v. *Gingles*,
  478 U.S. 30 (1986) ............................................................................ *passim*

*Veasey* v. *Perry*,
  769 F.3d 890 (5th Cir. 2014) ...................................................................24

*Westwego Citizens for Better Government* v. *Westwego*,
  872 F.2d 1201 (5th Cir. 1989) .................................................................11

*Wisconsin Legislature* v. *Wisconsin Elections Comm'n*,
  142 S. Ct. 1245 (2022) .............................................................................24

## Statutes

52 U.S.C. § 10301(a) .......................................................................................1, 7

52 U.S.C. § 10301(b) ..........................................................................................8

## Other Authorities

Amendment #116 to S.B. 5, 1st Spec. Sess. (La. 2022) .....................................5

Amendment #153 to H.B. 1, 1st Spec. Sess. (La. 2022) ....................................5

Amendment #62 to S.B. 2, 1st Spec. Sess. (La. 2022) .......................................5

Amendment #88 to H.B. 1, 1st Spec. Sess. (La. 2022) ......................................5

Amendment #91 to S.B. 5, 1st Spec. Sess. (La. 2022) .......................................5

Amendment #99 to H.B. 1, 1st Spec. Sess. (La. 2022) ......................................5

Department of Justice, *Section 5 Objection Letters*,
  https://www.justice.gov/crt/section-5-objection-letters (last visited Apr. 14,
  2022) .................................................................................................................................14

H.B. 12, 1st Spec. Sess. (La. 2022).................................................................................5

H.B. 4, 1st Spec. Sess. (La. 2022)...................................................................................5

H.B. 5, 1st Spec. Sess. (La. 2022)...................................................................................5

H.B. 7, 1st Spec. Sess. (La. 2022)...................................................................................5

H.B. 8, 1st Spec. Sess. (La. 2022)...................................................................................5

H.B. 9, 1st Spec. Sess. (La. 2022)...................................................................................5

S.B. 10, 1st Spec. Sess. (La. 2022).................................................................................5

S.B. 11, 1st Spec. Sess. (La. 2022).................................................................................5

S.B. 16, 1st Spec. Sess. (La. 2022).................................................................................5

S.B. 18, 1st Spec. Sess. (La. 2022).................................................................................5

S.B. 2, 1st Spec. Sess. (La. 2022)...................................................................................5

S.B. 4, 1st Spec. Sess. (La. 2022)...................................................................................5

S.B. 6, 1st Spec. Sess. (La. 2022)...................................................................................5

S.B. 9, 1st Spec. Sess. (La. 2022)...................................................................................5

U.S. Const. art. I § 2.........................................................................................................5

## PRELIMINARY STATEMENT

Louisiana's 2022 congressional map, enacted by the Louisiana State Legislature (the "Legislature") over a gubernatorial veto and without the support of a single Black member of either house of the Legislature, is only the latest action by the State that improperly dilutes the power of Louisiana's Black voters and impedes their ability to participate fully and equally in the political process.  Throughout the history of the State, Black Louisianans have experienced persecution and discrimination, including at the ballot box.  The pernicious effects of slavery, segregation, and more than a century of voting restrictions are evident today in explicit and implicit racial appeals in the electoral process, chronic underrepresentation of Black representatives in elected positions, wide disparities in areas such as education, employment, and health, and a stark pattern of racially polarized voting in election after election.

These facts and more establish that the 2022 congressional map violates Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, by depriving Black Louisiana voters of an equal opportunity to elect their candidates of choice to Congress.  The VRA was enacted by Congress in 1965 and reenacted in 1982 to protect Black voters from voting practices that discriminate against or prevent Black citizens from exercising their voices equally in the political process.  Although Black voters represent nearly one-third of Louisiana's voting age population, the 2022 congressional map dilutes Black voting strength by "packing" large numbers of Black voters into a single majority-Black congressional district (Congressional District 2, or CD 2), and "cracking" the State's remaining Black voters among the five remaining districts, all of which are majority white.  By failing to adopt a congressional map with two majority-Black districts, the State falls far short of what the VRA requires.

Plaintiffs readily satisfy the requirements for demonstrating that a preliminary injunction is warranted here.  To begin with, Plaintiffs are likely to succeed on the merits of the Section 2

1

claim.  The threshold factors identified by the Supreme Court in *Thornburg* v. *Gingles*, 478 U.S. 30 (1986) for establishing a VRA violation in the context of redistricting have been met.  As shown in the accompanying expert report of Anthony Fairfax, Black voters represent a sufficiently large and geographically compact group such that creation of a congressional map with two majority-Black congressional districts and conforming to traditional districting criteria is entirely feasible.  The illustrative plan prepared by Mr. Fairfax (the "Illustrative Plan") not only includes two majority-Black districts, but scores better than or as well as the Legislature's map by every traditional redistricting metric.  *See* Ex. 1[1]  And, as shown in the accompanying expert report of Dr. Lisa Handley, the remaining *Gingles* factors are also readily satisfied: Black voters in Louisiana are politically cohesive, and Louisiana's white majority votes sufficiently as a bloc to enable it usually to defeat the candidate preferred by Black voters.  *See* Ex. 2.  Finally, Plaintiffs easily satisfy their burden on the totality of the circumstances, including the stark underrepresentation of Black elected officials at all levels of State government; large gaps in educational attainment, unemployment, and other socioeconomic indicators between Black and white Louisianians; political campaigns marked by explicit and coded racial appeals; and the tenuous nature of the Legislature's proffered justifications for refusing to adopt a map with two majority-Black districts.  The 2022 congressional map impairs the ability of Black voters to elect their candidates of choice, as shown in the accompanying expert reports of R. Blakeslee Gilpin and Dr. Traci Burch.  *See* Exs. 3 & 4.

---

[1]     Citations to "Ex." Refer to Exhibits to the Declaration of John Adcock.

     Ex. 1 refers to the expert report of Anthony Fairfax; Ex. 2 refers to the expert report of Dr. Lisa Handley; Ex. 3 refers to the expert report of Dr. R. Blakeslee Gilpin; and Ex. 4 refers to the expert report of Dr. Traci Burch.

