## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENÉ SOULÉ, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, and POWER COALITION FOR EQUITY AND JUSTICE,

        Plaintiffs,

    v.

KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana,

        Defendant.

Case No. 3:22-cv-00211-SDD-SDJ c/w

EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, and TRAMELLE HOWARD,

        Plaintiffs,

    v.

R. KYLE ARDOIN, in his official capacity as Louisiana Secretary of State,

        Defendant.

Case No. 3:22-cv-00214-SDD-SDJ

## *GALMON* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD......................................................................................... 4

ARGUMENT ...................................................................................................... 5

    I.       Plaintiffs are substantially likely to prove that HB 1 violates Section 2 of the Voting Rights Act. ....................................................................................... 5

          A.    *Gingles* One: A second compact, majority-Black district can be drawn in Louisiana. .............................................................................. 6

          B.    *Gingles* Two: Black Louisianans are politically cohesive. ....................... 7

          C.    *Gingles* Three: White Louisianans engage in bloc voting to defeat Black-preferred candidates. ................................................................. 8

          D.    Under the totality of circumstances, HB 1 denies Black voters equal opportunity to elect their preferred candidates to Congress. ..................... 9

               1.    Senate Factor One: Louisiana has an ongoing history of official, voting-related discrimination. ....................................................... 10

               2.    Senate Factor Two: Louisiana voters are racially polarized. ........ 12

               3.    Senate Factor Three: Louisiana's voting practices enhance the opportunity for discrimination. ....................................................... 13

               4.    Senate Factor Four: Louisiana has no history of candidate slating for congressional elections............................................................. 14

               5.    Senate Factor Five: Louisiana's discrimination has produced severe socioeconomic disparities that impair Black Louisianans' participation in the political process. ............................................. 14

               6.    Senate Factor Six: Both overt and subtle racial appeals are prevalent in Louisiana's political campaigns................................. 15

               7.    Senate Factor Seven: Black Louisianans are historically underrepresented in elected office. ................................................. 17

               8.    Senate Factor Eight: Louisiana has not been responsive to its Black community. ................................................................................... 18

9.       Senate Factor Nine: The justification for the new congressional map is tenuous..............................................................................19

10.     Black Louisianians are significantly underrepresented—and white Louisianians are significantly overrepresented—under HB 1......20

II.     Plaintiffs and other Black Louisianians will suffer irreparable harm absent a preliminary injunction.........................................................................21

III.    The balance of equities and the public interest favor injunctive relief. ...............21

CONCLUSION................................................................................................................24

**INTRODUCTION**

Consider at the outset two critical facts: Louisiana has six congressional districts and a Black population of over 33%—one-third of the state's population. Given this demographic reality, it is unsurprising that voices across Louisiana called for the creation of a second Black-opportunity congressional district during the latest round of redistricting. This chorus, which shared the simple belief that the state's congressional delegation ought to reflect its population, came from all quarters. Activists, community leaders, and ordinary Louisianians petitioned lawmakers. Legislators introduced multiple maps that included a second majority-Black district. And Governor John Bel Edwards pledged to veto any new map that failed to comply with the requirements of federal law. Governor Edwards was correct: The creation of a second district in which Black voters have the opportunity to elect their candidates of choice is not only the fairest result for the people of Louisiana—it is *required* by Section 2 of the Voting Rights Act of 1965.

Despite the mandates of federal law and the entreaties of citizens and government officials alike, the Louisiana State Legislature enacted House Bill 1 ("HB 1"), drawing a new congressional map that dilutes the votes of the state's Black citizens. Louisiana has a Black population sufficiently large and geographically compact to create a second majority-Black congressional district that includes the Baton Rouge area and the delta parishes along the Mississippi border. Rather than draw this district as required by federal law, the Legislature engaged in textbook examples of "packing" and "cracking": The new plan packs Black voters into the Second Congressional District and cracks the rest among the state's remaining, predominantly white districts. Consequently, Louisiana's new congressional map—combined with the state's racially polarized voting, the severe socioeconomic disparities between Black and white Louisianians, and the ongoing effects of a tragic history of discrimination and racial appeals in campaigns—denies the state's Black voters equal access to the political process in violation of Section 2.

This case calls for a straightforward application of settled Voting Rights Act precedent—no more, no less. Without this Court's intervention prior to the 2022 elections, Louisiana will subject its Black citizens, including Plaintiffs, to an unlawful congressional districting plan and irreparably violate their fundamental right to vote. Plaintiffs are highly likely to succeed on the merits of their Section 2 claim, and given Louisiana's late election calendar, there is more than enough time to feasibly draw and implement a remedial plan. Plaintiffs therefore request that the Court preliminarily enjoin implementation of Louisiana's enacted congressional map and ensure the creation of an additional congressional district in which Black voters have the opportunity to elect their candidates of choice.

## BACKGROUND

Over the past decade, Louisiana's population grew by more than 120,000 people. *See* Ex. 1 ¶ 13.[1] The entirety of this growth is attributable to the state's minority population. *Id.* While the state's Black population increased by 3.8% overall between 2010 and 2020, its white population *decreased* by 5.1%. *Id*. By 2020, Louisiana's Black residents comprised 33.13% of the state's population. *Id*.

