# EXHIBIT 3

**April 15, 2022**

*Robinson, et al. v. Ardoin*, No. 3:22-cv-00211-SDD-SDJ
*Galmon, et al. v. Ardoin*, No. 3:22-cv-00214-SDD-SDJ

**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF LOUISIA0NA**

**EXPERT REPORT
OF
Allan J. Lichtman, Ph.D.
Distinguished Professor of History
American University
Washington, DC**

_____

Allan J. Lichtman

**I.    Statement of Purpose and Summary of Opinions**

I have been asked by the *Galmon* Plaintiffs' counsel to examine whether any of the nine "Senate Factors" detailed in a report accompanying the 1982 amendments to the Voting Rights Act of 1965 ("VRA") by the Senate Committee on the Judiciary and discussed in *Thornburg v. Gingles*, 478 U.S. 30 (1986), are present in Louisiana.

After a careful and thorough analysis, based on my qualifications discussed at length in Section II, and according to the methodology discussed below in Section III and throughout, I have reached the following opinions:

- Louisiana has a long and ongoing history of official discrimination against minorities in ways that have substantially affected the ability of minority group members to participate fully in the political process and elect candidates of their choice.

- Louisiana's history of discrimination is reflected in major socio-economic disparities between whites and minorities, including income, rates of poverty and unemployment, educational attainment, educational proficiency, housing, access to vehicles and telephones, and health measures.

- All Senate Factors are present in Louisiana, except Factor 4 on slating, which is inapplicable here since there is no candidate slating process in the state.

I am being compensated for my work in this matter at a rate of $500 per hour. I have included an updated curriculum vitae and a list of cases since 2015 for which I have provided written or oral testimony in Appendix 1, attached hereto.

**II.    Qualifications**

This report draws on my expertise in political history, political analysis, and historical and statistical methodology along with my experience as a voting rights litigation expert. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 45 years. Formerly, I served as Chair of the History Department and Associate

2

Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.

I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, and *Social Science History*. Additionally, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative methods to conduct contemporary and historical studies, published in such academic journals as *Proceedings of the National Academy of Sciences*, *American Historical Review*, *International Journal of Forecasting*, *International Journal of Information Systems & Social Change*, and *Journal of Social History*.

Quantitative and historical analyses also ground my books, including *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman). My most recent books are *The Case for Impeachment* (2017), *The Embattled Vote in America: From the Founding to the Present* (2018)*, and 13 Cracks: Repairing American Democracy After Trump* (2021). *The Embattled Vote*, published by Harvard University Press, examines the history

3

and current status of voting rights in America.

My book *White Protestant Nation* was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America. My book *FDR and the Jews* was published in 2013 under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the New York Times in 2013; the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award; and a finalist for the Los Angeles Times Book Prize in history. My book *The Case for Impeachment* was an independent bookstore bestseller. I was listed by rise.global at # 85 of the world's leading geopolitical experts. I received the Marquis Lifetime Achievement Award, reserved for the most accomplished of persons listed in *Marquis Who's Who*.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than one hundred voting and civil rights cases. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness numerous times for state and local jurisdictions. My work in Louisiana includes *Hays v. Louisiana,* 839 F. Supp. 1188 (W.D. La. 1993), and *Terrebonne Parish NAACP v. Jindal*, 274 F. Supp. 3d 395 (M.D. La. 2017). In the *Terrebonne Parish* litigation, I conducted a totality of circumstances analysis using the VRA Senate Factors as I have done in this report. And significantly, retired Associate Justice Anthony Kennedy authoritatively cited my statistical analysis in his majority opinion in *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006).

## III.    Methodology

This report draws upon sources standard in historical and social scientific analysis,

including scholarly books, articles, and reports; newspaper and other journalistic articles; demographic information; election returns; court opinions, briefs, and expert reports; government documents; legislative transcripts; letters; and scientific surveys. I have followed standard qualitative and quantitative methods used in my scholarship and my court testimony in utilizing these sources.

## IV.    Senate Factors Analysis

In a report that accompanied the 1982 renewal of the Voting Rights Act, the Senate Committee on the Judiciary set forth several "Senate Factors" for courts to consider when assessing whether, under the totality of circumstances, an electoral system interacts with social and historical conditions to cause an inequality in the political process.[1] These factors are:

(1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;"

(2) "the extent to which voting in the elections of the state or political subdivision is racially polarized;"

(3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;"

(4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process;"

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (quoting S. Rep. No. 97-417, at 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07).

(5) "the extent to which members of the minority group in the state or political subdivision

bear the effects of discrimination in such areas as education, employment and health, which

hinder their ability to participate effectively in the political process;"

(6) "whether political campaigns have been characterized by overt or subtle racial appeals;"

and

(7) "the extent to which members of the minority group have been elected to public office in

the jurisdiction." *Gingles*, 478 U.S. at 36-37, (quoting S. Rep. No. 97-417, at 28-29 (1982),

reprinted in 1982 U.S.C.C.A.N. 177, 206-07) (internal quotation marks omitted).

Additional factors (referred to herein as "Factor 8" and "Factor 9," respectively) include: (8) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and (9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.* (internal quotation marks omitted).

Here, an examination of these factors reveals that all factors except the fourth are present in Louisiana. Each factor is discussed separately below.

**Factor 1: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.**

Works by Richard Engstrom, et al. and Charles Vincent document the extensive history of discrimination against Blacks in Louisiana and its impact on their ability to participate in the political process.[2] The following examples highlight both the historical precursors to contemporary discrimination in Louisiana and the more recent discrimination that either directly impacts the ability of minorities to participate in the political process and elect candidates of their choice, indirectly affects the employment and educational opportunities open to minorities, or places a stigma on minority status in Louisiana.

**A.      Pre-Twenty-First Century Discrimination**

The state of Louisiana has a long, intense, and undisputed history of discriminating against Black people that directly impacts Black Louisianians' opportunity to participate fully in the political process and elect candidates of their choice. This history has been recognized by numerous federal courts, including, for example, *Clark v. Roemer*, 777 F. Supp. 445 (M.D. La. 1990) (acknowledging racially polarized voting patterns in multimember judicial districts statewide and finding that the multimember system minimized or canceled out Black voters' ability to elect their preferred candidates), *Clark v. Edwards*, 725 F. Supp. 285, 295 (M.D. La. 1988) (taking judicial notice of Louisiana's history of racially polarized voting, official acts of discrimination, racial campaign appeals, the low number of Black lawyers elected to judgeships, and other racial disparities in Black voters' ability to participate in the democratic process), *Chisom*

---

[2] Richard Engstrom, et al., "Louisiana," in Chandler Davidson and Bernard Grofman, eds., Quiet Revolution in the South (Princeton: Princeton University Press, 1994), pp. 106-135; Charles Vincent, "'Of Such Historic Importance…:' The African-American Experience in Louisiana," Journal of the Louisiana Historical Association, 50 (2009), 133-158.

*v. Edwards*, 690 F. Supp. 1524, 1534 (E.D. La. 1988) (taking judicial notice of state-implemented stratagems designed to "suppress black political involvement," including "educational and property requirements for voting, a 'grandfather' clause, an 'understanding' clause, poll taxes, all-white primaries, anti-single-shot voting provisions, and a majority-vote requirement," and recognizing modern-day racially polarized voting), and *Major v. Treen*, 574 F. Supp. 325, 339-41 (E.D. La. 1983) ("Louisiana's history of racial discrimination, both de jure and de facto, continues to have an adverse effect on the abilities of its black residents to participate fully in the electoral process."). Most recently, in 2017, Judge James J. Brady in *Terrebonne Parish NAACP v. Jindal*, recognized that "[i]t is indisputable that Louisiana has a long history of discriminating against black citizens." 274 F. Supp. 3d 395, 442 (M.D. La. 2017),

With the end of Reconstruction in the late nineteenth century, white supremacist governments in Louisiana established a rigid system of "Jim Crow"[3] discrimination against Black people. Under Jim Crow, Black Americans were confined to segregated and vastly underfunded and substandard schools; denied equal access to state-run public facilities, including, but not limited to, hospitals, asylums, old age homes, parks, beaches, and public restrooms; excluded from the political and criminal justice system; and made to use separate and substandard waiting rooms and rail cars. In fact, the notorious U.S. Supreme Court "separate but equal" decision in *Plessy v. Ferguson*, 163 U.S. 537 (1986), arose out of Louisiana's "separate car law" for whites and Blacks.

---

[3] As explained by the Encyclopedia Britannica, Jim Crow first referred to a white performer in black face. However, "Its adoption in the late 19th century as the identifier for the laws that reinstated white supremacy in the American South after Reconstruction speaks to the ways in which the demeaning caricature was used to legitimize notions of the alleged inferiority of Blacks and to rationalize the denial of equity and access that was at the heart of segregation." Jeff Wallenfeldt, "What is the Origin of the Term 'Jim Crow?'" Encyclopedia Britannica, https://www.britannica.com/story/what-is-the-origin-of-the-term-jim-crow.

In practice, separate was never close to equal for Blacks in Louisiana.[4]

In Louisiana, Jim Crow-era miscegenation laws, laws requiring segregation in all public forums, and racially restrictive housing covenants were prevalent. State law even required that blood used in transfusions must be labeled "Caucasian," "Negroid," or "Mongoloid."[5] Discriminatory enforcement of the criminal laws also forced Blacks into prisons like the notorious Angola, where their labor was—and still is—exploited under unhealthy and dangerous conditions. Unequal Louisiana *de facto* discrimination relegated Blacks to dead end, low paying jobs, while shutting Blacks out of such public accommodations as restaurants and hotels. Blacks also had less access than white people to credit and were forced to rely upon inferior health care facilities.[6]

With respect to specific voting restrictions, Louisiana's Constitutional Convention of 1898 was called explicitly and expressly to "establish[ing] the supremacy of the white race." In the 1898 constitution, Louisiana essentially snuffed out Black voting through devices such as the literacy and property requirements, while exempting many whites through a "Grandfather Clause" that gave the right to vote to persons who had voted prior to 1867 and to those whose ancestors had voted prior to that time. Louisiana's "Grandfather Clause" was imposed as a prerequisite for voter registration, education, and property requirements on state residents whose fathers or grandfathers had not been registered to vote before January 1, 1867. In justifying such restrictions, the president of the constitutional convention said, "Doesn't it let the white man vote, and doesn't it stop the

---

[4] Adam Fairclough, Race and Democracy: The Civil Rights Struggle in Louisiana, 1915–1972 (University of Georgia Press, 1999), esp. pp. 1-20.

[5] Ronald Schmidt Sr., et al., Newcomers, Outsiders and Insiders: Immigrants and American Racial Politics in the Early Twentieth Century (University of Michigan Press, 2010), p. 69.

[6] Fairclough, Race and Democracy; Great De Jong, A Different Day: Black Struggles for Justice in Rural Louisiana, 1900-1970 (University of North Carolina Press, 2002); Packard, American Nightmare: The History of Jim Crow (New York: St. Martins, 2002).

negro from voting, and isn't that what we came here for?"[7] From 1890 to 1900 the number of registered Blacks in Louisiana plummeted from 127,923 to 5,320, whereas the number of registered whites stayed constant at 126,884 in 1890, compared to 125,437 in 1900. The decline of Black voting eviscerated the Republican Party and created a one-party state in Louisiana controlled by white Democrats.[8]

The U.S. Supreme Court struck down the Grandfather Clause in its *Guinn v. United States*, 238 U.S. 347 (1915) decision, which caused state officials to later adopt other measures to prevent Blacks from voting in Louisiana. These included the all-white primary, which shut out people of color from participating in the deciding election in a state dominated by the Democratic party. Also blocking Black participation in politics was the "interpretative" and the complex literacy test, put in force by the 1921 "Understanding Clause" following the 1921 constitutional convention.[9] White officials routinely rejected Black registrants' applications, while applications from illiterate white registrants were almost uniformly accepted. These racially discriminatory measures were so complete that by the time the VRA was enacted in 1965, only about a third of Louisiana's Black voting-age population was registered to vote, compared with the overwhelming majority of the

---

[7] Rebecca Scott, Degrees of Freedom: Cuba and Louisiana After Slavery (Cambridge: Harvard University Press, 2005), p. 154.

[8] John Lewis and Archie E. Allen, "Black Voter Registration Efforts in the South," Notre Dame Law Review, 48 (1972): 105-107.

[9] Engstrom, et al., "Louisiana," p. 106. In 2014, an instructor at Harvard administered the Louisiana literacy tests used for black voters in 1964, prior to enactment of the Voting Rights Act, to a group of his students, all of whom failed the literacy test. *See* J. Morgan Kousser, The Shaping of Southern Politics : Suffrage Restriction and the Establishment of the One-Party South, 1880-1910 (New Haven, CT: Yale University Press, 1974), pp. 58-61; "The Ballot or the Book: Literacy Tests as a Tool of Voter Disenfranchisement," Literacy Mid-South 5 February 2016, https://literacymidsouth.wordpress.com/2016/02/05/the-ballot-or-the-book-literacy-tests-as-a-tool-of-voter-disenfranchisement/;  David McCormack, "Harvard Students Take The 1964 Louisiana Literacy Test That Black Voters Had to Pass Before Being Allowed to go to the Polls - And Every Single Person FAILED," Daily Mail, 12 November 2014, http://www.dailymail.co.uk/news/article-2831095/Harvard-students-sit-1964-Louisiana-Literacy-Test-black-voters-pass-allowed-polls-single-person-FAILED.html.

white voting-age population.[10] Thus, Louisiana's history of racial discrimination and consequentially low Black voter registration and voting rates led to its coverage under the pre-clearance requirement of Section 5 of the VRA. Since the late 1960s, the Justice Department has filed nearly 150 objections to proposed discriminatory voting changes in Louisiana. [11] More than a dozen of these objections applied statewide.[12]

Prior to 1968, Louisiana law prohibited at-large elections for police juries (parish councils) and parish school boards. In July 1968, however, and in response to increased Black registration and voting made possible by the VRA, Louisiana enacted new laws authorizing at-large elections for these parish governing bodies.[13] As the Justice Department recognized at the time, Louisiana was inspired to adopt at-large voting to undermine the voting strength of newly enfranchised Black voters under the VRA. In 1969, the Justice Department interposed statewide objections against the proposed implementation of the discriminatory at-large elections, finding the electoral system, "if widely implemented, will have the effect of discriminating against Negro voters."[14] Since that time, as long as preclearance still applied through mid-2013, the Justice Department interposed additional objections to efforts by parishes to use at-large elections for governing bodies.[15]

---

[10] Richard Engstrom, et al., "Louisiana," pp. 106-108.
[11] The Justice Department's objections for Louisiana can be found at,
http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=la (see, for example, objections from September 23, 1988, May 12, 1989, October 23, 1990), November 20, 1990, September 20, 1991, and March 17, 1992).
[12] Ibid. For a detailed analysis of Section 5 objections through 2006, see generally, Debo P. Adegbile, "Voting Rights in Louisiana: 1982-2006," Review of Law and Social Justice 17 (2008).
13 Ibid., Adegbile, "Voting Rights in Louisiana," p. 419.
[14] Op Cit., n. 8; Ibid.; Adegbile, "Voting Rights in Louisiana," pp. 440-441; Jerris Leonard, Assistant Attorney General to Jack P. P. Gremillion, Attorney General of Louisiana, 26 June 1969.
[15] Generally, Adegbile, "Voting Rights in Louisiana;" Op Cit., n. 8 for objection letters.

Delegates to the Louisiana Constitutional Convention in 1973 voted by an overwhelming margin to maintain the at-large system for electing judges to district and other courts in the state.[16] This resulted in Justice Department objections and successful voting rights litigation challenging at-large elections in numerous judicial districts with sufficient Black populations to create at least one Black majority opportunity subdistrict, as indicated below.[17]  In the *Clark v. Roemer* litigation that took place in 1990, the district court found that since the enactment of the VRA, the state had failed to obtain the necessary preclearance for eleven (11) of the forty (40) district courts (27.5%) existing at the time.[18] In the Terrebonne Parish litigation in 2017 (part of the parish lies in CD 6), the district court issued a strongly worded rebuke:

> "The DOJ is not the only entity who has recognized the discriminatory effects of at-large election systems in Louisiana. Numerous courts have found that at-large systems for the election of judges violated Section 2. Louisiana federal courts have also found that Louisiana consistently ignored its preclearance requirements under Section 5. In 1990, this Court reprimanded Louisiana for failing to seek preclearance for changes related to 15 judgeships in *Clark v. Roemer*: 'Louisiana has absolutely no excuse for its failure, whether negligent or intentional, to obtain preclearance of legislation when such preclearance is required by the Voting Rights Act.'"[19]

In the 1990s, findings of voting rights violations in numerous at-large judicial election systems throughout Louisiana led to a consent decree in *Clark v. Edwards* that "established election subdistricts in nine district courts in response to violations of the [VRA] with regard to the manner in which judges were elected in certain courts. Nine majority-minority opportunity judicial subdistricts were created, the East Baton Rouge Family Court, and one court of appeal

---

[16] Ibid, Adegbile, "Voting Rights in Louisiana," pp. 452-453; objection letters.
[17] Ibid. On voting rights litigation see, for example, *Clark v. Roemer*, 777 F. Supp. 471 (M.D. La. 1991); *Terrebonne Parish NAACP v. Jindal*, 274 F. Supp. 3d 395 (M.D. La. 2017).
[18] *Clark v. Roemer*, 751 F. Supp. 586, 588, 589 n.11, 600 (M.D. La. 1990).
[19] *Terrebonne Parish NAACP v. Jindal*, at 440.

circuit (1st Circuit, 2nd District). The consent decree also required the legislature to create subdistricts in two other district courts (23 Judicial District Court ("JDC") and 27 JDC) and one other court of appeal circuit (2nd Circuit, 1st and 3rd Districts)."[20] As part of a settlement to end further litigation, Act 780 of the 1993 Regular Session of the Louisiana Legislature established a majority-minority opportunity subdistrict in the 23rd JDC.[21]

## B.    Continuing Twenty-First Century Discrimination: Direct Voting and Political Opportunities

Louisiana's history of discrimination has continued into the twenty-first century. In 2005, Black plaintiffs in Jefferson Parish challenged an at-large method of electing members to the State of Louisiana, Fifth Circuit Court of Appeals, First District, on which no Black candidate, to that date, had ever been elected.[22] In response to the pressure of the lawsuit, the Louisiana Legislature adopted, and the Governor signed into law, Act 261 providing for the creation of a Black opportunity subdistrict to enable Black voters to have an opportunity, for the first time in history, to elect a candidate of choice to that court.[23] Again, Louisiana had acted in response to judicial pressure; as the legislature noted in its bill digest, the Act was pursuant to "settlement of claims in the matter entitled *Williams v. McKeithen*, CIV.A. 05-1180, 2005 WL 20375745 (E.D. La. Aug. 8,

---

[20] "State and Local Government in Louisiana: An Overview 2012-2016 Term, "http://house.louisiana.gov/slg/PDF/Chapter%201%20Part%20B%20-%20The%20Judicial%20Branch.pdf.
Though one of the districts alleged to violate Section 2 and the U.S. Constitution in Clark, the District Court ultimately found no violation with respect to the 32nd Judicial District. Clark v. Edwards, 725 F. Supp. 285, 289 (M.D. La. 1998). However, in 2017 after the Black population had increased to where a majority Black district could be drawn, the district court in 2017 in Terrebonne Parish NAACP v. Jindal found both a Section 2 violation and a violation of the 14th Amendment for intentional discrimination.
[21] Prejean v. Foster, 227 F.3d 504 (5th Cir. 2000) (discussing Act 780 as a response to the Clark v. Edwards litigation).
[22] Williams v. McKeithen, No. 05-1180, 2005 U.S. Dist. LEXIS 17788 (E.D. La. 2005).
[23] Act 261 of the 2006 Regular Session of the Louisiana Legislature, (Senate Bill 162), http://www.legis.la.gov/Legis/BillInfo.aspx?i=207134.

