IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENE SOULE, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, AND POWER COALITION FOR EQUITY AND JUSTICE, | CIVIL ACTION NO.  3:22-cv-00211<br><br>Chief Judge Shelly D. Dick Magistrate Judge Scott D. Johnson |

*Plaintiffs,*

v.

R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana,

*Defendant.*

| | |
|---|---|
| EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, and TRAMELLE HOWARD, | CIVIL ACTION NO. 3:22-cv-00214<br>(consolidated with Civil Action No. 3:22-cv-00211)<br><br>Chief Judge Shelly D. Dick Magistrate Judge Scott D. Johnson |

*Plaintiffs,*

v.

R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana,

*Defendant.*

## BRIEF *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY

# TABLE OF CONTENTS

INTEREST OF THE *AMICI CURIAE* .................................................... 1

SUMMARY OF ARGUMENT ............................................................. 3

ARGUMENT ................................................................................. 5

I.  Federal Caselaw Guides How a District Court Should Remedy a Congressional Redistricting Plan's Voting Rights Act Violation. ........................................ 5

   A.  Likelihood of Success on the Merits ........................................ 5

   B.  The Equities, the Public Interest, and the "*Purcell* Principle" ............................. 6

   C.  Remedial Roles of the Legislature, the Governor, and the Federal Court .......... 8

      1.  Curing the VRA Violation ..................................... 11

      2.  Avoiding the Excessive and Unjustified Use of Race ............................ 13

      3.  Complying with Other Legal Requirements ......................... 15

II.  The *Amicus* Map Illustrates the Benefits of Computational Redistricting When Remedying a Plan's Voting Rights Act Violation. ........................... 15

   A.  The *Amicus* Map Cures Any VRA Violation in the Enacted Plan. .................... 19

   B.  The *Amicus* Map Is Not Overly Race Conscious. ................................... 25

      1.  General criteria ............................................ 28

      2.  Geographic compactness ..................................... 28

      3.  Respect for political subdivisions ............................ 30

      4.  Respect for communities of interest .......................... 31

   C.  The *Amicus* Map Complies with All Other Legal Requirements. ..................... 33

      1.  Population Equality ......................................... 34

      2.  Racial Vote Dilution ........................................ 34

      3.  Partisan Fairness .......................................... 35

   D.  The *Amicus* Map Minimizes Changes to the Legislature's Enacted Plan. ......... 36

E.    *Amici*'s Computational-Redistricting Techniques Can Save the Court Precious Time During the Litigation's Remedial Phase.......................................37

CONCLUSION ....................................................................................................39

ADDENDUM .......................................................................................................41

    The *Amicus* Map—Statewide ...................................................................41

    The *Amicus* Map's New Orleans-Based District 2 ...................................42

    The *Amicus* Map's Baton Rouge-Based District 6 ...................................43

    The *Amicus* Map's Congressional-District Components .................................44

CASES

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015) ...............................13

*Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) ....................................................32

*Anderson v. Martin*, 375 U.S. 399 (1964).............................................................22

*Baltimore County Branch of the NAACP v. Baltimore County*, No. 21-cv-3232, 2022 WL 888419 (D. Md. Mar. 25, 2022)...........................................12

*Bartlett v. Strickland*, 556 U.S. 1 (2009)..............................................6, 11, 12, 14

*Bethune-Hill v. Virginia State Board of Elections*, 137 S. Ct. 788 (2017)..................13-14

*Bush v. Vera*, 517 U.S. 952 (1996) .....................................................................28

*Carter v. Chapman*, 270 A.3d 444 (Pa. 2022) .....................................................35

*Clark v. Edwards*, 725 F. Supp. 285 (M.D. La. 1988), *vacated on other grounds*, 750 F. Supp. 200 (M.D. La. 1990), *vacated*, 501 U.S. 1246 (1991) ......................................................................................................22

*Common Cause v. Rucho*, 284 F. Supp. 3d 780 (M.D.N.C. 2018)..........................7

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) ......................................................12, 13

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) .................................................12

*Gaffney v. Cummings*, 412 U.S. 735 (1973)........................................................36

*Growe v. Emison*, 507 U.S. 25 (1993)...............................................................5, 6

*Harding v. Edwards*, 487 F. Supp. 3d 498 (M.D. La. 2020).....................................6

*Hays v. Louisiana*, 839 F. Supp. 1188 (W.D. La. 1993), *vacated on other grounds*, 512 U.S. 1230 (1994) ......................................................................3

*Hays v. Louisiana*, 936 F. Supp. 360 (W.D. La. 1996) (*per curiam*) .......................3

*Hunt v. Cromartie*, 526 U.S. 541 (1999)............................................................26

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ............................................24, 25, 35

*Karcher v. Daggett*, 462 U.S. 725 (1983)...........................................................34

*LULAC v. Perry*, 548 U.S. 399 (2006) ................................................ 13, 28

*Maestas v. Hall*, 274 P.3d 66 (N.M. 2012) .......................................... 35

*Major v. Treen*, 574 F. Supp. 325 (E.D. La. 1983) ................... 8, 22, 27, 28

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ........................... 6, 7, 8, 38

*Miller v. Johnson*, 515 U.S. 900 (1995) ................................ 13, 14, 31

*Moore v. Harper*, 142 S. Ct. 1089 (2022) .............................................. 7

*North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (*per curiam*) .................. 8-9

*Palmer v. Hobbs*, No. C22-5035, 2022 WL 1102196 (W.D. Wash. Apr. 13, 2022) ............................................................................. 7

*Perry v. Perez*, 565 U.S. 388 (2012) ................................................ 10

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (*per curiam*) ........................... 6

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................................. 8

*Robinson v. Hunt County*, 921 F.3d 440 (5th Cir. 2019) ....................... 6

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ................................ 35

*Shaw v. Reno*, 509 U.S. 630 (1993) ................................................ 13

*Terrebonne Parish Branch NAACP v. Edwards*, 399 F. Supp. 3d 608 (M.D. La. 2019) ....................................................................... 32

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ....................................... 5, 6

*Upham v. Seamon*, 456 U.S. 37 (1982) (*per curiam*) ......................... 10

*White v. Weiser*, 412 U.S. 783 (1973) ............................................. 8

*Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245 (2022) (*per curiam*) .................................................... 13

CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. CONST. art. I, § 2 ............................................................. 34

U.S. CONST. amend. XIV .......................................................... 35

U.S. CONST. amend. XV ............................................................ 35

iv

52 U.S.C. § 10301(b) .................................................................................5, 12

Colo. Const. art. 5, § 44.5(4)(b) ...................................................................9

Kan. Const. art. 10, § 1(b) ...........................................................................9

La. Const. art. I, § 3 ...............................................................................35, 36

Or. Const. art. IV, § 6(2)(c) .........................................................................9

La. R.S. 18:467(2) .........................................................................................8

La. R.S. 18:468(A) .........................................................................................8

La. R.S. 18:1276 ...........................................................................................16

N.C. Stat. § 120-2.4(a) .................................................................................9

Legislative Materials

House Bill No. 1 (enrolled Mar. 30, 2022), https://www.legis.la.gov/Legis/
ViewDocument.aspx?d=1248568 .................................................................3

HCR 90, 2021 R.S. (effective June 11, 2021) ...........................................27

Other Authorities

Amariah Becker, Moon Duchin, Dara Gold & Sam Hirsch, *Computational
Redistricting and the Voting Rights Act*, 20 Election L.J. 407 (2021),
https://www.liebertpub.com/doi/full/10.1089/elj.2020.0704 .................2

Bruce E. Cain, et al., *A Reasonable Bias Approach to Gerrymandering:
Using Automated Plan Generation to Evaluate Redistricting
Proposals*, 59 Wm. & Mary L. Rev. 1521 (2018)....................................2

Fed. R. Civ. P. 53...........................................................................................10

Gary King, A Solution to the Ecological Inference Problem:
Reconstructing Individual Behavior from Aggregate Data
(1997)...........................................................................................................20

Olivia Lau, Ryan T. Moore & Michael Kellermann, *eiPack: R X C
Ecological Inference and Higher-Dimension Data Management*, R
News, vol. 7, no. 2 (Oct. 2007) ..................................................................20

Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-
Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131 (2005) .................10

Ori Rosen, Wenxin Jiang, Gary King & Martin A. Tanner, *Bayesian and Frequentist Inference for Ecological Inference: The* RxC *Case*, 55 STATISTICA NEERLANDICA 134 (2001) ..............................................................20

