IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

PRESS ROBINSON, et al.,

        Plaintiffs,

v.

KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana,

        Defendant.

*consolidated with*

EDWARD GALMON, SR., et al.,

Plaintiffs,

v.

KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana,

        Defendant.

CIVIL ACTION
NO. 3:22-CV-00211-SDD-SDJ
*consolidated with*
NO. 3:22-CV-00214-SDD-SDJ

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION.......................................................................................................... 1

STATEMENT OF FACTS............................................................................................. 1

LEGAL HISTORY ....................................................................................................... 2

ARGUMENT ................................................................................................................. 7

    I. Plaintiffs Do Not Meet the High Burden for an Injunction to Issue ................................. 7

    II. Plaintiffs Are Unlikely to Succeed on the Merits ............................................................ 8

        A. Plaintiffs' *Gingles* Claim Fails at the Geographic Compactness Threshold .............. 8

        B. Plaintiffs' Illustrative Plans Fail to Demonstrate the Existence of a Second
        Performing Majority Black District. ......................................................................... 13

        C. Plaintiffs' Claims also Fail Under the Totality of the Circumstances- Namely the
        Legislature's Policy Choice for Preserving Continuity of Representation. ................... 17

    III. The Purcell Doctrine Bars An Injunction at this Late Stage........................................ 18

    CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*, 138 S.Ct. 2305, 2332 (2018) ........................................................ 14, 15

*Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) ..................................... 5, 7

*Alpha Phi Alpha Fraternity, Inc., v. Raffensperger,* ___F.Supp.3d___, 2022 WL 633312, 1:21-cv-05337(N.D. Ga. Feb. 28, 2022)................................................................................. 21, 23

*Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) ........................................................... 19

*Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) .................................................... 7

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ............................................................. 2, 3, 16

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018)............................................................. 19

*Bluefield Water Ass'n, Inc. v. City of Starkville,* 577 F.3d 250, 253 (5th Cir. 2009) ................... 7

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992)........................................................... 22

*Bush v. Vera*, 517 U.S. 952, 978 (1996) ................................................................. 2

*Clarno v. People Not Politicians*, 141 S. Ct. 206 (2020)................................................. 19

*Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) ................................................... *passim*

*Covington v. North Carolina*, 316 F.R.D. 117, 167 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) (Mem.) ............................................................................... 4, 6, 23

*Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28 (2020).......................... 19, 24

*Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020) .................................................. 8, 17

*Growe v. Emison*, 507 U.S. 25, 40 (1993) ............................................................... 2

*Harding v. County of Dallas, TX.*, 948 F.3d, 302, 308-09 (2020) ........................................ 14, 17

*Harris v. McCrory,* 159 F.Supp.3d 600, 624 (M.D.N.C. 2016) ........................................... 15

*Hays v. Louisiana*, 839 F.Supp.1188 (W.D. La. 1993)................................................... 6

*Janvey v. Alguire*, 647 585, 595 (5th Cir. 2011)....................................................... 7

*Johnson v. De Grandy*, 512 U.S. 997,1017, 114 S.Ct. 2647 (1994)...................................... 14

*Karcher v. Dagett,* 462 U.S. 725, 470 (1983)........................................................... 18

*League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006) ............... 2, 3

*Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020) ............................................................ 19

*Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022)........................................................ 18, 19, 20, 23

*Merrill v. People First of Ala.*, 141 S. Ct. 190 (2020) ................................................. 19

*Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020) ................................................... 19

*Michael Goindakis v. Frank LaRose, in his capacity as Ohio Sec'y of State,* No. 2:22-CV-0773, 2022 WL 1175617, at *19 (S.D. Ohio Apr. 20, 2022) .......................................................... 22

*Miller v. Johnson*, 515 U.S. 900, 916 (1995)................................................................... 5

*Moore v. Harper,* No. 21A455*,* 595 U.S. ____ ............................................................. 21

*Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ................................................... 19, 22, 24

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020).......................... 19

*Shaw v. Hunt*, 517 U.S. 899, 908 (1996) .............................................................. 5, 15

*Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018) .......................................................... 22

*Texas Democratic Party v. Abbott,* 961 F.3d 389, 412 (5th Cir. 2020)................................... 7, 22

*Thornburg v. Gingles*, 478 U.S. 30,  (1986) .......................................................... *passim*

*United States v. Hays*, 515 U.S. 737 (1995), 936 F.Supp. 360 (W.D.La. 1996), 518 U.S. 1014 (1996) ...................................................................................................................... 6

*Upham v. Seamon*, 456 U.S. 37, 44, 102 S. Ct. 1518, 1522, 71 L. Ed. 2d 725 (1982)................ 23

*Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016)...................................................... 22

*Veasey v. Perry*, 574 U.S. 951 (2014).......................................................................... 19

*Western Surety Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 789 (M.D. La. 2018)................... 7

*Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022)........................ 13

# INTRODUCTION

Plaintiffs seek a preliminary injunction of Louisiana's Congressional Plan because the Legislature did not use race to draw a second majority-minority district. For the reasons stated herein, Plaintiffs do not meet their burden demonstrating that the Congressional Plan should be enjoined and the injunction motions should therefore be denied.

# STATEMENT OF FACTS

Pursuant to U.S. Const. art. I §2, the Louisiana Legislature was required to re-draw its congressional districts using new census data from the 2020 census. Hampering this already difficult task, the Census Bureau delivered the 2020 census data months later than in previous redistricting years, and well-past the statutory deadline. Despite this significant setback, on February 18, 2022, the Louisiana Legislature complied with its constitutional duties and passed both H.B.1 and S.B.5 which contained identical congressional districting configurations. However, on March 9, 2021, Governor Edwards vetoed both of these bills. On March 30, 2020 the Louisiana legislature overrode the Governor's veto, and the Louisiana Congressional Plan ("Congressional Plan") became law. The Secretary of State's office is actively working to implement this law.

