## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, et al., | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| v. | Chief Judge Shelly D. Dick |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | Consolidated with |
| v. | Civil Action No. 3:22-cv-00214-SDD-SDJ |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

## LEGISLATIVE INTERVENORS' OPPOSITION TO
## <u>MOTIONS FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

BACKGROUND ............................................................................................................... 1

    I.    The Legal and Historical Framework ............................................................ 1

    II.   The 2020 Redistricting ................................................................................... 4

    III.  Procedural Posture ......................................................................................... 8

LEGAL STANDARD ........................................................................................................ 9

ARGUMENT ..................................................................................................................... 9

    I.    Plaintiffs Are Unlikely To Succeed on the Merits ....................................... 9

        A.    The First *Gingles* Precondition ....................................................... 10

        B.    The Third *Gingles* Precondition ...................................................... 14

        C.    The Totality of the Circumstances ..................................................... 17

    II.   The Equities Militate Against an Injunction ............................................... 22

CONCLUSION ................................................................................................................. 25

CERTIFICATE OF SERVICE ......................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ................................................................................ *passim*

*Abbott v. Perez*,
    138 S. Ct. 49 (2017) ........................................................................................24

*Abrams v. Johnson*,
    521 U.S. 74 (1997) ...................................................................................12, 15

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
    --F. Supp. 3d--, 2022 WL 496908 (E.D. Ark. Feb. 17, 2022) .................................25

*Banerian v. Benson*,
    -- F. Supp. 3d --, 2022 WL 676001 (W.D. Mich. Mar. 4, 2022) ............................13

*Bartlett v. Strickland*,
    556 U.S. 1 (2009) (plurality opinion) ............................................................. *passim*

*Bethune-Hill v. Va. State Bd. of Elections*,
    326 F. Supp. 3d 128 (E.D. Va. 2018) ...........................................................10, 16

*Blaylock v. Cheker Oil Co.*,
    547 F.2d 962 (6th Cir. 1976) .............................................................................23

*Bush v. Vera*,
    517 U.S. 952 (1996) (plurality opinion) .............................................................2

*Cardona v. Oakland Unified Sch. Dist., Cal.*,
    785 F. Supp. 837 (N.D. Cal. 1992) ..............................................................23, 24

*Chisom v. Edwards*,
    690 F. Supp. 1524 (E.D. La. July 7, 1988) ..........................................................24

*Chisom v. Roemer*,
    853 F.2d 1186 (5th Cir. 1988) ..........................................................................24

*Citizens for a Better Gretna v. City of Gretna, La.*,
    636 F. Supp. 1113 (E.D. La. 1986) ...................................................................21

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ........................................................................................11

*Clark v. Calhoun Cty., Miss.*,
    88 F.3d 1393 (5th Cir. 1996) ........................................................22

*Cooper v. Harris*,
    137 S. Ct. 1455 (2017) ........................................................ *passim*

*Covington v. North Carolina*,
    316 F.R.D. 117 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017)...................................15, 16

*Diaz v. Silver*,
    932 F. Supp. 462 (E.D.N.Y. 1996) ........................................................23

*Fairley v. Hattiesburg, Miss.*,
    2:06-cv-167, 2008 WL 3287200 (S.D. Miss. Aug. 7, 2008), *aff'd*, 584 F.3d
    660 (5th Cir. 2009)........................................................11, 20, 21

*Foster v. Love*,
    522 U.S. 67 (1997)........................................................20, 21

*Georgia v. Ashcroft*,
    539 U.S. 461 (2003)........................................................1, 18, 20

*Gill v. Whitford*,
    137 S. Ct. 2289 (2017)........................................................24

*Gonzalez v. City of Aurora, Ill.*,
    535 F.3d 594 (7th Cir. 2008) ........................................................ *passim*

*Harding v. Cty. of Dallas, Tex.*,
    948 F.3d 302 (5th Cir. 2020) ........................................................18, 19

*Hays v. Louisiana*,
    839 F. Supp. 1188 (W.D. La. 1993) (*Hays I*) ........................................................3, 7, 10, 13

*Hays v. Louisiana*,
    862 F. Supp. 119 (W.D. La. 1994) (*Hays II*)........................................................3, 4

*Hays v. Louisiana*,
    936 F. Supp. 360 (W.D. La. 1996) (*Hays IV*)........................................................3

*Karcher v. Daggett*,
    455 U.S. 1303 (1982) (Brennan, J., in chambers)........................................................24

*Karcher v. Daggett*,
    462 U.S. 725 (1983)........................................................4

*Kilgarlin v. Martin*,
    252 F. Supp. 404 (S.D. Tex. 1966), *aff'd in relevant part sub nom. Kilgarlin v. Hill*, 386 U.S. 120 (1967).................................................................................24

*Klahr v. Williams*,
    313 F. Supp. 148 (D. Ariz. 1970), *aff'd sub nom. Ely v. Klahr*, 403 U.S. 108 (1971)..........................................................................................................24

*Kostick v. Nago*,
    878 F. Supp. 2d 1124 (D. Haw. 2012) ...........................................................23

*League of United Latin American Citizens v. Perry*,
    548 U.S. 399 (2006)...............................................................1, 12, 13, 18

*Lopez v. Abbott*,
    339 F. Supp. 3d 589 (S.D. Tex. 2018) ....................................16, 17, 20

*Louisiana v. Hays*,
    512 U.S. 1230 (1994)............................................................................3

*LULAC, Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) (*en banc*) ....................................... *passim*

*McConchie v. Scholz*,
    --F. Supp. 3d--, 2021 WL 6197318 (N.D. Ill. Dec. 30, 2021) ................................15

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022).........................................................11, 23, 24, 25

*Miller v. Johnson*,
    515 U.S. 900 (1995)....................................................................2, 7, 10, 12

*Mo. State Conference of NAACP v. Ferguson-Florissant School Dist.*,
    201 F. Supp. 3d 1006 (E.D. Mo. 2016)..............................................22

*Monroe v. City of Woodville, Miss.*,
    881 F.2d 1327 (5th Cir. 1989) ........................................................20

*NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*,
    858 F. Supp. 2d 516 (M.D.N.C. 2012) ...........................................23

*North Carolina v. Covington*,
    137 S. Ct. 808 (2017)........................................................................24

*North Carolina v. Covington*,
    138 S. Ct. 974 (2018)........................................................................24

*Perez v. Texas*,
    2015 WL 6829596 (W.D. Tex. Nov. 6, 2015) .......................................................23

*Pileggi v. Aichele*,
    843 F. Supp. 2d 584 (E.D. Pa. 2012) ...................................................................23

*Pub. Citizen, Inc. v. Miller*,
    813 F. Supp. 821 (N.D. Ga.), *aff'd*, 992 F.2d 1548 (11th Cir. 1993) ....................21

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) (per curiam) ................................................................23, 24, 25

*Reynolds v. Sims*,
    377 U.S. 533 (1964) .......................................................................................23, 24

*Rucho v. Common Cause*,
    138 S. Ct. 923 (2018) ...........................................................................................24

*Sensley v. Albritton*,
    385 F.3d 591 (5th Cir. 2004) ...............................................................................10

*Shapiro v. Berger*,
    328 F. Supp. 2d 496 (S.D.N.Y. 2004).................................................................23

*Shaw v. Hunt*,
    517 U.S. 899 (1996) (*Shaw II*)................................................................2, 10, 18

*Shaw v. Reno*,
    509 U.S. 630 (1993) (*Shaw I*) ...................................................................1, 8, 11

*Shelby County v. Holder*,
    570 U.S. 529 (2013)..............................................................................................11

*Singleton v. Merrill*,
    --F. Supp. 3d--, 2022 WL 265001 (N.D. Ala. Jan. 24, 2022)...............................25

*Sw. Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) ...............................................................................24

*Terrazas v. Clements*,
    581 F. Supp. 1329 (N.D. Tex. 1984) ...................................................................22

