**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| PRESS ROBINSON, et al., | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| *Plaintiffs,* | |
| | Chief Judge Shelly D. Dick |
| v. | Magistrate Judge Scott D. Johnson |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | Consolidated with |
| | Civil Action No. 3:22-cv-00214-SDD-SDJ |
| v. | |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

**DEFENDANTS' AMENDED JOINT POST-HEARING BRIEF**
**IN OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION[1]**

---

[1] Defendants submit this Amended Joint Post-Hearing Brief that has been updated and corrected with citations to the final transcripts for the preliminary-injunction proceedings.

## TABLE OF CONTENTS

Introduction..................................................................................................................1

Argument ....................................................................................................................2

I.       Plaintiffs Are Unlikely to Succeed on the Merits ............................................2

         A.       The First *Gingles* Precondition ................................................................3

                  1.       Racial Predominance ...............................................................3

                  2.       Non-Compliance with Traditional Districting Principles .......................13

         B.       The Third *Gingles* Precondition...............................................................16

II.      The Equities Militate Against an Injunction...................................................21

Conclusion ...............................................................................................................25

## INTRODUCTION

Plaintiffs have not satisfied their heavy burden to warrant a preliminary injunction. On the merits, the evidence establishes that—like Louisiana's 1990s-era redistricting plans—Plaintiffs' illustrative plans were created with "the *specific intent* of" including "two black . . . majority districts." *Hays v. Louisiana*, 839 F. Supp. 1188, 1195 (W.D. La. 1993) (*Hays I*). The evidence also establishes that these constitutionally suspect plans are neither justified nor compelled by Section 2 of the Voting Rights Act (VRA). There is no reason to believe two majority-minority districts can satisfy constitutional scrutiny now, when they did not in the 1990s, given that (1) Louisiana's Black population has not materially grown, (2) there is no evidence that it is differently dispersed, and (3) the State has one fewer congressional district with which to work. The challenged plan is "a carbon copy" of the 2011 plan precleared by the Department of Justice under the leadership of Attorney General Eric Holder. 5/9 Tr. 88:17–20.

Further, Plaintiffs failed to address, much less prove, the third *Gingles* precondition, which asks whether "the candidate of choice of African-American voters would usually be defeated without a VRA remedy." *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017). Every polarization expert on both sides testified that white crossover voting is sufficient to enable Black voters to elect their preferred candidates without majority-minority districts, the only available VRA remedy. The Supreme Court just two months ago summarily reversed a Wisconsin court that added a new majority-minority district to that state's legislative plans, just as Plaintiffs demand in this case. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1247 (2022). Plaintiffs fail to explain why the result would differ here.

On the equities, the *Purcell* doctrine is now practically conceded to apply, and it bars injunctive relief. Plaintiffs' own *Purcell* witness—who presented their only evidence concerning

1

*their* burden—conceded that a new plan would render election administration a "huge challenge," 5/11 Tr. 23:1–2, akin to what Hurricane Ida imposed. But *Purcell* forbids injunctions that have the impact of natural disasters, requiring "heroic efforts" from election officials who attempt to implement them. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). When a federal court in Alabama issued the very injunction Plaintiffs demand here—enjoining a plan with one majority-Black district and ordering the use of a plan with two—the Supreme Court promptly stayed that order.[2] Plaintiffs again fail to explain why the result would differ here. Plaintiffs' motions must be denied.

## ARGUMENT[3]

### I.    Plaintiffs Are Unlikely to Succeed on the Merits

A party seeking a preliminary injunction must "clearly carr[y] the burden of persuasion" in showing a likelihood of success. *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). Here, because Plaintiffs seek an injunction impacting the administration of an upcoming election, they must prove that "the underlying merits are entirely clearcut [their] favor." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). But, if anything is entirely clear, it is that Plaintiffs are unlikely to prevail at trial. Defendants' proposed conclusions of law explain the numerous reasons that is so. This brief focuses on the first and third *Gingles* preconditions, which are threshold elements Plaintiffs cannot satisfy.

---

[2] In addition, the Court granted certiorari before judgment in one of those consolidated matters, noted probable jurisdiction in the other, and set the cases for argument and review on the merits. *Merrill, et al. v. Milligan, et al.*, No. 21-1086 (U.S. 2022); *Merrill, et al. v. Caster, et al.*, No. 21-1087 (U.S. 2022).

[3] Due to space constraints and consolidation of briefing, the arguments presented in this brief are not exhaustive of those Defendants raise in this case and in any appeal. Additional arguments are in the contemporaneously filed proposed conclusions of law, which are incorporated herein for all purposes, including preservation.

## A.    The First *Gingles* Precondition

The first *Gingles* precondition requires a challenger to establish that the relevant minority group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district." *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986) (plurality opinion)). This precondition "specifically contemplates the creation of hypothetical districts." *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 (5th Cir. 1993). Plaintiffs have little chance of success on this element.

### 1.    Racial Predominance

Plaintiffs' alternative plans cannot be deemed "reasonably configured," *Wis. Legislature*, 142 S. Ct. at 1248, when they "segregate the races for purposes of voting." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (*Shaw I*). A plan that links "distinct locations" on the basis of race does not satisfy the first *Gingles* precondition. *Sensley v. Albritton*, 385 F.3d 591, 597 (5th Cir. 2004). The hearing evidence established that race was "the predominant factor motivating the placement of voters in or out of a particular district"—namely, Plaintiffs' remedial versions of CD2 and CD5. *Wis. Legislature*, 142 S. Ct. at 1248. Although Plaintiffs' demography experts, Messrs. Fairfax and Cooper, denied that race predominated, these assertions are purely semantic. Under the legal definition of predominance, their choice to "consciously dr[a]w the district[s] right around 50 percent [BVAP]" to "satisf[y] that first pre-condition," 5/9 Tr. 217:18–23, qualifies as suspect race-based redistricting.

a.    *Direct Evidence of Predominance*. Racial predominance occurs when (1) a mapmaker "purposefully established a racial target," such as that "African-Americans should make up no less than a majority of the voting-age population," and (2) the racial target "had a direct and significant impact" on the district's "configuration." *Cooper*, 137 S. Ct. at 1468–69. As

to the first element, there is no question that Plaintiffs' experts set out to draw majority-minority

districts. Mr. Fairfax admitted he was "using [a] 50 percent voting age population as" a "threshold"

to comply with *Gingles*, 5/9 Tr. 208:2–4, and that he purposefully drew CD2 and CD5 above 50

percent for the same reason, *id.* 218:18–22; *see also id.* 206:25–207:4 (Mr. Fairfax conceding that

he was "focused on complying with the first *Gingles* precondition"); *id.* 210:12–212:4 (similar).

