**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| PRESS ROBINSON, et al., | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| *Plaintiffs,* | Chief Judge Shelly D. Dick |
| v. | Magistrate Judge Scott D. Johnson |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | Consolidated with Civil Action No. 3:22-cv-00214-SDD-SDJ |
| v. | |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

**DEFENDANTS' AMENDED JOINT PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

---

[1] Defendants submit this Amended Joint Proposed Findings of Fact and Conclusions of Law that has been updated and corrected with citations to the final transcripts for the preliminary-injunction proceedings.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ................................................................................................ 1

[PROPOSED] FINDINGS OF FACT ................................................................................ 4

   I.    2020 Decennial Census ........................................................................................ 4

   II.   Louisiana's 2020 Redistricting Process ............................................................... 4

   III.  The State of Louisiana ....................................................................................... 11

   IV.  Parties ................................................................................................................ 15

       A.   *Robinson* Plaintiffs ................................................................................ 15

       B.   *Galmon* Plaintiffs ................................................................................. 15

       C.   Defendant R. Kyle Ardoin .................................................................... 15

       D.   Legislative Intervenor-Defendants ....................................................... 15

       E.   State Intervenor-Defendant ................................................................... 16

   V.    Procedural Posture ............................................................................................ 16

   VI.  Plaintiffs' Witnesses ......................................................................................... 16

       A.   Michael McClanahan ........................................................................... 16

       B.   Charles Cravins ..................................................................................... 18

       C.   Christopher Tyson .................................................................................. 19

       D.   Dr. Dorothy Nairne ............................................................................... 21

       E.   Ashley Shelton ...................................................................................... 22

       F.   Matthew Block ...................................................................................... 23

       G.   Mr. William Cooper .............................................................................. 25

       H.   Mr. Anthony Fairfax .............................................................................. 29

       I.    Dr. Maxwell Palmer .............................................................................. 32

       J.    Dr. Lisa Handley ................................................................................... 33

       K.   Dr. Traci Burch ..................................................................................... 38

       L.   Dr. Blakeslee Gilpin .............................................................................. 40

       M.   Dr. Allan Lichtman ............................................................................... 40

   VII.  DEFENDANTS' WITNESSES ......................................................................... 43

       A.   Ms. Sherri Hadskey ............................................................................... 43

       B.   Dr. Jeffrey B. Lewis .............................................................................. 46

       C.   Dr. Christopher Blunt ............................................................................ 48

D.  Dr. M.V. Hood III ................................................................. 52

E.  Mr. Thomas Bryan ................................................................ 57

F.  Dr. John R. Alford ................................................................ 64

G.  Dr. Alan Murray .................................................................. 66

H.  Dr. Tumulesh Solanky .......................................................... 67

[PROPOSED] CONCLUSIONS OF LAW ............................................ 73

I.  The Legal Standard ................................................................ 73

II.  Likelihood of Success on the Merits ............................................ 73

A.  The First *Gingles* Precondition ............................................. 76

1.  Racial Gerrymandering ..................................................... 78

(a)  Direct Evidence .......................................................... 79

(b)  Circumstantial Evidence ................................................ 81

(c)  Plaintiffs' Contrary Factual Arguments ............................... 86

(d)  Plaintiffs' Legal Arguments ............................................ 89

2.  Plaintiffs' *Gingles* Claim Fails at the Geographic Compactness Threshold ............. 94

3.  Plaintiffs Have Failed to Show The Numerosity Required By *Gingles* I ................ 100

B.  The Third *Gingles* Precondition ............................................. 103

1.  Levels of White Bloc Voting ............................................... 104

2.  Partisan Politics—Not Race—Created The Divergence Between Black And White Voting Preferences In Louisiana ......................... 109

C.  Totality of the Circumstances ................................................. 110

1.  No Measure of Vote Dilution ............................................. 110

2.  Disagreement of Discretion in Protecting Minority Voting Rights ........................ 113

3.  Senate Factors .............................................................. 117

(a)  Senate Factor 1: History of Official Discrimination In Voting ........................ 117

(b)  Senate Factor 2: Polarization ......................................... 122

(c)  Senate Factor 3: Voting Procedures .................................. 122

(d)  Senate Factor 4: Candidate Slating ................................... 123

(e)  Senate Factor 5: Impact of Historical Discrimination on…................................. Political Participation .................................................. 124

(f)  Senate Factor 6: Racial Appeals ...................................... 126

(g)  Senate Factor 8: Responsiveness ..................................... 128

(h)  Senate Factor 9: Strength Of State's Underlying Policy ................................ 130

ii

D.    Section 2 of The Voting Rights Action Creates No Private Right Of Action .......... 131

III.    The Equitable Factors Militate Against an Injunction ................................................. 133

A.    No Preservation of the Status Quo .................................................................... 133

B.    Risk of Constitutional Injury ........................................................................... 134

C.    The Purcell Doctrine Counsels Against Eleventh-Hour Judicial Intervention ......... 135

CONCLUSION ........................................................................................................................ 141

CERTIFICATE OF SERVICE ................................................................................................ 144

## SUMMARY OF THE CASE

These consolidated cases come before the Court on motions for a preliminary injunction. This is a challenge to Louisiana's congressional districts under Section 2 of the Voting Rights Act (VRA). The plaintiffs are two sets of Louisiana voters and public-advocacy organizations (respectively, *Robinson* Plaintiffs and *Galmon* Plaintiffs; collectively, Plaintiffs). They contend that Section 2 requires Louisiana to conduct its congressional elections under a plan containing two majority-Black districts out of six total. The plan the Legislature recently enacted includes one majority-Black district of six. Plaintiffs sued R. Kyle Ardoin in his official capacity as Secretary of State. The State of Louisiana, represented by its Attorney General, and the Speaker of the Louisiana House of Representatives and President of the Louisiana Senate subsequently intervened as defendants. Plaintiffs moved for a preliminary injunction, asking the Court to prohibit the State from utilizing the enacted congressional plan in the upcoming 2022 congressional elections, which federal law dictates must occur on November 8, 2022. Plaintiffs also seek an injunction to command the State to use a new plan for that election containing two majority-Black districts. The Court received briefing and exhibits on the motions and held a five day hearing, after which it received further briefing and proposed findings from the parties. The motions are now ripe for adjudication.

Plaintiffs' request is not new to Louisiana. In the 1990s, advocates with similar goals succeeded legislatively in obtaining a congressional plan with two majority-Black districts out of seven (as the State was then apportioned). A three-judge federal court invalidated that plan as an unconstitutional racial gerrymander. The Legislature again enacted a plan with two majority-minority districts, and it saw the same fate: a federal injunction on equal-protection grounds. The evidence shows that the Black percentage of Louisiana's population has not materially grown since the 1990s. It was then and has been since about one third of the population. And there is no

evidence that the dispersion of Black population differs materially now from what it was then. Plaintiffs' call for one third of the seats for one third of the population is difficult to square with that litigation history. And it is impossible to square with the text of Section 2, which does not "establish[] a right to have members of a protected class elected in numbers equal to their proportion in the population," 52 U.S.C. § 10301(b).

Plaintiffs' motion must be denied for the reasons set forth in the findings below. Plaintiffs begin from the wrong starting point. They looked to total-population figures and determined that a group with thirty percent of the population is entitled to majorities in thirty percent of the seats. Plaintiffs have given little heed to *where* that population lies and *who* composes it. But Section 2 approaches the problem of minority representation from the opposite perspective. It asks first whether a discrete group of individuals belonging to a protected class have experienced cognizable vote dilution and looks to concepts like proportionality at the back end. In this case, Plaintiffs' experts were able to achieve two majority-minority districts only through a configuration joining territory in what their own lay witness called "south Louisiana" with delta parishes in northeast Louisiana—parishes afforded the thinnest of mentions in Plaintiffs' complaints. Two sets of 40,000 computer-generated congressional plans did not arrive at that configuration (or an other configuration with even one majority-minority district), and the only precedent it has in Louisiana history is the 1990s districts found to be racial gerrymanders.

The illustrative districts, too, are racial gerrymanders. The hearing evidence established, virtually as a matter of law, that race was the predominant factor in their construction. It can hardly be emphasized enough that Plaintiffs, their lawyers, and their experts went looking for Black population. Where it was, and who those people were was an afterthought. This is precisely the type of districting scheme the Supreme Court has repeatedly invalidated as equal-protection

violations, and it bears uncanny similarity to a Texas district the Supreme Court found not to satisfy Section 2. Plaintiffs argue that their showing of polarized voting justifies the discriminatory features of their plans, but the Court cannot invalidate a plan Plaintiffs have stipulated they are not challenging as unconstitutional on the ground that it does not bear features of plans that are presumptively unconstitutional.

Moreover, Plaintiffs have not established legally significant polarized voting, so there is no arguable justification for the racially predominant redistricting they demand. Their experts established at best that Black and white voters in Louisiana tend to prefer different candidates. But the relevant question under Section 2 is whether the degree of white bloc voting is sufficient that only with a 50 percent majority Black voting-age population (BVAP) can the Black preferred candidate reliable prevail. Plaintiffs' own experts testified that this is *not the case*. Supreme Court precedent could not be clearer that, in such circumstances, "majority-minority districts would not be required in the first place." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion).

The equitable factors governing preliminary injunctive relief also compel the denial of the instant motions. The risk to the public in conducting the 2022 congressional elections under unconstitutional districts is unacceptable and decidedly against the public interest. So too is the risk of election administration error, even an election meltdown, as a court injunction in an election year after the enacted plan has been implemented would "require heroic efforts" to achieve. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). In Alabama, a federal court issued a materially identical injunction to that requested by Plaintiffs here, and under similar electoral conditions. The Supreme Court promptly stayed that injunction. There is no reason for this Court to follow in that court's footsteps, especially where this case is thoroughly deficient on the merits.

## [PROPOSED] FINDINGS OF FACT

### I.   2020 Decennial Census

1.     The U.S. Census Bureau releases data to the states after each census for use in redistricting. This data includes population and demographic information for each census block. Joint Stip. ¶ 50, Doc. 143.

2.     The Census Bureau delivered apportionment counts on April 26, 2021, and the redistricting data file was released to Louisiana in legacy format (P.L. 94-171) on August 12, 2021, and in easier-to-use formats on September 16, 2021. Joint Stip. ¶ 51, Doc. 143.

3.     Louisiana was apportioned six seats in the U.S. House of Representatives, the same number it was apportioned following the 2010 census. Joint Stip. ¶ 52, Doc. 143.

4.     The 2020 census reported that Louisiana's resident population was 4,657,757 as of April 2020. Joint Stip. ¶ 53, Doc. 143.

### II.   Louisiana's 2020 Redistricting Process

5.     Population shifts within the State of Louisiana resulted in each of the congressional districts deviating from the ideal population, requiring the existing districts to be modified to achieve "constitutionally required equal population." PR-56, 3:17–4:12.

6.     The Legislature began the redistricting process in June 2021 by adopting criteria mandating that proposed plans comply with all legal requirements (including "the Equal Protection Clause"), "contain whole election precincts," "maintain[] . . . communities of interest," and "respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable." LEG_7, HCR 90(B), (E)(2), (G)(1); *see also* Joint Stip. ¶ 54, Doc. 143.

7.     From October 2021 to January 2022, the Legislature held public hearings across the State to present information and solicit public feedback. *See, e.g.*, PR-38 to PR-46.

4

8.     The Legislature convened an Extraordinary Session beginning February 1, 2022, to enact redistricting plans for Congress and other offices.  Joint Stip. ¶ 55, Doc. 143.

9.     The congressional plan ultimately enacted, House Bill 1 and Senate Bill 5, satisfies the adopted criteria. *See* PR-54, 1:8–17:2; PR-71, 86:11–92:10; PR-72, 17:13–16, 86:3–87:9;[2] *see also* Joint Stip. ¶¶ 56–58, Doc. 143.

10.     The plan maintains the "core districts as they [were] configured" to "ensure continuity of representation." PR-54, 4:11–5:1; PR-57, 22:13–20; PR-68, 30:22–31:4, 31:22–32:8; PR-71, 88:16–89:4, 128:24–129:6. Although population shifts rendered some changes necessary, the plan preserves "the traditional boundaries as best as possible" and "keeps the status quo." PR-72, 12:13–17; PR-72, 6:19–7:4; PR-74, 4:19–5:4.

11.     Senator Hewitt and Speaker Schexnayder explained how the existing districts were under and overpopulated, and walked through the changes made to the existing districts by House Bill 1 and Senate Bill 5 in order to achieve the ideal population. PR-54, 6:15–17:2; PR-71, 90:4–92:10; PR-56, 4:21–9:5.

12.     On average, the plan maintains more than 96 percent of constituents per district in the same district as the 2011 benchmark plan. LEG_1-4; *see also* 5/12 Tr. 212:21–213:6.

13.     The plan respects political-subdivision boundaries and natural geography, and it splits just one precinct. PR-54, 3:23–4:2; PR-71, 88:9–13.

14.     The plan accounts for communities of interest identified in committee hearings, including by grouping major military installations and military communities in CD4, preserving the Acadiana region in CD3, and joining major cities and their suburbs as much as possible. PR-54, 5:2–6:15; PR-71, 89:4–90:2; PR-72, 15:7–9, 17:13–16. For example, Barksdale Air Force Base

---

[2]     *See also* Sen. Hewitt, Mar. 30, 2022, Senate Session at 53:38 to 55:06, https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2022/03/033022SCHAMB.

and Fort Polk remain in CD4 in the enacted plan, which is currently represented by a member who serves on the House Armed Services Committee. PR-54, 7:19–8:3. Keeping these districts together in the same district and providing for continuity of representation allows the state to have more influence in Washington and "compete for vital funding that's essential to [Louisiana's] economy." PR-54, 7:19–8:9.

15.    Of particular relevance to this case are CD5, CD6, and CD2.

16.    CD5, which was underpopulated by about 37,000 residents, is a rural district that accounts for nearly half of Louisiana's agricultural sales and borders a long stretch of the Mississippi River. PR-54, 8:23–9:14. Its incumbent serves on the House Agriculture Committee. PR-54, 9:17–20. The plan maintains rural communities as the "backbone" of CD5 by preserving the delta region and adding Point Coupee and rural parts of the Florida Parishes. PR-54, 9:14– 11:3.

17.    The enacted plan retains over 89 percent of the constituents of CD5 in the 2011 Plan. LEG_1-4.

18.    CD6, which was overpopulated by about 40,000 residents, is anchored in the Greater Baton Rouge area and joins its suburbs, including West Baton Rouge, Ascension, and Livingston—the residences of innumerable people who work, attend church, and send their children to school in Baton Rouge. PR-54, 14:16–15:2. The enacted plan improves CD6 by curing precinct splits from the prior plan. PR-54, 15:6–9.

19.    The plan retains nearly 99 percent of the constituents of CD6 in the 2011 plan. LEG_1-4.

20.    CD2 was the closest of any district to the ideal population, being under the ideal by 1,000 residents. PR-54, 15:19–24. The district joins the State's two largest urban areas, New

Orleans and portions of Baton Rouge, which share interests in the tourism industry, affordable housing, safe neighborhoods, and accessible healthcare. PR-54, 15:25–16:4. CD2 brings together ports along the Mississippi River, which is the "gateway to commerce." PR-54, 16:4–7. The "general makeup of this district remains the same" from the 2010 plan, though some precincts were shifted between District 2 and others to equalize population. PR-56, 5:25–6:9.

21.    The enacted version retains nearly 99 percent of the constituents of the 2011 version of CD2. LEG_1-4.

22.    CD2 remains a majority-Black district, with a Black Voting Age Population of over 57 percent. PR-54, 16:11–16; LEG_1-8.[3]

23.    There is no allegation that race predominated in the creation of CD2.

24.    The Legislature faced demands to engage in race-based redistricting.

25.    Some public commenters contended that, "[b]ecause over 1/3 of Louisiana's population is minority . . . at least 2 of the 6 districts should have a fair chance of electing a member of a minority." *Robinson* Compl. ¶ 48.

26.    Some legislators, too, argued for proportionality, contending "one third of six is two." PR-42, 63:16 (former Representative Ted James); *see also* PR-72, 87:12–88:34 (Representative Jenkins), 73:20–24 (Representative Marcelle).

27.    Legislators and members of the public proposed alternative plans containing two majority-Black districts representing that they were drawn with the specific intent to reach at least 50 percent Black voting-age population (or BVAP). *See, e.g.*, PR-71, 98:4–13 (Senator Fields explaining that the purpose of his Amendment 91 to Senate Bill 5 was to "add a second minority district" so that Black voters would not be "pack[ed]" into one district); PR-53, 2:24–3:3 (Senator

---

[3] As Dr. Hood explained, this 57.0 percent figure is based on the Black Voting Age Population as defined by the U.S. Department of Justice. LEG_1-6; 5/12 Tr. 221:8–19; LEG_1-8 (Table 4).

Luneau testifying he offered Senate Bill 16 because "with the changes in our population, it's pretty clear, that the Census [has] shown about a third of the population is minority" and that the plan "adds an additional majority-minority district."); PR-69, 9:20–22 (Senator Price explaining that the purpose of Amendment 153 to House Bill 1 was to "provide two minority district[s] – District 2 and District 5."); PR-68, 40:25–41:1 (Representative Duplessis stating he offered Amendment 116 to Senate Bill 5 to "creat[e] a second majority-minority district.").

28.    Senator Fields, for example, asserted that, "if you wish to create a majority-minority district, you can." PR-71, 101:5–6.

29.    The proposals transferred Black residents from CD2 to CD5, reducing CD2's BVAP. *See, e.g.*, LEG_34 (Senate Bill 9 showing BVAPs of 52.254 percent and 51.597 percent for CD2 and CD5, respectively).

30.    Some contained z-shaped districts that zigged and zagged across the state without regard to important communities of interest. *See* LEG_38 (Senate Bill 16); *see also* PR-53, 4:22–5:19 (Senator Hewitt commenting on the similarities between Senate Bill 16 and "the famous Z-Map that we had back in the day" and identifying communities disrupted in the plan: "You've got Lafayette in a district with New Orleans. You've got neighborhoods in Baton Rouge [that] would share a member of congress with Shreveport and Lake Charles is joined with parts of Monroe, it divides up some of the Barksdale community.").

31.    No one advocating a second majority-minority district presented a strong basis in evidence to conclude that § 2 demands such race-based steps.

32.    Plaintiffs Louisiana NAACP and Power Coalition for Equity and Justice claimed to have conducted racially polarized voting and performance analyses on various proposed congressional plans. LEG_8-6–7; LEG_9-4–5; LEG_11-4; *see also* PR-47, 133:11–135:7; PR-56,

106:5–13. But none of their submissions to the Legislature contained such an analysis or underlying data.

33.    Legislators repeatedly requested that Plaintiffs share these analyses with the committees tasked with redistricting. PR-47, 137:1–5, 141:2–14; PR-55, 22:11–23:15. Plaintiffs and their counsel refused, and did not answer questions about the elections purportedly analyzed. PR-47, 137:1–5, 141:2–14; PR-55, 22:11–23:15.

34.    For example, during the January 20, 2022, Joint Committee hearing, the Redistricting Counsel for the NAACP Legal Defense Fund (the same organization that is counsel to Plaintiffs in this litigation) testified regarding the maps submitted by Plaintiffs and the analyses performed on these maps. PR-47, 133:11–135:7. Senator Hewitt asked if Plaintiffs could provide these analyses because that information could be "very useful" to the committees. PR-47, 137:1–7. That counsel replied that he needed to consult with his colleagues and get back to Senator Hewitt. PR-47, 137:4–5.

35.    That information was never provided, despite the same counsel testifying again before the Legislature and providing additional submissions on behalf of Plaintiffs. During his testimony on February 3, 2022, before the Senate and Governmental Affairs Committee, where he referenced these analyses again, Senator Hewitt repeated the request that the analyses be shared. PR-55, 22:11–23:15. He refused, and promised to provide another submission with additional information. PR-55, 22:11–23:15. That submission, however, again failed to include any underlying analysis or data on which the Legislature could rely. *See* LEG_11.

36.    The only meaningful information that could be gleaned from any of the submissions was a summary of an analysis of a single 2018 run-off election, and it suggested that alternative configurations of CD5, rendering it a bare-majority-Black district, would not meaningfully

improve the Black community's opportunity to elect its preferred candidate. *See* LEG_9-4–5; PR-47, 134:14–136:6 (acknowledging the analysis showed that the margins "weren't quite so high" for CD5).

37.    Meanwhile, legislators continued to express concern that drawing two majority-minority districts with slim BVAP majorities would compromise Black opportunity in both. PR-56, 117:7–118:4; PR-54, 18:21–22:8; PR-76, 22:21–23:25; PR-71, 104:2–105:3.

38.    Legislators expressed similar concerns in connection with state legislative and judicial redistricting plans, calling districts with Black Voting Age Population in the 50.9 percent range "toss-ups," and still "kind of close" at 53 percent. PR-70, 61:1–10; PR-71, 43:12–17. Legislators proposed plans with higher levels of Black Voting Age Population in order to make districts "more securely minority" and ensure they continued to be presented by Black members. PR-70, 61:1–10; PR-71, 44:1–17.

39.    The Legislature resisted these calls to engage in race-based redistricting. House Bill 1 and Senate Bill 5 (amended to incorporate the identical congressional plans) were passed by the Legislature on February 18, 2022. *See* LEG_69; LEG_5; PR-76, 2:24–5:4; *see also* Joint Stip. ¶¶ 56–58, Doc. 143.

40.    As promised, the Governor vetoed both bills for failing to achieve his predetermined racial target. *See* LEG_6 (claiming that because the Black voting age population makes up "almost one-third of the State's population," the Legislature should have enacted a bill with two majority-minority districts); *see also* Joint Stip. ¶ 59, Doc. 143.

41.    The Legislature overrode the veto of House Bill 1 on March 30, 2022. *See* Joint Stip. ¶¶ 61–62, Doc. 143.[4]

---

[4] *See also* Sen. Hewitt, Mar. 30, 2022, Senate Session at 1:38:43 to 1:42:35.

42.    HB 1 was enrolled, became Act No. 5 of the 2022 First Extraordinary Session, and became effective on March 31, 2022. Joint Stip. ¶ 63, Doc. 143.

43.    Act 5 of the 2022 First Extraordinary Session is codified at La. R.S. 18:1276. Joint Stip. ¶ 64, Doc. 143.

44.    La. R.S. 18:1276 divides Louisiana into six congressional districts, and qualifies that electors of each district shall elect one representative to the Unites States House of Representatives. Joint Stip. ¶ 65, Doc. 143.

## III.    The State of Louisiana

45.    The State of Louisiana has made significant strides in addressing its inequitable past as part of its recent history. *See generally* State Ex. 5–29 (information regarding various equity initiatives within the State of Louisiana); *see also e.g.*, 5/9 Tr. 41:13–42:12 (testimony by the President of the Louisiana NAACP that he is on a number of statewide committees and that he believes "the state values the opinion of the NAACP.").

46.    The Louisiana Department of Health's Bureau of Minority Health Access and Promotions ("BMHA") sponsored and cosponsored minority health activities to help address the impact COVID-19 is having on minority communities. State Ex. 5.

47.    In January 2019, the Louisiana Department of Health ("LDH") created the Office of Community Partnerships & Health Equity. This office is focused on health and equity and ensuring LDH's services are equitably accessible and informed by the people, populations and communities it serves. State Ex. 6.

48.    The Louisiana Department of Insurance created the Division of Diversity and Opportunity that assists small, minority, and disadvantaged insurance agencies, producers and individuals by providing educational and informational services to foster a greater awareness of the opportunities available in the insurance industry. State Ex. 12.

11

49.     During the 2021 Regular Session of the Louisiana Legislature, the Legislature unanimously passed HCR-19 which created a task force to study issues relative to a lack of racial minority and female candidates for athletic director and head coach positions at public postsecondary institutions. State Ex. 13 & 14. The Louisiana Minority Sports Initiative Task Force will devise a plan to develop a more diverse group of candidates for head coach of athletic director positions. *Id.*

50.     Local governments also are making strides in bridging the gap between Louisiana's past and its present and future. On June 12, 2020, Baton Rouge Mayor-President Sharon Weston Broome enacted the Mayor's Commission on Racial Equity and Inclusion. The commission is focused on the creation of measurable outcomes, promotion of greater accountability, and coordination of community-wide efforts to achieve racial equality in the community. State Ex. 7. The City of Alexandria, Louisiana enacted the "Small and Emerging Business Development Program" that mandated inclusionary procedures in the bidding, and awarding of bids, process to better include minority business owners. State Ex. 10.

51.     Louisiana's universities are taking steps to address issues of diversity and inclusion. In 2019, Louisiana's flagship university, Louisiana State University ("LSU"), elected Stewart Lockett, its first Black student body president in nearly 30 years. State Ex. 8; State Ex. 8 at 1. LSU's student government is about half white, with a mix of Black, Latino, and Asian students making up the additional 50 percent. *Id.* Regarding the more diverse student government, Mr. Lockett said, "It's pretty cool. It's been a huge shift, and we're really proud of it." State Ex. 8 at 3. LSU created the Office of Diversity, Equity, and Inclusion, which has a staff that includes over 50 percent members of minority communities. State Ex. 11. One of LSU's "core principles includes fostering a culture of inclusivity and respect for every member of the community." State

Ex. 24 at 1. The LSU African American Diversity Organization hosts many programs throughout the year, including: (1) "Umoja", which is a welcome event for freshman and transfer students; (2) the Black Women's Empowerment Initiative; (3) Black History Month Celebration; (4) Robing Ceremony; (5) Juneteenth Celebration; and (6) Pre-Kwanzaa. State Ex. 19. In May 2021, LSU chose William F. Tate, IV to head the University.  He is the first Black president and chancellor of LSU and in fact, the first to lead any Southeastern Conference College.  He was appointed by unanimous vote of the LSU Board of Supervisors.  As chancellor, Tate will be responsible for the flagship campus's academic, financial and administrative matters.  As LSU president, he will be the chief executive officer of the colleges and universities associated with the system, which includes two four-year universities, one two-year institution, two medical schools, a law school, an agricultural center, research facilities and the Baton Rouge flagship educating roughly 50,000 students.  State Ex. 28.

    52.    The University of Louisiana Lafayette's "deliberate tradition of inclusion . . . is one of the pillars on which the institution rests. . . ." State Ex. 23 at 3. Toward that end, this past fall ULL began "a professional development curriculum as part of a research-based initiative to examine diversity, equity and inclusion challenges in online and traditional learning." State Ex. 22 at 2). The results of this research will be "disseminated, enabling other institutions in the University of Louisiana System and across the state and nation to adopt best practices . . . ." State Ex. 22 at 2.

    53.    The LSU System Diversity Task Force was established to serve as an advisory group to LSU System Administration and LSU Board of Supervisors. State Ex. 15. The task force will develop policy recommendations on best practices to increase cultural diversity and community engagement. *Id.*

54.    Louisiana State University Health Shreveport has the Office of Diversity Affairs that is dedicated to providing equal opportunity and assisting members of minority communities. State Ex. 20.

55.    McNeese University has an Office of Inclusive Excellence with the purpose to establish a strategic plan of operation for cultivating a campus culture that embraces diversity, enables inclusion, and provides equality to all campus constituents. State Ex. 21.

56.    Several professional organizations also are making diversity and inclusion a focus. On January 27 and 28, 2022, the Louisiana Society for Human Resource Management held its Diversity and Inclusion Summit in New Orleans. State Ex. 9.

57.    On October 1, 2021, Louisiana Economic Development announced the launch of the Diversity in Business initiative to accelerate growth in second-stage minority and women owned businesses. State Ex. 16.

58.    The Louisiana State Bar Association's Diversity ("LSBA") Statement states that the LSBA is committed to diversity in its membership, Board of Governors, staff, House of Delegates, committees and all leadership positions. State Ex. 17. The LSBA also issued a Statement of Diversity Principles that many of its members have agreed to abide by. (State Ex. 18).

59.    The Urban Land Institute ("ULI") – Louisiana's "mission" "is to promote responsible land use and support sustainable communities for all, regardless of race . . . ." State Ex. 26 at 1. ULI Louisiana understands that Louisiana "has an extensive history of racial inequity, and the real estate industry has played a significant role in maintaining that inequity and systemic racism." State Ex. 26 at 1-2.

IV.    **Parties**

60.    Two sets of Plaintiffs filed the instant consolidated Section 2 actions based on what they call "critical facts," including that "Louisiana has six congressional districts and a Black population of over 33 percent," that "[a]ctivists, community leaders, and ordinary Louisianans petitions lawmakers" to create a second majority-minority district," that the Governor "pledged to veto any new map that failed to" create such a race-based district, and that a district could be drawn including "the Baton Rouge area and the delta parishes" to achieve a 50 percent racial quota. Galmon Br., Doc. 42-1 at 1.

61.    On April 14, the two cases were consolidated into the instant case.

A.    *Robinson* Plaintiffs

62.    Plaintiffs in the first-filed case, *Robinson, et al. v. Ardoin*, Case No. 3:22-cv-211, are nine individuals, the Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP"), and the Power Coalition for Equity and Justice ("Power Coalition"). *See* Joint Stip. ¶¶ 13-44, Doc. 143.

B.    *Galmon* Plaintiffs

63.    Plaintiffs in the second-filed case, *Galmon, et al. v. Ardoin*, Case No. 3:22-cv-214, are four individuals. *See* Joint Stip. ¶¶ 1-12, Doc. 143.

C.    Defendant R. Kyle Ardoin

64.    Defendant R. Kyle Ardoin is the Louisiana Secretary of State and is named in his official capacity. Joint Stip. ¶ 45, Doc. 143.

65.    Defendant R. Kyle Ardoin is the "chief election officer of the state," La. R.S. 18:421(A). Joint Stip. ¶ 46, Doc. 143.

D.    Legislative Intervenor-Defendants

66.     Legislative Intervenor-Defendant Clay Schexnayder is the Speaker of the Louisiana House of Representatives. Joint Stip. ¶ 47, Doc. 143.

67.     Legislative Intervenor-Defendant Patrick Page Cortez is President of the Louisiana Senate. Joint Stip. ¶ 48, Doc. 143.

E.      State Intervenor-Defendant

68.     The State of Louisiana is represented by Attorney General Jeff Landry, Chief Legal Office of the State of Louisiana. Joint Stip. ¶ 49, Doc. 143.

**V.     Procedural Posture**

69.     Plaintiffs waited 16 days to file preliminary-injunction motions (and nine days to request a status conference concerning provisional relief). Docs. 16, 41, 42.

70.     They ask the Court to order the Legislature to redistrict and, if it does not, order the State to utilize one of their illustrative plans. Their core retention numbers fall far below those of the enacted plans, especial in CD2, CD5, and CD6. LEG_1-4. The plans do not even purport to be status quo plans.

71.     The Court held a hearing on Plaintiffs' motions beginning on May 9, 2022, and concluding on May 13, 2022. *See*, e.g., Doc. 152.