The remaining preliminary injunction factors also weigh strongly in favor of granting Plaintiffs' motion.  As a matter of law, Plaintiffs will suffer irreparable injury if forced to vote pursuant to maps that improperly dilute their vote in violation of the VRA.  Likewise, the balance of equities and the public interest strongly favor granting an injunction.  Plaintiffs' rights are protected and the public interest is advanced by the implementation of a congressional map that complies with federal law.  Any burden of an injunction upon Defendant is minimal, particularly in view of the fact that Election Day is still more than six months away.  Moreover, any burden on the State from an injunction results not from any action by Plaintiffs or the Court, but from the decision by the Legislature to enact a map with only a single majority-Black district despite compelling evidence in the legislative record that a congressional map with two majority-Black districts is both feasible and required by the VRA.

Timely intervention by this Court is needed to implement a congressional district map that satisfies the requirements of Section 2 of the VRA if the legislature fails to act, and to do so sufficiently in advance of the coming election.  The period for candidates to declare their candidacies, between July 20 and 22, 2022, is only a few short months away.[2]  Voters—and the organizations that work to educate and engage them—will likewise need time to learn the candidates' positions in order to participate effectively in the political process.

Plaintiffs seek by this motion to protect the fundamental right of Plaintiffs and Louisiana's Black voters to vote on an equal basis and to cast undiluted ballots this year for the congressional candidates of their choice.  This Court possesses ample authority to grant the relief that Plaintiffs seek and that Louisianans deserve.  Plaintiffs respectfully move for a preliminary

---

[2]      The dates of the candidate qualifying period and other election deadlines can be found on the Secretary's website.  Ex. 16.

injunction to prevent Defendant from conducting the 2022 congressional elections under the enacted district maps, to set a deadline of June 6, 2022 for the Legislature to enact a compliant map and, if the Legislature fails to do so, order that the November 2022 election be conducted under the Illustrative Plan. *See* Ex. 1.

This proposed remedial schedule allows the legislature ample time to have the first opportunity to implement a remedial map. The legislature is currently in session, and the date for final adjournment of that session is June 6, 2022, at 6:00 pm. Bills concerning congressional redistricting have already been introduced in both chambers of the Legislature, including at least three bills that would address the violation of the Voting Rights Act outlined below, any of which could serve as a vehicle for the adoption of a remedial map. If the legislature fails to act in this time frame, Plaintiffs' Illustrative Plan, which includes two majority-Black districts and conforms to all of the Legislature's stated redistricting criteria, provides an appropriate interim remedy that can be ordered immediately, providing ample time for the Defendant implement an interim plan and to administer the 2022 Congressional Election without disruption.

## FACTUAL BACKGROUND

The 2020 U.S. Decennial Census of Population and Housing confirmed that Louisiana is home to the second highest percentage of Black citizens in the country. Black Louisianans represent approximately 31.2% of the State's voting age population, and non-whites collectively represent nearly 40%. Ex. 1 at 16. Yet only one of the six congressional districts, representing little over 16% of the Louisiana's congressional delegations, has a majority-minority population. Ex. 2 at 9–10. In the 2020 census, the total number of Black Louisianans of voting age increased by 7.2%. Ex. 1 at 16, Table 2. Louisiana's population growth over the last decade was driven entirely by growth in minority populations, while the State's white population decreased by 5.1%. Ex. 1 at 15, Table 1. Louisiana's white population is dramatically overrepresented in the

2022 congressional map: only 58% of Louisiana's voting age population is non-Hispanic white, but non-Hispanic whites are a substantial majority in five of the State's six congressional districts—over 83%.  Ex. 1 at 16, Table 2.

The Legislature must redraw congressional district boundaries after each decennial census.  U.S. Const. art. I § 2.  Pursuant to Joint Rule 21 of the Legislature, each redistricting plan submitted for consideration by the Legislature in the current redistricting cycle must comply with state and federal law, including Section 2 of the VRA.  Ex. 17.

On February 18, 2022, the Legislature passed both H.B. 1 and S.B. 5—bills that contained identical district configurations, including only a single majority-Black district.  Comp. ¶ 82.  In public meetings and throughout the Special Legislative Session leading to the adoption of the 2022 congressional map, members of the public—including Plaintiffs—told the Legislature that such a congressional map with only a single majority-Black district would violate the VRA.  *See, e.g.*, Ex. 22.  The Legislature was provided multiple potential alternative maps that featured two majority-Black districts while respecting traditional districting principles (such as contiguity, compactness, and respect for political subdivisions) at least as well as—if not better than—H.B. 1 and S.B. 5.[3]

On March 9, Governor Edwards vetoed both H.B. 1 and S.B. 5, stating in his veto letters a "firm belief" that the map "violates Section 2 of the Voting Rights Act."  *See, e.g.*, Ex. 21.

---

[3]     *See, e.g.*, H.B. 4, 1st Spec. Sess. (La. 2022); H.B. 5, 1st Spec. Sess. (La. 2022); H.B. 7, 1st Spec. Sess. (La. 2022); H.B. 8, 1st Spec. Sess. (La. 2022); H.B. 9, 1st Spec. Sess. (La. 2022); H.B. 12, 1st Spec. Sess. (La. 2022); S.B. 2, 1st Spec. Sess. (La. 2022); S.B. 4, 1st Spec. Sess. (La. 2022); S.B. 6, 1st Spec. Sess. (La. 2022); S.B. 9, 1st Spec. Sess. (La. 2022); S.B. 10, 1st Spec. Sess. (La. 2022); S.B. 11, 1st Spec. Sess. (La. 2022); S.B. 16, 1st Spec. Sess. (La. 2022); S.B. 18, 1st Spec. Sess. (La. 2022); Amendment #88 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #99 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #153 to H.B. 1, 1st Spec. Sess. (La. 2022); Amendment #62 to S.B. 2, 1st Spec. Sess. (La. 2022); Amendment #116 to S.B. 5, 1st Spec. Sess. (La. 2022); Amendment #91 to S.B. 5, 1st Spec. Sess. (La. 2022).