Throughout the redistricting process that followed the 2020 census, Black Louisianians and civil rights groups called for the enactment of a second congressional district where minority voters would have a realistic opportunity to elect their preferred candidates. For example, at a public meeting of the Legislature's joint redistricting committee in Baton Rouge on November 16, 2021, residents pointed out that while Black Louisianians make up one-third of the state's population, only one of Louisiana's six congressional districts is majority Black. Representative Ted James, chair of the Legislative Black Caucus, emphasized this imbalance during his five-

---

[1] All exhibits are attached to the Declaration of Darrel J. Papillion, filed concurrently with this motion.

minute speech, repeating, "One third of six is two." Ex. 10. However, as representatives of the Public Affairs Research Council of Louisiana concluded, the Legislature "disregarded many of the public comments and much of the hours of testimony they received and fell into age-old patterns of protecting incumbent officials, political parties and personal allies." Ex. 11. They noted in particular that "[l]awmakers rejected overwhelming calls from people who attended hearings around the state and at the Louisiana Capitol to expand the number of majority-minority districts across several of the maps. It's not clear the Legislature made any significant changes to district lines, big or small, based on citizen input." *Id.*

As the Legislature deliberated, Senator Cleo Fields—who observed that "[i]t would be unconscionable for [the Legislature] to pass a plan with a single Black district"—introduced *three* maps that included two majority-Black districts. Ex. 12. Similar proposals were offered by Senators Karen Carter Peterson, Gary Smith, Gerald Boudreaux, Jay Luneau, and Joseph Bouie, Jr., many of which included a new Fifth Congressional District that would afford Black voters the opportunity to elect their preferred candidates. *Id.* But none of these maps was adopted by the Legislature. Instead, during an extraordinary legislative session that commenced on February 2, 2022, the House passed HB 1, which established a map that largely mirrors the 2011 congressional plan and preserves Louisiana's lone majority-Black congressional district. Ex. 13. The Senate in turn passed its own map, Senate Bill 5 ("SB 5"), which also included only a single minority-opportunity district. Ex. 14. Notwithstanding objections that the failure to draw a second majority-Black congressional district dilutes the votes of Louisiana's minority communities, the Legislature sent HB 1 and SB 5 to Governor Edwards's desk following final votes on February 18. Ex. 15.

Consistent with his earlier pledge to veto any congressional map that "suffer[s] from defects in terms of basic fairness," Ex. 16, Governor Edwards vetoed the proposed maps on March 9, 2022. In his accompanying message, he explained that he

> vetoed the proposed congressional map drawn by Louisiana's Legislature because it does not include a second majority African American district, despite Black voters making up almost a third of Louisianans per the latest U.S. Census data. This map is simply not fair to the people of Louisiana and does not meet the standards set forth in the federal Voting Rights Act. The Legislature should immediately begin the work of drawing a map that ensures Black voices can be properly heard in the voting booth. It can be done and it should be done.

Ex. 17; *see also* Ex. 18. Rather than heed this advice and draw a new congressional plan that complies with Section 2, the Legislature overrode Governor Edwards's veto of HB 1 on March 30, 2022. Ex. 19.

Louisiana's new congressional map packs Black voters into the state's only majority-Black district and cracks other Black voters among districts that extend into predominantly white communities in the southern, western, and northern reaches of the state. Consequently, the Second Congressional District, a serpentine district that snakes through New Orleans and Baton Rouge to collect minority voters, has a Black voting-age population of 58.67%, Ex. 1 ¶ 40—far more than is needed for Black voters to elect their candidates of choice in the district. Meanwhile, three of the state's five parishes with the highest Black populations—East Carroll Parish (70.7%), Madison Parish (63.5%), and Tensas Parish (55.8%)—are located in the predominantly white Fifth Congressional District. Ex. 1, Ex. C-1.

## LEGAL STANDARD

A preliminary injunction "should issue" when a plaintiff shows

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the

injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006).

## ARGUMENT

Plaintiffs readily satisfy the four required elements for issuance of a preliminary injunction.

**I.     Plaintiffs are substantially likely to prove that HB 1 violates Section 2 of the Voting Rights Act.**

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

To prevail on their Section 2 claim, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). Once Plaintiffs make this threshold showing, the Court must examine "the totality of circumstances"—including the nine factors identified in the Senate report that accompanied the 1982 amendments to the Voting Rights Act—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–45; *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991).

- 5 -

Significantly, "[n]o one of the factors is dispositive; the plaintiffs need not prove a majority of them; [and] other factors may be relevant." *Westwego Citizens*, 946 F.2d at 1120; *see also NAACP v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2001) (explaining that Section 2 requires "a flexible, fact-intensive inquiry predicated on 'an intensely local appraisal of the design and impact of the contested electoral mechanisms,'" "a searching practical evaluation of the 'past and present reality,'" and a "'functional' view of political life" (first quoting *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1147 (5th Cir. 1993); and then quoting *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 860 (5th Cir. 1993) (en banc))).

A.    *Gingles* **One: A second compact, majority-Black district can be drawn in Louisiana.**

Plaintiffs satisfy the first *Gingles* precondition because it is possible to "creat[e] more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *LULAC v. Perry*, 548 U.S. 399, 430 (2006) (plurality opinion) (quoting *De Grandy*, 512 U.S. at 1008). The numerosity requirement of this precondition involves a "straightforward," "objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality opinion).