2005), in which such consent judgment the parties agree to the implementation of the provisions of the new law."[24]

In January 2013, upon the retirement of Chief Justice Catherine Kimball of the Louisiana Supreme Court, Justice Johnson, *see* discussion *supra*, was slated to become the new Chief Justice, following the constitutional requirement, that the longest serving Justice becomes Chief Justice upon a vacancy in this position. *See* La. Const. art. V, §6. However, white Justices on the Court sought to block her ascension on the grounds that her tenure as the *Chisom* Justice should not count toward seniority.[25] Those Justices made this claim even though the *Chisom* Consent Decree explicitly stated that the new justice filling the eighth seat "shall participate and share equally in the cases, duties, and powers of the Louisiana Supreme Court."[26] A federal district court order ultimately was required to determine, under the terms of the Consent Decree, that *all* of Justice Johnson's service on the court counted towards her seniority.[27] Following this ruling, Justice Johnson, in 2013, was installed as the first Black Chief Justice of the Louisiana Supreme Court.[28]

In June 2018, the United States Commission on Civil Rights found that an analysis of polling places in Louisiana "shows that the number of polling locations per 1,000 registered voters in a census tract is negatively related to the number of black residents in that census tract. This indicates that there are fewer polling locations per voter in a geographical area if that area has more black residents. This in turn implies that black residents face longer travel distances to reach a

---

[24] Shepherd (SB 162), Act No. 261, http://www.legis.la.gov/Legis/ViewDocument.aspx?d=448306.
[25] Debbie Elliot, "La. Court In Racially Charged Power Struggle, Again," NPR, 14 Aug. 2012, http://www.npr.org/2012/08/14/158603523/la-court-in-racially-charged-power-struggle-again.
[26] Op. Cit., n. 24, Consent Judgment, Chisom v. Edwards, p. 3, ¶ 3.
[27] Chisom v. Jindal, 890 F. Supp. 2d 696, 728 (E.D. La. 2012).
[28] Associated Press, "Bernette Johnson Sworn in as Louisiana Supreme Court's First Black Chief Justice," 1 Feb. 2013, http://www.nola.com/politics/index.ssf/2013/02/bernette_johnson_sworn_in_as_l.html.

polling location."[29] Research has shown that access to polling places affects the opportunity for people to vote in elections.[30]

The Commission also found that polling places were inadequate for early voting. It noted that there were only "four early voting locations each in the three most populated parishes of East Baton Rouge, Jefferson, and Orleans. Caddo parish, which is the fourth most populated parish, has only one location for 260,000 residents."[31] This limitation on polling places has a particular impact on minorities who are disproportionally located in these large, diverse urban parishes. East Baton Rouge Parish has a 54% minority population according to U.S. Census estimates, Jefferson Parish is 46% minority, Orleans Parish is 69% minority, and Caddo Parish is 53% minority. With 92 polling places overall in Louisiana, these four parishes, which comprise a third of the state's population and 45% of the state's minority population, only have 14% of its polling places. Discriminatory allocation of polling places has become commonplace among southern jurisdictions previously required under Section 5 of the VRA to preclear any changes in election laws or regulations with the Justice Department or seek declaratory judgement from the federal court in the District of Columbia.[32]

---

[29] The Commission was referring to a statistical analysis by now Professor Jhacova Williams of Clemson University. Louisiana Advisory Committee of the United States Commission on Civil Rights, "Barriers to Voting in Louisiana," June 2018, p. 12, https://www.usccr.gov/pubs/2018/08-20-LA-Voting-Barriers.pdf.
[30] Henry E. Brady and John E. McNulty, "Turning Out to Vote: The Costs of Finding and Getting to the Polling Place," American Political Science Review 105 (2011),115-134; Moshe Haspel and H. Gibbs Knotts, "Location, Location, Location, Precinct Placement and the Costs of Voting," The Journal of Politics 67 (2005), 560-573.
[31] Census data is from U.S. Census, American Community Survey, 2011-2015.
[32] "The Great Poll Closure," November 2016, Leadership Conference Educational Fund, http://civilrightsdocs.info/pdf/reports/2016/poll-closure-report-web.pdf.

C.      Twenty-First Century Discrimination: Effects of the Disproportionate Incarceration of Black Louisianans

Louisiana has an unsavory reputation for discriminating against Black people in many ways, including, but not limited to, racial profiling and over-policing, mass incarceration, and disproportionate sentencing of Black defendants. This discrimination directly impacts the ability of Blacks to participate in the political process in Louisiana and elect candidates of their choice. In Louisiana, imprisoned felons cannot vote; until 2019, ex-felons on probation and parole could not vote; and even now after new reform legislation enfranchising ex-felons, there is a waiting period of 5 years for persons still on parole or probation. Several discriminatory practices contribute to disproportionate arrests and convictions of Blacks, including racial profiling, the striking of Blacks from juries, a failed public defender system, imprisonment for a failure to pay fines and fees, and, until very recently, the allowance for split-jury convictions in criminal cases.

In the 1974 Constitution, Louisiana disenfranchised persons "under an order of imprisonment," which a state law in 1976 extended to persons under parole or probation.[33] This provision harkens back to measures adopted during the Jim Crow era to disenfranchise Black persons. In 2016, 108,035 felons and former felons were disenfranchised in Louisiana, 68,065 of whom (63%) were Black. Some six percent of the Black adult population in Louisiana was disenfranchised. In 2018, the state modified this law to authorize voting by persons who have been under parole or probation for five years or more. This still means that most persons under parole and probation will remain disenfranchised. State Supreme Court Chief Justice Bernette Johnson— the only Black justice on the Court—said the new law doesn't go far enough. As a result of the five-year waiting period, she said, "numerous citizens on probation and parole will continue to be

---

[33] La. Const.1974, Art. 1, § 10. 4; La. R.S. 18:2(8); 102(A)(1).

disenfranchised even after the amended law goes into effect." Even after becoming eligible to vote, former felons still have the burden of proof, creating additional barriers to registering and voting. The new law includes no automatic notification or provision for educating ex-felons about their rights or about how to document their eligibility. To regain voting rights, eligible persons must get their probation or parole officer to sign a form certifying they are eligible to vote. Then they must bring that form to their local registrar's office to regain their franchise.[34]

Louisiana's history of disenfranchising persons on parole and probation also affects the opportunities open to this disproportionately Black group to restore their standing in society. In an amicus brief submitted in an unsuccessful lawsuit against the disenfranchisement of persons on probation and parole, the American Probation and Parole Association ("APPA"), the "national association of professionals who work in probation, parole, and community-based corrections," weighed in on providing voting rights to persons released from prison. The APPA, whose members include more than 700 probation and parole officers through the Louisiana Department of Public Safety and Corrections and the Caddo Parish Juvenile Services, said it "has focused on ways in which the parole and probation systems can be improved to better reintegrate offenders back into society. The APPA has found that restoring the right to vote to ex-offenders who have been released from incarceration is of critical importance to that mission." It pointed to a resolution that APPA had adopted in 2007, calling for "restoration of voting rights upon completion of an

---

[34] Joe Gyan Jr. "Louisiana Supreme Court Chief Justice Says New Law on Felons Voting Doesn't Go Far Enough," The Advocate, 30 October 2018, https://www.theadvocate.com/baton_rouge/news/courts/article_587a4d3c-dc5f-11e8-ada6-bb53a9bebb6b.html; Wallis Watkins, "Thousands Become Eligible To Vote Friday, As Louisiana's New Felon Voting Law Takes Effect," New Orleans Public Radio, 26 February 2019, https://www.wwno.org/post/thousands-become-eligible-vote-friday-louisianas-new-felon-voting-law-takes-effect.
.

offender's prison sentence," and for "no loss of voting rights while on community supervision."[35]

The five-year burden of disenfranchisement falls disproportionately upon Blacks. According to a June 30, 2018, report by the Louisiana State Department of Public Safety and Corrections, of 35,834 probationers, 62.5% are Black and of 29,207 parolees, 49.6% are Black.[36] The Black voting age population in Louisiana is 33%, according to the most recent U.S. Census data.

The APPA also concludes that the impact on voting and other rights from discrimination within the parole and probation community extends beyond formal disenfranchisement. It argued that "denying released offenders of this basic right takes away their full dignity as citizens, separates them from the rest of their community, and reduces them to second-class citizens. It makes their reintegration into society more difficult, increases recidivism and social ostracism, lowers community participation in the political process, and hinders effective policing."[37]

A 2018 study found racial disparities in arrests, which leads to a higher probability of disenfranchisement for minorities through incarceration, parole, and probation. The study found that "in 2016, black people were 2.9 times more likely than white people to be arrested for marijuana possession in Louisiana."[38] The researchers noted that this wide discrepancy existed in Louisiana even though "federal survey data show that white and black people use marijuana at similar rates; indeed, *black adults are less likely than white adults to use marijuana in the course*

---

[35] Court of Appeal, First Circuit State of Louisiana, Voice of the Ex-Offender v. Louisiana, DOCKET NO. 2017-CA-1141, APPA, Amicus Brief, pp. 1,2, https://fsaproject.wpengine.com/wp-content/uploads/2018/02/2-2.pdf.
[36] Ibid., Louisiana Department of Public Safety and Corrections, "Fact Sheet," June 30, 2018, https://www.doc.la.gov/media/1/Briefing%20Book/July%2018/6.p.and.p.pdf;
[37] Ibid., p. 5.
38 Southern Poverty Law Center, "Racial Profiling in Louisiana: Unconstitutional and Counterproductive," September 18, 2018, p. 8, https://www.splcenter.org/20180918/racial-profiling-louisiana-unconstitutional-and-counterproductive.

*of their lifetimes*, and adults account for the vast majority of the reported arrests" (emphasis in original).[39]

Once arrested, the criminal justice system in Louisiana then discriminates against Blacks by increasing the chances of incarceration in relation to whites. First, discrimination continues through state prosecutors' striking of Blacks empaneled to serve on juries. For example, a recent study of Caddo Parish found that state prosecutors peremptorily strike Blacks from juries at three times the rate of non-Blacks. This practice reduced the percentage of Blacks on juries from 35% to 25.5% in a parish that is 44.2% Black in its adult population. The study found that the racial composition of juries was related to the probability of conviction in trials where 83% of defendants were Black. The researchers found that "not one defendant was acquitted in a trial where there were two or fewer black jurors. The acquittal rate in the 49 trials where the number of black jurors was three or more, was 12%."[40]

Second, until very recently Louisiana was one of only two states that authorized criminal convictions without unanimous jury verdicts. In the white supremacist Constitutional Convention of 1898, Louisiana established a split-verdict law in criminal trials that prevailed in the state until 2018. Under this provision, a defendant could be convicted with a vote of fewer than all 12 jurors in a criminal trial. The purpose was to ensure that if a few people of color made it onto a jury, their votes could be ignored. "This was part of the 1898 constitutional convention, which is famous for disenfranchising black voters," said Tulane University history professor Lawrence Powell.[41] The

---

[39] Ibid.
[40] Ursula Noye, "Black Strike: A Study of the Racially Disparate Use of Peremptory Challenges by the Caddo Parish District Attorney's Office," Reprieve Australia, August 2015, pp. 7-11, https://blackstrikes.com/resources/Blackstrikes_Caddo_Parish_August_2015.pdf.
[41] German Lopez, "Louisiana Votes to Eliminate Jim Crow Jury Law With Amendment 2," Vox, 6 November 2018, https://www.vox.com/policy-and-politics/2018/11/6/18052540/election-results-louisiana-amendment-2-unanimous-jim-crow-jury-law.

Constitutional Convention of 1973 retained split verdicts, with the modification that 10 of 12 jurors rather than the prior 9 of 12 would be required for conviction. A study by *The Advocate* of 933 cases over six years found that 43% of convictions with Black defendants occurred in split-verdict cases, compared to 33% of convictions with white defendants. Louisiana was one of only two states to maintain a split-jury system until voters finally eliminated it in the November 2018 election.[42]

About a month before the 2018 vote, Louisiana district court judge Stephen B. Beasley struck down the split-verdict law as an unconstitutional racially discriminatory product of intentional discrimination.[43] Judge Beasley credited the testimony of Thomas Aiello, an associate professor of history and Black studies at Valdosta State University, that "race was a motivating factor behind the adoption of the 1898 constitution, especially with respect to the disenfranchisement of minority voters and stripping the ability of minorities to influence the judicial system." His testimony also persuasively showed that the 1973 Convention was not free of racial considerations and that the delegates at the convention were keenly aware of racial tensions when drafting the new constitution. His testimony provides the historical basis for this court's determination that the non-unanimous jury verdict scheme was motivated by invidious racial discrimination."[44] Drawing on the testimony of Thomas Frampton, a lecturer at Harvard University Law School and a Climenko Fellow, Judge Beasley found that there was a substantial racial disparity in the casting of "empty votes," that did not count in a final split-jury verdict:

---

[42] Jeff Adelson, "How an Abnormal Louisiana Law Deprives, Discriminates, and Drives Incarceration: Tilting the Scales," The Advocate, 1 April 2018, https://www.theadvocate.com/new_orleans/news/courts/article_16fd0ece-32b1-11e8-8770-33eca2a325de.html.
[43] 11th Judicial District, Sabine Parish, Louisiana, State of Louisiana v. Melvin Cartez Maxie, Docket No. CR-13-7252, "Judgment," October 11, 2018, 23, 30, 34, https://www.documentcloud.org/documents/5006536-Louisiana-District-Court-Ruling-Unanimous-Juries.html#document/.
[44] Ibid., at. 11.

"Black jurors are casting empty votes at 64% above the expected value and white jurors are casting empty votes 32% below the expected value." Moreover, Black defendants were convicted by split-jury votes at a rate 30% above white defendants.[45] "The current scheme," the judge ruled, "continues to perpetuate the discrimination intended and adopted in 1898."[46]

Ultimately Judge Beasley ruled that "based on the uncontroverted evidentiary record before this court, it is clear that the non-unanimous jury verdict scheme adopted in 1898 and perpetuated in 1913 and 1921 and reenacted as modified in 1973 is unconstitutional. The original scheme was motivated by invidious racial discrimination … In 1973, it was explicitly recognized that non-unanimous juries inflicted disparate impact on minority defendants."[47]  The court also found independent unconstitutional racial discrimination in the state's use of preemptory challenges to jurors, similar to the finding in Caddo Parish discussed above. It noted that, "the State used three peremptory challenges to exclude Black potential jurors" from the trial, and found "that the State was motivated by invidious racial discrimination in its use of these three peremptory challenges."[48]

Third, there is the system of imprisonment for failure to pay fines or fees. Judge Sarah S. Vance of the Eastern District of Louisiana ruled in December 2017 that the Orleans Parish Criminal District Court (OPCDC) had in effect been running a debtor's prison that disproportionately violated the rights of Blacks, who have the highest arrest rates and the highest poverty rates. Judge Vance found that the court had violated the constitutional rights of persons facing fines or fees by failing to inquire whether they were indigent. Any fees extracted to avoid prison were allocated to the judges' budget, creating a conflict of interest. This unconstitutional practice was tied directly

---

[45] Ibid., at 23-24.
[46] Ibid., at 34.
[47] Ibid., at 39.
[48] Ibid., at 42.

to the failure of the state and localities to adequately fund the court system, creating a dependence on fines and fees and a conflict of interest on the part of local judges. She wrote, "this conflict of interest exists by no fault of the Judges themselves. It is the unfortunate result of the financing structure, established by governing law, which forces the Judges to generate revenue from the criminal defendants they sentence. Of course, the Judges would not be in this predicament if the state and city adequately funded OPCDC."[49]

All of these discriminatory practices—disparately higher arrest rates for Blacks as compared to whites, targeting Black jurors for strikes, split-verdict convictions, and a burdensome treatment of fines and fees—limit opportunities for Black Louisianans to participate in the political process by increasing their chances of incarceration. Once incarcerated, a convicted felon cannot vote, and neither can those on parole and probation for fewer than five years. A felony conviction and imprisonment also impose the additional difficulty of reintegrating into society after being in the control of the criminal justice system. Thus, in Louisiana, despite some recent reforms, there have been a combination of practices that, taken together, impose barriers to the political participation of Blacks.

It is notable that in the U.S. News 2019 rankings of the states, Louisiana comes in last on "crime & corrections," as reported in **Table 6** below. As explained by U.S. News, "The crime & corrections rankings evaluated states on two general measures: their rates of both violent and property crimes, and their management of prison systems." In evaluating prison systems, the ranking considers both incarceration rates and "how their rates of incarceration differed for non-

---

[49] United States District Court Eastern District of Louisiana, Alana Cain et al. v. City of New Orleans, et al., 281 F.Supp.3d 624 (2017), at 658.

Hispanic whites and other groups."[50]

### D.    Twenty-First Century Discrimination: Education

As demonstrated below in Factor 5, educational deficiencies have an impact on political participation and voting, especially for Blacks who are also burdened by low income, high poverty rates, and low homeownership rates. As explained below, one of the well-established findings of scholarly research is that diminished socioeconomic standing limits opportunities for eligible persons to participate in the political process.

In 1954, the U.S. Supreme Court outlawed legalized segregation in schools (*Brown v. Board of Education*) and, in the Civil Rights Act of 1964, Congress prohibited all forms of legalized segregation, *de facto* segregation in public accommodations, and racial discrimination in employment. Yet the dominant white majority in Louisiana still sought to preserve Jim Crow. Many school districts in Louisiana long delayed the submission of desegregation plans. Segregation persisted in many districts aided and abetted by the state policy of providing financial aid to segregated private schools attended by white Louisiana students. In 1975, a federal court ruled that Louisiana had violated the U.S. Constitution by providing financial support to "racially segregated private schools [that] serve[d] as a haven to those leaving racially integrated public schools."[51]

Flowing from that legacy, a December 2014 study found that 34 school districts in Louisiana remained subject to open federal, non-voluntary desegregation orders. Only Alabama,

---

[50] U.S. News, "Crime & Corrections Rankings: Measuring the States Public Safety and Corrections," https://www.usnews.com/news/best-states/rankings/crime-and-corrections.
[51] Brumfield v. Dodd, 405 F. Supp. 338, 348 (E. D. La. 1975).