U.S. CENSUS BUREAU, ABOUT [METROPOLITAN AND MICROPOLITAN], https://www.census.gov/programs-surveys/metro-micro/about.html (last revised Nov. 22, 2021) .....................................................................................31

U.S. CENSUS BUREAU, QUICKFACTS: LOUISIANA (2021), https://www. census.gov/quickfacts/LA (last visited Apr. 14, 2022) ......................................35

Emily Rong Zhang, *Bolstering Faith with Facts: Supporting Independent Redistricting Commissions with Redistricting Algorithms*, 109 CALIF. L. REV. 987 (2021) ......................................................................................................2

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* Michael Mislove, Lisa J. Fauci, Robert Lipton, and Nicholas Mattei are professors of mathematics and computer science at Louisiana State University and Tulane University. *Amici* were intervenors in the recent state-court litigation before the Honorable Donald R. Johnson of the 19th Judicial District Court. In that litigation, *amici* and their expert team were prepared to offer the court a lawful and fair remedial map if Louisiana's congressional-redistricting process remained at an impasse. With the Legislature's recent override of Governor Edwards's veto, *amici* now wish to offer this same expertise to this Court, should it be useful.[1]

*Amici* believe this expertise could be especially helpful in addressing two key questions that this Court will face if it finds that Louisiana's recently enacted congressional map must be enjoined as a violation of the Voting Rights Act (VRA), as Plaintiffs allege:

- How can a redistricting plan's dilution of minority voting strength, in violation of Section 2 of the VRA, 52 U.S.C. § 10301, be remedied without engaging in the kind of excessive, unjustified consideration of race that violates the Equal Protection Clause's racial-gerrymandering doctrine?

- How can this be done quickly?

---

[1] All parties have consented to the filing of this *amicus* brief, which is not in support of any party.

*Amici* have assembled a team of experts, including the co-authors of the recent peer-reviewed journal article, *Computational Redistricting and the Voting Rights Act*,[2] who specialize in using high-performance computers to draw maps that attempt to optimize multiple redistricting criteria, all of which at some point come into tension with each other. The premise behind computational redistricting is simple: "Given the number of [redistricting] criteria typically present and the spatial nature of how the criteria operate, it is not easy for humans to find optimal redistricting outcomes on their own.... Put simply, good maps are needles in a haystack of bad or at least worse maps. Enter redistricting algorithms. They are capable of meticulous exploration of the astronomical number of ways in which a state can be partitioned. They can identify possible configurations of districts and zero in on the maps that best meet the redistricting criteria. The algorithms sort through the haystack more efficiently and more systematically so that the needle—the better maps—can be found."[3] In this way, a "computer program essentially substitutes for a very large body of neutral experts and the viable, neutral maps they draw."[4]

As further explained in *Computational Redistricting and the Voting Rights Act*, algorithms can help craft district maps that provide minority voters with an equal

---

[2] Amariah Becker, Moon Duchin, Dara Gold & Sam Hirsch, *Computational Redistricting and the Voting Rights Act*, 20 Election L.J. 407 (2021), https://www.liebertpub.com/doi/full/10.1089/elj.2020.0704.

[3] Emily Rong Zhang, *Bolstering Faith with Facts: Supporting Independent Redistricting Commissions with Redistricting Algorithms*, 109 Calif. L. Rev. 987, 1012–13 (2021) (internal quotation marks and footnotes omitted).

[4] Bruce E. Cain, et al., *A Reasonable Bias Approach to Gerrymandering: Using Automated Plan Generation to Evaluate Redistricting Proposals*, 59 Wm. & Mary L. Rev. 1521, 1536–37 (2018).

opportunity to elect their preferred candidates—without injecting excessive race-consciousness into the mapmaking process. This attribute could be especially relevant in Louisiana, where the State's attempts in the 1990s to create two congressional districts that were effective for Black voters were invalidated (twice) for excessive consideration of race and racial data. *See Hays v. Louisiana*, 936 F. Supp. 360, 362–72 (W.D. La. 1996) (three-judge court) (*per curiam*); *Hays v. Louisiana*, 839 F. Supp. 1188, 1209 (W.D. La. 1993) (three-judge court), *vacated on other grounds*, 512 U.S. 1230 (1994).[5]

## SUMMARY OF ARGUMENT

To fully appreciate the potential benefits of computational redistricting here requires an understanding of both the procedural and the substantive constraints that caselaw places on federal district courts involved in remedial redistricting. As for procedure, caselaw from the Supreme Court and the Fifth Circuit provides a clear legal framework for a district court upon finding that VRA plaintiffs seeking a preliminary injunction are likely to succeed on the merits of their claim. When, as here, there is still sufficient time available before the candidate qualifying period, the map can be enjoined while giving the State approximately two weeks to cure the VRA defect. If the Legislature and Governor act promptly to pass a map that fully cures the adjudicated VRA defect and complies with all other legal requirements, the federal court's work is done. But if the Legislature and Governor fail to meet the court's deadline or enact a new

---

[5] In the three decades since *Hays*, Louisiana's Black population has grown by nearly 19%, while its white population has declined by more than 6%. *Compare Hays*, 936 F. Supp. at 377 (showing that Louisiana's population was 67% white in 1990), *with* House Bill No. 1 (enrolled Mar. 30, 2022) (equivalent figure had fallen to 57% by 2020), https://www.legis.la.gov/Legis/ViewDocument.aspx?d=1248568.

map that again violates the VRA or any other law, then the court must move quickly to fill the void. Computational redistricting can be extraordinarily helpful at this point because redistricting involves satisfying multiple objectives simultaneously.

A court-ordered remedial redistricting plan must fully comply with the VRA without allowing race and racial data to predominate, must satisfy all other federal and state legal requirements, and must cure the VRA defect while otherwise leaving intact, to the extent possible, the State's plan and the political policy choices undergirding it. To show that this is possible, this brief presents an illustrative "*Amicus* Map" developed with the assistance of computational redistricting. It contains two districts—one in the New Orleans area, the other in the Baton Rouge area—that are both likely to elect candidates preferred by Black voters even though most of the districts' voters are not Black. Both districts, like all six districts in the map, are contiguous, geographically compact, respectful of political subdivisions such as parishes and municipalities, and respectful of communities of interest. The *Amicus* Map adheres to the "one person, one vote" doctrine more closely than any congressional plan in Louisiana history. And it is fair to all Louisianans, regardless of party, region, or race. In short, the *Amicus* Map is a powerful demonstration of the benefits of computational redistricting. And, using the same algorithmic techniques, it could be speedily adjusted to account for any additional criteria that surface during the Court's upcoming evidentiary hearing or from the factual findings and legal conclusions that the Court might issue following that hearing.

## I. Federal Caselaw Guides How a District Court Should Remedy a Congressional Redistricting Plan's Voting Rights Act Violation.

Precedents from the Supreme Court and the Fifth Circuit establish the legal framework for what a federal district court should do in a VRA Section 2 redistricting case if it concludes that plaintiffs seeking a preliminary injunction are likely to succeed on the merits of their claim.

### A. Likelihood of Success on the Merits

The merits inquiry requires the district court to evaluate whether plaintiffs challenging a statewide redistricting plan will likely be able to satisfy the three-pronged "*Gingles* test" and to show, "based on the totality of circumstances," that citizens from plaintiffs' racial or ethnic group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The *Gingles* test requires plaintiffs to show three "preconditions": (1) The minority group must be sufficiently large and geographically compact to constitute a majority in an additional, reasonably configured district, (2) the minority group must be politically cohesive, and (3) other voters must vote sufficiently as a bloc to enable them usually to defeat the minority group's preferred candidate. *See Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). As Justice Scalia explained for a unanimous Court in *Growe v. Emison*, 507 U.S. 25 (1993), *Gingles*'s first and second prongs, "[t]he 'geographically compact majority' and 'minority political cohesion' showings[,] are needed to establish that the minority has the potential to elect a representative of its own choice" in a possible district; and *Gingles*'s second and third

prongs, "the 'minority political cohesion' and 'majority bloc voting' showings[,] are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Id.* at 40 (citing *Gingles*, 478 U.S. at 50–51 & n.17).

At the liability phase of the proceedings, VRA Section 2 plaintiffs thus typically submit an "illustrative" alternative map containing at least one additional district (compared to the challenged map) in which members of the plaintiffs' minority group both (i) constitute a majority of the voting-age population and (ii) have the potential to elect a representative of their choice. *See Bartlett v. Strickland*, 556 U.S. 1, 12, 18, 26 (2009) (plurality op.).