*Galmon* and *Robinson* Plaintiffs both filed separate suits the same day as the veto, claiming the Congressional Plan violates the Voting Rights Act (the "VRA") because the legislature did not use race to draw a second majority-minority district. On April 14, these cases were consolidated. On April 15, both Plaintiffs filed motions for preliminary injunctions and expert reports. While counsel for Defendant continued to receive missing backup materials from experts over the next week, the reports and accompanying briefing clearly show that Plaintiffs' only goal here is to use race inappropriately to draw a second majority-minority district. In compliance with the Court's scheduling order, Defendant responds to Plaintiffs' motions for preliminary injunction today. In

doing so Defendant again raises the issue of lack of adequate time to respond to Plaintiffs' voluminous reports and evidence, some of which Defendant has only had for a week. Despite this extraordinarily short time frame, the factual record in this case shows only one thing clearly—that Plaintiffs' fail to meet their burden, and thus their motions for preliminary injunction must be denied.

## **LEGAL HISTORY**

For a legislature or a mapdrawer to legally draw districts based upon race, they must have evidence of the same three threshold conditions that a plaintiff must demonstrate to prove a claim under §2 of the VRA. These include evidence that (1) a "minority group' [is] 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; (2) "the minority group must be 'politically cohesive'"; and (3) a "district's white majority must vote 'sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) (citing *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)).

Proof of the *Gingles* threshold conditions show that "'the minority [group] has the potential to elect a representative of its own choice' in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is 'submerge[ed] in a larger white voting population'" *Id.* (citing *Growe v. Emison*, 507 U.S. 25, 40 (1993)). Only when a mapdrawer has evidence showing it has "good reason to think that all the '*Gingles* preconditions' are met" does he have "good reason to believe that Section 2 requires drawing a majority-minority district. . . . But if not, then not." *Id.* (citing *Bush v. Vera*, 517 U.S. 952, 978 (1996) (plurality)).

The Supreme Court has provided guidance on the first of the *Gingles* threshold conditions in two important cases, *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S.

399 (2006) and *Bartlett v. Strickland*, 556 U.S. 1 (2009). To understand these two decisions, it is important to define three different terms used by the courts to describe election districts "in relation to the requirements of the Voting Rights Act." *Bartlett*, 556 U.S. at 13. In "majority-minority" districts, "a minority group composes a numerical, working majority of the voting-age population." *Id.* There is no dispute that §2 can require the creation of this type of district. *Id.* "At the other end of the spectrum" are "influence" districts "in which the minority group can influence the outcome of an election[.]" *Id.* Finally, "crossover" districts are districts "in which the minority group is less than a majority of the population, but is potentially large enough to elect its candidate of choice with the help of voters who are members of the white majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13 (internal citation omitted).

The issue in both *LULAC* and *Bartlett* was whether §2 justifies a state legislature's decision to draw race-based districts with a targeted minority population of less than 50%. In *LULAC*, the Court held that §2 does not justify a state's use of race to create influence districts. *LULAC*, 548 U.S. at 445. The Court warned that interpreting §2 as requiring legislatures to adopt influence districts "would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *LULAC*, 548 U.S. at 445–46.

Subsequently, in *Bartlett*, the Court was called upon to decide whether §2 could be used by a state to justify using race to draw crossover districts. The defendants-petitioners in *Bartlett* argued that crossover districts satisfy the first *Gingles* condition because they allow the minority group to elect their candidate of choice and are therefore "effective minority districts.'" *Id.* at 14. The *Bartlett* Court rejected this proposition holding that §2 only authorizes state legislatures to use race to draw districts where a geographically compact minority group constitutes an actual majority of the voters. *Id.* at 14–18. Reaffirming its warning in *LULAC*, the Court stated "[to] the

extent there is any doubt about whether §2 calls for the majority-minority rule, we resolve that doubt by avoiding serious constitutional concerns under the Equal Protection Clause." *Id.* at 21.

After the decisions in *LULAC* and *Bartlett*, there can be no dispute that a mapdrawer cannot use race to draw districts absent evidence of a geographically compact minority group that would constitute an actual majority in a single member district. *See Cooper,* 137 S. Ct. at 1464.

The Supreme Court has also provided guidance on the third *Gingles* condition, i.e., that a state cannot draw districts on the basis of race unless it has evidence that the white majority is voting sufficiently in a bloc to usually defeat the minority's preferred candidate. This concept is called "legally significant racially polarized voting." *Gingles*, 478 U.S. at 52-55. Statistically significant "racially polarized voting" occurs whenever "there is a 'consistent relationship between [the] race of the voter and the way in which the voter votes.'" *Gingles*, 478 U.S. at 53 n.21. The mere existence of a correlation between a person's race and how they vote is not enough to satisfy the third threshold condition. Instead, mapdrawers must have evidence of "legally significant racially polarized voting." *Id*. at 55. This occurs only when "less than 50% of white voters cast a ballot for the black candidate." *Id.* Thus, the mapdrawer can only draw a majority black district under §2 where there is proof that the white majority usually votes as a bloc to defeat the minority's preferred candidate. *Cooper*, 137 S. Ct. at 1470; *Covington v. North Carolina*, 316 F.R.D. 117, 167 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) (Mem.).