*Terrebonne Par. Branch NAACP v. Jindal*,
    274 F. Supp. 3d 395 (M.D. La. 2017), *rev'd on other grounds sub nom.*
    *Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) ...............................................14

*Thomas v. Bryant*,
　938 F.3d 134 (5th Cir. 2019), *vacated on other grounds sub nom. Thomas v.*
　*Reeves*, 961 F.3d 800 (5th Cir. 2020) ...............................................................19, 20

*Thornburg v. Gingles*,
　478 U.S. 30 (1986)............................................................................ *passim*

*United States v. City of Euclid*,
　580 F. Supp. 2d 584 (N.D. Ohio 2008)...........................................................21

*United States v. Hays*,
　515 U.S. 737 (1995) (*Hays III*) ......................................................................3

*United States v. Marengo County Comm'n*,
　731 F.2d 1546 (11th Cir. 1984) ......................................................................21

*Univ. of Tex. v. Camenisch*,
　451 U.S. 390 (1981)..................................................................................9, 23

*Valenti v. Dempsey*,
　211 F. Supp. 911 (D. Conn. 1962) ..................................................................23

*Vera v. Richards*,
　861 F. Supp. 1304 (S.D. Tex. 1994) ...............................................................16

*Voinovich v. Quilter*,
　507 U.S. 146 (1993)....................................................................................14

*Washington v. Tensas Par. Sch. Bd.*,
　819 F.2d 609 (5th Cir. 1987) ...........................................................10, 17, 18

*Wenner v. Tex. Lottery Comm'n*,
　123 F.3d 321 (5th Cir. 1997) ...........................................................................9

*Westwego Citizens for Better Gov't v. City of Westwego*,
　946 F.2d 1109 (5th Cir. 1991) ......................................................................17

*Whitcomb v. Chavis*,
　403 U.S. 124 (1971)....................................................................................17

*Winter v. NRDC, Inc.*,
　555 U.S. 7 (2008)..................................................................................9, 22, 23

*Wis. Legislature v. Wis. Elections Comm'n*,
　142 S. Ct. 1245 (2022)................................................................................1, 10

*Wright v. Sumter Cnty. Bd. of Elections and Registration*,
　301 F. Supp. 3d 1297 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1281 (11th Cir. 2020).....................22

**Statutes**

2 U.S.C. § 7 ................................................................................................................21

52 U.S.C. § 10301(b) ..........................................................................................10, 18

Ala. Stat. § 17-13-5(b) ................................................................................................25

La. Rev. Stat. 18:1308.2 .............................................................................................25

**Other Authorities**

Frank Wilczek, *Einstein's Parable of Quantum Insanity*, Scientific American
    (Sep. 23, 2015) ......................................................................................................4

House Bill 1 .......................................................................................................4, 7, 8

James U. Blacksher & Larry T. Menefee, *From Reynolds v. Sims to City of
    Mobile v. Bolden: Have the White Suburbs Commandeered the Fifteenth
    Amendment?* 34 Hastings L.J. 1 (1982) ..............................................................11

Richard L. Engstrom & John K.Wildgen, *Pruning Thorns from the Thicket: An
    Empirical Test of the Existence of Racial Gerrymandering,* 2 Legis. Stud. Q.
    465 (1977) ............................................................................................................11

Senate Bill 5 ...........................................................................................................4, 8

Senate Bill 9 ................................................................................................................7

Senate Bill 16 ..............................................................................................................7

In the early 1990s, the Louisiana Legislature enacted two redistricting plans containing two majority-Black congressional districts out of seven districts total. A federal three-judge court invalidated both plans as violations of the Equal Protection Clause. Plaintiffs now ask this Court, as temporary relief to preserve the *status quo*, to order the State to use in the next election a congressional redistricting plan containing two majority-minority congressional districts out of six districts total. The Court should deny that request.

## BACKGROUND

### I.     The Legal and Historical Framework

1.      After each decennial census, "[s]tates must redistrict to account for any changes or shifts in population." *Georgia v. Ashcroft*, 539 U.S. 461, 489 n.2 (2003). "Redistricting is never easy." *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018). This is, in part, because "federal law restrict[s] the use of race in making districting decisions." *Id.* "The Equal Protection Clause forbids 'racial gerrymandering,' that is, intentionally assigning citizens to a district on the basis of race without sufficient justification." *Id.* (citing *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (*Shaw I*)). As a result, purposefully creating a new majority-minority district is presumptively unconstitutional. *See Cooper v. Harris*, 137 S. Ct. 1455, 1468–69 (2017). Districting maps that "sort voters on the basis of race 'are by their very nature odious.'" *Wis. Legislature v. Wis. Elections Comm'n,* 142 S. Ct. 1245, 1248 (2022) (quoting *Shaw I*, 509 U.S. at 643).

On the other hand, "[a] State violates § 2" of the Voting Rights Act (VRA) "if its districting plan provides 'less opportunity' for racial minorities 'to elect representatives of their choice.'" *Abbott*, 138 S. Ct. at 2315 (quoting *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 425 (2006) (*LULAC*)). The Supreme Court has "interpreted this standard to mean that, under certain circumstances, States must draw 'opportunity' districts in which minority groups form 'effective majorit[ies].'" *Id.* (citation omitted).

In the face of these "'competing hazards of liability,'" the Supreme Court has "assumed"—but never held—that "compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed." *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion)); *but see Miller v. Johnson*, 515 U.S. 900, 927 (1995) (observing that this assumption raises "troubling and difficult constitutional questions"). A state's burden to satisfy "strictest scrutiny" is demanding. *See Miller*, 515 U.S. at 915. The state must at a minimum adduce evidence—at the time of redistricting—establishing the three "*Gingles*" preconditions: that (1) the relevant minority group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; (2) the relevant minority group is "politically cohesive," and (3) the "district's white majority . . . 'vote[s] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper*, 137 S. Ct. at 1470 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)). It is insufficient that citizens or advocacy groups "want[] a State to create" a majority-minority district. *Abbott*, 138 S. Ct. at 2334. It is also insufficient that a government actor demands a majority-minority district. *See Miller*, 515 U.S. at 922 (striking down a majority-minority district, even though the federal government made it a condition of Section 5 preclearance); *Shaw v. Hunt*, 517 U.S. 899, 911–12 (1996) (*Shaw II*) (same). The Supreme Court has forbidden states from seeking to maximize the number of majority-minority districts. *Shaw II*, 517 U.S. at 913. "Nor is proportional representation the benchmark." *Gonzalez v. City of Aurora, Ill.*, 535 F.3d 594, 598 (7th Cir. 2008). No defendant has successfully invoked Section 2 in the Supreme Court as a racial-gerrymandering defense.

2.     Louisiana is no exception. After the 1990 census, the Louisiana Legislature twice enacted congressional plans with two majority-minority districts; both were invalidated under the Constitution. The 1992 plan included one majority-minority district (CD2) that "covers essentially

the same geographic area as did old District 2 in the previous plan" in Orleans Parish. *Hays v. Louisiana*, 839 F. Supp. 1188, 1191 (W.D. La. 1993) (three-judge court) (*Hays I*). That *status quo* district posed no equal-protection problem. *Id.*

But the plan also added a new majority-minority district (CD4), which the Legislature created because the U.S. Department of Justice "had let it be known that preclearance [under VRA Section 5] would not be forthcoming" without a second majority-minority district. *Id.* at 1196 n.1. In the subsequent equal-protection challenge, a three-judge court held that racial considerations predominated because "the Plan was drawn with the *specific intent* of ensuring the creation of a second, safe, black majority congressional district." *Id.* at 1204. The plan was not narrowly tailored under Section 2 because "it adversely affects more interests, if it generally wreaks more havoc, than it reasonably must to accomplish the articulated compelling state interest." *Id.* at 1208. The State appealed, but the appeal became moot when the Legislature enacted another plan, also with two majority-minority districts. *See Louisiana v. Hays*, 512 U.S. 1230 (1994) (mem.).