This testimony compels a finding of predominance. *See Cooper*, 137 S. Ct. at 1469 (holding that

lower court "could hardly have concluded anything but" predominance where mapmaker attested

to intent to draw a majority-minority district). Likewise, Mr. Cooper testified that a plan with two

majority-minority districts was non-negotiable:

> Q. During your map drawing process did you ever draw a one
> majority minority district?
>
> A. I did not because I was specifically asked to draw two by the
> plaintiffs.

5/9 Tr. 123:1–4. This, too, qualifies as a racial target. *See Cooper*, 137 S. Ct. at 1469 ("[W]hen (as

here) race furnished 'the overriding reason for choosing one map over others,'" race predominates

(quoting *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017)); *see also Shaw v.

Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*).

As to the second element, the evidence establishes "a direct and significant impact on the

drawing of at least some of [CD5's and CD2's] boundaries." *Ala. Legislative Black Caucus v.

Alabama*, 575 U.S. 254, 274 (2015). Mr. Fairfax testified that he was using a 50 percent threshold

for the purpose of "pulling in black population for these [majority-minority] districts," 5/9 Tr.

207:23–208:2, which is the essence of a target's direct and significant impact, *see Cooper*, 137 S.

Ct. at 1468–69. In fact, Mr. Fairfax testified that he consulted racial data at the outset of map-

drawing "to get an idea where the black population is inside the state in order to begin drawing,"

5/9 Tr. 208:6–8, because "you can't draw a plan in an area where black population doesn't exist,"

*id.* 209:22–23. Then, Mr. Fairfax continued assigning voters on the basis of race, to "pull the BVAP percentages back up to check [his] work." *Id.* 210:9–12; *see also id.* 210:12–212:4 (similar).

And Mr. Fairfax testified that drawing a least change plan was not an option because that would not produce a majority-minority district. 5/9 Tr. 204:21–22; *see Cooper*, 137 S. Ct. at 1468–69 (departing from prior map for race-based purpose amounted to predominance). He organized the plan's entire architecture around racial data and continued moving voters throughout the process on the basis of race to achieve a 50 percent BVAP target. That is "a textbook example of race-based districting." *Cooper*, 137 S. Ct. at 1469 (citation and quotation marks omitted). Mr. Cooper conceded that he only attempted districting configurations—combining East Baton Rouge Parish with "majority black" territory in the delta—he knew would achieve two majority-minority districts. 5/9 Tr. 130:25–131:9, 131:24–132:4; *see also id.* 124:19–125:1 (conceding he "stopped" adding BVAP to CD-5 after reaching 50.04 percent because, when the district achieved the ideal population, "it was still above 50 percent BVAP"); *id.* 155:11–14 (acknowledging achievement of *Bartlett v. Strickland*'s "50 percent plus 1" rule).

b.    *Circumstantial Evidence of Racial Predominance.* The circumstantial evidence confirms racial predominance. *See Bethune-Hill*, 137 S. Ct. at 797 (recognizing that racial predominance may be discerned through direct or circumstantial evidence).

First, Dr. Blunt simulated 10,000 Louisiana redistricting plans according to neutral, non-racial criteria that Messrs. Cooper and Fairfax claimed to have implemented in their illustrative plans, and not *one* plan produced even *one* majority-minority district. 5/12 Tr. 35:25–36:6. Plaintiffs contend that simulated plans shed no light on a map-maker's intent, but numerous courts have disagreed, finding simulated plans to be compelling evidence of redistricting motive—and in most of these cases the legal teams representing one or both sets of Plaintiffs here sponsored that

5

evidence.[4] Indeed, the Fourth Circuit reversed as clearly erroneous a district court's decision *not* to credit a simulation method in ascertaining intent. *Raleigh Wake Citizens Ass'n*, 827 F.3d at 344; *cf. Gonzalez v. City of Aurora, Ill.*, 535 F.3d 594, 600 (7th Cir. 2008). Plaintiffs' expert, Dr. Palmer, admitted that Dr. Blunt's method "is a standard approach to simulating redistricting plans, used by both scholars and testifying experts." Palmer Rep., GX-30 at 3, ¶ 11. Plaintiffs criticize Dr. Blunt's constraints as too restrictive, *id.*, but the result was the same even after Dr. Blunt conducted a robustness check by significantly relaxing the parameters of his criteria and thereby broadly increased the types of districts that might be simulated, 5/12 Tr. 45:4–48:4. What is telling is that Dr. Palmer admitted Dr. Blunt used a "standard redistricting package that's widely available and one that [he's] used a lot in [his] own academic work," 5/9 Tr. 329:25–330:2, but Dr. Palmer did not run his own simulations (or did not report the results), even though he had the skill and time to do so, *see id.* 346:22–347:13.

Second, evidence "such as stark splits in the racial composition of populations moved into and out of disparate parts of the district" is circumstantial evidence of predominance, *Bethune-Hill*, 137 S. Ct. at 800, and Mr. Bryan thoroughly demonstrated that these stark splits pervade CD2 and CD5 in each of the Plaintiffs' illustrative plans, *see generally* 5/11 Tr. 61–100. Mr. Bryan showed that predominantly Black portions of Baton Rouge, Lafayette, and other localities were placed into majority-minority districts, and predominantly white portions were placed elsewhere.