**VI.    Plaintiffs' Witnesses**

A.      Michael McClanahan

72.     Mr. Michael McClanahan ("McClanahan") was offered as a fact witness. 5/9 Tr. 15:20–22. Mr. McClanahan was not called in his individual capacity, but as the state president of the Louisiana NAACP. 5/9 Tr. 21:14–17. Mr. McClanahan has been president of the Louisiana NAACP for about 5 years and is also a life member of the NAACP. 5/9 Tr. 23:4–24. The Louisiana NAACP has about 40 local branches. 5/9 Tr. 25:4–8.

73.    Mr. McClanahan testified that he knows people in Louisiana who have one Black grandparent and three white grandparents—he said this type of racial make-up is "Louisiana"-- and he "consider[s] these people Black." 5/9 Tr. 26:17–23. McClanahan said he grew up in northwest Louisiana where he was taught "if we had one drop of Black blood, no matter what you look like on the outside, you considered Black." 5/9 Tr. 26:21–27:3.

74.    Mr. McClanahan stated that he testified at public meetings regarding redistricting and that he told the legislature he was in favor of proportional representation since Black Louisianians "make up at least a third of the population" the legislature "should take careful consideration as to the make up of the State of Louisiana so they could adequately reflect what it looks like in Louisiana." 5/9 Tr. 27:13–28:25. Mr. McClanahan said, "[m]y thought process is since Louisiana's made up of a third of African-Americans, that all maps should reflect that[.]" 5/9 Tr. 46:5–8.

75.    Mr. McClanahan undercut his credibility when he testified under oath that even though he was familiar with the legislative process in Louisiana and even though the NAACP was active in the last gubernatorial election, he did not know what political party the Governor is. *See* 5/9 Tr. 40:14–41:12; 5/9 Tr. 59:9–11.

76.    Mr. McClanahan serves on a number of committees and task forces for the State of Louisiana. 5/9 Tr. 41:13–17. McClanahan testified that he believes "the state values the opinion of the NAACP." 5/9 Tr. 42:9–12.

77.    Mr. McClanahan testified that he agrees "that at least some Black voters in Louisiana cannot be in a majority Black district." 5/9 Tr. 49:8–11. However, Mr. McClanahan still believed that any Black Louisianian who was not in a majority Black district was "cracked." 5/9 Tr. 49:8–50:19.

78.     Mr. McClanahan testified that the NAACP did not perform any studies relative to the performance of a second majority minority congressional district. 5/9 Tr. 51:2–5. He then testified that NAACP did perform studies, however he did not know when they were performed or where they were. 5/9 Tr. 52:23–54:6.

79.     Notwithstanding the ongoing redistricting litigation, the Louisiana NAACP has been able to still encourage people to vote and to register to vote. The NAACP has also continued to hold events across the State, including the "souls to the polls" program for the April 30, 2022, election. McClanahan testified that the NAACP's efforts to increase turnout via "souls to the polls" was "successful." 5/9 Tr. 56:18–60:3.

80.     The Louisiana NAACP does not endorse any candidates at any level. 5/9 Tr. 66:16–69:10.

81.     Mr. McClanahan testified that all Congressional districts have cities that are very distinct from each other and have distinct needs. 5/9 Tr. 63:17–23.

82.     Some people work in New Orleans and live in Baton Rouge and vice versa. 5/9 Tr. 65:12

83.     There's no record of the NAACP supporting or opposing candidates at the state levels since Mr. McClanahan has been state president. 5/9 Tr. 69:12–16.

B.      Charles Cravins

84.     Mr. Charles Cravins was offered as a fact witness. 5/9 Tr. 258:2. Mr. Cravins is a lawyer in Saint Landry Parish, Louisiana and he ran for district attorney as a democratic candidate in the 2020 election cycle. 5/9 Tr. 258:8–13; 259:17-19. Mr. Cravins appeared on the same ballot as the 2020 presidential election. 5/9 Tr. 259:20–22. However, Mr. Cravins testified that he did not pay attention to the margin of votes President Trump carried in Saint Landry Parish during that election cycle. 5/9 Tr. 259:23–260:3. Mr. Cravins testified that he lost the election, where he, as a

Democrat, received 48 percent of the votes and the opposing candidate, a Republican, received "51 point something" percent of the votes. 5/9 Tr. 260:8–13. Mr. Cravins believed that he received some crossover voters where people voted for both President Trump, a Republican, and himself, a Democrat. 5/9 Tr. 260:14–22.

85.    As part of his testimony, Mr. Cravins opined that it is critically important for Saint Landry Parish to maintain a connection with at least one of the three "centers of influence," which he identified as Baton Rouge, Lafayette, and Lake Charles because that connection allows Saint Landry Parish to have some political voice because Saint Landry Parish has a large African American population. 5/9 Tr. 266:25–267:17. However, while Mr. Cravins testified that Saint Landry Parish's connection to Baton Rouge, Lafayette, and Lake Charles would magnify Saint Landry's influence, he could not state whether or not those were the **only** three "centers of influence." 5/9 Tr. 267:25–268:16. Additionally, Mr. Cravins testified that "my focus is about politics" and clarified that he is looking at things "from a political standpoint." 5/9 Tr. 268:6–9.

86.    St. Landry Parish is not part of the defined media market of Baton Rouge.  5/9 Tr. 257:9–23.

87.    Baton Rouge is not currently in the same Congressional district as St. Landry Parish.  5/9 Tr. 266:17–267:9.

88.    St. Landry Parish has a lot of similarities with Evangeline Parish.  5/9 Tr. 272:16–24.

C.    <u>Christopher Tyson</u>

89.    Mr. Christopher Jordan Tyson ("Tyson") was offered as a fact witness.  Mr. Tyson, who is Black and currently a law professor, ran as the Democratic candidate for the Louisiana Secretary of State in 2015.  5/9 Tr. 276:6; 276:15–277:20.

90.     Mr. Tyson opined that the parishes in the delta region of Louisiana have a "unique connection" to East Baton Rouge Parish. 5/9 Tr. 291:13–17. However, Mr. Tyson could not explain in detail why Louisiana never had a congressional district from Baton Rouge running up into the delta with the exception of the 1992 *Hays* map, which was ultimately struck down. 5/9 Tr. 291:18–292:3. He also was not aware of any other congressional maps that would have run Baton Rouge up into the Louisiana delta prior to 1992. 5/9 Tr. 292:4-7. The only reason he could provide as to why the previous maps were drawn that way was because "politics I think play[ed] a role in that." 5/9 Tr. 291:23–292:3.

91.     When Mr. Tyson ran for Louisiana Secretary of State he ran against the Republican incumbent, Tom Schedler. 5/9 Tr. 294:19–24. Mr. Tyson testified that it can be easier to run for office as an incumbent as opposed to running as the challenger, and that the race for the Secretary of State position is particularly a hard race to run in. 5/9 Tr. 295:7–19. Particularly, it is a difficult race because it is hard to raise the funds that are necessary to campaign and so Tyson needed to take out a loan to finance the campaign. 5/9 Tr. 295:5–296:5. Mr. Tyson's campaign was considered more of a grass roots-style campaign and therefore he did not have the tremendous resources that are needed to fund a substantial media campaign. 5/9 Tr. 296:6–11. As such, he was not able to broadcast any campaign advertisements on television nor in any of the seven major media markets in Louisiana. 5/9 Tr. 296:12–16.

92.     When Mr. Tyson ran for the State Secretary of State position in 2015 as a Democrat, the seats for the governor, lieutenant governor, senator, mayor, and were all on the ballot as well. 5/9 Tr. 298:19–299:11. Former Mayor Kip Holden and Governor Edwards won East Baton Rouge Parish as Democratic candidates. 5/9 Tr. 299:24–300:10. Tyson received about 48 percent to 52 percent of the votes in East Baton Rouge during the 2015 election cycle. 5/9 Tr. 299:12–18.

93.     His father was one of the first Black graduates of the LSU Law Center.  5/9 Tr. 280:7–10.

94.     Black population in Louisiana is still centered around the Mississippi River.  5/9 Tr. 281:17–23.

95.     It could take about 4 hours and 20 minutes to get from Baton Rouge to Lake Providence, Louisiana.  5/9 Tr. 294:5–18.

D.     Dr. Dorothy Nairne

96.     Dr. Dorothy Nairne has resided in Congressional District 6 since 2017.  5/10 Tr. 82:8–11, 78:14–18.  She is a registered Democrat.  5/10 Tr. 92:24-93:1.  While Dr. Nairne testified that her house is "on the cusp" of District 2 and therefore it is "confusing" and "chaotic" to know where to vote, 5/10 Tr. 83:25–84:14, she also admitted that she did find out where to vote and she is aware of the Geaux Vote app that the Secretary of State uses to let people know where to vote. 5/10 Tr. 93:2–9.

97.     While Dr. Nairne agreed that she is a regular voter and that she is "pretty good at voting," 5/10 Tr. 96:1–10, she also admitted she did not vote in November 2021 or July 2020, nor did she vote in December 2018 for the secretary of state race between Kyle Ardoin and Gwen Collins.  5/10 Tr. 99:2–21.

98.     Dr. Nairne stated that regardless of who is elected in her congressional district and the outcome of this litigation she will "continue to be engaged with the elected representatives who represent" her. 5/10 Tr. 94:2–12.

99.     Dr. Nairne has only been a Louisiana resident for 5 years, moving here in 2017. 5/10 Tr. 92:8–10.

100.     Dr. Nairne has donated to independent, Green Party, and a few Democratic candidates.  5/10 Tr. 94:13-23.

21

101.    Dr. Nairne donated to a group called ActBlue.  5/10 Tr. 95:17–25.

E.    Ashley Shelton

102.    Ashley Shelton ("Shelton") worked in communities across the state of Louisiana in redistricting efforts during the last election cycle. 5/10 Tr. 239:18–240:7. She testified that she worked in a power coalition representing those who have asked for a fair and equitable redistricting process and did not receive it. 5/10 Tr. 239:18–240:7. The power coalition existed in Louisiana since about 2015. 5/10 Tr. 260:18–21.

103.    Shelton testified that the power coalition members who live in Congressional District 2 have candidates of choice. 5/10 Tr. 265:17–267:4. However, Shelton lives in congressional District 6 and she does not have the opportunity to elect a candidate of choice. 5/10 Tr. 267:5–8. She said her candidate of choice is not limited to any particular political party, but instead her candidate of choice is going to prioritize issues she cares about. 5/10 Tr. 267:9–268:8. Therefore, her candidate of choice could be conservative and could be Republican. 5/10 Tr. 268:4–7. She also said it is possible that her candidate of choice could be white, although that has not been her personal experience to date. 5/10 Tr. 268:8–10.

104.    Though Shelton lived in Baton Rouge her entire life, she was not sure if East Baton Rouge Parish was majority white when Kip Holden was elected. 5/10 Tr. 271:1-16.

105.    Regardless of the outcome of this litigation, and if the enacted map goes forward, the Power Coalition still will continue to fight for issues that it cares about. 5/10 Tr. 265:10–23. Over the past decade when there was only one majority minority congressional district in Louisiana, Power Coalition was still able to encourage individuals to register to vote. 5/10 Tr. 266:4-11.

106.    Every member of the Power Coalition who attended the legislative roadshows could turn in a card in support or opposition to any bill proposed.  5/10 Tr. 264:5–9.

107.    For the most part, everyone had an opportunity to provide public comment at the legislative roadshows.  5/10 Tr. 264:10–16.

F.    Matthew Block

108.    Mr. Matthew Block was added to Plaintiffs' witness list on May 9, 2022, after the hearing on Plaintiffs' motions for preliminary injunction had begun. 5/11 Tr. 13:14–21.  The court's deadline to list witnesses was April 29, 2022. 5/11 Tr. 13:14–16. Defendants objected to the untimely addition of Mr. Block, as the untimeliness prevented Defendants from conducting any discovery regarding Mr. Block.  5/11 Tr. 13:10–14:8.

109.    Plaintiffs' counsel stated at the hearing that "we informed defendants as soon as we could once we knew Mr. Block would be testifying," 5/11 Tr. 15:5–8, and "[w]e disclosed his participation as soon as we could," 5/11 Tr. 15:13–14, but in fact, Mr. Block testified that he was contacted the week before the hearing—after the witness lists were due—about testifying as a witness in the case. 5/11 Tr. 27:4–28:4.

110.    Mr. Block is executive counsel to Governor John Bel Edwards. 5/11 Tr. 17:4–20. Mr. Block testified that based on polling data, Governor Edwards was overwhelmingly supported by Black voters. 5/11 29:20–22.

111.    The executive branch of Louisiana government has been responsive to the needs of the Black community. 5/11 Tr. 29:23–30:5.

112.    The Governor expanded the Medicaid program to the benefit of many of the State's lower income residents, including Black citizens and residents. 5/11 Tr. 30:6–21.

113.    As a proponent of criminal justice reform the Governor signed a bill enacted by the Legislature (with a GOP House) that restored the voting rights to citizens with felony convictions. 5/11 Tr. 30:22–31:14.

114.    A number of African-Americans have been appointed to high ranking positions in state government in recent years. 5/11 Tr. 32:15–18.

115.    The head of the Louisiana Department of Health is a Black female by the name of Courtney Phillips.  She administers the largest budget in the State. 5/11 Tr. 32:20–33:9.

116.    Kimberly Robinson, also a Black female, served as Secretary of the State Department of Revenue.  She had a large role in state government for a number of years and now holds a position of authority at LSU. 5/11 Tr. 33:16–34:22.

117.    Lamar Davis, a Black male, was appointed as Superintendent of State Police and was the Governor's choice for that role. 5/11 Tr. 34:23–35:6.

118.    The Governor appointed Ava Cates, a Black female, to head the Louisiana Workforce Commission. 5/11 Tr. 35:10–35:16.

119.    The Louisiana Department of Health has implemented programs to improve the health of African-Americans. 5/11 Tr. 35:17–35:25.

120.    The State, through the Governor's office, made Juneteenth a state holiday. 5/11 Tr. 36:1–3.

121.    The Governor created a task force to track racial inequities in health care and took a number of COVID related measures to ensure free and available COVID testing and prevention. 5/11 Tr. 36:5–38:14.

122.    The Governor has worked with the Legislative Black Caucus on legislative matters. 5/11 Tr. 39:4–40:9.

123.     Mr. Block has never served as an election commissioner, nor an election commissioner in charge. 5/11 Tr. 28:5–11. He has never served on the parish board election supervisors, nor served on the state board of supervisors. 5/11 Tr. 28:12–17. He did work for the

clerk of court when he was in high school in Lafourche Parish, but he was never involved with elections. 5/11 Tr. 28:25–29:6. Mr. Block has not worked for a registrars office during any elections. 5/11 Tr. 29:7–9.

124.    Mr. Block testified that since the governor has been in office, elections have been moved nine times due to an emergency or natural disaster, and the last time this was done was to move November elections to December because of Hurricane Ida. 5/11 Tr. 18:6–21:6. Mr. Block testified that he was unable to speak about whether the Secretary of State's office has been able to successfully implement such special elections that have resulted due to emergencies or natural disasters. 5/11 Tr. 23:12–15.

125.    While Mr. Block thinks the Secretary of State's office was able to inform voters of any changes to elections, he personally did not know and could not give any assurances. 5/11 Tr. 23:16–23.

126.    Mr. Block admitted that the Secretary of State has not spoken to him about moving the upcoming elections happening this fall. 5/11 Tr. 43:14–21. Mr. Block gave no testimony as to what impact changing electoral maps or districts would have on the Louisiana elections process.

G.    Mr. William Cooper

127.    Mr. Cooper testified as an expert witness and was asked "to determine whether the Black population in Louisiana is sufficiently large and geographically compact to allow for the creation of two majority Black congressional districts out of the sixth district plan" and "to examine socioeconomic data to determine whether or not there are disparities between the races with respect to socioeconomic well-being statewide as well as at the state level." 5/9 Tr. 80:25–81:10.

25

128.    It took Mr. Cooper nearly two months to prepare his analysis, as he was hired "in early March or February of 2022," and he worked on his "illustrative maps" and other analyses until his expert report was submitted in April 2022. 5/9 Tr. 121:15–24.

129.    In an effort to "demonstrate to the court that plaintiffs have met the first *Gingles* 1 prong," Mr. Cooper also prepared "illustrative maps." 5/9 Tr. 90:14–22. Mr. Cooper claimed he applied traditional redistricting principles in drawing his maps, which he argues includes considering racial data. 5/9 Tr. 91:4–92:3. However, Mr. Cooper's testimony made clear that he did not evenly apply traditional redistricting criteria, and instead aimed to allow race to predominate over other traditional redistricting principles.

130.    Essentially admitting that racial considerations predominated over traditional districting criteria in drawing the illustrative maps, Mr. Cooper testified that he did not attempt to draw any maps with one majority-minority district instead of two because he "was specifically asked to draw two by the plaintiffs." 5/9 Tr. 123:3–4.

131.    The illustrative maps do not contain any districts with BVAP greater than or equal to 52 percent, even though he admits he could have drawn a district with a higher BVAP, suggesting that Mr. Cooper was targeting districts with a bare 50 percent majority. 5/9 Tr. 123:1–10; 114:6–21.  For example, in his illustrative plan two, Districts 2 and 5 contain BVAP of 50.65 percent and 50.04 percent. 5/9 Tr. 124:16–125:1. He argued that the districts did not contain more BVAP because he was "attempting to balance out the [district's] population so it was perfect," but when he "hit zero [population deviation], [he] stopped because it was still above 50 percent BVAP." *Id*. Yet in his illustrative plan four, District 2 contains 50.06 percent BVAP even though he was not attempting to reach zero population deviation. 5/9 Tr. 125:21–126:6. Mr. Cooper offered no explanation for why he still reaches only a bare 50 percent majority BVAP in these

maps when he is not adjusting for zero population deviation, and admits that he was "confident" he could have drawn a district with a higher BVAP.  5/9 Tr. 126:7–12. Later, in the same sentence that he attempted to deny drawing his plans to a racial target, Mr. Cooper acknowledged achieving *Bartlett v. Strickland*'s "rule that basically acknowledges that 50 percent plus 1 is the voting age majority," 5/9 Tr. 155:11–14.

132.    Mr. Cooper does not know whether the majority-minority districts in his illustrative plans would be likely to elect the preferred congressional candidates of Black voters. 5/9 Tr. 125:21–126:20.

133.    Each of Mr. Cooper's illustrative maps contains a District 5 that includes East Baton Rouge, East Carroll, West Carroll, Madison, Tensas, Concordia, and portions of Ouachita Parishes. 5/9 Tr. 126:21–128:17. However, in a prior redistricting cycle, a district combining East Baton Rouge Parish with East Carroll Parish was struck down as an unlawful racial gerrymander. 5/9 Tr. 139:13–142:23. Yet Mr. Cooper admits that you cannot draw a second majority-minority district in Louisiana without combining these parishes. 5/9 Tr. 130:1–9; 131:19–23.

134.    The extent to which Mr. Cooper subordinated traditional redistricting criteria to his goal of creating two majority-minority districts is apparent in his split of the Monroe MSA in each of the illustrative maps, which in every case resulted in Mr. Cooper placing heavily Black neighborhoods in District 5. 5/9 Tr. 133:6–137:21. In particular, Mr. Cooper did not dispute that he assigned 88.45 percent of the Ouachita Parish's Black population into his illustrative District 5, and 72.78 percent of East Baton Rouge's Black population into that same District 4. *Id.* 136:1–19.

135.    Mr. Cooper admits that his socioeconomic analysis only compares the differences between the socioeconomic status of whites and Blacks in Louisiana, but does not compare the

differences between the socioeconomic statuses of Blacks or whites in different areas of the state that are combined in his illustrative maps. 5/9 Tr. 142:17–144:17.

136.    Mr. Cooper's failure to compare the socioeconomic status of the Black communities that he combined in his illustrative maps is a glaring error in his analysis. The differences between Black residents in East Baton Rouge Parish, East Carroll Parish, and Ouachita Parish—which he combined in one district in his illustrative maps—are stark:

a.    50.6 percent of Black residents in East Baton Rouge Parish have post-high school education (some college, associates degree, or bachelor's degree or beyond), 5/9 Tr. 145:22–147:3, compared to only slightly over 27 percent of Black residents in East Carroll Parish 5/9 Tr. 146:2-6 and 40.7 percent[5] of Black residents in Ouachita Parish 5/9 Tr. 154:8–14.

b.    The median income of Black households in East Baton Rouge Parish is $42,643 5/9 Tr. 149:1–4, compared to only $14,800 for Black households in East Carroll Parish 5/9 Tr. 151:6–11 and $25,644 for Black households in Ouachita Parish 5/9 Tr. 153:24–154:2.

c.    16.6 percent of Black households were below the poverty line in the last year in East Baton Rouge Parish 5/9 Tr. 149:12–16, compared to 58 percent of Black households in East Carroll Parish, 5/9 Tr. 150:18-25, and 38.7 percent of Black households in Ouachita Parish 5/9 Tr. 153:10–16.

137.    Mr. Cooper claims that race was not a predominant factor in his illustrative plans, yet he contradicts himself by claiming that one of his goals was to avoid minority voting dilution.

---

[5] The transcript reports 47.7 percent, but the correct percentage is 40.7 percent. *See* William Cooper, Select Socio-Economic Data, Ouachita Parish, June 20, 2021, p. 21, *http://www.fairdata2000.com/ACS_2015_19/ Louisiana/22_Ouachita%20Parish,%20Louisiana_ACS_Black_and_Latino_5YR.pdf.*

5/9 Tr. 154:15–23. And he did not deny that race was an important factor that he considered. 5/9 Tr. 156:8–15.

138.    Mr. Cooper also admitted that he was aware of the racial breakdown of VTDs and used that data in drawing his maps. 5/9 Tr. 155:15–156:15.

139.    Though Mr. Cooper claimed to have considered the stated legislative goals in preparing his illustrative maps, he apparently chose not to follow those stated goals, making his illustrative maps an unhelpful comparator and calling into question whether those maps could have passed through the Louisiana legislature. 5/7 Tr. 157:19–158:18. For example, Mr. Cooper drew Vernon Parish, home of Fort Polk, and Shreveport, home of Barksdale Air Force Base, into different districts in his illustrative plans even though they were joined in the enacted plan. 5/9 Tr. 157:25–158:18.

140.    Furthermore, while Mr. Cooper claimed to have focused on preserving communities of interest, he only focused on certain "core-based statistical areas," rather than on various other communities of interest that may have motivated the districts in the enacted plan. 5/9 Tr. 157:16–157:6; 158:19–22. And moreover, Mr. Cooper admitted there was no "universal definition of community of interest" in this field. 5/9 Tr. 158:19–22.

   H.    Mr. Anthony Fairfax

141.    Plaintiffs asked Mr. Fairfax to analyze whether he could draw an illustrative congressional plan that satisfied the first *Gingles* precondition.  5/9 Tr. 206:14–207:22.

142.    Mr. Fairfax did not address the other two *Gingles* factors when drawing his illustrative congressional plans.  *Id.* at 207:7–208:4. He did not know if the Black population he placed in his two majority-Black congressional districts would elect a Black candidate of choice. *Id.*  He did not study whether the Black population he placed into his second majority district was

subject to or engaged in legally significant racially polarized voting. *Id.* Mr. Fairfax did not know how the Black population in his illustrative districts would vote in a real election. *Id.*

143.    Before drawing the illustrative plans, Mr. Fairfax turned on the dataview function of the mapdrawing software Maptitude and viewed the BVAP of each precinct in order to "get an idea where the Black population is inside the state in order to begin drawing." *Id.* at 209:2–10. Initially viewing the BVAP allowed Mr. Fairfax to determine where a second majority-Black district "could exist." *Id.* at 210:3–8.

144.    Though Mr. Fairfax claimed that race did not predominate in his drawing, he did not turn off the BVAP function when drawing his illustrative congressional plans. *Id.* at 210:16– 211:9. In fact, Mr. Fairfax testified that he would look at the BVAP to see if he was approaching 50 percent BVAP. *Id.* at 211:22–212:18.

145.    Mr. Fairfax admitted that he used 50 percent BVAP as a "threshold" to comply with *Gingles*, *id.* at 208:2–4, and that he purposefully drew CD2 and CD5 above 50 percent BVAP for that reason. *Id.* at 206:25-207:4; *see also id.* at 206:18–22.

146.    As to District 5, Mr. Fairfax started in the northern delta region of the existing plan and added population in order to get to 50 percent BVAP, but at one point he reached 60 percent BVAP and decreased the BVAP down to closer to 50 percent. *Id.* at 212:19–215:15. Thus, the AP BVAP in District 5 of his illustrative plan was 52.05 percent, and the DOJ BVAP was 50.96 percent. *Id.* at 215:24–216:19. The DOJ BVAP for District 2 in his illustrative plan was 50.02 percent. *Id.* at 216:14–17. Though the BVAP could have been higher, Mr. Fairfax drew District 5 closer to 50 percent in order to satisfy the first *Gingles* precondition. *Id.* at 216:20–217:23.

147.    In both of Mr. Fairfax's illustrative plans, District 5 was his second majority-Black district. *Id.* at 218:4–6. Both illustrative plans also include some or all of the northern delta

parishes in District 5. *Id.* at 217:24–218:3. Mr. Fairfax admitted that East Baton Rouge and West Baton Rouge Parishes are not part of the northern delta region, which Mr. Fairfax characterized as a unique community of interest. *Id.* at 219:3–21.

148.    Mr. Fairfax combined East Baton Rouge, which he characterized as having a significant Black population, with the northern delta region in his District 5. *Id.* at 219:22–220:22. When asked if he needed to include East Baton Rouge in his District 5 in order to reach a 50 percent BVAP district, Mr. Fairfax admitted it would be very difficult for him to draw a majority Black district without using East Baton Rouge as it is "the second largest metropolitan area in the state, [and] has a significant amount of Black population. It's understandable that that's going to have to be part of that second Black district." *Id.* Mr. Fairfax could not recall attempting to draw any plans that did not include East Baton Rouge. *Id.* at 220:23–221:6.

149.    Mr. Fairfax testified that to his understanding, compactness legally relates to geography, not population and geography. *Id.* at 224:17–22. But he agreed he only used mathematical tests to measure compactness of district lines, not tests that would examine population dispersion. *Id.* at 222:25–223:18.

150.    Figure 5 in Mr. Fairfax's first supplemental report overlays his illustrative congressional districts with populations that have no high school education. *See* PR-86 at p 13. The darker the shading, the more concentrated number of people with no high school education. 5/9 Tr. at 225:16–227:2. Mr. Fairfax admitted that the northern delta region is heavily shaded in Figure 5, while East Baton Rouge and West Baton Rouge are not heavily shaded. *Id.* at 227:3–13, 228:8–15.

151.    Figure 6 of Mr. Fairfax's first supplemental report overlays his illustrative congressional districts with median household income data. *See* PR-86 at p 15. The darker the

shading, the lower the income. 5/9 Tr. at 229:11–21. Mr. Fairfax admitted that the northern delta region is heavily shaded in Figure 6, while East Baton Rouge and West Baton Rouge are not heavily shaded. *Id.* at 229:22–230:11.

152. The Figure on page 16[6] in Mr. Fairfax's first supplemental report overlays his illustrative congressional districts with socioeconomic risk factors. *See* PR-86 at p 16. The darker the shading, the higher the socioeconomic risk. 5/9 Tr. at 232:1–6. Mr. Fairfax admitted that the northern delta region is heavily shaded in the Figure on page 16, while East Baton Rouge and West Baton Rouge are not heavily shaded. 5/9 Tr. 232:7–233:1. Despite this, Mr. Fairfax admitted he included all of West Baton Rouge in his District 5. *Id.* at 233:2–7.

I.      Dr. Maxwell Palmer

153. Dr. Maxwell Palmer ("Dr. Palmer") was tendered as an expert in racially polarized voting data analysis. 5/9 Tr. 305:11–15.

154. Dr. Palmer testified that he did not perform a regional specific analysis of racially polarized voting in the state of Louisiana. 5/9 Tr. 336:3–337:2.

155. Dr. Palmer admitted that there can be meaningful white crossover voting, even when there is strong evidence of racially polarized voting. 5/9 Tr. 337:3–8.

156. Dr. Palmer only looked at racially polarized voting at the Congressional district level. 5/9 Tr. 337:18–19.

157. Dr. Palmer inaccurately noted in his report that he examined statewide and Congressional elections in Louisiana from 2012 to 2020. 5/9 Tr. 337:20–25.

158. Dr. Palmer did not analyze any actual Congressional elections in Louisiana when performing a racially polarized voting analysis on Congressional districts. 5/9 Tr. 338:10–15. He

---

[6] Mr. Fairfax's first supplemental report contains two Figure 6s, one on page 15 and another on page 16. For clarity, we refer to the first as "Figure 6" and the later as "the Figure on page 16." *See* PR-86.

also admitted that he did not provide the voter turnout data that he is relying on in his report. 5/9 Tr. 339:9–11.

159.    The average candidate of choice for Black voters garnered 20.8 percent of the vote from white voters, 5/9 Tr. 339:18–22, with even higher levels of support for Black-preferred candidates in Congressional District 2 ("CD 2"). 5/9 Tr. 340:17–22.

160.    On average, one fifth of white voters in Louisiana vote for the Black-preferred candidate. 5/9 Tr. 340:23–341:1.

161.    Dr. Palmer's report demonstrated that voters in Congressional District 5 ("CD 5") vote for Black-preferred candidates. 5/9 Tr. 341:3–6.

162.    Galmon Illustrative Plan 1 demonstrated winning vote percentages for Black-preferred candidates in CD 2 and CD 5 between 50.9 percent and 79.1 percent. 5/9 Tr. 343:22–344:7. The any part Black voting age population (referred to as "BVAP" in Dr. Palmer's report) for CD 5 in Galmon Illustrative Plan 1 was 50.04 percent. 5/9 Tr. 345:11–13. Dr. Palmer could not testify to what amount of the winning vote percentage in CD 5 could be attributed to white crossover voting. 5/9 Tr. 346:14–17.

163.    Dr. Palmer agreed that CD 2 and CD 5 could likely be drawn at below 50 percent BVAP and still elect Black-preferred candidates. 5/9 Tr. 346:18–21.

164.    Dr. Palmer admitted that the methodology and package Dr. Blunt used is a commonly used, reliable method utilized by scholars and testifying experts to simulate redistricting plans.  Indeed, Dr. Palmer admitted that the package Dr. Blunt used is reliable and that Dr. Palmer has used the package in his own academic research.  5/9 Tr. 346:22–347:13.

J.    Dr. Lisa Handley

165.    Dr. Lisa Handley is a consultant and a part-time academic in the United Kingdom. 5/10 Tr. 11:1–11:5. Dr. Handley has been hired "scores" of times to conduct racial block voting

analysis as an expert witness and to testify about redistricting and racially polarized voting. 5/10 Tr. 12:1–12:12. Dr. Handley has worked with the ACLU in other states, but began discussing Louisiana with the ACLU within the past year. 5/10 Tr. 41:15–41:23.

166.    Dr. Handley estimated that she did polarization studies on the statewide elections before the initial plan was written. 5/10 Tr. 46:7–46:19. Dr. Handley did not provide any of her theories or calculations to the Louisiana legislature while it was preparing its congressional plans. 5/10 Tr. 44:24–45:9.