Governor Edwards's veto letter explained that in failing to enact a congressional map that complies with the Voting Rights Act, the Legislature "disregarded the shifting demographics of the state," particularly the increase in the Black voting age population since the 2010 census. *Id.* The 2022 Regular Legislative Session convened on March 14, 2022. On March 29, the Legislature entered into a veto session and each house voted to override the Governor's veto— the first successful veto override in over a quarter century. Every Black legislator voted against the override.

The 2022 congressional map artificially limits Black voters' influence by "packing" them into CD 2 and "cracking" them among the State's five remaining districts. These district lines, coupled with high levels of racially polarized voting (as federal courts have repeatedly recognized), greatly dilute the ability of the State's Black voters to elect their candidates of choice. State voters have elected only four Black members of Congress since Reconstruction. Ex. 4 at 25. Louisiana has not had a Black Governor or Lieutenant Governor since Reconstruction. It has not had a Black U.S. Senator, Secretary of State, or Attorney General since joining the Union in 1812. Blacks are persistently underrepresented at every level and in every branch of the State's government.

Plaintiffs are Black citizens and voters in Louisiana, who are denied an equal opportunity to elect candidates of their choice because the Legislature's congressional map dilutes their votes, as well as the NAACP and Power Coalition, organizations working to empower and engage civic and political participation that now must divert resources to combat the discriminatory impacts of the congressional district plan. *See, e.g.*, Ex. 14 ¶¶ 13–14; Ex. 15 ¶¶ 20–23. Time is of the essence. Absent swift relief, the 2022 elections will be held using maps that violate Section 2 of the Voting Rights Act.

## ARGUMENT

In order to prevail on a motion for a preliminary injunction, the movant must prove (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Harding* v. *Edwards*, 487 F. Supp. 3d 498 (M.D. La. 2020), *appeal dismissed sub nom. Harding* v. *Ardoin*, No. 20-30632, 2021 WL 4843709 (5th Cir. May 17, 2021); *see also Janvey* v. *Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). Because all four criteria are met here, the Court should issue an injunction.

I.    **Plaintiffs are substantially likely to prove that the Legislature's congressional district map violates Section 2 of the Voting Rights Act**

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). To prove a violation of Section 2 of the VRA in the redistricting context, Plaintiffs must satisfy the three preconditions the Supreme Court set out in *Thornburg* v. *Gingles,* 478 U.S. 30 (1986): (1) Black voters are "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) Black voters are "politically cohesive"; and (3) the white majority "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51; *see also LULAC* v. *Perry*, 548 U.S. 399, 425 (2006); *Citizens for a Better Gretna* v. *City of Gretna, La.*, 834 F.2d 496, 497 (5th Cir. 1987). Once all *Gingles* preconditions are met, the Court must examine "the totality of circumstances"—including the nine factors identified in the Senate report that accompanied the

1982 amendments to the Voting Rights Act—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group.  52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44.

A.    ***Gingles* One: An additional, compact, majority-Black district can be drawn in Louisiana.**

The Illustrative Plan presented by Plaintiffs' expert, Anthony Fairfax, demonstrates that Louisiana's Black population is sufficiently numerous and geographically compact to comprise a majority of the voting age population in two districts in the State's six-district congressional plan.  Mr. Fairfax's Illustrative Plan performs as well as or better than the enacted congressional plan on every measure of customary redistricting principles, as well as the state's own redistricting guidelines as set out by the Louisiana legislature in Joint Rule 21.  Ex. 17.

To establish the first *Gingles* precondition ("*Gingles* I") here, Plaintiffs must demonstrate that the Black voting age population is sufficiently numerous and geographically compact to form a second majority-Black congressional district in a six-district plan.  Satisfying the first part of *Gingles* I, compactness, normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans.  *See, e.g.*, *Fairley* v. *Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir. 2009).  In assessing these plans, the issue is not whether plaintiffs' plan is "oddly shaped, but whether the proposal demonstrate[s] that a geographically compact district could be drawn."  *Houston* v. *Lafayette Cnty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995) (emphasis omitted).

Compactness also requires accounting for "traditional districting principles such as maintaining communities of interest and traditional boundaries."  *LULAC*, 548 U.S. at 433 (a compactness "inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries" because "[t]he recognition of

nonracial communities of interest reflects the principle that a State may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls") (quoting *Abrams* v. *Johnson*, 521 U.S. 74, 92 (1997)).

Mr. Fairfax's Illustrative Plan readily satisfies *Gingles* I.  It is more compact than H.B. 1 and S.B. 5 by objective measures, adheres as well as or better than H.B. 1 and S.B. 5 on all traditional redistricting principles, and includes two congressional districts with a Black citizen voting age population of greater than 50%.  Ex. 1 at 3–4, 12, 13.  Plaintiffs' Illustrative Plan ensures equal population, contiguity, and compactness; minimizes or eliminates political subdivision splits, both of precincts and parishes; preserves communities of interest, including cities, landmarks, and census-designated places, and mitigates cracking of the Black population equal to or better than the enacted 2022 congressional map.  Ex. 1 at 18–23.  For example, legislators like Senator Hewitt emphasized that the 2022 congressional map kept census-designated places like the Fort Polk military base intact and "in connection with their surrounding communities." Senator Hewitt, Feb. 3 Senate and Governmental Affairs Testimony. The Illustrative Plan also preserves census-designated places, including the Fort Polk military base.  Ex. 1 at 21–22.  Mr. Fairfax's analysis underscores that the state could have achieved all of its stated redistricting objectives without diluting Black voting power.

   **B.**   ***Gingles* Two and Three: Black Louisianans are politically cohesive and white Louisianans vote as a bloc to defeat candidates preferred by Black Louisianans**

*Gingles* precondition II requires that Black voters in Louisiana are "politically cohesive," and precondition III requires that the white majority "votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate."  *LULAC*, 548 U.S. at 425 (citation omitted).  Plaintiffs, therefore, must prove (II) voting in Louisiana is highly polarized along racial lines and (III) under the enacted congressional map racially polarized voting ("RPV") will

result in the defeat of Black Louisianans' preferred candidates in majority-white districts. *Gingles*, 478 U.S. 56–63.