Expert demographer William Cooper has offered three illustrative plans that unequivocally satisfy the first *Gingles* precondition. *See, e.g.*, *Terrebonne Par. Branch NAACP v. Edwards*, 399 F. Supp. 3d 608, 611 (M.D. La. 2019) (first *Gingles* precondition satisfied based on illustrative maps). Mr. Cooper's illustrative maps demonstrate that Louisiana's Black community is sufficiently large and geographically compact to comprise more than 50% of the voting-age population in a second congressional district that connects the Baton Rouge area and St. Landry Parish with the delta parishes along the Mississippi border. *See* Ex. 1 ¶¶ 47, 60, 66, 71. Notably,

Mr. Cooper's illustrative maps are nearly as or even more compact than the new plan drawn by HB 1. *Id.* ¶¶ 72–77. They also comply with other traditional districting principles, including population equality, contiguity, maintaining political boundaries, and avoiding pairing of incumbents, *see id.* ¶¶ 52–56—all of which were guidelines adopted by the Legislature during this past redistricting cycle. *See* Ex. 20.

As described in the declarations of Christopher Tyson and Charles Cravins, a congressional district that includes the Baton Rouge area, St. Landry Parish, and the delta parishes along the Mississippi border would unite Louisianians with shared historical, familial, and economic interests. *See* Exs. 4–5. Baton Rouge has long served as the urban anchor for the delta parishes, providing educational and economic opportunities that link the state capital with communities to the north along the Mississippi River. Ex. 4 ¶¶ 6–11. And Baton Rouge and St. Landry Parish similarly possess strong economic and educational ties. Ex. 5 ¶¶ 3–6.

Moreover, Dr. Maxwell Palmer confirmed that Black voters would be able to elect their preferred candidates in each of Mr. Cooper's illustrative majority-Black districts. Under all three maps, Black-preferred candidates would have won at least 14 of 18 analyzed elections in the new majority-Black districts, with an average of at least 55% of the vote. *See* Ex. 2 ¶¶ 25–26. Plaintiffs therefore satisfy the first *Gingles* precondition. *See Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) (first *Gingles* factor requires "an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate").

**B.**     ***Gingles* Two: Black Louisianians are politically cohesive.**

Plaintiffs also satisfy the second *Gingles* precondition because Louisiana's Black voters are politically cohesive. *See* 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Id.* at 68.

Dr. Palmer analyzed political cohesion and racially polarized voting across the state and in each individual congressional district. *See* Ex. 2 ¶ 6. To perform his analysis, Dr. Palmer used official election data from 2012 to 2020 and a widely accepted methodology called ecological inference analysis. *See id.* ¶¶ 9–11; *see also, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018) (recognizing ecological inference as "the 'gold standard' for use in racial bloc voting analyses"), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

Dr. Palmer found "a clear pattern of racially polarized voting" statewide and in each individual congressional district. Ex. 2 ¶¶ 21–22. His analysis shows that Black Louisianians voted cohesively in most elections over a decade span. *Id.* ¶ 17. In 18 of the 22 elections he analyzed, Black voters had clearly identifiable preferred candidates and voted as a bloc for these candidates with an average of 91.4% of the vote. *Id.* ¶¶ 17–18. These results more than satisfy the legal threshold of cohesive voting, and Plaintiffs therefore satisfy the second *Gingles* precondition. *See* 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim.").

### C. *Gingles* Three: White Louisianians engage in bloc voting to defeat Black-preferred candidates.

Finally, Plaintiffs satisfy the third *Gingles* precondition because, in the area where Mr. Cooper proposes a new majority-Black district, "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidates." 478 U.S. at 51.

Dr. Palmer found high levels of white bloc voting in opposition to the candidates whom Black voters cohesively supported. In 17 of the 18 elections where Black voters had a preferred candidate, the white majority voted as a bloc against the Black-preferred candidate with an average

of 82.9% of the vote. Ex. 2 ¶¶ 18–19. Dr. Palmer found similar results exist in each individual congressional district. *Id.* ¶ 22.

The effect of this bloc voting is unmistakable: The candidates preferred by white voters won 18 of the 20 elections analyzed, while Black-preferred candidates prevailed only *twice* across the same elections*. Id.* ¶¶ 23–24. In short, Black Louisianians' candidates of choice are consistently defeated by white bloc voting statewide and in each of the state's congressional districts, except where Black voters make up a majority of eligible voters—thus satisfying the third *Gingles* precondition. *See* 478 U.S. at 68 ("Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice.").

**D.     Under the totality of circumstances, HB 1 denies Black voters equal opportunity to elect their preferred candidates to Congress.**

Considering the "totality of circumstances," HB 1 denies Black Louisianians an equal opportunity to elect their preferred congressional representatives. 52 U.S.C. § 10301(b). Notably, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). This is not an unusual case.

The factors outlined in the Senate Judiciary Committee report accompanying the 1982 Voting Rights Act amendments—the "Senate Factors"—are "typically relevant to a § 2 claim" and guide this analysis. *LULAC*, 548 U.S. at 426; *see also Gingles*, 478 U.S. at 36–37 (listing Senate Factors). They are not exclusive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29 (1982)); *see also Westwego Citizens*, 946 F.2d at 1120.