Georgia, and Mississippi had more such orders.[52] As recently as 2013, the Justice Department filed a complaint alleging that Louisiana had impeded desegregation in at least 13 districts under federal supervision through a voucher program that funneled students into private schools that it enacted without authorization from the federal courts. The Justice Department's analysis of the voucher program found that "at least 34 schools in 13 school districts operating under desegregation orders experienced a loss of students in a way that impeded the desegregation process."[53] In 2014, a federal court ruled that Louisiana must provide the Justice Department with regular reports on the state's voucher program to ensure Louisiana's compliance with an earlier desegregation order. The Fifth Circuit Court of Appeals nullified this ruling on procedural grounds[54]

Within the current public school system there is also disparate treatment of white and Black students. A report prepared by a 38-member study group of school superintendents, counselors, principals, and others established by the Louisiana State Department of Education found that Black students make up 44% of the public school population, but 85% of those tossed out of their schools and sent to alternative programs.[55] "There are a disproportionate number of African-American students enrolled in alternative education, due to expulsion and suspension. Black students are 3.25 times more likely to be expelled and 7.8 times more likely to be suspended, when compared

---

[52] Yu Qui and Nikole Hannah-Jones, "A National Survey of School Desegregation Orders," Pro Publica, 14 December 2014, https://projects.propublica.org/graphics/desegregation-orders.

[53] *United States v. Dodd*, Civil Action N. 71-1316, U. S. District Court, Easter District of Louisiana, United States' Memorandum in Support of its Motion for Further Relief, at 9.

[54] In 2014 the District Court ruled that Louisiana must provide regular reports to federal officials on the state's voucher program to ensure that Louisiana complies with the 1975 desegregation order regarding the appropriation of state money for private schools. The state officials must provide federal officials with lists of voucher applicants, information on schools in the voucher program, and enrollment and racial breakdowns on public schools and private schools in the voucher program. Prior to the Fifth Circuit's ruling, the district court rejected a motion by pro-voucher interveners to vacate this order. Ibid., "Order and Reasons." *Brumfield v. Louisiana State Board of Education*, No. 14-31010 (5th Cir., 2015), at 14.

[55] Louisiana Department of Education, "Alternative Education Study Group Report," October 2017, pp. 3-4, https://www.louisianabelieves.com/docs/default-source/district-support/alternative-education-study-group-report.pdf?sfvrsn=2.

to Caucasian students."[56] Moreover, "[m]any students are exited from home schools for minor to moderate infractions, resulting in both too many students in alternative settings and unfortunate racial and socioeconomic disparities. Approximately 88% of students at alternative sites in Louisiana are there for nonviolent offenses including the catch-all category "willful disobedience. … Home schools should build greater staff capacity to address minor to moderate behavior infractions at the home school."[57]

The report warned that the 18,000 students in these programs "are not receiving the services they need in Louisiana's alternative schools. … Students in Louisiana alternative education settings rarely receive academic, behavioral, social and emotional services needed to address the root cause of their exit from the home school." The result is that "given these striking gaps in service, it should come as no surprise that students referred to an alternative school in Louisiana are five times more likely than their peers to drop out of school."[58] Kathy Edmonston of the State Board of Elementary and Secondary Education said that dropping out of school "is the schools to prison pipeline."[59] In fact, a Louisiana study of students left back in the eighth grade found that this group was disproportionately Black.[60] It additionally found that the students who were left back were more likely than other students to commit violent crime: "this evidence is consistent with a sizable effect of education on crime, and it suggests that the promotion policy, in its current

---

[56] Ibid., p. 4.
[57] Ibid., p. 3
[58] Ibid., p. 4.
[59] Will Sentell, "Report: Louisiana Too Quick to Toss Troubled, Especially Black Students; Alternative Schools Not Helping," The Advocate, 23 October 2017,
https://www.theadvocate.com/baton_rouge/news/education/article_df2af9e0-b5ae-11e7-a466-b7e30395b078.html.
[60] Ozkan Eren, Michael F. Lovenheim, and Naci H. Mocan, "The Effect of Grade Retention on Adult Crime: Evidence From a Test-Based Promotion Policy," National Bureau of Economic Research, Working Paper 25384, p. 27, http://papers.nber.org/tmp/56052-w25384.pdf, p. 10.

form, harms at least a subset of students and creates important negative externalities in the form of more violent felonies being committed in the future."[61]

The state of Louisiana has also been resistant to efforts to desegregate its system of higher public education. According to Nikki Brown, Associate Professor of History at the University of New Orleans, "Louisiana was ordered—on at least ten occasions from 1965 to 1998—to integrate segregated universities and professional schools or compensate the state's historically black colleges and universities for generations of neglect."[62]

### E.    Twenty-First Century Discrimination: Segregation

Metropolitan areas in the United States are substantially segregated, with a median Black/white dissimilarity index of .526 (on a scale of 0 to 1), according to a study of 233 metropolitan areas using 2017 5-year U.S. Census data.[63] This level of residential segregation means that more than half of Black residents would have to relocate to another neighborhood to become fully integrated with white residents.[64] Metropolitan areas in Louisiana typically exceed even this level of predominant segregation. The study found that six of nine Louisiana metropolitan areas included were above the national median for Black/white segregation. These six areas, which include New Orleans and Baton Rouge, comprised 85% of the Black population in the nine Louisiana areas studied.[65]

Similar results apply to segregation in schools. A study of 2015-2016 Department of Education data found that of 242 metropolitan areas studied, the index of public-school segregation

---

[61] Ibid., p. 27.
[62] Nikki Brown, "Jim Crow/Segregation," Encyclopedia of Louisiana, http://www.knowla.org/entry/735/.
[63] "Residential Segregation Data for U.S. Metro Areas," Governing Magazine, http://www.governing.com/gov-data/education-data/residential-racial-segregation-metro-areas.html.
[64] Ibid.
[65] Ibid.

was slightly higher than the index for racial segregation at .545. This result means that more than half of students would have to attend another school to achieve racial balance based on the demography of the metro area.[66] Of Louisiana areas included, five of nine were above the national median.[67] These five areas, which include New Orleans and Baton Rouge, comprised 79% of the Black student population in the nine Louisiana areas.[68] A study by Gary Orfield of the University of California, Los Angeles (UCLA), John Kucsera of the Civil Rights Project, and Genevieve Siegel-Hawley of Virginia Commonwealth University (VYCE), finds that in Louisiana, 73.9% of all Black public secondary and elementary school students attend majority-minority schools; only 13 other states have higher percentages of Black students in such schools.[69]

**Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

The report of Dr. Maxwell Palmer establishes the presence of significant racially polarized voting in Louisiana. From the 1980s through the present, courts have also found substantial racially polarized voting in Louisiana.[70]

Additional statewide evidence of such polarization is provided by the polling data reported and analyzed below. **Table 1** and **Chart 1** analyze the vote for president by race in Louisiana using

---

[66] School Segregation Data for U.S. Metro Areas," Governing Magazine, https://www.governing.com/gov-data/education-data/school-segregation-dissimilarity-index-for-metro-areas.html.

[67] Ibid.

[68] Ibid.

[69] Gary Orfield, John Kucsera & Genevieve Siegel-Hawley, E Pluribus… Separation Deepening Double Segregation For More Students, Civil Rights Project, Sept. 2012, p. 46, http://civilrightsproject.ucla.edu/research/k-12-education/integration-and-diversity/mlk-national/e-pluribus...separation-deepening-double-segregation-for-more students/orfield_epluribus_revised_omplete_2012.pdf.

[70] See, e.g., *Major v. Treen*, 574 F. Supp. 325 (1983); *Citizens for a Better Gretna v. City of Gretna*, 636 F. Supp. 1113 (E.D. La. 1986), aff'd, 834 F.2d 496 (5th Cir. 1987); *E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 691 F. Supp. 991, 1002 (E.D. La. 1988); *Clark v. Roemer*, 777 F. Supp. 471 (M.D. La. 1991); *United States v. Louisiana*, 952 F. Supp. 1151, 1154 (W.D. La. 1997), aff'd, 521 U.S. 1101 (1997); *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000); *St. Bernard Citizens for a Better Gov't v. St. Bernard Parish Sch. Bd.*, Civ. A. No. 02-2209- C(4), 2002 U.S. Dist. LEXIS 16540 (2002); *Terrebonne Parish NAACP v. Jindal*, 274 F. Supp. 3d 395 (M.D. La. 2017.

post-election polling from the Cooperative Congressional Election Study ("the Study"), which is a standard source for political analysis.[71] That data show that 95% of Black voters voted for Democrat Barack Obama in the presidential election of 2012, compared to 20% of white voters, for a racial gap of 75 percentage points. In the presidential election of 2016, the Study found that 91% of Black voters voted for Democrat Hillary Clinton, compared to 26% of white voters, for a racial gap of 65 percentage points. In the presidential election of 2020, the Study found that 98% of Black voters voted for Democrat Joseph Biden, compared to 22% of white voters, for a racial gap of 76 percentage points. All results are statistically significant well beyond the stringent .01 level in social science.[72]

Additional analysis shows that there is a powerful correlation between race and party in Louisiana. Party labels by themselves do not motivate racially polarized voting. In fact, from the late nineteenth century through much of twentieth century, Blacks in the South voted Republican, and whites voted Democratic. These historic alignments, as well the current alignments, result substantially from the infusion of race into party. Simply put, to the extent that racial voting aligns along party lines, race not party is the driving causal mechanism.

During the Reconstruction period that followed the Civil War, Blacks across the South had the opportunity to vote and hold political office. During this period, Blacks in the South voted and identified overwhelmingly with the Republican Party—the party of Abraham Lincoln and of Reconstruction. Most white southerners in turn voted and identified withDemocrats. In 1869 Congress sought to guarantee Black male voting rights with the passage of the Fifteenth Amendment that prohibited the states from denying the right to vote "on account of race, color, or

---

[71] See Appx. at 1-2.

[72] This means that there is less than a 1% probability of obtaining the results under a chance hypothesis.

previous condition of servitude." The Amendment passed the U.S. House and Senate with only Republicans and no Democrats voting in the affirmative.[73]

Blacks in the South expected that the amendment would assure their continued suffrage rights. Instead, what happened was "the return to power of the Democrats in the southern states and the U.S. House of Representatives, the Republican retreat from Reconstruction, and the resurgence of Jim Crow, with its inventive and unjust measures designed to deny Blacks the vote on grounds other than "race, color, or previous condition of servitude."[74]

The enactment of the Voting Rights Act of 1965 sparked the beginning of a political revolution in Louisiana as elsewhere in the South. For the first time since Reconstruction, Blacks had broad opportunities to register and vote and to elect candidates of their choice to public office. Through the late twentieth and early twenty-first centuries, the parties reversed their traditional roles in the state with Democrats now associated with racial values, policies, and attitudes appealing to Blacks and Republicans the reverse. As in the earlier period, party identification is conjoined with race, although party labels had come to mean the opposite of what they once were.[75]

The conjoining of party and race in Louisiana is demonstrated both by the policy positions

---

[73] A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875, Congressional Globe, House of Representative, 40th Congress, 3rd Session, 25 February 1869, pp. 1563-1564, http://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=087/llcg087.db&recNum=62, http://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=087/llcg087.db&recNum=63; A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875, Congressional Globe, Senate, 40th Congress, 3rd Session, 26 February 1869, pp. 1641, http://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=087/llcg087.db&recNum=140.

[74] Hugh Davis, "We Will Be Satisfied with Nothing Less": The Black Struggle for Equal Rights in the North during Reconstruction (Ithaca, NY: Cornell University Press, 2011), p. 71.

[75] On the conjoining of race and party in recent years see, for example, Bruce E. Cain and Emily R. Zhang, "Blurred Lines: Conjoined Polarization and Voting Rights," Ohio State Law Journal, 77 (2016): 867-904; Edward G. Carmines & James A. Stimson, Issue Evolution: Race and the Transformation of American Politics, (Princeton University Press: 1989), 27–58; Michael L. Rosino and Matthew W. Hughey "Who's Invited to the (Political) Party: Race and Party Politics in the USA," Ethnic and Racial Studies, 39 (2016): 325-332; "Old Times There Are Not Forgotten: Race and Partisan Realignment in the Contemporary South," American Journal of Political Science, 49 (2005): 572-688.

held by Democratic and Republican officeholders and by the race-related attitudes and beliefs of rank-and-file Democratic and Republican voters. As indicated in **Table 2,** all Republicans Senators and House members in Louisiana receive very low scores (on a scale of 0% to 100%) on the rankings of both the NAACP and the Leadership Conference on Civil and Human Rights, organizations dedicated to promoting minority rights.[76]

The NAACP scorecard is based on more than 30 votes in the U.S. Senate and House, respectively, that the organization deems relevant to assessing the "civil rights voting patterns" of members in each state's delegation.[77] The Leadership Conference scorecard is likewise based on more than 30 votes in the U.S. Senate and House, respectively. It addresses "such civil rights issues as criminal justice, economic security, education, workers' rights, health care, immigration, key judicial and executive branch nominations, and more."[78] On the NAACP rankings, the two Republican Senators score 9% and 13% and Republican House members score between 6% and 9%. On the Leadership Conference rankings, the two Republican Senators score between 0% and 7% and all Republican House members score between 0% and 6%. In contrast, the lone Democratic House member scores over 90% on the two rankings.

Louisiana is not an outlier. Stark differences in rankings between Republicans and Democrats emerge across the nation and the South. As indicated in **Table 3** and **Chart 2**, nationwide Republican senators averaged 11% in the NAACP rankings, compared to 98% for Democratic senators, for a difference of 87 percentage points. Republican senators averaged two

---

[76] *See* Appx. At 3.
[77] NAACP Civil Rights Federal Legislative Report Card, https://naacp.org/sites/default/files/documents/115th-Final-Report-Card.pdf
[78] Leadership Conference on Civil and Human Rights, Civil and Human Rights Coalition Scores the 115th Congress, https://civilrights.org/resource/civil-and-human-rights-coalition-scores-the-115th-congress/.

percent in the Leadership Conference rankings, compared to 95% for Democratic senators, for a difference of 93 percentage points. For House members nationwide, Republicans averaged five percent in the NAACP rankings, compared to 94% for Democrats, for a difference of 89 percentage points. Republican House members averaged five percent in the Leadership Conference rankings, compared to 92% for Democrats, for a difference of 87 percentage points.[79]

Similar differences are found for the South (the 11 states of the former Confederacy) as further indicated in **Table 3** and **Chart 2**. Southern Republican senators averaged 11% in the NAACP rankings, compared to 100% for Democratic senators, for a difference of 89 percentage points. Republican senators averaged one percent in the Leadership Conference rankings, compared to 88% for Democratic senators, for a difference of 87 percentage points. For House members in the South, Republicans averaged three percent in the NAACP rankings, compared to 92% for Democrats, for a difference of 89 percentage points. Republican House members averaged four percent in the Leadership Conference rankings, compared to 91% for Democrats, for a difference of 87 percentage points.

As demonstrated by survey data reported in **Tables 4 to 7** and **Charts 3 to 6**, there are substantial differences among rank-and-file Republican and Democratic voters in Louisiana on racial attitudes and views. According to **Table 4 and Chart 3**, 93% of Louisiana Trump voters in 2020 strongly or somewhat agreed that "[t]he Irish, Italians, Jews and many other minorities overcame prejudice and worked their way up. Blacks should do the same without any special favors."[80] This compares to only 18% of Louisiana Biden voters who strongly or somewhat

---

[79] *See* Appx. at 4-5.
[80] *See* App. at 6-7.

agreed.[81]

According to **Table 5 and Chart 4**, 76% of Louisiana Biden voters in 2020 strongly or somewhat agreed that "Generations of slavery and discrimination have created conditions that make it difficult for Blacks to work their way out of the lower class."[82] In contrast, only six percent of Louisiana Trump voters strongly or somewhat agreed.[83]

According to **Table 6** and **Chart 5**, 77% of Louisiana Biden voters in 2020 strongly or somewhat agreed that "White people in the U.S. have certain advantages because of the color of their skin." This compares to only six percent of Louisiana Trump voters who strongly or somewhat agreed.[84]

In 2008 the CCES asked another question indicative of racial attitudes and beliefs. It asked whether respondents backed the recreation of a literacy test for voting. Specifically, the survey asked whether respondents supported a requirement "that all voters be able to read a passage from the U. S. Constitution." As indicated in **Table 7** and **Chart 6**, a 61% majority of McCain voters backed this form of a literacy test with 26% opposed and the remainder unsure. Among Obama voters, only 18% backed the literacy test with 62% opposed and the remainder unsure.[85]

In addition, there is evidence of racially polarized voting in Louisiana independent of party. The 2008 Democratic primary for president in Louisiana included as its major contenders a Black candidate, Barack Obama, and a white candidate, Hillary Clinton, as well as other non-Black candidates. As indicated in **Table 8** and **Chart 7**, voting in this primary was polarized along racial

---

[81] Id.
[82] See Appx. at 8-9.
[83] Id.
[84] *See* Appx. at 10.
[85] *See* Appx. at 11.

lines, with 86%of Black voters voting for Obama, compared to 13%for Clinton. Among white

voters, 30% voted for Obama, compared to 58% for Clinton. In all, 70% of white voters supported

non-Black candidates.[86]

Further evidence of racially polarized voting untethered to party is provided by the voting

of Black and white Democrats in the general presidential election that followed the 2008 primaries.

As demonstrated in **Table 9** and **Chart 8**, 98% of Black Democrats voted for Obama, compared

to just two percent who voted for Republican candidate John McCain. However, only 38%t of

white Democrats voted for Obama, compared to 60%who voted for McCain.[87]

**Factor 3: The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

This Factor is impacted by the unique open primary system in Louisiana that creates a

disparate burden on Black voters as compared to white voters. As explained by the Secretary of

State, Louisiana has an open primary system with a majority vote requirement:

> All statewide and local candidates in Louisiana are elected by majority vote. A majority vote is one more than 50% of the total votes cast for that office. When one candidate is to be elected, a candidate who receives a majority of the votes cast for an office in a primary election is elected. If no candidate receives a majority, the top two candidates who receive the most votes advance to the general election.[88]

A similar majority vote requirement applies when there is more than one position to be

elected:

> If there are two or more offices of the same character to be filled, the number of votes necessary to constitute a majority shall be the greater result obtained by:

---

[86] *See* Appx. at 12.

[87] *See* Appx. at 14.

[88] Louisiana Secretary of State, "State, Local, and Congressional Primary Elections are Majority Vote Elections," https://www.sos.la.gov/ElectionsAndVoting/GetElectionInformation/HowAreCandidatesElected/Pages/default.aspx.

- dividing the total votes cast for all of the candidates by the number of offices to be filled; and
- dividing the result so obtained by two plus one.

. . .