## B. The Equities, the Public Interest, and the "*Purcell* Principle"

Before ordering a preliminary injunction, a district court must consider not only the movant's likelihood of success on the merits, but also the equities, including the likely harm to both parties, and the public interest. *See Harding v. Edwards*, 487 F. Supp. 3d 498, 505 (M.D. La. 2020) (citing *Robinson v. Hunt County*, 921 F.3d 440, 451 (5th Cir. 2019)). Under *Purcell v. Gonzalez*, 549 U.S. 1, 4–6 (2006) (*per curiam*), and its progeny, in election cases the equities and the public interest suggest that a federal district court ordinarily should not enjoin a state districting plan during "the period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of stay applications). As Justice Kavanaugh recently explained, this "*Purcell* principle" reflects "a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption

and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Id.* at 880–81. Addressing the temporal scope of the *Purcell* principle, Justice Kavanaugh wrote: "How close to an election is too close [to issue a federal injunction] may depend in part on the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Id.* at 881 n.1.

When the "nature of the election law at issue" is a redistricting plan, one key date is clear: the time for candidates to file their notices of candidacy. *Compare Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring in denial of stay application) (declining to order changes to congressional districts after candidate qualifying had closed), *with id.* at 1091–92 (Alito, J., joined by Thomas & Gorsuch, JJ., dissenting) (stating that "promptly granting a stay" during the candidate qualifying period "would have been only minimally disruptive in the[se] circumstances"). *Amici* are not aware of any published redistricting case in which the Supreme Court or any other federal court cited *Purcell* to block a change in a redistricting plan more than a week before the opening of the candidate qualifying period.[6]

---

[6] *See, e.g.*, *Common Cause v. Rucho*, 284 F. Supp. 3d 780, 791 (M.D.N.C. 2018) (denying a request to stay a decision invaliding congressional districts where candidate filing was set to begin more than two weeks after the deadline that the court had imposed for the Legislature to enact a new districting plan). *But see Palmer v. Hobbs*, No. C22-5035, 2022 WL 1102196, at *1–4 (W.D. Wash. Apr. 13, 2022) (unpublished) (denying preliminary injunction 19 days before the deadline for redrawing precincts, where plaintiffs' proposed map divided many precincts).

In *Merrill v. Milligan*, the recent Alabama congressional-redistricting case, state law had established a January 28, 2022 candidate qualifying deadline; but the federal district court did not preliminarily enjoin the Legislature's congressional plan until January 24, just four days before the deadline. And the district court made it clear that it expected the remedial process to take a few weeks, so the actual map might not have been ordered into effect until well into February. The Supreme Court thus stayed the

By statute, Louisiana's congressional candidate qualifying period will commence this year on Wednesday, July 20, and close on Friday, July 22. *See* LA. R.S. 18:467(2), 18:468(A). Prior to those dates in July, potential candidates may need several days, perhaps a week or two, to consult with their supporters and decide whether and where to run. But ordering changes to Louisiana's congressional districts in, say, June or early July will not cause the kind of chaos, confusion, or hardship for candidates, voters, or election administrators that the *Purcell* principle is designed to prevent. In any event, every day that the court can save during the remedial phase—for example, by taking full advantage of computational redistricting—is one more day that the Court can devote to adjudicating the merits of the case or can provide to potential candidates to decide whether and where to run for office.

### C. Remedial Roles of the Legislature, the Governor, and the Federal Court

If plaintiffs are deemed likely to succeed on the merits of their VRA claims, and if equitable considerations, including the timing concerns addressed by the *Purcell* principle, favor granting a preliminary injunction, the federal district court would ordinarily give the State an opportunity (and a deadline) to cure the VRA violation, while simultaneously preparing for the contingency that the court itself ultimately will have to adopt its own remedial map. *See, e.g., Major v. Treen*, 574 F. Supp. 325, 355–56 (E.D. La. 1983) (three-judge court); *see also White v. Weiser*, 412 U.S. 783, 794–95 (1973); *Reynolds v. Sims*, 377 U.S. 533, 586 (1964). *But see, e.g., North Carolina v. Covington*, 138 S. Ct.

---

January 24 preliminary injunction on February 7. *See* 142 S. Ct. at 879–80 (Kavanaugh, J., concurring in grant of stay applications).

2548, 2553–54 (2018) (*per curiam*) (affirming district court's decision not to give the Legislature another opportunity to enact a remedial map because doing so could interfere with the upcoming election cycle).

In a few States, the constitution or a statute has set out a specific period—typically 12 to 15 days—for the Legislature (or other redistricting body) to enact a remedial plan.[7] Although no such provision exists in the Louisiana Constitution, providing the Legislature with approximately two weeks to pass a remedial redistricting plan and have that plan signed by the Governor would be customary.

If the Legislature and the Governor timely enact a remedial plan that fully cures the VRA violation and otherwise complies with all federal and state legal requirements, then the federal district court should issue a preliminary injunction barring the use of the prior, invalid plan and ordering the Legislature's new, valid plan into effect for the upcoming elections. In this scenario, enactment of the latter plan (assuming it can remain in effect until the next federal decennial census) ordinarily will moot the VRA plaintiffs' case entirely and thus effectively end the litigation.

If, however, the State fails to timely enact a remedial plan, or if the court concludes that the newly enacted "remedial" plan does not fully cure the VRA violation or fails to

---

[7] *See, e.g.*, COLO. CONST. art. 5, § 44.5(4)(b) ("the commission shall have twelve days … to return an adopted plan that resolves the court's reasons for disapproval"); KAN. CONST. art. 10, § 1(b) ("[T]he legislature shall enact a statute of reapportionment conforming to the judgment of the supreme court within 15 days."); N.C. STAT. § 120-2.4(a) (giving the General Assembly "not … less than two weeks" "to remedy any defects identified by the court in its findings of fact and conclusions of law"); *see also* OR. CONST. art. IV, § 6(2)(c) (requiring a judicial order by September 15 and a corrected redistricting plan "on or before November 1").

comply with other legal requirements, then the court should adopt its own map and issue a preliminary injunction ordering it into effect for the next election cycle. In anticipation of this possibility, the federal district court typically will have invited the parties and *amici* to submit their own proposed remedial maps. *See, e.g., Upham v. Seamon*, 456 U.S. 37, 38 (1982) (*per curiam*). The deadline for the parties' and *amici*'s submissions can, but does not have to, be the same deadline that the court sets for the State's remedial enactment. Once plans are submitted and evaluated, the court may either choose from among the litigants' proposed plans or draw its own remedial map, often with the help of a special master. *See* Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 GEO. WASH. L. REV. 1131, 1148–50 (2005); *see also* FED. R. CIV. P. 53.

A court-ordered map is subject to the same substantive legal constraints that the State would be subject to (discussed below). But in addition, principles of federalism and judicial restraint counsel that a federal district court should not "intrude upon state policy any more than necessary" or make modifications to a state districting plan unless they are "necessary to cure any constitutional or statutory defect." *Upham v. Seamon*, 456 U.S. at 41–43 (internal quotation marks omitted); *see Perry v. Perez*, 565 U.S. 388, 393 (2012) ("[A] district court should take guidance from the State's recently enacted plan in drafting an interim plan."). Tailoring modifications to a map to avoid needless changes is a task to which computational redistricting is particularly well suited, as explained below (*see infra* Part II-D).

Whether the task is evaluating a remedial plan newly enacted by the Legislature and Governor, evaluating a remedial plan proposed by a party or *amicus*, or crafting a court-drawn remedial plan, there are three main substantive legal constraints for the district court to apply. First, the remedial plan must cure the VRA violation in the challenged map. Second, in curing the VRA violation, the court must avoid the excessive and unjustified use of race and racial data. And third, the remedial plan must comply with all other federal and state legal requirements. Each of these three legal constraints is discussed below. And each can best—and most rapidly—be satisfied by employing the algorithmic techniques developed by computational redistricters, as demonstrated below (*see infra* Part II).