Only when all of these preconditions are met may a mapdrawer use race to draw districts.[1] Otherwise, the plan is at risk of being a racial gerrymander. The Supreme Court first recognized a claim for racial gerrymandering in *Shaw v. Reno*, 509 U.S. 63, 649 (1993). The *Shaw I* plaintiffs challenged North Carolina's infamous I-85, Twelfth Congressional District. *Id*. at 635–36. This

---

[1] As we will discuss, Plaintiffs must also prove that a second majority-minority district is required by the "totality of the circumstances." *See Fusilier v. Landry,* 963 F.3d 447, 455 (5th Cir. 2020).

district was enacted by the General Assembly in an attempt to obtain preclearance of its 1992 Congressional Plan under §5 of the VRA. *Id.* In reversing the district court's dismissal of the plaintiffs' challenge, the Supreme Court held that plaintiffs had stated a claim under the Fourteenth Amendment by alleging that the Twelfth District "cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Id*. at 649. The Supreme Court subsequently clarified that "[a] plaintiff pursuing a racial gerrymandering claim must show that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

Assuming a plaintiff satisfies the burden of proof explained in *Miller*, mapdrawers can defend the use of race in the drawing of districts if "its redistricting plan was in pursuit of a compelling state interest" and provided "its districting legislation is narrowly tailored to achieve [that] compelling interest." *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) ("*Shaw II"*) (quoting *Miller*, 515 U.S. at 920) (alteration in original). The Supreme Court has "long assumed that one compelling interest [that can justify the predominant use of race in the drawing of districts] is complying with operative provisions of the [VRA]." *Cooper* 137 S. Ct. at 1464. To date, the Supreme Court has not identified *any* other compelling governmental interest that might justify separating voters into different districts because of their race.

But, recent Supreme Court jurisprudence should leave mapdrawers wary of this exception. Just last redistricting cycle, the Supreme Court upheld lower court opinions holding that legislatively enacted plans were racial gerrymanders where a majority-minority district based on race was drawn in an attempt to comply with the VRA by relying upon two expert reports showing

the presence of "statistically significant" racially polarized voting as grounds for establishing the third *Gingles* threshold condition. *Cooper*, 137 S. Ct. at 1471 n.5; *Covington,* 316 F.R.D. at 169–71. This jurisprudence inevitably puts mapdrawers in a difficult situation as the attenuated relationship between the VRA and racial gerrymandering claims continues to be litigated.

Redistricting litigation over Louisiana congressional plans and the placement of East Baton Rouge Parish ("EBR") in majority black districts created under those plans is also highly relevant to this case. In the 1980s, the Louisiana congressional plan contained only a single majority black district. In the early 1990s, the United States Department of Justice ("DOJ") adopted a policy (known as the "max black theory") requiring the maximization of the number of majority black districts for a covered state to obtain preclearance under Section 5 of the VRA. To achieve preclearance, the Louisiana Legislature adopted two different plans which included two majority black districts. In both versions, the legislature used portions of EBR to anchor the second majority black district (CD 4) found in both plans. In both instances, the federal district court found that the second majority black district was an illegal racial gerrymander. In 1996, the district court adopted a congressional plan that was used for the rest of the decade. The court's plan reverted back to Louisiana's policy of establishing only a single majority black district. The court's plan did not use EBR as the keystone for a second majority black district and instead placed that parish into a majority white district (CD 6). Therefore, there is no precedent for EBR being lawfully used as the primary building block for a second majority black district. *Hays v. Louisiana*, 839 F.Supp.1188 (W.D. La. 1993), *vacated*, 512 U.S. 1230 (1994), *order on remand*, 862 F.Supp 119 (W.D. La. 1994), *vacated sub nom.*, *United States v Hays*, 515 U.S. 737 (1995), decision on remand, 936

F.Supp. 360 (W.D.La. 1996), *affirmed*, 518 U.S. 1014 (1996); See also Ex. 1, Expert Report of Dr. Sadow ("Sadow") ¶¶ 15-21.[2]

## ARGUMENT

### I. Plaintiffs Do Not Meet the High Burden for an Injunction to Issue

The burden is on Plaintiffs to establish the following elements for a preliminary injunction to issue:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 585, 595 (5th Cir. 2011) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Furthermore, given that "[a] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Western Surety Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 789 (M.D. La. 2018); *see also Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) ("We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements.").

Importantly, in the context of a preliminary injunction, the burden is on the plaintiffs to establish a "'clear showing' of standing to maintain the injunction." *Texas Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020) (quoting *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017)). At the outset, Plaintiffs have failed to make a clear showing of standing. In challenges to redistricting plans the harm is directly to a voter "who lives in the district attacked, [b]ut they do

---

[2] The district court's 1993 opinion in *Hays* was vacated by the Supreme Court because the Legislature passed its second plan with two majority black districts while on appeal, mooting the appeal. The 1994 opinion by the district court was subsequently vacated because the plaintiffs didn't live in the challenged districts, and thus lacked standing.

not so keenly threaten a voter who lives elsewhere in the State." *Alabama*, 575 U.S. at 263. In fact, voters must live in a challenged district in order to have standing. *Id. Galmon* Plaintiffs challenge the entire congressional plan, but only have Plaintiffs living in Congressional Districts 2,5, and 6. As a result they lack standing to challenge the entire plan, and lack standing to maintain this action.

In any event, as shown below in greater detail, Plaintiffs cannot clearly carry their burden of persuasion on all four elements. Plaintiffs clearly cannot show a likelihood of success on the merits, nor can they show that the injunction will not disserve the public interest, or that the harm of the injunction does not outweigh the threatened injury.[3]

## II. Plaintiffs Are Unlikely to Succeed on the Merits

To prove that the Louisiana Congressional Plan violates §2, Plaintiffs must meet the preconditions set forth in *Gingles,* namely that (1) black voters are "sufficiently large and geographically compact to constitute a majority in a single member district"; (2) black voters are politically cohesive; (3) the white majority "votes sufficiently as a block to enable it…usually to defeat the minority's preferred candidate." 428 U.S. at 50-51. However, Plaintiffs must also show based on the "Zimmer Factors" that "under the totality of circumstances, they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020).