A second challenge ensued. Again, the three-judge court concluded that race predominated, finding that "[t]he Legislature was justifiably convinced that the United States Department of Justice would preclear no redistricting plan for Louisiana that failed to include a second majority-minority district" and therefore passed the plan "for the very reason that it was effective in separating black voters from white." *Hays v. Louisiana*, 936 F. Supp. 360, 368 (W.D. La. 1996) (*Hays IV*).[1] The court found that CD4 failed strict scrutiny because, "[d]espite a minority population of approximately 30%, demographic distribution is simply too diffuse to generate a majority voting age population in any district outside of the Orleans Parish region." *Id.* at 124 n.4.

---

[1] The three-judge court reached the same conclusion in a prior ruling, *Hays v. Louisiana*, 862 F. Supp. 119 (W.D. La. 1994) (*Hays II*), but the Supreme Court vacated that ruling because no plaintiff had standing to challenge CD4, *United States v. Hays*, 515 U.S. 737 (1995) (*Hays III*).

3

The three-judge court imposed a remedial plan with one majority-minority district (CD2). *Id.* at 124–25.

**II.    The 2020 Redistricting**

"Insanity is doing the same thing over and over and expecting different results."[2] The Louisiana Legislature did not succumb to this malady.

1.    In the 2000 and 2010 decades, the Legislature maintained CD2 anchored in Orleans Parish as a majority-minority district, and did not enact a second majority-minority district. The U.S. Department of Justice precleared these plans. The Black population has not materially grown as a percentage of Louisiana's overall population; as in 1994, it has been "approximately 30%" of the voting-age population, *Hays IV*, 862 F. Supp. at 124 n.4; Hood Rep., Ex. A, at 4. Meanwhile, after the 2010 census, Louisiana lost a congressional district, going from seven to six.

2.    In the 2020 apportionment, Louisiana retained six districts. But population shifts within the State necessitated redistricting to "achieve population equality 'as nearly as is practicable.'" *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) (citation omitted). The Legislature began the process in June 2021 by adopting criteria mandating that proposed plans comply with all legal requirements (including "the Equal Protection Clause"), "contain whole election precincts," "maintain[] . . . communities of interest," and "respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable." Ex. B, HCR 90(B), (E)(2), (G)(1). From October 2021 to January 2022, the Legislature held public hearings across the State to present information and solicit public feedback.

The Legislature convened an Extraordinary Session beginning February 1, 2022. The congressional plan ultimately enacted, House Bill 1 and Senate Bill 5, satisfies the adopted

---

[2] *E.g.*, Frank Wilczek, *Einstein's Parable of Quantum Insanity*, Scientific American (Sep. 23, 2015), https://www.scientificamerican.com/article/einstein-s-parable-of-quantum-insanity/.

criteria.[3] The plan maintains the "core districts as they [were] configured" to "ensure continuity of representation."[4] Although population shifts rendered some changes necessary, the plan preserves "the traditional boundaries as best as possible" and "keeps the status quo."[5] On average, the plan maintains more than 96% of constituents per district in the same district as the 2011 plan. Hood Rep., Ex. A, at 2. The plan respects political-subdivision boundaries and natural geography, and it splits just one precinct.[6] The plan accounts for communities of interest identified in committee hearings, including by grouping major military installations and military communities in CD4, preserving the Acadiana region in CD3, and joining major cities and their suburbs as much as possible.[7] Of particular relevance to this case are CD5, CD6, and CD2:

- CD5, which was underpopulated by about 37,000 residents, is a rural district that accounts for nearly half of Louisiana's agricultural sales and borders a long stretch of the Mississippi River. Its incumbent serves on the House Agriculture Committee. The plan maintains rural communities as the "backbone" of CD5 by preserving the delta region and adding Point

---

[3] *See* Sen. Hewitt, Feb. 3, 2022 Senate and Governmental Affairs (Part 2) at 32:55 to 55:20, https://senate.la.gov/s_video/videoarchive.asp?v=senate/2022/02/020322SG2; *see also* Sen. Hewitt, Feb. 8, 2022 Senate Session at 1:59:45 to 2:08:33, https://senate.la.gov/s_video/videoarchive.asp?v=senate/2022/02/020822SCHAMB; Speaker Pro Tempore Magee, Feb. 10, 2022 House Session at 1:21:08 to 1:21:48, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2022/feb/0210_22_Day09_20221ES_Redist.
[4] Sen. Hewitt, Feb. 3, 2022 Senate and Governmental Affairs (Part 2) at 37:19 to 38:05; *see also* Sen. Hewitt, Feb. 4, 2022 Senate and Governmental Affairs at 28:12 to 28:26, https://senate.la.gov/s_video/videoarchive.asp?v=senate/2022/02/020422SG; *see* Sen. Hewitt, Feb. 8, 2022 Senate Session at 2:03:00 to 2:03:40; *see also* Sen. Hewitt, Mar. 30, 2022, Senate Session at 53:38 to 55:06, https://senate.la.gov/s_video/videoarchive.asp?v=senate/2022/03/033022SCHAMB.
[5] Speaker Pro Tempore Magee, Feb. 10, 2022 House Session at 8:34 to 9:01, 12:55 to 13:02; *see also* Rep. Stefanski, Feb. 18, 2022 House Session (Part 1) at 4:24 to 4:48, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2022/feb/0218_22_Day15_20221ES_Redist; *see also* Speaker Schexnayder Testimony, Feb. 4, 2022 House and Governmental Affairs at 1:50 to 12:30, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2022/feb/0204_22_HG.
[6] *See* Sen. Hewitt, Feb. 3, 2022 Senate and Governmental Affairs (Part 2) at 36:38 to 37:18; *see also* Sen. Hewitt, Feb. 8, 2022 Senate Session at 2:02:40 to 2:03:00.
[7] *See* Sen. Hewitt, Feb. 3, 2022 Senate and Governmental Affairs (Part 2) at 38:06 to 40:05; *see also* Sen. Hewitt, Feb. 8, 2022 Senate Session at 2:03:45 to 2:04:50; *see also* Speaker Pro Tempore Magee, Feb. 10, 2022 House Session at 14:06 to 14:18.

Coupee and rural parts of the Florida Parishes.[8] The enacted plan retains over 89% of the constituents of CD5 in the 2011 Plan. Hood Rep., Ex. A, at 2.

- CD6, which was overpopulated by about 40,000 residents, is anchored in the Greater Baton Rouge area and joins its suburbs, including West Baton Rouge, Ascension, and Livingston. The enacted plan improves CD6 by curing precinct splits from the prior plan.[9] The plan retains nearly 99% of the constituents of CD6 in the 2011 plan. Hood Rep., Ex. A, at 2.

- CD2 was the closest of any district to the ideal population, being under the ideal by 1,000 residents. The district joins the State's two largest urban areas, New Orleans and portions of Baton Rouge, which share interests in the tourism industry, affordable housing, safe neighborhoods, and accessible healthcare. CD2 brings together ports along the Mississippi River, which is the "gateway to commerce."[10] The "general makeup of this district remains the same" from the 2010 plan, though some precincts were shifted between District 2 and others to equalize population.[11] The enacted version retains nearly 99% of the constituents of the 2011 version of CD2. Hood Rep., Ex. A, at 2. CD2 remains a majority-Black district, with a Black Voting Age Population of over 58%.[12] There is no allegation that race predominated in the creation of CD2.