---

[4] *See, e.g.*, *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978 (S.D. Ohio), *vacated and remanded on other grounds*, *Chabot v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 102 (2019); *League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867 (E.D. Mich.), *vacated on other grounds sub nom. Chatfield v. League of Women Voters of Mich.*, 140 S. Ct. 429 (2019); *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333 (4th Cir. 2016); *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 251 F. Supp. 3d 935, 937 (M.D.N.C. 2017); *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 2018 U.S. Dist. LEXIS 146635 (M.D.N.C. August 27, 2018); *Harper v. Hall*, 2022-NCSC-17, 868 S.E.2d 499; *Adams v. DeWine*, 2022-Ohio-89, 2022 WL 129092 (Jan. 14, 2022); *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-65, 2022 WL 110261 (Jan. 12, 2022); *League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737 (2018); *Harkenrider v. Hochul*, No. 22-00506, 2022 WL 1193180 (N.Y. App. Div. Apr. 21, 2022), *aff'd as modified*, No. 60, 2022 WL 1236822 (N.Y. Apr. 27, 2022); *Common Cause v. Lewis*, 2019 N.C. Super. LEXIS 56 (N.C. Super. Ct. Sep. 3, 2019).

*Id*. 86:4–88:13. This was also true at the census-block level, as the lines "were very, very precisely drawn with blocks that were 50 percent or more black population on one side of the line and less than 50 percent, sometimes less than 25 percent of the population on the other side of the line being white population." *Id*. 89:13–20. This evidence of predominance is sufficient to override direct denials of predominance. *See Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 144–75 (E.D. Va. 2018) (three-judge court).

Third, the incentives brought to bear on Messrs. Fairfax and Cooper undergird the overwhelming evidence of predominance and undercut their confusing denials. Plaintiffs hired Messrs. Fairfax and Cooper and charged them with preparing plans containing two majority-minority districts.[5] It is eminently plausible that they employed a high degree of intentionality in doing so and implausible that they did not. Experts have no incentive to produce reports undermining the claims of the parties that hire them. And, here, only a limited set of configurations could achieve this goal—i.e., configurations containing Baton Rouge, Monroe, and other regions with large percentages of Black residents. Only by building their plans around the goal of two majority-minority districts could that goal be achieved. Plaintiffs' experts surely did not stumble upon such configurations as the mere byproduct of non-racial goals.

Fourth, the standard of predominance is lower here than in the numerous Supreme Court cases where racial predominance was found or affirmed. In those cases, the presumption of good faith afforded to state legislatures and the unique sensitivity in redistricting demand that courts "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Bethune-Hill*, 137 S. Ct. at 797 (citation and quotation marks omitted). No

---

[5] In some plans, the proposed remedial districts were majority Black VAP under the most expansive (and legally dubious) definition by only a couple of hundred individuals out of several hundred thousand residents. This result does not occur without precise focus on racial targets.

presumption of good faith applies, or need for caution arises, when courts evaluate evidence presented by litigants' hired experts.

c.     *Plaintiffs' Contrary Factual Arguments*. Plaintiffs' arguments on the facts are designed to confuse, not persuade.

First, Plaintiffs' experts say "diluting minority voting strength" is among "the traditional districting factors" that weighs against a racial goal for purposes of assessing the predominant motive. *See, e.g.*, 5/9 Tr. 97:17–98:5; Fairfax Reb. Rep., PR-86, at 8. But the Supreme Court defines traditional districting principles for the purpose of the racial-predominance test as "*race-neutral* districting principles." *Bethune-Hill*, 137 S. Ct. at 797 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (emphasis added)). Plaintiffs' experts defined their supposed traditional districting principle of avoiding minority vote dilution as drawing a "majority black district," 5/9 Tr. 154:24–155:7, but the Supreme Court precedent defines that as a race-*based* goal, *Wis. Legislature*, 142 S. Ct. at 1248–51; *Cooper*, 137 S. Ct. at 1468–69.

Second, Plaintiffs appear to argue that the race-based goal of creating a majority-minority district falls short of predominance so long as the mapmaker has "followed other traditional redistricting principles." 5/9 Tr. 155:4–7; *accord id.* 222:12–19. But that is "a legal proposition foreclosed . . . as soon as it was raised in this Court," because the Supreme Court rejected it in *Bethune-Hill*, "holding that when (as here) race furnished 'the overriding reason for choosing one map over others,' a further showing of 'inconsistency between the enacted plan and traditional redistricting criteria' is unnecessary to a finding of racial predominance." *Cooper*, 137 S. Ct. at 1469 n.3 (quoting *Bethune-Hill*, 137 S. Ct. at 799). Plaintiffs' assertions regarding compactness scores and other good-government principles do not change the fact that achieving two majority-minority districts "was the criterion that . . . could not be compromised." *Shaw II*, 517 U.S. at 907;

*see, e.g.*, 5/9 Tr. 94:23–95:11. Likewise, Plaintiffs' experts' efforts to distinguish the *Hays* districts by their appearance, 5/9 Tr. 222:16–19 (Fairfax), ignores that *Hays* found the direct evidence of motive sufficient to establish predominance, irrespective of district appearance, *Hays I*, 839 F. Supp. at 1204; *Hays v. Louisiana*, 936 F. Supp. 360, 368 (W.D. La. 1996).

Third, Plaintiffs get the traditional-principles argument wrong even on their own terms. They suggest, for example, that compliance with the one-person, one-vote principle is among the traditional districting principles that weigh against racial motivation. *See, e.g.*, 5/9 Tr. 97:17–98:5. But "the equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.' Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met." *Ala. Legislative Black Caucus*, 575 U.S. at 272. This criterion carries no weight.

Plaintiffs also assert that their experts' use of race is not suspect because racial identity is a facet of communities of interest. *See, e.g.*, 5/9 Tr. 289:13–22 (Cravins); 5/10 Tr. 190:18–191:14 (Lichtman). But this is just another suspect use of race. "[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 137 S. Ct. at 1473 n.7; *Miller*, 515 U.S. at 914 (stating that the "use of race as a proxy" for "political interest[s]" is "prohibit[ed]").