167.    Dr. Handley was asked by Plaintiffs to analyze the voting patterns by race in the State of Louisiana and to evaluate the opportunity for Black voters to elect their candidates of choice. 5/10 Tr. 12:13–12:20. This work included evaluating the enacted plan, as well as "several illustrative plans." 5/10 Tr. 12:15–12:20.

168.    Dr. Handley bases her definition of "racially polarized voting" on the Supreme Court's opinion in *Thornburg v. Gingles*, and contends that "if Black voters voting alone elected different candidates than white voters, then the contest is racially polarized." 5/10 Tr. 13:9–13:16. Dr. Handley also relied on *Gingles* in her report stating that "an analysis of voting patterns by race serves as the foundation of two of the three elements of the 'results test' as outlined in *Thornburg v. Gingles*." PR-12 at 4. Dr. Handley further stated in her report that "a racial block voting analysis is needed to determine whether the minority group is politically cohesive; and the analysis is required to determine whether if whites are voting sufficiently as a bloc to usually defeat the candidates preferred by the Black voters." *Id*.

169.    Dr. Handley testified that she was asked by Plaintiffs "to conduct an analysis of the voting patterns by race in Louisiana and to evaluate proposed districts that is in the enacted plan and several illustrative plans to ascertain the opportunity for Black voters to elect candidates of

choice." 5/10 Tr. 12:13–12:20. Dr. Handley used three statistical techniques in her analysis: homogeneous precinct analysis, ecological regression, and ecological inference. 5/10 Tr. 13:17–13:24. The ecological inference technique was developed after Supreme Court's opinion in *Thornburg v. Gingles*. 5/10 Tr. 14:17–14:25.

170.    Dr. Handley analyzed 15 statewide elections, which she selected because they were recent elections from 2015 on and because the contests included Black candidates. 5/10 Tr. 15:24–16:8. Dr. Handley claims that all 15 contests were polarized because Black voters and white voters would have elected different candidates if they voted separately. 5/10 Tr. 20:22–21:4. Dr. Handley testified that she relied upon a simple definition of polarization that she claims is based on *Thornburg v. Gingles,* namely that "*Thornburg v. Gingles* tells us that voting is polarized in [sic] Black voters and white voters vote differently. In other words, if Black voters voting alone elect different candidates than white voters, then the contest is racially polarized." 5/10 Tr. 13:9–13:16.

171.    With respect to congressional elections, Dr. Handley concluded that the elections in Districts 3, 4, 5, and 6 were all polarized, whereas most of the elections in District 2 were not polarized. 5/10 Tr. 24:8–24:14.

172.    Dr. Handley acknowledged that not all congressional elections are racially polarized. 5/10 Tr. 47:21–48:3.

173.    Dr. Handley agrees that "substantively significant racial polarization" means that minority and white voters are voting for different candidates. 5/10 Tr. 52:24–53:3.

174.    Dr. Handley acknowledged that there may be "pockets" of Louisiana where the crossover vote is higher than the average. 5/10 Tr. 56:24–57:3. However, Dr. Handley did not conduct a parish-by-parish study of polarization rates. 5/10 Tr. 57:4–57:7.

175.    Dr. Handley determined the "Black voting age population" by counting all persons who checked that they were any part Black or African-American on their census form. This resulted in a higher Black percentage in the districts that she reviewed than if she had used a single race Black measurement. 5/10 Tr. 58:2–58:15.

176.    Dr. Handley did not conduct a polarization study of all congressional districts in the plan that was enacted in 2022. 5/10 Tr. 59:9–59:17 (noting that Handley did not evaluate Congressional District 1). Similarly, Dr. Handley did not prepare a polarization analysis for the illustrative plans prepared by Plaintiffs' expert, Anthony Fairfax. 5/10 Tr. 59:22–60:12. Rather, Dr. Handley generally testified that "because voting is racially polarized Black voters can only elect their candidates of choice if the district is drawn that gives them this opportunity." 5/10 Tr. 34:12–34:21.

177.    The definition of polarized voting used by Dr. Handley in her report mirrors the Supreme Court's explanation for racial polarization that is legally significant. *See* PR-12 at 4 ("racial bloc voting analysis is required to determine if whites are voting sufficiently as a block to usually defeat the candidate preferred by minority voters").

178.    In contrast, during her testimony, Dr. Handley defined polarized voting in a manner that mirrors the Supreme Court's definition of legally *insufficient* polarized voting. ("*Thornburg v Gingles* tells us that voting is polarized in [sic] Black voters and white voters vote differently…"). 5/10 Tr. 13:9-13:16.

179.    Dr. Handley's report and her trial testimony demonstrate that she understands and is familiar with the two definitions given by the Supreme Court in *Gingles* for polarized voting versus legally significant polarized voting.

180.    In light of the two different definitions for racially polarized voting used by Dr. Handley, it is significant that she failed to claim that she was not hired to determine whether a majority Black district was needed for Blacks to have an opportunity to elect their candidates of choice.

181.    Nor did Dr. Handley testify that a district must be drawn with a Black voting age population in excess of 50 percent to provide Black voters anywhere in Louisiana with an opportunity to elect their preferred candidates.

182.    Dr. Handley recognized that there are districts where Black voters are able to elect their candidate of choice even if they are not the majority, and that this involved white voters crossing over to help elect the Black candidate of choice. 5/10 Tr. 62:3–62:13.

183.    Dr. Handley acknowledged that an effective district could be a district that has less than a 50 percent voting age population, meaning that the district could still provide the Black community an opportunity to elect their candidate of choice. 5/10 Tr. 63:1–63:12.

184.    Dr. Handley has conducted functional analyses in other cases to determine whether a district could provide African-Americans with the opportunity to elect their candidate of choice with a Black population percent that is below 50 percent; however, she did not conduct a functional analysis in this case. 5/10 Tr. 63:13–63:22. Similarly, Dr. Handley did not conduct a study to determine whether a district with a Black percent that is below 50 percent would provide an equal opportunity to elect a Black candidate. 5/10 Tr. 65:12–65:16.

185.    Although Dr. Handley did not include Governor Edwards' election in 2015 and 2019 in her report, she acknowledged that Governor Edwards was the preferred candidate of choice for the Black community. 5/10 Tr. 66:12–66:21.

186.    Dr. Handley agreed that it is better to use more highly visible political races to calculate racially polarized voting. 5/10 Tr. 68:16–68:21. Despite this, she relied on the 2018 Special Election for Secretary of State, where voter turnout was a quarter of that in a presidential election. PR-12 at 6; 5/11 Tr. 189:12–19.

187.    Dr. Handley contends that all elections under the enacted plan were polarized for all districts, including District 2. 5/10 Tr. 74:7–74:13.

K.    Dr. Traci Burch

188.    Dr. Traci Burch "was asked to evaluate the set of factors relevant to this case in Louisiana, particularly Senate factors five, six, seven, eight and nine." 5/10 Tr. 106:11–16. Dr. Burch's analysis of these factors is flawed, as she cherry-picks anecdotes that support her ultimate conclusions, while ignoring facts that countermand those opinions.

189.    In her analysis of Senate Factor 6, examining the extent to which racial appeals are used in campaigns, Dr. Burch identified only three examples of use of racial appeals in Louisiana in the past 30 years, none of which are probative to courts examining this issue. 5/10 Tr. 121:9–21; 135:15–136:10.

190.    First, she identified an exchange between gubernatorial candidates Edwards and Rispone in 2019 with each trading accusations that the other was racist.  5/10 Tr. 135:10–136:7); PR-14 at 24.

191.    Second, she identified a political advertisement by the Louisiana GOP in 2019 related to the Edwards-Rispone exchange and arguing that Edwards was racist.  *Id.*  Dr. Burch testified that Rispone lost the gubernatorial contest with now-Governor Edwards.  5/10 Tr. 137:11–13.

192.    Third, Dr. Burch identified a Facebook post by a State Senator about immigration policy and questioning whether the Democratic Party represents the interests of Black voters.  5/10

38

Tr. 135:15–136:7; PR-14 at 24-25.  Dr. Burch conceded at the hearing that this "was probably more general, but it probably referred in general to support of Black people for Democratic parties."  5/10 Tr. 136:19–137:10.

193.     Plaintiffs' own witness Ashley Shelton, the founder, president and CEO of Plaintiff Power Coalition for Equity & Justice, echoed the same sentiment that she did not think the Black community was represented well by the Democratic Party.  5/10 Tr. 256:16–257:5.

194.     Dr. Burch's analysis of Factor 9—whether the policy underlying the enacted plan was tenuous, or whether there was a "proper justification," as Dr. Burch phrased it—was exposed as tenuous itself in her testimony. 5/10 Tr. 126:3–6.  Dr. Burch did not take a position as to whether the rationale offered by the legislature in adopting the enacted plan was tenuous. 5/10 Tr. 138:18–19. Dr. Burch claims to have reviewed the legislative record to support her conclusion that the justifications offered by the legislature lacked "empirical support." 5/10 Tr. 139:4–14. Despite admitting that a proper review of the legislative record would avoid cherry picking from the record and ignoring legislative priorities that were stated repeatedly, that is exactly what Dr. Burch did. 5/10 Tr. 139:20–140:2.

195.     Dr. Burch testified that the enacted plan being a continuity of representation plan "actually started to enter the record at the end" of the legislative process. 5/10 Tr. 140:12–142:16; 143:8–20. However, Dr. Burch either ignored, cherry-picked, or completely missed the statements in the legislative record that were consistently made from the outset of the legislative session that identified the goal of the legislature to achieve continuity of representation in the enacted plan. 5/10 Tr. 144:8–148:15.

196.     Dr. Burch conceded at the hearing that she never examined whether the Legislature's policy of drawing a least change "continuity of representation" map was tenuous.

5/10 Tr. 149:21–150:17 ("of course, the boundaries had to change a little bit, but as far as whether they got as close as possible to the old boundaries, no, I didn't look at that."); 5/10 Tr. 151:5–10 ("Q: I understand from your testimony just now that you did no examination of continuity of the representation in your report, correct?" "A: Right.  That's not those figures aren't in the record.").

197.    In addition to not studying whether so-called tenuousness was due to the Legislature's goal of drawing a continuity of representation plan, Dr. Burch also conducted no examination of whether so-called tenuousness was due to political as opposed to racial choices. 5/10 Tr. 152:8–153:2.

198.    Dr. Burch also provided a rebuttal report in which she "was asked to examine the relationship between race [and] partisanship," 5/ 10 Tr. 129:2–5, and she concluded that there was a "link between race, racial attitudes and partisanship," 5/10 Tr. 129:17–19.

199.    Dr. Burch has written that voters in a racial or ethnic group cannot be assumed to share policy preferences but she did not examine whether Black voters in rural Louisiana would vote the same way as Black voters in urban Baton Rouge, 5/10 Tr. 134:6–16, and nor does her report examine white crossover voting, i.e., white voters voting for the candidates of choice of Black voters, 5/10 Tr. 134:11–23.

L.    Dr. Blakeslee Gilpin

200.    Dr. Gilpin testified that while he is aware of Louisiana's effort to draw a second majority minority congressional district after the 1990 census in order to comply with the Voting Rights Act, and that such district was struck down as racially gerrymandered by the courts, he did not include the related *Hays* line of cases in his report even though they would have fallen "perfectly" under his section titled Voting Rights in Louisiana 1982 to 2013.  5/10 Tr. 234:9–235:12; 235:25–236:5.

M.    Dr. Allan Lichtman

201.    Dr. Allan Lichtman ("Dr. Lichtman") was offered as an expert witness by the Galmon Plaintiffs in the fields of American politics, American political history, voting rights, and qualitative and quantitative social sciences. 5/10 Tr. 156:22–157:15. Dr. Lichtman's principal areas of research include American politics, American political history, voting rights, quantitative methods, qualitative methods, and political prediction. 5/10 Tr. 161:1–6.

202.    Dr. Lichtman was asked by Plaintiffs to examine the nine Senate factors that relate to the *Gingles* totality of the circumstances analysis. 5/10 Tr. 162:14–23.

203.    Dr. Lichtman served as an expert witness in the 1990 *Hays* case on behalf of the then defendant state of Louisiana 5/10 Tr. 201:19–202:3. The state of Louisiana had a seven Congressional district plans with two majority-Black districts for a brief period in the early 1990s, but the plans were invalidated as racial gerrymanders in violation of the Equal Protection Clause. In Hays, the Court did not credit Dr. Lichtman's testimony in support of the seven Congressional District plans with two majority-Black districts. 5/10 Tr. 208:7–15. Finding his testimony based on "spurious correlations." *Hays v. State of La.*, 839 F. Supp. 1188, 1203 n.48 (W.D. La. 1993).

204.    Dr. Lichtman included in his report evidence of white crossover voting greater than 25 percent in favor of Black-preferred candidates. 5/10 Tr. 197:23–198:3. In fact, Dr. Lichtman testified to the presence of white crossover voting ranging from 20 percent to 26 percent in the three elections analyzed. 5/10 Tr. 198:14–18.

205.    Dr. Lichtman testified that he presented data in his report showing differentials between Black and white turn-out in recent elections in Louisiana that can extend into double digits. 5/10 Tr. 176:22–177:8.

206.    Dr. Lichtman testified that a Black candidate of choice can win in a district as low as "in the 40 percent range." 5/10 Tr. 198:22–25. He also testified that in his "North Carolina

41

testimony in the Covington case" the court accepted his analysis that African American candidates could win in the 40 percent range minority population. 5/10 Tr. 200:5–10. He also testified that he would not rule out that a state could create two districts with about forty-five (45) percent in African American in their voting age population given that there's going to be Hispanics and others in that district who do tend to vote Democrat. 5/10 Tr. 200:11–16. Dr. Lichtman testified that this would all depend on the district specific analysis. 5/10 Tr. 200:16–20.

207.     Dr. Lichtman testified that: "Whites win in the white majority districts in the state house of representatives and in the state senate. I even drilled down for more fine grain level, the level of mayoral elections; that is, I looked at mayoral elections in municipalities and wards in Louisiana and no Blacks are elected in any majority white municipality, only Blacks are elected in majority Black municipalities and there are no Black Republicans." 5/10 Tr. 169:25–170:9. However, Dr. Lichtman later stated that he did not know whether or not the mayor of East Baton Rouge is Black. 5/10 Tr. 214:25–215:3. He testified that in his analysis, he did not determine whether or not a parish had a majority Black population but instead analyzed cities and whether it had a majority Black population. 5/10 Tr. 216:11–14.

208.     Dr. Lichtman testified that he did not examine any plans presented by Plaintiffs. 5/10 Tr. 205:13–14. He was also unable to opine as to whether or not the Black population has become more compact or geographically concentrated since 1990 because he did not analyze the plans. 5/10 Tr. 210:6–15.

209.     Dr. Lichtman also testified that he did not look into the issue of dispersion of the Black population in the State of Louisiana. 5/10 Tr. 210:20–23.

210.     Additionally, Dr. Lichtman testified that it was beyond his scope of his expertise to opine in any way whether Louisiana is different than many other states in the sense that it has large

urban Black populations in a couple locations but very dispersed rural Black populations in virtually every parish in the state. 5/10 Tr. 212:10–20. He also could not testify as to how many Black elected officials there are in the state of Louisiana, 5/10 Tr. 212:21–23 but did acknowledge that the Black candidate of choice did win the last two gubernatorial races. 5/10 Tr. 213:17–25.

## VII.    DEFENDANTS' WITNESSES

### A.    Ms. Sherri Hadskey

211.    Sherri Hadskey is the current Louisiana Secretary of State's Commissioner of Elections. 5/13 Tr. 29:13–29:21; SOS_1 p 1.  In this role, Ms. Hadskey oversees several aspects of election operations and the administration of elections for the State.  5/13 Tr. 29:22–30:17; SOS_1 pp 1-2.  Her duties also include implementation and administration of new districting plans at the state and federal level.  5/13 Tr. 31:1–4.

212.    Ms. Hadskey testified to her office's readiness to conduct the 2022 congressional election under the Enacted Plan.  Substantial administrative work has already been completed on administration of the Enacted Plan.  *Id.* at 31:5–15. In order to implement a new congressional plan Ms. Hadskey's office has to reassign voters who are in new congressional districts to their new districts in the Enacted Plan.  This required her office to reassign voters in no less than fifteen Louisiana parishes.  All of these parish changes have now been properly coded in the Secretary of State's ERIN system.  Moreover, approximately 250,000 voting cards have been sent to voters whose parishes changed districts following reapportionment.  *Id.*; *see also* SOS_1 at p 4.  Those voters have been notified of the specific congressional district in which they will be voting this year. *See id.*

213.    Additionally, Ms. Hadskey testified to the importance of an upcoming June 22, 2022 deadline for potential congressional candidates.  By June 22, all congressional candidates who wish to qualify for the ballot by nominating petition must submit nominating petitions with a

thousand signatures from voters in their congressional district. 5/13 Tr. at 31:16–32:15; 55:4–7. In order to meet the June 22 deadline, Ms. Hadskey's office must notify voters (and potential candidates) of which districts they live in—which has already been done under the Enacted Plan. *Id.* at 32:2–15. Candidates and voters need adequate notice of these districts to ensure they have enough time to decide whether to attempt to qualify by petition or, in the case of voters, who to support. *See id.*

214.    If congressional candidates do not meet the June 22 qualification deadline, the candidates will have to pay a filing fee and qualify by between July 20–22, 2022. *Id.* at 32:16–20. Between now and July 20, Ms. Hadskey's office must complete several tasks to ensure timely and accurate administration of the 2022 election in Louisiana for all offices. *Id.* at 32:21–36:5. These activities include, *inter alia*: (1) implementing complicated school board and municipal redistricting plans; (2) conducting a June 4 special election in Calcasieu Parish due to a redistricting error; (3) conducting yearly maintenance on scanners and voting equipment; (4) processing an estimated 800 legislative acts when the latest session ends; and (5) completing a statewide voter registration canvas to maintain the voter rolls.[7] *Id.*; *see* SOS_1 pp 4–5. None of these tasks is straightforward and all are under limited time constraints.

215.    For example, school board and municipal redistricting requires coding of the new districts into the ERIN system and distribution of voter cards notifying voters of their school board and municipal districts. *Id.* at 33:1–7; 35:11–15.

216.    Additionally, the voter canvas starting on May 23, 2022, requires comparing USPS addresses to NOCCA to determine whether a voter's address or registered name has changed. If

---

[7] Ms. Hadskey also testified to the nationwide ballot paper shortages and issues with timely printing of Louisiana's unique ballot envelopes. *See, e.g.*, 5/13 Tr. 39:19-40:11, 49:10-50:5; SOS_1 p 6. The paper shortages could also interfere with the printing of voter notification cards and other required items, such as the poll book pages, required by state and federal law. 5/13 Tr. 50:14-51:24.

there is a change, the voter must be sent a card with instructions to update their information. *Id.* at 34:18–35:10.

217.    In sum, between now and July 20, 2022, some voters could receive three to four notices of changed districts for different election contests. *Id.* at 36:1–5.

218.    Ms. Hadskey also testified to the election administration hurdles of implementing a wholly new congressional plan that could result from litigation. COVID-19 and census data delays have already strained election administration resources. SOS_1 at p 5.  Specifically, if Ms. Hadskey's office were forced to implement one of Plaintiffs' illustrative plans, at a minimum the following tasks would need to be completed by July 20 at the latest: (1) undoing the coding of the fifteen parishes already completed for the Enacted plan; (2) coding the approximately twenty-five parish changes under an illustrative plan, and (3) timely notifying voters and potential candidates of those changes. 5/13 Tr. 36:6–38:2. At each stage, Ms. Hadskey testified that the process would rushed which gives her a significant concern that voters' information could be coded incorrectly, leading to incorrect information on ballots used in the election.  *Id.* at 37:14–38:2.

219.    Further complications arise if an illustrative map splits precincts, as the registrar of voters for each parish is responsible for moving voters in split precincts by hand.  *Id.* at 38:3–12. For example, in Calcasieu Parish, late census information caused a rushed entry of voter information and led to entry of incorrect voter information, ultimately resulting in the issuance of incorrect ballots.  *Id.* at 38:3–21. As a result, a judge required state and local officials to hold a special municipal election in Calcasieu Parish to remedy the issue.  *Id.*; SOS_1 at pp 5–6.

220.    Ms. Hadskey expressed great concern that the issues Calcasieu Parish experienced will arise again, but on a larger scale, if a new congressional plan is implemented by the Court in

June or July—especially considering the fact that there are nineteen (19) new registrars across the state who have not handled decennial redistricting before.  5/13 Tr. at 38:22–39:4.

221.    In sum, Ms. Hadskey had great concern as to whether her office could administer an error-free election on a new congressional plan within the next few months:

> I'm extremely concerned.  I'm very concerned because when you push – when you push people to try a and get something done quickly and especially people that have not done this process before, the worst thing you can hear from a voter is I'm -- I'm looking at my ballot and I don't think it's right, I think I'm in the wrong district or I don't feel like I have the right races.
>
> The other thing is notifying the voters.  I think we all can relate to we know who our person is that we voted for for Congress or for a school board or any race; and when you get there and you realize it's not the person you are looking for, you're thinking that's who you are going to vote for and then you find out, wait, I'm in a different district.  If we don't notify them in enough time and have that corrected, it causes confusion across the board, not just confusion for the voters, but also confusion for the elections administrators trying to go back and check and double check that what they have is Correct

*Id.* at 40:12–41:15; SOS_1 pp 4–6.  In the entirety of Ms. Hadskey's thirty-year career in Louisiana election administration, she has never moved a federal election.  5/13 Tr. 56:24–57:12.

B.    Dr. Jeffrey B. Lewis

222.    Dr. Jeffrey B. Lewis ("Dr. Lewis") is a professor of political science at the University of California, Los Angeles ("UCLA") and past department chair of UCLA's political science department.  5/12 Tr. 168:18–169:6.

223.    Dr. Lewis earned a B.A. in Political Science and Economics from Wesleyan University in 1990 and a Ph.D. in Political Science from the Massachusetts Institute of Technology ("MIT") in 1998.  5/12 Tr. 168:21–169:1.

224.    Dr. Lewis's specialty is quantitative political methodology with a focus on making inferences about preferences and behavior from the analysis of voting patterns in the mass public

and in legislatures.  He has been offered in this case, without objection, as an expert in political science, census data analysis, statistics, and racially polarized voting analyses.  5/12 Tr. 167:9–15.

225.    Dr. Lewis has been retained as an expert in roughly a dozen cases.  5/12 Tr. 169:7–10.

226.    No court has ever found Dr. Lewis unqualified to testify about racially polarized voting or to lack credibility as a witness.  5/12 Tr. 163:9–15.

227.    A copy of Dr. Lewis's complete CV is contained in his report.  5/12 Tr. 168:14–17.

228.    In this case, Dr. Lewis was asked to calculate the fraction of voters in the November 3, 2020, presidential election who identified as Black in the second and fifth districts of the Louisiana Congressional district plans proposed by Plaintiffs.  He was also asked to estimate the support of Black and non-Black voters for the Biden-Harris ticket in the same election among voters residing in each of those illustrative districts.  Finally, Dr. Lewis was asked to calculate the support for Biden-Harris among all voters residing in each illustrative district and the support that Biden-Harris would have received in those same districts in the absence of non-Black "crossover" voting.  5/12 Tr. 170:3–15.  Dr. Lewis used plaintiffs' expert, Dr. Palmer's, data to conduct his analysis. 5/12 Tr. 173:10–14.

229.    Dr. Lewis's calculations show that Black voters would rely on white crossover voting in Plaintiffs' illustrative CD 2 and CD 5 plans to have an opportunity to elect their candidates of choice.  5/12 Tr. 177:6–14.  More specifically, Black voters relied on white crossover voting to elect candidates of choice in Plaintiffs' illustrative plans in seven of eight races.  5/12 Tr. 177:6–14. Dr. Lewis found that the majority-Black districts drawn by Plaintiffs' experts would still need to rely on white crossover voting to reach a majority vote for Black candidates of choice in all but one case. 5/12 Tr. 178:9–13.

230.    Dr. Lewis evaluated whether CD 2 and CD 5 required 50 percent BVAP or greater to afford Black voters an opportunity to elect their candidate of choice and came to a conclusion consistent with Plaintiffs' experts' views that the districts could be effective at less than 50 percent BVAP. 5/12 Tr. 179:7–179:18; LEG_2 p. 6-7 ("the analysis suggests that Biden/Harris would have received over 50 percent of the vote in each of the illustrative districts considered even if the BVAP in those districts was reduced to as low as 30 percent in the second district or as low as 48 percent in the fifth district.").

C.    Dr. Christopher Blunt

231.    Dr. Christopher C. Blunt ("Dr. Blunt") is a professional political scientist who earned a Ph.D. in Political Science from the University of California at Los Angeles with emphases in American government, campaigns, and voting behavior. 5/12 16:13–17. He is the owner and president of Overbrook Research, a public opinion and consulting practice that he has operated since 2003.  5/12 Tr. 17:17–22.

232.    Dr. Blunt's work at Overbrook Research focuses on campaign turnout modelling, public opinion studies for political campaigns or corporate communications purposes.  He frequently studies voting behavior as part of his work and has conducted data analysis for campaigns for President, Senate, and other offices across the country.  5/12 Tr. 17:23–19:4.

233.    Dr. Blunt is an expert in the field of political science with an emphasis in quantitative political science and data analysis.  5/12 Tr. 12:18–23.

234.    Dr. Blunt prepared two reports in this case.  5/12 Tr. 14:11–13.

235.    Dr. Blunt has studied and maintained familiarity with quantitative political analysis, to include the redistricting literature, since the early 1990s. 5/12 Tr. 19:20–20:22.

236.    The background and expertise of Dr. Blunt includes the political science literature on the use of simulation methods for the purposes of studying redistricting, an accepted

methodology that has been accepted by courts in redistricting cases in multiple states.  5/12 Tr. 21:17–24. Dr. Blunt frequently works with census data when conducting his work. 5/12 Tr. 23:25–24:1.

237.    In this case, Dr. Blunt was asked "to analyze and determine whether a race blind redistricting process following the traditional redistricting criteria would or would not be likely to produce a plan with two majority-minority districts." 5/12 Tr. 25:8–12. Dr. Blunt generated a set of 10,000 possible Louisiana Congressional districting plans that adhere to traditional redistricting criteria to conduct his analysis. 5/12 Tr. 25:24–26:4. To conduct the simulations, he used the REDIST software package, a program developed by a team at Harvard University. 5/12 Tr. 26:7–16. It is the most common and popular program, widely used by researchers and it frequently appears in literature. 5/12 Tr. 26:8–15.

238.    The criteria that Dr. Blunt required the simulated maps to follow was contiguity, respecting parish boundaries, maintaining population equality (within 0.25 percent of ideal), and compactness. 5/12 Tr. 28:20–29:2. The simulations did not consider race, partisanship, or prior district boundaries. 5/12 Tr. 29:3–6. Plaintiffs' experts Mr. Cooper and Mr. Fairfax asserted that they followed those same criteria, but also asserted that they followed communities of interest. 5/12 Tr. 29:10–18.

239.    Dr. Blunt did not implement an explicit constraint in his simulations for "communities of interest." He testified that to his knowledge, there is not a "generally accepted definition of a community of interest in political science," 5/12 Tr. 30:3–7, and that Messrs. Cooper and Fairfax used *different* definitions in their work. 5/12 Tr. 30:10–17. Hence, there was no reliable way to control for "communities of interest," and from a methodological perspective, Dr. Blunt was "hesitant to include something like a community of interest that doesn't have a firm, legal

49

definition the same way that, say, a parish would, … because … a community of interest … could have served as a – proxy for race." 5/12 Tr. 31:21–32:7. If his goal was to study the role of race in development of the plan, he did not want to "bake [a potential proxy for race] into the models if it had been, you know, baked in somehow by the way they had drawn the maps." 5/12 Tr. 32:4–7. However, because his simulated plans split very few parish boundaries, his plans did preserve communities of interest "to some extent" because communities of interest contained entirely within a parish would only infrequently be divided. 5/12 Tr. 29:19–25.

240.    Dr. Blunt calculated BVAP for each of the six districts in each of the 10,000 simulated plans. 5/12 Tr. 34:16–23. In his analysis, Dr. Blunt used "Any Part Black" as his BVAP definition to match the definition used by Plaintiffs. 5/12 Tr. 25:17–20.

241.    None of the 10,000 simulated plans contained *even one* majority-minority districts, let alone the *two* that appear in all of Messrs. Cooper and Fairfax's illustrative plans. 5/12 Tr. 35:25–36:6. In fact, of the 60,000 district Dr. Blunt simulated (each plan contains six districts), the highest BVAP district Dr. Blunt encountered contained a BVAP of 45.47 percent. 5/12 Tr. 36:7– 11. The average, highest BVAP in the 10,000 simulations was 38.56 percent. The district with the second highest BVAP had a BVAP of 42.24 percent which an average just over 36 percent. 5/12 Tr. 36:23–37:12.

242.    Only 75 out of the 10,000 simulated plans had two districts with a BVAP above 40 percent. 5/12 Tr. 32:13–21. Only 200 plans out of the 10,000 simulated plans reached 39 percent BVAP in two districts. 5/12 Tr. 37:21–22. Based on these findings, Dr. Blunt concluded that it would be "extremely unlikely" for a Louisiana Congressional redistricting plan to include two majority-minority districts following only the traditional redistricting criteria used by Dr. Blunt, 5/12 Tr. 37:23–38:6. Dr. Blunt further "found that using only these traditional criteria, … a

50

districting plan would be extremely unlikely to contain two MMDs. So to draw a plan in Louisiana with two such districts would almost certainly require prioritizing racial considerations[s] or some proxy for race…" 5/12 Tr. 42:2 –43:3. The Court credits this conclusion and analysis.

243.    Compactness scores on Dr. Blunt's simulated plans were better on average than Plaintiffs' illustrative plans. 5/12 Tr. 38:21–40:2. The simulated plans also split fewer parishes than Plaintiffs' illustrative plans, splitting on average about half of the splits in Mr. Fairfax or Mr. Cooper's plans. 5/12 Tr. 40:17–41:17.

244.    In response to Dr. Palmer's criticisms of Dr. Blunt's simulations for "splitting too few parishes", 5/12 Tr. 45:9–22, Dr. Blunt re-ran another set of 10,000 additional simulated maps without the constraint to avoid splitting parishes. 5/12 Tr. 46:9–16. In the second set of simulated maps, Dr. Blunt found that the district with the highest BVAP increased "very slightly" from 45.47 percent to just over 46 percent Black, and there were still no plans with a single majority-minority district. 5/12 Tr. 47:21–48:4. Dr. Blunt concluded that "even with the parish split constraint removed, it did not substantially change the results." 5/12 Tr. 49:9–11. However, it did result in in compactness scores dropping "quite a bit." 5/12 Tr. 49:21–22.

245.    Although Dr. Palmer testified that Dr. Blunt's simulations "constrain population deviation too tightly." 5/12 Tr. 50:13–17. However, Dr. Palmer did not express that criticism anywhere in his rebuttal report, and Dr. Blunt testified that he relaxed his population deviation constraint and that, too, did not change his results. 5/12 Tr. 50:19–51:13.