As shown in the accompanying expert report of Dr. Handley, these preconditions are met here.  Ex. 2 at 1.  Dr. Handley's analysis is in accord with the consistent finding by federal courts that voting in Louisiana is racially polarized.  *See, e.g.*, *Terrebonne Par. Branch NAACP* v. *Jindal*, 274 F. Supp. 3d 395, 433–37 (M.D. La. 2017), *rev'd on other grounds*, *Fusilier* v. *Landry*, 963 F.3d 447 (5th Cir. 2020) (finding RPV in judicial elections in Terrebonne Parish); *St. Bernard Citizens For Better Gov't*, 2002 WL 2022589, at *6–7 (E.D. La. Aug. 26, 2002) (finding RPV in statewide gubernatorial and local parish elections); *La. State Conference of NAACP* v. *Louisiana*, 490 F. Supp. 3d 982, 1019 (M.D. La. 2020) (holding that plaintiff had standing to challenge Louisiana's Supreme Court district map on the basis, in part, of allegations of polarized voting).

It is beyond dispute that Black voters in Louisiana have voted as a cohesive bloc.  Dr. Handley used the standard statistical tool of ecological inference to review 15 biracial exogenous statewide elections from 2015 to 2020.  Ex. 2 at 7.  These 15 contests consist of recent statewide elections that include Black candidates, *id.*, which are considered the most probative evidence of RPV.  *See League of United Latin Am. Citizens, Council No. 4434* v. *Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (holding that evidence from "elections between white candidates [is] generally less probative in examining the success of minority-preferred candidates . . . [than] elections involving black or Hispanic candidates").  In these 15 elections, voting was highly racially polarized.  *Id.* at 7.  The average percentage of Black voter support for the Black-preferred candidate was 83.8%, even when some contests had multiple candidates.  *Id.*; *see Gingles*, 478 U.S. at 68 ("[I]t will frequently be the case that a black candidate is the choice of blacks, while a white

candidate is the choice of whites."). Moreover, in contests with just two candidates, the cohesion

is stronger, with the support for the preferred Black candidate averaging 93.5%. Ex. 2 at 7.

Dr. Handley's analysis of nine recent *endogenous* congressional elections involving

Black candidates shows the same pattern of Black voters voting as a cohesive bloc. *Id.* at 7.

Analysis of voting patterns in endogenous elections—ones that involve districts at the same level

of government at issue in the litigation—is important. *See Clark* v. *Calhoun Cnty.*, 88 F.3d

1393, 1397 (5th Cir. 1996).[4]  This analysis included three elections in CD 2 and six elections in

other congressional districts. Ex. 2 at 7–8 and App. B. All six of the elections outside CD 2

were racially polarized. *Id.*[5]  CD 2 is the only district in Louisiana with a majority-Black

population, and its current congressman is Representative Troy Carter, who is Black. Within all

---

[4]    However, while "exogenous elections are less probative than elections for the particular office at issue . . . 'the exogenous character of . . . elections does not render them nonprobative.'" *NAACP* v. *Fordice*, 252 F.3d 361, 370 (5th Cir. 2001(quoting *Rangel* v. *Morales*, 8 F.3d 242, 247 (5th Cir. 1993)). Moreover, "plaintiffs may not be denied relief simply because the absence of black candidates has created a sparsity of data on racially polarized voting in purely indigenous elections. Rather, plaintiffs' claims should stand or fall based upon the probative value of the evidence of racial bloc voting that they *have* adduced, along with the presence or absence of other factors demonstrating a lack of access to the political process." *Westwego Citizens for Better Government* v. *Westwego*, 872 F.2d 1201, 1209-10 (5th Cir. 1989) (emphasis added).

[5]    However, Dr. Handley noted that the results for the 2020 election in Congressional District 2 were inconclusive. Ex. 2 at 7 and n.11. Three out of the four evaluations Dr. Handley preformed show polarized voting with a plurality of white votes supporting then-Representative Cedric Richmond's white opponent. Ex. 2 at 7 and App. B. Moreover, there are likely special circumstances to explain Mr. Richmond's success with white voters of a little over 50% in the 2018 election. The only white candidate on the ballot in the 2018 election was Jesse Schmidt. He was not a viable candidate, described in local news coverage as an "underfunded, long shot candidate." Ex. 18. White voters' support of Mr. Richmond dropped considerably in the 2020 election when a viable alternative white candidate was on the ballot. Special circumstances that explain a minority candidate's success should not be used defeat claims of vote dilution in otherwise racially polarized electorate. *See, e.g., Rodriguez* v. *Bexar Cnty.*, 385 F.3d 853, 864 (5th Cir. 2004) (citing *Gingles*, 478 U.S. at 57); *Fusilier*, 963 F.3d at 447.

these endogenous elections, Black voters voted has a cohesive bloc. In CD 2, Black voters have supported their candidate of choice with a range of support from 80% to 96%. Ex. 2 at App. B. In the other six elections involving Black candidates, all of which involved multiple candidates, the voting patterns demonstrate that Black voter support was cohesive. Ex. 2 at 8. Of the six contests, four were decided at the primary stage, with the white candidate that was preferred by white voters prevailing. Two elections required a runoff, but due to white bloc voting, no Black candidate made it to the runoff in either case. Ex. 2 at App. B.