### 1. Senate Factor One: Louisiana has an ongoing history of official, voting-related discrimination.

As courts have recognized—and as explored in the expert report of Dr. Allan Lichtman, *see* Ex. 3—Louisiana's history of voting-related discrimination is so deeply ingrained that "it would take a multi-volumed treatise to properly describe the persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process." *Citizens for Better Gretna v. City of Gretna*, 636 F. Supp. 1113, 1116 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir. 1987); *see also United States v. Louisiana*, 225 F. Supp. 353, 363 (E.D. La. 1963) (three-judge court) (extensively cataloging Louisiana's "historic policy and the dominant white citizens' firm determination to maintain white supremacy in state and local government by denying to [Black citizens] the right to vote"), *aff'd*, 380 U.S. 145 (1965). These discriminatory actions have evolved over the years, but they have persisted. As a result of the centuries-long effort to marginalize and disenfranchise Black Louisianians, they still lack equal access to the state's political processes today.

In 1898, Louisiana called a constitutional convention for the sole purpose of "establish[ing] the supremacy of the white race." Ex. 3 at 9 (alteration in original). One tactic the State employed was imposition of educational and property requirements for voter registration on residents whose fathers or grandfathers were not registered to vote prior to January 1, 1867—the "Grandfather Clause." *Id.* The convention's president made the intent of the Grandfather Clause evident, asking, "Doesn't it let the white man vote, and doesn't it stop the negro from voting, and isn't that what we came here for?" *Id.* at 9–10. The U.S. Supreme Court's decision in *Guinn v. United States*, 238 U.S. 347 (1915), ultimately struck down the Grandfather Clause, finding that while it was race neutral, it was also designed to protect the voting rights of illiterate white voters while disenfranchising Black voters. Ex. 3 at 10.

The Supreme Court's intervention did not deter state officials, who subsequently introduced a number of measures to discourage and prevent Black voting in Louisiana. *Id.* These racially discriminatory measures included the all-white primary and a type of literacy test made possible by the "Understanding Clause," which was put in place during the state's 1921 constitutional convention. *Id.* This clause required voters to give a "reasonable interpretation" of a section of the state's constitution, and if that interpretation was incorrect under a registrar's unfettered discretion, then the applicant's registration application was rejected. *Id.* This and other discriminatory measures were so effective that, by the advent of the Voting Rights Act, only about *one-third* of Louisiana's Black voting-age population was registered to vote, compared with the overwhelming majority of the white voting-age population. *Id.* at 10–11. The Understanding Clause remained in force until 1965, when the U.S. Supreme Court struck it down in *Louisiana v. United States*, 380 U.S. 145 (1965).

That same year, Congress passed the Voting Rights Act of 1965, which sparked a widespread increase in Black voter registration—and just as it did following ratification of the Fifteenth Amendment, the State of Louisiana retaliated. In July 1968, Louisiana enacted new laws authorizing at-large elections for police juries and parish school boards, which were previously prohibited. Ex. 3 at 11. In 1969, the U.S. Department of Justice objected to this new system, finding that the at-large electoral system would discriminate against Black voters if implemented. *Id.* Indeed, since the late 1960s, the Department of Justice has filed nearly 150 objections to proposed laws in Louisiana that would discriminate against Black voters. *Id.*

Louisiana's discrimination against Black voters is not confined to history books; instead, it has persisted well into the 21st century. In June 2018, the U.S. Commission on Civil Rights found that geographical areas within the state with more Black residents have fewer polling places

per voter. *Id.* at 14. On average, Louisiana's Black voters must therefore travel farther than white voters to access polling locations. *Id.* at 14–15. The commission also found that polling places were inadequate for early voting, with only four early voting locations in each of the three most populated—and most diverse—parishes of East Baton Rouge, Jefferson, and Orleans. *Id.* at 15. And Caddo Parish in the northwestern corner of the state, which has a 53% minority population, has only *one* early voting location for its 260,000 residents. *Id.* Louisiana's racial discrimination in voting persists in indirect ways as well: The State overincarcerates, and consequently disenfranchises, its Black citizens. *Id.* at 17–23.

Louisiana's centuries-long efforts to discriminate against Black voters continue to this day. This factor thus weighs decidedly in Plaintiffs' favor.

### 2. Senate Factor Two: Louisiana voters are racially polarized.

"Evidence of racially polarized voting is at the root of a racial vote dilution claim because it demonstrates that racial considerations predominate in elections and cause the defeat of minority candidates or candidates identified with minority interests." *Citizens for a Better Gretna*, 636 F. Supp. at 1133 (quoting *Johnson v. Halifax County*, 594 F. Supp. 161, 170 (E.D.N.C. 1984)). Courts have found that voting in Louisiana is racially polarized.[2] These findings were confirmed by Dr. Palmer's analysis discussed above, *see supra* Sections I.B–C, which found "a clear pattern of

---

[2] *See, e.g.*, *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 436–37 (M.D. La. 2017) (recognizing racially polarized voting in Terrebonne Parish), *overruled on other grounds sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020); *St. Bernard Citizens for Better Gov't v. St. Bernard Par. Sch. Bd.*, No. CIV.A. 02-2209, 2002 WL 2022589, at *9 (E.D. La. Aug. 26, 2002) (recognizing racially polarized voting in St. Bernard Parish); *Clark v. Edwards*, 725 F. Supp. 285, 298–99 (M.D. La. 1988) (concluding that "across Louisiana and in each of the family court and district court judicial districts as well as in each of the court of appeal districts, there is consistent racial polarization in voting"), *vacated on other grounds*, 750 F. Supp. 200 (M.D. La. 1990); *Citizens for Better Gretna*, 636 F. Supp. at 1124–31 (recognizing racially polarized voting in City of Gretna); *Major v. Treen*, 574 F. Supp. 325, 337–39 (E.D. La. 1983) (three-judge court) (recognizing racial polarization in Orleans Parish).

racially polarized voting" statewide and in each of the state's six congressional district. Ex. 2 ¶¶ 21–22. This factor thus supports a finding of vote dilution.