 If there are remaining offices to be filled due to a lack of a majority in the primary election, the number of candidates who qualify for the general election is twice the number of offices remaining to be filled.[89]

This means that even if a Black candidate wins a plurality in a white jurisdiction as a result of splits in the white vote, they must still face a white candidate one-on-one in a runoff contest. Given the polarized nature of voting in Louisiana, a Black candidate is quite unlikely to win such a contest in the state's predominantly white electorate.

For example, in the 2015 statewide election for Lieutenant Governor, a Black candidate, Democrat Melvin "Kip" Holden finished first in the primary election with a plurality of 361,092 votes, approximately 33% of the vote, compared to 324,849 votes cast for his nearest competitor, Republican "Billy" Nungesser.[90] Despite leading by more than 46,000 votes in the primary, Holden decisively lost in the general election with just 45% of the vote to 55% for Nungesser.[91]

Likewise, in the 2017 election for State Treasurer, Black Democrat Derrick Edwards achieved an even more decisive primary victory with 125,503 votes, about 31%, compared to 96,440 votes for his nearest competitor, Republican John Schroeder, who finished with just 24%of the vote.[92] However, Edwards also decisively lost to Schroeder in the general election, finishing with just 44% of the vote.[93]

---

[89] Ibid.
[90] Louisiana Secretary of State, Official Results, October 24, 2015, https://voterportal.sos.la.gov/graphical.
[91] Ibid., November 21, 2015.
[92] Ibid., October 24, 2017.
[93] Ibid., November 18, 2017.

In the 2018 statewide election for Secretary of State, a Black candidate, "Gwen" Collins-Greenup, nearly won a plurality in the primary election. Collins-Greenup finished with 289,097 votes, finishing a close second to white candidate Kyle Ardoin, who garnered 298,657 votes. This result put both candidates into a runoff election.[94] "As the only Black on the ballot, she made an impressive showing and got into to the runoff, but I think that's where it ends," said Albert L. Samuels, professor, and Chair of the Department of Criminal Justice and Political Science at Southern University. "It's good to get into the runoff, but we still haven't elected a Black statewide. I see nothing to break that trend."[95] Samuels was right. Ardoin won the runoff overwhelmingly, with 306,568 votes (59%), compared to 210,085 for Collins-Greenup (41%).[96]

There are other examples as well of Black candidates advancing to a runoff but then losing to a white contender.

**Factor 4: If there is a candidate slating process, whether the members of the minority group have been denied access to that process.**

This factor is not relevant to congressional elections in Louisiana under current district configurations. The election of a Black candidate of choice is only possible in packed Congressional District 2 and otherwise precluded in the remaining five districts, as per the discussion under the ninth Senate Factor, whether the policy underlying the state's use of the congressional map is tenuous.

---

[94] Ibid.,  November 6, 2018.
[95] Mark Ballard, "How 'Perfect Storm' Lead to Louisiana's Unusual Secretary of State Runoff," The Advocate, 10 November 2018, https://www.theadvocate.com/baton_rouge/opinion/mark_ballard/article_86afb27c-e444-11e8-9c83-6ffdea26541b.html.
[96] Op cit., n. 75, December 8, 2018.

**Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

The persistent effects of Louisiana's long history of discrimination against Blacks are substantially demonstrated in the deficient socioeconomic position of Blacks in Louisiana, which are documented in **Tables 10-12**.[97] Indeed, as demonstrated above, and in the Expert Report of Dr. Charles Vincent, the history of discrimination extends beyond voting rights to virtually every aspect of economic and social life in the state and, accordingly, persistent disparities are manifest in every area of life.

Decades of social science research have demonstrated that socioeconomic standing significantly impacts the ability to participate fully in the political process. For example, health problems might make it more difficult to stand in line to vote or travel to a polling place. A lack of available vehicles makes it more challenging to travel to polling places, especially given the large area of congressional election districts compared to state and local legislative districts.

The lack of available or reliable vehicles also makes it more difficult to travel to a second polling place if the voter initially arrives at an incorrect location. This problem is exacerbated in Black communities[98] as demonstrated by fewer total numbers of polling and early vote locations in Black communities, *see* discussion *supra* at 14-15. Lack of home ownership means that minorities are more likely to be transient and required to frequently change polling locations.[99] Lower levels of education make it more difficult to understand and navigate the voting process generally, requiring assistance to navigate the rules.[100] It should also be noted that disparities in

---

[97] See Appx. at 15-17.
[98] Id. at 15, Table 10.
[99] Id., supra n.2 (Table 10).
[100] Id. at 16, Table 11.

access to broadband internet between whites and Blacks in Louisiana exploit existing disparities in educational attainment. Disparities in internet access are reflected in disparities for the online learning in Louisiana that began with the onset of the pandemic in 2020.[101] Poor and less educated persons tend to be less engaged with politics, less likely to have the ability to seek public office, less likely to have an influence on the political process through lobbying and advocacy, and less likely to be sought after as voters by politicians. This is born out in Louisiana as **Table 13**[102] shows that Blacks in Louisiana have lower turnout rates than whites.[103]

Perpetuated and solidified racial segregation, which is evident in Louisiana, magnifies the effects of discrimination on the socioeconomic standing of minorities, which impacts their ability to participate fully in the political process and elect candidates of their choice. A comprehensive study of the socioeconomic consequences of racial segregation found that "the quantitative evidence thus suggests that any process that concentrates poverty within racially isolated neighborhoods will simultaneously increase the odds of socioeconomic failure within the

---

[101] Louisiana Department of Education, "Louisiana Department Of Education Releases Virtual Learning Guides For Families And Educators," 12 August 2020, https://www.louisianabelieves.com/newsroom/news-releases/2020/08/12/louisiana-department-of-education-releases-virtual-learning-guides-for-families-and-educators; JC Canicosa, Omicron COVID-19 leads schools around Louisiana to go virtual, Louisiana Illuminator, 10 January 2022, https://lailluminator.com/briefs/omicron-covid-19-leads-schools-around-louisiana-to-go-virtual/.

[102] *See* App. at 18.

[103] Steven J. Rosenstone and John Mark Hansen, Mobilization, Participation and Democracy in America,(Macmillan, 1993); Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady, Voice and Equality: Civic Volunteerism in American Politics (Harvard, 1995); D. Sunshine Hillygus, The Missing Link: Exploring the Relationship Between Higher Education and Political Engagement, 27 Political Behavior 25-47 (2005); Michael Parkin and Frances Zlotnick, English Proficiency and Latino Participation in U.S. Elections, 39 Politics and Policy 515-37 (2011),; Pew Research Center, The Party of Non-Voters, October 31, 2014, http://www.people-press.org/2014/10/31/the-party-of-nonvoters-2/; Jan E. Leighley and Jonathan Nagler, Who Votes Now? Demographics, Issues, Inequality and Turnout in the United States, (Princeton University Press, 2014); Randall Akee, et al., "Family Income and the Intergenerational Transmission of Voting Behavior: Evidence from an Income Intervention" National Bureau of Economic Research, Working Paper, No. 24770, June 2018, https://www.nber.org/papers/w24770; Joseph M. Colomer, "Benefits and Costs of Voting," Electoral Studies 10 (1991), 313-325; Lee Sigelman and William D, Berry, "Costs and the Calculus of Voting," Political Behavior 4 (1982), 419-428; Martin Gilens and Benjamin I. Page, "Testing Theories of American Politics: Elites, Interest Groups, and Average Citizens," Perspectives on Politics, 12 (2004), pp. 564-581.

segregated group. People who grow up and live in environments of concentrated poverty and social isolation are more likely to become teenage parents, achieve low quality educations as a result of attending under-funded schools or dropping out of school entirely, earn lower incomes in adulthood, and engage in criminal activity or be the victim of such activity. As the structural factor controlling poverty concentration, segregation perpetuates the socioeconomic disadvantage among Blacks."[104]

A study by the Urban Institute found that "higher levels of black-white segregation are associated with lower black per capita income," that "higher levels of black-white segregation are associated with lower levels of bachelor's degree attainment for both blacks and whites," and that "higher levels of black-white segregation are associated with higher homicide rates."[105] The report concluded that "high degrees of segregation based on race and class result in stratifying access to education and other public services, opportunities for social interaction, labor market prospects, and health outcomes."[106]

Another study published in *Public Health Reports* found that the evidence reviewed by the authors "suggests that segregation is a primary cause of racial differences in socioeconomic status (SES) by determining access to education and employment opportunities. SES in turn remains a fundamental cause of racial differences in health. Segregation also creates conditions inimical to health in the social and physical environment."[107]

---

[104] Douglas S. Massey, "Residential Segregation and Neighborhood Conditions in U.S. Metropolitan Areas" in Neil S. Smelser, et al., eds. America Becoming: Racial Trends and Their Consequences, vol. 1 (National Academy Press., 2001), pp. 391-434.
[105] The Costs of Segregation" National Trends and the Case City of Chicago, 1990-2010," Urban Institute, March 2017, pp. vii-vii, https://www.urban.org/sites/default/files/publication/89201/the_cost_of_segregation.pdf
[106] Ibid., p. 5.
[107] David R. Williams and Chiquita Collins, "Racial Residential Segregation: A Fundamental Cause of Racial Disparities in Health," Public Health Reports 116 (2001), p. 404, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1497358/pdf/12042604.pdf.

In sum, it is important to note the context in which the lingering effects of discrimination continue to burden Blacks in the most critical areas of life. Overall, as **Table 14**[108] demonstrates, U.S. News ranks Louisiana at or near the bottom of every state in all nine rankings of measures that gauge well-being and opportunities for social, political and economic advancement. Louisiana ranks last in economic opportunity, crime and corrections, quality of life, and the composite of all individual rankings. By this data, Blacks in Louisiana, who are already statistically at the bottom within the state, face conditions in Louisiana that are among the worst in the nation.

**Factor 6: Whether political campaigns have been characterized by overt or subtle racial appeals.**

Political campaigns in Louisiana have been marked in recent years by both subtle and overt racial appeals, as illustrated by the examples below. In the 1991 Louisiana gubernatorial race, former Ku Klux Klan Wizard David Duke finished second to Democratic former governor Edwin W. Edwards. During the campaign, Duke compared the Nazi Holocaust to affirmative action in the United States. In an interview, Duke stated, "The closest thing that I know to the policies of Germany in this country is the so-called affirmative action or quota systems."[109]

The 1995 gubernatorial runoff election pitted former-Governor Mike Foster against U.S. Representative Cleo Fields, who was the first Black candidate for governor in Louisiana in more than 100 years. In an article published in *Social Science Quarterly*, academic researchers noted, "perhaps the best example of symbolic racism came during the runoff campaign, when Foster was discussing the problem of crime. He noted that predominantly white Jefferson Parish 'is right next

---

[108] *See* App. at 19.
[109] Robert Suro, "THE 1991 ELECTION: Louisiana; Bush Denounces Duke As Racist and Charlatan" New York Times, 7 November 1991, https://www.nytimes.com/1991/11/07/us/the-1991-election-louisiana-bush-denounces-duke-as-racist-and-charlatan.html.

to the jungle in New Orleans and it has a very low crime rate' (quoted in Ott, 1995:2). This is precisely the sort of racial code word central to the new symbolic racism (Edsall and Edsall, 1992: Chap. 10). Thus, there does seem to be enough evidence that in the 1995 Louisiana gubernatorial election, certain candidates succumbed to 'the electoral temptation of race.'"[110]

After a controlled statistical analysis, the authors, Knuckey and Orey, concluded: "that symbolic racism was an important determinant of vote choice in the 1995 Louisiana gubernatorial election, even after controlling for partisanship and ideology[,] demonstrates its explanatory power."[111] The authors note that such racial appeals need not strategically echo the overt racism of a David Duke but that they can succeed even more as subtle references, especially in a white versus Black election.[112]

In 2010, Republican incumbent Senator David Vitter released a campaign ad that the Times Picayune explained "show[ed] Hispanic 'illegal aliens' sneaking through a hole in a fence and being welcomed by folks holding a Charlie Melancon banner, a giant check made out to 'all illegal aliens' and signed by Treasury Secretary Timothy Geithner. The immigrants also are greeted by a band playing 'America the Beautiful,' fireworks and a limo that drives them away," as they hang their check out of window, jeering all the way.[113]

The paper reported that Darlene Kattan, executive director of the Hispanic Chamber of Commerce of Louisiana, characterized the ad as "racist" in the way that it plays off a "Hollywood stereotype image of Latino workers." In addition, "Frank Sharry, executive

---

[110] Jonathan Knuckey and Byron D'Andra Orey, "Symbolic Racism in the 1995 Louisiana Gubernatorial Election," Social Science Quarterly, 29 (2000), p. 1030.
[111] Ibid., p. 1032.
[112] Ibid., pp. 1033-1034.
[113] *See* App. at 20.

director of America's Voice, which advocates for immigration overhaul from a liberal perspective, rated Vitter's ad, along with those of Republican Senate candidate Sharon Angle in Nevada, as the most offensive he had seen this campaign cycle."[114] An edited version of the Vitter ad included a still photo of three menacing-looking, dark-skinned young Hispanic men staring at the viewer. The photo has the misleading caption, "Melancon voted for Benefits for Illegals."[115]

In 2011, candidate for lieutenant governor Billy Nungesser ran a video ad called "Sleepless in Louisiana," in which he attacked his opponent for failing to protect the people of Louisiana from having their jobs stolen by illegal immigrants.[116]

In 2014, U.S. Representative Steve Scalise, the third-highest ranking member of the Republican congressional leadership, admitted that in 2002, while serving as a Louisiana state representative, he had addressed a white supremacist group founded by David Duke. A 2004 post from the neo-Nazi site Stormfront stated that Scalise offered "his support for issues that are of concern to us."[117] The post further stated that Scalise "would be a good alternative" to Duke in Congress.[118] The video has since been taken down and is not currently available.

In 2015, Black Republican candidate for lieutenant governor Elbert Guillory released a campaign ad invoking a racial slur using a voiceover of President Lyndon Johnson from fifty years

---

[114] Jonathan Tilove, "David Vitter Ad Slammed as Racist by Advocates for Immigrants," The Times Picayune, 9 October 2010, https://www.nola.com/politics/2010/10/david_vitter_ad_slammed_as_rac.html. Video at https://www.youtube.com/watch?v=9uvp0Jljh6U. [115] *See* App. at 21.

[115] *See* App. at 21.

[116] "Dardenne or Nungesser?" https://noitsjustme.blogspot.com/2011/10/dardenne-or-nungesser.html. This video has since been removed.

117 Stormfront, "David Duke Mulls Run for Congress After Prison," 28 January 2004, https://www.stormfront.org/forum/t112059-4/.

[118] Ashley Parker and Alan Rappeport, Steve Scalise of Louisiana Admits Addressing Racist Group in 2002, New York Times, 29 December 2014, https://www.nytimes.com/2014/12/30/us/politics/louisiana-congressman-steve-scalise-acknowledges-addressing-racist-group-in-2002.html.

41

earlier. The ad states "[w]e've got to give them a little something, just enough to quiet them down, not enough to make a difference. I'll have them n------s voting Democratic for the next 200 years."[119] The ad then dissolves into a Guillory campaign logo.[120]

In 2015, gubernatorial candidate David Vitter made national news when he released a campaign ad reminiscent of the notoriously racist Willie Horton ad run against Democratic candidate Michael Dukakis in the 1988 presidential campaign.[121] The ad melded together photographs of Vitter's Democratic opponent John Bel Edwards with President Barack Obama, whom he never met, as though they were next to each other. A menacing announcer warns, "[v]oting for Edwards is like voting to make Obama Louisiana's next governor. Obama dangerously calls for releasing six thousand criminals from jail. Edwards joined Obama, promising at Southern University he'll release fifty-five hundred in Louisiana alone. Fifty-five hundred dangerous thugs, drug dealers, back into our streets … Obama and Edwards, wrong for Louisiana."[122]

In July 2019, Republican gubernatorial candidate Eddie Rispone released a campaign ad promising to "end taxpayer benefits for illegal immigrants," even though non-citizens are not eligible for such benefits. Rispone also released a campaign ad stating that if elected governor, "we won't tolerate replacing the American flag at government buildings with Mexican ones." The ad also falsely claimed that "Governor John Bel Edwards is the reason New Orleans is a sanctuary

---

[119] Cheryl Devall, "Guillory Goes for Drama in First TV Ad," News Star, 17 August 2015, https://www.thenewsstar.com/story/news/politics/2015/08/17/guillory-goes-drama-first-campaign-tv-ad/31885871/.
[120] Ibid.
[121] *See* App. at 22.
[122] Campaign video available at http://link.brightcove.com/services/player/bcpid1764219419001?bckey=AQ~~,AAAAAETmrZQ~,EVFEM4AKJd RI6UgfPhFgV0s-3wZ2v95n&bctid=4581843421001.

city."[123] Rispone also released an ad from a mother whose son was allegedly killed in a hit and run by a Mexican national 13 years earlier in 2006.[124]

In September 2019, the Republican Governor's Association released a campaign ad against Democratic gubernatorial candidate John Bel Edwards.[125] The ad featured a photo and video of Georgia gubernatorial candidate, Stacey Abrams. The caption read, "John Bel Edwards and Stacey Abrams: Too Liberal For Louisiana ... Extreme Partisanship."[126]

In August 2021, two conservative, Republican-affiliated groups, Louisiana Citizens for Job Creation and Conservative Louisiana ran Facebook ads that accused President Biden of "letting in" or "welcoming," to the United States, COVID-19-positive illegal immigrants. Conservative Louisiana stated, "We need to stop this invasion!"[127]

In September 2021, U.S. Representative Mike Johnson ran an ad that falsely accused the Biden administration of "[c]ommitting lawless acts right before our eyes!" Johnson claimed that the Biden administration was "shipping illegal migrants all over the country! No court dates. No COVID protection … This is tyranny right before our eyes and I won't stand for the hypocrisy!"[128] And earlier that summer in July 2021, U.S. Senator John Kennedy produced a video in which he claimed that the United States "border with Mexico is as open as a Waffle House at 2 a.m. on

---

[123] After a court ruling, President Trump's Attorney General Jeff Sessions issued a narrow definition of so-called "sanctuary cities" that did not include New Orleans. Katherine Sayre, "Mayor Landrieu: Feds. Definition of Sanctuary Cities Puts New Orleans in the Clear," NOLA, 7 July 2017; https://www.nola.com/news/politics/article_cb1a7b30-e7f0-5c64-9a46-45a29baaebff.html; R.J. Rico, "Louisiana Senators Reject Call to Punish 'Sanctuary Cities,'" AP, 30 May 2017, https://apnews.com/article/21007280faf64be1be743e62d6c1ed9c; America's Voice, GOP Ad Tracker, https://gopadtracker.com/node/140.
[124] America's Voice, GOP Ad Tracker, http://gopadtracker.com/index.php/node/138.
[125] See App. at 22.
[126] Republican Governor's Association, https://www.rga.org/rga-releases-new-video-exposing-john-bel-edwards-ties-to-radical-left-wing-activist-stacey-abrams/.
[127] See App. at 23; see also America's Voice, GOP Ad Tracker, http://gopadtracker.com/index.php/node/2062; http://gopadtracker.com/node/2063.
[128] America's Voice, GOP Ad Tracker, http://gopadtracker.com/node/2193.