### 1. Curing the VRA Violation

Like the "illustrative" plan that plaintiffs present in the liability phase, a valid remedial plan must contain at least one additional district (compared to the challenged map) in which members of the plaintiffs' minority group have the potential to elect a representative of their choice. But unlike plaintiffs' liability-phase illustrative plan— which must comply with the requirement of *Bartlett v. Strickland*, 556 U.S. 1 (2009), to show that there is an additional district in which members of the plaintiffs' minority group constitute a majority of the voting-age population—in a remedial plan, members of the plaintiffs' minority group need not constitute a majority of the voting-age population in the additional district. The harm inflicted on plaintiffs is not that they reside in a district with the "wrong" demographic composition, but rather that they reside and vote in a district where they will be deprived the "opportunity … to elect representatives of their

choice," 52 U.S.C. § 10301(b), as their preferred candidates will routinely lose to nonminority voters' preferred candidates.

The Supreme Court explained this distinction in *Bartlett v. Strickland*. The plurality there held, on the one hand, that VRA ***plaintiffs*** have to show that their minority group is sufficiently large and geographically compact to constitute a literal, numerical majority in an additional, reasonably configured district. But it further held, on the other hand, that VRA ***defendants*** can prevail by pointing to what the Court called "crossover" districts. In a crossover district, minority adults, though outnumbered, can elect their preferred candidates with limited, but predictable, crossover support from nonminority voters. *Compare Strickland*, 556 U.S. at 12–14, 18–19, 26 (plurality op.) (requiring plaintiffs to meet the 50% threshold to satisfy the first prong of the *Gingles* test), *with id.* at 23–24 (encouraging defendants to rely on "crossover voting patterns and … effective crossover districts"); *see Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017) (explaining that the VRA can "be ***satisfied by*** crossover districts"); *Baltimore Cnty. Branch of the NAACP v. Baltimore Cnty.*, No. 21-cv-3232, 2022 WL 888419, at *1–6 (D. Md. Mar. 25, 2022) (approving defendant's proposed remedial plan, with a reconfigured district in which Black voters would not constitute a numerical majority but would have an opportunity to elect a representative of their choice); *see also Fusilier v. Landry*, 963 F.3d 447, 456 n.7 (5th Cir. 2020) (distinguishing district court's remedial map from plaintiffs' "*Gingles* step one" map). As explained immediately below, this asymmetry can make it easier for a court to remedy a VRA violation without running afoul of the Equal

Protection Clause, especially if the court takes advantage of computational-redistricting methods designed to reconcile the statutory and constitutional demands.

## 2. Avoiding the Excessive and Unjustified Use of Race

Compliance with the VRA obviously requires both awareness and active consideration of race and racial data. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995). But if that consideration is excessive and unjustified, it violates the Equal Protection Clause under a line of Supreme Court "racial gerrymandering" precedents that commenced with *Shaw v. Reno*, 509 U.S. 630 (1993). Redistricters—including federal district courts at the remedial phase of a voting-rights suit—therefore must walk a fine line between paying too little attention to race and violating the VRA and paying too much attention to race and violating the Constitution.

The caselaw articulating the racial-gerrymandering doctrine identifies three potential triggers for deeming a district subject to strict scrutiny. First, some Justices have suggested, although the Court has never held, that intentionally creating a particular number of majority-minority districts is, by itself, presumptively unconstitutional. *See, e.g., LULAC v. Perry*, 548 U.S. 399, 517 (2006) (Scalia, J., joined by Roberts, C.J, and Thomas & Alito, JJ., concurring in judgment in part and dissenting in part); *cf. Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1247, 1249 (2022) (*per curiam*). Second, the Court has held that it is presumptively unconstitutional for a State to draw districts to "maintain a particular numerical minority percentage" or to meet arbitrary or "mechanical racial targets." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 267, 273–75 (2015); *see Cooper v. Harris*, 137 S. Ct. at 1468–69; *Bethune-Hill*

*v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799, 801–02 (2017). And third, over the last few decades, the Court has repeatedly held districts presumptively unconstitutional if they subordinate traditional nonracial districting principles—such as contiguity, compactness, respect for political subdivisions, and respect for communities of interest— to racial considerations. *See, e.g., Miller v. Johnson*, 515 U.S. at 916.

As the *Bartlett v. Strickland* plurality recognized, "crossover districts" where Black adults lack a numerical majority but nonetheless have the potential to elect representatives of their choice may be less vulnerable to claims of racial gerrymandering. *See Strickland*, 556 U.S. at 23. These districts can enhance "minority voting strength" while "diminish[ing] the significance and influence of race" and "encouraging minority and majority voters to work together" toward common goals. *Id.* The Court found these districts "can lead to less racial isolation, not more." *Id.* Moreover, these districts (by definition) are not the product of intentionally creating a particular number of majority-minority districts or of drawing districts to maintain an arbitrary numerical minority percentage or meet a mechanical racial target.

Again, this is an area in which computational redistricting can be particularly helpful: Racial subordination of traditional neutral districting principles can be avoided if algorithms draw districts emphasizing criteria like compactness and the integrity of parishes and municipalities and focusing on electoral outcomes for minority-preferred candidates rather than on raw demographic data.

### 3. Complying with Other Legal Requirements

Finally, a remedial redistricting plan not only must cure the VRA violation while avoiding excessive and unjustified race-consciousness, but also must comply with all other federal and state legal requirements. The list of applicable requirements here is brief: population equality, compliance with the VRA as to racial and ethnic groups other than the plaintiffs', and (although it is no longer an independently justiciable issue in federal court) the avoidance of excessive partisanship or political skew. Consideration for these legal mandates can be incorporated into the algorithmic instructions used in computational redistricting.

## II. The *Amicus* Map Illustrates the Benefits of Computational Redistricting When Remedying a Plan's Voting Rights Act Violation.

As sketched above, the task potentially facing this Court is (1) to adopt a map that cures any VRA violation (2) without being overly race-conscious (3) while complying with other legal requirements, (4) minimizing needless changes, and (5) moving quickly. This is where computational redistricting shines. One could hardly imagine a better "fit" between a task and a technology.

To demonstrate how this could work in practice, *amici* here present a possible "*Amicus* Map." They do so purely for illustrative purposes and make no claim that it is an "ideal" map, if there even is such a thing. But it is an example of a map developed with the aid of computational redistricting and thus reflects some of the advantages inherent in this technology and methodology.[8] Importantly, should this Court find that a remedial

---

[8] *Amici* are electronically delivering a comma-delimited block-equivalency file and a set of shapefiles for the *Amicus* Map to counsel for all parties in these consolidated cases, so

map is warranted, the inputs used to generate this map could be easily and swiftly altered to create a map that aligns with the facts determined at the evidentiary hearing in this matter.

Perhaps most significantly, in response to the allegations leveled by Plaintiffs that the recently enacted plan violates the VRA, the *Amicus* Map contains **two** districts—one based in New Orleans, the other in Baton Rouge—that can elect congressional candidates preferred by Black voters, even over white voters' heavy—but not unanimous—opposition. At the same time, the *Amicus* Map contains **zero** districts that are majority-Black or that could be plausibly deemed "racial gerrymanders" by the Court of Appeals or the Supreme Court.

As shown below, the *Amicus* Map (1) fully cures any VRA violation that this Court could find in the Louisiana Legislature's recently enacted congressional plan, LA. R.S. 18:1276 ("the Enacted Plan"); (2) avoids being overly race-conscious; (3) complies with other federal and state legal requirements; (4) otherwise leaves intact the Enacted Plan and the legislative policy judgments it embodies; and (5) could speedily be modified, including to account for new evidence adduced at the Court's upcoming evidentiary hearing and for findings of fact and conclusions of law that this Court might issue following that hearing.

A large color version of the *Amicus* Map, as well as color blowups of the New Orleans- and Baton Rouge-based districts (Districts 2 and 6, respectively), along with a

---

that they can more easily analyze the map themselves. *Amici* would be happy to supply the same files to the Court upon its request.

detailed legal description of all six districts, can be found in the Addendum to this brief. On the next page of the brief is a matching pair of color maps showing both the Enacted Plan (with its majority-Black District 2 shown in green) and the *Amicus* Map (with its Districts 2 and 6 in green and blue, respectively).

## The Enacted Plan



## The *Amicus* Map



### A. The *Amicus* Map Cures Any VRA Violation in the Enacted Plan.

The gravamen of Plaintiffs' VRA claims is that minority voters generally, and Black voters specifically, have less opportunity than other citizens to elect their preferred candidates to Congress. This is because, realistically, their opportunities are confined to only one of Louisiana's six congressional districts. To cure the violation that Plaintiffs have alleged would require drawing a remedial congressional map with two districts, rather than only one district, where Black voters could elect their preferred candidates to the U.S. House of Representatives.