### A. Plaintiffs' *Gingles* Claim Fails at the Geographic Compactness Threshold

With regard to the first *Gingles* precondition, Plaintiffs concede that they must prove that Black Voting Age Population ("BVAP") is both sufficiently numerous and geographically compact to form a majority black district (D.E. 41-1 p.8). All of Plaintiffs' illustrative maps reply upon using portions of EBR as the cornerstone for a second proposed majority black district. But,

---

[3] Nor have Plaintiffs proved that they will suffer any irreparable harm. Rather, Defendant's evidence proves that if anyone will be irreparably harmed, it would be the State and the voters of Louisiana.

Plaintiffs' whole argument rests on the idea that simply because Louisiana has a BVAP statewide that could proportionally create a second district, that such a district *must* be created, regardless of how spread out across the state's black voters are. This argument is very similar to the "max black" theory underlying two different congressional plans rejected as racial gerrymanders in the 1990s. *See supra* at p. 6. And like the state in the 1990s, Plaintiffs ignore their burden to prove that the second majority-minority district is also geographically compact. Perhaps in acknowledgement that their illustrative plans do not draw geographically compact second majority-minority districts, Plaintiffs focus on statewide levels of compactness (D.E. 41-1 p. 9) and argue a case from nearly 30 years ago that "oddly shaped" plans are perfectly acceptable. This is flawed. The first *Gingles* precondition is not concerned with statewide compactness scores, but the geographic compactness of the majority-minority district. And Plaintiffs' illustrative plans provide anything but that.

Take, for example, Mr. Cooper's three illustrative plans. CD5 for each of these plans combines portions of EBR with parishes in the far north of the state like East and West Carroll. And Plaintiffs concede these parishes have some of the highest black population in the state (D.E. 42 p. 4). Plaintiffs' rationale for this is that Baton Rouge is the "urban center" for these areas. (*Id.* at p. 7). But the fact remains that federal courts have twice rejected plans that used EBR to build a second majority black district on the ground that such districts were uncompact racial gerrymanders that did not satisfy the *Gingles* preconditions. *See supra* at p. 6; Sadow at ¶¶ 15-21.

As recognized by the original decision in *Hays*, Plaintiffs' argument for combining EBR with rural northeastern parishes is absurd on its face. Delta Parishes, like East Carroll Parish, are approximately an hour from the urban areas of Vicksburg, Greenville, and Monroe, and less than two hours from the urban areas of Jackson and Natchez. In contrast, East Carroll Parish is a

whopping 3 hours and 25 minutes from Baton Rouge. Even Shreveport is a full hour closer to East Carroll Parish than Baton Rouge. So too is Little Rock, Arkansas.

In fact it's nearly 200 miles, snaking along I-65 and I-61 from EBR to East and West Carroll parishes, a combination featured in all of Mr. Cooper's plans. In Cooper's Illustrative Plan 1, District 5 is stretched even further from EBR, to Moorehouse Parish, a 3 hour and 45 minute drive, at the fastest route.[4] Illustrative Plan 3 largely follows this same route, but carves out oddly shaped portions of Tangipahoa and Ouachita parishes. In his Illustrative Plan 2, Cooper draws an even more bizarre district which connects EBR, through Moorehouse Parish then swings west to Claiborne Parish and down to Bienville Parish creating a fish hook shape. The distance from EBR to Claiborne Parish is approximately 250 miles, over a four hour drive.

The legally unprecedented combinations used by Cooper to create his proposed Fifth Districts, results in ridiculous districts for the rest of the state. Each of Cooper's illustrative plans splits more parishes than the Congressional Plan, and splits more population in Metropolitan Statistical Areas than the Congressional Plan. (Sadow p. 21-23, Tables 1-3). Further, the travel time required to get between cities in the districts proposed by Cooper is more evidence of the noncompact nature of the illustrative plans. (Sadow p. 25, Tables 4-7). Driving from central city to central city within each district of the enacted Congressional Plan would require 904 miles of driving. Compare this with 1,244 miles of driving under Cooper Plan 1, 1,047 miles of driving under Cooper Plan 2, and a whopping 1,720 miles of driving (roughly the equivalent of miles from New Orleans to Las Vegas) in Cooper Plan 3. (Sadow p. 25, Tables 4-7). Cooper Plan 1 grabs at portions of Baton Rouge, Monroe, Alexandria, and Lafayette, marries another portion of Baton Rouge to Hammond and half of St. Tammany, while the other portion of St. Tammany wraps

---

[4] *Robinson* Plaintiffs' expert, Mr. Fairfax offers an illustrative plan that is similar to this plan. *See* D.E. 41-2 at p. 26.

around south of New Orleans and up through bayou country. (Sadow ¶68). Cooper Plan 2 similarly scoops from Monroe, Alexandria, and Baton Rouge only to then hurl itself across the northern border of the state. (Sadow ¶69). Cooper Plan 2 continues on to separate Lafayette from its suburbs, but somehow unites the shores of Lake Pontchartrain with the Atchafalaya River Basin and Swamps thereby "connecting New Orleans jazz with Breaux Bridge zydeco – often conflated in movies, but never before in congressional representation." (*Id.*). But, as Dr. Sadow explains, Cooper Plan 3 may be the most audacious of all, featuring the same "strange bedfellows" of Baton Rouge and St. Tammany, and finding a way to stitch together Macon Ridge, the central hills, Cajun country, the strawberries of the Florida Parishes by ingesting parts of Monroe, Alexandria, Lafayette, Baton Rouge, and Hammond. (Sadow ¶70).

It is clear that in all of Cooper's illustrative plans he looks to connect concentrated black voters in East Carroll, Tensas, and Madison Parish to urban EBR, along a stretch of state highway in a manner that ignores communities of interests along the way. (Sadow ¶¶67-72). This blatant racial tactic belies any argument that these proposed fifth districts are geographically compact, or that the BVAP in these regions is geographically compact enough to form a majority-minority district. In any other instance in this country, connecting voters based on their race to other voters 3.5-4 hours away would be a racial gerrymander in violation of the Fourteenth Amendment and that is exactly what Plaintiffs' illustrative plans are.