3.    The Legislature faced "demands" to engage in race-based redistricting. *See Abbott*, 138 S. Ct. at 2334. Some public commenters contended that, "[b]ecause over 1/3 of Louisiana's population is minority . . . at least 2 of the 6 districts should have a fair chance of electing a member of a minority." *Robinson* Compl. ¶ 48. Some legislators, too, argued for proportionality, "repeating, 'One-third of six is two.'" *Galmon* Compl. ¶ 30. Legislators and members of the public

---

[8] *See* Sen. Hewitt, February 3, 2022 Senate and Governmental Affairs (Part 2) at 43:42 to 46:50.
[9] *See* Sen. Hewitt, Feb. 3, 2022 Senate and Governmental Affairs (Part 2) at 52:05 to 53:45.
[10] *See* Sen. Hewitt, Feb. 3, 2022 Senate and Governmental Affairs (Part 2) at 53:45 to 54:38.
[11] *See* Speaker Schexnayder, Feb. 4, 2022 House and Governmental Affairs at 6:00 to 7:05.
[12] *See* Sen. Hewitt, Feb. 3, 2022 Senate and Governmental Affairs (Part 2) at 53:45 to 54:38.

proposed alternative plans containing two majority-Black districts representing that they were drawn with the specific intent to reach at least 50% Black voting-age population (or BVAP).[13] Senator Fields, for example, asserted that, "if you wish to create a majority-minority district, you can."[14] The proposals transferred Black residents from CD2 to CD5, reducing CD2's BVAP,[15] and some contained z-shaped districts that zigged and zagged across the state.[16] The Governor announced that he would veto any congressional plan that "does not include a second majority African American district." *Galmon* Compl. ¶ 38; *compare Hays I*, 839 F. Supp. at 1196 n.1; *Miller*, 515 U.S. at 917–18; *see also Shaw II*, 517 U.S. at 902–03.

No one advocating a second majority-minority district presented "a strong basis in evidence to conclude that § 2 demands such race-based steps." *Cooper*, 137 S. Ct. at 1471. Plaintiffs Louisiana NAACP and Power Coalition for Equity and Justice claimed to have conducted statistical analyses.[17] But no submission contained such an analysis or underlying data.

---

[13] *See, e.g.,* Sen. Fields, Feb. 8, 2022 Senate Session at 2:20:50 to 2:21:13; *see also* Sen. Luneau, Feb. 3, 2022 Senate and Governmental Affairs (Part 1) at 1:48 to 2:00, https://senate.la.gov/s_video/videoarchive.asp?v=senate/2022/02/020322SG (testifying he offered Senate Bill 16 because "with the changes in our population, it's pretty clear, that the Census has shown about a third of the population is minority" and that the plan "adds an additional majority-minority district."); *see also* Sen. Price, Feb. 15, 2022 Senate and Governmental Affairs at 12:20 to 12:33, https://redist.legis.la.gov/default_video?v=senate/2022/02/021522SG (explaining that the purpose of Amendment 153 to House Bill 1 was to "provide two minority district[s] – District 2 and District 5."); Rep. Duplessis, Feb. 15, 2022 House and Governmental Affairs at 1:13:10 to 1:13:15, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2022/feb/0215_22_HG (explaining he offered Amendment 116 to SB 5 to "creat[e] a second majority-minority district.").

[14] Sen. Fields, Feb. 8, 2022 Senate Session at 2:28:00 to 2:28:27.

[15] *See, e.g.*, Senate Bill 9, https://legis.la.gov/legis/ViewDocument.aspx?d=1245001 (showing BVAPs of 52.254% and 51.597% for CD2 and CD5, respectively).

[16] *See* Sen. Hewitt, February 3, 2022 Senate and Governmental (Part 2) at 4:15 to 5:20 ("You've got Lafayette in a district with New Orleans, you've got neighborhoods in Baton Rouge would share a member of congress with Shreveport, and Lake Charles is joined with parts of Monroe. It divides up some of the Barksdale community.").

[17] *See* October 18, 2021 Letter at 5–6, https://redist.legis.la.gov/2020_Files/MtgFiles/Email%20Testimony%20-%20Michael%20Pernick,%20NAACP%20Legal%20Defense%20&%20Educational%20Fund,%20Inc.,%20&%20others.pdf; December 14, 2021 Letter at 2–3, https://redist.legis.la.gov/2020_Files/MtgFiles/Dec15/Email%20Testimony%20-%20Arielle%20McTootle%20and%20NAACP%20Legal%20Defense%20and%20Educational%20Fund,%20Inc..pdf; *see also* Michael Pernick, Jan. 20, 2022 at 2:45:40 to 2:48:03, https://redist.legis.la.gov/default_video?v=house/2022/jan/0120_22_JGA_BatonRouge_Redist.

Plaintiffs and their counsel refused to provide analyses and did not answer questions about the elections purportedly analyzed.[18] The only meaningful information that could be gleaned from the submissions was a summary of an analysis of a single 2018 run-off election, and it suggested that alternative configurations of CD5, rendering it a bare-majority-Black district, would not meaningfully improve the Black community's opportunity to elect its preferred candidate.[19] Meanwhile, legislators expressed the concern that drawing two majority-minority districts with slim BVAP majorities would compromise Black opportunity in both.[20] Legislators made similar assertions in connection with state legislative and judicial redistricting plans.[21]

4.    The Legislature resisted these calls "to segregate the races for purposes of voting." *Shaw I*, 509 U.S. at 642. House Bill 1 and Senate Bill 5 (amended to incorporate the identical congressional plans)[22] were passed by the Legislature on February 18, 2022. As promised, the Governor vetoed both bills for failing to achieve his predetermined racial target. The Legislature overrode the veto of House Bill 1 on March 30, 2022.[23]

## III.    <u>Procedural Posture</u>

Two sets of Plaintiffs filed the instant consolidated Section 2 actions based on what they call "critical facts," including that "Louisiana has six congressional districts and a Black population of over 33%," that "[a]ctivists, community leaders, and ordinary Louisianans petitions

---

[18] *See* Michael Pernick, Jan. 20, 2022 Joint Committee at 2:50:08 to 2:50:20, 2:54:37 to 2:55:04; *see also* Michael Pernick, Feb. 3, 2022 Senate and Governmental Affairs (Part 3) at 33:10 to 34:19, https://senate.la.gov/s_video/videoarchive.asp?v=senate/2022/02/020322SG3.

[19] *See* Dec. 14, 2021 Letter at 2; *see also* Michael Pernick, January 20, 2022 Joint Committee at 2:47:00 to 2:49:00.

[20] *See* Rep. Carter, Feb. 4, 2022 House and Governmental Affairs at 2:24:00 to 2:25:29; *see also* Sen. Hewitt, Feb. 3, 2022 Senate and Governmental Affairs (Part 2) at 58:10 to 1:03:05; Sen. Hewitt, Feb. 18, 2022 Senate Session (Part 1), 30:57 to 32:32 https://senate.la.gov/s_video/videoarchive.asp?v=senate/2022/02/021822SCHAMB; *see also* Sen. Hewitt, Feb. 8, 2022 Senate Session, 2:32:30 to 2:33:59.

[21]    *See* Rep. Carter, Feb. 16, 2022, House and Governmental Affairs at 1:11:10 to 1:11:44, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2022/feb/0216_22_HG; Sen. Carter, Feb. 8, 2022 Senate Session at 1:01:08 to 1:03:10.

[22] *See* Sen. Hewitt, Feb. 18, 2022 Senate Session (Part 1) at 2:45 to 5:45.

[23] *See, e.g.,* Sen. Hewitt, Mar. 30, 2022, Senate Session at 1:38:43 to 1:42:35.

lawmakers" to create a second majority-minority district," that the Governor "pledged to veto any new map that failed to" create such a race-based district, and that a district could be drawn including "the Baton Rouge area and the delta parishes" to achieve a 50% racial quota. *Galmon* Br. (Doc. 42-1) at 1. They waited 16 days to file preliminary-injunction motions (and nine days to request a status conference concerning provisional relief). They ask the Court to order the Legislature to redistrict and, if it does not, order the State to utilize one of their illustrative plans. Their core retention numbers fall far below those of the enacted plans, especial in CD2, CD5, and CD6. Hood Rep., Ex. A, at 2. The plans do not even purport to be *status quo* plans.

## LEGAL STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Preliminary injunctions "favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned." *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24.