Mr. Fairfax intimated at times that his stark racial choices were the result of drawing districts to align with "socioeconomic" data. 5/9 Tr. 186:20–187:1; *id.* 202:25–203:2. This argument fails like so many other attempts to a predominance finding. Mr. Fairfax's maps tracked racial patterns at the census-block level. *See* 5/11 Tr. 89:13–20. Mr. Fairfax had only racial data available at that level. 5/9 Tr. 180:2–8. Mr. Fairfax's socio-economic information is reported at

the census tract level, which is a higher, and less precise, level of census geography. *See* 5/9 Tr. 187:10–20, 226:14–16. Because the lines track race at the census-block level, Mr. Fairfax cannot credibly claim socioeconomic data caused the splits. *See Bush v. Vera*, 517 U.S. 952, 970–7 (1996) (plurality opinion); *Bethune-Hill*, 326 F. Supp. 3d at 175. Nor can Plaintiffs credibly pin the blame for their race-based lines on housing patterns. *See, e.g.*, 5/9 Tr. 114:7–115:24. Lines tracking those patterns were not inevitable, or even likely, absent racial predominance.

Finally, Plaintiffs suggested that drawing majority-minority districts was somehow non-racial because majority-minority districts are, in their view, racially balanced districts. *See, e.g.*, 5/11 Tr. 140:18–147:1. That again is a concession of invidious intent. "[R]acial balancing, . . . is patently unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). The argument contravenes the entire *Shaw* line of cases, each of which invalidated majority-minority districts that could equally have been alleged to create racial balance. The law is clear that the "assignment of voters on the basis of race" is "subject to" the "strictest scrutiny." *Miller*, 515 U.S. at 915.

d.    *Plaintiffs' Legal Arguments*. Plaintiffs' strained contentions that race did not predominate betray a lack of confidence in their legal argument that racial predominance presents no problem. *See* Doc. 120 at 10 n.10; Doc. 123 at 2–3. And that argument makes little sense. The Legislature enacted a redistricting plan that Plaintiffs stipulated they have not alleged impinges on constitutional rights. Plaintiffs ask this Court to compare that non-suspect plan against race-based plans the Supreme Court has called constitutionally "odious." *Wis. Legislature*, 142 S. Ct. at 1248 (citation and quotation marks omitted). But no statute, including the VRA, may compel the constitutionally odious, especially when it was enacted to enforce the very constitutional rights being impinged. Plaintiffs do not address these problems, but instead rely on *Clark v. Calhoun*

*Cnty., Miss.*, 88 F.3d 1393 (5th Cir. 1996). Plaintiffs misread the relevant part of *Clark* and ignore how it fits within the larger body of relevant precent.

To begin, Plaintiffs fail to appreciate that *Clark* addressed not one but two racial-gerrymandering arguments in the context of a Section 2 claim. Plaintiffs cite only *Clark*'s first holding (in Section III.B) that the predominance test of *Miller v. Johnson* "does not apply to the first *Gingles* precondition." 88 F.3d at 1406–07. They bypass, however, *Clark*'s treatment of an argument it saw as distinct (in Section III.C): "that the County" sued in that case "did not violate § 2 because the plaintiffs' proposed remedy violates the Equal Protection Clause." *Id.* at 1407. On that latter question, the Fifth Circuit did not find predominance irrelevant but, instead, remanded because "[t]here has been no finding that the plaintiffs' plans subordinate traditional race-neutral districting plans to racial considerations," and the plaintiffs had presented an illustrative plan "which allegedly made minimal changes to existing districts and precinct lines." *Id.* at 1408 (internal quotation marks omitted). The court determined that an inquiry should be made into whether "those changes are truly 'minimal'" and whether the "predominant factor test" was satisfied.[6] *Id.* (citation omitted). That is, *Clark did* view the predominance test as applicable to the illustrative plans, but as only part of the remedial analysis.

Supreme Court and Fifth Circuit precedent have both since held that the remedial and liability inquiries are not separate but are one in the same. *Abbott v. Perez*, 138 S. Ct. 2305, 2333 (2018); *Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 309–10 (5th Cir. 2020). It is therefore no longer a legally available possibility that, as *Clark* assumed, a predominance analysis is appropriate at the remedial phase but not at the liability phase. *See also Wright v. Sumter Cnty. Bd.*

---

[6] Here, there is no argument that the illustrative plans make minimal changes as compared to the enacted plans. Plaintiffs experts admitted that they made no effort to minimize changes. *See* 5/9 Tr. 157:19–158:18. *Clark* undermines their assertions that a least-change plan cannot be a Section 2 remedy, as a least change plan was asserted to be a Section 2 remedy in that case.

*of Elections & Registration*, 979 F.3d 1282, 1302–03 (11th Cir. 2020) ("[A] district court's remedial proceedings bear directly on and are inextricably bound up in its liability findings."). What the Fifth Circuit held in Section III.C now has equal applicability to Section III.B.

Further, the law of racial gerrymandering has advanced since *Clark*. Whereas *Clark* instructed the district court to evaluate to what degree the alternative plans "use[d] race at the expense of traditional political concerns," 88 F.3d at 1408, the Supreme Court has since clarified that "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement," *Bethune-Hill*, 137 S. Ct. at 799. Before *Bethune-Hill*, the Supreme Court had "not affirmed a predominance finding, or remanded a case for a determination of predominance, without evidence that some district lines deviated from traditional principles." *Id.* When *Clark* was decided, it was not clear that a plan meeting the *Gingles* preconditions—which incorporate "traditional districting principles such as maintaining communities of interest and traditional boundaries," *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (quoting *Bush*, 517 U.S. at 977)—could be presumptively unconstitutional. Now, it is clear that this can be so and normally is so. "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *LULAC v. Perry*, 548 U.S. 399, 433–34 (2006) (citation omitted). Setting racial predominance as the VRA standard is the wrong way to go about doing that.[7]

Finally, when *Clark* was decided, Fifth Circuit decisions had held that Section 2 remedies may not be created with predominantly racial intent. *See Washington v. Tensas Par. Sch. Bd.*, 819

---

[7] To the extent *Clark* is read otherwise, Defendants hereby preserve the argument that *Clark* was wrongly decided and should be overruled in an appropriate appellate tribunal, for reasons stated in the main text. The Supreme Court in *Merrill* is considering how racial predominance interacts with the first precondition and may well override *Clark* next Term. Plaintiffs' claim here would necessarily fail if that occurs, which is another reason to deny these motions or stay the case pending *Merrill*.

F.2d 609, 612 (5th Cir. 1987). Under the rule of orderliness, "the earlier precedent controls." *United States v. Walker*, 302 F.3d 322, 325 (5th Cir. 2002).