246.    While protecting incumbents and preservations of the cores of existing districts are considered traditional redistricting principles, 5/12 Tr. 69:18–70:22, Dr. Blunt did not control for these factors because Mr. Cooper and Mr. Fairfax did not follow those criteria in creating their

illustrative plans, 5/12 Tr. 107:4–13, and in this case, Dr. Blunt was analyzing Plaintiffs' illustrative plans. 5/12 Tr. 109:20–110:2.

D.    Dr. M.V. Hood III

247.    Dr. M.V. Hood III ("Dr. Hood") is a tenured professor of political science at the University of Georgia, where he has been employed since 1999. 5/12 Tr. 206:21–25, 207:8–10. He also serves as the Director of the School of Public and International Affairs Survey Research Center. 5/12 Tr. 207:3–7.

248.    Dr. Hood has three degrees in political science—a Ph.D. from Texas Tech University, a M.A. from Baylor University, and a B.S. from Texas A&M University. 5/12 Tr. 206:16–20.

249.    A copy of Dr. Hood's complete CV is contained in his initial report. 5/12 Tr. 205:1–10; LEG_1-10–25.

250.    Dr. Hood teaches courses in American politics and policy, including courses in Southern politics that has a heavy dosage of voting rights and redistricting, at both the undergraduate and graduate levels, and has taught courses in election administration at the graduate level. 5/12 Tr. 207:11–24.

251.    Dr. Hood has written two books and dozens of peer-reviewed papers and has received research grants to study election administration issues, as reflected in his CV. 5/12 Tr. 207:25–209:1. His current areas of research and publication are within the larger umbrella of American politics and policy—Southern politics and election administration, including redistricting. 5/12 Tr. 207:25–208:8.

252.    Dr. Hood currently serves on the editorial boards for *Social Science Quarterly* and *Election Law Journal*, which specializes in election administration. 5/12 Tr. 209:2–8.

253.    Dr. Hood regularly uses and analyzes census data in his academic work and in the courses he teaches. 5/12 Tr. 209:9–14.

254.    Dr. Hood is an expert in the fields of political science, quantitative political analysis, and election administration.  5/12 Tr. 202:16–203:16. The Court accepted Dr. Hood as an expert in these fields. 5/12 Tr. 202:16–203:16.

255.    Dr. Hood has testified as an expert witness in upwards of 25 cases, including in redistricting cases.  5/12 Tr. 209:21–24. Most recently, he was qualified and found to be a credible expert witness by a three-judge panel in a redistricting case in Alabama federal court. 5/12 Tr. 209:25–210:6.

256.    Dr. Hood was retained as an expert by Legislative Intervenors in this case and prepared two reports. 5/12 Tr. 205:23–22, 205:8–21.

257.    Dr. Hood was retained to examine two in this case—district congruity between the 2011 benchmark plan, the 2022 enacted plan, and plans proposed by Plaintiffs and amicus curiae, using both population and geography-based comparisons, and the district racial composition of those plans.  5/12 Tr205:22–206:15. In his initial report, Dr. Hood analyzed the enacted plan, the Robinson plan, and the Galmon 1, Galmon 2, and Galmon 3 plans. 5/12 216:15–20. In his supplemental report, Dr. Hood analyzed the Robinson 2A plan, the Galmon 4 plan, and the amicus curiae plan proposed by professors from LSU and Tulane. 5/12 216:21–217:2.

258.    Dr. Hood's district congruity analysis concluded that the enacted plan is highly congruent with the benchmark plan, while the plans proposed by the plaintiffs are less congruent. 5/12 Tr. 211:16–212:5; LEG_1-6.

259.    Dr. Hood used two metrics to perform his district congruity analysis. 5/12 Tr. 211:5–15.

260.    First, he used a core retention analysis that measures the percentage of the population in a new district that is carried over from the benchmark district on a scale from 0 to 100. 5/12 Tr. 212:6–11. The higher the percentage, the more representative a district is of its former self—a score of 100 indicates the district wholly contains population from the previous district, and a score of 0 indicates there is no overlap in population between the current and previous districts. 5/12 Tr. 212:11–20; LEG_1-4.

261.    The enacted plan has a mean core retention score of 96.4, meaning that it retains more than 96 percent percent of constituents in their same district from the 2011 benchmark plan. *See* 5/12 Tr. 212:21–213:6; LEG_1-4 (Table 1). The enacted plan retains over 89 percent of constituents in CD5, almost 94 percent in CD4, almost 98 percent in CD1, nearly 99 percent in CD2 and CD6, and 100 percent in CD3.  LEG_1-4 (Table 1).

262.    The mean core retention scores of the plans proposed by Plaintiffs and amicus curiae are significantly lower. *See* 5/12 Tr. 213:7–17; LEG_1-4 (Table 1); *see also* 5/12 Tr. 216:21–217:18; LEG_78-2 (Table 1).

263.    The core retention scores were also higher for each district in the enacted plan than in their corresponding district in any of Plaintiffs' or the amicus curiae's plans. 5/12 Tr. 213:18–214:4; LEG_1-4 (Table 1); LEG_78-2 (Table 1).

264.    Second, Dr. Hood used the Similarity Index, detailed in peer-reviewed literature, to measure the shared geography between districts in the 2011 benchmark plan and the other plans analyzed on a scale from 0 to 100. 5/12 Tr. 214:13–215:4; LEG_1-5. A score of 100 indicates the district is comprised wholly of geography from the previous district, while a score of 0 indicates there is no geographic overlap between the districts. 5/12 Tr. 215:4–8; LEG_1-5.

265.    In terms of geography, the enacted plan is highly congruent with the benchmark plan, with a mean Similarity Index score of 88 percent. 5/12 Tr. 215:12–23; LEG_1-5–6 (Table 2).

266.    Overall and on a district-by-district basis, the plans proposed by Plaintiffs and the amicus curiae are significantly less geographically congruent—none of these alternatives have a mean Similarity Index score above 50 percent, and each district in the enacted plan has a higher Similarity Index score than the corresponding district in any of the proposed alternatives. *See* 5/12 Tr. 215:12–216:14; LEG_1-6 (Table 2); 5/12 Tr. 217:19–218:6; LEG_78-3 (Table 2).

267.    Dr. Hood also performed a district racial composition analysis, which compared the percentage of the Black population within each district in the 2011 benchmark plan, the enacted plan, and Plaintiff and amicus curiae-proposed plans. 5/12 Tr. 218:7–16; LEG_1-6; LEG_78-4.

268.    Dr. Hood used the definition of Black provided by the U.S. Department of Justice to calculate the percentage of the total Black population and the Black voting age population in each district. 5/12 Tr. 218:17–219:8; LEG_1-6.

269.    Dr. Hood explained the importance of having one metric of the percentage of the Black population in the districts in all of the plans discussed and proposed in this case to do a side-by-side comparison. 5/12 Tr. 219:14–24.

270.    Using the DOJ definition of Black, the total population that was Black in Louisiana declined from 32.2 percent in 2010 to 32.1 percent in 2020. 5/12 Tr. 219:25–220:7; LEG_1-6.

271.    Using the DOJ definition of Black, the voting age population that was Black in Louisiana was 30 percent in 2010 and 30.4 percent in 2020. 5/12 Tr. 220:8–14; LEG_1-6.

272.    These numbers show that the Black population in Louisiana over the last decade has been "fairly stationary." 5/12 Tr. 220:15–19; LEG_1-6.

273.    Both the benchmark and the enacted plans contain one majority-Black district at 57 percent, based on the DOJ Black voting age population. 5/12 Tr. 221:8–19; LEG_1-8 (Table 4).

274.    Two of the plaintiff-proposed plans Dr. Hood analyzed in his initial report (Robinson and Galmon-3) contain a single majority-Black district, CD5, at 51.2 percent and 50.8 percent, respectively. 5/12 Tr. 221:20–222:3; LEG_1-8 (Table 4). The other two plans (Galmon-1 and Galmon-2) contained no majority-Black districts. 5/12 Tr. 222:3–5; LEG_1-8 (Table 4). CD 2, the majority-Black district in the benchmark and enacted plans, is not a majority-Black district in any of the four plaintiff-proposed plans analyzed in the initial report based on DOJ Black voting age population. 5/12 Tr. 222:6–9; LEG_1-8 (Table 4).

275.    The additional plan proposed by the Galmon Plaintiffs, and the plan proposed by the amicus curiae, still contained no majority-Black districts using based on DOJ Black voting age population. 5/12 Tr. 222:24–223:18; LEG_78-5 (Table 4).

276.    Based on 2010 Census Data, CD2 had a Black voting age population of 58.7 percent in the 2011 benchmark plan. 5/12 Tr. 222:10–18; LEG_1-8 (Table 5). But, based on 2020 Census Data, the Black voting age population in CD2 in the 2011 benchmark plan dropped by nearly 2 percent over the last decade. 5/12 Tr. 222:19–23; LEG_1-8 (Tables 4 & 5).

277.    LEG_79, which was admitted under Federal Rule of Evidence 1006, is a compilation of 2010 and 2020 Census Data for the 2011 benchmark plan, the 2022 enacted plan, and the various plans proposed by Plaintiffs and amicus curiae. 5/12 Tr. 226:21–229:15; 5/13 Tr. 62:24–65:12.

278.    Mr. Fairfax's May 2, 2022 supplemental report does not dispute Dr. Hood's core retention or similarity index calculations. 5/12 Tr. 224:11–15; *see also* PR-86. Dr. Hood rebutted the criticism of Mr. Fairfax that Dr. Hood should have included additional individuals in his

56

calculation of the Black population as defined by DOJ, clarifying that the extension of the calculation is only used in DOJ enforcement actions. 5/12 Tr. 224:19–225:4. In any event, Dr. Hood estimated that the percentage of the statewide Black population would only increase by two-tenths of a percentage point. 5/12 Tr. 225:5–21.

279.    In his May 2, 2022 rebuttal report, Mr. Cooper states that he "does not disagree with" Dr. Hood's core retention calculations. GX-29-0011.

E.    Mr. Thomas Bryan

280.    Mr. Bryan was accepted by the Court as an expert in demographics, redistricting, and census data. 5/11 Tr. 51:5–9.

281.    Mr. Bryan is the President and owner of Bryan GeoDemographics, a company that works in redistricting cases across the country. 5/11 Tr. 52:9–16. He holds a Master's Degree of Urban Studies from Portland State University in the areas of demography and statistics as well as a Master's Degree from George Washington University in the areas of management and information systems. 5/11 Tr. 52:17–53:3.

282.    Mr. Bryan has studied and worked actively in demography using census data for thirty years, and he has applied that knowledge in the field of redistricting for twenty years. 5/11 Tr. 54:9–15.

283.    Mr. Bryan has served as an expert witness in another redistricting case in Alabama which is currently stayed and before the Supreme Court of the United States, though his analysis in this case differs from his analysis in the Alabama case. 5/11 Tr. 54:16–56:8.

284.    Mr. Bryan prepared an expert report and a supplemental report. 5/11 Tr. 56:18–22. He also prepared a supplemental report conducting the same analysis for Mr. Cooper's illustrative plan four. 5/11 Tr. 56:23–57:18.

285.    Mr. Bryan was asked to measure the performance of the Enacted Plan and the Illustrative Plans in terms of numerosity as well as whether race was the prevailing factor in the design of the Illustrative Plans. 5/11 Tr. 58:16–59:5.

286.    Mr. Bryan's analysis demonstrates that the Illustrative Plans only create two Black majority-minority districts using the most expansive measure of "Black," "Any Part Black." 5/11 Tr. 68:19–69:7.

287.    Mr. Bryan produced several tables showing the Black voting age population ("BVAP") for each district under the Enacted Plan and the Illustrative Plans. State Ex. 2 at 18–21. Mr. Bryan explained several of the terms used in his report. The tables in his expert report and discussed at the hearing use a few different definitions of the term Black, identified and defined as follows:

288.    "Black Alone" means "Black not Hispanic, not in combination with any other race population." 5/11 Tr. 62:3–7.

289.    "Black DOJ" means "Black in combination with white alone, two races in combination, not Hispanic." 5/11 Tr. 62:7–13.

290.    "Any Part Black" means "Black in combination with any other race whether it is in combination with Hispanic or not," and is "the most liberal or the most expansive definition you could use to define a Black population." 5/11 Tr. 62:14–22. It is also the second step of the DOJ definition of Black. 5/11 Tr. 63:16–64:12.

291.    Mr. Bryan also explained that for purposes of the census, the term Hispanic is an ethnicity, which is a "separate construct" from race. 5/11 Tr. 62:23–63:15. He also explained that he used the term "white not Hispanic" to measure whites for purposes of his expert report, which is "the most exclusive of the definitions of the white population." 5/11 Tr. 63:9–15.

292.    Looking at the Enacted Plan, Mr. Bryan's Table III.A.3 shows that there is one majority-minority district. 5/11 Tr. 65:13–17. This table also demonstrates the effect of the differing definitions of the term Black: as the leniency of who is included in the definition of the term Black is increased, so too is the number of people in that category and the percentage of BVAP in a district. 5/11 Tr. 66:6–11.

293.    Table III.A.4 of Mr. Bryan's report shows how the Robinson Illustrative Plan ostensibly creates two majority-minority districts using the Any Part Black metric, but only creates one majority-minority districts using the Black Alone or Black DOJ metrics. 5/11 Tr. 66:12–67:18.

294.    Similarly, Table III.A.5 of Mr. Bryan's report shows how the Galmon Illustrative 1 Plan creates two bare majority-minority districts using the Any Part Black metric, but fails to create any majority-minority districts using the Black Alone or Black DOJ metrics. 5/11 Tr. 67:19–68:14.

295.    This pattern repeats throughout each of the remaining Illustrative Plans, leading Mr. Bryan to conclude that "[a]ll of the plans only achieve the two Black majority-minority districts with the use of the most expansive interpretation of any part [Black]." 5/11 Tr. 68:19–25. He further concluded that none of the illustrative plans had two Black majority-minority districts using the Black Alone or Black DOJ metrics. 5/11 Tr. 69:1–7.

296.    Mr. Bryan concludes that the Illustrative Maps were drawn precisely with race as a prevailing factor. 5/11 Tr. 97:19–98:5.

297.    In addition to measuring the BVAP under different definitions of the term Black in the Enacted Plan and the Illustrative Plans, Mr. Bryan also conducted a two-step analysis of different geographic splits. 5/11 Tr. 69:17–70:5. The first step of the splits analysis examines the number of splits of parishes, municipalities, and VTDs. 5/11 Tr. 70:6–14. The second step involves

59

assessing the demographic impact of those splits and preparing an index of misallocation, which is a standard demographic tool frequently used by Mr. Bryan in his work that allows a comparison of how much different plans split a population. 5/11 Tr. 70:15–71:5.

298.    Mr. Bryan prepared an index of misallocation in his report comparing the Enacted Plan and the Illustrative Plans. 5/11 Tr. 70:15–20; 71:17–25.

299.    The "index of misallocation" methodology allows one to "quantify[] the degree to which a plan splits administrative geography by race . . . by measuring how much of a minority population would be in" a given geography.  State Ex. 2 at 23; *see also* 5/11 Tr. 71:10-25. As an example, in Tables III.B.2 and 3 of Mr. Bryan's report he explains that one calculates the index of misallocation in this context by comparing the total population in a city to the actual and expected Black populations of the, in this case, congressional districts that split that city. State Ex. 2 at 24. So, looking at Lafayette in the third Galmon Illustrative Plan, 30 percent of the total population for Lafayette is in District 5 yet 67 percent of the total Black population of Lafayette is in that same district. State Ex. 2 at 24. Therefore, according to this example, the Black population of Lafayette is "misallocated" by about 37 percent. *See id*. That is, there is 37 percent "extra" Black population in District 5 than if the population was allocated evenly. *See id.* If the district divided the Black and white populations evenly, one would expect a similar percentage of the Black population to the overall population. *Id*.  That is not what you find in any of the illustrative plans. 5/11 Tr. 97:2–18 (showing that every split in each of the illustrative plans had evidence of misallocation on racial lines).

300.    He developed several tables which show for each plan how many municipalities are split along with how much of the population, and the percentage white or Black, that went into

each piece. 5/11 Tr. 73:3–19; State Ex. 2 at 38–42; State 2(b). And, he conducted the same analysis for parishes. State Ex. 2 at 43–47.

301.    Mr. Bryan also prepared maps of cities split in the Enacted Plan and Illustrative Plans showing the districts contained within particular cities along with shading of census blocks depending on the percentage of Black population therein in order to determine which census blocks are contributing to a majority-minority district: grey for no population, orange for under 25 percent Black, yellow for 25–50 percent Black, light green for 50–75 percent Black, and dark green for over 75 percent Black. 5/11 Tr. 80:9–82:7.

302.    Reviewing the splits in the Enacted Plan in Baton Rouge, Mr. Bryan observed that out of the population of 230,000, 79,000 (or approximately one third of the population) were in District 2, including approximately 5 percent of the white population and 57 percent of the Black population of Baton Rouge, compared to 148,000 (or approximately two thirds of the population) were in District 6, including approximately 95 percent of the white population and 43 percent of the Black population of Baton Rouge. 5/11 Tr. 74:17–76:23. Also, neither Monroe nor Lafayette are split in the Enacted Plan. 5/11 Tr. 77:4–6.

303.    The Robinson Illustrative Plan splits Baton Rouge, Lafayette, and Monroe to carefully separate Black and white voters. Reviewing the Robinson Illustrative Plan, Mr. Bryan observes that this plan is the only plan that splits Baton Rouge into three districts, with 15 percent of the population in District 2, and "roughly equal parts" in Districts 5 and 6. 5/11 Tr. 78:20–79:80:1. 68.64 percent of the white population of Baton Rouge is excluded from Districts 2 and 5, the majority-minority districts in this plan, and placed into District 6. 5/11 Tr. 79:5–16. Mr. Bryan opines that this is notable because the white population in District 6 should be 40 percent if it was being distributed in the same way as the total population, but instead is "over indexed as 28

percentage points more white than total and then proportionally it's lower shares in the two minority districts." 5/11 Tr. 68:13–23. Relatedly, there is "a significantly higher Black population in District 5 than is represented for the total population." 5/11 Tr. 79:17–80:1.

304.    A map showing the split of Lafayette in the Robinson Illustrative Plan reveals that, "[s]imilar to what we see in the Baton Rouge illustrative plans," the city is split "precisely to the edge of where the majority Black neighborhoods are." 5/11 Tr. 83:13–84:5.

305.    Mr. Bryan also observed that the Robinson Illustrative Plan similarly splits the city of Monroe with "a northwest to southeast split," separating the "almost exclusively white" population in the northwest corner of the city from the "very heavily Black part of the city" which is kept in the illustrative majority-minority District 5. 5/11 Tr. 95:6–96:10.

306.    Galmon Illustrative Plan 1 splits Baton Rouge between Districts 5 (a majority-minority district) and 6, with roughly two-thirds of the population in District 5 and one third in District 6; however, the white population is flipped, with approximately one third in District 5 and two-thirds in District 6. 5/11 Tr. 84:23–85:18. Moreover, the "overwhelming majority of the Black population of Baton Rouge was put by the map drawer in District 5 . . . ." 5/11 Tr. 85:1–18. The corresponding map shows that the heavily Black census blocks are drawn into District 5 and confirms that "District 5 has a large share of the Baton Rouge Black population." 5/11 Tr. 86:13–87:1.

307.    Galmon Illustrative Plan 1 splits Lafayette with 70 percent of its population in District 3 and 30 percent in District 5. In comparison, only one-third of the black population in Lafayette is in District 3 with two-thirds in District 5—"almost a 39 percentage point differential between the share of the electorate in District 5 and the Black share of the population that is in

District 5." 5/11 Tr. 87:21–88:13. Mr. Bryan observed that had the map been drawn "race blind," then the share of BVAP would be "consistent with the total population." 5/11 Tr. 88:14–22.

308.    Reviewing a map showing the split of Lafayette in Galmon Illustrative Plan 1 with BVAP percentages overlaid, Mr. Bryan observed that the districts "were drawn in a way that literally were very, very precisely drawn" to place the heavily Black census blocks of Lafayette in majority-minority District 5 while placing the heavily white census blocks of Lafayette in District 3. 5/11 Tr. 89:8–20.

309.    Mr. Bryan observed the same population imbalance in the split of Baton Rouge in Galmon Illustrative Plan 2 as in the other Illustrative Plans – despite a population split of 58 percent in District 5 and 42 percent in District 6, 81 percent of the Black population is in District 5. 5/11 Tr. 90:8–20. And looking at the map Mr. Bryan prepared, he observed a "jagged line" that "was drawn to the block, exactly precisely dividing the Black and white populations there." 5/11 Tr. 91:20–92:2.

310.    Likewise, Galmon Illustrative Plan 2 splits the population of Lafayette approximately one-third in District 2 and two-thirds in District 3, yet "District 3 has overwhelmingly a much higher share of the white population and then the Black population has very -- significantly higher share of District 2, the -- majority-minority district in the plan." 5/11 Tr. 92:14–24. Mr. Bryan's map of Lafayette confirms that Galmon Illustrative Plan 2 places the heavily Black census blocks in majority-minority District 2. 5/11 Tr.92:14–94:8.

311.    In short, Mr. Bryan concluded that while the Illustrative Plans "had just subtle differences in how they drew these boundaries," 5/11 Tr. 89:8–20, every one of the Illustrative Plans that Mr. Bryan reviewed follows the same pattern as the examples he discussed: "there is not one place that was split that was not in a way that put a disproportionate majority share of the

Black population into a majority- minority district." 5/11 Tr. 82:1–83:2; *see also* State Ex. 2 at 39–47.

312.    Mr. Bryan further concluded after reviewing the tables and "the way the maps were very precisely drawn around these different levels of census geography" that "race was a prevailing factor in the design of" the Illustrative Plans. 5/11 Tr. 97:19–98:5; *see also* State Ex. 2 at 39–47; State Ex. 2(b). This is confirmed by the city split maps in Mr. Bryan's reports. State Ex. 2 at 54–101.

F.    Dr. John R. Alford

313.    Dr. Alford was qualified as an expert in "redistricting focusing on the *Gingles* 2 and 3 factors and racially polarized voting." 5/12 Tr. 131:9–13. Alford is a professor of political science at Rice University and has been at Rice for about 35 years. 5/12 Tr. 132:1–7. Alford holds a B.S. in Political Science and a Master's in Public Administration from the University of Houston, a Master's degree and Ph.D. in Political Science from the University of Iowa. 5/12 Tr. 132:8–14.

314.    Alford has previously been qualified as an expert witness in between 30–40 cases, including in voting rights litigation. 5/12 Tr. 132:19–133:3.

315.    He was asked to provide an analysis related to the evidence of racially polarized voting in the joined cases of *Robinson, et al v. Ardoin* and *Galmon, Sr., et al v. Ardoin*, with particular regard to the reports of Lisa Handley and Maxwell Palmer.  State Ex. 1 at 1.

316.    Alford reviewed the reports of Plaintiffs' experts Handley and Palmer as well as their data. 5/12 Tr. 133:19–24. After "spot" checking both Handley and Palmer's data and analysis, Alford concluded that it generally matched his data and calculations. 5/12 Tr. 136:24–137:6. Alford, as well as Handley and Palmer, used a technique that is standard and accepted in the political science/redistricting field called ecological inference or "EI" to study voting behavior. 5/12 Tr. 133:21–136:19.

64

317.    Alford specifically looked at the following elections contests that were also analyzed by Drs. Handley or Palmer or both: the Presidential election contests for 2012, 2016, and 2020; three Republican versus Republican statewide elections from 2015 and 2019; and various other statewide elections from 2014-2020 to assess voter preference. State Ex. 1 at 5-8.

318.    Dr. Alford found that in presidential elections Black voters vote in the low to mid 90 percent for the Democratic candidate irrespective of the race of the candidate. 5/12 Tr. 140:20–141:8.

319.    In analyzing elections that pitted a Republican against another Republican, Dr. Alford concludes that when party "contestation" is removed there is not "really . . . any particular or obvious pattern in terms of a differentiation between how black and white voters vote." 5/12 Tr. 144:2–14.

320.    When voters of both races have a choice between two Republicans, their selectiveness is quite similar.  5/12 Tr. 143:4–10.

321.    When looking at the other statewide elections analyzed by Dr. Handley, he concludes that one sees a pattern of Black preference for Black candidates but one "can't distinguish that from saying the same thing about Democrat versus Republican candidates." 5/12 Tr. 146:5–24.

322.    When looking at races that Dr. Palmer analyzed but Dr. Handley did not, Dr. Alford concludes that "it [is] pretty clear that there is a very strong preference among blacks for Democratic candidates and less strong preference among white voters for Republican candidates; but both the nature of that preference which voters prefer which candidate and the level at which they favor both candidates is remarkably similar to the table that includes racially-contested election." 5/12 Tr. 147:8–148:7.

323.    Dr. Alford notes that the party of the candidate "produc[es] a strong polarization here in voter behavior." 5/12 Tr. 149:3–13. This fact is in part because the party affiliation of the candidate is readily available to all voters because it appears on every ballot. *Id*. The partisan polarization found by Dr. Alford is also evidenced by the fact that the polarization goes away once the candidates are of the same party. 5/12 Tr. 149:3-150:11.

324.    Dr. Alford concludes that "[t]here's clearly partisan polarization. The black voters are voting cohesively for Democratic candidates; white voters are voting cohesively although slightly less cohesively for Republican candidates. . . . [T]hat's what the election analysis provided by" Drs. Handley and Palmer shows. 5/12 Tr. 151:10–21. In summary Dr. Alford concludes that "from the evidence that's been provided here, I don't think there's any question that the party affiliation of candidates is the driving force in [explaining divergent voting patterns between Blacks and whites in Louisiana] and not the race of the candidate. 5/12 Tr. 153:1–9.

325.    However, in a Republican versus Republican contest, such as the Attorney General election in 2015, Alford concluded that when you take away the element of Democrat versus Republican, we don't see any particular or obvious pattern in terms of a differentiation between how Black and white voters vote.  5/12 Tr. 144:2–14.

326.    In the final analysis, Alford concluded that the party affiliation of the candidates is the driving force for voter behavior and not the race of the candidates.  5/12 Tr. 153:1–9.

327.    Ultimately, it was not the analysis that Drs. Handley and Palmer conducted but their conclusions that Dr. Alford questioned. 5/12 Tr. 162:15-164:12.

G.    Dr. Alan Murray

328.    Dr. Alan Murray was qualified as an expert in demographic analysis, spatial analytics as it relates to race, and statistics. 5/13 Tr. 6:20–7:15. Dr. Murray has a B.S. in Mathematics, an M.A. in Statistics and Applied Probability, and a Ph.D. in Geography all from

the University of California at Santa Barbara. State Ex. 4 at 2, 27. Dr. Murray has 287 publications that have been cited a total of approximately 16,590 times. State Ex. 4 at 2. In total, Dr. Murray has over 30 years of experience in spatial analytics. State Ex. 4 at 2.

329.    Dr. Murray looked at the population distribution of Black and white populations in Louisiana and concluded that they "are not distributed in the same manner geographically." 5/13 Tr. 12:1–8; State Ex. 4 at 20, 25.

330.    Dr. Murray also found that the distribution of white individuals living near white individuals and Black individuals living near other Black individuals is statistically significant across the state. State Ex. 4 13–22.

331.    Dr. Murray confirmed the same result at the local level for New Orleans and Baton Rouge, that there is segregation in Louisiana both at the statewide and local level. State Ex. 4 at 22.

332.    Dr. Murray also showed that Monroe and Baton Rouge are 152 miles away "as the crow flies." 5/13 Tr. 21:7–16; *see also* State Ex. 4 at 24.

H.    Dr. Tumulesh Solanky

333.    Dr. Tumulesh Solanky was accepted by the Court as an expert in mathematics and statistical analysis.  5/11 Tr. 164:24–165:1.

334.    Dr. Solanky is a professor of mathematics, and the current chair of the mathematics department, at the University of New Orleans.  5/11 Tr. 166:14–167:4; SOS_4 at p 15.  He is currently the chair of the mathematics department, a position he's held for fourteen years.  *Id*.  Dr. Solanky also serves as the University of Louisiana System Foundation and Michael and Judith Russell professor in data science.  *Id.*

335.    Dr. Solanky routinely serves as a qualified expert in statistics and mathematics in state and federal court for plaintiffs, and defendants, as well as by court appointment.  5/11 Tr.

167:8–168:16.  Dr. Solanky has also offered his expertise to other government agencies like the FBI and NASA. *Id.*  In this case, Dr. Solanky looked at the voting patterns in the State of Louisiana and illustrative plans for District 5, and in particular, East Baton Rouge Parish. 5/11 Tr. 168:17–25.

336.    To conduct his initial analysis, Dr. Solanky relied on data supplied from the Secretary of State that specified the amount of registered voters in the state as of the November 2020 election, the amount of registered voters that actually voted in the 2020 presidential election, and the race, gender, and parish of the registered voters.  5/11 Tr. 169:17–170:12. With additional time, Dr. Solanky examined more elections, and found this pattern held true for additional elections. 5/11 Tr. 200:14–201:14.

337.    In general, Dr. Solanky found that voting patterns in Louisiana vary.  5/11 Tr. 169:11–16.  He found high voter participation in the presidential races, but in other races noted much lower turnout.  SOS_5 at 3–6; 5/11 Tr. 187:2–189:11. He also concluded that East Baton Rouge Parish votes "very differently" from the other parishes that are under consideration for inclusion in Congressional District 5.  5/11 Tr. 169–8:11.

338.    To do this, Dr. Solanky analyzed the total number of registered voters as of the November 2020 presidential election broken down by race for the 28 parishes that are in consideration under the various illustrative plans for Congressional District 5.  5/11 Tr. 169:25–170:9; SOS_4 at 6–8.

339.    With regard to East Baton Rouge Parish, Dr. Solanky testified that there are more registered white voters in East Baton Rouge Parish than registered Black voters in East Baton Rouge Parish.  5/11 Tr. 171:21–172:22; SOS_4 at 6–8.    Additionally, 113,622 white voters in East Baton Rouge Parish voted in the November 2020 presidential election, which is "significantly

larger" than the 85, 672 Black voters in East Baton Rouge Parish that voted in the same election. *Id.*

340.    Dr. Solanky testified that this performance in East Baton Rouge Parish contrasted with other Parishes that would be partially or wholly included in the illustrative Fifth Congressional districts. 5/11 Tr. 173:1–174:9; 179:9–180:19. For example, Dr. Solanky testified that East Carroll Parish, Tensas Parish, Madison Parish, and St. Helena Parish all were majority Black parishes, who did not need white crossover voting to elect the minority candidate of choice in the 2020 Presidential Election. *Id.*

341.    Dr. Solanky also testified that he found that Iberville Parish, which contained numbers of white voters and Black voters that are "split quite evenly" needed white crossover voting for the minority candidate of choice to be elected in the 2020 presidential election. 5/11 Tr. 177:14–178:7.