It is also beyond dispute that racial bloc voting by white voters nearly always results in the defeat of Black Louisianans' preferred candidates in majority-white districts. *Gingles*, 478 U.S. 56–63. While Section 2 does not guarantee Black electoral success, "[o]ne may suspect vote dilution from political famine." *Johnson* v. *De Grandy*, 512 U.S. 997, 1017 (1994). Dr. Handley found that in every one of the 15 statewide election contests in which a Black candidate was running, white voters voted in bloc against the candidate supported by Black-voters, preventing the Black voters' candidate of choice from being elected. Ex. 2 at 7. The average percentage of white voters for the Black-preferred candidate in these elections was only 11.7%. *Id.* Likewise, in the recent endogenous congressional elections, the Black-preferred candidate did not win in any district other than in CD 2. *Id.* at 8. White support for the Black congressional candidates in the six elections in districts outside of CD 2 ranged from 1.1% to 7.4%. *Id.* at App. B. For example, in CD 5 in 2020, Sandra Christopher, who is Black, was the plurality choice of Black voters, but less than 5% of white voters supported her and she did not even make it to the runoff election. *Id.* at 9. In Louisiana congressional elections, Black preferred candidates outside CD 2 fail to win or even advance to the runoffs. *Id.*

Dr. Handley also found that the recently enacted 2022 congressional map, like the 2011 map, offers only one district where Black voters will have the opportunity to elect their candidate of choice. *Id.* at 10–11, Table 4. Performing a functional analysis, Dr. Handley found Black-preferred candidates in recent statewide elections would have performed similarly under the enacted plan as they did under the 2011 map, and the new plan is therefore unlikely to result in the election of Black-preferred candidates in future congressional elections outside of CD 2. *Id.*

Dr. Handley also conducted an analysis of the extent to which Black voters would have greater electoral opportunities under Mr. Fairfax's Illustrative Plan, looking at likely voting patterns of Congressional Districts 2, 3, 4, 5 and 6 in the enacted plan. *Id.* at 12–13. Under Mr. Fairfax's plan, the additional majority-Black district, CD5, draws in parts of each of these districts. Dr. Handley found that in all of these districts, Black voters vote as a cohesive bloc. *Id.* at 13. The percentage of support of Black voters for Black-preferred candidates across all five districts that would contribute voters to illustrative CD 5 was 82.8% to 84.5%. *Id.*

*Gingles* preconditions II and III have been met. In Louisiana, the Black community is cohesive in support of its preferred candidates and white voters consistently vote in bloc to defeat these candidates.

## II.    The totality of the circumstances indicates that the Legislature's map denied Black voters a meaningful opportunity to elect their preferred candidates

As shown in detail in the accompanying expert reports of Dr. R. Blakeslee Gilpin and Dr. Traci Burch, each of the factors relevant to an assessment of the totality of the circumstances shows that the Legislature's congressional map deprives Black voters of a meaningful opportunity to elect their candidates of choice. *See Gingles*, 478 U.S. at 36–37 (setting forth relevant Senate factors). We summarize their findings briefly here.

1.    **Senate Factor 1: Louisiana has an ongoing history of official, voting-related discrimination**

Louisiana has been persistent and creative in seeking to prevent its Black citizens from voting. Louisiana maintained a Grandfather Clause until the Supreme Court struck down this device in 1915. *See* Ex. 3 at 30. Thereafter, the state enacted an Understanding Clause to replace it, which required Louisiana voters to "give a reasonable interpretation of any section of the federal or state constitution in order to vote." *Bossier Parish School Board* v. *Reno*, 907 F. Supp. 434, 455 (D.D.C. 1995) (Kessler, J., dissenting) (internal quotation marks omitted). Poll taxes and voter roll purges were also used to hinder Black registration. *Major* v. *Treen*, 574 F. Supp. 325, 340 (E.D. La. 1983). The state at one time "prohibited elected officials from helping illiterates" and established an all-white democratic primary, which completely excluded Black Louisianans from the political process between 1923 and the Supreme Court's condemnation of the practice in 1944. *See* Ex. 3 at 30; *Smith* v. *Allwright*, 321 U.S. 649 (1944). In 1950, citizenship tests and a prohibition against single-shot voting were instituted. *Major*, 574 F. Supp. at 340. Between 1940 and 1964, the States Rights Party "spearheaded a strong movement against black enfranchisement and judicially-directed desegregation." *Id.*

From 1965 to 1989, the U.S. Attorney General issued 66 objection letters (11 to the State and 55 to local governments) nullifying over 200 voting changes. Ex. 3 at 35. Louisiana's preclearance requirement was renewed in 1970, 1975, and 1982. *Id.* at 35. From 1990 until the preclearance regime was struck down in *Shelby County* v. *Holder*, 570 U.S. 529 (2013), the U.S. Attorney General issued 79 additional objection letters in response to voting related changes in the State. *See* Department of Justice, *Section 5 Objection Letters*, https://www.justice.gov/crt/section-5-objection-letters (last visited Apr. 14, 2022).

Redistricting in Louisiana has repeatedly been characterized by racially discriminatory maps. After the 1981 redistricting cycle, a federal court found the State's redistricting plan, which included no majority-Black district, violated Section 2 of the VRA by diluting Black voting strength. *See Major*, 574 F. Supp. at 331.

The post-1990 round of redistricting was also tainted by Voting Rights Act violations. Ex. 3 at 44. The Department of Justice objected to the State's legislative redistricting plan and stated that it had "examined the 1991 House redistricting choices in light of a pattern of racially polarized voting that appears to characterize elections at all levels in the state." Ex. 19. The Justice Department found that "[i]n seven areas . . . the proposed configuration of district boundary lines appears to minimize black voting strength, given the particular demography of those areas. . . ." *Id.* Just two years later, in the *Chisom* v. *Roemer* cases, five Black voters in Orleans Parish filed a class action suit on behalf of all Black voters registered in the parish alleging that electing two at-large supreme court justices from Orleans, St. Bernard, Plaquemines, and Jefferson Parishes violated the VRA. Ex. 3 at 39. The state eventually settled the litigation in 1992, creating a majority-Black district in the state's supreme court plan, which to-date is the only district from which a Black justice has been elected. *Id.*

Local jurisdictions in the state have repeatedly been the subject of Section 5 objections and findings of liability under Section 2 of the VRA. Ex. 3 at 40–41.