### 3. Senate Factor Three: Louisiana's voting practices enhance the opportunity for discrimination.

As discussed above, Louisiana has historically employed a variety of voting practices that have discriminated against Black voters. *See supra* Section 1.D.1; Ex. 3. Even today, the state employs a unique open primary system that negatively impacts minority voters. *See City of Port Arthur v. United States*, 459 U.S. 159, 167 (1982) (describing how such circumstances "permanently foreclose a black candidate from being elected").

Louisiana's open primary system effectively imposes a majority-vote requirement; that is, a candidate prevails if they win an outright majority in the open primary, but if no candidate receives a majority, then only the top two candidates proceed to the general election. Ex. 3 at 33–34. The same rules apply to elections where there are multiple seats to be filled. *Id.* Consequently, even if a Black or Black-preferred candidate were to win a plurality of the vote in a predominantly white jurisdiction because the white vote is divided among multiple candidates, that candidate would be defeated by white bloc voting in the subsequent general election. *See id.* at 34.

This phenomenon has been repeatedly illustrated in statewide elections. In the 2015 race for lieutenant governor, Black Democrat Melvin Holden won 33% of the vote compared to his nearest competitor, white Republican Billy Nungesser, who earned only 30%. *Id.* In the general runoff election, Nungesser decisively won 55% of the vote to Holden's 45%. *Id.* Similarly, in the 2017 race for state treasurer, Black Democrat Derrick Edwards won 31% of the primary vote while his nearest competitor, white Republican John Schroeder, finished with only 24%. *Id.* In the general election, Schroeder defeated Edwards, 56% to 44%. *Id.*

Ultimately, Louisiana's open primary system serves to reduce the opportunity of Black voters to elect their preferred candidates to office. *See City of Port Arthur*, 459 U.S. at 171. This factor thus weighs in Plaintiffs' favor.

### 4. Senate Factor Four: Louisiana has no history of candidate slating for congressional elections.

Because Louisiana's congressional elections do not use a slating process, *see* Ex. 3 at 2, this factor is not relevant to Plaintiffs' claim.

### 5. Senate Factor Five: Louisiana's discrimination has produced severe socioeconomic disparities that impair Black Louisianians' participation in the political process.

Louisiana's Black community continues to suffer as a result of the state's history of discrimination.

Black per-capita income ($19,381) is barely half of white per-capita income ($34,690), while the Black child poverty rate (42.7%) is nearly triple the white child poverty rate (15.0%). Ex. 1 ¶ 84. White Louisianians are more likely than Black Louisianians to have finished high school, much more likely to have obtained a bachelor's degree, more likely to be employed, and much more likely to be employed in management or professional occupations. *Id.* Fewer than half of Black Louisianians live in houses they own, compared to 76.6% of white residents, and the average white-owned home is worth above $50,000 more than the average Black-owned home. *Id.* The inequities extend to vehicle access (16.4% of Black households in Louisiana lack access to a vehicle, compared to only 4.7% of white households), computer access (84.3% of Black households have a computer, compared to 91.6% of white households), and internet access (72.6% of Black households enjoy broadband internet connections, compared to 84.3% of white households). *Id.*

These striking data points only confirm the findings of previous courts as to the stark socioeconomic disparities between Black and white Louisianians. *See, e.g.*, *Major v. Treen*, 574 F. Supp. 325, 340–41 (E.D. La. 1983) (three-judge court) (finding that "Blacks in contemporary Louisiana have less education, subsist under poorer living conditions and in general occupy a lower socio-economic status than whites"; that "[t]hese factors are the legacy of historical discrimination in the areas of education, employment and housing"; and that "[a] sense of futility engendered by the pervasiveness of prior discrimination, both public and private, is perceived as discouraging blacks from entering into the governmental process").

As Dr. Lichtman documents, these persistent inequities significantly hinder Black Louisianians' ability to participate in the political process. Ex. 3 at 36–39. For example, lack of vehicle access makes it more challenging to travel to polling places; the transience that results from lack of home ownership results in changing polling locations; and lower levels of education and internet access make it more difficult to learn and navigate voting procedures. *Id.* Ultimately, "[p]erpetuated and solidified racial segregation, which is evident in Louisiana, magnifies the effects of discrimination on the socioeconomic standing of minorities, which impacts their ability to participate fully in the political process and elect candidates of their choice." *Id.* at 37. This factor thus supports a finding of unlawful vote dilution.

6. **Senate Factor Six: Both overt and subtle racial appeals are prevalent in Louisiana's political campaigns.**

As explored in detail in Dr. Lichtman's report, *see* Ex. 3 at 39–46, racial appeals have been a mainstay in Louisiana politics over the past four decades.