Saturday night."[129]

The harping by Louisiana politicians on the dangers of illegal immigrants and so-called "Sanctuary Cities" is also part of an "immigrant threat narrative," that has become common in American politics. A 2012 study by Professor Xia Wang of Arizona State University found that "although the weight of evidence suggests that immigration does not cause more crime, this finding has not, it seems, affected public perceptions of immigrant criminality because public opinion about immigrants seems to be driven more by stereotype than by empirical fact." Professor Wang found that "the perceived size of undocumented immigrants is likely to prompt perceptions of undocumented immigrants as a criminal threat for native respondents." The researcher also linked this perceived immigrant threat to "the media and politicians who desire to restrict immigration have portrayed undocumented immigrants as undeserving criminals."[130]

Evidence produced since Professor Wang's work demonstrates that counter to their demonization, illegal immigrants commit crimes, including violent crimes at lower rates than native-born Americans and that jurisdictions attacked as "Sanctuary Cities" are not uniquely dangerous. A 2019 study by the libertarian CATO Institute has access to individual criminal records in Texas—"the only state that records criminal convictions and arrests by immigration status." The study found that "illegal immigrants were 37.1% less likely to be convicted of a crime than native-born Americans and legal immigrants were about 57.2% less likely to be convicted of a crime than native-born Americans." The study additionally found that "In 2019, homicide conviction rates for illegal and legal immigrants were 27.7% and 57.1%, respectively,

---

[129] America's Voice, GOP Ad Tracker, http://gopadtracker.com/index.php/node/1736.
[130] Xia Wang, Undocumented Immigrants as Perceived Criminal Threat: A Test of the Minority Threat Perspective," Criminology, 50 (2012): 743-776, quotes on pp. 744,763.

below those of natives."[131] A study published in 2020 in the Proceedings of the National Academy of Sciences of the United States of America (PNAS), one of the world's leading scientific journals, found that contrary to the hyperbole about so-called "Sanctuary Cities," sanctuary policies reduced deportations but did not increase crime rates.[132] My own studies of alleged "Sanctuary Cities" in Florida found that the adoption of sanctuary policies in Miami-Dade County—Florida's most populous county—was associated with reductions in overall and violent crime. My studies also found, when controlling for factors associated with crime, so-called "Sanctuary Cities" in Florida had no more and likely less crime and violent crime than other jurisdictions.[133]

In February 2022, Democratic candidate for U.S. Senate Gary Chambers released a video campaign ad entitled "Scars and Bars" showing Chambers holding up a confederate flag, opening with the famous words of the Declaration of Independence "[w]e hold these truths to be self-evident that all men are created equal." However, as the video continues, Chambers is seen pouring gasoline on the Confederate flag and lighting it afire, saying "[i]t's time to burn what remains of the Confederacy down."[134] At the end, he invokes the Song of the Confederacy by saying, "I do believe that the South will rise again, but this time it will be on our own terms." The purpose of

---

[131] Alex Nowrasteh, "Criminal Immigrants in Texas in 2019: Illegal Immigrant Conviction Rates and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes," Cato Institute, 11 May 2021, https://www.cato.org/immigration-research-policy-brief/criminal-immigrants-texas-2019.
132 Michael T. Light, Jingying He, and Jason P. Robey,  "Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas,"  Proceedings of the National Academies of Sciences of the United States of America, 117 (2020), 32340-32347. David K. Hausman, "Sanctuary Policies Reduce Deportation Without Increasing Crime," Proceedings of the National Academies of Sciences of the United States of America, 117 (2020), 27262-27267.
[133] City of South Miami v. DeSantis,
 CASE NO: 19-CV-22927, SB 168, Expert Report of Allan J. Lichtman, at 76-78. See also,
Ricardo D. Martínez-Schuldt and Daniel E. Martínez, "Sanctuary Policies and City-Level Incidents of Violence, 1990 to 2010" Justice Quarterly, 36 (2019): 567-593;;
Benjamin Gonzalez O'Brien, Loren Collingwood, and Stephen Omar El-Khatib, "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration" Urban Affairs Review, 55 (2019): 3-40..
134 "Scars and Bars," https://www.youtube.com/watch?v=X6iSRU9486I

this ad was not to stir up animosity or fears regarding Black Louisianians, but to explain what Chambers believes is ongoing discrimination against Black Louisianians.

And currently, in his quest for re-election in the 2022 midterm cycle, Senator John Kennedy responded to President Biden's pledge to nominate a Black woman to the Supreme Court stating, "number one, I want a nominee who knows a law book from a J. Crew catalog. Number two, I want a nominee who's not going to try to rewrite the Constitution every other Thursday to try to advance a 'woke agenda.'"[135] Other minority Supreme Court nominees, such as Justice Thurgood Marshall, the first Black nominee; Justice Sonia Sotomayor, the first Hispanic (man or woman) nominee; Justice Ketanji Brown Jackson, the first Black woman nominee; and Justice Louis Brandeis, the first Jewish nominee, all faced similar political assaults, despite sterling credentials. Republicans, however, did not object to President Ronald Reagan's commitment to put a woman on the Supreme Court, who was Justice Sandra Day O'Connor, or President George H. W. Bush's nomination of Clarence Thomas to replace Justice Marshall.

These racial appeals demonstrate racial animus or, at least, a propensity to exploit racial bigotry and fears for political advantage. These appeals exploit and inflame rather than dampen or heal racial divisions.

**Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.**

During Reconstruction, five Black Louisianians won election to statewide office—three Lieutenant Governors, a Treasurer, and a Secretary of State. Another Black person won election to Congress. Since Reconstruction, no Black candidate has been elected to statewide office in

---

[135] Nicole Lyn Pesce, "Sen. John Kennedy Wants Biden Nominee to Know 'a Law Book From a J. Crew Catalog,'" Market Watch, 3 February 2022, https://www.marketwatch.com/story/sen-john-kennedy-wants-bidens-supreme-court-nominee-to-know-a-law-book-from-a-j-crew-catalog-which-means-what-exactly-11643828658.

Louisiana.[136] It was not until 1991 that another Black person was elected to a Louisiana congressional seat. Since 1991, only four Black people have served in Congress from Louisiana, and only once in the history of the state—from 1993 to 1997—have two Black people served in Congress at the same time.

To date, no Black person has been elected to Congress in a non-majority-Black district. Currently, as indicated in **Table 15**, one Black person from Louisiana serves in Congress, Rep. Troy Carter, who replaced former congressman Cedric Richmond following his appointment to the Biden Administration. He represents 16.7% of the state's congressional delegation. That is 47% lower than the Black voting age population of 31.3%, for a gap of 14.6 percentage points lower, essentially one seat (.146 * 6 = .88 seats). These racial disparities also exist in the Louisiana State Legislature.

Since 1990, the percentage of Black people in the Louisiana Legislature has remained relatively constant. Blacks comprise 23.1% of the members of the Louisiana Senate, which is 26% lower than their percentage of the voting-age population or the equivalence of about three legislative seats in the 39-member body (.082*39 seats = 3.2). In the Louisiana House of Representatives, Blacks comprise 22.9% which is 27% lower than their percentage of the voting-age population, for a gap of 8.4 percentage points, equivalent to nearly nine legislative seats in the 105-member body (.084*105 seats = 8.8). Currently, all Black members of the state legislature

---

[136] "Black Officeholders in the South," Facing History, https://www.facinghistory.org/reconstruction-era/black-officeholders-south; Jas M. Sullivan & Jonathan Winburn, The Louisiana Legislative Black Caucus: Race and Representation in the Pelican State (LSU Press, 2011); Debo P. Adegbile, Report: Voting Rights in Louisiana: 1982-2006, 17 S. Cal. Rev. L. & Social Justice 413, 421-425 (2008).

were elected from majority-Black districts.[137]

Charles L. Zelden notes in his book, *Voting Rights on Trial*, that in Louisiana, "24 black representatives (22.0%) and eight black senators (20.5%) served in the state house by 1990, each from newly created districts found in predominantly [B]lack parishes."[138]

As noted in **Table 15**, Black Louisianians are also underrepresented in the Louisiana judiciary. According to a 2018 study by researchers at the Newcomb College Institute of Tulane University, Black Louisianians comprised 23.4% of judges in Louisiana. That is 25%lower than their percentage of the voting-age population, for a gap of 7.9 percentage points, equivalent to 29 judgeship seats among the 367 judges studied (.079*367 judgeships = 29). And Blacks comprise just 14.3% of positions on the Louisiana State Supreme Court. That is 54% lower than their percentage of the voting-age population, for a gap of 17 percentage points, equivalent to 1.2 justices among the seven Supreme Court justices (.17*7 Supreme Court justices = 1.2). There is only one other member of a minority group among the 357 judgeships studied.

Low Black representation on the judiciary has been an ongoing problem in Louisiana. In 1992, a Consent Judgment created an additional court of appeal position in a single-member majority-Black district.[139] Under the Consent Judgment the election winner in that upcoming 1992 election would be assigned to the Louisiana Supreme Court. Under this new system, the winner of

---

[137] Louisiana House of Representatives, Redistricting 2011, "DOJ Submission Docs," http://house.louisiana.gov/h_redistricting2011/; [137] Louisiana State Senate, Redistricting 2011, "District Summary – Total Pop and Voting Age," http://senate.la.gov/redist2011/Maps/Report/%20District%20Summary%20Tot%20Pop%20and%20Voting%20Age. pdf.

[138] Charles L. Zelden, Voting Rights on Trial: A Sourcebook with Cases, Laws and Documents (ABC-CLIO, 2002), P. 146.

[139] This consent judgement was the response to a federal court finding in Chisom v. Roemer that the at-large election of two justices to the Louisiana Supreme Court diluted Black voting strength. See Chisom v. Roemer, C.A. 86-4075 (E.D. La. Aug. 21, 1992).

the election in the single-member majority-Black opportunity district—Catherine D. Kimball—

became the first Black to serve on the Louisiana Supreme Court. Upon Kimball's retirement in

1994, Bernette Johnson, who is also Black, won the court of appeal election and the *Chisom* seat

on the Louisiana Supreme Court. Johnson held the *Chisom* seat until 2000, when she was elected

to a newly apportioned single-member Supreme Court seat in Orleans Parish. She won reelection

in 2010. Again, as with so many other changes to mitigate voting discrimination against Black

Americans, Louisiana only responded to outside federal pressure. This pressure over time had

come from both the U.S. Department of Justice and the federal courts.[140]

Pascal Frank Calogero Jr., who is white and served for 18 years as Chief Justice of the

State Supreme Court, has stressed the importance of majority-Black districts for the election of

Black judges in Louisiana: "Together, *Chisom* and *Clark* prompted reforms that helped transform

a virtually all-white (and all-male) judiciary through the creation of majority-black electoral

districts across Louisiana. Today, majority-Black subdistricts are used to elect judges to the 1st,

4th, 9th, 14th, 15th, 16th, 18th, 19th, 23rd, 24th, 27th, and 40th judicial district courts, and

numerous other trial and appellate courts."[141] Calogero cited the findings of the 1996 Task Force

on Racial and Ethnic Fairness in the Courts that stressed the importance of a diverse judiciary,

saying, "More than 20 years later, I remain of the view that the report's findings, including on the

importance of ensuring diversity through electoral subdistricts, continues to resonate today."[142]

---

[140] Consent Judgment, *Chisom v. Edwards*, C.A. 86-4075 (E.D. La. Aug. 21, 1992), available at
http://www.lawyerscommittee.org/admin/site/documents/files/Consent-Judgment-8-21-1992_1.pdf; Amanda
Bronstadt, "Ruling Could Give Louisiana Its First Black Chief Justice," National Law Journal, 4 Sept. 2012,
http://www.ghwlegal.com/pdf/2012-09-04-nlj-la-ruling.pdf; Michael Kunzelman, Associated Press, "La. Supreme
Court Rules That Bernette Johnson Will Be Next Chief Justice," 16 Oct. 2012,
http://www.wwltv.com/story/news/local/2014/09/03/14552862/.
[141] Pascal Frank Calogero Jr, "We Still Need Majority-Minority Judicial Subdistricts," The Advocate, 8 June 2017,
https://www.theadvocate.com/baton_rouge/opinion/article_4b579fec-4c64-11e7-a07b-2327eceeb04c.html.
[142] Ibid.

**Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.**

Louisiana has historically failed to act in a way that would have substantially benefited the lives of Black Louisianians in the areas of public education, health care, economic opportunity, criminal justice, and the environment. As a result, disparities in these areas persist and hinder Black Louisianians' political participation and overall advancement.

### A.    Education

The Louisiana public school system is majority-minority (56.6%) and has nearly the same percentage of white (44.2%) and Black (43.2%) students.[143] Yet as of fall 2017, 74% of teachers in Louisiana's public schools were white, and only 22% were Black, a sharp decline from some 30% in 2002.[144] The predominant minority make-up of Louisiana's public schools reflects the lower age demographic of the minority population but also white flight from public schools. Unlike whites, Black Americans overall lack the economic ability to pay for private schooling. Louisiana ranks second in the nation only to Hawaii in the percentage of K-12 students enrolled in private schools. Its percentage of private school enrollment is 17.6%, compared to a national average of nine percent. Of all metropolitan areas in the nation, in 2014, New Orleans is first in the percentage of private school students (25.1%) and Baton Rouge was fourth (19.1%).[145] Not surprisingly, given

---

[143] Louisiana Department of Education, "Student Attributes, 2018-19," http://www.louisianabelieves.com/resources/library/student-attributes. Overall, public school enrollment is 7.6 % Hispanic, 2.7 % multi-race, 1.6 % Asian, and 55.8 % total minority.

[144] Terry L. Jones, "Lack of Diversity Among Teaching Staff in Louisiana's Schools Raising Concerns," The Advocate, 10 June 2018, https://www.theadvocate.com/baton_rouge/news/education/article_1660a52a-690c-11e8-afcf-03458b9b701a.html.

[145] "Where Private School Enrollment Is Highest and Lowest Across the U.S.," City Lab, 13 August 2014, https://www.citylab.com/equity/2014/08/where-private-school-enrollment-is-highest-and-lowest-across-the-us/375993/; National Center for Education Statistics, Private School Universe Survey, "Number of Private Schools, Students, 2015-16," https://nces.ed.gov/surveys/pss/tables/TABLE15fl.asp; National Center for Education Statistics, "Enrollment in Public Elementary and Secondary Schools, Fall 2015," https://nces.ed.gov/programs/digest/d17/tables/dt17_203.20.asp;

the much higher socio-economic standing of whites as compared to Blacks in Louisiana, the white percentage of students in private elementary and secondary schools of 20.2% is more than three times higher than the Black percentage of 5.9%, according to U.S. Census data.[146] And despite facing close to the most challenging educational situation in the nation, Louisiana ranked only 26th among states in 2015 in per-pupil spending after adjusting for differential state costs.[147] As indicated in **Table 16**, rankings by five rating organizations placed Louisiana from 45th to 50th among the states on educational measures for elementary and secondary schooling.[148]

Louisiana also enrolls some 80,000 students in charter schools, which are independently run and managed but financed with public funds. A 2015 report found that the state was deficient in its oversight of such schools. The report found that "[t]he rapid growth and massive investment in charter schools has been accompanied by a dramatic underinvestment in oversight, leaving Louisiana's students, parents, teachers and taxpayers at risk of academic failures and financial fraud." It noted that their "research finds that possible fraud this year alone may total tens of millions of dollars. In the academic oversight system, oversight agencies play almost no role in helping charter schools improve academic outcomes. As a consequence, our research finds, that Louisiana has spent approximately $700 million since 2005 on charter schools that currently have not exceeded a D or F rating." The researchers said, "[t]oday, the state has no system in place to provide a path to high-quality academics for all struggling charter schools, nor is there an adequate system in place to proactively protect taxpayers from fraud, waste, or mismanagement." Thus,

---

[146] U.S. Bureau of the Census, School Enrollment, Type of School, American Community Survey, 2006 -2010, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_10_SF4_B14002&prodType=table.

[147] Edweek.org, State Finance Indicators, 24 February 2019, http://www.edcounts.org/createtable/step1.php.

[148] *See* App. at 25.

"due to this underinvestment, tens of thousands of children are still trapped in struggling schools. In essence, Louisiana has replaced one failing system for another."[149]

Louisiana has had long-term deficiencies in its public education system that have placed unique burdens on minority students who are overrepresented in the public schools. Yet it delayed any significant effort at reform until 2017-2018.