Properly analyzing whether a map contains two effective districts for Black voters requires using data from recent elections to determine which candidates were preferred by Black voters and whether those candidates prevailed among the voters in any particular proposed district. Statewide elections are particularly useful because they allow apples-to-apples comparisons between alternative districts, as the voters in all districts faced the same set of candidates (and campaigns). To determine which candidate carried a proposed district, one simply sums the votes cast in every precinct contained within the district. As discussed below, every district in both the Enacted Plan and the *Amicus* Map is constructed entirely from whole, intact precincts; so determining which statewide candidate carried any of these districts does not require statistical inference, just arithmetic. Determining which candidate in a given election was preferred by Black voters is more complicated, but political scientists and statisticians have developed well-accepted, sophisticated methodologies that compare each precinct's racial composition to

its voting behavior and thus draw inferences about how members of each racial group voted.[9]

In Louisiana, as elsewhere, data from statewide elections can reliably forecast congressional-election results. The following figure is a scatterplot showing, for each of Louisiana's 3,000-plus precincts, the most recent *statewide* election results (the Democratic percentage of the precinct's major-party vote in the November 2020 presidential contest) on the x-axis and the most recent *congressional* election results (the Democratic percentage of the same precinct's major-party vote) on the y-axis. That the former is an excellent proxy for the latter is obvious from even a quick glance.

---

[9] *See, e.g.,* GARY KING, A SOLUTION TO THE ECOLOGICAL INFERENCE PROBLEM: RECONSTRUCTING INDIVIDUAL BEHAVIOR FROM AGGREGATE DATA (1997). Here, *amici*'s experts used an extension of King's Ecological Inference, specifically the ei.MD.bayes function from eiPack. *See* Olivia Lau, Ryan T. Moore & Michael Kellermann, *eiPack: R X C Ecological Inference and Higher-Dimension Data Management*, R NEWS, vol. 7, no. 2, at 43–47 (Oct. 2007); Ori Rosen, Wenxin Jiang, Gary King & Martin A. Tanner, *Bayesian and Frequentist Inference for Ecological Inference: The* RxC *Case*, 55 STATISTICA NEERLANDICA 134 (2001).



Statistical analysis has shown that, at least in recent years, the Black-preferred candidates in Louisiana's statewide (and congressional) elections have consistently been Democrats. And the leading Democratic vote-getter in every statewide election since 2012 was also the Black-preferred candidate. In recent statewide elections with one Democratic candidate on the ballot, that candidate has always won 74 to 95 percent of the Black vote. Conversely, during the same period, white-preferred candidates were consistently Republicans; the leading Republican vote-getter in every statewide election was also the white-preferred candidate; and when one Republican candidate was on the ballot, that candidate has always won 63 to 90 percent of the white vote. In sum, Louisiana's long history of significant and consistent racially polarized voting is hardly a

thing of the past. *See Clark v. Edwards*, 725 F. Supp. 285, 298–99 (M.D. La. 1988) (finding "consistent racial polarization" in voting "across Louisiana"), *vacated on other grounds*, 750 F. Supp. 200 (M.D. La. 1990), *vacated*, 501 U.S. 1246 (1991); *Major v. Treen*, 574 F. Supp. at 337–39, 351–52 (finding consistent racial polarization in the New Orleans area); *cf. Anderson v. Martin*, 375 U.S. 399, 400–04 (1964) (invalidating a 1960 Louisiana statute designed to encourage white bloc voting against Black-preferred candidates by requiring each candidate's race to be printed next to the candidate's name on the ballot).

The following Table One shows the 19 statewide elections in the last decade in which one candidate is estimated to have received at least 85 percent of the Black vote. This list includes every Democratic candidate who received more than one-third of the statewide vote since 2011. The columns in Table One show the month and year of the election, with a "p" indicating a primary election; the office being filled; the Black-preferred candidate's surname (or surnames, for a presidential and vice-presidential ticket), with italics indicating a Black candidate; the statewide estimated percentage support that this candidate received from Black voters and from non-Hispanic white voters; and a list of the congressional districts (by district number) that the candidate carried in the Enacted Plan and in the *Amicus* Map. The elections are listed in order by the candidate's estimated level of statewide Black support, starting with President Obama, who was preferred by more than 95 percent of all Louisiana Black voters. In 8 of the 19 elections in Table One the candidates preferred by Black voters were white.

| Month and Year | Office(s) | Candidate(s) Preferred by Black Voters | Estimated Support for Candidate(s) | | Enacted Plan Districts Carried by Black-Preferred Candidate(s) | *Amicus* Map Districts Carried by Black-Preferred Candidate(s) |
|---|---|---|---|---|---|---|
| | | | Black Voters | White Voters | | |
| 11/12 | President/VP | *Obama*/Biden | 95 | 12 | 2 | 2, 6 |
| 12/14 | U.S. Senator | Landrieu | 95 | 17 | 2 | 2, 6 |
| 11/15 | Governor | J.B. Edwards | 95 | 37 | 2, 3, 4, 5, 6 | 2, 4, 5, 6 |
| 11/19 | Governor | J.B. Edwards | 95 | 28 | 2 | 2, 6 |
| 11/16 | President/VP | Clinton/Kaine | 94 | 12 | 2 | 2, 6 |
| 12/16 | U.S. Senator | Campbell | 94 | 14 | 2 | 2, 6 |
| 11/19 | Sec'y of State | *Collins-Greenup* | 93 | 15 | 2 | 2, 6 |
| 11/15 | Lt. Governor | *Holden* | 93 | 22 | 2 | 2, 6 |
| 11/14p | U.S. Senator | Landrieu | 92 | 20 | 2 | 2, 6 |
| 10/19p | Governor | J.B. Edwards | 92 | 27 | 1, 2, 3, 4, 5, 6 | 2, 3, 4, 6 |
| 11/20 | President/VP | Biden/*Harris* | 91 | 14 | 2 | 2, 6 |
| 10/15p | Sec'y of State | *Tyson* | 91 | 16 | 2 | 2 |
| 10/19p | Treasurer | *D. Edwards* | 91 | 12 | 2 | 2 |
| 12/18 | Sec'y of State | *Collins-Greenup* | 90 | 14 | 2 | 2, 6 |
| 10/19p | Att'y General | *Jackson* | 90 | 11 | 2 | 2 |
| 11/17 | Treasurer | *D. Edwards* | 90 | 19 | 2 | 2 |
| 10/19p | Lt. Governor | *Jones* | 89 | 10 | 2 | 2 |
| 10/19p | Sec'y of State | *Collins-Greenup* | 88 | 12 | 2 | 2, 6 |
| 10/15p | Governor | J.B. Edwards | 85 | 21 | 2, 4, 5, 6 | 2, 4, 5, 6 |

Table One shows that, under the Enacted Plan, every Black-preferred candidate carried District 2; but none of the candidates, other than Governor Edwards, carried any of the other five districts. By contrast, under the *Amicus* Map, the Black-preferred candidate would have prevailed not only in District 2 in all 19 elections but also in District 6 in 14 of the 19 elections, including the 11 elections in which the candidate attracted the strongest levels of Black support. It is telling that each of the last three Democratic presidential tickets lost statewide by nearly 20 points but handily carried the *Amicus*

Map's District 6.  In four of the five elections in Table One in which the Black-preferred candidate failed to carry the *Amicus* Map's District 6, the candidate was severely underfunded, received less than 38 percent of the vote statewide, and thus lost in a landslide—a circumstance that would be highly unlikely in a ***congressional*** election confined to District 6, which in this map is a competitive district likely to attract strong, well-funded candidates.

In any event, the mere fact that Black-preferred statewide candidates have occasionally failed to carry District 6 does not prevent it from fully curing any VRA liability that Plaintiffs might prove.  As the Supreme Court has explained, the Act's "ultimate right … is equality of opportunity, not a guarantee of electoral success." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).  "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at 1017.