But we don't just have to rely on common sense to tell us this. Supreme Court precedent is clear on this issue. In *Shaw II,* the Supreme Court determined that the "snakelike" and "approximately 160 miles long" features of the now infamous District 12 in North Carolina created a racial gerrymander that could not be justified by a defense of avoiding liability under §2. 517 U.S. at 917. In fact, as the Supreme Court explained in *Shaw I:*

Reapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. 509 U.S. at 647.

Subsequently, in *Miller v. Johnson,* 115 S.Ct. 2475 (1995), the Supreme Court clarified that districts drawn based upon race could fail the compactness requirement of *Gingles* even when they were not as obviously irregular in shape as the bizarre North Carolina CD 12. In the 1991 redistricting cycle, the DOJ refused to preclear plans that did not maximize the number of majority black districts. In Georgia, the DOJ refused to preclear a remedial plan drawn by the Georgia General Assembly, because the General Assembly refused to create the third majority-minority district found in the "max-black" plan drafted by the ACLU for the General Assembly's black caucus. *Id.* at 2484. "Twice spurned" by the DOJ's refusal to preclear plans with less than three majority-black districts, the General Assembly finally relented and enacted the ACLU's "max-black" plan. *Id* at 2484. The hallmark of the ACLU's "max-black" plan was the "Macon/Savannah trade" which moved the densely black population of Macon into a new district, thereby creating a district that connected "black neighborhoods of metropolitan Atlanta to the poor black populace of Coastal Chatham County" near Savannah. *Id.* This new district was 260 miles long and "worlds apart in culture." *Id.* The Supreme Court found that this district was a "geographic monstrosity" that tied majority black population centers at the periphery of Atlanta, Augusta, and Savannah with a sparsely populated rural area called "plantation country." *Id.* In striking down this "max-black" strategy, the Supreme Court held that only "a shortsighted and unauthorized view of the Voting Rights Act…which has played a decisive role in redressing some of our worst forms of

discrimination" could support "the very racial stereotyping the Fourteenth Amendment forbids." *Id.* at 2494.

It appears the ACLU's strategy has changed very little in the last 25 years. Mr. Cooper's plans are anywhere from 50-100 miles longer than what is widely regarded as the most egregious racial gerrymander of all times struck down in *Shaw I* and *II*. It also bears striking geographic similarities to the ACLU's 1991 "max-black" plan for Georgia. At the outset, Mr. Cooper's Illustrative Plan 3, is almost the exact same length as the Georgia district struck down in *Miller.* Moreover, all of his Illustrative Plans take the urban and suburban areas of EBR and connect them to far north eastern parishes in the old "Natchez district", an area which has always had a largely rural and agrarian economy dating back to the days of its original development for cotton plantations. These configurations have never been seen in Louisiana before in any lawful district though they are very similar to a district rejected by the federal court in the 1990s. (Sadow ¶68-70). This is exactly the sort of line-drawing the Supreme Court condemned in *Miller.* In fact, Plaintiffs' illustrative plans do nothing but create convoluted lines to include in one district individuals of the same race who are otherwise "widely separated by geographical and political boundaries" which reinforces the abhorrent "perception that members of the same racial group… think alike." *Shaw I,* 509 U.S. at 647. It cannot be that Plaintiffs can succeed on their VRA claims, by producing a district that is such an obvious racial gerrymander.

### B. Plaintiffs' Illustrative Plans Fail to Demonstrate the Existence of a Second Performing Majority Black District.

Plaintiffs contend they are entitled to a second majority-minority congressional district, but have done little else other than offer alternative maps showing that it's possible to draw one, which is insufficient for a preliminary injunction. For example, the Supreme Court recently rejected a similar argument that states must draw as an additional majority black based solely upon proof

that the district can be based upon "sufficiently large and compact population of black residents to fill it." *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022). The Court held that this was "just the sort of uncritical majority-minority district maximization that we have expressly rejected. *citing Johnson v. De Grandy*, 512 U.S. 997, 1017,114 S.Ct. 2647 (1994)("Failure to maximize cannot be the measure of § 2"). Instead, among other elements, plaintiffs must show that the alleged majority black district actually has enough black voting age population so that black voters actually have the ability to elect their candidate of choice, as opposed to a bare majority that functions as a crossover or influence district.

In *Harding v. County of Dallas, TX.*, the Fifth Circuit affirmed a district court's rejection of a plaintiffs' §2 vote dilution claim based on a 2011 redistricting plan for county commissioners that provided only one Anglo-minority district. The district court held that the plaintiffs failed to prove the "ultimate question" of vote dilution under §2 – that the minority group (Anglos) had the potential to elect their candidate of choice in a second district. 948 F.3d, 302, 308-09 (2020). On appeal, the plaintiffs claimed that they only needed to provide an alternative map with two Anglo-majority districts. Critically, the plaintiffs had not offered any evidence about the functionality of their proposed remedial plan – i.e., how the candidates of choice (Republicans) of the Anglo minority group would perform in elections under their remedial plans. 948 F.3d at 309.

Relying upon *Abbott v. Perez*, the Fifth Circuit held that simply proposing an alternative map containing an additional majority-minority district did not establish an increased opportunity to elect candidates of choice under *Gingles*. *Id*. In *Abbott*, the plaintiffs' expert estimated the performance of two proposed Latino opportunity districts and found that one performed in only 7 out of 35 relevant elections, and the other did not perform in any of the elections, unless county lines were broken in multiple places, which the district court found was beyond what §2 required.

138 S.Ct. 2305, 2332 (2018). The *Abbott* court rejected the district court's suggestion that the §2 claim could survive because the plaintiff did <u>not</u> show that the two districts would not perform:

> This observation twisted the burden of proof beyond recognition. It suggested that a plaintiff might succeed on its §2 claim because its expert failed to show that the necessary factual basis for the claim could not be established. Courts cannot find §2 effects violations on *the basis of uncertainty*.