## ARGUMENT

**I.    Plaintiffs Are Unlikely To Succeed on the Merits**

Plaintiffs are unlikely to prove that the Legislature violated Section 2 by doing what the Constitution requires. The Legislature was permitted to create a second majority-minority district only if it had "good reason to think that all the '*Gingles*' preconditions are met." *Cooper*, 137 S. Ct. at 1470. "But if not, then not." *Id.* The Legislature had before it no evidence justifying race-

based redistricting. There can be little doubt that the Legislature would have violated the Equal Protection Clause had it enacted the plans Plaintiffs demand this Court impose as Section 2 remedies. And this would have been true of both CD5 and CD2, as CD2 would be deemed a "donor" of BVAP to CD5, which amounts to inherently suspect redistricting. *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 174 (E.D. Va. 2018) (three-judge court). The fact that Plaintiffs, citizens advocacy groups, and the Governor demanded race-based districts only underscores the Legislature's prudence in declining their overtures. *See Hays I*, 839 F. Supp. at 1196 n.1; *Miller*, 515 U.S. at 917–18; *see also Shaw II*, 517 U.S. at 902–03, 907; *Abbott*, 138 S. Ct. at 2334. And Plaintiffs' insistence that Section 2 demands proportionality (one third of the districts for one third of the population) stands rejected not only in precedent, *Washington v. Tensas Par. Sch. Bd.*, 819 F.2d 609, 612 (5th Cir. 1987), but also in Section 2's unmistakable text: "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," 52 U.S.C. § 10301(b). In short, a plan providing the same Section 2 opportunity as has existed for decades is unlikely to be found to violate Section 2 after trial on the merits.

A.    The First *Gingles* Precondition

Plaintiffs are unlikely to show that discrete Black communities are "sufficiently large and compact to constitute a majority" in two "reasonably configured district[s]." *Wis. Legislature*, 142 S. Ct. at 1248. Plaintiffs' alternatives fail on several grounds.

1.    Race was the predominant factor behind Plaintiffs' alternative majority-minority districts. Their renditions of CD5 and CD2 were "carefully drawn to avoid areas of higher Caucasian population concentration so as to ensure that African–Americans remained a majority." *Sensley v. Albritton*, 385 F.3d 591, 597 (5th Cir. 2004). "If proposed alternatives are purposefully drawn to avoid areas densely populated by whites and to bring in African-Americans from other

communities that already have an African-American majority, then the court may question the minority group's compactness." *Fairley v. Hattiesburg, Miss.*, 2:06-cv-167, 2008 WL 3287200, at *6 (S.D. Miss. Aug. 7, 2008), *aff'd*, 584 F.3d 660 (5th Cir. 2009). Section 2 compares the challenged plan against "a race-neutral process," not a race-based process. *Gonzalez*, 535 F.3d at 598. Any other reading would render Section 2 unconstitutional by compelling redistricting authorities to engage in presumptively unconstitutional conduct to satisfy Section 2, which enforces the Fourteenth and Fifteenth Amendments. *See Shelby County v. Holder*, 570 U.S. 529, 542 n.1 (2013). Just as "Congress does not enforce a constitutional right by changing what the right is," *City of Boerne v. Flores*, 521 U.S. 507, 508 (1997), it does not enforce the Civil War Amendments by compelling states to violate them.[24]

Plaintiffs' majority-minority districts were designed "to segregate the races." *Shaw I*, 509 U.S. at 642. A set of 10,000 computer-simulated redistricting plans generated without racial criteria and according to neutral principles produces *zero* majority-minority congressional districts in Louisiana in *any* map—let alone *two* as Plaintiffs demand. Report of Christopher Blunt, Ex. C, ¶¶ 3–4, 20–28. This result demonstrates that race predominated the construction of Plaintiffs' alternative districting plans and that a two majority-minority district plan cannot be drawn without subordinating traditional, non-racial criteria to race.[25]

---

[24] *Gingles* itself relied on commentators who argued that "the relevant question should be whether the minority population is so concentrated that, if districts were drawn pursuant to accepted *nonracial* criteria, there is a reasonable possibility that at least one district would give the racial minority a voting majority." James U. Blacksher & Larry T. Menefee, *From Reynolds v. Sims to City of Mobile v. Bolden: Have the White Suburbs Commandeered the Fifteenth Amendment?* 34 Hastings L.J. 1, 64 n.330 (1982) (emphasis added) (cited repeatedly at *Gingles*, 478 U.S. at 47-51); *see also* Richard L. Engstrom & John K.Wildgen, *Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering*, 2 Legis. Stud. Q. 465, 465 (1977) (cited in *Gingles*, 478 U.S. at 46 n.11).
[25] A court in Alabama issued a preliminary injunction demanding a second majority-minority district in Alabama, even though two sets of race-neutral computer simulations akin to those Dr. Blunt performed in this case failed to draw such a plan. The Supreme Court promptly stayed the injunction. *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022).

As Judge Easterbrook of the Seventh Circuit explained in rejecting a Section 2 challenge to the City of Aurora's ward districts:

> Suppose that after 1,000 different maps of Aurora's wards have been generated, 10% have two or three "safe" districts for Latinos and the other 90% look something like the actual map drawn in 2002: one safe district and two "influence districts" where no candidate is likely to win without substantial Latino support. Then we could confidently conclude that Aurora's map did not dilute the effectiveness of the Latino vote.

*Gonzalez*, 535 F.3d at 600. As in *Gonzales*, "Plaintiffs did not conduct such an exercise . . . (or, if they did, they didn't put the results in the record)." *Id.* They cannot meet their burden by neglecting it. And, because a sample of computer-generated maps that *was* submitted produces *no* plan with *any* majority-minority congressional district in Louisiana, the Court can safely conclude that a plan lacking *two* majority-minority districts is not dilutive.

2.    Plaintiffs' alternatives rewrite the Legislature's non-racial goals. The compactness "inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *LULAC*, 548 U.S. at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). "The recognition of nonracial communities of interest reflects the principle that a State may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." *Id.* (quotation marks omitted; alterations accepted). "In the absence of this prohibited assumption, there is no basis to believe a district that combines two far flung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *Id.* For example, in *Miller*, the Supreme Court faulted the Georgia legislature of "connecting" in one district "the black neighborhoods of metropolitan Atlanta and the poor black populace of coastal Chatham County, though 260 miles apart in distance and worlds apart in culture." 515 U.S. at 908. Likewise in *LULAC*, Texas improperly combined an urban Latino community of Austin with

12

Latinos some 300 miles away in the rural Rio Grande Valley, despite those communities' different "characteristics, needs, and interests." 548 U.S. at 434.

The same is true of Plaintiffs' alternatives, each of which combines urban Baton Rouge and its suburbs in some way with the distant rural communities of Louisiana's delta parishes. Plaintiffs cite no evidence that Louisiana has ever utilized such an odd configuration of disparate groups, who share race in common and not much else. And the only apparent precedent is the district invalidated in *Hays*, which "meander[ed] down the west bank of the Mississippi River" before "swallow[ing] predominantly black portions of several more parishes" around Baton Rouge. *Hays I*, 839 F. Supp. at 1199.

Plaintiffs' alternatives flout other principles the Legislature prioritized, such as preserving incumbencies and their constituencies and district cores. Hood Rep, Ex. A, at 2. The Legislature made the sound determination to prioritize retaining constituents in their districts, which enables the populace to hold its representatives accountable for their representation over time. *Id.* at 2 n.2, 3. Plaintiffs' plans, by contrast, dismantle district cores and decouple representatives from the voters they represented in recent years, severing the link of accountability. *See id.* at 2. Plaintiffs ignore this and utilize different goals, such as avoiding "fracking," that come with no basis in the legislative record. Fairfax Rep. (Doc. 41-2) at 14–15. Notwithstanding the *Galmon* Plaintiffs' identification of residents who believe their preferred configuration makes communities-of-interest sense, it is the Legislature's role to identify communities of interest, not the Court's or Plaintiffs' (or third-party affiant's) role. *See Banerian v. Benson*, -- F. Supp. 3d --, 2022 WL 676001, at *2–3 (W.D. Mich. Mar. 4, 2022). Because Plaintiffs' alternatives dismantle the Legislature's legitimate and race-neutral goals, it is not an appropriate comparator. *See Gonzales*, 535 F.3d at 598–99.