### 2.    Non-Compliance with Traditional Districting Principles

Plaintiffs' illustrative plans fail the first *Gingles* precondition because, in creating it, they declined to "take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Abrams*, 521 U.S. at 92 (citation omitted). "[T]here is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *LULAC*, 548 U.S. at 433. This is because Section 2 rights are individual in nature and do not exist at the statewide level. *Shaw II*, 517 U.S. at 917. A district is not a Section 2 remedy when "the only common index" between the combined territory "is race." *Id.* at 435.

a.    That is the case here. As explained, Plaintiffs' illustrative districts are racial gerrymanders, and it is especially critical that Plaintiffs' experts began from a racial starting point, reasoning that "[y]ou can't draw a plan in an area where black population doesn't exist." 5/9 Tr. 209:22–23. Only after discerning that a 50 percent target requires that specific territory be joined— namely, East Baton Rouge Parish, Ouachita Parish (Monroe), and other portions of the delta region—did Plaintiffs seek communities-of-interest and traditional-principles justifications for the choice. 5/9 Tr. 137:13–138:10 (Cooper); *id.* 234:21–235:5. (Fairfax). Plaintiffs' experts did not analyze similarities and differences among these regions. *See* 5/9 Tr. 143:8–146:14.[8] And they conceded these regions are in fact different (e.g., that "East Baton Rouge, West Baton Rouge are not part of the Louisiana delta region"). *Id.* 219:17–20. Their analyses showed marked differences

---

[8] Mr. Fairfax's references to public comments at the Legislature's road-shows fails to adduce a single comment suggesting that Monroe and East Baton Rouge be joined; the references all concern concepts that lie far from the core of the non-compact configuration necessary to achieve a 50 percent BVAP threshold. *See* 5/9 Tr. 195:10–196:1.

in household income, educational attainment, and poverty levels of Black residents in East Baton Rouge Parish compared to Black residents of the delta parishes. *See* 5/9 Tr. 151:6–154:14; *id.* 232:7–24; *id.* 234:6–18.  A defense expert testified that these disparate regions were joined with a transparently racial motive and without regard to actual shared interests. 5/11 Tr. 52–164.

Plaintiffs approached this case from the wrong legal direction. They concluded that two majority-Black districts in Louisiana somewhere—anywhere—should be created and then sought to identify the location as an afterthought. By contrast, Section 2 asks whether a discrete minority community suffers vote dilution. *See Gonzalez*, 535 F.3d at 599–600; *Shaw II*, 517 U.S. at 917.

b.      Plaintiffs' efforts to establish compactness in the face of these deficiencies are unavailing. *See Growe v. Emison*, 507 U.S. 25, 41–42 (1993) (it is Plaintiffs' burden to establish the *Gingles* preconditions). First, their experts provide mathematical compactness calculations purporting to show that their illustrative district meet certain scores. *See, e.g.*, 5/9 Tr. 106:5–108:19. But this reduces the compactness inquiry to "style points." *LULAC*, 548 U.S. at 434. "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *Id.* at 433 (citation omitted). An illustrative district is not compact if it adjoins disparate communities on the basis of race, *see Sensley*, 385 F.3d at 597, notwithstanding their "different characteristics, needs, and interests," *LULAC*, 548 U.S. at 434. A district joining urban and suburban Black residents in East Baton Rouge Parish together with rural Black residents of the delta region (e.g., Ouachita and East Carroll Parishes) up to one-hundred eighty miles away, *see* Murray Rep., State_4, at 23–24, is precisely the type of district *LULAC* and *Sensley* found non-compact. *See Sensley*, 385 F.3d at 597 (finding a district joining discrete communities "roughly 15 miles apart from one another" failed the first precondition); *see also Miller*, 515 U.S. at 907–08

(condemning district that "connect[ed] the black neighborhoods of metropolitan Atlanta and the poor black populace of coastal Chatham County").

Second, Plaintiffs' experts measured the extent to which their plans split political-subdivision boundaries, metropolitan statistical areas, and other units of census geography they purported to be communities of interest. *See, e.g.*, 5/9 Tr. 99:21–104:24. But the compactness question is not principally whether the plans *split* areas recognized by the Census Bureau but whether they *join* areas separated by "enormous geographic difference" having "disparate needs and interests." *LULAC*, 548 U.S. at 435. No "mathematical possibility" of minimizing abstractly defined splits can justify the joinder of persons in these disparate regions. *Id.*

Third, Plaintiffs' efforts to compare their illustrative remedies to the majority-white districts of the enacted plan, 5/9 Tr. 93:8–97:3, 100:8–111:1, 116:5–118:8 (Cooper), are legally irrelevant and factually incorrect. They are legally immaterial because no one contends that the plan's majority-white districts are compelled by a federal statute, the Legislature has no obligation to meet the *Gingles* compactness requirement to draw them, and a federal court has no role in policing a state's choices in this respect. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019); *Banerian v. Benson*, --F. Supp. 3d--, 2022 WL 676001, at *2 (W.D. Mich. Mar. 4, 2022) (three-judge court). The question is whether the remedial districts meet the compactness standard of *LULAC* and other precedents interpreting Section 2, not whether they meet some standard Plaintiffs' experts purport to infer from the enacted plan's majority-white districts. Plaintiffs' arguments are factually incorrect because the record establishes beyond cavil that *all* districts in the enacted plan adhere to "traditional boundaries." *LULAC*, 548 U.S. at 433 (citation omitted). Louisiana's congressional redistricting plans have remained markedly similar since the *Hays*

litigation, signaling that generations of legislators have viewed lines like those before the Court as respecting the State's communities of interest. *See* Hood Rep., Leg_1, at 2–4.