342.    In order to estimate the number of votes each candidate received, broken down by Race, Dr. Solanky was able to calculate the total votes by race by first calculating the percentage of voters who voted in the November 2020 general election, but not the November 2020 presidential election, which equated to .98 percent.  5/11 Tr. 175:5–176:19. Once Dr. Solanky assigned this percentage proportionally, he was then able to estimate the total amount of voters by race, which is depicted in the three columns in table 6 of his report.  *Id.*

343.    Dr. Solanky read the reports of Dr. Palmer and Dr. Handley and he does not recall them mentioning how they accounted for individuals who may have voted generally in an election, but may not have voted in a particular race.  5/11 Tr. 176:20–177:5.

344.    Dr. Solanky further examined the voting patterns in the 19 parishes that make up Mr. Cooper's illustrative plan 1 broken down by race and voting pattern for the 2020 Presidential election. 5/11 Tr. 178:8–179:8.

345.    Out of the 19 parishes in Mr. Cooper's illustrative Plan 1, Dr. Solanky explained that President Biden carried 5 of those parishes, including East Baton Rouge, East Carroll, Madison, St. Helena, and Tensas.  5/11 Tr. 179:9–17. Of those parishes Dr. Solanky testified that East Baton Rouge Parish differs from the four other parishes in that it not a Black majority parish, while the other four parishes are Black majority parishes.  5/11 Tr. 179:18–180:19. Despite this, when examining the margin of victory in each of the 5 parishes that carried President Biden, Dr. Solanky found that East Baton Rouge Parish fell in the middle with a 13 percent margin of victory. *Id.* This means that East Baton Rouge Parish, a majority white parish, was carried by President Biden by a larger percentage than some parishes with a supermajority of minority voters. *Id.*

346.    Dr. Solanky then quantified the voting patterns in the 19 parishes of Mr. Cooper's illustrative plan 1.  5/11 Tr. 181:5–18. Dr. Solanky did this through Figure 1 of his report, which he explained in detail during the hearing. *Id.* Dr. Solanky testified that Figure 1 (going from left to right) showed the percentage of white voters compared to Black voters increasing, and going from bottom to top shows the difference in votes between President Biden and Trump. *Id.*  The line that runs through the figure is the regression line, which is a mathematical representation of where the letters B and T fall on the figure. 5/11 Tr. 181–182:19. The closer the dots or letters are to the line, means that the better fit of the regression line. *Id.* The regression line examining the 2020 presidential election was a good fit, and able to explain 94.71 percent of the variation of the data. SOS_4 at 13. The letter B represents parishes that were won by President Biden and T represents parishes win by Trump.  5/11 Tr. 182:17–23.  Letters that appear above the regression line indicate

parishes that are more supportive of Trump than the trend, and letters that appear below the regression line indicate parishes more supportive of Biden than the trend.  5/11 Tr. 182:24–183:12.

347.    Dr. Solanky testified that East Baton Rouge Parish fell significantly below the regression line in figure 1 of his report, which means there was significant voting in favor of President Biden instead of Trump compared to the observed trend from the 18 other parishes.  5/11 Tr. 183:13–184:5. Dr. Solanky opined that, in his expert opinion, this made East Baton Rouge Parish a statistical outlier in comparison to the other parishes in Mr. Cooper's illustrative plan one. *Id.* Dr. Solanky further explained that he could state that East Baton Rouge Parish was a statistical outlier with mathematical certainty, as East Baton Rouge Parish fell outside of the confidence interval, which indicated that the variation of East Baton Rouge Parish's voting patters could not be "attributed to by chance at all." 5/11 Tr. 184:4–15.

348.    In response to criticism from Dr. Handley that Dr. Solanky only reached his conclusions by examining one election, Dr. Solanky looked at other elections to see if the voting patterns in East Baton Rouge Parish were a statistical outlier under those elections, too. 5/11 Tr. 185:7–24. Dr. Solanky examined an additional 7 statewide elections. 5/11 Tr. 186:1–7; SOS_5 at 13–20. In examining these elections Dr. Solanky found that voter turnout for the presidential elections was significantly higher than other elections, especially as compared to special elections like the 2018 Secretary of State Election, which had a fourth of the voters statewide, as the 2020 presidential election. 5/11 Tr. 187:2–189:11. Dr. Solanky also criticized Dr. Handley's reliance on the 2018 Secretary of State election, stating that as a mathematician, it would be improper to give a special election like the December 2018 election, with significantly lower turnout, the same weight in an analysis as other elections. 5/11 Tr. 189:12–19.

349.    An analysis of the additional 7 statewide elections confirmed Dr. Solanky's previous findings. SOS_5 at 6-20; 5/11 Tr. 190:12–191:5. For example, when examining the 2019 Secretary of State election, Dr. Solanky found that when examining the parishes in Mr. Cooper's illustrative plan 1, the same 5 parishes that voted for President Biden in the 2020 presidential election, voted for the minority candidate of choice, Ms. Greenup in that election. 5/11 Tr. 191:141–193:14. As with the 2020 Presidential election, the minority candidate of choice, Ms. Greenup, could not have carried East Baton Rouge Parish without white crossover voting. *Id*. And as with the 2020 presidential election, when comparing the voter trend of the 19 parishes in Mr. Cooper's illustrative plan 1, East Baton Rouge Parish was again a statistical outlier. 5/11 Tr. 194:21–195:21. The same was true of the 2016 presidential election, which also had a high level of voter turnout. 5/11 Tr. 196:20–197:24.

350.    In fact, for each of the elections Dr. Solanky examined, East Baton Rouge Parish voted significantly differently than the trend shown in the remaining 18 parishes in Mr. Cooper's illustrative plan 1. 5/11 Tr. 198:7–201:14. And in 7/8 of those elections, that difference was statistically significant, meaning the difference cannot be explained by chance alone. 5/11 Tr. 201:17–202:23. Dr. Solanky was further able to show a significant amount of white crossover voting leading to a victory in East Baton Rouge Parish of the minority candidate of choice, particularly the 2020 Presidential Election, the 2016 Presidential Election, the 2019 Secretary of State Election, the 2019 Governor Election, the 2015 Governor Election. SOS_5 at 13–20. This allowed Dr. Solanky to conclude that East Baton Rouge Parish, which makes up over 1/3 of the parish populations making up Mr. Cooper's illustrative plan 1, voted significantly different than the voter trend of the remaining 18 parishes, in favor of the democratic, or minority preferred candidate. 5/11 Tr. 205:12–206:23; SOS_4 at 13.

## [PROPOSED] CONCLUSIONS OF LAW

### I.    The Legal Standard

351.    "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Preliminary injunctions "favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned." *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997). Mandatory injunctive relief "is particularly disfavored, and should not be issued unless the facts and the law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *see also Miami Beach Fed. Sav. & Loan Assoc. v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) ("A mandatory injunction, especially at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.").

352.    "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24. It may not be awarded unless "the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *PCI Transp. Inc. v. Fort Worth & W.R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (quoting *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195 (5th Cir. 2003)).

### II.    Likelihood of Success on the Merits

353.    The question before the Court is whether Plaintiffs are likely to succeed on their claim under Section 2 of the Voting Rights Act (VRA). 52 U.S.C. § 10301. There are two types of Section 2 claims, an intent claim, which is coterminous with a Fifteenth Amendment claim, and

73

an effects claim, which Congress created in 1982 in response to the Supreme Court's decision in *City of Mobile, Ala. v. Bolden*, 446 U.S. 55 (1980). *See Chisom v. Roemer*, 501 U.S. 380, 383–84 (1991). Plaintiffs have not asserted an intent-based claim. They rely solely on the effects element.

354.    A Section 2 effects challenge to a redistricting plan is governed by the standard of *Thornburg v. Gingles*, 478 U.S. 30 (1986), and its progeny. Under this test, a challenger must first establish "three threshold conditions" called the *Gingles* preconditions. *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017). "First, a 'minority group' must be 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district." *Id.* (quoting *Gingles*, 478 U.S. at 50). "Second, the minority group must be 'politically cohesive.'" *Id.* (quoting *Gingles*, 478 U.S. at 51). "And third, a district's white majority must 'vote sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Id.* (quoting *Gingles*, 478 U.S. at 51) (edit marks omitted). "Those three showings . . . are needed to establish that 'the minority group has the potential to elect a representative of its own choice' in a possible district, but that racially polarized voting prevents it from doing so . . . .'" *Id.* (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

355.    The *Gingles* preconditions only begin the inquiry; they do not end it. "The three Gingles preconditions are necessary but not sufficient to prove vote dilution." *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1395 (5th Cir. 1996). "The question which the court must answer in a section 2 case is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) (citation omitted). The inquiry "depends upon a searching practical evaluation of the past and present reality" and on a "functional view of the political process." *Id. See also Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994).

356.    If a plaintiff satisfies the *Gingles* preconditions, the inquiry then shifts to the totality of the circumstances test under 52 U.S.C. § 10301(b). Under that test, "the plaintiffs must further prove that under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Clark,* 88 F.3d at 1395 (citation and quotation marks omitted). "Although unlawful vote dilution 'may be readily imagined and unsurprising' where the three *Gingles* preconditions exist, that conclusion 'must still be addressed explicitly, and without isolating any other arguably relevant facts from the act of judgment.'" *Id.* (citation omitted). The totality-of the circumstances inquiry is guided by the so-called Senate factors, often known as the *Zimmer* factors in the Fifth Circuit, which are quoted from the 1982 amendments senate report in *Gingles*, 478 U.S. at 44–45. *Clark*, 88 F.3d at 1396.

357.    The VRA must not be interpreted in a vacuum. This is because, while Section 2 sometimes requires redistricting authorities to consider race in redistricting, at the same time "federal law restrict[s] the use of race in making districting decisions." *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018). "The Equal Protection Clause forbids 'racial gerrymandering,' that is, intentionally assigning citizens to a district on the basis of race without sufficient justification." *Id.* (citing *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (*Shaw I*)). Districting maps that "sort voters on the basis of race 'are by their very nature odious.'" *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (quoting *Shaw I*, 509 U.S. at 643). As a result, purposefully creating a new majority-minority district is presumptively unconstitutional. *See Cooper*, 137 S. Ct. at 1468–69.

358.    In the face of these "'competing hazards of liability,'" the Supreme Court has "assumed" that "compliance with the VRA may justify the consideration of race in a way that

would not otherwise be allowed." *Abbott*, 138 S. Ct. at 2314 (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion)). The Supreme Court has never held this, however. *See Miller v. Johnson*, 515 U.S. 900, 927 (1995) (observing that this assumption raises "troubling and difficult constitutional questions"). And, in any event, a state's burden to satisfy "strictest scrutiny" is demanding. *Id.* at 915. A redistricting authority has never successfully justified racially predominant redistricting in any Supreme Court case by asserting Section 2 as a defense.

359.    In this case, Plaintiffs have not presented evidence showing that the Legislature had a strong basis in evidence to believe that two majority-minority districts are required in the congressional plan at the time of redistricting. All evidence presented in this case is new; none of it was before the Legislature when it drew the plans. The legislative record indicates that assertions of Section 2-compelled need to create a second majority-minority district were not backed up with evidence. Thus, it is clear that, had the Legislature adopted a configuration along the lines of what Plaintiffs seek here, it would have violated the Equal Protection Clause.

360.    In all events, Plaintiffs are unlikely to succeed on the merits of their Section 2 claim, even after a generous opportunity to make the requisite showing.

A.    The First *Gingles* Precondition

361.    The first *Gingles* precondition requires a challenger to establish that the relevant minority group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district." *Cooper*, 137 S. Ct. at 1470 (quoting *Gingles*, 478 U.S. at 50). A majority means just that: 50 percent of the voting-age population plus one. *See Bartlett v. Strickland*, 556 U.S. 1 (2009). This precondition "specifically contemplates the creation of hypothetical districts." *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 (5th Cir. 1993).

362.    In this case, the two sets of Plaintiffs hired demographic experts who presented a total of six illustrative plans, four at the initial stage of preliminary-injunction briefing and two

more in rebuttal reports—one of which had to be amended. This was a highly sophisticated effort, but sometimes sophistication does more to reveal flaws in a case than overcome them.

363.    The evidence shows that it is not easy to create a Louisiana congressional districting plan with two districts crossing the 50 percent threshold. There are not many configurations that can accomplish this. That should be no surprise. In the 1990s, the Louisiana Legislature twice heeded calls to create a second majority-minority district, and these plans were twice invalidated as racial gerrymanders. *Hays v. Louisiana*, 839 F. Supp. 1188, 1195 (W.D. La. 1993) (*Hays I*); *Hays v. Louisiana*, 936 F. Supp. 360, 368 (W.D. La. 1996) (*Hays IV*).

364.    As discussed in the findings of fact, the Black percentage of the population has not meaningfully grown since 1990. Plaintiffs have referenced a growth in Hispanic population, but the Hispanic group is not alleged to have suffered vote dilution, and no evidence was presented establishing that the Hispanic population is part of a legally significant coalition with the Black population. *Cf. Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989).

365.    Thus, it is only through a very specific set of contortions that a second majority-minority district can be extracted from Louisiana's demographics. All of Plaintiffs' illustrative plans are similar in that they combine East Baton Rouge Parish with territory far away in northeast Louisiana, known as the delta region or delta parishes. All the illustrative plans provide variations on this theme, and there can be no serious question that the configuration was chose precisely because that configuration alone can achieve the over 50 percent BVAP target Plaintiffs must achieve to create a majority-minority district.

366.    This fundamental feature of this case raises troubling questions both of racial gerrymandering and compactness. It ultimately dooms Plaintiffs' request for a preliminary injunction, which requires a clear showing that they are likely to succeed.

1.    Racial Gerrymandering

367.    "The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) (quoting *Miller*, 515 U.S., at 911). Race therefore must not be "the predominant factor motivating" the "decision to place a significant number of voters within or without a particular district." *Id.* (quoting *Miller*, 515 U.S. at 916).

368.    Although the predominance test is typically applied where a state redistricting authority is accused of racial gerrymandering, there is no colorable argument that a federal court is permitted to violate the Constitution where a legislature would be prohibited from doing so. The Court may not impose on Louisiana a redistricting scheme that Louisianans could not obtain from their own elected representatives. *Dillard v. City of Greensboro*, 74 F.3d 230, 233–34 (11th Cir. 1996) ("Whether a redistricting plan is adopted by a court or a legislature does not affect a party's right to challenge the plan.").

369.    For the same reason, Plaintiffs' alternative plans cannot be deemed "reasonably configured," *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022), when they "segregate the races for purposes of voting." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (*Shaw I*). A plan that links "distinct locations" on the basis of race does not satisfy the first *Gingles* precondition. *Sensley v. Albritton*, 385 F.3d 591, 597 (5th Cir. 2004).

370.    The hearing evidence established that race was "the predominant factor motivating the placement of voters in or out of a particular district"—namely, Plaintiffs' remedial versions of CD2 and CD5. *Wis. Legislature*, 142 S. Ct. at 1248. Although Plaintiffs' demography experts, Messrs. Fairfax and Cooper, denied that race predominated, these assertions are purely semantic. Under the legal definition of predominance, their choice to "consciously dr[a]w the district[s] right

around 50 percent [BVAP]" to "satisf[y] that first pre-condition," 5/9 Tr. 217:18–23, qualifies as suspect race-based redistricting.

371.    Racial predominance occurs when (1) a mapmaker "purposefully established a racial target," such as that "African-Americans should make up no less than a majority of the voting-age population," and (2) the racial target "had a direct and significant impact" on the district's "configuration." *Cooper*, 137 S. Ct. at 1468–69. Predominance may be shown through either direct or circumstantial evidence. *Bethune-Hill*, 137 S. Ct. at 797. Here, both types of evidence clearly establish predominance.

(a)    Direct Evidence

372.    The direct evidence establishes both the intent to draw districts above a racial target and that target's direct and significant impact on district lines.

373.    As to the first element, there is no question that Plaintiffs' experts set out to draw majority-minority districts. Mr. Fairfax admitted he was "using [a] 50 percent voting age population as" a "threshold" to comply with *Gingles*, 5/9 Tr. 208:2–4, and that he purposefully drew CD2 and CD5 above 50 percent for the same reason, 5/9 Tr. 218:18–22; *see also id.* 206:25–207:4 (Mr. Fairfax conceding that he was "focused on complying with the first *Gingles* precondition"); *id.* 206:18-22 (similar). This testimony compels a finding of predominance. *See Cooper*, 137 S. Ct. at 1469 (holding that lower court "could hardly have concluded anything but" predominance where mapmaker attested to intent to draw a majority-minority district).

374.    Likewise, Mr. Cooper testified that a plan with two majority-minority districts was non-negotiable:

> Q. During your map drawing process did you ever draw a one majority minority district?

A. I did not because I was specifically asked to draw two by the plaintiffs.

5/9 Tr. 123:1–4. This, too, qualifies as a racial target. *See Cooper*, 137 S. Ct. at 1469 ("[W]hen (as here) race furnished 'the overriding reason for choosing one map over others,'" racial predominance exists (quoting *Bethune-Hill*, 137 S. Ct. at 799); *see also Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*).

375.    As to the second element, the evidence establishes "a direct and significant impact on the drawing of at least some of [CD5's and CD2's] boundaries." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 274 (2015). Mr. Fairfax testified that he was using a 50 percent threshold for the purpose of "pulling in Black population for these [majority-minority] districts," 5/9 Tr. 207:23–208:2, which is the essence of a target's direct and significant impact, *see Cooper*, 137 S. Ct. at 1468–69. In fact, Mr. Fairfax testified that he consulted racial data at the outset of map-drawing "to get an idea where the Black population is inside the state in order to begin drawing," 5/9 Tr. 208:6–8, because "you can't draw a plan in an area where Black population doesn't exist," *id.* 209:22–23. Then, Mr. Fairfax continued assigning voters on the basis of race, to "pull the BVAP percentages back up to check [his] work." *Id.* 210:9–12; *see also id.* 211–13 (similar).

376.    And Mr. Fairfax testified that drawing a least change plan was not an option because that would not produce a majority-minority district. 5 Tr. 204:21–22; *see Cooper*, 137 S. Ct. at 1468–69 (departing from prior map for race-based purpose amounted to predominance). He founded the architecture of the plan on racial data and continued moving voters throughout the process on the basis of race to achieve a 50 percent BVAP target. That is "a textbook example of race-based districting." *Cooper*, 137 S. Ct. at 1469 (citation and quotation marks omitted).

377.   Mr. Cooper conceded that he only attempted districting configurations—combining East Baton Rouge Parish with "majority Black" territory in the delta—he knew would achieve two majority-minority districts. 5/9 Tr. 130:25–131:9, 131:24–132:4; *see also id.* 124:19–125:1 (conceding he "stopped" adding BVAP to CD-5 after reaching 50.04 percent because, when the district achieved the ideal population, "it was still above 50 percent BVAP"); *id.* 155:11–14 (acknowledging achievement of *Bartlett v. Strickland*'s "50 percent plus 1" rule).

(b)   Circumstantial Evidence

378.   The circumstantial evidence erases any lingering doubt on the question of predominance. As discussed, only one type of configuration has been shown to be available to achieve Plaintiffs' majority-minority goal, and there can be no serious factual contention that they purposefully identified that configuration and made only adjustments from that foundation that achieved the majority-minority target.

379.   One piece of evidence that bears this out is the simulations method employed by Dr. Blunt. Dr. Blunt simulated 10,000 Louisiana redistricting plans according to neutral, non-racial criteria that Messrs. Cooper and Fairfax claimed to have implemented in their illustrative plans, and not *one* plan produced even *one* majority-minority district. 5/12 Tr. 35:25–36:6. In other words, a computer that was not looking for the precise configuration Plaintiffs needed to hit the 50 percent target did not find it through race-neutral means. This is powerful, if not dispositive, evidence that race was the predominant reason the configuration was chosen.

380.   Plaintiffs' contrary position that simulations do not shed light on intent defies common sense. With 10,000 tries, a computer failed to achieve even *one* majority-minority district through race-neutral means. It is virtually impossible that Plaintiffs' experts stumbled upon *two* such districts without the predominant intent of finding them in Louisiana's diverse population.

81

381.    Plaintiffs have suggested that the simulations method does not establish predominance because it does not measure degree. They reason that, because some degree of racial awareness and intent is permissible (the test being *predominance* not *awareness*), the simulations method cannot distinguish between permissible levels of race-based redistricting and predominant racial intent that is constitutionally suspect. This argument is unavailing.

382.    To the extent Plaintiffs mean to argue simply that predominance is a legal conclusion for the Court to adjudicate, that is axiomatic and beside the point. Courts are always faced with discerning the legal significance of evidence, but that does not render the evidence itself relevant to the adjudication. Quite the opposite, evidence that sheds light on a legal question is highly relevant; it need not be dispositive standing alone to inform a court's legal judgement.

383.    To the extent Plaintiffs mean to argue that the simulations method is not probative on the degree of racial intent, they are plainly wrong. It is certainly a matter of *degree* to reveal that not even *one* majority-minority district is created in 10,000 rolls of the redistricting dice. Plaintiffs would have a better argument if there was a closer comparison—say, if most of the simulations had at least one majority-minority district, if some had two, or if the difference between the simulations ensemble and the result of their work were otherwise closer. But the gulf between the race-neutral ensemble and the illustrative plans is so stark that, absent predominant intent, it is practically impossible to have occurred.

384.    Courts have, accordingly, consistently found simulations methods highly relevant to the question of redistricting intent. *See, e.g.*, *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978 (S.D. Ohio), *vacated and remanded on other grounds*, *Chabot v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 102 (2019); *League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867 (E.D. Mich.), *vacated on other grounds sub nom. Chatfield v. League of Women Voters of*

82

*Mich.*, 140 S. Ct. 429 (2019); *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333 (4th Cir. 2016); *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 251 F. Supp. 3d 935, 937 (M.D.N.C. 2017); *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 2018 U.S. Dist. LEXIS 146635 (M.D.N.C. August 27, 2018); *Harper v. Hall*, 2022-NCSC-17, 868 S.E.2d 499; *Adams v. DeWine*, 2022-Ohio-89, 2022 WL 129092 (Jan. 14, 2022); *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-65, 2022 WL 110261 (Jan. 12, 2022); *League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737 (2018); *Harkenrider v. Hochul*, No. 22-00506, 2022 WL 1193180 (N.Y. App. Div. Apr. 21, 2022), *aff'd as modified*, No. 60, 2022 WL 1236822 (N.Y. Apr. 27, 2022); *Common Cause v. Lewis*, 2019 N.C. Super. LEXIS 56 (N.C. Super. Ct. Sep. 3, 2019). The Fourth Circuit reversed as clearly erroneous a district court's decision *not* to credit a simulation method in ascertaining intent. *Raleigh Wake Citizens Ass'n*, 827 F.3d at 344; *cf. Gonzalez v. City of Aurora, Ill.*, 535 F.3d 594, 600 (7th Cir. 2008).

385.    Another fact bearing on this inquiry is that Plaintiffs' own expert has admitted that Dr. Blunt's method is valid. Dr. Palmer testified that Dr. Blunt used a "standard redistricting package that's widely available and one that [he's] used a lot in [his] own academic work." 5/9 Tr. 329:25–330:2. It is also telling that Plaintiffs' counsel either did not ask Dr. Palmer (or another qualified expert) to run simulations or else they did not submit the results. *Id.* 346:22–347:13. This was not for lack of sophistication or funding: Plaintiffs' presentation was otherwise a state-of-the-art presentation relying on the latest technology and social-science methods. If some other method of simulations, or different parameters, undercut Dr. Blunt's conclusion, Plaintiffs surely would have figured that out and presented their findings.

386.    Indeed, although Dr. Palmer criticized Dr. Blunt's simulations parameters, the evidence indicates that different parameters would not change the result. Dr. Palmer asserted that

Dr. Blunt's criteria were too restrictive, but when Dr. Blunt re-ran his simulations under far more lenient criteria, the 10,000 maps produced still contained *no* majority-minority district. 5/12 Tr. 45:4–48:4. That means, with 40,000 maps simulating 240,000 districts absent racial parameters, not a single majority-minority district emerged.

387.    A careful review of the district lines themselves showed why that is and provides further evidence of racial predominance. Evidence "such as stark splits in the racial composition of populations moved into and out of disparate parts of the district" demonstrates predominance. *Bethune-Hill*, 137 S. Ct. at 800. Mr. Bryan thoroughly demonstrated that these stark splits pervade CD2 and CD5 in each of the Plaintiffs' illustrative plans, *see generally* 5/11 Tr. 61–100.

388.    Mr. Bryan showed that, with nearly surgical precision, predominantly Black portions of Baton Rouge, Monroe, Lafayette, and other localities were placed into majority-minority districts, and predominantly white portions were placed elsewhere. 5/11 Tr. 86:4–88:13, 95:6–96:10. This pattern was also true at the census block level, as the lines "were very, very precisely drawn with blocks that were 50 percent or more Black population on one side of the line and less than 50 percent, sometimes less than 25 percent of the population on the other side of the line being white population." 5/11 Tr. 89:13–20. Mr. Cooper did not deny, for example, that in one of his illustrative plans, he assigned 88.45 percent of Ouachita Parish's Black population into his illustrative CD5, as well as 72.78 percent of East Baton Rouge Parish's Black population. 5/9 Tr. 136:1–19.

389.    This overriding evidence of predominance is sufficient to override direct denials of predominance. *See Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 144–75 (E.D. Va. 2018) (three-judge court).

390.    Moreover, the incentives brought to bear on Messrs. Fairfax and Cooper undergird the overwhelming evidence of predominance and undercut their confusing denials. Plaintiffs hired Messrs. Fairfax and Cooper and charged them with preparing plans containing two majority-minority districts. It is eminently plausible that they employed a high degree of intentionality in doing so and implausible that they did not. Experts have no incentive to produce reports undermining the claims of the parties that hire them.

391.    In some cases, the districts were majority Black VAP using the most expansive definitions of race, as noted in Defendants' proposed conclusions of law, by only a couple of hundred individuals out of several hundred thousand total voting age population residents. This result does not occur without precise focus on racial targets.

392.    And, here, only a limited set of configurations could achieve the majority-minority goal—i.e., configurations containing Baton Rouge, Monroe, and other parts of the delta region with large percentages of Black residents. Only by building their plans around the goal of two majority-minority districts could that goal be achieved. Plaintiffs' experts surely did not stumble upon such configurations as the mere byproduct of non-racial goals.

393.    Finally, it bears emphasizing that the standard of predominance is lower here than in the numerous Supreme Court cases where racial predominance was found or affirmed. In those cases, the presumption of good faith afforded to state legislatures and the unique sensitivity in redistricting demand that courts "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Bethune-Hill*, 137 S. Ct. at 797 (citation and quotation marks omitted). No presumption of good faith or need for extraordinary caution exists when courts evaluate evidence presented by litigants' hired experts.

(c)    Plaintiffs' Contrary Factual Arguments

394.    Plaintiffs' experts, through their testimony and otherwise through examination by counsel at the hearing, attempted to argue that race was not predominant in their illustrative plans. These fail to persuade and are largely rejected in binding precedent.

395.    First, Plaintiffs attempted to reframe the terms of the inquiry, which measures the impact of racial intent against the impact of traditional districting principles or other criteria, on the district lines. Plaintiffs asserted that "diluting minority voting strength" is among "the traditional districting factors" that exists in contradistinction to a racial goal. *See, e.g.*, 5/9 Tr. 97:17–98:5; PR-86 at 8. In other words, they tried to argue that their purposeful intent in creating majority-minority districts does not count as predominance, but rather as a traditional districting principle that can cut against a finding of predominance.

396.    That is wrong as a matter of law. The Supreme Court defines traditional districting principles for the purpose of the racial-predominance test as "*race-neutral* districting principles," *Bethune-Hill*, 137 S. Ct. at 797 (quoting *Miller*, 515 U.S. at 916) (emphasis added). Creating majority-minority districts is a *race-based* goal. *Wis. Legislature*, 142 S. Ct. at 1248–51; *Cooper*, 137 S. Ct. at 1468–69. Plaintiffs' experts admitted that the so-called goal of avoiding racial vote dilution was achieved by drawing majority-minority districts. 5/9 Tr. 154:24–155:7. That is a racial goal, not a neutral goal, and Plaintiffs' misunderstanding of the difference is itself evidence that race did predominance, as their denials seem to be informed by an error of what predominance is.

397.    Second, Plaintiffs appear to argue that the race-based goal of creating a majority-minority district falls short of predominance so long as the mapmaker has "followed other traditional redistricting principles." 5/9 Tr. 155:4–7; *accord id.* 222:12–19. At one time, this argument would have had some currency, as "[c]ertain language in *Shaw I* can be read to support requiring a challenger who alleges racial gerrymandering to show an actual conflict with traditional

86

principles." *Bethune-Hill*, 137 S. Ct. at 798. But, in *Bethune-Hill*, the Supreme Court rejected this standard and held that "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering." 137 S. Ct. at 799. It is only "persuasive circumstantial evidence tending to show racial predomination." *Id.* In *Cooper*, the Court reaffirmed this holding and clearly established the above-described predominance test. 137 S. Ct. at 1469 n.3 (quoting *Bethune-Hill*, 137 S. Ct. at 799). That is, predominance occurs where (1) a mapmaker "purposefully established a racial target," such as that "African-Americans should make up no less than a majority of the voting-age population," and (2) the racial target "had a direct and significant impact" on the district's "configuration." *Id.* at 1468–69.

  398. As discussed, the *Cooper* test is met: Plaintiffs' experts had a majority-minority goal, and they configured their entire plans around it, making innumerable choices on the foundation of that race-based architecture. That is a racial target having a direct and significant impact on lines.

  399. Third, Plaintiffs are not even correct in their assertions about what an actual conflict with traditional districting principles means. For example, they argue that compliance with the one-person, one-vote principle is among the traditional districting principles that stand in contradistinction to racial motivation. *See, e.g.*, 5/9 Tr. 97:17–98:5. But "the equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.' Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met." *Ala. Legislative Black Caucus*, 575 U.S. at 272. This criterion, then, is not a traditional principle that can be weighed against racial intent in the

predominance analysis. Their assertions, in effect, that *race* did not predominate but rather *equalization* predominated do not speak to the predominance question—why did *some* voters get moved in or out of a district, rather than *others*, for equalization to be achieved? The answer, across the board, was that the *race* of the voters dictated those choices.

400.    Plaintiffs also assert that their experts' use of race is not suspect because racial identity is a facet of communities of interest. *See, e.g.*, 5/9 Tr. 289:13–22 (Cravins); 5/10 Rough Tr. 177–78 (Lichtman). But this is just another suspect use of race. "[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 137 S. Ct. at 1473 n.7; *Miller*, 515 U.S. at 914 (stating that the "use of race as a proxy" for "political interest[s]" is "prohibit[ed]"). This is yet another admission of racial predominance.

401.    At times, Plaintiffs' expert Mr. Fairfax tried to claim that he was not following racial data, but rather was looking at socio-economic data in the line-drawing. This is unavailing and lacking in credibility. As an initial matter, it ignores that Mr. Fairfax *began* his mapmaking exercise by first locating the general area of Black residents in Louisiana, making race the very foundation of his map. That he *later* looked to socio-economic information to guide marginal changes ignores that the predominant purpose had already been established.