### 2. Senate Factor 2: Louisiana voters are highly racially polarized

Federal courts have consistently found that voting in Louisiana is racially polarized to a very great extent. As described in detail, *supra* pp. 9–13, and in the expert report of Dr. Lisa Handley, the state's elections demonstrate stark patterns of racial polarization. In 2020, Louisiana's most recent congressional elections, voters in four of the five white majority districts had a choice between Black and white candidates. In each instance, the white candidate

prevailed with little Black support, while white support for Black candidates was virtually non-existent. *See* Ex. 2 at 8. Moreover, the gap between Black and white support for Black-preferred candidates is significant and consistent across elections at every level of government.

> **3.    Senate Factor 5: Discrimination in Louisiana has produced severe socioeconomic disparities impairing the ability of Black Louisianans to participate in the political process**

The ongoing effects of discrimination on Black Louisianans, which can be seen across multiple metrics, including economic, health, employment, living, and environmental conditions, hinder Black Louisianans' ability to participate in the political process in the state.

*Economic:* The U.S. Census Bureau's American Community Survey ("ACS") demonstrates that Black and Latino poverty rates are nearly three times as high as the white poverty rate in Louisiana. The median income for Black Louisianan households is about $29,000 less than that of white households. Ex. 4 at 10. Over three times as many Black households lack access to a vehicle as white households. *Id.* Moreover, Black Louisianans are underrepresented among small business owners. *Id.* Black Louisianans, while often located in areas of the State most affected by natural disasters, face more difficulty than white Louisianans in securing relief to rebuild homes and businesses after natural disasters occur. *Id.*

*Health:* Dramatic health disparities between Black and white Louisianans persist in Louisiana. According to the Centers for Disease Control and Prevention ("CDC"), in Louisiana, white men are expected to live over seven years longer than Black men and white women are expected to live over five years longer than Black women. Ex. 4 at 16–17.

Between 2016 and 2018, infant and child mortality rates among Black children were about twice as high as those for white children, Ex. 4 at 17. While rates of invasive cancer are similar for Black and white Louisianans, there is a statistically significant disparity in the mortality rate from invasive cancers (211.2 deaths per 100,000 adults for Black Louisianans vs.

173.6 deaths per 100,000 for white Louisianans).  Ex. 4 at 16.  According to the CDC, 42.9% of

Black Louisianans are obese, compared to 32.4% of white Louisianans.  *Id*.  According to the

2019 ACS, white Louisianans are more likely to have health insurance than Black Louisianans.

Ex. 4 at 17–18.

 *Employment:*  Severe racial discrimination in employment persists in Louisiana.

Between 2011 and 2021, nearly 8,700 charges of race- or color-based employment

discrimination were filed in Louisiana.  Ex. 4 at 10.

 *Education*:  Black Louisianans have faced educational discrimination throughout

Louisiana's history, and de facto racial segregation remains a persistent feature of the State's

educational system.  As recently as 2017, ProPublica's *Miseducation* project demonstrated high

levels of racial segregation within 50% of all Louisiana school districts, with nine out of 68

school districts over 87% non-white. Ex. 4 at 7.

 School segregation detrimentally affects the academic performance of minority students.

Despite comprising 43.5% of public school students in the 2017-2018 school year, Black

students were only 22.9% of students in gifted and talented programs and 35.5% of students

taking Advanced Placement courses.  Ex. 4 at 8.  Two-thirds of the students with a school

suspension that school year were Black.  Ex. 4 at 8.  Among current students, there is a racial gap

in assessment test scores.  Black eighth graders score 30 points lower in Math on average and 26

points lower in Reading on average than white eighth graders.  Ex. 4 at 8.

 *Environmental living conditions*:  As a result of racial residential segregation, chemical

plants and other hazards are located near heavily Black residential areas.  In Cancer Alley, an

area of Louisiana between New Orleans and Baton Rouge, studies have linked elevated levels of

air pollution to increased risk of cancer, COVID-19, and asthma.  Ex. 4 at 18.  Flooding in

Louisiana disproportionately affects Black neighborhoods.  Ex. 4 at 16.  When Hurricane Katrina hit southeast Louisiana in 2005, the damage was most extensive in the region's Black neighborhoods.  *Id.*  Mortality rates for adults 30 years and older were significantly higher for Black residents of Orleans Parish than white residents.  *Id.* at 18. In the aftermath of Hurricane Katrina, Black New Orleans residents were more likely to be displaced, and for longer periods, than white New Orleans residents, and Black residents had a more difficult time returning to their neighborhoods due to delays in disaster relief and rebuilding efforts.  *Id.*

*Criminal Justice & Incarceration*:  As of 2021, Louisiana has the highest incarceration rate in the country.  *Id.* at 20.  Black Louisianans are dramatically overrepresented in the incarcerated population: despite comprising just 33% of state residents, Black Louisianans are imprisoned at a rate double their presence in the population.  Nearly 66% of prisoners, 49% of probationers, and 70 % of parolees in Louisiana are Black.  Ex. 4 at 20.

### 4.    Senate Factor 6: Louisiana political campaigns are marked by overt and subtle racial appeals

Louisiana's political campaigns have persistently been characterized by both explicit and implicit racial appeals.  Most notable is the political career of former state legislator and Ku Klux Klan leader and long-time neo-Nazi David Duke.  In 1989, Duke, who founded the National Association for the Advancement of white People, openly appealed to white racial fears in his numerous bids for public office in Louisiana. Ex. 4 at 23.  Duke has also endorsed other Louisiana politicians in recent elections, including former Louisiana Governor Mike Foster, who went on to win 84% of the white vote.  *Id.*

Several other candidates have likewise been associated with white-supremacist groups. In 2002, Steve Scalise, the current U.S. representative for CD 1 (which is 72.7% white) spoke at

a conference organized by a white supremacist group associated with neo-Nazi activists while serving as a Louisiana state representative.  Ex. 20.