Most infamously, David Duke—former Grand Wizard of the Knights of the Ku Klux Klan—made several runs for statewide political office, including a successful 1989 run for the Louisiana House of Representatives. *See id.* at 39; Ex. 21. In the 1991 Louisiana gubernatorial

race, Duke finished second to former Governor Edwin Edwards. Ex. 3 at 39. During the campaign, Duke compared affirmative action in the United States to the Holocaust, stating, "The closest thing that I know to the policies of Germany in this country is the so-called affirmative action or quota systems." *Id.* Duke also stoked fears of a rapidly diversifying America, stating to loud applause at a rally on the shore of Lake Pontchartrain, "If you are white these days you are a second-class citizen in your own country." Ex. 22. Although Duke lost the election, he still amassed more than 670,000 votes—nearly 40%—and declared a symbolic victory: "Perhaps the messenger was rejected in this state of Louisiana, but the message wasn't. The people believe in what I believe. The polls all show that." Ex. 23.

While David Duke might be the most overt and salacious purveyor of racial appeals in Louisiana's modern political history, other examples abound. In the 1995 gubernatorial race, the successful Republican candidate—who defeated then-Congressman Cleo Fields, the first Black Louisiana gubernatorial candidate in more than a century—noted that the predominantly white Jefferson Parish "is right next to the jungle in New Orleans and it has a very low crime rate." Ex. 3 at 39–40. Scholars later observed that "symbolic racism was an important determinant of vote choice in the 1995 Louisiana gubernatorial election, even after controlling for partisanship and ideology." *Id.* at 40. In 2011, lieutenant governor candidate Billy Nungesser ran an ad called "Sleepless in Louisiana," in which he attacked his opponent for failing to protect Louisianians from having their jobs stolen by illegal immigrants. *Id.* at 41. And in 2014, a Louisiana congressman—the U.S. House Republican whip—admitted that, while serving as a Louisiana state representative in 2002, he had addressed a white supremacist group founded by David Duke. *Id.*

Racial appeals were also featured in Louisiana's two most recent gubernatorial elections. In 2015, Republican gubernatorial candidate David Vitter released a campaign ad that, as Dr.

Lichtman observes, was "reminiscent of the notoriously racist Willie Horton ad." *Id.* at 42. The ad pictured now-Governor Edwards alongside former President Barack Obama and warned that "Edwards joined Obama" in promising to release "[f]ifty-five hundred dangerous thugs, drug dealers, back into our streets." *Id.* Four years later, Governor Edwards's Republican opponent released a campaign ad promising to "end taxpayer benefits for illegal immigrants," despite non-citizens being ineligible for such benefits. *Id.* In a different campaign ad, the Republican candidate falsely claimed that New Orleans was a sanctuary city for immigrants. *Id.* at 42–43.

In short, Louisiana's history of racial appeals in campaigns continues to this day. This factor also weighs in Plaintiffs' favor.

### 7. Senate Factor Seven: Black Louisianians are historically underrepresented in elected office.

As a consequence of Louisiana's history of voter suppression and racially polarized voting, Black Louisianians have struggled to win election to public office. Not a single Black candidate has been elected to statewide office in Louisiana since Reconstruction. Ex. 3 at 46–47. Since 1991, only four Black Louisianians have represented the state in Congress, and only once—from 1993 to 1997—have two Black Louisianians served in Congress at the same time. *Id.* at 47. And no Black Louisianian has been elected to Congress from a non-majority-Black district. *Id.*

Since 1990, the percentage of Black members of the Legislature has remained relatively constant. *Id.* Despite comprising one-third of the state's population, Black legislators constitute only 23.1% of the Louisiana State Senate and 22.9% of the Louisiana House of Representatives. *Id.* Currently, all Black members of the Legislature were elected from majority-Black districts. *Id.* at 47–48.

Black Louisianians are also underrepresented in the state's judiciary. *Id.* at 48. According to a 2018 study by researchers at the Newcomb College Institute of Tulane University, Black

Louisianians comprised just 23.4% of the state's judges. *Id.* And only one Black justice sits on the Louisiana Supreme Court. *Id.* at 48–49. This factor thus supports a finding of vote dilution.

8.    **Senate Factor Eight: Louisiana has not been responsive to its Black community.**

Louisiana is largely unresponsive to the needs of its Black citizens in virtually every metric of general well-being: education, healthcare, economic opportunity, criminal justice, and environmental quality. The socioeconomic inequities created by this nonresponsiveness foreclose Black citizens' political participation, *see supra* Section I.D.5, and overall diminishes their quality of life.

In his report, Dr. Lichtman describes the vast disparities between Black and white Louisianians and how government nonresponsiveness has exacerbated this inequality. For example, Louisiana's public school system is majority-minority and consistently ranks near the bottom of state educational systems nationwide on measures for elementary and secondary schooling. Ex. 3 at 50–51. As for higher education, a study by the University of Southern California Race and Equity Center ranked Louisiana last on its higher education racial equity score for public institutions. *Id.* at 52. Notwithstanding these shortcomings, Louisiana slashed its spending on higher education by 44.9% from 2008 to 2017—the second-highest cut among all states. *Id.*

In the area of criminal justice, Louisiana has chronically underfunded its public defender system. *Id.* at 54–56. In January 2019, the Louisiana Public Defender Board found that the system is understaffed and only has the capacity to handle 21% of its workload—that is, the current workload for Louisiana public defenders is *five times* what it should be. *Id*. at 55.