Black students also face challenges within Louisiana's colleges and universities. A study by the University of Southern California Race and Equity Center ranked Louisiana last on its higher education racial equity score for public institutions.[150] Although Blacks comprise 29.2% of public college and university enrollments, Black faculty comprise only 16.6% of full-time equivalent instructional faculty. Whites comprise 53.3% of enrollments but 71.4% of full-time equivalent faculty.[151] Although public institutions represent the best path to higher education for Black students, from 2008 to 2017, Louisiana slashed its spending on higher education by 44.9%, the second highest cut among all states and much higher than the third state of Illinois with a cut of 36.9%.[152]

### B.    Healthcare

For several decades, the United Health Foundation has provided overall state rankings on health, based on 35 indicators. In its 2018 report, United Health Care ranked Louisiana ranked last

---

[149] All quotations are from: Center for Popular Democracy and Coalition for Community Schools, "System Failure: Louisiana's Broken Charter School Law," May 2015, pp. 1, 5, 16, https://populardemocracy.org/sites/default/files/Charter-Schools-Louisiana-Report_web3.pdf.
[150] Ross Brenneman, Report: Public Colleges Are Hindering Black Student Success," USC Race and Equity Center, 15 September 2018, https://rossier.usc.edu/report-public-colleges-are-hindering-black-student-success/.
[151] Higher Education State Fact Book Louisiana Board, of Regents, 2017-2018, pp. 4-5, http://as400.regents.state.la.us/pdfs/Retention/hesfb/Louisiana-Higher-Education-Fact-Book.pdf
[152] Michael Mitchell, Michael Leachman, and Kathleen Masterson, A Lost Decade in Higher Education Funding," Center On Budget And Policy Priorities," 27 August 2017, https://www.cbpp.org/research/state-budget-and-tax/a-lost-decade-in-higher-education-funding.

among all states.[153] A new 2019 report on seniors' health ranked Louisiana 48th among the states.[154] Similarly, as indicated in **Table 14**, in its 2019 report, U.S. News independently ranked Louisiana 45th among the states in health care and 50th in quality of life.[155]

Although Louisiana is one of 37 states to have adopted Medicaid expansion, it was among the last five states to do so.[156] It did not do so until an executive order in January 2016 from newly elected Democratic governor John Bel Edwards. The prior governor, Republican Bobby Jindal had opposed Medicaid expansion.[157] Louisiana is tied with California for the largest percentage of persons eligible for Medicaid or the Children's Health Insurance Program (CHIP), at 25%. The national average is 19%.[158] And without question, Medicaid recipients are disproportionately Black, as demonstrated in **Table 12**.[159]

## C.    Economic Opportunity

Economic opportunity in Louisiana is important to Black residents, given the substantial gap in the state between the economic standing of Blacks and whites. A report by the Annie E. Casey Foundation ranked Louisiana last in economic well-being and 48th in family and community well-being.[160] Another report by Loyola University, New Orleans, found that "Louisiana now

---

[153] United Health Foundation, "America's Health Rankings, 2018 Annual Report," p. 3, https://www.americashealthrankings.org/learn/reports/2018-annual-report/findings-state-rankings.
[154] United Health Foundation, "Senior Report 2019," p. 5, https://assets.americashealthrankings.org/app/uploads/ahr-senior-report_2019_final.pdf.
[155] *See* App. at 19.
[156] Advisory Board, "Where the States Stand on Medicaid Expansion," 1 April 2019, https://www.advisory.com/daily-briefing/resources/primers/medicaidmap.
[157] Ibid., "Louisiana."
[158] Kaiser Family Foundation, "Medicaid State Fact Sheets," 27 September 2018, https://www.kff.org/interactive/medicaid-state-fact-sheets/?utm_campaign=KFF-2018-September-Medicaid-Fact-Sheets-U.S.-Health-Care&utm_source=hs_email&utm_medium=email&utm_content=2&_hsenc=p2ANqtz--RUR2TquAdcoHJto8mO-9seFr0BgX1uA9OAzc3xEP5P_8rp39VMkh9XvCqfpH9gaudpub2Iz1ZSI4hGZ6ml33izwfwjg&_hsmi=2.
[159] See App. at 17.
[160] Annie E. Casey Foundation, "2018 Kids Count Data Book: State Trends in Child-Well Being," pp. 22, 28, 44, http://www.aecf.org/m/resourcedoc/aecf-2018kidscountdatabook-2018.pdf.

stands as having the third-lowest average income among low-income households in the nation. The state also has the second-largest wage gap between White people and people of color."[161]

### D.    Criminal Justice

The many ways in which the criminal justice system in Louisiana fails Black Americans are documented in Factor 5. But despite the state's critical criminal justice needs, which especially impact Black Louisianians, the state has chronically underfunded public defenders for indigent defendants to the point where it has created a crisis for the system. In January 2017, a federal district court judge ruled that "by all objective measures, there is a crisis in public defense funding in Louisiana."[162] He noted, "[t]here is no dispute that the state legislature has chronically underfunded Louisiana's public defender system. The system relies overwhelmingly on a $45 fee assessed on those convicted of a crime. In practice, approximately two-thirds of public defense funding comes from fees collected on traffic tickets. This system is inherently unreliable and inadequate. It renders public defender funding dependent on factors entirely divorced from the actual demand for public defenders."[163] He said that "[b]udget shortages are no excuse to violate the United States Constitution. The legislature must resolve the crisis and locate a stable source of funding."[164] He also quoted a criminal court judge as follows:

> The defendants' constitutional rights are not contingent upon budget demands, waiting lists, and the failure of the legislature to adequately fund indigent defense... We are now faced with a fundamental question, not only in New Orleans, but across Louisiana: What kind of criminal justice system do we want? One based on fairness or injustice, equality or prejudice, efficiency or chaos, right or wrong?[165]

---

161 Bailey Champagne, "New Research Shows That Louisiana Ranks Low on Social Justice," Loyola University, New Orleans, 12 February 2021, https://loyolamaroon.com/10030787/news/new-social-research-shows-louisiana-ranking-low-on-social-justice/.
162 *Yarls v. Bunton*, 231 F.Supp.3d 128 (2017), at 132.
163 Ibid., n. 20.
164 Ibid., at 137.
165 Ibid.

In its January 2019 report, the Louisiana Public Defender Board confirmed this long-standing and ongoing crisis in the public defender system. The report stated that the state had adopted the stop-gap measure of shifting funds to localities from other areas such as capital defense, which has only "shifted the shortfall to capital defense, where we currently have a waitlist of clients for whom we cannot provide a defense."[166] The shifting of funds also curtailed training for public defenders and specialized services such as appeals. The Board found that "even after funds were shifted to the districts, workloads were too high through the state, creating backlogs in courts, overworked attorneys, and under-represented clients."[167] The Board commissioned an independent study that concluded "the Louisiana public defense system is currently deficient in attorneys and has the capacity to handle only 21% of the current workload. To put it another way, the workload of our attorneys is almost five times what it should be."[168]

The report found that "no other state in the country funds it public defense system on the fees generated from traffic tickets for the simple reason that the funding source is unreliable, unstable, and inefficient." It noted that supplemented funds from the state "can no longer cover the depletion in local funds."[169] Thus, "we are headed for yet another but more severe crisis, and there are no more Louisiana Public Defender Funds available to shift to the districts. This new crisis can come as early as 2020."[170] Regardless of how Louisiana chooses to deal with the current situation, it cannot wipe away the impact of decades of unresolved crisis in the public defender system. The inadequate public defender system has impacted millions of persons over time. In

---

[166] Louisiana Public Defender Board, "2018 Annual Board Report," 2018, January 2019, p. 1, http://lpdb.la.gov/Serving%20The%20Public/Reports/txtfiles/pdf/2018%20LPDB%20Annual%20Report%20Website%20Version.pdf.
[167] Ibid., p. 3.
[168] Ibid., p. 3.
[169] Ibid. pp. 1-2.
[170] Ibid., p. 1.

2018 alone, the Board reported that the raw number of cases handled by public defenders was 241,919.[171]

In January 2019, Louisiana district court judge Todd Hernandez allowed a class-action lawsuit challenging the public defender system in the state for violating the constitutional rights of poor defendants to advance to trial. "The enforcement of or protection of individual constitutional rights can never be dependent upon the availability of public funds," Judge Hernandez wrote.[172] "Whether the public defense system in the State of Louisiana violates federal and state constitutional rights of the class plaintiffs … is a factual question that must be decided at trial."[173]

The expert for plaintiffs in that case, Robert C. Boruchowitz of the Seattle University School of Law, found that:

> Louisiana's system for providing defense counsel for the poor fails to meet Constitutional and professional standards and creates an unacceptable risk that indigent defendants throughout the State who are charged in non-capital cases carrying a threat of imprisonment will be denied effective representation by counsel. Louisiana's public defenders consistently are failing to subject the cases against such defendants to meaningful adversarial testing, and, as a result, the State is failing to meet its foundational constitutional obligation to provide counsel to eligible persons."[174]

**E. Environmental Pollution**

Louisiana has become internationally notorious for its so-called "Cancer Alley" (renamed "Death Alley" by local residents), a concentration of petrochemical plants and refineries along the

---

[171] Ibid., p. 41.
[172] *Allen et. al. v. Bel Edwards et. al*, Number 655,079, Section 27, 19th Judicial District Court, "Ruling on Defendant's Motion for Partial Summary Judgment," 16 January 2019, at 2.
[173] Ibid., at 2-3.
[174] *Allen et. al. v. Bel Edwards et. al*, "Affidavit of Robert C. Boruchowitz," p. 6, https://www.splcenter.org/sites/default/files/documents/2017.05.04_boruchowitz_report.pdf.

Mississippi River, mostly near poor, Black neighborhoods. A 2012 study found that residents of "cancer alley" had a 50% higher risk of contracting cancer than the national average.[175] An Environmental Protection Agency (EPA) assessment from 2014 shows an extraordinarily caner toxic risk incident along "cancer alley" strip of land as demonstrated in Map 1 (green and dark green).[176] An updated 2017 EPA study showed 6 census tracks in the strip at the 95th to 99th percentile for air toxics cancer risk.[177] The EPA's 2020 Risk-Screening Environmental Indicators finds extremely high risk along the strip and demonstrated in Map 2.

A March 2021 report by the United Nations Human Rights Commission noted that "human rights experts today raised serious concerns about further industrialization of the so-called Cancer Alley in the southern U.S. state of Louisiana, saying the development of petrochemical complexes is a form of environmental racism." According to the experts, "This form of environmental racism poses serious and disproportionate threats to the enjoyment of several human rights of its largely Black residents, including the right to equality and non-discrimination, the right to life, the right to health, right to an adequate standard of living and cultural rights."[178]

A 2020 academic study found that exposure to particulate matter pollution was highly correlated with concentrations of Black population in Louisiana. The study found that the correlation between exposure to particulate pollution (the term for a mixture of solid particles and liquid droplets found in the air)[179] and the percentage of Blacks in Louisiana census tracts, was

---

[175] James Wesley, Chungron Jia, and Satish Kadia, "Uneven Disparities of Cancer Risks From Air Toxins," International Journal of Environmental Research & Public Health, 9 (2012), 4365-4385.
[176] EPA, "2014 National Air Toxics Assessment," https://gispub.epa.gov/NATA/.
[177] EPA, "2017 Air Toxics Cancer Risk," https://ejscreen.epa.gov/mapper/.
[178] United Nations Human Rights, Office of the High Commissioner, "USA: Environmental Racism In "Cancer Alley" Must End – Experts," March 2021, https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=26824&LangID=E.
[179] U.S. Environmental Protection Agency, "Particulate Matter," https://www.epa.gov/pm-pollution/particulate-matter-pm-basics.

+.23, compared to -.27 for the percentage of whites in census tracts. The study additionally found that exposure to pollutants was correlated with COVID-19 deaths. Over the ten Louisiana parishes with the highest death rates as of July 17, 2020, six were in "Cancer Alley" and two were adjacent to "Cancer Alley." The correlation between the percent of Blacks in a parish and COVID death rates was +.32, compared to -.34 for the white percentage. All correlations are statistically significant beyond the standard .05 level in social science. The researchers concluded that "These COVID-19 associations were not driven by the prevalence of diabetes, obesity, or smoking. Finally, Louisiana's patterns of $PM_{2.5}$ [particulate] pollution have changed dramatically over time, with vehicle emissions declining substantially, industrial sources becoming a relatively larger fraction of $PM_{2.5}$, and the state recently losing ground on long-term air quality improvements.[180]

**Environmental injustice by race in Louisiana is tied to official policy.** An analysis published in the *Villanova Environmental Law Journal* notes that more affluent white communities can better resist the siting of polluting operations. The study faults both federal and state of Louisiana regulators for failing to protect Black residents from environmental pollution.[181] A coalition of environmental groups in 2021 gave the Louisiana legislature an "F" for how it handles environmental issues. The coalition found that both Republicans and Democrats in the state legislature had voted for bills that made it more difficult for the public to gain information from polluters and blocked bills that would have increased transparency. However, there were major partisan differences in how the coalition graded Republican and Democratic members.

---

[180] Kimberly A. Terrell and Wesley James, "Racial Disparities in Air Pollution Burden and COVID-19 Deaths in Louisiana, USA, in the Context of Long-Term Changes in Fine Particulate Pollution," Environmental Justice, Online Ahead of Print, https://www.liebertpub.com/doi/10.1089/env.2020.0021.

[181] Idna G. Castellon, "Cancer Alley and the Fight Against Environmental Racism," Villanova Environmental Law Journal, 32 (2021), 15-43.

As compiled by the Gulf Coast Center for Law and Policy and the Power Coalition for Equity and Justice, the mean environmental justice score for Democrats in the Louisiana State House is 72.6%, which is 30 percentage points and 70% higher than the mean Republican score of 42.6%. The mean environmental justice score for Democratic members of the Louisiana State Senate is 71.1%, which is 18.7 percentage points and 36% higher than the mean Republican score of 52.4%.[182]

A study by Louisiana State University, New Orleans, School of Public Health lists the ways in which official Louisiana policies have contributed to racial environmental injustice:

The current project identified potential factors contributing to this injustice:[183]

1) arbitrary environmental justice assessment protocols; lack of consideration of cumulative risks in industry citing and permit decisions

2) laws limiting aid provided by academic law clinics;

3) insufficient environmental monitoring in fence line communities;

4) inadequate regulatory oversight and enforcement;

5) biased industrial tax exemption program decisions; and

6) lack of investments in infrastructure for transportation, education, health care, fresh foods, drinking water and renewable energy.

A 2022 report shows that the EPA is finally recognizing and cracking down on racial environmental injustice in Louisiana. The Associated Press reported in January 2022 that "The

---

[182] Together Louisiana, Louisiana Budget Project, the Gulf Coast Center for Law and Policy and the Power Coalition for Equity and Justice Legislative Scorecard: Clean Air, Land, and Water" https://howtheyvote.la/how-they-rank/.
[183] Victoria Peluso, Larry Sorapuru , and Adrienne Katner, "Recommendations to Ensure Equity Associated with Air Pollution in Louisiana's Climate Change Plan for COVID-19 Vulnerable Communities," LSU, New Orleans, School of Public Health, 2021, https://publichealth.lsuhsc.edu/honorsday/2021/docs/Posters/Peluso_COVID-19_Vulnerable_Communities.pdf.

Environmental Protection Agency is taking a series of enforcement actions to address air pollution, unsafe drinking water and other problems afflicting minority communities in three Gulf Coast states [Louisiana, Mississippi, and Texas] following a 'Journey to Justice' tour by EPA Administrator Michael Regan last fall." Regan said, "In every community I visited during the Journey to Justice tour, the message was clear: residents have suffered far too long and local, state, and federal agencies have to do better." Regan, who is Black, added "[a]s I look at many of the folks in these communities, they look just like me." The Associated Press noted that "A pilot project combining high-tech air pollution monitoring with additional inspectors will begin in three Louisiana parishes, including St. John the Baptist, St. James, and Calcasieu. The parishes are home to scores of industrial sites and have long suffered from water and air pollution."[184]

**Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.**

The state of Louisiana has no significant justification for its failure to create a second majority-Black district in the post-2020 redistricting processes. After the 2010 Census, the Louisiana redistricting process, controlled by a Republican legislature and Republican Governor Bobby Jindal, aimed to maximize Republican success in congressional elections.[185] Jindal and Republicans cited incumbency protection as a guiding principle for the redistricting, but this is equivalent to maximizing Republican representation given that the only Democrat was elected from the majority-black district.[186]

---

[184] "EPA Acts on Environmental Justice in Louisiana, Mississippi, and Texas," Associated Press, 26 January 2022, https://www.bizneworleans.com/epa-acts-on-environmental-justice-in-louisiana-mississippi-and-texas/.
[185] Stephanie Grace, "Redistricting Designed for Incumbents," Times-Picayune, 17 April 2011, https://www.nola.com/opinions/article_186a83ed-7211-513e-a3cc-996eb7a507aa.html; Times-Picayune Staff, "Jindal Signs Bill Creating New Louisiana Congressional, Legislative Districts," 15 April 2011, https://www.nola.com/news/politics/article_80067ce1-70b5-54d8-966d-2a9244624249.html.
[186] Ibid.

During the post-2020 Census redistricting cycle, the Republican-controlled legislature and Democratic Governor John Bel Edwards were at odds throughout. Gov. Bel Edwards believed that Louisiana's results from the 2020 Census supports the creation of a second majority-Black district while the legislature opted to maintain the status quo and, ultimately, Gov. Bel Edwards vetoed the legislatively passed map. In doing so, he remarked:

"Today, after careful consideration, review, discussion with legislators, and consultation with voting rights experts, I have vetoed the proposed congressional map drawn by Louisiana's Legislature because it does not include a second majority African American district, despite Black voters making up almost a third of Louisianans per the latest U.S. Census data. This map is simply not fair to the people of Louisiana and does not meet the standards set forth in the federal Voting Rights Act."[187]The legislature then overrode Gov. Bel Edwards' veto. In effect, because HB 1 is an iteration of the 2011 congressional plan, *see* **Table 17**, I believe that HB 1 will function to further dilute the votes of Black Louisianians across the state.[188]

The 2011 map packed Black voters into Congressional District 2 at a level far higher than what was needed to enable Black Louisianians to elect candidates of their choice. Per the 2010 Census, District 2 had a Black population that was 61.9% Black and a Black voting age population of 59.7%. Based on the 2017 U.S. Census American Community Survey, District 2 had a total population of 62.6% Black and a voting age population of 60.1% Black. The packing of Black voters into Congressional District 2 was accompanied by the cracking of the remainder of Black voters in other districts. Thus, in a state with more than a 31% Black voting age population, Black

---

[187] Office of the Governor, Gov. Edwards Vetoes Proposed Congressional District Map, Announces Other Action on Newly Drawn District Maps, https://gov.louisiana.gov/index.cfm/newsroom/detail/3585.
[188] *See*App. at 28.

voters in Louisiana did not reach 35% of the voting-age population in any other congressional district based on either 2010 or current Census data.[189]

To pack Black voters into District 2, the legislature split several communities of interest. According to the *Times-Picayune*, "[b]esides continuing to divide minority voting influence in north Louisiana, the congressional plan also splits several geographic regions. Parishes from Orleans to East Baton Rouge were divided to help craft the 2nd District, though that did not raise complaints. St. Landry, Terrebonne, and Lafourche parishes, meanwhile, were partitioned over the ardent protests of their representatives and senators."[190] Thus, there appears to have been no reason, particularly given the strong presence of almost all Senate Factors, to reject the maps proposing two majority-minority districts.

An updated 2015 analysis by Ballotpedia, a standard, independent and nonpartisan source of information about elections and voting,[191] found that District 2 had the fourth highest Black population of any district in the nation. A 50% Black population is typically more than sufficient to enable Black voters to elect candidates of their choice to partisan office. The logic is simple. As compared to whites, Black Americans are overwhelmingly Democratic, including in Louisiana as **Table 1** demonstrates, and as a result will dominate the Democratic primaries in districts with a 50% Black population or even in districts where the Black population is as low as 40%. In turn, there will be more than enough cross-over voting to elect the Democratic candidate of choice of Black voters in general elections. Of 22 congressional districts nationwide with a Black population

---

[189] Ibid, "Jindal Signs Bill."
[190] Staff, "Jindal Signs Bill Creating New Congressional, Legislative Districts, 1 Times-Picayune, 5 April 2011, https://www.nola.com/news/politics/article_80067ce1-70b5-54d8-966d-2a9244624249.html,
[191] For examples of the widespread use of Ballotpedia information, see, for example, "Ballotpedia in the News," https://ballotpedia.org/Ballotpedia:What_people_are_saying.

of 50% or more, 95.5% have a Black representative of eight congressional districts nationwide with a Black population of at least 40%, but less than 50%, all have a Black representative.[192]

According to the State Board of Elections website, in 2012, the first election following the post-2010 Census redistricting, in Louisiana's Congressional District 2, the combined Democratic candidates won 80.2% of the primary election vote. Black candidate Cedric Richmond, the candidate of choice of Black voters, was comfortably in the lead with 55.2 %, thereby avoiding a runoff. His nearest competitor won 25.0% of the vote.[193] In 2014, 2016, and 2018, no Republican even contested CD 2, and Richmond overwhelmingly prevailed with 68.7%, 69.8%, and 80.6% of the vote.[194]

In fact, the packing of Black Louisianians into Congressional District 2 cannot be justified on the basis of conforming to traditional redistricting principles. As **Map 2** and **Map 3** show, to achieve this packing, the state created an elongated, distorted district that was much less compact than the post-2000 Census plan.[195] The 2011 CD 2 has a large and irregular finger that extends from New Orleans to East Baton Rouge Parish to pick up pockets of black population. It wraps CD 6 around CD 2 to capture white population. Ironically, a comparison of **Map 4** and **Map 5** shows that CD 2 in Louisiana resembles the 1812 salamander-like district drawn by Massachusetts governor Elbridge Gerry that gave rise to the term "gerrymander."[196] HB 1 further whittles away

---

[192] *Supra*, n 102.