Table One also demonstrates one of the two main reasons why the *Amicus* Map's Districts 2 and 6 are effective for Black voters even though their voting-age populations are not majority-Black:  Although white voters are cohesive in voting against Black-preferred candidates, they are not as cohesive as Black voters are in supporting those same candidates.  On average in these contests, the statewide Black vote split about 92 to 8 percent, while the statewide white vote split about 85 to 15 percent in the opposite direction.  The second reason is that voters who identify as neither Black nor white, including substantial numbers of Latino and Asian-American citizens, consistently vote Democratic in Louisiana, which helps Black-preferred candidates.  The latter point is

especially salient in the *Amicus* Map's New Orleans-based District 2, where 10 percent of all registered voters identify as neither white nor Black.[10]

The Supreme Court has expressly encouraged the creation of crossover districts like the *Amicus* Map's Districts 2 and 6, which foster cross-racial coalition-building. "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics." *De Grandy*, 512 U.S. at 1020.

Any dilution of minority voting strength caused by the Enacted Plan's "packing" Black voters into District 2 (and cracking them elsewhere) would be cured by the *Amicus* Map—or any other map that harnessed computational redistricting to foster equal electoral opportunity by accounting for precinct-level returns from recent elections.

## B. The *Amicus* Map Is Not Overly Race Conscious.

As explained above (*see supra* Part I-C-2), the excessive and unjustified consideration of race and racial data might render a district invalid under the Equal Protection Clause if the mapmaker (i) intentionally created a particular number of majority-Black districts; (ii) drew districts to maintain a particular numerical minority percentage or meet arbitrary or mechanical racial targets; or (iii) allowed race to

---

[10] In November 2020, in the *Amicus* Map's Baton Rouge-based District 6, Joe Biden and Kamala Harris won the Black vote by about 92 percentage points (*i.e.*, about 96% to 4% among major-party voters) and won the non-Black minority vote by about 70 points, but lost the white vote by about 79 points. In the *Amicus* Map's New Orleans-based District 2, they won the Black vote by about 93 percentage points and won the non-Black minority vote by about 61 points, but lost the white vote by about 30 points.

predominate over traditional nonracial districting principles such as contiguity, compactness, respect for political subdivisions, and respect for communities of interest.

Computational redistricting can aid in curing a VRA violation without engaging in any of these types of excessive race-consciousness. For one thing, the computational-redistricting methods employed by *amici*'s expert team replace reliance on simplistic, racial rules of thumb with systematic evaluation of actual precinct-specific electoral returns. Moreover, the *Amicus* Map can easily satisfy all three standards and thus could not plausibly be labeled a "racial gerrymander" or subjected to strict scrutiny for excessive race-consciousness.

First, *Amici* and their expert team did not intentionally create two majority-Black districts. This is apparent from the simple fact that the number of majority-Black districts in the *Amicus* Map is zero. Furthermore, in crafting two districts that, although not majority-Black, would present Black voters with a fair opportunity to elect their preferred candidates to Congress, *Amici*'s expert team generally relied not on racial data, but rather on electoral data—especially the performance of Democratic statewide candidates, some of whom were Black and some of whom were not. *See Hunt v. Cromartie*, 526 U.S. 541, 549–52 (1999).

Second, the *Amicus* Map's New Orleans-based District 2 and Baton Rouge-based District 6 obviously were not built to hit any arbitrary demographic threshold or target, such as being 50 percent or 55 percent Black in voting-age population, or VAP. Table Two presents the relevant figures:

| Metric for Black Percentage | *Amicus* Map District 2 Greater New Orleans | *Amicus* Map District 6 Greater Baton Rouge |
|---|---|---|
| Voting-Age Population (2020) | 41.5 | 42.9 |
| Registered Voters (2021) | 42.4 | 44.2 |
| Total Population (2020) | 43.8 | 45.3 |

Third, Louisiana's traditional neutral districting principles, not race, predominated in crafting the *Amicus* Map generally and Districts 2 and 6 specifically. Last year, largely reaffirming similar criteria applied in earlier decades, the Louisiana Legislature enacted Joint Rule No. 21, which adopted the following discretionary criteria for congressional redistricting: (1) each district must be "composed of contiguous geography"; (2) the plan must "provide for single-member districts"; (3) each district must "have a population as nearly equal to the ideal district population as practicable"; (4) the plan must "be a whole plan which assigns all of the geography of the state"; (5) "[t]o the extent practicable, each district … [must] contain whole election precincts"; and (6) the plan must "respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable," although "this criterion is subordinate to and shall not be used to undermine the maintenance of communities of interest within the same district to the extent practicable." HCR 90, 2021 R.S. (effective June 11, 2021); *see also Major v. Treen*, 574 F. Supp. at 330–31 (listing traditional principles).

### 1. General criteria

The *Amicus* Map easily complies with the first five criteria from Joint Rule No. 21: The Map is a whole plan that assigns all of Louisiana's geography to one of six single-member congressional districts, each of which is composed of contiguous geography and (as discussed below) contains whole election precincts and has a population as nearly equal to the ideal district population as practicable (given adherence to the whole-precinct criterion).

### 2. Geographic compactness

Although Joint Rule No. 21 does not expressly list geographic compactness as a criterion, it is a traditional redistricting principle in Louisiana and may be inferred from the Joint Rule's references to political subdivisions and communities of interest (discussed in more detail below). *See Major v. Treen*, 574 F. Supp. at 330–31, 353 n.34. And compactness is a prominent traditional redistricting principle in the Supreme Court's caselaw on racial gerrymandering. *See, e.g., LULAC v. Perry*, 548 U.S. at 432–33; *Bush v. Vera*, 517 U.S. 952, 962 (1996) (plurality op.). All six districts in the *Amicus* Map are geographically compact—and that is certainly true for Districts 2 and 6, as demonstrated by this color map:



©2021 CALIPER

When evaluating the compactness of a remedial map, the compactness of the Enacted Plan's districts may serve as a useful benchmark for comparison. Table Three reports three standard mathematical measures of district compactness for the Enacted Plan and the *Amicus* Map, breaking out the districts with larger Black populations (District 2 in both plans and District 6 in the latter plan). For each compactness measure, the scores range from a low near zero, for a dramatically bizarre shape, to a high of one, for a perfect circle. The Polsby-Popper measure focuses on a shape's jaggedness, which would penalize a district shaped like a gear; the Reock measure focuses on elongation, penalizing a district shaped like a string bean; and the Convex Hull measure focuses on concaveness, penalizing a district shaped like a crescent moon. Table Three shows that

the *Amicus* Map's districts are generally more compact than the Enacted Plan's—and this is especially true when one focuses on the districts with the greatest Black electoral opportunity. So it is clear that race did not predominate over the traditional redistricting principle of compactness in drawing the *Amicus* Map's Districts 2 and 6.

TABLE THREE

| Compactness Score (higher is better) | Enacted Plan: All Districts | *Amicus* Map: All Districts | Enacted Plan: District 2 | *Amicus* Map: Districts 2 & 6 |
|---|---|---|---|---|
| Average Polsby-Popper Compactness Score | 0.140 | 0.241 | 0.058 | 0.324 |
| Average Reock Compactness Score | 0.350 | 0.436 | 0.155 | 0.550 |
| Average Convex Hull Compactness Score | 0.621 | 0.738 | 0.383 | 0.767 |

### 3. Respect for political subdivisions

The *Amicus* Map is highly respectful of political subdivisions such as Louisiana's 64 parishes and 304 municipalities (cities, towns, and villages). Specifically, the *Amicus* Map splits only 7 parishes and 6 municipalities.[11] By contrast, the Enacted Plan splits more than twice as many parishes (15) and more than three times as many municipalities (19). Most of those divisions—9 parish splits and 10 municipal splits—can be attributed to just one of the Enacted Plan's districts, the majority-Black District 2, which starts in eastern New Orleans and snakes its way to north Baton Rouge. Indeed, more political

---

[11] Four of the six split municipalities are divided because a district line follows a parish line and the municipality falls into two parishes. The *Amicus* Map thus divides only two municipalities within a single parish (Hammond in Tangipahoa Parish and Lockport in Lafourche Parish). And the Enacted Plan also splits Hammond.

subdivisions are divided by this one district in the Enacted Plan than by all six districts combined in the *Amicus* Map.

Furthermore, while the Enacted Plan's majority-Black District 2 divides 9 of the 10 parishes it touches, the *Amicus* Map's Districts 2 and 6 divide only 4 of the 16 parishes they touch. There is not a single parish or municipality that is divided by the *Amicus* Map's District 2 or District 6 that was not already divided in the Enacted Plan. So, race did not predominate over respect for political subdivisions in the *Amicus* Map's districts.