*Abbott*, 138 S. Ct. at 2333 (*emphasis added*). Ultimately, the *Harding* court held that the burden remains upon Plaintiffs to provide evidence that Anglos could elect a second Republican commissioner.

There is nothing but uncertainty here. There is no consensus as to the percentage of BVAP needed for a minority candidate to be able to elect their candidate of choice, or even if there is a sufficiently cohesive and geographically compact group of voters to warrant such a district. In the past, notable Louisiana experts and even incumbent congressmen believed that a district with at least 60% black voting age population was necessary for a district to perform as a true majority minority district. *See* Sadow ¶¶24, 34. Moreover, there is no evidence from Plaintiffs' experts providing a localized racially polarized voting analysis. Rather, Plaintiffs' experts relied on statewide races, for a statewide analysis, which is impermissible. *See Shaw II,* 517 U.S. at 917.

Therefore, not only is Plaintiffs' evidence unpersuasive– it is also based on a faulty legal premise as illustrated by *Cooper v. Harris.* In *Cooper* the Supreme Court struck down North Carolina's CD1 finding that the inclusion of the urban areas of Durham, was an impermissible racial quota where the state was trying to draw a majority-minority district. 137 S.Ct. at 1466-1472. The Court held that the electoral history provided "no evidence that a §2 plaintiff could demonstrate the third *Gingles* prerequisite- effective white block voting." *Id.* at 1472. In fact, no such evidence existed in part, because as the lower court noted, there was "no evidence that the general assembly conducted or considered any sort of a particularized polarized voting analysis

during the 2011 redistricting process for CD1" *Harris v. McCrory,* 159 F.Supp.3d 600, 624 (M.D.N.C. 2016). In 1986, the Supreme Court in *Gingles,* found that there was no racially polarized voting in Durham, due to the success of black candidates in that county. *Gingles,* 478 U.S. at 41. Thirty years later, both the district court and the Supreme Court questioned the inclusion of Durham in the state's first congressional district because of the absence of legally significant racially polarized voting in that county. Both courts also pointed to the district's history as an extraordinarily safe district for minority preferred candidates, even though District 1's BVAP hovered between 46-48%. *Cooper* at 1472. The Supreme Court held that the victories by preferred candidates occurred because the district's white population did *not* vote sufficiently as a bloc to thwart black voter preference. *Id.* This doomed the state's efforts to redraw CD1 with a majority black population because "in areas with substantial cross over voting" Section 2 plaintiffs cannot prevail because they cannot establish the 3rd *Gingles* criteria. *Id. citing Strickland,* 556 U.S. at 24.

Here, like *Cooper,* there is no evidence that any of Plaintiffs' experts produced the sort of localized racially polarized voting analysis required under Supreme Court jurisprudence. If Plaintiffs had done even a cursory study on their proposed second majority-minority district, they would have seen what Dr. Solanky discovered—Plaintiffs have a *Cooper* problem. Here, there is ample evidence that each of the proposed Fifth Congressional Districts reach into Baton Rouge and pull out Black voters primarily from EBR—just like North Carolina's CD1 reached into Durham. (Sadow ¶¶68-72) And like *Cooper,* there is no evidence of legally significant racially polarized voting in EBR. (Ex. 2, Expert Report of Dr. Solanky, ("Solanky") ¶30)

Rather, it appears that there is significant white cross over voting in EBR. In 2020, only 44.1 percent of the voters in EBR were black, but the Parish overwhelmingly voted for President Biden in the 2020 election. (Solanky p. 11 Table 7) In fact, when Dr. Solanky examined the Fifth

District in Cooper's Illustrative Plan 1, he found that of the five parishes that voted for President Biden in 2020, EBR was the *only* majority-white parish. (Solanky ¶20). The other four parishes were majority-minority. (Solanky ¶20). Furthermore, Parish-wide races in EBR show that white voters are not voting as a bloc to defeat the minority preferred candidate, but voting to elect that candidate. (Solanky ¶¶ 23, 26, 30; Ex. 3, Declaration of Joel Watson, Jr. ("Watson") ¶ 9). This is evidenced by the election of a black candidate for Mayor- President in EBR since 2004. (Watson ¶9). And as shown by Dr. Solanky, EBR makes up a significant portion of the Fifth District under the illustrative plans. (Solanky ¶27). For example, in Cooper's First Illustrative Plan, EBR comprises 34.2% of the parishes used by Cooper to create this version of the illustrative Fifth District. (Solanky ¶27). Therefore there is a lack of bloc voting sufficient to satisfy *Gingles* in the largest Parish comprising the illustrative fifth district.

### C. Plaintiffs' Claims also Fail Under the Totality of the Circumstances- Namely the Legislature's Policy Choice for Preserving Continuity of Representation.

Even if Plaintiffs could satisfy all of the *Gingles* preconditions, this would still not be enough to prove likelihood of success, because the totality of the circumstances show that minority voters possess the same opportunities to participate in the political process and elect their candidate of choice. *See Fusilier,* 963 F.3d at 455. Specifically, under *Gingles,* the "ultimate question" is whether the district dilutes votes of minority voters, but the Fifth Circuit has held that "it is hard to see how this standard could be met if the alternative to the districting decision at issue would not enhance the ability of minority voters to elect their candidates of choice." *Id. citing Harding,* 948 F.3d at 310-311. Like in *Fusilier,* the record here casts doubt about the effectiveness of the proposed second majority-minority district. *Id.* at 455-456. In fact, it is highly unlikely that the proposed fifth district is effective.