3.      Plaintiffs also fail to present an alternative plan that satisfies the majority-minority requirement in more than one district. "[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality opinion). Under the method the U.S. Department of Justice uses to analyze redistricting plans, none of Plaintiffs' alternatives cross the 50% BVAP mark in two districts. Hood Rep., Ex. A, and 4–6. To compensate, Plaintiffs use a different calculation of "Black," called "any part Black," "which counts as black any person who self-identifies as black alone or black in combination with any other race or ethnicity, including those who self-identify as Hispanic." *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 419 (M.D. La. 2017), *rev'd on other grounds sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020). But Plaintiffs fail to establish the polarized-voting preconditions as to members of these other races and ethnicities and do not justify the use of a measure the Department of Justice does not use.

B.      The Third *Gingles* Precondition

Plaintiffs are unlikely to establish an "amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56 (citations omitted). The question is not merely "whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.'" *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (*en banc*) (citation omitted). Plaintiffs' showing falls short of legal significance.

1.      The evidence indicates that there are sufficient levels of white crossover voting to afford Black voters an equal electoral opportunity without a 50% BVAP district. "[I]n the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Voinovich v. Quilter*, 507 U.S. 146, 158

(1993) (quoting *Gingles*, 478 U.S. at 49 n. 15); *accord Bartlett*, 556 US at 24 ("In areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition—bloc voting by majority voters."). A political scientist can describe voting as "polarized" in any "circumstance in which 'different races vote in blocs for different candidates.'" *Covington v. North Carolina*, 316 F.R.D. 117, 167 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) (quoting *Gingles*, 478 U.S. at 62). But, as *Covington* explained, white bloc voting is only legally significant if it "exist[s] at such a level that the candidate of choice of African-American voters would usually be defeated *without a VRA remedy*." 316 F.R.D. at 168 (emphasis added). A VRA remedy is a 50% minority VAP district. *See Bartlett*, 556 U.S. at 19.

The polarized voting estimates indicate that white crossover voting exists at sufficient levels that a 50% BVAP district is unnecessary to ensure an equal opportunity for the Black community. Lewis Rep., Ex. D, ¶ 13. The *amicus* brief of mathematics and computer-science professors presents an analysis of 19 elections demonstrating that districts of about 42% BVAP afford an equal minority electoral opportunity. *Amicus* Brief in Support of Neither Party (Doc. 97) at 23, 27, 34–34. Plaintiffs depend on white crossover voting insofar as they propose alternative districts with slim BVAP majorities, where Black voters are the minority in turnout, rendering the Black community dependent on white crossover voting to elect their candidates of choice. Lewis Rep., Ex. D, ¶¶ 7–11. But the converse is also true: white bloc voting at the levels likely to be shown at trial is low enough (and crossover voting is high enough) to permit Black voters to elect their preferred candidates without 50% BVAP districts. As a result, any polarization carries no legal significance. *See Abrams*, 521 U.S. at 93; *Cooper*, 137 S. Ct. at 1470; *McConchie v. Scholz*, --F. Supp. 3d--, 2021 WL 6197318, at *8 (N.D. Ill. Dec. 30, 2021) (three-judge court).

Plaintiffs and their experts argue that white crossover voting is insufficient to enable Black-preferred candidates to prevail consistently in CD5 as enacted at about 33% BVAP. *See, e.g.*, Palmer Rep. (Doc. 47) at 6–7. Even if that were true, the argument does not address CD2, and, further, the question is not whether the enacted plan hits an ideal BVAP target somewhere above 33% BVAP, but whether a district above 50% BVAP—i.e., "a VRA remedy," *Covington*, 316 F.R.D. at 168—is necessary to ensure equal electoral opportunity. Section 2 does not mandate crossover districts.[26] *Bartlett*, 556 U.S. at 18–20.

2.      Plaintiffs also fail to show that any "tendency among minorities and whites to support different candidates" is "somehow tied to race." *Clements*, 999 F.2d at 850. *Gingles* requires "an inquiry into the circumstances underlying unfavorable election returns." *Id.* "Courts must undertake the additional inquiry into the reasons for, or causes of, these electoral losses in order to determine whether they were the product of 'partisan politics' *or* 'racial vote dilution,' 'political defeat' *or* 'built-in bias.'" *Id.* at 854. The Fifth Circuit has stated that there is "a powerful argument supporting a rule that plaintiffs, to establish legally significant racial bloc voting, must prove that their failure to elect representatives of their choice cannot be characterized as a mere euphemism for political defeat at the polls, or the result of partisan politics." *Id.* at 859 (citation and quotation marks omitted). At a minimum, "Plaintiffs have the duty, in the first instance, to demonstrate some evidence of racial bias through the factors used in the preconditions and totality of circumstances test." *Lopez v. Abbott*, 339 F. Supp. 3d 589, 604 (S.D. Tex. 2018)[27]; *cf. Vera v.*

---

[26] The point can further be understood by imagining that the Legislature had chosen, as Plaintiffs demanded, to create two 50% BVAP districts, donating BVAP from CD2 to CD5. *See Bethune-Hill*, 326 F. Supp. at 149, 154, 157, 158, 174. Each district would have been invalidated as a racial gerrymander because white bloc voting is sufficient to ensure equal opportunity without 50% BVAP districts. *See Covington*, 316 F.R.D. at 167–71; *Cooper*, 137 S. Ct. at 1470–74. This case presents the other side of that coin: white bloc voting does not arise to the level to compel 50% BVAP districts. It therefore is not legally significant.

[27] *Lopez* incorrectly located this inquiry in the totality-of-the circumstances analysis, 339 F. Supp. 3d at 602, where the Fifth Circuit clearly held that the inquiry "concerns *Gingles*' white bloc voting inquiry" as well as "the closely related *Zimmer* factor," *Clements*, 999 F.2d at 850.

*Richards*, 861 F. Supp. 1304, 1339 (S.D. Tex. 1994) (three-judge court) ("In *LULAC*, the plaintiffs' burden was to prove whether race motivated white voters throughout the state.").

Plaintiffs make no effort to establish that voting preferences "are somehow tied to race." *Clements*, 999 F.2d at 850. They did not analyze the question, and they considered only elections involving minority candidates. This excluded the kinds of races where a divergence between racial and partisan intent might be shown. They therefore fail to present even "some evidence of racial bias." *Lopez*, 339 F. Supp. 3d at 604. Further, the trial record is likely to show that the alleged failure of Black-preferred candidates is "a 'mere euphemism for political defeat at the polls.'" *Clements*, 999 F.2d at 859 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971)). It is difficult for any Democratic candidate, white or Black, to win in Louisiana, except under special circumstances.

C.    The Totality of the Circumstances

"The question which the court must answer in a section 2 case is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) (citation omitted). The inquiry "depends upon a searching practical evaluation of the past and present reality" and on a "functional view of the political process." *Id.*

1.    *No Vote Dilution*. Plaintiffs have erroneously "staked their all on a proposal that [Black residents] are entitled at least to proportional representation via two [Black]-effective districts no matter what the consequences of race-blind districting would be." *Gonzalez*, 535 F.3d at 600. "Neither our written law nor the construct of our constitutional republic assures any race, or otherwise identifiable voting group, strict proportional representation." *Washington*, 819 F.2d at 612. "The Voting Rights Act does not require [that] outcome." *Gonzalez*, 535 F.3d at 600. It

17

disclaims it. 52 U.S.C. § 10301(b). Plaintiffs do not focus on alleged discrimination against a discrete group in a discrete locality, relying instead on statewide elections and statewide ideals of proportionality. That is not how Section 2 operates. *Shaw II*, 517 U.S. at 917. Because Plaintiffs "lack any evidence of dilution," *id.*, their claim fails for the reasons the claims in *Washington* and *Gonzalez* failed.