Fourth, Plaintiffs' reliance on lay witness testimony to establish the compactness requirement is insufficient to establish a likelihood of success. As an initial matter, the testimony appears to comprise "*post hoc* justifications" contrived only after Plaintiffs' experts determined that hitting the majority-minority goal required a given conglomeration of regions. *Bethune-Hill*, 137 S. Ct. at 799. In any event, the testimony undermined their argument. Mr. Cravins repeatedly testified that Baton Rouge is part of "south Louisiana." 5/9 Tr. 240:23–241:3; *see also id.* 240:24–247:20 (five additional references to "south Louisiana"). The delta parishes are not part of "south Louisiana" by any arguable definition. This testimony appeared to be intended to establish that East Baton Rouge should be joined to St. Landry Parish. *See, e.g.*, 5/9 Tr. 240:24–241:22. But no map was presented demonstrating that a remedial district joining East Baton Rouge and St. Landry Parish, and anchored in "south Louisiana" would cross the 50 percent BVAP threshold in a plan with two majority-minority districts.

B.    **The Third *Gingles* Precondition**

The third *Gingles* precondition requires a challenger to prove an "amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56 (citations omitted). This element cannot be shown "[i]n areas with substantial crossover voting," *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009), which is defined as an area where the Black-preferred candidate can prevail "without a VRA remedy"—i.e., a 50 percent minority VAP district, *Covington*, 316 F.R.D. at 168. Here, it is undisputed that white crossover voting levels are sufficient to obviate the need for even one 50 percent BVAP district. Plaintiffs

therefore have no meaningful chance of proving that two 50 percent BVAP districts are legally required.

1.    Plaintiffs structured their polarized voting evidence around the wrong legal standard. Both their polarization experts, Dr. Palmer and Dr. Handley, defined polarized voting as existing where "black voters and white voters voted differently." 5/10 Tr. 13:12–13; *see also id.* 20:9–10; *5*/9 Tr. 309:23–310:2. In particular, they view polarized voting as existing where "black voters and white voters would have elected different candidates if they had voted separately." 5/10 Tr. 21:2–4. That would occur any time bare majorities of Black voters and white voters vote for different candidates.

From that starting point, "the experts opined (to no one's great surprise) that in [Louisiana], as in most States, there are discernible, non-random relationships between race and voting." *Cooper*, 137 S. Ct. at 1471 n.5. That is exactly the error that led to "the most extensive unconstitutional racial gerrymander ever encountered by a federal court," *Covington v. North Carolina*, 270 F. Supp. 3d 881, 892 (M.D.N.C. 2017), and embellishment with terms like "stark," 5/10 Tr. 13:7, cannot hide this. In *Covington*, the North Carolina legislature created twenty-eight majority-minority districts in its state house and senate plans, based on the advice of statistical experts who found "statistically significant racially polarized voting in 50 of the 51 counties studied." *Covington*, 316 F.R.D. at 169 (quotation marks omitted). A three-judge court found that every one of those districts was a racial gerrymander, and the Supreme Court summarily affirmed that decision in one sentence. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017). The case was not close. *Covington*, 270 F. Supp. 3d at 892 ("The Supreme Court affirmed that conclusion <u>without argument and without dissent</u>. And the Supreme Court <u>unanimously</u> held that Senator

Rucho and Representative Lewis incorrectly believed that the Voting Rights Act required construction of majority-minority districts[.]" (underlining in original)).

The problem was that North Carolina's experts, like Plaintiffs' experts, addressed "the general term 'racially polarized voting'" which "simply refers to when different racial groups 'vote in blocs for different candidates.'" *Covington*, 316 F.R.D. at 170 (citation omitted). But they missed "crucial difference between <u>legally</u> significant and <u>statistically</u> significant racially polarized voting." *Id.* at 170 (underlining in original). Whereas polarized voting can be said to occur "when 51% of a minority group's voters prefer a candidate and 49% of the majority group's voters prefer that same candidate," *id.* at 170, "the third *Gingles* inquiry is concerned only with 'legally significant racially polarized voting,'" *id.* (quoting *Gingles*, 478 U.S. at 51, 55–56). Non-actionable polarized voting becomes legally significant only when "racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, *if no remedial district were drawn*." *Id.* at 168 (quotation and edit marks omitted; emphasis added). The question is whether "the candidate of choice of African-American voters would usually be defeated *without a VRA remedy*." *Id.* (emphasis added).

The *Covington* court—endorsed by every Supreme Court justice—criticized the North Carolina legislature because it "**Never Analyzed *Gingles*' Third Factor.**" *Id.* at 167 (bolding and capitalization in original). They did not assess whether the Black-preferred candidate would likely lose "absent some remedy," and this "failure" was "fatal to their Section 2 defense." *Id.* The same is true here. Dr. Palmer and Dr. Handley did not analyze "whether majority bloc voting exist[s] at such a level that the candidate of choice of African-American voters would usually be defeated *without a VRA remedy*." *Id.* at 168 (emphasis added); *see* 5/10 Tr. 62:23–65:16. That is a failure

to prove the third precondition. "Section 2 'does not assume the existence of racial bloc voting; plaintiffs must prove it.'" *Growe*, 507 U.S. at 42 (quoting *Gingles*, 478 U.S. at 46).

In fact, Plaintiffs' experts testified—and the undisputed evidence establishes—that a VRA remedy is unnecessary for the Black-preferred candidate to have an equal opportunity to prevail.[9] The Supreme Court held in *Bartlett* that a VRA remedy is a district that meets "the majority-minority requirement," i.e., 50 percent plus one. 556 U.S. at 17. The question is whether a white voting bloc is sufficient to defeat the Black-preferred candidate in districts below 50 percent BVAP or, by contrast, whether a district below 50 percent BVAP would perform. Here, Dr. Lewis concluded that a 50 percent BVAP district is unnecessary in either the footprint of CD5 or CD2. Lewis Rep., Leg_2, ¶ 13. But the Court need not take his word for it: Plaintiffs' experts, and a sophisticated *amicus* brief submitted by Tulane and Louisiana State University (LSU) math and computer science professors, have found the same. Dr. Palmer testified that there is meaningful white crossover voting, 5/9 Tr. 339:18–343:10, and that CD2 and CD5 could be drawn below 50 percent and enable the Black community to elect its preferred candidates, *id.* 346:18–21. Dr. Lichtman—who was the challengers' expert in *Covington*—agreed that a district around 40 percent BVAP can perform and compared this case to *Covington* without prompting. 5/10 Tr. 198:14–200:20. Dr. Handley testified that it is possible districts below 50 percent BVAP may perform. *Id.* 75:7–11. The Tulane and LSU professors' *amicus* brief presents an analysis of nineteen elections demonstrating that districts of about 42 percent BVAP afford an equal minority electoral opportunity. *Amicus* Brief in Support of Neither Party, Doc. 97, at 23, 27, 34–34. Indeed, Plaintiffs' contention that their remedial districts will perform depends on white crossover voting,