402.    Moreover, Mr. Fairfax's own data betrays his testimony. Mr. Fairfax testified, consistent with how the Census Bureau reports information, that his socio-economic data was reported at the census-tract level. *See* 5/9 Tr. 187:10–20, 226:14–16. That is a higher level of census geography than the census-block level: a census tract is an assemblage of a group of census blocks, which are the smallest units of census geography. But Mr. Bryan showed that Mr. Fairfax made race-based choices at the census-block level. These choices cannot be explained by socio-

economic data because the data was not available at the census-block level to allow him to make the surgical divisions of population that he made using such data. But Mr. Fairfax certainly had the *racial* data down to the block-level. Efforts to make similar arguments have consistently been rejected in precedent. *See Bush v. Vera*, 517 U.S. 952, 970–17 (1996) (plurality opinion) (rejecting argument that political data governed decisions made at the census block level, where only racial data was available); *Bethune-Hill*, 326 F. Supp. 3d at 175 (similar).

403.    Nor can Plaintiffs credibly blame housing patterns for their experts' purposeful choice to draw race-based lines. *See, e.g.*, 5/9 Tr. 114:7–115:24. The mere fact that there are racial patterns in housing—which is common in the United States, especially in the footprint of the Fifth Circuit—does not compel race-based lines. It takes close attention to race to draw lines to match segregated housing patterns. Lines tracking those patterns with precision were not inevitable, or even likely, absent racial predominance.

404.    Finally, Plaintiffs' made an assertion at the hearing that majority-minority districts are racially balanced, which appeared to amount to an assertion that race could not have predominated. That is illogical. It takes racial intent to create racial balance. And that intent is invidious. "[R]acial balancing, . . . is patently unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). The argument contravenes the entire *Shaw* line of cases, each of which invalidated majority-minority districts that could equally have been alleged to create racial balance. The law is clear that the "assignment of voters on the basis of race" is "subject to" the "strictest scrutiny." *Miller*, 515 U.S. at 915.

(d)    Plaintiffs' Legal Arguments

405.    Plaintiffs also argue that racial predominance is permitted in Section 2 illustrative plans. As an initial matter, they seemed to have little if any confidence in that argument. If racial

predominance is permitted, why did Plaintiffs' devote so much time—in an expedited proceeding—to trying to persuade the Court that race did not predominate?

406.    In any event, the argument is not likely to succeed on the merits. Section 2 of the VRA enforced the Civil War Amendments. *See Shelby County v. Holder*, 570 U.S. 529, 542 n.1 (2013). It is difficult to see how a statute enforcing those Amendments can be constitutional, at least as applied to a case where a state is being compelled to take action presumptively unconstitutional. Just as "Congress does not enforce a constitutional right by changing what the right is," *City of Boerne v. Flores*, 521 U.S. 507, 508 (1997), it does not enforce the Civil War Amendments by compelling states to violate them.

407.    Whatever may be said of other Section 2 cases, two facts are salient here. First, Plaintiffs have stipulated that they are not arguing the challenged plan was drawn with predominant racial intent. That means the Court is obligated to presume that the challenged plan complies with the Fourteenth and Fifteenth Amendments. *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944) ("State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared."). Second, race was clearly the predominant factor in creating Plaintiffs' illustrative plans, for reasons stated. Thus, Plaintiffs' plans are presumptively unconstitutional. The prospect that a legislature's presumptively constitutional plan can be judged deficient under Section 2 based on presumptively unconstitutional plans presents a constitutionally infirm comparison.

408.    Plaintiffs have nothing to say on this topic and do not seriously dispute the points above. Their contrary positions are reliant on a Fifth Circuit case, *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393 (5th Cir. 1996), but they are not likely to succeed in this reliance, for several reasons.

409.    One is that *Clark* was not the Fifth Circuit's first review of racial motive in Section 2 cases. The court had previously held on at least two occasions that race should not be the predominant motive for a Section 2 remedy. *Washington v. Tensas Par. Sch. Bd.*, 819 F.2d 609, 612 (5th Cir. 1987); *Wyche v. Madison Par. Police Jury*, 635 F.2d 1151, 1161 (5th Cir. 1981). Under the so-called rule of orderliness, "the earlier precedent controls." *United States v. Walker*, 302 F.3d 322, 325 (5th Cir. 2002). Likewise, precedent post-dating *Clark* rejected race-based Section 2 remedies. *See Sensley*, 385 F.3d at 597.

410.    Another is that *Clark*'s holding regarding the predominance test was based on a legal fiction that has since been rejected in both the Supreme Court and the Fifth Circuit. *Clark* posited that what it called the *Miller* predominance test (after *Miller v. Johnson*) does not apply at the threshold liability phase, but it *does* apply to a court-ordered remedy at the end of the case. *See* 88 F.3d at 1406–08. To be precise, *Clark* held in Section III. B of the opinion that the predominance test of *Miller v. Johnson* "does not apply to the first *Gingles* precondition." 88 F.3d at 1406–07. But it distinguished that holding in the very next section, Section III.C, in addressing the distinct argument "that the County" sued in that case "did not violate § 2 because the plaintiffs' proposed remedy violates the Equal Protection Clause." *Id.* at 1407.

411.    On that latter question, the Fifth Circuit did not find predominance irrelevant but, instead, remanded because "[t]here has been no finding that the plaintiffs' plans subordinate traditional race-neutral districting plans to racial considerations," and the plaintiffs had presented an illustrative plan "which allegedly made minimal changes to existing districts and precinct lines." *Id.* at 1408 (internal quotation marks omitted). The court determined that an inquiry should

be made into whether "those changes are truly 'minimal'" and whether the "predominant factor test" was satisfied.[8] *Id.* (citation omitted).

412.    But that distinction no longer has any legal foundation. The Supreme Court and Fifth Circuit precedent have both since held that the remedial and liability inquiries are not separate but are one in the same. *Abbott v. Perez*, 138 S. Ct. 2305, 2333 (2018); *Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 309–10 (5th Cir. 2020). As the Eleventh Circuit has since explained the rule, "a district court's remedial proceedings bear directly on and are inextricably bound up in its liability findings." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1302–03 (11th Cir. 2020). When a plaintiff proposes a Section 2 illustrative plan, the plaintiff is showing a remedy that is actually possible. This means that a remedial-phase analysis is essential at the liability phase. As explained, a remedy that is presumptively unconstitutional cannot form the basis of liability in the first instance. What the Fifth Circuit held in Section III.C now has equal applicability to Section III.B.

413.    Further, the law of racial gerrymandering has advanced since *Clark*. Whereas *Clark* instructed the district court to evaluate to what degree the alternative plans "use[d] race at the expense of traditional political concerns," 88 F.3d at 1408, the Supreme Court has since clarified that "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement," *Bethune-Hill*, 137 S. Ct. at 799. Before *Bethune-Hill*, the Supreme Court had "not affirmed a predominance finding, or remanded a case for a determination of predominance, without evidence that some district lines deviated from traditional principles." *Id.* This means that, when *Clark* was decided, it was not clear that a plan meeting the *Gingles*

---

[8] Here, there is no argument that the illustrative plans make minimal changes as compared to the enacted plans. Plaintiffs experts admitted that they made no effort to minimize changes. *See* 5/9 Tr. 157:19–158:18. *Clark* undermines their assertions that a least-change plan cannot be a Section 2 remedy, as a least change plan was asserted to be a Section 2 remedy in that case.

preconditions—which require adherence to "traditional districting principles such as maintaining communities of interest and traditional boundaries," *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (quoting *Bush*, 517 U.S. at 977)—could be presumptively unconstitutional. Now, it is clear that this can be so and normally is so. "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *LULAC v. Perry*, 548 U.S. 399, 433–34 (2006) (citation omitted). Setting racial predominance as the VRA standard is the wrong way to go about doing that.

414.    A final problem with Plaintiffs' position is that the Supreme Court has now taken a case to address it and will rule next Term. *Merrill et al. v. Milligan, et al.,* No. 21-1086 (U.S. 2022); *Merrill, et al. v. Caster, et al.*, No. 21-1087 (U.S. 2022). In that litigation, the Supreme Court issued a stay of an Alabama court's preliminary injunction compelling that state to hold the 2022 elections under a plan with two-majority minority districts, rather than one majority-minority district. *See Singleton v. Merrill*, No. 2:21-CV-1291-AMM, 2022 WL 265001 (N.D. Ala. Jan. 24, 2022). The Supreme Court also took the extraordinary step of treating the stay motions, respectively, as a petition for certiorari and jurisdictional statement and scheduling argument next Term.

415.    The question in that case is whether the predominance test applies to the first *Gingles* precondition. There, a plan with two majority-Black congressional districts was not created in a large set of simulations, and the state argued that a racially predominant plan is not an appropriate Section 2 baseline. The similarities between *Merrill* and this case are difficult to overstate.

416.    Given the Supreme Court's consideration of this matter, and its exceptional action in issuing a stay and seizing jurisdiction for itself, it would be irresponsible for the Court to issue

a materially identical injunction on materially identical grounds. The question is whether Plaintiffs are likely to succeed. They are not likely to succeed when the very premise of their case is being considered in the Supreme Court, as this case is pending.

417.    For this reason alone, the motions must be denied.

2.    Plaintiffs' *Gingles* Claim Fails at the Geographic Compactness Threshold

418.    A related but independent flaw in Plaintiffs' illustrative plans is that they join disparate segments of Louisiana, with little if anything in common but race, in disregard of compactness as Section 2 defines it.

419.    "[T]he § 2 compactness inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Abrams*, 521 U.S. at 92 (citation omitted). "[T]here is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first Gingles condition contemplates." *LULAC*, 548 U.S. at 433. This is "because the right to an undiluted vote does not belong to the 'minority as a group,' but rather to 'its individual members.'" *Id.* at 437 (citation omitted).

420.    Plaintiffs concede that they must prove that the Black Voting Age Population ("BVAP") is both sufficiently numerous and geographically compact to form a majority black district. Doc. 41-1 at 8. All Plaintiffs' illustrative maps have a similar design. They use portions of East Baton Rouge ("EBR") as the cornerstone for a second proposed majority Black district.

421.    Plaintiffs' argument rests on the idea that simply because Louisiana has sufficient BVAP statewide to proportionally create a second district, that such a district *must* be created, regardless of how spread out across the state's Black voters are. This is another iteration of the "max Black" theory that caused two different congressional plans to be rejected as racial gerrymanders in the 1990s.

94

422.    At that time, the United States Department of Justice ("DOJ") adopted a policy, known as the "max Black" theory, requiring the maximization of the number of majority Black districts for a covered state to obtain preclearance under Section 5 of the VRA. To achieve preclearance, the Louisiana Legislature adopted two different plans which included two majority Black districts. In both versions, the legislature used portions of EBR to anchor the second majority Black district (CD 4) found in both plans. In both instances, the federal district court found that the second majority Black district was an illegal racial gerrymander. In 1996, the district court adopted a congressional plan that was used for the rest of the decade. The court's plan reverted back to Louisiana's policy of establishing only a single majority Black district. The court's plan did not use EBR as the keystone for a second majority Black district and instead placed that parish into a majority white district (CD 6). Therefore, there is no precedent for EBR being lawfully used as the primary building block for a second majority Black district. *Hays v. Louisiana*, 839 F.Supp.1188 (W.D. La. 1993) *vacated*, 512 U.S. 1230 (1994), *order on remand*, 862 F. Supp 119 (W.D. La. 1994), *vacated sub nom.*, *United States v Hays*, 515 U.S. 737 (1995), *decision on remand*, 936 F. Supp. 360 (W.D. La. 1996), *affirmed*, 518 U.S. 1014 (1996).

423.    Both the Cooper and Fairfax Illustrative Plans use EBR as an anchor for a second majority-Black district.  5/9 Tr. 130:25–132:4 (Cooper); *id.* 219:22–220:22 (Fairfax).

424.    Fairfax admits that a second majority-Black district could not be drawn without incorporating EBR and the northern delta parishes. 5/9 Tr. 219:22–220:22.

425.    However, even Fairfax's evidence demonstrates that the Black communities in EBR and the delta parishes are vastly different in culture and socioeconomic status.  5/9 Tr. 225:16–227 (differences in education level); *id.* 229:11–230:11 (differences in median household income); *id.* at 232:1–233:7 (differences in socioeconomic risk factors).  In short, the only reason

to combine these different Black communities into a congressional district is the color of their skin.

426.    As the Supreme Court explained in *Shaw I:*

> Reapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. 509 U.S. at 647.

427.    Subsequently, in *Miller v. Johnson,* 115 S. Ct. 2475 (1995), the Supreme Court clarified that districts drawn for predominantly racial reasons fail the *Gingles* compactness requirement, even if they are not as obviously irregular as the North Carolina district invalidated in the *Shaw* cases. *Miller* arose from the same max-black policy addressed in *Shaw I*. In Georgia, the DOJ refused to preclear a remedial plan drawn by the Georgia General Assembly, because the General Assembly refused to create the third majority-minority district found in the "max-black" plan drafted by the ACLU for the General Assembly's Black caucus. *Id.* at 2484.  "Twice spurned" by the DOJ's refusal to preclear plans with less than three majority-Black districts, the General Assembly finally relented and enacted the ACLU's "max-black" plan.  *Id*. at 2484. The hallmark of the ACLU's "max-black" plan was the "Macon/Savannah trade" which moved the densely Black population of Macon into a new district, thereby creating a district that connected "black neighborhoods of metropolitan Atlanta to the poor black populace of Coastal Chatham County" near Savannah. *Id.* This new district was 260 miles long and "worlds apart in culture." *Id.* The Supreme Court found that this district was a "geographic monstrosity" that tied majority Black population centers at the periphery of Atlanta, Augusta, and Savannah with a sparsely populated

rural area called "plantation country." *Id.* In striking down this "max-black" strategy, the Supreme Court held that only "a shortsighted and unauthorized view of the Voting Rights Act…which has played a decisive role in redressing some of our worst forms of discrimination" could support "the very racial stereotyping the Fourteenth Amendment forbids." *Id.* at 2494.

428.    It appears the ACLU's strategy has changed very little in the last 25 years. Mr. Cooper's plans are anywhere from 50 to 100 miles longer than the egregious racial gerrymander struck down in the *Shaw* cases. It also bears striking geographic similarities to the ACLU's 1991 "max-black" plan for Georgia. These configurations have never been seen in Louisiana before in any lawful district. Their only precedential support lies in the fact that they are similar to the district rejected in *Hays*. This is exactly the sort of line-drawing the condemned in *Miller.* Plaintiffs' illustrative plans do nothing but create convoluted lines to include in one district individuals of the same race who are otherwise "widely separated by geographical and political boundaries" which reinforces the abhorrent "perception that members of the same racial group . . . think alike." *Shaw I,* 509 U.S. at 647.

429.    Plaintiffs' illustrative plans (and, by extension, their claims) are also based on a faulty legal premise, as illustrated by *Cooper.* In *Cooper* the Supreme Court struck down North Carolina's CD1, drawn as a majority-minority district, as a racial gerrymander. 137 S. Ct. at 1466–1472. The Court held that the legislature had "no evidence that a § 2 plaintiff could demonstrate the third *Gingles* prerequisite—effective white block voting." *Id.* at 1472. This was, in part, because as the lower court noted, there was "no evidence that the general assembly conducted or considered any sort of a particularized polarized voting analysis during the 2011 redistricting process for CD1." *Harris v. McCrory,* 159 F. Supp. 3d 600, 624 (M.D.N.C. 2016).

430.    In 1986, the Supreme Court in *Gingles,* found that there was no racially polarized voting in Durham, due to the success of Black candidates in that county. *Gingles*, 478 U.S. at 41. Thirty years later, in *Cooper*, both the district court and the Supreme Court questioned the inclusion of Durham in the state's first congressional district because of the absence of legally significant racially polarized voting in that county.  Both courts also pointed to the district's history as a safe district for minority-preferred candidates, even though District 1's BVAP hovered between 46 and 48 percent. *Cooper*, 137 S. Ct. at 1472.

431.    Here, Plaintiffs' experts did not produce the sort of localized racially polarized voting analysis required under this precedent. If Plaintiffs had done even a cursory study on their proposed second majority-minority district, they would have seen what Dr. Solanky discovered— Plaintiffs have a *Cooper* problem. In this case, there is ample evidence that each of Plaintiffs' illustrative CD5s reach into Baton Rouge and pull out Black voters primarily from EBR—just like North Carolina's CD1 reached into Durham. Solanky Rep., SOS_3, ¶¶ 68–72.  And, as with Durham in *Cooper,* there is no evidence of legally significant racially polarized voting in EBR. *Id.* ¶ 30.

432.    Rather, it appears that there is significant white crossover voting in EBR. In 2020, only 44.1 percent of the voters in EBR were Black, but the Parish overwhelmingly voted for President Biden in the 2020 election. SOS_4 at 11, Table 7.  In fact, when Dr. Solanky examined the Fifth District in Mr. Cooper's Illustrative Plan 1, he found that, of the five Louisiana parishes that voted for President Biden in 2020, EBR was the only majority-white parish. *Id.* ¶ 20. The other four parishes were majority-minority. *Id.* ¶ 20. Furthermore, parish-wide races in EBR show that white voters are not voting as a bloc to defeat the minority preferred candidate, but voting to elect that candidate. *Id.* ¶¶ 23, 26, 30; SOS_2 ¶ 9. This is evidenced by the election of a Black

candidate for mayor-president in EBR since 2004. SOS_2 ¶ 9. And as shown by Dr. Solanky, EBR makes up a significant portion of the Fifth District under the illustrative plans. SOS_4 ¶ 27. For example, in Cooper's First Illustrative Plan, EBR comprises 34.2 percent of the parishes used by Cooper to create this version of the illustrative Fifth District. *Id.*

433.    Furthermore, Dr. Solanky shows that the voting trends in East Baton Rouge Parish, which makes up a significant population portion of Plaintiffs' illustrative CD5s, is different from those of the remaining parishes. 5/11 Tr. 205:12–206:23; SOS_4 at 13. In fact under the eight statewide elections Dr. Solanky studied, East Baton Rouge Parish voted differently from the trend in the remaining parishes making up illustrative CD5. Under seven of eight of those elections, this was a statistically significant difference, which means chance alone cannot account for this difference. SOS_5 at 6–20; 5/11 Tr. 190:12–191:5.

434.    On the other hand, in several parishes making up CD5, including many that are wholly contained parishes in each illustrative CD5, white voters cannot practically vote as a bloc to defeat a minority candidate of choice, because Black voters are a supermajority of voters in the parish. These parishes are East Carroll, Madison, Tensas, and St. Helena parishes. SOS_4 at 6–8. 5/11 Tr. 173:1–174:9; 179:9–180:19. Plaintiffs' experts' choice to include these vastly different Black populations into one district reinforces that the choice could only be made along racial lines, and no other reason.

435.    Because Plaintiffs' illustrative plans only keep parishes with large minority populations whole, and slice and dice their way through other parishes to pick up minority voters, Plaintiffs' illustrative plans can only be achieved by targeting minority voters with surgical precision in violation of the Supreme Court's holding in *LULAC* that using race to primarily draw

districts "would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *LULAC*, 548 U.S. at 445–46.

> 3.    Plaintiffs Have Failed to Show The Numerosity Required By *Gingles* I

436.    To satisfy their burden under the first *Gingles* precondition, Plaintiffs must show that it is possible to "creat[e] more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *LULAC*, 548 U.S. at 430. To satisfy this test, these remedial districts must contain a 50 percent plus one majority of minority citizens of voting age population. *Bartlett,* 556 U.S. at 19–20.

437.    There are several ways in which to calculate the Black Voting Age Population ("BVAP") for purposes of this precondition.

438.    The definition used by the United States Department of Justice ("DOJ Black") includes the "sum of the Census responders identifying as 'Black o[r] African American alone' and 'Two Races: White; Black or African American'"; "this definition does not include Hispanic individuals that may identify as black, nor multiracial individuals identifying as a combination of races other than 'White' and 'Black or African American.'" *Pope v. Cty. of Albany*, No. 1:11-cv-0736 (LEK/CFH), 2014 U.S. Dist. LEXIS 10023, at *7–8 n.3 (N.D.N.Y. Jan. 28, 2014).

439.    The definition used by Plaintiffs experts ("Any Part Black") is a broader census category that includes anyone that is "Black," as well as "Black" combined with any other race.

440.    "Any Part Black" includes persons who may be 1/7th black, and who also self-identify as both black and Hispanic.

441.    The only illustrative maps in Plaintiffs' initial volley of illustrative maps that meet the *Bartlett* "50 percent plus one" voting age population requirements are those that use "Any Part Black" to calculate BVAP, and even using this expansive definition, none of the illustrative maps have a BVAP that exceeds 52.05 percent.

100

442.    Using "DOJ Black" to calculate the BVAP results in a single majority-minority congressional district that exceeds *Bartlett*'s "50 percent plus one" voting age population requirement, and that congressional district has a BVAP of 50.81 percent.

443.    Plaintiffs have argued that *Ashcroft* established "Any Part Black" as the proper BVAP measurement to use in a Section 2 case, but that is not true. Although it considered Georgia's choice to "include[] those people who self-identify as both black and a member of another minority group, such as Hispanic," for purposes of evaluating a redistricting plan, 539 U.S. at 473 n.1., it was not a Section 2 case and therefore did not consider whether the *Gingles* numerosity requirement was met. Courts that have addressed this question in Section 2 cases have treated the question as unresolved by Supreme Court precedent. *See Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 419–20 & n.118 (M.D. La. 2017), *rev'd on other grounds sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020). *Ashcroft* was a Section 5 case, and the two statutes have different mechanics and purposes. *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471 (1997). Section 5 does not include a majority-minority requirement, and so the "slightly different figures" exhibited between the various metrics, 539 U.S. at 473 n.1, carry a different legal significance under Section 2 than under Section 5.

444.    Although no court has ever conclusively settled the question of what degree persons who self-identify with more than one racial or ethnic identity should be categorized for the purposes of the Voting Rights Act, *see Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003), the party seeking the creation of an additional majority-minority congressional district has done so by showing that the *Bartlett* "50 percent plus one" voting age population requirement is satisfied using numerous BVAP definitions. *See, e.g, Pope v. Cty. of Albany*, 687 F.3d 565, 577 n.11 (2d Cir. 2012) ("Because plaintiffs satisfy the first *Gingles* factor for DOJ Non-Hispanic Blacks, we need

not here consider whether the relevant minority group might more appropriately be identified as "Any Part Black," for which the minority VAP percentages are even higher.").

445.    Plaintiffs' inability to satisfy the *Bartlett* "50 percent plus one" voting age population requirement using any definition except for the most expansive "Any Part Black" definition compels the conclusion that, as a matter of law, they have not carried their burden under *Gingles* Step I.

446.    To this criticism, Plaintiffs have mostly responded with theatrics, arguing that the defense's challenge to numerosity is somehow an extension of the "one drop" rule utilized in Louisiana's past to identify members of different racial groups. *See, e.g.,* 5/11 Tr. 108:16–110:1; 5/10 Tr. 229:25–231:1. This argument is baffling. The metric the defense is advancing is called *DOJ* Black. It is called that because the U.S. Department of Justice Voting Rights Section uses it to evaluate redistricting plans. *See Ashcroft*, 539 U.S. at 474 n.1 (observing that "the United States" does not "include[] those people who self-identify as both black and a member of another minority group, such as Hispanic," whereas Georgia did). There is obviously no connection between this calculation and the history of racism in Louisiana or even the south generally. Indeed, in Ashcroft, it was the former Confederate state of Georgia that utilized the measure Plaintiffs propose here, and the federal government that utilized the measure the defense proposes.

447.    And the reason the Voting Rights Section utilizes DOJ Black is to prevent state actors from artificially inflating the minority counts of their redistricting plans to make it seem like there is more minority opportunity than there is. That is, without a showing that members of different racial groups are internally cohesive, there is little reason to believe that a number bringing together a diverse coalition will perform. For that reason, the incentive in picking a calculation of minority VAP is for the state usually to count as many minority members as possible

in discussions with the Voting Rights Section, either to persuade the Section not to bring suit or, at the time of preclearance, to approve a proposed plan. The entire point of the DOJ Black metric was to prevent this type of gamesmanship and to take a more conservative position on likely minority opportunity. The notion that this has some tie to the "one drop" rule in Louisiana is preposterous; DOJ Black was designed to prevent state gimmicks when faced with federal VRA review of their plans.

448.    Here, it is Plaintiffs who are incentivized to inflate the potential performance of their district, and their choice of "Any Part Black" as the metric to use underscores how weak their illustrative remedies are. Their unfortunate litigation choice to throw mud at the defense fails to move the needle on the legal questions before the Court.

449.    Because Plaintiffs carry the burden of establishing all three of the *Gingles* preconditions, their failure to satisfy the first mandates denial of their motions for a preliminary injunction.

B.    The Third *Gingles* Precondition

450.    The third *Gingles* precondition requires a challenger to prove an "amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56 (citations omitted). The question is not merely "whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.'" *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc) (citation omitted).

451.    Plaintiffs' experts conducted standard polarized voting studies and opined in their reports and at the hearing that voting is polarized. By that, they meant that white voters and Black voters generally prefer different candidates.

103

452.    Although necessary, this is not sufficient. The question in this case is whether Plaintiffs are likely to establish at trial that the voting patterns carry legal significance.

453.    There are two distinct questions of legal significance in this case. The first is whether white bloc voting arises to the requisite level of legal significance or, on the other hand, whether there are sufficient levels of white "crossover" voting (where white voters support Black-preferred candidates) to obviate the need for a VRA remedy. The second question is whether polarized voting is the result of racial attitudes in the general populace or whether it results from, for example, differences in partisan affiliation or political and policy views.

454.    On both of these questions, Plaintiffs are unlikely to succeed.

1.    Levels of White Bloc Voting

455.    Perhaps the question on which the hearing evidence was most clear, and on which there is no room for a dispute of material fact, is that white crossover voting is sufficient to enable the Black community to elect its preferred candidates of choice in districts below 50 percent BVAP. As discussed below, this means white bloc voting is not legally significant and that the third *Gingles* precondition is not met.

456.    "[I]n the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (quoting *Gingles*, 478 U.S. at 49 n. 15). That is, "[i]n areas with substantial crossover voting" a challenger will not "be able to establish the third *Gingles* precondition—bloc voting by majority voters." *Bartlett*, 556 U.S. at 24.

457.    According to governing precedent, crossover voting becomes "substantial" when it arises to the level that "a VRA remedy," i.e., a majority-minority district, is unnecessary to enable the Black community to usually elect its preferred candidates. *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017).

458.    The Supreme Court made this clear in *Bartlett*. That decision held that Section 2 does not require jurisdictions to create "crossover" districts, in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." 556 U.S. at 13 (plurality opinion). One of the rationales for this conclusion was that a crossover-district requirement "would require us to revise and reformulate the *Gingles* threshold inquiry that has been the baseline of our § 2 jurisprudence." *Id.* at 16. The Court reasoned that "the majority-bloc-voting requirement" will not "be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate." *Id.* The Court further explained that, where crossover voting is sufficient to create performing crossover districts, "*majority-minority districts would not be required in the first place*." *Id.*at 24 (emphasis added).

459.    A subsequent summary affirmance confirmed this definition of legally significant white bloc voting. In *Covington*, the North Carolina legislature created twenty-eight majority-minority districts in its state house and senate plans, based on the advice of statistical experts who found "statistically significant racially polarized voting in 50 of the 51 counties studied." *Covington*, 316 F.R.D. at 169 (quotation marks omitted). The problem was that North Carolina's experts, addressed "the general term 'racially polarized voting'" which "simply refers to when different racial groups 'vote in blocs for different candidates.'" *Covington*, 316 F.R.D. at 170 (citation omitted).

460.    But they missed "crucial difference between legally significant and statistically significant racially polarized voting." *Id.* at 170 (underlining in original). Whereas polarized voting can be said to occur "when 51% of a minority group's voters prefer a candidate and 49% of the majority group's voters prefer that same candidate," *id.* at 170, "the third *Gingles* inquiry is

concerned only with 'legally significant racially polarized voting,'" *id.* (quoting *Gingles*, 478 U.S. at 51, 55–56). Non-actionable polarized voting becomes legally significant only when "racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, *if no remedial district were drawn*." *Id.* at 168 (quotation and edit marks omitted; emphasis added). The question is whether "the candidate of choice of African-American voters would usually be defeated *without a VRA remedy*." *Id.* (emphasis added).

461.    The *Covington* court—whose decision was endorsed by every Supreme Court justice—criticized the North Carolina legislature because it "**Never Analyzed *Gingles*' Third Factor.**" *Id.* at 167 (bolding and capitalization in original). The legislature did not assess whether the Black-preferred candidate would likely lose "absent some remedy," and this "failure" was "fatal to their Section 2 defense." *Id.* As *Bartlett* had explained, where a crossover district would perform, "majority-minority districts would not be required in the first place." 556 U.S. at 24 (plurality opinion). They were not required in North Carolina.

462.    *Covington* is not controversial. The case was not close. The three-judge court—led by Fourth Circuit Judge James Wynn—subsequently called the invalidated North Carolina plan "the most extensive unconstitutional racial gerrymander ever encountered by a federal court," *Covington v. North Carolina*, 270 F. Supp. 3d 881, 892 (M.D.N.C. 2017). The U.S. Supreme Court summarily affirmed the decision, which fell within its appellate jurisdiction, in a one-sentence order by a unanimous vote. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017); *Covington*, 270 F. Supp. 3d at 892 ("The Supreme Court affirmed that conclusion <u>without argument and without dissent</u>. And the Supreme Court <u>unanimously</u> held that Senator Rucho and Representative Lewis incorrectly believed that the Voting Rights Act required construction of majority-minority districts[.]" (underlining in original)). The Supreme Court reached a materially identical

106

conclusion in *Cooper*, finding that a majority-minority district was unnecessary, and hence racially gerrymandered, where crossover voting levels were such that a crossover district would perform. 137 S. Ct. at 1471–72.

463.    It is worth recounting this because this case is the other side of the *Covington* coin. As in *Covington*, the evidence shows that a white crossover voting arises to the level that a district could perform below 50 percent BVAP. *Covington* held that the North Carolina legislature should not have drawn majority-minority districts in that instance. Here, the Legislature followed that advice: it maintained a "carbon copy" of CD2 for reasons that are not alleged to be racially predominant. 5/9 Tr. 88:17–20. Beyond that, it created no majority-minority districts.

464.    Plaintiffs are unlikely to prove at trial that the Legislature violated Section 2 by doing what *Covington* said the Constitution requires. Plaintiffs structured their polarized voting evidence around the wrong legal standard. Both their polarized voting experts, Dr. Palmer and Dr. Handley, defined polarized voting as existing where "black voters and white voters voted differently." 5/10 Tr. 13:12–13; *see also* 5/9 Tr. 309:23–310:2. In particular, they view polarized voting as existing where "black voters and white voters would have elected different candidates if they had voted separately." 5/10 Tr. 21:2–4. That would occur any time bare majorities of Black voters and white voters vote for different candidates.