Even where there is no explicit endorsement of white supremacy, candidates regularly attempt to make racial resentment and fear salient in the minds of voters.  Ex. 4 at 22.   In 2012, a candidate for Louisiana Supreme Court District 5, Justice Jeff Hughes, darkened the image of his Black opponent, John Guidry, in campaign materials, and referred to Guidry as an "affirmative action Democrat."  *La. State Conf. of the NAACP*, 490 F. Supp. 3d at 993.  In the 2019 gubernatorial race, Eddie Rispone, the Republican candidate, produced a campaign ad that began with a prominent display of mugshots of Black men and other men of color, and in which Rispone blamed Governor Edwards for crimes committed by people after early release from prison.  Ex. 4 at 23.  The images are juxtaposed with all-white images of Rispone with his constituents.  *Id*.

5.    **Senate Factor 7: Black candidates in Louisiana are underrepresented in office and rarely win elections outside majority-minority districts**

Despite constituting approximately one-third of the Louisiana population, Black Louisianans remain underrepresented in public office at all levels.  Louisiana has never had a Black U.S. Senator.  Louisiana has only elected four Black congresspeople since Reconstruction. Ex. 4 at 25.  Representative Troy Carter (the only Black member of Louisiana's current House delegation) is from the CD 2, a majority-Black district created in the 1980s as a result of a Section 2 challenge to Louisiana's congressional scheme.

This significant lack of representation extends beyond representation in the federal government.  Louisiana has not had a Black Governor or Lieutenant Governor since Reconstruction.  Ex. 4 at 25.  Louisiana has never had a Black Secretary of State or Attorney General, seats that directly impact voting and criminal justice.  Currently, Black legislators hold

19

25% of state legislative seats (36 of 144). Ex. 4 at 25. There are ten Black State Senators (10/39) and 26 Black members of the State House (26/105). All were elected from majority-Black districts. *Id.*

Less than a quarter of Louisiana mayors are Black (71/304). *Id.* Only two of the eight elected Board of Elementary and Secondary Education members are Black. Ex. 4 at 25–26.

Black judges have also been "underrepresented in the trial and appellate courts. While the black population comprises about 30.5% of the voting age population in Louisiana, black people only account for about 17.5% of the judges in Louisiana." *Terrebonne Par. Branch NAACP*, 274 F. Supp. 3d at 445. Today, 26.1% of Louisiana's state court judges are Black. Ex. 4 at 25. Of the 42 district courts in the state, Black women serve or have served as judges on only six district courts and Black men serve or have served as judges on 13 district courts. Only one Black justice sits on the Louisiana Supreme Court, Ex. 4 at 26, and she was elected in a majority-Black district created as a result of a Section 2 challenge to Louisiana's at-large judicial electoral scheme. *In re Off. of Chief Just., Louisiana Supreme Ct.*, 2012-1342, 101 So. 3d 9, 21 (La. Oct. 16, 2012).

### 6.    Senate Factor 8: Louisiana is not responsive to Black residents

As discussed above, Black Louisianans disproportionately suffer from the effects of racial discrimination across many areas, including health, employment, and education. In each of these areas, severe racial disparities are indicative of a failure on the part of elected officials to address the needs of Black residents.

During the redistricting roadshow, Black Louisianans often and explicitly connected the lack of responsiveness of officials to race. For instance, at a meeting in Lake Charles, Lydia Larse, a Black resident, said: "I feel as though my voice is not being heard because y'all don't need us. We're not needed. You don't care." Ex. 4 at 27.

7.    **Senate Factor 9: The justification for the new congressional map is tenuous**

The sponsors and advocates of H.B. 1 and S.B. 5 provided several justifications for supporting these bills over maps that provided for two majority-Black districts in Louisiana. However, many of the given justifications lacked evidentiary support or were based on misunderstandings. The final plan adopted by the Louisiana legislature did not achieve the very redistricting principles the bill sponsors stressed were important.

Sponsors of H.B. 1 and S.B. 5 claimed that traditional redistricting principles, such as compactness, maintaining communities of interest, or respecting political boundaries, were important. When presented with alternative bills that added a second majority-Black district while outperforming H.B. 1 and S.B. 5 on those metrics, they backed away from these principles. In fact, by the end of the process, supporters of H.B. 1 in particular shifted their legislative priorities. Instead of compactness or other measures, Representative Magee said that the primary criterion for drawing the congressional districts was "to honor the traditional boundaries as best as possible." Ex. 4 at 39. Representative Magee said the drafters of H.B. 1 prioritized the traditional boundaries after looking at all the other criteria they could have used. Yet Representative Magee publicly stated that he did not even look at any performance data on this or any other metric to compare H.B. 1 with plans that would create two majority-Black districts.

III.    **Plaintiffs will suffer irreparable injury absent an injunction**

If preliminary relief is denied, Plaintiffs and similarly situated Louisiana voters will suffer irreparable injury. Vote dilution in violation of Section 2 of the VRA "irreparably injures the plaintiffs' right to vote and to have an equal opportunity to participate in the political process." *Patino* v. *City of Pasadena*, 229 F. Supp. 3d 582, 590 (S.D. Tex. 2017); *Casarez* v.

*Val Verde Cty.*, 957 F. Supp. 847, 865 (W.D. Tex. 1997) (holding that violation of local election laws and the Voting Rights Act was "a harm monetary damages cannot address").

Plaintiffs have a strong interest in exercising their right to vote free from a racially discriminatory districting scheme that violates Section 2 of the VRA. But if Defendant moves forward with the current legally non-compliant map, Plaintiffs will have no choice and ultimately be forced to vote in districts that dilute their vote. *See, e.g.*, Ex. 5 ¶¶ 8-9; Ex. 13 ¶ 12; Ex. 11 ¶ 12. Plaintiffs residing in "packed" and "cracked" districts will not have equal access to their congressional representatives as compared to voters in other districts. *See, e.g.*, Ex. 10 ¶ 10; Ex. 7 ¶ 12.

Plaintiffs, and all similarly situated Black voters, will be deprived of the opportunity to elect candidates of their choice. *Id.* And "once the election occurs, there can be no do-over and no redress," so the injury to "voters is real and completely irreparable if nothing is done to enjoin" the challenged conduct. *League of Women Voters of N.C.* v. *North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). The "restriction on [this] fundamental right to vote therefore constitutes irreparable injury." *Michigan State A. Philip Randolph Inst.* v. *Johnson*, 833 F.3d 656 (6th Cir. 2016).