Perhaps the most egregious instances of the state's nonresponsiveness to the Black community concern the environment and pollution. A stretch of petrochemical plants and refineries along the Mississippi River known as "Cancer Alley" or "Death Alley" is primarily

situated near impoverished Black neighborhoods. *Id.* at 56–57. A 2017 study by the U.S. Environmental Protection Agency reported six census tracks in this strip of land that fall within the 95th and 99th percentiles for air-toxic cancer risks. *Id.* at 57. A March 2021 report by the United Nations Human Rights Commission noted that "human rights experts today raised serious concerns about further industrialization of the so-called Cancer Alley in the southern U.S. state of Louisiana, saying the development of petrochemical complexes is a form of environmental racism." *Id.* A 2020 academic study found that exposure to particulate-matter pollution was highly correlated with concentrations of Black population in Louisiana. *Id.* at 57–58. The study additionally found that exposure to pollutants was correlated with COVID-19 deaths: Of the 10 Louisiana parishes with the highest death rates as of July 17, 2020, six were in, and two were adjacent to, "Cancer Alley." *Id.* at 58. Reports by academics and activists have tied the disproportionate impact of pollution on Louisiana's Black residents to government inaction. *Id.* at 58–60.

Ultimately, the stark socioeconomic disparities between Black and white Louisianians not only discourage political participation in the state's Black community—they are also exacerbated by government disregard and official nonresponsiveness. This factor also weighs in Plaintiffs' favor.

> **9.** **Senate Factor Nine: The justification for the new congressional map is tenuous.**

Finally, no legitimate government interest justifies denying Black Louisianians the ability to elect candidates of their choice to Congress. HB 1 was met with resounding opposition from Black voters and legislators across the state, and Governor Edwards vetoed the new map because it fails to comply with the Voting Rights Act. *See* Exs. 12–18. Although lawmakers were on notice of HB 1's legal infirmities—and despite having before them various proposed congressional plans

that included a second minority-opportunity congressional district—they nevertheless chose not to draw one. *See id.* Although the Legislature touted preservation of past district boundaries as a rationale for HB 1, *see* Ex. 13, this is insufficient: A desire to keep things the same simply does not justify the continued dilution of Black voting strength—or, for that matter, excuse the requirements of federal law.

10. **Black Louisianians are significantly underrepresented—and white Louisianians are significantly overrepresented—under HB 1.**

Although not one of the enumerated Senate Factors, proportionality "provides some evidence of whether 'the political processes leading to nomination or election in the State or political subdivision are not equally open to participation'" by Black Louisianians. *LULAC*, 548 U.S. at 437 (quoting 52 U.S.C. § 10301(b)); *cf. De Grandy*, 512 U.S. at 1012 (noting that "proportionality . . . is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization, 'to participate in the political process and to elect representatives of their choice.'" (quoting 52 U.S.C. § 10301(b))).

HB 1's disproportionality is readily apparent. Black Louisianians make up 33.13% of the state's total population and 31.25% of its voting-age population. Ex. 1 ¶¶ 14, 18. But under the new congressional plan, Black Louisianians will be able to elect their candidates of choice in less than *17%* of the state's congressional districts. By contrast, white Louisianians comprise 55.75% of the state's total population and 58.31% of its voting-age population, *id.*—and yet will be able to elect their candidates of choice in more than 83% of the state's congressional districts. There is no justification for this strikingly disparate treatment.

The creation of a second congressional district in which Black voters will be able to elect their preferred candidates—as otherwise required by Section 2—would bring Louisiana much closer to proportionality. Under Mr. Cooper's illustrative plans, Black Louisianians would be able

to elect their preferred candidates in one-third of the state's districts—roughly equal to their share of the population. White Louisianians, in turn, would be able to elect their preferred candidates in the remaining two-thirds of districts—still more than 10 percentage points higher than their share of the state's population.

## II. Plaintiffs and other Black Louisianians will suffer irreparable harm absent a preliminary injunction.

Plaintiffs will suffer irreparable harm absent preliminary injunctive relief. The candidate qualification period for the 2022 congressional elections is scheduled to begin on July 20, 2022, with the state's open primary election following on November 8. *See* Ex. 24. If this deadline and the elections that follow occur under HB 1's unlawful congressional map, then Black Louisianians' voting rights will be unlawfully diluted—a violation of their fundamental rights for which there is no adequate remedy. "[O]nce the election occurs, there can be no do-over and no redress" for citizens whose voting rights were violated. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Accordingly, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *Id.* (citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)).

## III. The balance of equities and the public interest favor injunctive relief.

The balance of the equities and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), also strongly favor injunctive relief. As courts have recognized, the "cautious protection of . . . franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *accord Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348–49 (N.D. Ga. 2015) ("[T]he public interest is best served by ensuring not simply that more voters have a chance to vote but ensuring that all citizens . . . have an equal opportunity

to elect the representatives of their choice."). Moreover, "[i]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (second alteration in original) (quoting *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011)); *see also Bank One, Utah v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999) ("[T]he public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law."). Accordingly, the public interest would most assuredly be served by enjoining implementation of a congressional districting scheme that violates Section 2.