[193] Louisiana Secretary of State, Official Election Results, Results for Election Date: 11/6/2012, https://voterportal.sos.la.gov/static/2012-11-06/resultsRace/Congressional.

[194] Ibid., Results for Election Date: 11/4/2014, https://voterportal.sos.la.gov/static/2014-11-04/resultsRace/Congressional; Results for Election Date: 11/8/2016, https://voterportal.sos.la.gov/static/2016-11-08/resultsRace/Congressional; Results for Election Date: 11/6/2018, https://voterportal.sos.la.gov/static/2018-11-06/resultsRace/Congressional.

[195] *See* App. at 29-30.

[196] *See* App. at 31.

the irregular shape of CD 2 by continuing the needless packing of Black voters into CD 2.[197]

The foregoing analysis demonstrates that the rationale for the post-2020 congressional redistricting plan is tenuous at best. Black Louisianians comprise more than 31% of the state's voting-age population but have an opportunity to elect candidates of their choice in just one of six districts (16.7%). There is no good government rationale for this plan. Instead, HB 1 further dilutes the votes of heavily Democratic Black voters and assures the continued Republican domination of the state's congressional delegation.

---

[197] PVI, https://www.cookpolitical.com/pvi-0.

## VI. Conclusions

The analysis above indicates that eight Senate Factors are present in Louisiana while the only remaining factor, Factor 4 on slating, is not relevant for congressional elections. Of particular importance is the extensive and continuing history of discrimination in the state. This ongoing history bears directly on the inability of Black Louisianians to participate fully in the political process and elect candidates of their choice. It contributes to the socioeconomic disadvantages of Black voters, which also inhibits political opportunities. Moreover, the lack of responsiveness to the particularized needs of Black citizens is another indicator of a political system in which Blacks lack full participation. In turn, this lack of responsiveness contributes to the ongoing socio-economic disparities between minorities and whites. Given Black voter cohesion, the opportunities for Black voters to elect candidates of their choice in the face of white oppositional bloc voting, is thwarted by the packing and cracking of congressional districts under both the post-2010 and post-2020 redistricting plans.

Other factors are likewise important as well. The majority-vote requirement in Louisiana poses a barrier to Black electoral success. Racial appeals are indicative of discriminatory attitudes towards minorities and contribute to a climate of racial tension. Disparities in the representation of Blacks among elected officials indicate a lack of full participation by Black voters in the political process. It is worth noting that every Black American holding a seat in Louisiana's congressional delegation and the Louisiana State Legislature was elected from a majority-Black district. The tenuousness of public policy rationales for the challenged redistricting plan provides further evidence that the plan has a discriminatory impact. Not only does HB 1 pack and crack Black Louisianians to further distort CD 2, but HB 1 woefully splits communities of interest to achieve

65

this end.

I reserve the right to continue to supplement my declaration in light of additional facts, testimony, and/or materials that may come to light.

Respectfully submitted,

Allan J. Lichtman

# APPENDIX

*Senate Factor 2*

| TABLE 1 VOTING FOR CANDIDATES, BLACKS AND WHITES, 2012, 2016, 2020 PRESIDENT | | | |
|---|---|---|---|
| **ELECTION, CANDIDATE** | **% BLACK VOTE** | **% WHITE VOTE** | **RACIAL GAP** |
| | | | |
| LOUISIANA OBAMA, 2012 PRESIDENT | 95% | 20% | **75 Percentage Points** |
| LOUISIANA CLINTON, 2016 PRESIDENT | 91% | 26% | **65 Percentage Points** |
| LOUISIANA BIDEN, 2020 PRESIDENT | 98% | 22% | **76 Percentage Points** |
| * Source, Cooperative Congressional Election Study (CCES), 2012, 2016, 2020 https://cces.gov.harvard.edu/. | | | |

# CHART 1

## VOTING FOR CANDIDATES, BLACKS AND WHITES, 2012, 2016, 2020 PRESIDENT



**TABLE 2**

**NAACP & LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS, RATINGS, 2017 and 2017-2018 LOUISIANA MEMBERS OF US SENATE AND HOUSE**

| MEMBER | PARTY | NAACP RATING 2017-2018 | LEADERSHIP CONF. RATING 2019-2020 |
|---|---|---|---|
| | | | |
| **U.S. SENATORS** | | | |
| | | | |
| BILL CASSIDY | REPUBLICAN | 13% | 0% |
| JOHN KENNEDY | REPUBLICAN | 9% | 7% |
| | | | |
| **U.S. HOUSE MEMBERS** | | | |
| | | | |
| STEVE SCALISE | REPUBLICAN | 9% | 0% |
| CLAY HIGGINS | REPUBLICAN | 6% | 0% |
| MIKE JOHNSON | REPUBLICAN | 9% | 3% |
| RALPH ABRAHAM | REPUBLICAN | 6% | 3% |
| GARRET GRAVES | REPUBLICAN | 9% | 6% |
| CEDRICK RICHMOND | DEMOCRAT | 91% | 96% |
| | | | |
| Sources: NAACP Civil Rights Federal Legislative Report Card, https://naacp.org/sites/default/files/documents/115th-Final-Report-Card.pdf; Leadership Conference on Civil and Human Rights, 2017-2018 Ratings, https://votesmart.org/interest-group/169/rating/10931#.XauZaEZKjIU. | | | |

**TABLE 3**

**NAACP & LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS, RATINGS, 2017-2018 NATIONAL AND SOUTHERN MEMBERS OF US SENATE AND HOUSE**

| GEOGRAPHY | PARTY | NAACP RATING | LEADERSHIP CONF. RATING |
|---|---|---|---|
| | | | |
| US SENATORS | | | |
| | | | |
| NATION | REPUBLICAN | 11% | 2% |
| | DEMOCRAT | 98% | 95% |
| | | | |
| DIFFERENCE DEM-REP | | +87 Percentage Points | +93 Percentage Points |
| | | | |
| SOUTH | REPUBLICAN | 11% | 1% |
| | DEMOCRAT | 100% | 88% |
| | | | |
| DIFFERENCE DEM-REP | | +89 Percentage Points | +87 Percentage Points |
| | | | |
| US HOUSE MEMBERS | | | |
| | | | |
| NATION | REPUBLICAN | 5% | 5% |
| | DEMOCRAT | 93% | 92% |
| | | | |
| DIFFERENCE DEM-REP | | +88 Percentage Points | +87 Percentage Points |
| | | | |
| SOUTH | REPUBLICAN | 3% | 4% |
| | DEMOCRAT | 87% | 88% |
| | | | |
| DIFFERENCE DEM-REP | | +84 Percentage Points | +84 Percentage Points |
| | | | |
| Sources: NAACP Civil Rights Federal Legislative Report Card, 2017-2018, https://naacp.org/sites/default/files/documents/115th-Final-Report-Card.pdf; Leadership Conference on Civil and Human Rights, 116TH Congress, Ratings, http://civilrightsdocs.info/pdf/voting-record/VotingRecord-116thCongress-TheLeadershipConference-October2020.pdf. | | | |

**CHART 2**

**SOUTH, NAACP & LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS, RATINGS, 2017 and 2017-2018 MEMBERS OF US SENATE AND HOUSE**



# TABLE 4

**RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2020: "The Irish, Italians, Jews and many other minorities overcame prejudice and worked their way up. Blacks should do the same without any special favors."**

| VOTERS | STRONGLY AGREE | SOMEWHAT AGREE | STRONGLY OR SOMEWHAT AGREE |
|---|---|---|---|
|  |  |  |  |
| BIDEN VOTERS N=180 | 5% | 13% | 18% |
|  |  |  |  |
| TRUMP VOTERS N=244 | 61% | 32% | 93% |
|  |  |  |  |
| **DIFFERENCE OBAMA-ROMNEY VOTERS** | **-56 Percentage Points** | **-19 Percentage Points** | **-75 Percentage Points** |
| Source: Cooperative Congressional Election Survey (CCES), 2012, https://cces.gov.harvard.edu/. | | | |

**CHART 3**

**RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2012: "The Irish, Italians, Jews and many other minorities overcame prejudice and worked their way up. Blacks should do the same without any special favors."**



# TABLE 5

## RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2020:
**"Generations of slavery and discrimination have created conditions that make it difficult for Blacks to work their way out of the lower class."**

| VOTERS | STRONGLY AGREE | SOMEWHAT AGREE | STRONGLY OR SOMEWHAT AGREE |
|---|---|---|---|
| | | | |
| BIDEN VOTERS N=179 | 56% | 20% | 76% |
| | | | |
| TRUMP VOTERS N=244 | 3% | 3% | 6% |
| | | | |
| **DIFFERENCE OBAMA-ROMNEY VOTERS** | **+53 Percentage Points** | **+17 Percentage Points** | **-70Percentage Points** |
| | | | |
| Source: Cooperative Congressional Election Survey (CCES), 2012, https://cces.gov.harvard.edu/. | | | |

**CHART 4**

**RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2012:**
**"RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2012:**
**"Generations of slavery and discrimination have created conditions that make it difficult for Blacks to work their way out of the lower class."**



# TABLE 6

## RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2020:

**"White people in the U.S. have certain advantages because of the color of their skin."**

| VOTERS | STRONGLY AGREE | SOMEWHAT AGREE | STRONGLY OR SOMEWHAT AGREE |
|---|---|---|---|
| | | | |
| BIDEN VOTERS N=180 | **62%** | **27%** | **89%** |
| | | | |
| TRUMP VOTERS N=245 | **0%** | **9%** | **9%** |
| | | | |
| **DIFFERENCE OBAMA-ROMNEY VOTERS** | **+62 Percentage Points** | **+18 Percentage Points** | **+80 Percentage Points** |
| | | | |
| Source: Cooperative Congressional Election Survey (CCES), 2012, https://cces.gov.harvard.edu/. | | | |

# CHART 5

## RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2020:
**"White people in the U.S. have certain advantages because of the color of their skin."**



-App. 10-

**TABLE 7**

**RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2008:**

**"Require that all voters be able to read a passage from the U. S. Constitution."**

| VOTERS | SUPPORT | OPPOSE | UNSURE |
|---|---|---|---|
| OBAMA VOTERS N=78 | 18% | 62% | 21% |
| | | | |
| MCCAIN VOTERS N=186 | 61% | 26% | 13% |
| | | | |
| DIFFERENCE OBAMA-MCCAIN VOTERS | -43 Percentage Points | +36 Percentage Points | +8 Percentage Points |
| | | | |
| Source: Cooperative Congressional Election Survey (CCES), 2008, https://cces.gov.harvard.edu/. | | | |

**CHART 6**

**RESPONSES TO QUESTION BY PRESIDENTIAL VOTE 2008: "Require that all voters be able to read a passage from the U. S. Constitution."**



## TABLE 8

## VOTING BY RACE IN THE 2008 DEMOCRATIC PRIMARY FOR PRESIDENT IN LOUISIANA, FEBRUARY 9, 2008

| CANDIDATE | % OF BLACK VOTERS FOR | % OF WHITE VOTERS FOR | DIFFERENCE BLACK-WHITE |
|---|---|---|---|
| | | | |
| OBAMA (B) | 86% | 30% | +56 PERCENTAGE POINTS |
| | | | |
| CLINTON (W) | 13% | 58% | -45 PERCENTAGE POINTS |
| | | | |
| OTHERS (4W,1H) | 1% | 12% | -11 PERCENTAGE POINTS |
| ALL NON-BLACK CANDIDATES | 14% | 70% | -56 PERCENTAGE POINTS |
| | | | |
| Source: ABC News 2008 Democratic Primary Exit Poll Results - Key Groups, https://abcnews.go.com/images/PollingUnit/08DemPrimaryKeyGroups.pdf. 1,861 Respondents. | | | |

**CHART 7**

**VOTING BY RACE IN THE 2008 DEMOCRATIC PRIMARY FOR PRESIDENT IN LOUISIANA, FEBRUARY 9, 2008**



-App. 13-

# TABLE 9

## VOTING BY RACE & PARTY IN THE 2008 GENERAL ELECTION FOR PRESIDENT IN LOUISIANA

| CANDIDATE | % OF ALL BLACK DEMOCRATIC VOTERS FOR | % OF WHITE DEMOCRATIC VOTERS FOR | DIFFERENCE BLACK-WHITE DEMS |
|---|---|---|---|
|  |  |  |  |
| OBAMA (B) | 98% | 38% | +60% |
|  |  |  |  |
| MCCAIN (W) | 2% | 60% | -58% |
|  |  |  |  |

# CHART 8

## VOTING BY RACE & PARTY IN THE 2008 GENERAL ELECTION FOR PRESIDENT IN LOUISIANA



-App. 14-

*Senate Factor 5*

| TABLE 10 ECONOMIC MEASURES, BLACK (INCLUDING MULTI-RACIAL) AND NON-HISPANIC WHITE PEOPLE, LOUISIANA | | |
|---|---|---|
| **MEASURE** | **AFRICAN AMERICANS** | **NON-HISPANIC WHITES** |
| **MEDIAN HOUSEHOLD INCOME** | $32,631 | $61,967 |
| **MEDIAN FAMILY INCOME** | $42,430 | $79.574 |
| **PER-CAPITA INCOME** | $19,464 | $34,690 |
| **ALL PERSONS IN POVERTY** | 29.4% | 12.7% |
| **CHILDREN IN POVERTY** | 43.2% | 15.0% |
| **UNEMPLOYED** | 8.0% | 4.2% |
| **EMPLOYED MANAGEMENT, PROFESSIONAL** | 26.3% | 40.4% |
| **HOUSEHOLD RECEIVED FOOD STAMPS LAST 12 MONTHS** | 27.0% | 8.6% |
| **HOMEOWNERS** | 48.8% | 76.6% |
| **MEDIAN HOME VALUE** | $132,400 | $186,700 |
| **NO VEHICLE AVAILABLE IN HOUSEHOLD** | 16.5% | 4.7% |
| **NO BROADBAND INTERNET** | 15.7% | 27.8% |
| Source: U. S. Census, American Community Survey, 2019, 1-Year Estimates. | | |

| TABLE 11<br><br>EDUCATION MEASURES, BLACK (INCLUDING MULTI-RACIAL) AND NON-HISPANIC WHITE PEOPLE, LOUISIANA | | |
|---|---|---|
| **MEASURE** | **AFRICAN AMERICANS** | **NON-HISPANIC WHITES** |
| **HIGH SCHOOL GRADUATES OR MORE AGE 25+** | 82.1% | 88.9% |
| **BACHELOR'S DEGREE+ AGE 25+** | 17.0% | 28.9% |
| **% AT OR ABOVE BASIC 8TH GRADE MATH** | 41% | 77% |
| **% AT OR ABOVE BASIC 8TH GRADE READING** | 52% | 79% |
| **HIGH SCHOOL GRADUATION RATE** | 73% | 83% |
| Source: U. S. Census, American Community Survey, 2019, 1-Year Estimates; National Assessment of Educational Progress, The Nation's Report Card, 2019 Louisiana, https://nces.ed.gov/nationsreportcard/subject/publications/stt2019/pdf/2020013LA8.pdf; https://nces.ed.gov/nationsreportcard/subject/publications/stt2019/pdf/2020014LA8.pdf;<br><br>National Center for Educational Statistics, "Public High School Graduation Rate," 2018-2019, https://nces.ed.gov/programs/coe/indicator/coi. | | |

| TABLE 12 HEALTH MEASURES, BLACK AND NON-HISPANIC WHITE PEOPLE, LOUISIANA | | |
|---|---|---|
| **MEASURE** | **AFRICAN AMERICANS** | **NON-HISPANIC WHITES** |
| | | |
| **INFANT MORTALITY RATE PER 1,000 LIVE BIRTHS** | 12.4 | 5.3 |
| | | |
| **LOW BIRTH WEIGHT BABIES** | 15.5% | 7.8% |
| | | |
| **LIFE EXPECTANCY** | 72.4 | 76.7 |
| | | |
| **ADULT MEN POOR OR FAIR HEALTH** | 25% | 18% |
| | | |
| **ADULT WOMEN POOR OR FAIR HEALTH** | 28% | 21% |
| | | |
| **COMPOSITION OF MEDICAL SCHOOL GRADS** | 8.3% | 72% |
| | | |
| **NON-ELDERLY MEDICAID** | 47% | 20% |
| | | |
| **WITH PRIVATE INSURANCE** | 43.3% | 67.5% |
| | | |
| **WITH NO INSURANCE** | 8.9% | 6.9% |
| | | |
| Source: Louisiana Department of Health, "Minority Health, 2017," http://ldh.la.gov/index.cfm/page/672. Insurance data from U.S. Census, American Community Survey, 2019. | | |

| TABLE 13 | | | | |
|---|---|---|---|---|
| **BLACK AND WHITE TURNOUT, PERCENT OF VOTING AGE POPULATION (VAP), 2012-2018** | | | | |
| **ELECTION & RACE** | **VAP** | **TURNOUT** | **% OF VAP** | **DIFFERENCE WHITE V. BLACK** |
| | | | | |
| **2018 WHITE** | **2,176,419** | **1,022,263** | **47.0%** | **+7.9 PERCENTAGE POINTS** |
| **2018 BLACK** | **1,119,452** | **437,796** | **39.1%** | |
| | | | | |
| **2016 WHITE** | **2,184,562** | **1,380,917** | **63.2%** | **+10.7 PERCENTAGE POINTS** |
| **2016 BLACK** | **1,111,623** | **584,028** | **52.5%** | |
| | | | | |
| **2014 WHITE** | **2,178,444** | **1,028,727** | **47.2%** | **+7.3 PERCENTAGE POINTS** |
| **2014 BLACK** | **1,093,266** | **436,109** | **39.9%** | |
| | | | | |
| **2012 WHITE** | **2,166,848** | **1,324,914** | **61.1%** | **+3.3 PERCENTAGE POINTS** |
| **2012 BLACK** | **1,067,717** | **617,318** | **57.8%** | |
| | | | | |
| Source: U.S. Bureau of the Census, American Community Survey, 2017, 2016, 2014, 2012; Louisiana Secretary of State, Post-Election Statistics – Statewide, https://www.sos.la.gov/ElectionsAndVoting/Pages/PostElectionStatisticsStatewide.aspx. | | | | |

| TABLE 14 U.S. NEWS, RANKINGS OF THE STATES, 2019, LOUISIANA | |
|---|---|
| **MEASURE** | **LOUISIANA RANKING** |
| | |
| **HEALTH CARE** | **45th** |
| | |
| **EDUCATION** | **48th** |
| | |
| **ECONOMY** | **49th** |
| | |
| **OPPORTUNITY** | **50th** |
| | |
| **INFRASTRUCTURE** | **48th** |
| | |
| **CRIME AND CORRECTIONS** | **50th** |
| | |
| **FISCAL STABILITY** | **43rd** |
| | |
| **QUALITY OF LIFE** | **50th** |
| | |
| **OVERALL** | **50th** |
| | |
| Source: U.S. News, "State Rankings," 2019, https://www.usnews.com/news/best-states/rankings; Educational ranking includes both K-12 and higher education. | |

*Senate Factor 6*

## FROM DAVID VITTER AD 2010 SENATORIAL CAMPAIGN



**FROM DAVID VITTER EDITED AD, 2010 SENATORIAL
CAMPAIGN**



**FROM DAVID VITTER AD 2015 GUBERNATORIAL CAMPAIGN**



**REPUBLICAN GOVERNOR'S ASSOCIATION AD AGAINST
DEMOCRATIC GUBERNATORIAL CANDIDATE JOHN BEL
EDWARDS, 2019**



## LOUISIANA CITIZENS FOR JOB CREATORS, AUGUST 2021 AD

Ricardo D. Martínez-Schuldt and Daniel E. Martínez, "Sanctuary Policies and City-Level Incidents of Violence, 1990 to 2010" *Justice Quarterly,* 36 (2019): 567-593.