### 4. Respect for communities of interest

The Supreme Court has also noted that a racial-gerrymandering claim can fail if districts were drawn to respect "communities defined by actual shared interests." *Miller v. Johnson*, 515 U.S. at 916. Often, a combination of respect for parishes (or counties) and municipalities, respect for precincts, and geographic compactness serves as a reasonable proxy for respecting communities of interest.

However, it can also be helpful to understand which parishes should sensibly "go together" in a given congressional district. Here, "metropolitan statistical areas," or MSAs, are helpful. "The United States Office of Management and Budget (OMB) delineates metropolitan … statistical areas according to published standards that are applied to Census Bureau data. The general concept … is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."[12]

---

[12] *See* U.S. CENSUS BUREAU, ABOUT [METROPOLITAN AND MICROPOLITAN], https://www.census.gov/programs-surveys/metro-micro/about.html (last revised Nov. 22, 2021).

District 2 in the *Amicus* Map contains the core area of Louisiana's largest city, New Orleans, in its entirety, plus all parts of the New Orleans MSA that lie to the core's east or south, including all of Orleans, St. Bernard, and Plaquemines Parishes, and most of Jefferson Parish. The district largely tracks area code 504. The Jefferson Parish portion of District 2 covers the entire West Bank and the part of East Bank that abuts New Orleans; so it includes the parish seat, Gretna, the city of Westwego, and unincorporated places such as Marrero, Terrytown, Harvey, Estelle, and the bulk of Metairie. District 2 thus encompasses every Jefferson Parish suburb that is linked to New Orleans in Louisiana Supreme Court District Seven. *See Allen v. Louisiana*, 14 F.4th 366, 368 (5th Cir. 2021) (map).[13] The *Amicus* Map's District 2 contains no territory outside the New Orleans MSA; and more than 88 percent of the remainder of the MSA's population resides in District 1, mostly in St. Tammany, Livingston, and northern Jefferson Parishes.

District 6 in the *Amicus* Map is based in Louisiana's second-largest city, Baton Rouge, which is kept intact. District 6 contains about 8½ of the 10 parishes that constitute the Baton Rouge MSA, including the Parishes of East Baton Rouge and West Baton

---

[13] Likewise, fully nested in the *Amicus* Map's District 2 are the entire populations of Jefferson Parish Council Districts 1 and 5; Jefferson Parish School Board Districts 1, 2, 3, and 6; Senate Districts 5, 7, and 8; and House Districts 80, 83, 84, 85, 87, 94, and 105. *See Terrebonne Par. Branch NAACP v. Edwards*, 399 F. Supp. 3d 608, 616–17 (M.D. La. 2019) (adopting remedial map that respected communities of interest by following parish council and school-board district lines).

Rouge.[14]  More than 85 percent of District 6's residents live in the Baton Rouge MSA. And almost the entirety of area code 225 falls into this district.

The *Amicus* Map's other districts also follow natural communities and MSAs. District 3 contains almost all of Louisiana's Gulf Coast, stretching from Lafourche and Terrebonne Parishes west to the Texas border, and including the entire Lafayette MSA in between.  District 4 takes in western Louisiana, from Lake Charles through DeRidder and Fort Polk, up to Shreveport and Bossier City (another intact MSA).  And District 5 is a heavily rural and agricultural district that also contains the entirety of the Monroe and Alexandria MSAs.

Overall, the *Amicus* Map is highly respectful of communities defined by actual shared interests.  This is no accident: The algorithm used to help create the *Amicus* Map expressly considered a full hierarchy of socially meaningful geographic areas, from precincts to municipalities to parishes to MSAs.

### C.  The *Amicus* Map Complies with All Other Legal Requirements.

Computational redistricting also helped ensure that the *Amicus* Map complies with all other federal and state legal requirements, including the "one person, one vote" population-equality doctrine, the prohibitions against racial and ethnic vote dilution (aside from Plaintiffs' VRA allegations regarding Black voters), and the constitutional limitations on partisanship that constrain court-ordered districting maps.

---

[14] The Baton Rouge metropolitan area's population is too large for one congressional district.  Livingston Parish, the one Baton Rouge MSA parish wholly excluded from the *Amicus* Map's District 6, has given each of the last three Democratic presidential tickets less than 15% of the total vote.

### 1. Population Equality

The *Amicus* Map complies with the "one person, one vote" principle embodied in Article I, Section 2 of the U.S. Constitution. That provision does not require that congressional districts be drawn with "[p]recise mathematical equality," but does require a showing that population differences between districts that could have been, but were not, avoided "were necessary to achieve some legitimate state objective." *Karcher v. Daggett*, 462 U.S. 725, 730, 740 (1983).

The *Amicus* Map has a total deviation of less than 0.008% of the population of an ideal, or average, district—with a difference of only 61 persons between the Map's smallest and largest districts (776,257 residents in District 6 and 776,318 residents in District 4, respectively). The total population deviation in the *Amicus* Map is thus lower than that in the Enacted Plan (65 persons) or apparently (based on *amici*'s research) in any congressional plan in the history of Louisiana. Moreover, the *Amicus* Map's deviation is fully justified under the Louisiana Legislature's longstanding policy of keeping all 3,000-plus precincts fully intact when redrawing congressional lines.

### 2. Racial Vote Dilution

The *Amicus* Map does not unlawfully dilute the voting strength of any racial or ethnic group. As explained above (*see supra* Part II-A), the *Amicus* Map accounts for Louisiana's highly polarized voting patterns by including two congressional districts where Black voters can elect their preferred candidates and four districts where white voters can do so. None of Louisiana's other (*i.e.*, nonwhite, non-Black) racial or ethnic groups, such as Latino or Asian-American citizens, is sufficiently large and

34

geographically compact; and as noted earlier, these groups consistently support Black-preferred candidates. Regardless of whether one considers Black voters specifically or all minority voters collectively, a map in which two of six districts are effective is nondilutive, given that Louisiana's adult citizen population is about 62 percent white and 32 percent Black.[15] Therefore, there is no racial or ethnic group that would have a viable claim against the *Amicus* Map under the VRA. *See De Grandy*, 512 U.S. at 1006–22. And for similar reasons, no viable claim of racial vote dilution could be lodged against the *Amicus* Map under the Fourteenth or Fifteenth Amendment to the United States Constitution, U.S. CONST. amends. XIV–XV, or under the Louisiana Constitution's prohibition against racially discriminatory laws, LA. CONST. art. I, § 3.

### 3. Partisan Fairness

Although the Supreme Court has held that partisan-gerrymandering claims are no longer justiciable in federal court, it has also concluded that extreme partisan gerrymanders are "incompatible with democratic principles" and violate the Federal Constitution. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (quotation marks omitted); *see id.* at 2514–15 (Kagan, J., dissenting). A court adopting a remedial congressional redistricting plan therefore should avoid any map that is excessively partisan. *See, e.g., Carter v. Chapman*, 270 A.3d 444, 470 (Pa. 2022) (adopting a remedial congressional plan that reflected "statewide partisan preferences" (internal quotation marks omitted)); *Maestas v. Hall*, 274 P.3d 66, 80 (N.M. 2012) (court-ordered plan should

---

[15] U.S. CENSUS BUREAU, QUICKFACTS: LOUISIANA (2021), https://www.census.gov/quickfacts/LA (last visited Apr. 14, 2022).

"avoid ... political advantage to one political party and disadvantage to the other"); *see also Gaffney v. Cummings*, 412 U.S. 735, 736, 753 (1973) (approving a plan intended to "achieve 'political fairness' between the political parties").  And this is especially true here in Louisiana, where the state constitution expressly forbids arbitrary, capricious, and unreasonable discrimination based on "political ideas or affiliations."  LA. CONST. art. I, § 3.

The *Amicus* Map easily satisfies any reasonable standard for partisan fairness.  In a state where the last four Democratic presidential candidates all received between 38 and 41 percent of the total vote and their Republican counterparts all received between 57 and 59 percent, it is eminently reasonable for a six-district plan to contain two districts that lean Democratic and four districts that lean Republican.

### D. The *Amicus* Map Minimizes Changes to the Legislature's Enacted Plan.

As explained above (*see supra* Part I-C), in fashioning a court-ordered redistricting plan, a federal district court should not intrude on state policy or make modifications to a state plan except where doing so is necessary to cure a constitutional or statutory defect.  Again, this is a task for which computational redistricting is well-tailored.