Furthermore, Plaintiffs' oddly shaped versions of CD5 "suggests that race served as the *sine qua non* for selecting which blocks to include in the proposed district" exactly like the district at issue in *Fusilier*. 963 F3d at 455. Both cases also feature a non-tenuous state interest. In *Fusilier* the Fifth Circuit held that Louisiana has a substantial interest in retaining at-large elections for judges so that everyone in the Parish could vote for each Judge. *Id.* at 462. Here, Louisiana has an equally substantial interest in maintaining the continuity of representation in its districting plans, as it has for the previous two redistricting cycles. *See Karcher v. Dagett*, 462 U.S. 725, 470 (1983) (explaining that retaining the cores of prior districts or avoiding contests between incumbents are legitimate legislative policies during redistricting). As explained by Dr. Sadow, the state adopted its policy of maintaining continuity of representation since at least 2001. (Sadow ¶¶45-47). And it has done so after federal courts rejected the legality of any congressional plan which contained a second majority-minority district that was drawn into EDR and during a period where the proportional of majority black districts within the state's congressional plan has actually increased despite the percentage of black population remaining flat or even declining. *Id.*

In all respects, Plaintiffs' case here fares no better than the *Fusilier* plaintiffs. Both sets of plaintiffs offer marginal cases of vote dilution, coupled with evidence that casts doubt on the performance of the proposed majority-minority districts. *Fusilier*, 963 F.Supp. at 462-63. Moreover, drawing districts to maintain continuity of representation is not an attenuated state policy. *Id.* Therefore, under the controlling *Fusilier* opinion, it is unlikely that Plaintiffs can prove under a totality of the circumstances that minority voters lack the same opportunities to participate in the political process.

### III. The Purcell Doctrine Bars An Injunction at this Late Stage

In a normal election cycle, "[r]unning elections state-wide is extraordinarily complicated and difficult." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant

of applications for stays). Elections officials must navigate "significant logistical challenges" that require "enormous advance preparations." *Id.* But, admittedly, the 2022 election cycle has been far from a "normal" cycle in Louisiana. In addition to the challenge of needing to draw new districts and conduct elections under these new districts, numerous other parishes and school boards are also redistricting this year. Exacerbating this already challenging scenario, the Covid-19 pandemic delayed the results of the 2020 census and, in turn, Louisiana's redistricting efforts.

In 2006 the United States Supreme Court held in *Purcell v. Gonzalez*, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." 549 U.S. 1, 4-5 (2006) (per curiam).

In the wake of this seminal opinion, the United States Supreme Court has consistently admonished courts not to alter state election laws and processes in the period close to an election *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring in grant of stay application) see *also Milligan*, 142 S. Ct. at 879; *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020); *Merrill v. People First of Ala.*, 141 S. Ct. 190 (2020); *Clarno v. People Not Politicians*, 141 S. Ct. 206 (2020); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (per curiam); *Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28 (2020) (declining to vacate stay); *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (per curiam); *Veasey v. Perry*, 574 U.S. 951 (2014).

The 2022 election cycle already underway is no exception. Over two months ago, the United States Supreme Court in *Milligan* issued a stay of the district court's opinion that enjoined the use of Alabama's congressional redistricting plan. In his concurring opinion, Justice Kavanaugh invoked the *Purcell* doctrine for the proposition that courts "should not enjoin a state's

election laws in the period close to an election." 142 S. Ct. at 879-880. This is because, "filing deadlines need to be met" candidates need to "be sure what district they need to file for" or even determine "which district they live in." *Id.* In this concurrence Justice Kavanaugh opined that the *Purcell* doctrine "might" be overcome if the Plaintiff establishes "at least" that:

> (i) the underlying merits are entirely clear-cut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship. *Id.* at 881.

Plaintiffs utterly fail to meet this test. As shown above, Plaintiffs fail to even prove that they are likely to succeed on the merits of their claims, much less that the evidence is "entirely clear-cut" in their favor. *Id.* Nor can Plaintiffs prove that their requested change, an entirely new congressional plan, is feasible before the election, and certainly not without significant cost, confusion, and hardship. For any redistricting plan, each Louisiana voter must be assigned to their new districts in the state election database system called ERIN. (Ex. 4, Declaration of Sherri Hadskey ("Hadskey") ¶14). Once voters are assigned, this information must be carefully proofed, before it goes "live" in the ERIN system. (*Id*). Once voters are assigned to their new districts, voter registration cards are mailed reflecting a voter's new district. (*Id.* at ¶15). These cards serve a dual purpose. Not only do they decrease voter confusion, the cards also let citizens know what district they can run in, and what district they need to gather signatures if they seek candidate qualification by nominating petition in lieu of paying the filing fee. (*Id.*). Because of these purposes, cards must be mailed well before the deadline to submit nominating petitions, which this year is June 22, 2022. (*Id.* at 16). Eliminating or extending this deadline could have the effect of jeopardizing the ability of lower-income citizens to run for office. Given this tight timeline and the delay in census

data, the Secretary of State's office has already begun assigning voters to their new congressional districts in ERIN, and cards are being mailed. (*Id.* at 19).

Furthermore, after the nominating petition deadline, there is only 30 days to verify the signatures on these petitions, as under state law candidate qualifying ends on July 22, 2022. (*Id.* at 16). Objections to candidates must be filed no later than July 29, 2022, and absentee ballots to service members must be mailed no later than September 24, 2022. (*Id.*). Therefore under the current schedule, there is already less than a two-month period to adjudicate objections to candidates and prepare all ballots. (*Id.*). This tight timeframe cannot be rushed any further. Smaller municipal elections that ran on March 26th with a short, but longer lead up time than would be feasible if the Court implemented new maps, already saw administration problems. (*Id.* at 19). As a result of these problems, a judge required state and local officials to hold a new election in the City of Sulphur because voters were wrongly assigned to the district in question. (*Id.*). Changing the congressional districts at this stage clearly creates an unacceptable risk of the same sort of issues happening state-wide. And lastly, should the Court order a new plan, the cost to the state would be astronomical in terms of overtime, additional postage, and additional printing of voter ID cards and potentially absentee ballots in a national election paper shortage. (*Id.* at 20).