　　　　2.　　　*Disagreement of Discretion*. The question in this case is not whether Black voting strength should be protected. The enacted plan protects it in a race-neutral way through CD2, which has "an effective majority." *LULAC*, 548 U.S. at 426. The question is *how* to protect Black voting strength. But Supreme Court precedent directs that question to state legislatures, holding that Section 2 "allows States to choose their own method of complying." *Bartlett*, 556 U.S. at 23. For example, "a State may choose to create a certain number of 'safe' districts, in which it is highly likely that minority voters will be able to elect the candidate of their choice," or else "a State may choose to create a greater number of districts in which it is likely—although perhaps not quite as likely as under the [alternative] plan—that minority voters will be able to elect candidates of their choice." *Ashcroft*, 539 U.S. at 480; *see also Bartlett*, 129 S. Ct. at 23 (citing *Ashcroft* for this proposition applicable to Section 2); *LULAC*, 548 U.S. at 429 ("States retain broad discretion in drawing districts to comply with the mandate of § 2." (citation omitted)).

　　　　The problem in this case is that it is unclear, at best, whether the Black community is better served with one congressional majority-minority district of a healthy BVAP of about 58%, as the enacted plan provides, or two that barely qualify (and may not qualify) as majority-minority districts, as Plaintiffs propose. It is a Section 2 plaintiff's obligation to prove that "the alternative to the districting decision at issue would . . . enhance the ability of minority voters to elect the candidates of their choice." *Abbott*, 138 S. Ct. at 2332; *accord Harding v. Cty. of Dallas, Tex.*, 948

F.3d 302, 311 (5th Cir. 2020). "[A]n alternative map containing an additional majority-minority district does not necessarily establish an increased opportunity." *Harding*, 948 F.3d at 309. It is therefore insufficient that Plaintiffs present plans with an additional district slightly (if at all) above 50% BVAP. And that is especially so where creating that district requires a marked reduction in BVAP compromising its likely performance. The evidence shows that Plaintiffs' illustrative plans render Black voters in both CD2 and CD5 dependent on white voters to elect their preferred candidates. Lewis Rep., Ex. D, ¶¶ 7–11. But "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions." *Bartlett*, 556 U.S. at 15. And, where an alternative renders a minority group beholding to the electoral choices of the majority, it is at best uncertain whether that is an improvement. "Courts cannot find § 2 effects violations on the basis of *uncertainty*." *Abbott*, 138 S. Ct. at 2333.

Plaintiffs recognize this problem and respond with recompiled election analyses purporting to show that districts at such low BVAP levels will perform. But "[t]hey look at the wrong jurisdiction, the wrong election years," and the wrong election days. *Thomas v. Bryant*, 938 F.3d 134, 163 (5th Cir. 2019), *vacated on other grounds sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020). The analyses rely on elections that generally occur in odd years or in October, and no congressional races are considered. Further, Plaintiffs fail to account for the fact that there was a material decline in BVAP in CD2 over the past decade. Hood Rep., Ex. A, at 6. Plaintiffs make no effort to show that CD2, reduced to the barest of majorities, will continue to perform over the next decade. The Legislature was justified in rejecting Plaintiffs' short-termism.

Besides, "the Legislature surely had the 'broad discretion' to comply as it reasonably saw fit," *Abbott*, 138 S. Ct. at 2333 (citation omitted), with one somewhat higher BVAP district than with two districts that do not even meet the majority-minority requirement under the industry-

19

standard measure, *see Ashcroft*, 539 U.S. at 480 (citing *Gingles*, 478 U.S. at 48–49). Because Section 2 requires functional majorities, districts with superficial majorities could as easily violate Section 2 as to vindicate it. *See Thomas*, 938 F.3d at 158 & n.120; *see also Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1333 (5th Cir. 1989), *opinion corrected on reh'g*, 897 F.2d 763 (5th Cir. 1990). The Legislature was within its discretion to comply with Section 2 as it did.

2.    *The Senate Factors*. "The so-called '*Zimmer* factors'" confirm that there is no absence of equal opportunity. *Fusilier*, 963 F.3d at 455. To be sure, because Plaintiffs "lack any evidence of dilution, there is no point in traipsing through the[se] multiple factors." *Gonzalez*, 535 F.3d at 600. But, in all events, these factors undermine Plaintiffs' claims.

a.    Plaintiffs point to Louisiana's general sordid history of discrimination, but the question is whether there is "recent evidence of discrimination." *Lopez*, 339 F. Supp. 3d at 611. Plaintiffs have little to say on that topic and no recent evidence of intentional discrimination by the Legislature. This factor, at best, "has only slight weight, favoring Plaintiffs." *Id.* at 612; *see also Fairley*, 2008 WL 3287200, at *9 ("[T]hese discriminatory practices ceased long ago, and no evidence was submitted to prove official discrimination on the part of the City continues to exist.").

b.    As discussed, Plaintiffs' have not establish racially polarized voting to any degree of legal significance. Plaintiffs have shown, at most, that there is partisan polarization. But that is insufficient. *See Clements*, 999 F.2d at 850. "Therefore, this factor weighs . . . in favor of the State." *Lopez*, 339 F. Supp. 3d at 614.

c.    Plaintiffs contend that the majority-vote requirement and runoff system may enhance the opportunity for voting discrimination, but "there is no evidence that racial bias . . . motivated the adoption of these practices." *Lopez*, 339 F. Supp. 3d at 615. Rather, the system appears to be a response to *Foster v. Love*, 522 U.S. 67 (1997), which struck down

Louisiana's open primary system occurring in October as violative of a federal statute requiring federal elections to occur in November, *see* 2 U.S.C. § 7. *Foster* recognized an exception where "no candidate receives a majority vote on federal election day, there has been a failure to elect and a subsequent run-off election is required." 522 U.S. at 72 n.3 (citing *Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821 (N.D. Ga.), *aff'd*, 992 F.2d 1548 (11th Cir. 1993)). Louisiana reconfigured its election to match what the Supreme Court described in *Foster*.

d.    There is every reason to believe that Black candidates are not excluded from candidate slating processes. "A slating organization can either be an official political party or an unofficial nonpartisan organization." *United States v. City of Euclid*, 580 F. Supp. 2d 584, 608 (N.D. Ohio 2008); *see also Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113, 1122–23 n.24 (E.D. La. 1986) (defining a slating group as "an organization whose purpose is to recruit candidates, nominate them, and campaign for their election to office in a nonpartisan election system."). The relevant question is, "where there is an influential official or unofficial slating organization, [what is] the ability of minorities to participate in that slating organization and to receive its endorsement?" *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984). Plaintiffs do not, and cannot, argue that political parties and other slating organizations exclude Black candidates. This factor favors the defense.

e.    Plaintiffs contend that "Louisiana's Black community continues to suffer as a result of the state's history of discrimination," *Galmon* Br. 14, but "there is no indication that this lower standard of living hinders their ability to participate effectively in the political process," *Fairley*, 2008 WL 3287200, at *9. Plaintiffs overlook the legal standard governing this factor. It is their burden to show "that the [Black] group does not in fact participate to the same extent as other citizens" in voting, *Clements*, 999 F. 2d at 866, i.e., "evidence of reduced levels of black voter

21

registration" or "lower turnout among black voters," *id.* at 867. Plaintiffs' expert reports show that Black voting turnout and registration are on par with white turnout and registration in congressional elections. *See* Handley Rep. (Doc. 41-3 at 28–30) at App. B. If that is not so, then their slim majority BVAP remedial districts are no remedy at all. This factor favors the defense. *See Clements*, 999 F.2d at 866–868.

       f.      Plaintiffs' arguments regarding lack of responsiveness are subjective, limited, often have no apparent connection to responsiveness, and "responsiveness has 'limited relevance'" in any event. *Clark v. Calhoun Cty., Miss.*, 88 F.3d 1393, 1400 (5th Cir. 1996) (citation omitted).

       g.      The policy behind the redistricting plan is far from "tenuous." *Fusilier*, 963 F.3d at 455 n.6. The Legislature avoided presumptively unconstitutional race-based redistricting. Legal compliance—indeed, *constitutional* compliance—is a "non-tenuous" policy. *See, e.g., Terrazas v. Clements*, 581 F. Supp. 1329, 1357 (N.D. Tex. 1984) ("We cannot conclude that compliance with federal constitutional and statutory standards are only tenuously related to the district lines as drawn"); *Mo. State Conference of NAACP v. Ferguson-Florissant School Dist.*, 201 F. Supp. 3d 1006, 1081 (E.D. Mo. 2016) (finding a non-tenuous justification where voting practice was "required by Missouri law"). Additionally, the Legislature had compelling reasons to minimize changes, preserve the status quo, and keep constituent-incumbent relationships intact. *See Wright v. Sumter Cnty. Bd. of Elections and Registration*, 301 F. Supp. 3d 1297, 1321–22 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1281 (11th Cir. 2020); Hood Rep., Ex A, at 2 n.2, 3.