---

[9] This is a remarkable development in a southern state and a mark of progress from the days when the VRA was read to require districts be drawn above 60 percent BVAP to afford Black residents an equal opportunity to elect candidates of their choice. *See, e.g., Ketchum v. Byrne*, 740 F.2d 1398, 1415 (7th Cir. 1984); *Jeffers v. Clinton*, 756 F. Supp. 1195, 1198 (E.D. Ark. 1990).

as their experts concede that the success of the Black preferred candidates in their projected election results occurs only with some form of white cooperation (either in voting for the Black-preferred candidate or declining to vote). *See* 5/10 Tr. 54:18–55:18; *id.* 62:3–13.

2.    There is no merit in Plaintiffs' contrary view that CD5 violates Section 2 because it is below the roughly 40 percent BVAP level that may be necessary for the Black-preferred candidate to prevail. This argument does not explain why a majority-minority district is essential in the footprint of CD2, and it is legally erroneous under *Bartlett*, which held that Section 2 does not mandate crossover districts. 556 U.S. at 23. In so holding, *Bartlett* reasoned that, in areas where white crossover voting is sufficient to create functioning crossover districts, white bloc voting carries no legal significance under the third *Gingles* precondition. *See id.* at 23–24.[10]

Plaintiffs also retort that their illustrative remedies are majority-minority districts, not crossover districts. Doc. 120 at 12–13. But *Bartlett* holds that, where white crossover voting is sufficient to create a functioning crossover district, "majority-minority districts *would not be required in the first place*." 556 U.S. at 24 (emphasis added). *Covington* held the same, condemning majority-minority districts in the absence of evidence that crossover districts would not perform. *See also Cooper*, 137 S. Ct. at 1471–72 (striking down majority-minority congressional district because legislature failed to assess whether a crossover district would perform). If the Legislature had drawn a second majority-minority district, it would have reenacted *Covington*, and *Covington*'s result would have followed. If the Legislature cannot create a district, neither can this Court. *See Clark*, 88 F.3d at 1408; *accord Dillard v. City of Greensboro*, 74 F.3d 230, 233–34 (11th Cir. 1996) ("Whether a redistricting plan is adopted by a court or a legislature does not affect a party's right to challenge the plan."). The Supreme Court recently made clear that

---

[10] For that reason, the *amicus* request that the Court fashion crossover districts as a VRA remedy is legally foreclosed. *Amicus* Brief in Support of Neither Party, Doc. 97, at 4, 27, 39.

court-drawn plans are subject to the same racial gerrymandering standards governing legislatures—finding the principle so obvious as to justify summary reversal. *Wis. Legislature*, 142 S. Ct. at 1250.

## II.    The Equities Militate Against an Injunction

Plaintiffs' motions fail because they have failed to prove "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs were required to "clearly carr[y] the burden of persuasion" on these requirements. *PCI Transp.*, 418 F.3d at 545. They failed to do so.

A.    Plaintiffs do not, and could not, deny that the injunction they seek would establish a state of affairs that never before existed and does not preserve the *status quo* pending trial. *See* Doc. 120 at 19–20; Doc. 123. The *Galmon* Plaintiffs contend that this poses no problem, Doc. 120 at 19–20, but the 1979 Fifth Circuit case they cite predates the Supreme Court's holding that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Plaintiffs also ignore precedent holding that "mandatory injunctive relief, which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and the law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). And Plaintiffs do not cite any redistricting case to have ordered a new redistricting plan as *temporary* relief. Numerous courts have declined the invitation Plaintiffs extend to this Court here. Doc. 199-1 at 23. This Court should as well.

B.    The public interest decisively cuts against an injunction because it poses a severe risk of widespread constitutional violations—of the magnitude approaching "the most extensive unconstitutional racial gerrymander ever encountered by a federal court," *Covington*, 270 F. Supp.

3d at 892. Plaintiffs cite the principle that provisional relief from state action contravening "the requirements of federal law" is in the public interest. Doc. 42-1 at 22 (citation omitted); *accord* Doc. 41-1 at 23. But Plaintiffs' illustrative remedies are presumptively unconstitutional, and any legislative or court-crafted redistricting plan with two majority-minority districts would be as well. *Cooper*, 137 S. Ct. at 1468–69. Entering an injunction, then, carries the unacceptable risk—if not the certainty—of violating the equal-protection rights of hundreds of thousands of Louisiana citizens, of all races, colors, and ethnicities. *See United States v. Hays*, 515 U.S. 737, 745 (1995) (holding that every resident of a racially gerrymandered district suffers injury in fact).

Because it "is always in the public interest to prevent the violation of a party's constitutional rights," *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014), the risk that the demanded injunction would inflict a gross and widespread equal-protection violation cannot be justified by the possibility of a statutory violation. The Court must err in favor of the Constitution. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The Court is required "to balance the harm that would be suffered by the public if the preliminary injunction were denied against the possible harm that would result to United if the injunction were granted." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985). Here, if Plaintiffs ultimately do not prevail on the merits, then the 2022 election will have inflicted a staggering constitutional injury that can never be remedied. In these circumstances, an injunction would be irresponsible, at best.