465.    From that starting point, "the experts opined (to no one's great surprise) that in [Louisiana], as in most States, there are discernible, non-random relationships between race and voting." *Cooper*, 137 S. Ct. at 1471 n.5. But, as described, that is the exact error *Covington* condemned. Like the experts whose work erroneously led to a gross constitutional violation in North Carolina, the experts in this case failed to ask whether white bloc voting is so severe that only a majority-minority district can secure an equal opportunity to elect. Plaintiffs bear the burden

on this question and cannot shoulder that burden by ignoring it. "Section 2 'does not assume the existence of racial bloc voting; plaintiffs must prove it.'" *Growe*, 507 U.S. at 42 (quoting *Gingles*, 478 U.S. at 46).

466.    In fact, when probed on the question, Plaintiffs' experts admitted that their own studies show that a VRA remedy is not necessary. Dr. Palmer testified that there is meaningful white crossover voting, 5/9 Tr. 337, and that CD2 and CD5 could be drawn below 50 percent and enable the Black community to elect its preferred candidates, 5/9 Tr. 346. Dr. Lichtman—who was also the plaintiffs' expert in *Covington*—agreed that a district around 40 percent BVAP could perform and compared this case to *Covington* without prompting. 5/10 Tr. 198–200. Dr. Handley testified that it is possible districts below 50 percent BVAP may perform. 5/10 Tr. 75–76. The *amicus* brief of mathematics and computer-science professors at LSU and Tulane University presents an analysis of nineteen elections asserting that districts of about 42 percent BVAP afford an equal minority electoral opportunity. *Amicus* Brief in Support of Neither Party (Doc. 97) at 23, 27, 34–34. A defense expert, Dr. Lewis, concluded that a 50 percent BVAP district is unnecessary in either the footprint of CD5 or CD2. Lewis Rep., Leg_2, ¶ 13.

467.    There is, then, not even a material dispute of fact on this question. Plaintiffs are not likely to succeed at trial, when summary judgment could be entered against them on the current record.

468.    Plaintiffs' responses on the law are quite plainly contrary to governing precedent.

469.    First, Plaintiffs appear to argue that CD5 is not a crossover district and thus is vulnerable to a Section 2 challenge even in the face of high crossover voting levels. But that contradicts *Bartlett*, which, as discussed, rejected any Section 2 requirement of crossover districts.

470.    Second, Plaintiffs also seem to that they have proposed majority-minority districts that do satisfy *Bartlett*. That is true, but, where a crossover district can perform, "majority-minority districts would not be required in the first place." *Bartlett*, 556 U.S. at 24. And this argument does not distinguish the case from *Covington*.

2.    <u>Partisan Politics—Not Race—Created The Divergence Between Black And<br>White Voting Preferences In Louisiana</u>

471.    If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens," then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *League of United Latin Am. Citizens, Council No. 4434 v. Clements,* 999 F.2d 831, 850 (5th Cir. 1993).

472.    This is so because "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.'" *Id*. at 854 (emphasis added) (quoting *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992)).

473.    Section 2 "is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *Id*.

474.    Dr. Alford, professor of political science from Rice University, conducted an analysis of the reports submitted by Plaintiffs' experts. 5/12 Tr. 131:9-13; State Ex. 1 at 1.

475.    Dr. Alford found that while "voting may be correlated with race . . . the differential response of voters of different races to the race of the candidate is not the cause." State Ex. 1 at 9; 5/12 Tr. 153:1–9. He testified that "I don't think there's any question that the party affiliation of candidates is the driving force in [explaining divergent voting patterns between blacks and whites in Louisiana] and not the race of the candidate." 5/12 Tr. 153:1–9. This is conclusively shown when one removes partisanship from the analysis. When looking at election contests that pit

109

Republicans against Republicans, there is no obvious pattern of differentiation between how black and white voters' vote. 5/12 Tr. 144:2–14; State Ex. 1 at 5-6.

476.    He found that, instead of race being the driver of differences in voting patterns, the polarization seen in the data is a result of Democratic party allegiance. State Ex. 1 at 6, 8; 5/12 Tr. 153:1–9.

477.    The protections of Section 2 of the Voting Rights Act "extend only to defeats experienced by voters 'on account of race or color.'" *Clements*, 999 F.2d at 850. That means that when "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens" then there is no legally sufficient white bloc voting. *Id.*

478.    In other words, Plaintiffs have not shown there is "legally significant" bloc voting. *See id.*

479.    Without a showing of legally significant bloc voting, Plaintiffs' motions for a preliminary injunction must be denied.

C.    Totality of the Circumstances

480.    Because the threshold *Gingles* preconditions are not satisfied, the Court need not address the totality of the circumstances. However, as shown below, factors relevant to this case under the totality test confirm that vote dilution is unlikely to be proven to exist at trial.

1.    No Measure of Vote Dilution

481.    Plaintiffs "lack any evidence of dilution," as Section 2 defines it. *Gonzalez v. City of Aurora, Illinois*, 535 F.3d 594, 600 (7th Cir. 2008). Section 2 forbids a voting procedure that leaves members of a protected class "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). But it expressly disclaims a requirement of proportionality: "nothing in this section

establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

482.    Plaintiffs' have built their case on the very proportionality Section 2 disclaims, contending that a new majority-minority district must be created somewhere in Louisiana, without regard to the State's traditional district boundaries or even for which minority communities should be joined.

483.    This is the wrong concept. In *Washington v. Tensas Parish School Board*, 819 F.2d 609 (5th Cir. 1987), the Fifth Circuit reiterated that, "although some democracies provide for proportional representations of parties and ethnic groups, that has never been an American tradition." *Id.* at 612 (citation omitted; alterations accepted). The court rejected the notion that a minority group having three majority districts of seven was entitled to a fourth district to match its percentage of the population. *Id.* at 611–12. The court reasoned that, "while race may be considered as a factor, safe seats for the minorities are not required of a reapportionment plan." *Id.* at 612 (citation omitted); *Wyche v. Madison Par. Police Jury*, 635 F.2d 1151, 1161 (5th Cir. 1981) ("Even as a remedial measure, court plans should not aim at proportional representation.").

484.    The Seventh Circuit applied similar reasoning in rejecting a Section 2 challenge to the city of Aurora's council districts in *Gonzalez*. Judge Easterbrook (joined by Judges Wood and Sykes) reasoned that Section 2 contains no obligation on the part of redistricting authorities to create "the maximum influence Latinos could have." 535 F.3d at 598. "Nor is proportional representation the benchmark." *Id.* Instead, "the Voting Rights Act protects the rights of individual voters, not the rights of groups." *Id.* at 598 (discussing *LULAC*, 548 U.S. 399).

485.    In *Gonzalez*, the Seventh Circuit assumed that the three *Gingles* preconditions were satisfied, but "[t]his just sets the stage." *Id.* at 597. The challengers there failed to establish some

reasonable baseline to measure dilution. They did not, for example, identify "a minority group in one part of a jurisdiction [that] has been thrown to the wolves," as occurred in *LULAC v. Perry*. *Id.* at 598. Another possibility, said the Seventh Circuit, was to utilize computer simulations, which "can use census data to generate many variations on compact districts with equal population." *Id.* at 599. That method might show "that Latinos are sufficiently concentrated that the random, race-blind exercise we have proposed yields three 'Latino effective' districts at least 50% of the time. Then a court might sensibly conclude that Aurora had diluted the Latino vote by undermining the normal effects of the choices that Aurora's citizens had made about where to live." *Id.* at 600. But the challengers "did not conduct such an exercise . . . (or, if they did, they didn't put the results in the record)." *Id.* "Because plaintiffs lack any evidence of dilution," said the unanimous panel, their Section 2 claim failed. *Id.*

486.    This case is no different. The central premise of this case is that "Louisianans who identify as any part Black constitute 31.2% of the state's voting age population" and are injured because "only around 17% of the state's congressional districts" are under their "control." Doc. 1 ¶ 1 (*Robinson* Complaint); *Galmon* Compl. ¶ 2 ("Louisiana has the second-highest proportion of Black residents in the United States, comprising nearly one-third of the state's population. But Black Louisianians have the opportunity to elect their candidates of choice in only *one* of Louisiana's six congressional districts.").

487.    But Plaintiffs identify no discrete "minority group in one part of a jurisdiction [that] has been thrown to the wolves." *Gonzalez*, 535 F.3d at 598. Although the illustrative plans all operate, on a general level, to unite East Baton Rouge and territory in its vicinity to the so-called delta parishes in northeast Louisiana, 180 miles away, they fail to make out a community-oriented case concerning these individual voters. Indeed, the *Robinson* Complaint does not so much as

mention the delta parishes. The *Galmon* Complaint does so only twice, and in both instances, it merely makes the point that combining the delta parishes with territory in and around Baton Rouge can achieve a 50 percent threshold. *Galmon* Compl. ¶¶ 34, 96. This is not a voter-centric approach to the VRA. It is a proportionality approach, and Plaintiffs have little meaningful prospect of success in establish a claim the VRA expressly disclaims.

488.    Also, as in *Gonzalez*, Plaintiffs either did not run simulations to show that two majority-minority district is the likely non-race-based outcome of traditional districting principles or else they declined to present that information in court. 535 F.3d at 599–600. Unlike *Gonzalez*, the defense side did sponsor such testimony, and that makes this case an even weaker than the claim *Gonzalez* rejected.

### 2.    Disagreement of Discretion in Protecting Minority Voting Rights

489.    Plaintiffs challenge the legitimate, discretionary choice of the Legislature in how to protect minority voting strength. "Plaintiffs challenging single-member districts may claim, not total submergence, but partial submergence; not the chance for some electoral success in place of none, but the chance for more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012–13 (1994). "When the question thus comes down to the reasonableness of drawing a series of district lines in one combination of places rather than another, judgments about inequality may become closer calls." *Id.* "As facts beyond the ambit of the three *Gingles* factors loom correspondingly larger, factfinders cannot rest uncritically on assumptions about the force of the *Gingles* factors in pointing to dilution." *Id.*

490.    Plaintiffs' claim, at base, is that two districts in which minority opportunity is dependent on white voting choices are better than one district in which the functional Black majority controls its own electoral destiny. It is undisputed that CD2, as enacted, provides the Black community in Baton Rouge, New Orleans, and surrounding areas "a functional working

majority." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 802 (2017). Section 2 requires such "an effective majority," *LULAC v. Perry*, 548 U.S. 399, 426 (2006), not a superficial majority, *Anne Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 309 (5th Cir. 2020); *Thomas v. Bryant*, 938 F.3d 134, 158 & n.120 (5th Cir. 2019), *vacated on other grounds sub nom. Thomas v. Reeves*, 961 F.3d 800 (5h Cir. 2020). There is, then, no serious question that CD2 satisfies Section 2.

491. The question Plaintiffs present, however, is whether two bare-majority districts are better than one functional-majority district. Like the Wisconsin plan summarily rejected as a racial gerrymander, Plaintiffs' illustrative plans all achieve the "addition" of another majority-minority district "by reducing the black voting-age population in the other" majority-Black district. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 n.1 (2022). Setting aside the readily apparent problem of racial predominance—which exists for the same reason it existed in *Wisconsin Legislature*—Plaintiffs' proposals are questionable under Section 2 itself, since the practice of drawing down BVAP to spread out Black voters can, under some circumstances, be legally actionable "cracking," even where the BVAP is above 50 percent. *Thomas*, 938 F.3d at 158 & n.120.

492. "[A]n alternative map containing an additional majority-minority district does not necessarily establish an increased opportunity." *Harding*, 948 F.3d at 309. It is not at all obvious that Plaintiffs' proposals will enhance opportunity. Plaintiffs' experts have made projections based on statewide elections from last decade, but they admit (as they must) that no elections have occurred under the challenged plan or under their illustrative plans. 5/10 Tr. 24:22–25:1 (Handley); *id.* 25:11–13. Past performance is no prediction of future outcomes, especially where the past performance is not even in the same elections for the same offices. These predictions, purporting

114

to indicate what will happen in a *decade's* worth of future elections, are something like farmer's almanac forecasts of weather for a coming season. Maybe they are right. Maybe not.

493.    There are good reasons to take these predictions with more than a grain of salt. For one thing, the BVAP numbers in the illustrative versions of CD2 and CD5 constitute the barest of bare majorities. For another thing, Plaintiffs' experts admit that white voting choices will determine the outcomes in all events. Dr. Lewis showed that only with white crossover voting can the Black-preferred candidate reliably prevail in the illustrative version of CD2 and CD5. Dr. Palmer responded that a Black-preferred candidate may also win if white voters chose not to vote at all. *See* 5/9 Tr. 328:4–18. But that only underscores that the white voting choices (whether to vote for the Black-preferred candidate or not vote) control the elections in these proposed districts. "There is a difference between a racial minority group's 'own choice' and the choice made by a coalition." *Bartlett*, 556 U.S. at 15. Plaintiffs fail to explain how a legislature that acknowledges that difference, and affords a minority group a meaningful opportunity to elect its preferred candidates without being dependent on other groups, violates Section 2.

494.    Another factor is that the BVAP in CD2 dropped markedly in the decade beginning in 2011 and had good reasons to believe it needed more than the slim majorities Plaintiffs proposed to ensure that a majority-minority district remains such over the course of 10 years.

495.    A further cause for concern about the viability of Plaintiffs' alternatives stems from the fact that Plaintiffs—who shoulder both the preliminary-injunction and Section 2 burdens—have taken conflicting positions on critical case issues. On the question of performance, they insist that that districts of the slimmest Black majorities will ensure an equal Black electoral opportunity. *See* Handley Rep., PR-12, at 13–14; Palmer Rep., GX-2, at 6–8. On the question of white bloc voting (for the third *Gingles* precondition), Plaintiffs insist that bloc voting is severe and white

crossover voting very low. 5/10 Tr. 76:11–18 (Handley). On the question of Black turnout (for the fifth Senate factor), Plaintiffs insist that Black turnout is significantly lower than white turnout. 5/10 Tr. 177:1–8 (Lichtman).

496.    But not all of that can be true. If white crossover voting is *de minimis* and Black turnout lags behind white turnout, then the white vote will prevail in districts with miniscule Black majorities. On the other hand, if such districts can be deemed to "enhance the ability of minority voters to elect the candidates of their choice," and thus to perform functionally, *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018), then there must be some explanation for the projected success of the Black preferred candidates. Either Black turnout must match or exceed white turnout—in which case the fifth Senate factor favors the defense—or else white crossover voting must be substantial—in which case the third *Gingles* precondition cannot be proven. It cannot be that the facts align perfectly for Plaintiffs to prevail on *each* of these issues.

497.    In any event, this complex calculus admits of substantial unclarity, and "[c]ourts cannot find § 2 effects violations on the basis of *uncertainty*." *Abbott*, 138 S. Ct. at 2333. The Supreme Court in *Abbott*, and the Fifth Circuit in *Harding* and *Fusilier v. Landry*, 963 F.3d (5th Cir. 2020), have held that Section 2 challengers "must meet the overarching demand that their new districting scheme enhances their ability to elect candidates of their choosing." *Id.* at 462. Plaintiffs cannot meet this standard when core aspects of their case contradict the necessary factual predicates.

498.    And the Supreme Court has consistently counseled that these gray zones are the proper sphere for judicial deference to state legislatures' "broad discretion" to "comply" as they "reasonably s[ee] fit." *Abbott*, 138 S. Ct. at 2333 (citation and quotation marks omitted).  Here, reasonable compliance by maintaining one majority-minority district in the same region that has

hosted a majority-minority district for generations, and at a level of minority voting-age population sufficient to ensure Section 2 compliance, was at least as reasonable as Plaintiffs' proposed high-risk, high-reward gamble with Black electoral opportunity—which came with no analytical support whatsoever during the redistricting.

499.    Indeed, this question is the paradigmatic question of legislative discretion under the VRA. "In order to maximize the electoral success of a minority group, a State may choose to create a certain number of 'safe' districts, in which it is highly likely that minority voters will be able to elect the candidate of their choice. Alternatively, a State may choose to create a greater number of districts in which it is likely—although perhaps not quite as likely as under the benchmark plan— that minority voters will be able to elect candidates of their choice." *Georgia v. Ashcroft*, 539 U.S. 461, 480 (2003). Section 2 "does not dictate that a State must pick one of these methods of redistricting over another." *Id.*; *see also Bartlett*, 129 S. Ct. at 23 (confirming that this rule applies under VRA Section 2). The choice of one safe seat or two less safe seats falls well within the Legislature's discretionary choices.

### 3.    Senate Factors

500.    The Senate factors, which guide the totality of the circumstances inquiry, cut against a finding of vote dilution.

#### (a)    Senate Factor 1: History of Official Discrimination In Voting

501.    Senate Factor 1 looks to the "extent of any history of official discrimination in the state...that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process . . . ." *Gingles,* 478 U.S. at 36–37. Here, the most relevant question is whether there is "recent evidence of discrimination." *Lopez v. Abbott*, 339 F. Supp. 3d 589, 611 (S.D. Tex. 2018). Plaintiffs did not present any meaningful *recent* evidence of official

discrimination. Instead, most of Plaintiffs' historical evidence pre-dates the 21st Century, with Dr. Gilpin's analysis reaching back to 1724 and the passage of the Code Noir. PR-13 at 4.

502.    While Louisiana's history of discrimination is tragic, it is in the distant past and is not especially probative of this Section 2 case in 2022. "The Supreme Court has cautioned that 'unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value,'" *Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016) (quoting *McCleskey v. Kemp*, 481 U.S. 278, 298 n.20 (1987)). The Nation has changed considerably over the past few decades, and those changes must be taken into account. *See, e.g., Fusilier v. Landry*, 963 F.3d 447, 459 n.9 (5th Cir. 2020) (recognizing that "as the Chief Justice has observed, 'our country has changed' in its treatment of minorities" (quoting *Shelby County v. Holder*, 570 U.S. 529, 557 (2013))); *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1332 (11th Cir. 2021) (cautioning against "allowing the old, outdated intentions of previous generations to taint [a state's] ability to enact voting legislation"); *Fairley v. Hattiesburg, Miss.*, No. 2:06cv167, 2008 WL 3287200, *9 (S.D. Miss. Aug. 7, 2008) ("[T]hese discriminatory practices ceased long ago, and no evidence was submitted to prove official discrimination on the part of the City continues to exist."). For those reasons, "the most relevant 'historical' evidence is relatively recent history, not long-past history." *Veasey*, 830 F.3d at 232 (holding that "the district court's disproportionate reliance on long-ago history was error").

503.    Indicative of the change present in Louisiana over the past decades is the fact that experts now believe—as detailed during the hearing—that Black voters in Louisiana can have an opportunity to elect candidates of choice in districts below 50 percent BVAP. Due to meaningful white crossover voting (where white voters support Black candidates of choice), Dr. Palmer testified that CD2 and CD5 in *Galmon* Plaintiffs' illustrative plans could be drawn below 50

percent and still enable the Black community to elect its preferred candidates, 5/9 Tr. 346. Dr. Handley testified that it is possible districts below 50 percent BVAP may perform. 5/10 Tr. 75–76. Indeed, Dr. Lichtman agreed that a district around 40 percent BVAP could perform, 5/10 Tr. 198–200, a conclusion shared by the LSU and Tulane professors who submitted the *amicus* brief arguing that districts about 42 percent BVAP afford an equal minority electoral opportunity. *Amicus* Brief in Support of Neither Party (Doc. 97) at 23, 27, 34–34.

504.    Further reflective of that point is the fact that Plaintiffs have not presented recent, specific history of official discrimination with respect to Louisiana's congressional district plans. *See Lopez*, 339 F. Supp. 3d at 612 (finding Factor 1 as having "slight weight" despite Texas's "long history of official racial discrimination" where Plaintiffs failed to "identify any specific history of official discrimination with respect to establishing or maintaining the multimember nature of voting for the State's high courts," the offices at issue in that case). Since the 1980s, the only finding of discrimination with respect to Louisiana's congressional plans were the *Hays* line of cases in the 1990s that struck down two-majority-minority district plans as illegal racial gerrymanders—which, of course, is the same basic plan Plaintiffs urge this Court to impose.[9]

505.    Plaintiffs' other Senate Factor 1 evidence is likewise lacking. As one example, Plaintiffs rely upon the fact that, prior to *Shelby County* inactivating Section 5 of the Voting Rights Act, the U.S. Department of Justice had denied preclearance to proposed voting changes in Louisiana under Section 5 dozens of times. GX-3 at 11-13; PR-13 at 37. But as a matter of law, a state's failure to receive "preclearance from DOJ under the now-void Section 4 of the VRA does

---

[9] At best, *Robinson* Plaintiffs cite a 2021 settlement between the U.S. Department of Justice and the City of West Monroe, Louisiana concerning at-large voting for the City's Board of Aldermen. PR-13 at 49. Those parties entered into a consent decree by which the City adopted a "mixed" method of electing two Aldermen at-large and three through single-member districts. *See id.* at n. 230 (citing press release announcing terms of settlement). But a settlement and consent decree are different than a fully litigated and contested Section 2 decision, and the issues in that case were limited to a single municipality and in no way related to the State's congressional plan.

not prove" historical voting discrimination for Senate Factor 1 purposes, "because the Section 4 test did not deal with actual discrimination in election practices but with the lesser charge of 'backsliding.'" *Fusilier*, 963 F.3d at 459. The denial of preclearance does not establish that Louisiana discriminated against voters on the basis of race.

506.    For another, Plaintiffs also cite limitations on felon voting in Louisiana as evidence of present-day discrimination. Even though Louisiana passed Act 636 in 2018[10] to loosen the State's restrictions on voting for convicted felons, Dr. Gilpin nevertheless argued the State still made registration "burdensome and difficult for former felons," which he asserted were disproportionately Black. PR-13 at 48–49. Dr. Lichtman makes a similar argument. GX-3 at 17. But courts have repeatedly rejected challenges to felon disenfranchisement statutes under the Voting Rights Act, whether because the court read the VRA to not apply to felon-disenfranchisement statutes (among other reasons, to avoid conflict with Section 2 of the Fourteenth Amendment, which permits states to deny the franchise to those convicted of felonies), or simply upon the claim's merits. *See, e.g., Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1234 (11th Cir. 2005) (en banc); *Hayden v. Pataki*, 449 F.3d 305, 322–23 (2d Cir. 2006) (en banc); *Simmons v. Galvin*, 575 F.3d 24, 41–42 (1st Cir. 2009); *Farrakhan v. Gregoire*, 623 F.3d 990, 993–94 (9th Cir. 2010) (en banc); *Wesley v. Collins*, 791 F.2d 1255, 1261–63 (6th Cir. 1986). *See also United States v. Ward*, 352 F.2d 329, 331 n.1 (5th Cir. 1965) (recognizing that "Louisiana may exclude persons convicted of felonies" from the franchise). Plaintiffs have failed to prove

---

[10] Act 636 amended La. Rev. Stat. § 18:102(A) to permit felons on probation or parole, who have not been incarcerated for at least five years, to register and to vote. An editorial in THE ADVOCATE reported that passage of Act 636 restored the electoral franchise to approximately 40,000 Louisianans. *Our Views: Thanks to new law, more Louisiana voters have a stake in democracy*, THE ADVOCATE, Mar. 1, 2019, https://www.theadvocate.com/baton_rouge/opinion/our_views/article_2bd6919c-3b6d-11e9-a86c-9733299a2efb.html (visited May 17, 2022).

why Louisiana's permissive felon-voting regime under Act 636 is evidence of discrimination when a flat-out prohibition on felon voting is legal.

507.    *Robinson* Plaintiffs also point to this Court's preliminary injunction decision in *Harding v. Edwards*, 487 F. Supp. 3d 498 (M.D. La. 2020) requiring Louisiana to modify certain early-voting procedures to account for the COVID-19 pandemic, *see* PR-13 at 47, but plaintiffs in that case did not seek a preliminary-injunction under the VRA and the Court did not find a violation of the VRA in that case.

508.    More recent and current conditions in Louisiana reflect an equality of opportunity for Black voters in Louisiana to vote. Commissioner of Elections Sherri Hadskey testified that Louisiana has a 90 percent voter registration rate and that it is very easy to register to vote in Louisiana, with online voting registration available. 5/13 Tr. 44:1–14. In addition, the Louisiana Secretary of State has a division devoted to voter outreach, 5/13 Tr. 43:20, and does a significant amount of outreach to minority voters to ensure they are familiar with the voting process. *Id.* 45:11–46:4.

509.    In addition, Louisiana has a history of high standards of ballot and election integrity. Recently, Louisiana was ranked 7th in the nation for election integrity. Louisiana's Operation Geaux Vote has been recognized as one of three state finalists by the National Association of Secretaries of State ("NASS") IDEAS award. After a thorough audit over numerous months, the Louisiana Legislative Auditors found that the state has procedures and processes in place to ensure election integrity.  *See* SOS_01 at ¶ 12.

510.    Indeed, there is no evidence of discrimination as it relates to minorities' right to register to vote or otherwise participate in the democratic process. Plaintiffs offered no evidence at the hearing that any voter had been denied the right to vote or participate in the democratic

process because of their race. No evidence was offered that is more difficult for anyone to register to vote because of their race. In Louisiana, it is clear that people of all races can easily register to vote, and no legal obstacles exist that would prevent a registered voter from voting in an election. *See e.g.,* 5/10 Tr. 266:8-11; 5/13 Tr. 43:10-44:14; 5/11 Tr. 56:18-57:13.

511.    For all these reasons, Senate Factor 1 has little weight and does not favor Plaintiffs.

(b)    Senate Factor 2: Polarization

512.    As discussed in conjunction with the third *Gingles* precondition, polarization in Louisiana does not arise to a legally significant level. This factor, too, cuts against Plaintiffs.

(c)    Senate Factor 3: Voting Procedures

513.    The third Senate Factor inquires into "the extent to which the state...has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37.  Dr. Lichtman cites, as his sole evidence supporting Senate Factor 3, Louisiana's majority-vote requirement and runoff system, and the fact that three Black candidates—Melvin Holden for Lt. Gov. in 2015, Derrick Edwards for Treasurer in 2017, and "Gwen" Collins-Greenup for Secretary of State in 2018—finished in the top two in the primary but lost to white Republicans in runoff elections. 5/10 Tr. 173:9–174:1. *See also* GX-3 at 33–35.

514.    But "there is no evidence that racial bias . . . motivated the adoption of these practices." *Lopez*, 339 F. Supp. 3d at 615. Rather, the system emerged after *Foster v. Love*, 522 U.S. 67 (1997), struck down Louisiana's open primary system occurring in October as violative of a federal statute requiring federal elections to occur in November, *see* 2 U.S.C. § 7. *Foster* recognized an exception where "no candidate receives a majority vote on federal election day, there has been a failure to elect and a subsequent run-off election is required." 522 U.S. at 72 n.3

(citing *Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821 (N.D. Ga.), *aff'd*, 992 F.2d 1548 (11th Cir. 1993)). Louisiana reconfigured its election to match what the Supreme Court described in *Foster*.

515.    Moreover, Dr. Lichtman's three examples from statewide elections do not prove that Louisiana's electoral system "enhances" the opportunity for discrimination in congressional elections. For one, the electorates are different; U.S. Representatives are not elected at-large, like statewide officials, but from single-member districts. For another, Plaintiffs have failed to demonstrate how the majority-vote requirement and runoff contributed to the failure of Black candidates. In the 2018 Secretary of State race, for example, one Democrat (Ms. Collins-Greenup) and one Republican (Mr. Ardoin) advanced from a six-way primary, and Ms. Collins-Greenup's vote-share in the runoff (40.7 percent) was roughly equivalent to the total vote-share of both Democratic candidates in the primary (36.2 percent). *See* PR-12 at 24–25. A similar pattern holds true for Mr. Edwards' Treasurer race in 2017, PR-25 at 25, and for Mr. Holden's Lieutenant Governor race in 2015, PR-25 at 25, GX-3 at 34. Dr. Lichtman analyzes this dynamic in racial terms, *see* GX-3 at 34, but the partisan dimension of those runoff races (one Republican vs. one Democrat) is impossible to ignore. It is unclear how Louisiana's primary system "enhanced" any opportunity for discrimination; to the contrary, in each case a Black Democratic candidate advanced from the open primary to the runoff and was thereby able to increase his or her vote-share by consolidating all Democratic votes.

(d)    Senate Factor 4: Candidate Slating

516.    The fourth Senate Factor requires Plaintiffs to establish whether, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37. "A slating organization can either be an official political party or an unofficial nonpartisan organization." *United States v. City of Euclid*, 580 F. Supp. 2d 584, 608 (N.D. Ohio 2008); *see also Citizens for a Better Gretna v. City of Gretna, La.*, 636 F.

123

Supp. 1113, 1122–23 n.24 (E.D. La. 1986) (defining a slating group as "an organization whose purpose is to recruit candidates, nominate them, and campaign for their election to office in a nonpartisan election system."). The relevant question is, "where there is an influential official or unofficial slating organization, [what is] the ability of minorities to participate in that slating organization and to receive its endorsement?" *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984).

517.   Plaintiffs did not introduce any evidence regarding the candidate slating process to prove Senate Factor 4. Indeed, there is no reason to believe that Black candidates are excluded by political parties and other slating organizations in their endorsement and "slating" processes. This factor accordingly favors the defense.

(e)   <u>Senate Factor 5: Impact of Historical Discrimination on Political Participation</u>

518.   The fifth Senate factor calls for an inquiry into "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37 (quoting S. Rep., at 28–29, U.S. Code Cong. & Admin. News 1982, pp. 206–207). The "long history of discrimination" in practically any jurisdiction within the footprint of the Fifth Circuit "is not the subject of dispute." *Clements*, 999 F.2d at 866. Nor is there typically any basis for the defense to "question[] plaintiffs' assertion that disparities between white and minority residents in several socioeconomic categories are the tragic legacies of the State's discriminatory practices." *Id.* But that does not end the inquiry. It does not even begin it.

519.   Instead, the fifth Senate factor calls for initial "proof that participation in the political process is in fact depressed among minority citizens." *Clements*, 999 F.2d at 867. The

124

statute at issue here is, after all, the *Voting* Rights Act. This lawsuit is not an all-purpose vehicle for ending the various grievances referenced in submission of the evidence. It is only if past discrimination results in "reduced levels of black voter registration, lower turnout among black voters, or any other factor tending to show that past discrimination has affected their ability to participate in the political process" that the Senate factor favors the challenger. *Id.* "[P]roof of socioeconomic disparities and a history of discrimination 'without more' d[oes] not suffice to establish" this factor. *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1399 (5th Cir. 1996).

520.    Plaintiffs attempted to make this showing in two ways.

521.    First, Dr. Burch opined that the disadvantages suffered by Black Louisianans are the types of disadvantages, according to the literature, that can result in decreased political participation. PR-14 at 4. But generic testimony "that individuals of lower socioeconomic status were not as likely to vote as individuals of higher socioeconomic status" does not meet the legal threshold. *Clark*, 88 F.3d at 1399. In *Clark*, the Fifth Circuit held that it was insufficient that an expert "based her conclusion on political science literature, not 'an "intensely local appraisal" of the social and political climate' of" the jurisdiction." *Id.* at 1399. Dr. Burch's testimony is no different.