## IV.    The balance of equities and the public interest weigh in favor of an injunction

When the defendant is a government actor, courts consider the harm to the opposing party and the weight of the public interest together. *See Nken*, 556 U.S. at 435. In this case, on balance, preserving the rights of Louisianans is strongly in the public interest and the threat of disenfranchising Black Louisianans vastly outweighs the minimal potential administrative burden that an injunction might impose on Defendant.

The injury faced by Plaintiffs is grave—a denial of their fundamental right to vote.  *See Dunn* v. *Blumstein*, 405 U.S. 330, 336 (1972) (right to vote is of particular public importance because it is "preservative of all rights" (internal quotation marks omitted)).  The public interest "favors permitting as many qualified voters to vote as possible."  *Obama for Am.* v. *Husted*, 697 F.3d 423, 437 (6th Cir. 2012).  It will serve the public interest for Defendant to be prohibited from enforcing, implementing, or conducting elections using a map that violates Section 2.

In contrast, the harm, if any, that this injunction would cause to the State is minimal.  A state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found to violate Section 2 of the VRA.  On the contrary, courts have found that such injunctions benefit the state.  *Giovani Carandola Ltd.* v. *Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *see also Charles H. Wesley Educ. Found., Inc.* v. *Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005).  Further, "[t]he public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve." *Casarez*, 957 F. Supp. at 865 (quoting *Nobby Lobby, Inc.* v. *City of Dallas*, 767 F. Supp. 801, 821 (N.D. Tex. 1991), *aff'd*, 970 F.2d 82 (5th Cir. 1992)).  On balance, any harm the State can identify pales in comparison to the harms suffered by Plaintiffs in this case.

Though the state may argue that it is too late in the election cycle to implement a new congressional plan without risking voter confusion, the facts of this case are not at odds with the so-called "*Purcell* principle."  The Supreme Court and the Fifth Circuit have recognized that the *Purcell* principle warns "lower federal courts should ordinarily not alter . . . election rules *on the eve of an election.*"  *Republican Nat'l Comm.* v. *Dem. Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (emphasis added); *Tex. Democratic Party* v. *Abbott*, 978 F. 3d 168, 181–82 (5th Cir. 2020).  Under *Purcell*, courts should avoid issuing orders that may cause voters to become

confused and stay away from the polls.  *Purcell* v. *Gonzalez*, 549 U.S. 1, 4–5 (2006); *Mi Familia Vota* v. *Abbott*, 497 F. Supp. 3d 195, 221–22 (W.D. Tex. 2020).  Historically, court-ordered changes to the impending election process that do not pass muster under *Purcell* are those that would confuse the electorate and that are ordered immediately before an impending election. *See, e.g.*, *Veasey* v. *Perry*, 769 F.3d 890, 893–95 (5th Cir. 2014) (seeking an injunction that would require new election procedure nine days before election period, and which would require the state to train 25,000 new poll workers).  The Supreme Court's recent redistricting rulings are consistent with granting a preliminary injunction here.  *Compare, e.g.*, *Merrill* v. *Milligan*, 142 S. Ct. 879, 879 (2022) (applying *Purcell* to stay injunction against Alabama's congressional map entered seven weeks before the beginning of primary election), *with Wisconsin Legislature* v. *Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022) (striking down Wisconsin's state legislative plans five months before the beginning of primary election).  Here, the election is over six months away, meaning the risk of confusing the electorate is significantly reduced. Moreover, courts have noted that if there is a countervailing threat to the deprivation of the fundamental right to vote, this threat outweighs the potential harm laid out in the *Purcell* doctrine.  *See Self Advocacy Sols. N.D.* v. *Jaeger*, 464 F. Supp. 3d 1039, 1055 (D.N.D. 2020); *Mi Familia Vota*, 497 F. Supp. 3d at 222.  The chaos and harm that would be suffered by the Louisiana voters if maps violating Section 2 of the VRA are used in the 2022 elections would result in precisely the type of confusion the *Purcell* doctrine seeks to avoid.  The sooner this Court imposes an injunction on Defendant, the more strongly the public interest will be served.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be granted.



By: /s/*John Adcock*
          John Adcock
          Adcock Law LLC
          L.A. Bar No. 30372
          3110 Canal Street
          New Orleans, LA 70119
          Tel: (504) 233-3125
          Fax: (504) 308-1266
          jnadcock@gmail.com


Leah Aden (admitted *pro hac vice*)
Stuart Naifeh (admitted *pro hac vice*)
Kathryn Sadasivan (admitted *pro hac vice*)
Victoria Wenger (admitted *pro hac vice*)
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
laden@naacplef.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
vwenger@naacpldf.org

R. Jared Evans*
Sara Rohani[†]*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Robert A. Atkins (admitted *pro hac vice*)
Yahonnes Cleary (admitted *pro hac vice*)
Jonathan H. Hurwitz (admitted *pro hac vice*)
Daniel S. Sinnreich (admitted *pro hac vice*)
Amitav Chakraborty (admitted *pro hac vice*)
Adam P. Savitt (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue Of The Americas, New York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
ratkins@paulweiss.com
ycleary@paulweiss.com
jhurwitz@paulweiss.com
dsinnreich@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com

Nora Ahmed (admitted *pro hac vice*)
Megan E. Snider
LA. Bar No. 33382
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org
msnider@laaclu.org

Tracie Washington
LA. Bar No. 25925
Louisiana Justice Institute
Suite 132
3157 Gentilly Blvd
New Orleans LA, 70122
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

T. Alora Thomas*
Sophia Lin Lakin*
Samantha Osaki*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
athomas@aclu.org
slakin@aclu.org
sosaki@aclu.org

Sarah Brannon*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

* *Pro hac vice* applications forthcoming

† Admitted in California only. Practice limited to matters in United States federal courts.

*Counsel for Plaintiffs*