Significantly, enjoining HB 1—and implementing a remedial congressional plan—would be more than feasible at this time. Courts must weigh the benefits and import of injunctive relief in the voting rights context against the confusion it might cause, particularly "[a]s an election draws closer." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam); *see also Merrill v. Milligan*, 142 S. Ct. 879, 879–80 (2022) (Kavanaugh, J., concurring) (cautioning against enjoining congressional maps when beginning of election is "imminent"). But here, the qualifying period for Louisiana's congressional candidates does not begin until July 20—more than *three months* from now. Ex. 24. And given the state's unique jungle primary, the open congressional primary election will not occur until November 8, with early voting commencing on October 25. *Id.*; *cf. Merrill*, 142 S. Ct. at 879 (Kavanaugh, J., concurring) (staying preliminary injunction of congressional map issued on January 24 where early voting for primary election purportedly began on March 30); *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1251 (2022) (per curiam) (vacating court-ordered maps and remanding for adoption of new maps on March 23 where early voting for primary election is scheduled to begin on July 26).

Indeed, the feasibility of implementing a remedial map in this case was underscored *by Defendant himself* in previous state court litigation. In objecting to a state court's exercise of jurisdiction over redistricting claims as premature, Defendant argued that the Legislature could override Governor Edwards's veto of another plan passed during its regular session "in a veto session[] before [the] fall elections." Declinatory, Dilatory, & Peremptory Exceptions on Behalf of the Secretary of State to Plaintiffs' Petition for Injunctive & Declaratory Relief at 3, *Bullman v. Ardoin*, No. C-716690 (La. 19th Jud. Dist. Ct. Mar. 16, 2022) (attached as Ex. 26); *see also* Declinatory, Dilatory, & Peremptory Exceptions on Behalf of Clay Schexnayder, in His Official Capacity as Speaker of the Louisiana House of Representatives, and Patrick Page Cortez, in His Official Capacity as President of the Louisiana Senate at 4, *Bullman v. Ardoin*, No. C-716690 (La. 19th Jud. Dist. Ct. Mar. 29, 2022) (attached as Ex. 27) ("Even if the Governor vetoes a congressional redistricting bill from the 2022 Regular Session, the Legislature has an opportunity to override the veto in a veto session, or to call into session another Extraordinary Session, before the fall elections.").[3] The Legislature's regular session is scheduled to end on June 6, 2022, Ex. 25; accordingly, Defendant represented to the state court that a new map could be passed and implemented *after* June 6 of this year—nearly two months from now. Defendant's view confirms that there is ample time for this Court to consider Plaintiffs' motion and order the adoption of a remedial congressional map that complies with Section 2 ahead of the 2022 elections.[4]

---

[3] Defendant repeated this argument in a motion for a stay of the state court proceedings. *See* Motion for Stay to Be Taken up After Exception Hearing, If Exceptions Are Denied by the District Court at 3, *Bullman v. Ardoin*, No. C-716690 (La. 19th Jud. Dist. Ct. Mar. 24, 2022) (attached as Ex. 28).

[4] Notably, if the Court were to give the Legislature an opportunity to craft a remedial congressional plan in the first instance, then it would need to allow only a brief period to craft a new map—especially given that Louisiana contains only six congressional districts, and the availability of alternative maps introduced during the legislative process and by Mr. Cooper in this litigation. *See, e.g.*, *Harper v. Hall*, 867 S.E.2d 554, 558 (N.C. 2022) (providing 14 days for legislature to adopt new congressional *and* state legislative plans); *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, Nos. 2021-1193, 2021-1198, 2021-

## CONCLUSION

Plaintiffs have readily demonstrated that HB 1 violates Section 2 of the Voting Rights Act, and the equities weigh strongly in favor of immediate relief to safeguard the fundamental voting rights of Black Louisianians. Plaintiffs therefore request that the Court preliminarily enjoin implementation of HB 1 and ensure the creation of a second congressional district in which Black voters have the opportunity to elect their preferred candidates. Plaintiffs further request that the Court expedite its consideration of this motion to ensure that necessary remedies are timely adopted and a lawful congressional map is in place well in advance of this year's midterm elections.

[SIGNATURE BLOCK ON NEXT PAGE]

---

1210, 2022 WL 110261, at *28 (Ohio Jan. 12, 2022) (providing 10 days for redistricting body to adopt new state legislative plans).

Dated: April 15, 2022

Respectfully submitted,

By *s/Darrel J. Papillion*
Darrel J. Papillion (Bar Roll No. 23243)
Renee C. Crasto (Bar Roll No. 31657)
Jennifer Wise Moroux (Bar Roll No. 31368)
**WALTERS, PAPILLION,
THOMAS, CULLENS, LLC**
12345 Perkins Road, Building One
Baton Rouge, Louisiana 70810
Phone: (225) 236-3636
Fax: (225) 236-3650
Email: papillion@lawbr.net
Email: crasto@lawbr.net
Email: jmoroux@lawbr.net

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: akhanna@elias.law
Email: jhawley@elias.law

Lalitha D. Madduri**
Olivia N. Sedwick*
Jacob D. Shelly*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: lmadduri@elias.law
Email: osedwick@elias.law
Email: jshelly@elias.law

*Counsel for Plaintiffs*

*Admitted *pro hac vice*
**Pro hac vice* application pending