*Senate Factor 7*

| TABLE 15 | | | | |
|---|---|---|---|---|
| **AFRICAN AMERICAN REPRESENTATION AMONG LOUISIANA PUBLIC OFFICIALS** | | | | |
| **Public Office** | **% of Office Holders** | **VAP** | **Percentage Point Gap** | **Differential # of Positions** |
| | | | | |
| State Executive Officials | 0% (0 of 7) | 31.3% | 31.3% | -7.0 |
| | | | | |
| Congress | 16.6% (1 of 6) | 31.3% | 14.7% | -.88 |
| | | | | |
| State Senate | 23.1% (9 of 39) | 31.3% | 8.2% | -3.2 |
| | | | | |
| State House | 22.9% (24 of 105) | 31.3% | 8.4% | -8.8 |
| | | | | |
| Judiciary | 23.4% (86 of 367) | 31.3% | 7.9% | -29 |
| | | | | |
| State Supreme Court | 14.3% (1 of 7) | 31.3% | 17% | -1.2 |
| | | | | |
| Sources: Population by Age and Race, 2017 American Community Survey, United States Census; Louisiana.gov, "Executive Officials," http://louisiana.gov/Government/Executive_Branch/#electedofficials; Louisiana Legislative Black Caucus, http://house.louisiana.gov/H_Reps/H_Reps_Caucus_LLBC.aspx; Louisiana House of Representatives, 2016-2020, http://house.louisiana.gov/H_Seating/H_SeatingPicsLinks.aspx; Louisiana State Senate, "Membership Statistics," http://senate.la.gov/Senators/Data.asp; Heather J. Johnson and Sally J. Kenney, "The Gender and Race of Louisiana Judges, 1992 to 2017," January 2018, p. 9, https://tulane.app.box.com/s/umogen66ysw04ckmxrdc89tp62lwkdt4. | | | | |

*Senate Factor 8*

| TABLE 16<br>LOUISIANA RANKINGS, ELEMENTARY AND SECONDARY SCHOOLS | | | | | |
|---|---|---|---|---|---|
| Measure | Education Week | National Assessment of Educational Progress | Cato | WalletHub | US News |
| **Quality** | 48th | | | 46th | |
| **Chance for Success** | 48th | | | | |
| **Safety** | | | | 50th | |
| **Mathematics** | | 50th | | | |
| **Reading** | | 48th | | | |
| **Overall** | | | 49th | | 46th |

Sources: Education Week Research Center, "State Grades on K-12 Education: Map and Rankings," Updated, 10 October 2018, https://www.edweek.org/ew/collections/quality-counts-2018-state-grades/report-card-map-rankings.html; Education Week Research Center, "State Grades on Chance for Success," 15 January 2019, https://www.edweek.org/ew/collections/quality-counts-2019-state-grades/state-grades-on-chance-for-success-2019.html; National Center for Educational Statistics, National Assessment of Educational Progress, 2017 Results, State Profiles, https://www.nationsreportcard.gov/profiles/stateprofile?chort=1&sub=RED&sj=AL&sfj=NP&st=MN&year=2017R3 Stan J. Liebowitz and Matthew L. Kelly, Fixing the Bias in Current State K–12 Education Rankings, Cato Institute, 18 November 2018, https://object.cato.org/sites/cato.org/files/pubs/pdf/pa-854-updated.pdf; Pre-K to 12 Rankings, U.S. News, July 2019, https://www.usnews.com/news/best-states/rankings/education/prek-12.

**MAP 1**

**EPA, 2014 NATIONAL TOXICS AIR ASSESSMENT (GREEN AND DARK GREEN SHOWS HIGH CANCER RATES)**



**MAP 2**
**EPA RISK SCREENING ENVIRONMENTAL INDICATORS (PURPLE SHOWING
HIGH RISK)**



*Senate Factor 9*

**TABLE 17**
**COOK'S PARTISAN VOTING INDEX (PVI) FOR POST-20210 AND POST-2020**
**CONGRESSIONAL REDISTRICTING PLAN, LOUISIANA**

| CONGRESSIONAL DISTRICT | COOK'S PVI POST-2010 PLAN | COOK'S PVI POST-2020 PLAN |
|---|---|---|
| CD 1 | R+22 | R+23 |
| CD 2 | D+25 | D+25 |
| CD 3 | R+21 | R+21 |
| CD 4 | R+14 | R+24 |
| CD 5 | R+17 | R+16 |
| CD 6 | R+18 | R+19 |
| Source: David Wasserman: "New Maps and 2022 Ratings: Louisiana, Ohio," Cook Political Report, 31 March 2022, https://www.cookpolitical.com/analysis/house/redistricting/new-maps-and-2022-ratings-louisiana-ohio. | | |

## MAP 2
## 2011 CONGRESSIONAL PLAN DISTRICTS



# MAP 3

# PRE-2011 CONGRESSIONAL DISTRICTS, LOUISIANA



United States Congressional Districts in Louisiana: 2003 ~ 2013
Data source: http://cdmaps.polisci.ucla.edu, *Digital Boundary Definitions of United States Congressional Districts, 1789 ~ 2012.*

**MAP 4**

**ELBRIDGE GERRY'S 1812 SALAMANDER-LIKE DISTRICT**
(https://www.fairvote.org/happy-200th-birthday-to-the-gerry-mander)



**MAP 5**

**2011 CONGRESSIONAL PLAN DISTRICT 2**



# Curriculum Vitae

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

## EDUCATION

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

## PROFESSIONAL EXPERIENCE

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

Expert witness in more than 90 redistricting, voting rights and civil rights cases

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

## HONORS AND AWARDS

Outstanding Teacher, College of Arts and Sciences, 1975-76

Outstanding Scholar, College of Arts and Sciences, 1978-79

Outstanding Scholar, The American University, 1982-83

Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000-meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500 meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

 Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Texas Congressional redistricting case *LULAC v. Perry* (2006)

Interviews nominated by the Associated Press for the Edward R. Murrow Award for broadcasting excellence.

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT: Finalist for the 2008 National Book Critics Circle Award in general nonfiction.

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

FDR AND THE JEWS: Designated for Belknap Imprint of the Harvard University Press,

reserved for works of special distinction and lasting value; *New York Times* editors' choice book for 2013, submitted for Pulitzer Prize 2013, winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History.

THE CASE FOR IMPEACHMENT: Independent bookstore bestseller, Amazon.com bestseller in several academic categories, *Newsweek*, best new book releases, April 18, 2017.

Winner of the Alfred Nelson Marquis Life Time Achievement Award for top 5% of persons included in Marquis WHO'S WHO, 2018.

Listed by rise.global as # 85 among 100 most influential geopolitical experts in the world.

**SCHOLARSHIP**

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books Edition, 2005)

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).

THE KEYS TO THE WHITE HOUSE, 2016 EDITION (Lanham: Rowman & Littlefield)

THE CASE FOR IMPEACHMENT (HarperCollins, April 2017, updated paperback January 2018)

THE EMBATTLED VOTE IN AMERICA: FROM THE FOUNDING TO THE PRESENT (Harvard University Press, 2018)

REPEAL THE SECOND AMENDMENT: THE CASE FOR A SAFER AMERICA (St. Martin's Press, 2020)

THE KEYS TO THE WHITE HOUSE, 2020 EDITION (Lanham: Rowman & Littlefield, 2020)

THIRTEEN CRACKS: CLOSING DEMOCRACIES LOOPHOLES ((Lanham: Rowman & Littlefield, 2021)


Monographs:

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001

B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds., POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D. C.: American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History:`Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW

5

JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow, 1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?," SOCIAL EDUCATION  60 (1996)

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

 "What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT (Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of," ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House:  A Preliminary Forecast for 2012" INTERNATIONAL JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010) REF

 "The Keys to the White House:  Forecast for 2012," FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

"The Keys to the White House: Prediction for 2016," SOCIAL EDUCATION (February 2016)

"The Keys to the White House," SOCIAL EDUCATION (October 2016)

"The Keys to the White House: Forecast for 2016," WORLD FINANCIAL REVIEW (January-February 2016)

"Barack Obama" in James M. Banner, Jr., ed., PRESIDENTIAL MISCONDUCT: FROM GEORGE WASHINGTON TO TODAY (New Press, 2019)

"The 2020 Presidential Election: How the Keys Are Pointing**,"** SOCIAL EDUCATION, Jan./Feb. 2020.

"The Keys to the White House: Forecast for 2020," HARVARD DATA SCIENCE REVIEW

(Oct. 2020) REF

 "The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973) REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons, `The Substance of Inherency,`" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert 2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted:
LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES
Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE
MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR
Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February
17, 1982)

"How to Bet in 1984.  A Presidential Election Guide," WASHINGTONIAN MAGAZINE
(April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6,
1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page,
(December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All,
(May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page,
(April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken
DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in

1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?," WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May, 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)

"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op Ed (June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of the Right," NEWSDAY, (August 7, 2005)

 "Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO ( June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPORTER (October 17, 2008)

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

"Why Democrats Need Hillary Clinton in 2016," THE HILL, June 11, 2014

"How Corporations Buy Our Government," THE HILL, July 1, 2014

"Who Rules America," THE HILL, August 12, 2014

"The End of Civil Discourse?" THE HILL, September 10, 2014

"Pass the Ache Act and Stop Destroying Appalachia?" THE HILL, October 28, 2014

"Democrats Have No One to Blame But Themselves,' THE HILL, November 7, 2014

"Donald Trump's Best Friend: Bernie Sanders," THE HILL March 10, 2016

"Trump Had One Thing Right About Abortion," THE HILL, April 1, 2016

"What is so Progressive About Sanders' Old-Fashioned Protectionism," April 7, 2016

"Sanders is Only Helping Trump by Staying in Race," THE HILL, June 30, 2016

"7 Pieces of Advice for Hillary Clinton," THE HILL, July 25, 2016

"Donald Trump's Call For Russia To Hack Hillary Clinton's Email Is A New Low For American Politics — And Maybe A Crime, NEW YORK DAILY NEWS, July 27, 2016

"Here's the Big Speech Clinton Needs to Make," THE HILL, September 9, 2016

"The Real Story Behind Trump's Tax Returns," THE HILL, October 3, 2016

"Trump is Establishment No Matter What He Says," THE HILL, October 12, 2016

"Trump Brings the Big Lie About Voter Fraud," THE HILL, October 19, 2016

"How a New Clinton Presidency Will Change American Politics Forever," THE HILL, October 22, 2016

"The Media is Rigging the Election by Reporting WikiLeaks Emails," THE HILL, October 26, 2016

"Why James Comey Must Resign Now," THE HILL, November 3, 2016

"Why Trump is Vulnerable to Impeachment," USA TODAY, April 18, 2017

"Donald Trump Meet the Real Andrew Jackson," THE HILL, May 5, 2017

11

"Why Does Trump's Voter Fraud Commission Really Wants Your Personal Voter Information,"

THE HILL, August 3, 2017

"Trump is a Lot Closer to Being Impeached, TIME.COM, November 2, 2017

"American Democracy Could be at Risk in the 2018 Elections," VICE December 20, 2017

"We are One Tantrum Away From Accidental War With North Korea," THE HILL, January 25,

2018

"Democrats Can't Survive on Anti-Trumpism Alone," TIME.COM, January 28, 2018

"Don't Expect the Mueller Investigation to End Anytime Soon," VICE March 21, 2018

"President Trump Faces Political Disaster if he Tries to Fire Mueller," THE HILL April 5, 2018

"Framers Fail: Voting is a Basic Right But They Didn't Guarantee it in the Constitution," USA TODAY, September 26, 2018

Suppressing Voting Rights is as Old as the Republic, But the Tactics Change," ZOCALO, October 8, 2018

"Voter Fraud Isn't a Problem in America. Low Turnout Is," WASHINGTON POST, Made for History, October 22, 2018

"Here are five ways a Democratic US House might try to impeach Donald Trump," LONDON SCHOOL OF ECONOMICS, US CENTRE, October 26, 2018.

"The Midterm Results Will Reveal What Drives Voters: A Love or Hate of Trump," THE GUARDIAN, November 5, 2018

"Unless Democrats Find a 2020 Candidate Like Beto O'Rourke, Trump May Well Be Set to Win" THE DAILY CALLER, November 7, 2018

"Why Nancy Pelosi Should be the Next Speaker, FORTUNE, November 27, 2018

"Its Well Past Time to Restructure the U.S. Senate," DAILY CALLER, December 4, 2018

"The Seven Crucial Takeaways From William Barr's Confirmation Hearings," SPECTATOR USA, January 16, 2019

"Did Democrats Forfeit, 2020" THE HILL March 14, 2019

"Barr's 'Summary' Of The Mueller Report Hardly Vindicates Trump," DAILY CALLER, March

25, 2019

"Collusion and Obstruction by Trump remain Open Questions after Attorney General's "Summary" of the Mueller Report," ARTSFORUM, March 26, 2019

"21 Questions for Robert Mueller," THE HILL, April 24, 2019

With U.S. Representative Al Green, "Congress Has a Duty to go Through With the Impeachment and Trial of Donald Trump," THE HILL, May 17, 2019

"If Democrats Want to Beat Trump, They Need to Take off the Gloves in the Primary," GQ, June 26, 2019

"Why Impeachment Of William Sulzer Is Solid Precedent For Donald Trump," THE HILL, September 9, 2019

"Not Futile To Impeach," NY DAILY NEWS, September 25, 2019

"Why Impeachment Favors Democrats In The Election," THE HILL, September 28, 2019

"If Trump is Impeached, Pence Should Go Too," TPM, October 7, 2019

"Time to Stop Talking 'Quid Pro Quo," and Start Looking at Actual Crimes," THE HILL, November 13, 2019

"Of all the Presidential Impeachment Inquiries, This is the One That Transcends Politics the Most," POLITICO, November 16, 2019

"Bill Barr's Dangerous Celebration of Unchecked Presidential Power, NEW YORK DAILY NEWS, November 25, 2019

"What Trump Really Wanted From Ukraine Was Not About Enemies," THE HILL, November 25, 2019

"Pelosi, Schiff Should Take More Time If They Want A Successful Impeachment Effort," DAILY CALLER, November 29, 2019

"It's Our Political System, Not Impeachment, That Is Broken. And Only Politics Can Fix It," POLITICO, December 6, 2019

"The 2010s Were the Decade That Brought Democracy to the Breaking Point," TPM, December 23, 2019

"Will Roberts Call Balls and Strikes at the Impeachment Trial," THE HILL, December 30, 2019

"The Bill Clinton Trial Cannot Serve as the Model for the Donald Trump Trial," THE HILL,

January 8, 2020

"What Law Did Donald Trump Break?" THE HILL, January 23, 2020

"The Flawed Case of Alan Dershowitz," THE HILL, January 30, 2020

"What Will the History Books Say About This Impeachment," POLITICO, February 5, 2020

"Why Bernie Sanders is Electable," THE HILL, February 24, 2020

"The Ugly History of Trump's Looting/Shooting Threat," NEW YORK DAILY NEWS, May 29, 2020

"What Joe Biden Must do Now," THE HILL, June 10, 2020

"Bad Economies do not Threaten Lives," (with Sam Lichtman), THE HILL, July 6, 2020

"He Predicted Trump's Win in 2016: Now He's Ready to Call 2020," NEW YORK TIMES VIDEO, August 5, 2020

"Time to Jettison Horse Race Polls," THE HILL, November 19, 2020

"Here is the Smoking Gun Evidence to Back Impeachment of Donald Trump," THE HILL, February 8, 2021.

"There's No Constitutional Question: The Senate Can Try Trump," NEW YORK DAILY NEWS, February 8, 2021

Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 - 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

Contributor: THE HILL, 2014-present

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.

**TEACHING**

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth Century, United States Economic History, Historiography, Major Seminar in History, Graduate Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), Historians and the Living Past for Honors Students, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, Government and the Citizen (Honors Program), Introduction to Historical Quantification, Public Policy in U. S. History, Honors Seminar in U.S. Presidential Elections, America's Presidential Elections, What Is America?, Honors Seminar on FDR, Jews, and the Holocaust, The Modern American Presidency, Voting and Elections in America, American Conservatism.
.

**TELEVISION APPEARANCES**

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally, including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

**RADIO SHOWS**

I have participated in many thousands of radio interview and talk shows broadcast nationwide, in foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

**PRESS CITATIONS**

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia Inquirer, Time, Newsweek, Business Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES**

Invited participant and speaker, Bostick Conference on Fogel and Engerman`s TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History, October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication

16

Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930`s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyer's Committee for Civil Rights Under Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April, 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April, 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November, 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February, 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August, 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

Testimony Presented Before the Texas State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Texas State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2013

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, "Election 2008: What Happened and Why?" Boston, February 2009

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, "The Keys for 2012" Chicago, April 2010

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October, 2010, 2011

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forun, Krynica, Poland, 2013

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department
of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social
Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History,
1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University,
1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle States Accreditation Review 1992-1994

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

**OTHER POSITIONS**

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:

   1.  directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.
   2. chairing a public session at the Smithsonian on how to do the history of one's own family.
   3. helping to direct the Sixth International Smithsonian Symposium on Kin and Communities in America (June 1977).
   4. editing the volume of essays from the symposium.

23

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential Candidates." This document was a major component of Anderson's legal arguments against restrictive ballot laws that ultimately prevailed in the Supreme Court (Anderson v. Celebreeze 1983).  According to Anderson's attorney: "the basis for the majority's decision echoes the themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition techniques to their work on the recovery of communities from the effects of such natural disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.