For example, the *Amicus* Map readily satisfies this "least change" standard.  Though it would make adjustments to District 6 to comply with the VRA, the *Amicus* Map otherwise leaves untouched much of the Enacted Plan, and the legislative policy choices undergirding it.  As already noted (*see supra* Part II-B), the *Amicus* Map is highly respectful of the traditional redistricting criteria that the Louisiana Legislature

expressly adopted last year, including population equality, contiguity, parish integrity, municipal integrity, and maintenance of communities of interest.

Furthermore, the *Amicus* Map keeps the vast majority of Louisianans—more than 3 million residents—in their current congressional district in the Enacted Plan, with their current Representative. Not surprisingly, District 6 and its neighbor, District 1, retain less of their prior cores than do the other districts. But even District 6 retains more than 57 percent of its constituents. And the New Orleans-based District 2 retains nearly two-thirds of its constituents. In the western part of the state, where the impact of replacing one minority district with two is muted, Districts 3, 4, and 5 each keep almost three-quarters of their constituents in the same district as under the Enacted Plan.

Significantly, none of the *Amicus* Map's districts contains the residences of more than one U.S. Representative. So, like the Enacted Plan, the *Amicus* Map would avoid pitting two sitting Members of Congress against each other in this November's election. This, too, shows maximal respect for the Legislature's political policy choices, while making sufficient changes to vindicate the voting rights of Louisiana's Black and minority citizens.

### E. *Amici*'s Computational-Redistricting Techniques Can Save the Court Precious Time During the Litigation's Remedial Phase.

Being able to conduct a speedy remedial process with the aid of computational redistricting could help the Court's schedule in two ways. First, it could free up more time for the Court to hear and decide the merits of Plaintiffs' VRA claims. Second, a speedy remedial process could help the Court vindicate important rights by issuing a proper injunction early enough to leave potential candidates, political parties, election

administrators, and others sufficient time to prepare for the November and December 2022 elections. *E.g.*, *Merrill v. Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring in grant of stay applications); *see also supra* Part I-B.

The remedial phase of successful redistricting cases can vary considerably in length, but often takes roughly two to four weeks. If the Court gives the Legislature and the Governor an opportunity (and a deadline) to enact a lawful remedial plan, it should simultaneously set in motion the process for adopting a map of its own choosing if the Legislature defaults. Then, when the Legislature's deadline arrives, the court can quickly proceed to analyze the map the Legislature and the Governor have enacted, if any, and adopt either that map or, if necessary, an alternative map of the court's own choosing. That is where the computational-redistricting expertise that *amici* and their team bring can be of great help—ensuring that the Court has access to the best alternative maps, which reflect the Court's factual findings and legal conclusions and integrate all applicable legal requirements with the State's legitimate redistricting policy preferences.

Once the parties have presented their evidence and the Court has ruled on the Plaintiffs' likelihood of success on the merits, *amici* are ready to assist the Court in putting the Court's findings and conclusions into action, either through further *amici* submissions or in any other capacity that the Court deems helpful.

As stated at the outset, *amici curiae* offer this brief, and their *Amicus* Map, not in support of either party, but rather as a public service to assist the Court. Given the tight time constraints facing any court adjudicating redistricting claims in an election year, and given the complexity of vindicating minority citizens' rights under the Voting Rights Act while avoiding excessive race-consciousness and complying with all other federal and state legal requirements, as well as respecting the legitimate policy choices that the Louisiana Legislature embedded in the Enacted Plan, *amici* firmly believe that their team's expertise in computational redistricting is a potentially valuable asset. *Amici* thus stand ready to serve the Court, and the people of Louisiana, in whatever capacity would be most helpful to the Court, whether as *amici* or in any other role.

Dated: April 20, 2022

**JENNER & BLOCK LLP**

Sam Hirsch*
Jessica Ring Amunson*
Alex S. Trepp*
JENNER & BLOCK LLP
1099 New York Avenue, NW,
Suite 900
Washington, D.C. 20001
(202) 639-6000
shirsch@jenner.com
jamunson@jenner.com
atrepp@jenner.com

Respectfully submitted,

**BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.**

*/s/ Judy Y. Barrasso*

Judy Y. Barrasso (La. Bar No. 2814)
Viviana Aldous (La. Bar No. 38653)
BARRASSO USDIN KUPPERMAN
  FREEMAN &SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, LA 70112
Tel: (504) 589-9700
Fax: (504) 589-9701
jbarrasso@barrassousdin.com
valdous@barrassousdin.com

*Counsel for Amici*

Keri L. Holleb Hotaling*
Andrew J. Plague*
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 923-2975
khotaling@jenner.com
aplague@jenner.com

*Pro hac vice motion filed*

# The *Amicus* Map—Statewide



©2021 CALIPER

The *Amicus* Map's New Orleans-Based District 2



©2021 CALIPER

The *Amicus* Map's Baton Rouge-Based District 6



**The *Amicus* Map's Congressional-District Components**

The *Amicus* Map divides the State of Louisiana into six congressional districts:

District 1 is composed of Precincts 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 25, 26, 27, 33, 35, 41, 72, 76, 77, and 78 of Ascension Parish; Precincts 1, 1-H, 1-K, 2, 2-H, 2-K, 3-H, 3-K, 4-H, 4-K, 5-H, 5-K, 6-H, 6-KA, 6-KB, 7, 7-H, 7-KA, 7-KB, 8-H, 8-K, 9-H, 9-K, 10-K, 11-K, 12-K, 13-KA, 13-KB, 14-K, 15-K, 16-K, 17-K, 18-K, 19-K, 20-K, 21-K, 22-K, 23-K, 24-K, 25-K, 26-K, 27-K, 28-K, 29-K, 30-K, 31-K, 33-K, 34-K, 35-K, 51, 52, 53, 54, 55, 56, 57, 104, 105, 108, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125A, 125B, 126, and 130 of Jefferson Parish; Precincts 8-1, 9-1, 9-2, 10-1, 10-2, and 10-15 of Lafourche Parish; Livingston Parish; St. Charles Parish; Precincts 4-13, 5-1, and 5-4 of St. John the Baptist Parish; St. Tammany Parish; Precincts 44, 70, 70A, 71, 72, 72A, 73, 74, 102, 104, 104A, 106, 106A, 108, 110, 112, 114, 116, 118, 120, 120A, 120B, 122, 122A, 122B, 124, 124A, 137, 137A, 137B, 137C, 137D, 139, 141, 141A, 143, 143A, 145, 147, 149, 149A, and 151 of Tangipahoa Parish; and Washington Parish.

District 2 is composed of the Precincts of Jefferson Parish that are not located in District 1; Orleans Parish; Plaquemines Parish; and St. Bernard Parish.

District 3 is composed of Acadia Parish; Precincts 260, 261, 262, 800, 801, 860S, and 861E of Calcasieu Parish; Cameron Parish; Iberia Parish; Jefferson Davis Parish; Lafayette Parish; the Precincts of Lafourche Parish that are not located in District 1; St. Martin Parish; St. Mary Parish; Terrebonne Parish; and Vermilion Parish.

District 4 is composed of Beauregard Parish; Bienville Parish; Bossier Parish; Caddo Parish; the Precincts of Calcasieu Parish that are not located in District 3;

Claiborne Parish; De Soto Parish; Red River Parish; Sabine Parish; the Precincts of Vernon Parish that are not located in District 5; and Webster Parish.

District 5 is composed of Allen Parish; Avoyelles Parish; Caldwell Parish; Catahoula Parish; Concordia Parish; East Carroll Parish; Evangeline Parish; Franklin Parish; Grant Parish; Jackson Parish; LaSalle Parish; Lincoln Parish; Madison Parish; Morehouse Parish; Natchitoches Parish; Ouachita Parish; Rapides Parish; Richland Parish; St. Landry Parish; Tensas Parish; Union Parish; Precincts 5-1A, 6-1, 6-3, 8-2, and 8-3 of Vernon Parish; West Carroll Parish; and Winn Parish.

District 6 is composed of the Precincts of Ascension Parish that are not located in District 1; Assumption Parish; East Baton Rouge Parish; East Feliciana Parish; Iberville Parish; Pointe Coupee Parish; St. Helena Parish; St. James Parish; the Precincts of St. John the Baptist Parish that are not located in District 1; the Precincts of Tangipahoa Parish that are not located in District 1; West Baton Rouge Parish; and West Feliciana Parish.

The precincts listed here are the precincts used by the Louisiana Legislature in Act 5 of the Veto Session of 2022 (the "Enacted Plan").