Courts across the country are following the *Milligan* precedent in this redistricting cycle, and this Court should too. Three weeks after the *Milligan* opinion was issued, the Georgia district court in *Alpha Phi Alpha Fraternity, Inc., v. Raffensperger,* followed suit, declining to enjoin the State's redistricting plan due to the *Purcell* doctrine. ___F.Supp.3d___, 2022 WL 633312, 1:21-cv-05337(N.D. Ga. Feb. 28, 2022). Days after that, the Supreme Court denied a stay application that would have resulted in different congressional districts in North Carolina over two months before North Carolina's scheduled primary. *Moore v. Harper,* No. 21A455*,* 595 U.S. ____

(Kavanaugh, J. concurring). And just this month, a three judge panel convened in the Southern District of Ohio affirmatively put in place a plan already rejected by a state supreme court, to ensure that the people of Ohio could hold elections under the *Purcell* doctrine, months ahead of the new August primary date. *Michael Goindakis, v. Frank LaRose, in his capacity as Ohio Sec'y of State, et al.,* No. 2:22-CV-0773, 2022 WL 1175617, at *19 (S.D. Ohio Apr. 20, 2022).

Courts in this Circuit have also routinely abided by the *Purcell* doctrine to not meddle with state election laws in a period close to an election. *See Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (Remanding Section 2 case for new trial but ordering that no remedy could be enforced until after the election, which was four months away); *Texas Democratic Party v. Abbott,* 961 F.3d 389, 412 (5th Cir. 2020) (staying enforcement of a preliminary injunction to minimize voter confusion on June 4, 2020, five months prior to the election). And Plaintiffs arguments that *Purcell* does not apply because the election is months away are unavailing. As shown in Ms. Hadskey's Declaration, work on these elections has already begun, and ballots must be mailed to overseas voters no later than September 24, 2022, in a mere five months. Circuit courts have upheld the denial of preliminary injunctions with even more time before an election. *See Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018) (upholding district court's denial of a preliminary injunction because the district court properly "concluded that the appellants had failed to justify such a disruptive injunction" in its April 25, 2018 opinion, over six months before the election.)

This precedent is designed to prevent 11th hour judicial intervention which risks impinging upon an individual's right with the "most fundamental significance under our constitutional structure"—the right to vote. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see also Purcell*, 549 U.S. at 4-5. Additionally, when a Court makes changes close to the election, these changes "can themselves result in voter confusion and consequent incentive to remain away from the polls."

*Purcell*, 549 U.S. at 4-5. Late intervention can also impose significant burdens on state and local elections staff, as well as unfairly impact candidates or political parties. *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring in grant of applications for stays).

Plaintiffs ask this Court to eschew this well-reasoned precedent and create election chaos. Plaintiffs ask that this Court enjoin Louisiana's Congressional Plan, an action which cannot possibly occur until the last day of the hearing on May 13, at the earliest, a mere 5 weeks before the nominating petition date of June 22, Even if the Court were inclined to grant this drastic remedy, that would leave the Louisiana Legislature with insufficient time to pass a new congressional plan, and certainly no time for a Court to review this remedial action.

Simply, Plaintiffs requested relief is the sort of relief the *Purcell* doctrine encourages courts to decline on the eve of an election. And this is true even if the Court believes the underlying election laws at issue may be constitutionally circumspect, which, as shown above, is not the case here. *See Merrill*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of applications for stays of enforcement where lower court found VRA violations in Alabama's Congressional redistricting plan); *Covington* 316 F.R.D. at 177 (refusing to enjoin election 2.5 months away despite entering a final judgment holding certain North Carolina legislative districts were racial gerrymanders because "such a remedy would cause significant and undue disruption to North Carolina's election process and create considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials."); *Raffensperger*, 2022 WL 633312 (noting that the Court's denial of the preliminary injunction on the basis of the *Purcell* doctrine "should not be viewed as an indication of how the Court will ultimately rule on the merits at trial"); *Upham v. Seamon*, 456 U.S. 37, 44, 102 S. Ct. 1518, 1522, 71 L. Ed. 2d 725 (1982) (holding that even though there was error by the lower court the interim plan should be used

because the filing date for candidates had "come and gone" and the primary was looming.) Therefore, even assuming *arguendo* the Court were inclined to believe Plaintiffs arguments that the Congressional Plan violates the VRA, which it does not, the Court should allow the 2022 elections to go forward under the Congressional Plan while adjudicating the merits of Plaintiffs' claims.

If Plaintiffs' expansive relief is granted at this late hour, the prejudice to voters, and especially absentee and overseas voters will be immense. This is exactly the "increased risk" of confusion the Supreme Court warned about in *Purcell. See also Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28, 42 (2020) (*DNC*) (Kagan, J., dissenting) ("Last-minute changes to election processes may baffle and discourage voters…). This risk is in addition to jeopardizing state and parish election officials' ability to prepare for and administer the election. This Court should follow *Purcell* and its progeny and decline to create election chaos in Louisiana.

## **CONCLUSION**

For the reasons stated above, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this the 29th day of April, 2022.

By:/s/ Phillip J. Strach* (Lead Counsel)
phillip.strach@nelsonmullins.com
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612

Telephone: (919) 329-3800
Facsimile: (919) 329-3799

/s/ John C. Walsh
John C. Walsh (Louisiana Bar Roll No. 24903)
john@scwllp.com
**SHOWS, CALI & WALSH, L.L.P.**
P.O. Box 4046
Baton Rouge, LA 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-5561

*Counsel for Defendant*
*\*Admitted Pro Hac Vice*

4862-9699-2286 v.1

25