## II.    **The Equities Militate Against an Injunction**

      Plaintiffs fail to establish "that the balance of equities tips in [their] favor, and that an injunction is in the public interest."[28] *Winter*, 555 U.S. at 20. "In exercising their sound discretion,

---

[28] It is also difficult to see how they establish irreparable harm from congressional districts substantially similar to those in existence for more than a decade, but the Court need not reach that issue to deny the motions.

courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* The equities in this case cut against an injunction.

A.    Plaintiffs demand exceptional, possibly unprecedented, relief in the form of a *temporary* injunction ordering a new redistricting plan. Louisiana has never had two majority-Black congressional districts, except for the brief periods before such plans were invalidated in the 1990s. A provisional injunction serves "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex.*, 451 U.S. at 395. The Court should not create a new state of affairs that never before existed at this stage. *See, e.g., Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976). Plaintiffs cite no case in which redistricting plaintiffs were awarded a new plan at the preliminary-injunction phase, and this form of relief is routinely denied. *See, e.g., Pileggi v. Aichele*, 843 F. Supp. 2d 584, 596 (E.D. Pa. 2012); *Diaz v. Silver*, 932 F. Supp. 462, 468–69 (E.D.N.Y. 1996); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992); *Kostick v. Nago*, 878 F. Supp. 2d 1124, 1147 (D. Haw. 2012); *NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 530 (M.D.N.C. 2012); *Perez v. Texas*, 2015 WL 6829596, at *4 (W.D. Tex. Nov. 6, 2015); *Valenti v. Dempsey*, 211 F. Supp. 911, 912 (D. Conn. 1962); *Shapiro v. Berger*, 328 F. Supp. 2d 496, 501 (S.D.N.Y. 2004).

B.    The equities analysis in an election case is governed by the *Purcell* principle, "which establish[es] (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when, as here, lower federal courts contravene that principle." *Merrill*, 142 S. Ct. at 879 (Kavanaugh, J. concurring) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). This principle antecedes *Purcell* by two generations, having its genesis in *Reynolds v. Sims*, 377 U.S. 533 (1964). *Reynolds* ruled that the lower court "acted wisely in declining to stay the impending primary election in

Alabama," *id.* at 586, even though the plan had been adjudicated as a gross constitutional violation of tens of thousands of citizens' voting rights, *see id.* at 545.

"*Sims* has been the guidon to a number of courts that have refrained from enjoining impending elections," *Chisom v. Roemer*, 853 F.2d 1186, 1190 (5th Cir. 1988), "even in the face of an undisputed constitutional violation," *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003); *see, e.g.*, *Chisom*, 853 F.2d at 1190 (vacating *Chisom v. Edwards*, 690 F. Supp. 1524 (E.D. La. July 7, 1988)); *Kilgarlin v. Martin*, 252 F. Supp. 404, 444 (S.D. Tex. 1966), *aff'd in relevant part sub nom. Kilgarlin v. Hill*, 386 U.S. 120 (1967) (February 2 was too late to implement remedy for that year's elections); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 843 (N.D. Cal. 1992) (February 25 was too late to interfere with that year's elections); *Klahr v. Williams*, 313 F. Supp. 148, 152 (D. Ariz. 1970), *aff'd sub nom. Ely v. Klahr*, 403 U.S. 108 (1971). In cases where a lower court has chosen differently, "the Supreme Court" has consistently "stayed [that] district court's hand." *Chisom*, 853 F.2d at 1190; *Karcher v. Daggett*, 455 U.S. 1303 (1982) (Brennan, J., in chambers) (issuing stay in March of election year); *Gill v. Whitford*, 137 S. Ct. 2289 (2017) (issuing stay about a year and a half before the next election); *Rucho v. Common Cause*, 138 S. Ct. 923 (2018) (issuing stay); *North Carolina v. Covington*, 138 S. Ct. 974 (2018) (same); *Abbott v. Perez*, 138 S. Ct. 49 (2017) (same); *North Carolina v. Covington*, 137 S. Ct. 808 (2017) (same).

*Merrill* is just the Supreme Court's latest correction of this all-too-familiar error. There, the Supreme Court intervened both to stay a three-judge panel's redistricting injunction and to take jurisdiction of the matter for itself. 142 S. Ct. at 879. According to the two Justices whose votes were decisive, the strength of the *Purcell* principle, standing alone, compelled that result. *Id.* at *879–82 (Kavanaugh, J., concurring). The principle, at a minimum, "heightens the showing

necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id.* at 881.

The *Purcell* principle undermines Plaintiffs' demanded relief. Plaintiffs make vague efforts to distinguish *Merrill* and the entire body of *Purcell* decisions. *See Robinson* Br. 24; *Galmon* Br. 22–23. "[I]t suffices to say that this argument is an incredibly difficult sell." *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, --F. Supp. 3d--, 2022 WL 496908, at *5 (E.D. Ark. Feb. 17, 2022). In *Merrill* the trial-court preliminary injunction hearing ended 82 days before the nominations period under Alabama law concluded. *See Singleton v. Merrill*, --F. Supp. 3d--, 2022 WL 265001, at *8 (N.D. Ala. Jan. 24, 2022); Ala. Stat. § 17-13-5(b). In this case, a final hearing date of May 13 would occur 70 days before Louisiana's analogous deadline. La. Rev. Stat. s 18:467(2), 18:468 (July 22, 2022). Ballots are set to be delivered four months after that date (Sept. 24). La. Rev. Stat. 18:1308.2; see *Merrill*, 142 S. Ct. at 179 (Kavanaugh, J. concurring) (similar time frame). And Plaintiffs ignore that, whereas the legislature in Alabama "enacted its current plan in less than a week," *Merrill*, 142 S. Ct. at 888 (Kagan, J., dissenting), it took the Legislature much longer here, so additional time beyond what was even arguably needed in *Merrill* is needed here. The *Purcell* principle applies in full force and demands that the Court stay its hand.

## CONCLUSION

The motions should be denied.

Respectfully submitted,

| | |
|---|---|
| */s/ Michael W. Mengis* | */s/ Erika Dackin Prouty* |
| Michael W. Mengis, LA Bar No. 17994 | Erika Dackin Prouty* |
| **BAKERHOSTETLER LLP** | **BAKERHOSTETLER LLP** |
| 811 Main Street, Suite 1100 | 200 Civic Center Dr., Ste. 1200 |
| Houston, Texas 77002 | Columbus, Ohio 43215 |
| Phone: (713) 751-1600 | (614) 228-1541 |
| Fax: (713) 751-1717 | eprouty@bakerlaw.com |
| Email: mmengis@bakerlaw.com | |

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile**
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

* *Admitted pro hac vice*
** *Pro hac vice motion pending*

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

## CERTIFICATE OF SERVICE

I certify that on May 2, 2022, this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system. Copies of the filing are available on the Court's system.

/s/ Erika Dackin Prouty
Erika Dackin Prouty *(admitted pro hac vice)*
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*