C.    And all that comes before the *Purcell* principle, which standing alone defeats Plaintiffs' motions. There can be no serious question that "considerations specific to election cases" bar an injunction here. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). The facts

attested to by Louisiana's Commissioner of Elections, Sherri Hadskey—who has 30 years of experience as an elections administrator—stand unrebutted. *See* SOS Ex. 01. Election deadlines are looming; candidate qualification must be complete by July 22, 2022; objections must be filed by July 29; overseas ballots must go out no later than September 24; printing must be complete well *before* that; and early voting begins October 18. *Id.* ¶ 16. The existing congressional redistricting plan has already been implemented. 5/13 Tr. 31:9–15. To implement a new redistricting plan, the Secretary of State's office must assign voters to their congressional districts in the ERIN system, mail voter registration cards to voters in newly assigned districts, and mail notification cards to assist voters in navigating the electoral process. SOS Ex. 01 ¶¶ 18–20. The Secretary of State's office must do all of this while also handling school-board redistricting, 5/13 Tr. 33:1–4, municipal redistricting, *id.* 33:4–7, a special election called due to a previous redistricting error, *id.* 33:7–11; *see also* State_30 at 218:26–224:2 (ordering new election because errors resulting from "the short time that the Registrar of Voters had with regard to redistricting."), yearly voting equipment maintenance, 5/13 Tr. 33:15–21, and the potential that legislative acts may change certain processes, *id.* 33:22–34:7. In addition, the voter cards have already been mailed to 250,000 voters—letting them and potential congressional candidates know what districts they are in—and would need to be changed, reprinted, and sent out again. *See id.* 34:18–35:10; *id.* 39:5–9; *id.* 31:9–15. And all that would need to occur despite a paper shortage that is impacting the Secretary's operations. *Id.* 39:19–40:11.

And, even with an injunction, that cannot occur yet because a new redistricting plan (as provisional relief) has yet to be fashioned, either in a lengthy legislative or judicial process. Given that forty-nine days have passed since Plaintiffs filed this lawsuit—and more time will have passed

before an order on the instant motions issues—it would be fanciful to assume a new plan could be in place for a period of months. A whole new round of litigation would follow an injunction.

An injunction "would require heroic efforts by those state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion." *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring). That is hardly contested; Plaintiffs' evidence *supports* it. Plaintiffs' election-administration witness, Matthew Block, confirmed how thoroughly flawed their *Purcell* position is. As an initial matter, Mr. Block has no credentials comparable to those of Ms. Hadskey: he has never been an elections commissioner, never served on a parish board of supervisors, never sat on a state elections board, and never done anything meaningful by way of elections administration. 5/11 Tr. 28:5–29:9. Any conflict between the witnesses presents no serious contest. The Commissioner of Elections testified that she is "very concerned" with the prospect of implementing a new map with minimal time and potentially harmful effects. 5/13 Tr. 40:12–43:9. No witness of her credibility on this topic disagreed.

Nor is there a conflict between her and Mr. Block, who confirmed that administration of a new plan would require heroism. The premise of Mr. Block's testimony was that the election might be administered *sans* disaster if the ultimate election date, November 8, 2022, is pushed back, as occurred with state legislative elections after Hurricane Ida. 5/11 Tr. 21:17–22:21. That premise fails: Louisiana may move its state election dates, but not the *federal* election date because Congress codified that date, *see* 2 U.S.C. §§ 1 and 7, under its Elections Clause authority, *see Foster v. Love*, 522 U.S. 67, 69 (1997). This Court lacks the same authority because it shares none of the Elections Clause's delegated power. *See Rucho*, 139 S. Ct. at 2495–96. Nor can Plaintiffs plausibly assert that the election-day statute poses an as-applied constitutional violation when a statute supplies the sole basis of their claim.

Moreover, Mr. Block testified that, even if the election date could move, elections administration would be a "huge challenge." 5/11 Tr. 23:1–2. This concedes away the *Purcell* issue. The *Purcell* doctrine does not afford federal district courts free reign to meddle with state election laws so long as the administrative burdens they impose fall short of the "impossible." 5/13 Tr. 57:14. Quite the opposite, *Purcell* requires "that federal district courts ordinarily should not enjoin state election laws in the period close to an election," because "[l]ate judicial tinkering with election laws *can* lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring) (emphasis added). The doctrine does not permit courts to play election-meltdown roulette on the theory that the odds of disaster are, all things considered, on the lower end. *Purcell* forbids injunctions that act like hurricanes. The very fact that Plaintiffs sponsored testimony drawing that comparison proves that this case falls squarely within *Purcell*.

## CONCLUSION

The Black percentage of Louisiana's population has remained essentially the same since the 1990s. There is no testimony that its geographic concentration has changed. It was impossible to create two majority-Black congressional disticts of seven in the 1990s in compliance with the Equal Protection Clause. There is every reason to believe it is impossible now, and Plaintiffs have provided no cogent argument otherwise. Plaintiffs' motions lack merit and must be denied.

Respectfully submitted,

/s/ Michael W. Mengis

Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

/s/ Erika Dackin Prouty

Erika Dackin Prouty*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

\* *Admitted Pro Hac Vice*

*/s/ Phillip J. Strach* (Lead Counsel)*
phillip.strach@nelsonmullins.com
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Telephone: (919) 329-3800
Facsimile: (919) 329-3799

*/s/ John C. Walsh*
John C. Walsh (Louisiana Bar Roll No. 24903)
john@scwllp.com
**SHOWS, CALI & WALSH, L.L.P.**
P.O. Box 4046
Baton Rouge, LA 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-5561

*Counsel for Defendant R. Kyle Ardoin*
*Admitted Pro Hac Vice*

26

Jeff Landry
Louisiana Attorney General

Jason B. Torchinsky (DC 976033)*
Phillip M. Gordon (DC 1531277)*
Dallin B. Holt (VSB 97330)*9
Holtzman Vogel Baran
Torchinsky & Josefiak, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
(540) 341-8808 phone
(540) 341-8809 fax
jtorchinsky@holtzmanvogel.com
pgordon@holtzmanvogel.com
dholt@holtzmanvogel.com

*Admitted Pro Hac Vice

*/s/Angelique Duhon Freel*
Elizabeth B. Murrill (LSBA No. 20685)
Shae McPhee (LSBA No. 38565)
Morgan Brungard (CO Bar No. 50265)*
Angelique Duhon Freel (LSBA No. 28561)
Carey Tom Jones (LSBA No. 07474)
Jeffrey M. Wale (LSBA No. 36070)
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
freela@ag.louisiana.gov
walej@ag.louisiana.gov
jonescar@ag.louisiana.gov
mcphees@ag.louisiana.gov
brungardm@ag.louisiana.gov

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on May 23, 2022, this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system. Copies of the filing are available on the Court's system.

/s/ *Erika Dackin Prouty*

Erika Dackin Prouty *(admitted pro hac vice)*
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*