522.    Second, Plaintiffs rely on Dr. Lichtman's opinion. His opinions, too, predominantly addressed the impact of past discrimination on political participation in highly generic terms. GX-3 at 36–40. Dr. Lichtman's testimony has been rejected for this failing before. *See Fairley v. Hattiesburg Mississippi*, 662 F. App'x 291, 298 (5th Cir. 2016) ("Lichtman's testimony and report are not evidence that African Americans in Hattiesburg *actually* have depressed political participation, but rather support the theory that socioeconomic disparity can effect political participation generally.").

523.    At the hearing, Dr. Lichtman went a step further an opined, based on one of the defense experts' reports, that Black turnout lags behind white turnout "sometimes up into the double digits" (i.e., by 10 percent or more). 5/10 Tr. 177:17–22. The principal problem with this, however, is that Plaintiffs' contention that their bare-majority districts will perform depends on the factual premise that Black participation is on par with white participation. The Court cannot assume different levels of participation, depending on the circumstances in which one answer or another hurts or undercuts Plaintiffs' position. Further, courts have found this factor met where "voter registration rate[s]" of the relevant minority group are "significantly lower than those of whites." *Lopez v. Abbott*, 339 F. Supp. 3d 589, 616 (S.D. Tex. 2018); *see also Perez v. Perry*, No. SA-11-CV-360, 2017 WL 962686, at *174 (W.D. Tex. Mar. 10, 2017) (discussing Latino turnout rates between four and nineteen percent).

(f)    Senate Factor 6: Racial Appeals

524.    "While the existence of racial appeals in political campaigns is a factor that may be indicative of a law's disparate impact, it is not highly probative here." *Veasey*, 830 F.3d at 261. Plaintiffs' efforts to demonstrate that political campaigns are marred by racial appeals generated more heat than light.

525.    As an initial matter, Dr. Burch testified that some racial appeals "target Black voters." PR-14 at 24. But, in *Veseay*, the Fifth Circuit held that this element was not probative, in part, because "racial appeals seem to have been used by both minorities and non-minorities." 830 F.3d at 261. This fact therefore cuts against the relevance of this factor.

526.    As for racial appeals aimed at white voters, Plaintiffs cite only one example of a racial appeal even purporting to relate to congressional elections. Dr. Lichtman opines that "U.S. Representative Steve Scalise . . . admitted that in 2002, while serving as a Louisiana state representative, he had addressed a white supremacist group founded by David Duke." GX-3 at 41.

126

But Dr. Lichtman fails to explain why that is a racial *appeal*, which occurs where "racial campaign tactics" are used "to defeat candidates" having support of the minority community. *White v. Regester*, 412 U.S. 755, 767 (1973). The trial evidence is likely to show that Rep. Scalise's address was news in 2014 because the congressman was *apologizing* for the 2002 speech and insisting that he did not know of the group's true stances.[11] The Court need not address the sincerity of his apology or the accuracy of his excuse: the relevant point is that the event harmed his image with the public. It was not an appeal to help him win congressional elections.

527.    The remaining alleged examples of racial appeals are of diminished probative value because they do not involve congressional elections, and they are, in any event, not persuasive evidence of racism in the electorate. The examples fall roughly into several categories.

528.    The first category, which is by far the largest, is purported racial appeals regarding the policy question of persons unlawfully present in the United States. *See* GX-3 at 40–46. There are two problems with Plaintiffs' arguments. One is that a policy of opposing the unlawful entry of aliens into the United States is both a legitimate (if debatable) policy position and one comporting with federal law as it currently exists. *See Arizona v. United States*, 567 U.S. 387, 395–96 (2012). It is difficult to see how campaigning to enforce existing immigration law amounts to racial prejudice, and construing the test otherwise would politicize the VRA analysis to a troubling degree. The second problem is that, even if such campaign amounts to racial appeals, it concerns persons of Hispanic or Latino ethnicity. But Plaintiffs here allege vote dilution against Black residents.

---

[11] Bruce Alpert, Scalise still could move up in House; His apology has been accepted, New Orleans Times Picayune (June 2, 2015), 2015 WLNR 904753;  Scalise will have to repair credibility, New Orleans Times Picayune (June 2, 2015), 2014 WLNR 36984698

529.    A second category of alleged appeals, like the first, attempts to spin relatively common, if hard-hitting, political campaign as racial, with no evidence. For example, an advertisement showing then-candidate John Bel Edwards with Stacey Abrams was intended to paint the former as "Too Liberal for Louisiana." *See* GX-3 at 43 (footnote omitted). That Abrams is Black does not somehow translate this into a racial appeal. If the element were otherwise, then every campaign portrayal of a racial or ethnic minority person would be a racial appeal, and racial appeals would be generated automatically by the mere fact that racial and ethnic minorities participate in politics—which the VRA was meant to encourage.

530.    A third category of alleged appeal does involve racial themes, but the transparent purpose is to accuse the target of the ad of being racist, not to use racism in the populace against the target. An example is the campaign advertisement of Black candidate Elbert Guillory, a Republican who was attempting to turn the racial script against Democrats and paint them as racist. GX-3 at 41. Another example is an exchange identified by Dr. Burch between gubernatorial candidates Edwards in Rispone with each trading accusations that the other was racist.  PR-14 at 24. These examples, again, are evidence that racism is not tolerated, which hardly assists Plaintiffs in showing that candidates leverage invidious racial attitudes to their benefit.

531.    A fourth category is alleged appeals that are old and stale, such as the 1995 gubernatorial runoff election and 1991 gubernatorial race. GX-3 at 41; *see Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 179 n.61 (E.D. Va. 2018) (declining to consider "electoral results from the 1990s" because it "was outdated for purposes of the 2011 redistricting.").

(g)    Senate Factor 8: Responsiveness

532.    The eighth Senate Factor is "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."

*Fusilier*, 963 F.3d at 455 n.6.  *See also Harding v. Edwards*, 487 F. Supp. 3d 498, 520 (M.D. La. 2020) (Dick, C.J.) ("[E]lected officials' failure to respond to the needs of minority groups is a factor to be considered by the court.").

533.    Though it is one factor to be considered as part of the "totality of the circumstances," *LULAC*, 999 F.2d at 849, "responsiveness has limited relevance" in this inquiry. *Clark v. Calhoun Cty., Miss.*, 88 F.3d 1393, 1400 (5th Cir. 1996) (citation and internal quotation marks omitted).  In applying this factor, the Fifth Circuit has cautioned that "responsiveness cannot be weighed in the abstract" and that "[r]esponsiveness, like many things, is a question of both kind and degree." *Id.* at 1401.

534.    To the extent that responsiveness is relevant in this case, Plaintiffs have not shown that Louisiana's congressional delegation lacks responsiveness.  A desire to "elect more African American candidates . . . reasonable as it may be, does not in itself establish the non-responsiveness of current elected officials to minority needs."  *Hall v. Louisiana*, 108 F. Supp. 3d 419, 442 n.20 (M.D. La. 2015).  Nor does the continued existence of a wide variety of economic and social problems in Louisiana mean that Plaintiffs have identified "any concrete need or concern of a minority member that was *ignored* by an elected official, either judicial or non-judicial[.]"  *Id.* at 442 (emphasis added).  To decide otherwise would be transform evidence of *any* societal problem—or even mere policy disagreements—into evidence of non-responsiveness.

535.    Plaintiffs' generalized arguments about responsiveness are also unpersuasive because they do not speak specifically to whether the *Louisiana congressional delegation*, or its members, are not responsive to the particularized needs of Black Louisianans.  Because this case is about Louisiana's congressional map, it is only logical that the responsiveness inquiry should focus on the legislative body in question, not on the prospects of African-Americans in Louisiana

more generally.  *See, e.g.*, *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1410 (S.D. Miss. 1992) (noting the absence of proof as to responsiveness by elected officials and "specifically the justices of the Supreme Court of the State of Mississippi, to the particularized needs of blacks"), *aff'd,* 994 F.2d 1143 (5th Cir. 1993); *Jeffers v. Clinton,* 730 F. Supp. 196, 213 (E.D. Ark. 1989) *(*"We are not convinced, however, that the charge of unresponsiveness can be sustained as to the members of the State Legislature, and it is with them that we must be particularly concerned in this case.").

536.    Because Plaintiffs have not established a lack of responsiveness on the part of Louisiana's existing congressional delegation or its members, this factor weighs against Plaintiffs.

(h)    <u>Senate Factor 9: Strength Of State's Underlying Policy</u>

537.    The ninth Senate Factor is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Fusilier*, 963 F.3d at 455 n.6.

538.    In crafting the redistricting plan, the Legislature avoided presumptively unconstitutional race-based redistricting, and it retained the cores of existing districts.  These policies are not tenuous.

539.    As a threshold matter, compliance with federal law—and indeed, compliance with the U.S. Constitution—cannot be a "tenuous" policy interest.  *See, e.g.*, *Terrazas v. Clements*, 581 F. Supp. 1329, 1357 (N.D. Tex. 1984) ("We cannot conclude that compliance with federal constitutional and statutory standards are only tenuously related to the district lines as drawn"); *Mo. State Conference of NAACP v. Ferguson-Florissant School Dist.*, 201 F. Supp. 3d 1006, 1081 (E.D. Mo. 2016) (finding a non-tenuous justification where voting practice was "required by Missouri law").  Additionally, there are compelling reasons to minimize changes, preserve the status quo, and keep constituent-incumbent relationships intact.  *See Wright v. Sumter Cty. Bd. of*

*Elections and Registration*, 301 F. Supp. 3d 1297, 1321–22 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1281 (11th Cir. 2020).  In light of these factors, the policies reflected in the Legislature's redistricting plan cannot be dismissed as "tenuous."  Indeed, quite the opposite is true.

540.    In any event, the Fifth Circuit has rejected tenuousness arguments precisely like the ones advanced by Plaintiffs in this case.  *See Fairley v. Hattiesburg Mississippi*, 662 F. App'x 291, 299 (5th Cir. 2016) (upholding district court's finding as to tenuousness where the "primary goal in redistricting was to correct" for population deviation "with as little change to the ward lines as possible").  Here, the districts drawn by the Legislature rate very highly on core retention, 5/12 Tr. 212:21–213:6 (Hood) and evince a clear policy that "align[s] with traditional districting principles."  *Fairley*, 662 F. App'x at 299.

541.    It is also significant, for purposes of this factor, that the Legislature faced a set of interrelated problems and crafted a policy that "balanced these competing considerations."  *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 799 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015).  *Rodriguez* confirms that where legislative bodies have to balance, *inter alia*, compliance with federal law, population shifts, and maintaining incumbent relationships, the limited inquiry is whether the Legislature's reasons "for adopting and maintaining the [plan] are arbitrary or without adequate basis."  *Id.*  The enacted plan more than clears that bar.

      D.    <u>Section 2 of The Voting Rights Action Creates No Private Right Of Action</u>

542.    The United States Supreme Court has never held that Section 2 of the Voting Rights Act creates a private right of action. *Brnovich. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring) ("Our cases have assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2. . . . [T]his Court need not and does not address that issue today.").

543.    The Fifth Circuit has recently acknowledged that it remains an open question as to whether a private right of action exists under Section 2 of the Voting Rights Act. *Thomas v. Reeves*, 961 F.3d 800, 808 (2020) (Costa, J. concurring); *see also id.* at 818 (Willett, J. concurring).

544.    The Eastern District of Arkansas has recently held that "[i]t is undisputed that Congress did not include in the text of the Voting Rights Act a private right of action to enforce Section 2." *Arkansas State Conference of the NAACP v. Arkansas Board of Apportionment*, 2022 U.S. Dist. LEXIS 29037, *21 (E.D. Ark Feb. 17, 2022).

545.    To determine if an implied right of action exists, a court must first assess whether the statute demonstrates "a congressional intent to create new rights;" and, if so, the court must then determine whether the statute "manifest[s] an intent to create a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001).

546.    Section 12 of the Voting Rights Act is the only section of the statute that provides a remedy for Section 2, and that provision only identifies the Attorney General of the United States as the party who may enforce the statute. 52 U.S.C. § 10308(d).

547.    "[T]he canon of *Expressio Unius Est Exclusio Alterius* . . . provides that 'expressing one item of [an] associated group or series excludes another left unmentioned.'" *Baptist Mem'l Hosp. – Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020) (quoting *NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (alteration in original)).

548.    By including a right of action for the United States Attorney General but nonetheless omitting a private cause of action, Congress intended for the former, but not the latter, to have the power to sue under Section 2 of the Voting Rights Act.

549.    Because Plaintiffs have no private cause of action under Section 2 of the Voting Rights Act, their motions for a preliminary injunction necessarily fail.

III.    **The Equitable Factors Militate Against an Injunction**

550.    "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Thus, a party seeking such relief must also establish clearly "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. For example, in *Winter*, the Supreme Court held that a lower court abused its discretion in issuing a preliminary injunction because the public interest cut against that relief. *Id.* at 31–33. Plaintiffs are require "clearly carr[y] the burden of persuasion" on these requirements. *PCI Transp.*, 418 F.3d at 545. They failed to do so.

A.    No Preservation of the Status Quo

551.    One equitable deficiency in their claim is that the requested injunction does not preserve the *status quo*. The Supreme Court has held that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). That is not the case here. There is no colorable argument that the illustrative plans, or some new plan the Legislature might enact as a remedy, represents that status quo, and there is no colorable argument that the requested injunction would preserve the parties' relative positions before trial. This is true both in the sense that a plan never before used in Louisiana cannot be called the status quo and in the sense that the specific plans at issue here depart markedly from the general district configurations utilized in the State for more than a generation.

552.    Plaintiffs respond with a 1979 Fifth Circuit case that expressed toleration for preliminary injunctions that alter the status quo. Doc. 120 at 19–20. But that decision proceeds *Camenisch*, and Plaintiffs fail to explain how that position comports with its crystal-clear directive

133

that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." 451 U.S. at 395.

553.    In any event, case law from around that time period also made clear that that "mandatory injunctive relief, which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and the law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). Thus, an even higher showing than ordinary applies, and, as shown, Plaintiffs have failed even the ordinary preliminary-injunction standard.

554.    Plaintiffs do not cite any redistricting case to have ordered a new redistricting plan as *temporary* relief. Many cases have denied such relief. *See, e.g.*, *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 596 (E.D. Pa. 2012); *Diaz v. Silver*, 932 F. Supp. 462, 468–69 (E.D.N.Y. 1996); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992); *Kostick v. Nago*, 878 F. Supp. 2d 1124, 1147 (D. Haw. 2012); NAACPGreensboro *Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 530 (M.D.N.C. 2012); *Perez v. Texas*, 2015 WL 6829596, at *4 (W.D. Tex. Nov. 6, 2015); *Valenti v. Dempsey*, 211 F. Supp. 911, 912 (D. Conn. 1962); *Shapiro v. Berger*, 328 F. Supp. 2d 496, 501 (S.D.N.Y. 2004). It would be imprudent for the Court to break new ground in such a weak case.

### B.    Risk of Constitutional Injury

555.    The public interest cuts against an injunction because granting it would pose an unacceptable risk of constitutional injury to hundreds of thousands of Louisiana residents. Ironically, Plaintiffs rely on the line of cases holding that a constitutional violation is never in the public interest, and enjoining such a violation is always in the public interest. Doc. 42-1 at 22 (citation omitted); Doc. 41-1 at 23.

556.    But they forget that the roles here are reversed. They did not bring a constitutional claim. And, if their claim is ultimately deemed deficient, the result will be a gross constitutional violation as the *result* of the injunction they request. They ask the Court to compel the very action that resulted in "the most extensive unconstitutional racial gerrymander ever encountered by a federal court," *Covington*, 270 F. Supp. 3d at 892. That risk is not in the public interest, especially given both the magnitude and breadth of the injury that would be imposed. *See United States v. Hays*, 515 U.S. 737, 745 (1995) (holding that every resident of a racially gerrymandered district suffers injury in fact). It is not in the public interest to impose an "odious" injunction. *Wis. Legislature*, 142 S. Ct. at 1248 (citation and quotation marks omitted).

557.    Because it "is always in the public interest to prevent the violation of a party's constitutional rights," *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014), the risk that the demanded injunction would inflict a gross and widespread equal-protection violation cannot be justified by the possibility of a statutory violation. The Court must err in favor of the Constitution. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The Court is required "to balance the harm that would be suffered by the public if the preliminary injunction were denied against the possible harm that would result to United if the injunction were granted." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985). Here, if Plaintiffs ultimately do not prevail on the merits, then the 2022 election will have inflicted a staggering constitutional injury that can never be remedied. In these circumstances, an injunction would be irresponsible, at best.

C.    The Purcell Doctrine Counsels Against Eleventh-Hour Judicial Intervention

558.    As the Supreme Court of the United States held in *Purcell v. Gonzalez*, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion

and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." 549 U.S. 1, 4-5 (2006) (per curiam). Since this seminal opinion in 2006, Court's nation-wide have applied the *Purcell* doctrine. *See Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring in grant of stay application) see *also Milligan*, 142 S. Ct. at 879; *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020); *Merrill v. People First of Ala.*, 141 S. Ct. 190 (2020) *Clarno v. People Not Politicians*, 141 S. Ct. 206 (2020; *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (per curiam); *Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28 (2020)(declining to vacate stay); *Benisek v. Lamone*, 138 S. Ct. 1942 (2018(per curiam); *Veasey v. Perry*, 574 U.S. 951 (2014).

559.    In a normal election cycle, "[r]unning elections state-wide is extraordinarily complicated and difficult." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022 (Kavanaugh, J., concurring in grant of applications for stays). Elections officials must navigate "significant logistical challenges" that require "enormous advance preparations." *Id.* But, the 2022 election cycle has been far from a "normal" cycle in Louisiana, as the Covid-19 pandemic delayed census results, exacerbating the challenge of needing to draw new districts and conduct elections under these new districts, state and parish wide.

560.    The 2022 election cycle already underway is no exception. Over two months ago, the United States Supreme Court in *Milligan* issued a stay of the district court's opinion that enjoined the use of Alabama's congressional redistricting plan. In his concurring opinion, Justice Kavanaugh invoked the *Purcell* doctrine for the proposition that courts "should not enjoin a state's election laws in the period close to an election." 142 S. Ct. at 879-880. This is because, "filing deadlines need to be met" candidates need to "be sure what district they need to file for" or even determine "which district they live in." *Id.* As a result, Courts this redistricting cycle have applied

the *Purcell* doctrine for plans in Georgia, North Carolina, and Ohio. *Alpha Phi Alpha Fraternity,*

*Inc., v. Raffensperger,* . ___F.Supp.3d___, 2022 WL 633312, 1:21-cv-05337(N.D. Ga. Feb. 28,

2022; *Moore v. Harper,* No. 21A455, 595 U.S. (Kavanaugh, J. concurring); *Michael Goindakis,*

*v. Frank LaRose, in his capacity as Ohio Sec'y of State, et al.,* No. 2:22-CV-0773, 2022 WL

1175617, at *19 (S.D. Ohio Apr. 20, 2022).

561.    Justice Kavanaugh opined *Milligan* that the *Purcell* doctrine "might" be overcome

if the Plaintiff establishes "at least" that:

> the underlying merits are entirely clear-cut in favor of the plaintiff;
> (ii) the plaintiff would suffer irreparable harm absent the injunction;
> (iii) the plaintiff has not unduly delayed bringing the complaint to
> court; and (iv) the changes in question are at least feasible before the
> election without significant cost, confusion, or hardship.

*Milligan*, 142 S. Ct. 879 at 881.

562.    Plaintiffs fail to even prove that they are likely to succeed on the merits of their

claims, much less that the evidence is "entirely clear-cut" in their favor. *Id.* Nor can Plaintiffs

prove that their requested change, an entirely new congressional plan, is feasible before the

election, and certainly not without significant cost, confusion, and hardship.

563.    Sherri Hadskey, who is the current Louisiana Secretary of State's Commissioner of

Elections and oversees election administration and implementation of new districting plans at the

state and local level testified about the significant cost, confusion and hardship associated with

implementing a new districting plan at this late date. 5/13 Tr. 29:13-31:4; SOS_1 p 1. Particularly,

Ms. Hadskey testified:

- That substantial administrative work has already been completed on administration
  of the Enacted Congressional Plan. 5/13 Tr. 31:5–15. In order to implement a new
  congressional plan Ms. Hadskey's office would have to reassign voters who are in
  new congressional districts to their new districts in the Enacted Plan. The Secretary
  of State's office has already reassign voters in the fifteen Louisiana parishes that
  required changes under the enacted plan in the Secretary of State's ERIN system.

137

Moreover, approximately 250,000 voting cards have been sent to voters whose parishes changed districts following reapportionment. *Id.*; *see also* SOS_1 at p 4. Those voters have been notified of the specific congressional district in which they will be voting this year. *See id.*

- To the importance of the upcoming June 22, 2022 deadline for potential congressional candidates. By June 22, all congressional candidates who wish to qualify for the ballot by nominating petition must submit nominating petitions with a thousand signatures from voters in their congressional district. 5/13 Tr. at 31:16-32:15; 55:4–7. As of the date of this submission this date is a mere 5 weeks away. In order to meet the June 22 deadline, Ms. Hadskey's office must notify voters (and potential candidates) of which districts they live in—which has already been done under the Enacted Plan by the mailing of the new voter cards. *Id.* at 32:2–15. Candidates and voters need adequate notice of these districts to ensure they have enough time to decide whether to attempt to qualify by petition or, in the case of voters, who to support. *See id.* If congressional candidates do not meet the June 22 qualification deadline, the candidates will have to pay a filing fee and qualify by between July 20-22, 2022. *Id.* at 32:16–20.

- Between now and July 20, Ms. Hadskey's office must complete several tasks to ensure timely and accurate administration of the 2022 election in Louisiana for all offices. *Id.* at 32:21-36:5. These activities include, *inter alia*: (1) implementation of complicated school board and municipal redistricting plans; (2) conducting a June 4 special election in Calcasieu Parish due to a redistricting error; (3) conducting yearly maintenance on scanners and voting equipment; (4) processing an estimated 800 legislative acts when the latest session ends; and (5) completion of a statewide voter registration canvas to maintain the voter rolls[12]. *Id.*; *see* SOS_1 pp 4-5. None of these tasks are straightforward and all are under limited time constraints. For example, school board and municipal redistricting requires coding of the new districts into the ERIN system and distribution of voter cards notifying voters of their school board and municipal districts. *Id.* at 33:1–7; 35:11–15.

- The voter canvas starts in five days, on May 23, 2022. This requires comparing USPS addresses to NOCCA to determine whether a voter's address or registered name has changed. If there is a change, the voter must be sent a card with instructions to update their information. *Id.* at 34:18-35:10.

564.    Implementing a new congressional districting plan would create undue hardship

and chaos for Louisiana and its voters. Specifically, if Ms. Hadskey's office were forced to

---

[12] Ms. Hadskey also testified to the nationwide ballot paper shortages and issues with timely printing of Louisiana's unique ballot envelopes. *See, e.g.*, 5/13 Tr. 39:19-40:11, 49:10-50:5; SOS_1 p 6. The paper shortages could also interfere with the printing of voter notification cards and other required items, such as the poll book pages, required by state and federal law. 5/13 Tr. 50:14-51:24.

implement one of Plaintiffs' illustrative plans, at a minimum the following tasks would need to be completed by July 20 at the latest: (1) undoing the coding of the fifteen parishes already completed for the Enacted plan; (2) coding the approximately twenty-five parish changes under an illustrative plan, and (3) timely notifying voters and potential candidates of those changes. 5/13 Tr. 36:6-38:2. At each stage, Ms. Hadskey testified that the process would rushed which gives her a significant concern that voters' information could be coded incorrectly, leading to incorrect information on ballots used in the election. *Id.* at 37:14-38:2. This task would be further complicated if an illustrative map splits precincts, as the registrar of voters for each parish is responsible for moving voters in split precincts by hand. *Id.* at 38:3–12. In addition to regularly scheduled early voting, Ms. Hadskey testified that overseas ballots must be mailed no later than September 24, 2022, under the federal UOCAVA deadline. *Id.* at 45:1-10.

565.    In addition to the confusion created by reassigning voters, there is a real risk that doing so on such a compressed time frame could lead to the issuance of incorrect ballots, and even in a worse case scenario, and invalidated election. Ms. Hadskey testified that this scenario has already occurred due to a compressed timeframe this cycle. For example, in Calcasieu Parish, late census information caused a rushed entry of voter information and led to entry of incorrect voter information, ultimately resulting in the issuance of incorrect ballots. *Id*. at 38:3–21. As a result, a judge required state and local officials to hold a special municipal election in Calcasieu Parish to remedy the issue. *Id.*; SOS_1 at pp 5-6. Ms. Hadskey expressed great concern that the issues Calcasieu Parish experienced will arise again, but on a larger scale, if a new congressional plan is implemented by the Court in June or July—especially considering the fact that there are nineteen (19) new registrars across the state who have not handled decennial redistricting before. 5/13 Tr.

at 38:22-39:4.  Ms. Hadskey expressed her great concern as to whether her office could administer an error-free election on a new congressional plan within the next few months:

> I'm extremely concerned.  I'm very concerned because when you push – when you push people to try a and get something done quickly and especially people that have not done this process before, the worst thing you can hear from a voter is I'm -- I'm looking at my ballot and I don't think it's right, I think I'm in the wrong district or I don't feel like I have the right races.
>
> The other thing is notifying the voters.  I think we all can relate to we know who our person is that we voted for for Congress or for a school board or any race; and when you get there and you realize it's not the person you are looking for, you're thinking that's who you are going to vote for and then you find out, wait, I'm in a different district.  If we don't notify them in enough time and have that corrected, it causes confusion across the board, not just confusion for the voters, but also confusion for the elections administrators trying to go back and check and double check that what they have is Correct

*Id.* at 40:12-41:15; SOS_1 pp 4-6.  In the entirety of Ms. Hadskey's thirty-year career in Louisiana election administration, she has never moved a federal election.  5/13 Tr. 56:24-57:12.

566.    Plaintiffs' claims that *Purcell* does not apply because of Louisiana's late elections fail. Louisiana is four months away from the UOCAVA deadline to mail ballots. And prior to mailing those ballots, ballots must be prepared in accordance to state and federal law. Particularly, Louisiana's requirement that the ballot have an affidavit on the envelope flap makes it difficult to source and print. *Id.* at 49:10-50:5. Courts in the Fifth Circuit have routine abided by the *Purcell* doctrine to not meddle in an election in a period this close to an election. *See Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (remanding Section 2 case for new trial but ordering that no remedy could be enforced until after the election, which was four months away); *Texas Democratic Party v. Abbott,* 961 F.3d 389, 412 (5th Cir. 2020) (staying enforcement of a preliminary injunction to minimize voter confusion on June 4, 2020, five months prior to the election).

567.    Plaintiffs' requested relief is the sort of relief the *Purcell* doctrine commands courts to decline on the eve of an election. And this is true even if the Court were to believe the underlying

election laws may be legally suspect, which, as shown above, is not the case here. *See Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring in grant of applications for stays of enforcement where lower court found VRA violations in Alabama's Congressional redistricting plan); *Covington,* 316 F.R.D. at 177 (refusing to enjoin election despite a final judgment against certain North Carolina legislative districts because "such a remedy would cause significant and undue disruption to North Carolina's election process and create considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials."); *Raffensperger*, 2022 WL 633312, at \*76 (noting that the Court's denial of the preliminary injunction on the basis of the *Purcell* doctrine "should not be viewed as an indication of how the Court will ultimately rule on the merits at trial"); *Upham v. Seamon*, 456 U.S. 37, 44 (1982) (holding that even though there was error by the lower court the interim plan should be used because the filing date for candidates had "come and gone" and the primary was looming.) Therefore, even assuming *arguendo* the Court were inclined to believe Plaintiffs' arguments that the Congressional Plan violates the VRA, which it does not, the *Purcell* doctrine would require the 2022 elections to go forward under the Congressional Plan pending adjudicating of Plaintiffs' claims.

568.   Plaintiffs' expansive relief cannot be denied because of the "increased risk" of confusion the Supreme Court warned about in *Purcell. See also Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28, 42 (2020) (*DNC*) (Kagan, J., dissenting) ("Last-minute changes to election processes may baffle and discourage voters…).

## <u>CONCLUSION</u>

For the aforementioned reasons, and those reasons found in Defendants' combined post-hearing brief, Plaintiffs' motions should be denied.

Respectfully submitted,

/s/ Michael W. Mengis

Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

* *Admitted pro hac vice*

/s/ Erika Dackin Prouty

Erika Dackin Prouty*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

*Counsel for Legislative Intervenors, Clay
Schexnayder, in his Official Capacity as
Speaker of the Louisiana House of
Representatives, and of Patrick Page Cortez, in
his Official Capacity as President of the
Louisiana Senate*

/s/ Phillip J. Strach* (Lead Counsel)

phillip.strach@nelsonmullins.com
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Telephone: (919) 329-3800
Facsimile: (919) 329-3799

142

*/s/ John C. Walsh*
John C. Walsh (Louisiana Bar Roll No. 24903)
john@scwllp.com
**SHOWS, CALI & WALSH, L.L.P.**
P.O. Box 4046
Baton Rouge, LA 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-5561

*Counsel for Defendant R. Kyle Ardoin*
*\*Admitted Pro Hac Vice*

Jeff Landry
Louisiana Attorney General

Jason B. Torchinsky (DC 976033 )*        */s/Angelique Duhon Freel*
Phillip M. Gordon (DC 1531277)*          Elizabeth B. Murrill (LSBA No. 20685)
Dallin B. Holt (VSB 97330)*              Shae McPhee (LSBA No. 38565)
Holtzman Vogel Baran                     Morgan Brungard (CO Bar No. 50265)*
Torchinsky & Josefiak, PLLC              Angelique Duhon Freel (LSBA No. 28561)
15405 John Marshall Highway              Carey Tom Jones (LSBA No. 07474)
Haymarket, VA 20169                      Jeffrey M. Wale (LSBA No. 36070)
(540) 341-8808 phone                     Office of the Attorney General
(540) 341-8809 fax                       Louisiana Department of Justice
jtorchinsky@holtzmanvogel.com            1885 N. Third St.
pgordon@holtzmanvogel.com                Baton Rouge, LA 70804
dholt@holtzmanvogel.com                  (225) 326-6000 phone
*admitted pro hac vice                   (225) 326-6098 fax
                                         murrille@ag.louisiana.gov
                                         freela@ag.louisiana.gov
                                         walej@ag.louisiana.gov
                                         jonescar@ag.louisiana.gov
                                         mcphees@ag.louisiana.gov
                                         brungardm@ag.louisiana.gov

## CERTIFICATE OF SERVICE

I certify that on May 23, 2022, this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system. Copies of the filing are available on the Court's system.

/s/ Erika Dackin Prouty
Erika Dackin Prouty *(admitted pro hac vice)*
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*