# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, et al., *Plaintiffs,* v. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, *Defendant.* | Civil Action No. 3:22-cv-00211-SDD-SDJ<br><br>Chief Judge Shelly D. Dick<br><br>Magistrate Judge Scott D. Johnson |
| EDWARD GALMON, SR., et al., *Plaintiffs,* v. R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, *Defendant.* | Consolidated with<br>Civil Action No. 3:22-cv-00214-SDD-SDJ |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## JOINT MOTION FOR STAY PENDING APPEAL

Defendants respectfully move the Court to stay its injunction of June 6, 2022, pending their appeals to the U.S. Court of Appeals for the Fifth Circuit. Defendants have a right of appeal under 28 U.S.C. § 1292(a)(1), and each set of Defendants has filed a notice of appeal. Defendants respect the Court's ruling but respectfully submit that it is vulnerable to reversal on appeal. This is not merely a remote possibility. As the Court is aware, a three-judge district court in Alabama issued an injunction similar to this Court's, and the Supreme Court stayed that injunction pending appeal. *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022). Defendants are well within their rights to seek the same relief here.

This motion provides this Court an opportunity to correct the irreparable harm to Defendants and all Louisiana citizens that will result from the injunction. Federal Rule of Appellate Procedure 8(a)(1)(A) commands an appellant to provide a district court this opportunity before seeking relief in a court of appeals. In this Rule, it is "fairly contemplated" that "tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844–45 (D.C. Cir. 1977).

Alternatively, the Court should issue a temporary stay, often called an "administrative" stay, to permit Defendants the opportunity to file and brief an emergency stay motion in the Fifth Circuit. "The purpose of [an] administrative stay is to give the court sufficient opportunity to consider the emergency motion for stay." *Garza v. Hargan*, No. 17-5236, 2017 WL 4707112, at *1 (D.C. Cir. Oct. 19, 2017). It is a "routine practice" in the Fifth Circuit that "falls within the 'power inherent in *every* court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020) (*Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)) (emphasis added). Such a stay would, if granted, apply temporarily and terminate upon an order of the Fifth Circuit resolving Defendants' forthcoming appellate stay motions.

However, if the Court is inclined to disagree with these requests, Defendants respectfully request that the Court issue a prompt order denying this motion to permit Defendants to move the Fifth Circuit for a stay pending appeal. In all events, the exigencies of this case require immediate relief, and Defendants respectfully request a ruling by close of business June 9 to permit them to file a motion for a stay in the Fifth Circuit. *See* FRAP 8(a)(2)(A)(1).

## ARGUMENT

Under the "traditional" standard for a stay pending appeal, a court considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted); *see also NFIB v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665–66 (2022). These factors are not to be applied "in a rigid or mechanical fashion." *Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014) (alterations accepted). A movant "need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay." *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983) (citation omitted).

As the Supreme Court "has often indicated, however, that traditional test for a stay does not apply (at least not in the same way) in election cases when a lower court has issued an injunction of a state's election law in the period close to an election." *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring). The Supreme Court "has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election, and [the Supreme] Court in turn has often stayed lower federal court injunctions that contravened that principle." *Id.* That standard is appropriately read to provide "a district court may *never* enjoin a State's election laws in the period close to an election." *Id.* at 881 (Kavanaugh, J., concurring). There is also an arguable "relaxed" interpretation of the rule, requiring "a *plaintiff* [to] establish[] at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly

3

delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.* (emphasis added). A stay is warranted under all of these standards.

A.  Defendants are likely to succeed on the merits, and the merits are certainly not clear-cut in Plaintiffs' favor. At a minimum, the Court should have "little difficulty concluding that the legal questions presented by this case are serious, both to the litigants involved and the public at large, and that a substantial question is presented for [the Fifth Circuit] to resolve." *Campaign for S. Equal.*, 773 F.3d at 57. Defendants' arguments are more thoroughly set forth in their consolidated post-hearing brief, Doc. 158, and their consolidated post-hearing proposed conclusions of law, Doc. 159. Defendants have preserved all these arguments for appeal and incorporate them by reference. They summarize several critical points here for the sake of completeness.

1.  Plaintiffs cannot satisfy the first *Gingles* precondition with illustrative plans that qualify as racial gerrymanders. A plan that links "distinct locations" on the basis of race does not satisfy the first *Gingles* precondition. *Sensley v. Albritton*, 385 F.3d 591, 597 (5th Cir. 2004). As Defendants have shown, *see, e.g.*, Doc. 158 at 3–13, that is the case here. Plaintiffs' post-hearing brief raised no quarrel with the proposition that racially predominant redistricting schemes cannot satisfy the first *Gingles* precondition. *See* Doc. 161 at 11. Instead, they mischaracterize Defendants' argument as a claim that "*any* consideration of race" amounts to predominance. *Id.* That is a straw man. The evidence clearly establishes more than consideration of race. It establishes that Plaintiffs' experts (1) "purposefully established a racial target" that "African-Americans should make up no less than a majority of the voting-age population," and (2) the racial target "had

4

a direct and significant impact" on the "configuration" of districts. *Cooper v. Harris*, 137 S. Ct. 1455, 1468–69 (2017). As a matter of law, that is predominance.

This Court's order found that Defendants' arguments regarding predominance are "hypercritical," Doc. 173 at 117, but the Supreme Court has found the same evidentiary indicators of predominance to support a finding of racial predominance. *Cooper*, 137 S. Ct. at 1469 (affirming district court finding of a "textbook example" of "race-based districting"); *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) (reversing finding of a lack of racial predominance); *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015) (calling materially identical evidence "strong, perhaps overwhelming, evidence that race did predominate"). The Court also concluded that *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393 (5th Cir. 1996), deems racial predominance irrelevant to Section 2 claims, Doc. 173 at 112–13, but the Court's recognition "that the liability and remedial phases are highly interrelated," *id.* at 115, underscores the extent to which *Clark*'s discussion of racial predominance is unlikely to withstand scrutiny in the appellate courts empowered to interpret, modify, or overrule it. *Clark* recognized that the predominance inquiry *does* apply at the remedial phase. Given the Court's acknowledgment of record interrelatedness between the liability and remedial phases, predominance cannot be deemed irrelevant when a court decides to order a remedial phase.

Defendants submit that the distinction this Court would draw between "state action" in drawing a Section 2 remedial plan, and Section 2 illustrative remedies drawn by "demographers," *e.g.*, *id.* at 114, is unlikely to withstand appellate scrutiny. This Court has ordered the Louisiana Legislature to enact a new plan containing "an additional majority-Black congressional district," *id.* at 2, after Plaintiffs have provided that district's basic design in the form of illustrative plans replete with Plaintiffs' demographers' predominantly racial goals. Having a state actor essentially

5

follow those blueprints does not eliminate the taint. Indeed, the Court seemingly recognizes this problem: it relies on the dissent in the Supreme Court's recent decision in *Merrill v. Milligan*, 142 S. Ct. 879 (2022), and on the district-court decision it stayed, *see* Doc. 173 at 118.

2.     Plaintiffs' illustrative plans are also unlikely to withstand appellate scrutiny under the first precondition for the additional reason that they combine "farflung segments of a racial group with disparate interests." *LULAC v. Perry*, 548 U.S. 399, 433 (2006) (plurality opinion). Plaintiffs' experts scanned Louisiana for pockets of Black population, reasoning that "[y]ou can't draw a plan in an area where black population doesn't exist." 5/9 Tr. 209:22–23. Only after discerning that a 50 percent target requires that specific territory be joined—namely, East Baton Rouge Parish, Ouachita Parish (Monroe), and other portions of the delta region—did Plaintiffs seek communities-of-interest and traditional-principles justifications for the choice. *Id.* 137:13–138:10 (Cooper); *id.* 234:21–235:5. (Fairfax). As Defendants have explained, *see, e.g.*, Doc. 158 at 13, this does not qualify as a Section 2 district. Indeed, the only time anything like this configuration (combining East Baton Rouge with East and West Carroll and Morehouse Parishes) has ever been utilized was in a district invalidated as a racial gerrymander in the 1990s *Hays* litigation. *See Hays v. Louisiana*, 936 F. Supp. 360, 376 (W.D. La. 1996).

The Court's order bypasses this problem, focusing instead on mathematically derived compactness scores and other mathematical metrics. *See* Doc. 173 at 90–106. The Court did not justify combining portions of Louisiana Plaintiffs' lay witness repeatedly referred to as "south Louisiana" with the Delta Parishes in the northeast corner of the state. Rather, the Court criticized Defendants for failing to present evidence demonstrating that the illustrative plans did not combine coherent communities of interest. *See, e.g.*, Doc. 173 at 100–01. This "twisted the burden of proof beyond recognition." *Abbott v. Perez*, 138 S. Ct. 2305, 2333 (2018). It was *Plaintiffs'* burden to

identify the communities allegedly subject to vote dilution, and not to rely on statewide concepts of proportionality. *Washington v. Tensas Par. Sch. Bd.*, 819 F.2d 609, 612 (5th Cir. 1987); *Gonzalez v. City of Aurora, Illinois*, 535 F.3d 594 (7th Cir. 2008). Moreover, it was Plaintiffs' burden to show that the farflung communities it stitched together in their illustrative plans' second majority-Black district (i.e., District 5) shared "similar interests" and characteristics beyond race. *LULAC*, 548 U.S. at 434–35. They failed to do so.

      3.      The third *Gingles* precondition was not satisfied at the preliminary injunction phase and cannot be established in this case. The parties agree that white crossover voting is sufficient to enable Black communities in the relevant areas to elect their preferred candidates without majority-minority districts. *See, e.g.*, 5/9 Tr. 339:18–343:10; *id.* 346:18–21. The third *Gingles* precondition cannot be shown "[i]n areas with substantial crossover voting." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (principal opinion). Where there is sufficient crossover voting to enable the construction of performing crossover districts "majority-minority districts would not be required in the first place." *Id.* That is the case here.

      The Court's contrary view overlooks "crucial difference between <u>legally</u> significant and <u>statistically</u> significant racially polarized voting." *Covington v. North Carolina*, 316 F.R.D. 117, 169–70 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017). The order does not even cite *Bartlett*'s discussion of legally significant white bloc voting, and its discussion of *Covington* does not address the relevant question whether "a VRA remedy" is necessary. *Covington*, 316 F.R.D. at 168. To establish "legally significant white bloc voting," a challenger must show that "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes." *Thornburg v. Gingles*, 478 U.S. 30, 31 (1986). Here, that standard was not met, and cannot be met, because all experts agreed that the alleged white voting bloc is not sufficiently large to defeat the

7

combined strength of minority voters plus white crossover votes "without a VRA remedy." *Covington*, 316 F.R.D. at 168. A VRA remedy is therefore neither necessary nor legally supportable. The Court's contrary position yet again shifted the onus to Defendants to prove that a crossover district could perform, *see* Doc. 173 at 126. And any doubt on this point would be a matter of legislative discretion. The Court called this proposition "attenuated." Doc. 173 at 127.[1] Actually, the Supreme Court's precedent establishes this proposition in unmistakable terms. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2333 (2018); *LULAC*, 548 U.S. at 429; *Shaw v. Hunt*, 517 U.S. 899, 917 n.9 (1996).

"It is not [this Court's] task today to resolve the merits of this conflict in deciding the instant motion." *Campaign for S. Equal.*, 773 F.3d at 58. It is sufficient that Defendants' raise at least one "serious legal issue" warranting preservation of the *status quo* pending appeal. *Id.* (citation omitted).

B.     "The equities do not justify withholding interim relief." *NFIB*, 142 S. Ct. at 666. They *command* interim relief. *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring). The injunction imposes irreparable harm *per se* by enjoining a duly enacted State law. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). "If the district court judgment is ultimately reversed, the State cannot run the election over again, this time applying" the enacted redistricting plan. *Veasey v. Perry*, 769 F.3d 890, 896 (5th Cir. 2014) (issuing stay pending appeal). This is *per se* a harm to the public interest. *See, e.g.*, *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 605 (E.D. La. 2016*), aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017).

---

[1] The Court also observed that "neither side" had "presented" any "evidence of a successful crossover district" in Louisiana, Doc. 173 at 127, but the Court overlooked the LSU/Tulane Professors' amicus plan which drew two such districts.

The injunction imposes further irreparable harm by compromising the State's election administration during an election year. And it compounds that irreparable harm by ordering the Legislature to enact a racial gerrymander and requiring the State to conduct elections under a racial gerrymander in November in all events. Defendants' arguments are more thoroughly recounted in their consolidated post-hearing brief, Doc. 158, and their consolidated post-hearing proposed conclusions of law, Doc. 159. Defendants have preserved all these arguments for appeal and incorporate them by reference. They summarize several critical points here for the sake of completeness.

1. There can be no serious question that the *Purcell* principle applies in this case. Defendants sponsored the testimony of the State Commissioner of Elections. *See, e.g.*, Doc. 158 at 22–25 and materials cited therein. Based on an extensive discussion of election-administration problems that will likely result if the injunction is not stayed, the Commissioner testified that she is "very concerned" with implementing a new map with minimal time and potentially harmful effects. 5/13 Tr. 40:12–43:9. There is no contrary record evidence. Plaintiffs relied on the testimony of the Governor's attorney, who has no meaningful experience administering elections, and even he testified that an injunction would pose a "huge challenge." 5/11 Tr. 23:1–2. He reached that conclusion assuming that the ultimate election date, November 8, 2022, is subject to alteration. 5/11 Tr. 21:17–22:21. He is wrong. *Foster v. Love*, 522 U.S. 67, 69 (1997). The Court nevertheless relied heavily on his testimony. Doc. 173 at 147.

The Court's order concedes that it is "Placing a bureaucratic strain on a state agency." Doc. 173 at 145. It will ultimately be the Fifth Circuit's (or the Supreme Court's) responsibility to determine whether the Court's order despite that constitutes a *Purcell* violation. For the time being, it is sufficient to note that the Court's ruling required it to move the candidate-qualification

deadline, which is hardly a compelling basis for an appellate tribunal to conclude that *Purcell* is totally irrelevant. The change of that deadline will have the domino effect of reducing the amount of time registrars have to program the map, error check, and notify voters of their new districts. Meanwhile, the Court's reliance on statements by Legislative Defendants in an impasse case ignores the timing of those statements (March 2022) and the fact that, in an impasse case, there is no need to adjudicate liability, meaning the judicial map-drawing can occur immediately.

2. The balance of equities favors a stay for the additional reason that the injunction risks a widespread and severe infringement of constitutional rights in order to vindicate this Court's interpretation of a *statute*. It "is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014). A stay would vindicate constitutional rights. The Court failed to address this problem at all in its order, and its suggestion that state action is not involved here is difficult to square with the fact that—without a stay—a presumptively unconstitutional plan is about to be imposed on hundreds of thousands of Louisiana voters.

All of these harms signal that "the public interest weighs strongly in favor of issuing the stay." *Veasey*, 769 F.3d at 896.

3. Any harm Plaintiffs may incur through a stay "does not outweigh the other three factors." *Veasey*, 769 F.3d at 896. "In consideration of this factor, the maintenance of the status quo is important." *Louisiana by & through Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022). Louisiana has, since the *Hays* litigation, run its congressional elections under plans with one majority-Black district, not two. A stay would preserve that status quo to permit the Fifth Circuit to address the difficult legal question whether another majority-Black

10

district is required. In these circumstances, the alleged harm of an election under a plan with one majority-Black district cannot outweigh the numerous harms of an injunction.

        C.      The Court's order is unlikely to withstand appellate scrutiny for the additional reason that it provides a remedial redistricting schedule that is unworkable. A court that invalidates redistricting legislation must "afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). The Court's order requires the Louisiana Legislature to enact redistricting legislation by June 20, as provisional relief, but the Legislature has no ability to meet that deadline. Because the Louisiana Legislature concluded its Regular Session on June 6, 2022,[2] the day the Court issued its injunction, the Legislature must now convene a new Extraordinary Session to consider redistricting legislation. La. Const. art. 3, § 2(B). The Louisiana Constitution sets a seven-day notice period "prior to convening the legislature in extraordinary session." *Id.* The Louisiana Constitution also requires that "each bill shall be read at least by title on three separate days in each house." La. Const. art. 3, § 15(D). The three-readings rule is mandatory, not discretionary, and legislation that does not go through three readings in each house is unconstitutional. *Doll v. City of New Orleans*, 85 So.2d 514, 515 (La. 1956); *Casey v. Southern Baptist Hosp.*, 526 So.2d 1332, 1336 (La. App. 4th Dist. 1988). Further, the Constitution provides that "[n]o bill shall be considered for final passage unless a committee has held a public hearing and reported on the bill." La. Const. art. 3, sec. 15(D).

This timeline assumes one proposed bill and no amendments, which is unlikely to occur. *See* LEG_4, LEG_5, and LEG_31 to 48 (showing 19 congressional bills and multiple amendments introduced during the 2022 First Extraordinary Session). Amendments, multiple bills or

---

[2] *See* 2022 Regular Session Information Bulletin, Louisiana Legislature, at 1 (Sept. 1, 2021), at https://legis.la.gov/legisdocs/22rs/22RS_House_Bulletin.pdf (visited June 6, 2022).

negotiation—in other words, the act of legislating—would add time to this schedule. Finally, to become law, a bill also must be signed by the Governor. The Court—after waiting more than three weeks from the preliminary injunction hearing before issuing its ruling—gave the Legislature only 14 days to enact a remedial plan. But it is not possible for the Legislature to comply with the seven-day notice period, the days of bill readings, the committee-hearing requirement, negotiating multiple bills and amendments into one bill, and the requirement of presentment to the Governor in 14 days. That would be so even without the complexities inherent in redistricting, and it is all more plain in light of those inherent complexities. The point of providing a legislature a meaningful opportunity to create a remedy is to allow the body to legislate; the Court's timeline precludes this work.

        D.      Alternatively, the Court should stay its injunction pending Defendants' forthcoming motions to stay in the Fifth Circuit. An administrative stay freezes the *status quo* to allow time for orderly adjudication of a stay motion in an appellate tribunal. A court need not find the stay factors met to issue such a stay. *See Garza*, 2017 WL 4707112, at *1. The Court should order that its injunction does not take effect until after the Fifth Circuit rules on Defendants' forthcoming emergency motions for a stay pending appeal.

## CONCLUSION

The Court should stay its injunction pending appeal. Alternatively, the Court should issue an administrative stay of its injunction to permit Defendants to adjudicate a renewed stay motion in the Fifth Circuit. If the Court declines to deny either form of relief, it should promptly issue an order denying this motion to permit Defendants to seek expedited relief in appropriate appellate tribunals.

Respectfully submitted,

/s/ Michael W. Mengis                      /s/ Erika Dackin Prouty
Michael W. Mengis, LA Bar No. 17994        Erika Dackin Prouty*
**BAKERHOSTETLER LLP**                     **BAKERHOSTETLER LLP**
811 Main Street, Suite 1100                200 Civic Center Dr., Ste. 1200
Houston, Texas 77002                       Columbus, Ohio 43215
Phone: (713) 751-1600                      (614) 228-1541
Fax: (713) 751-1717                        eprouty@bakerlaw.com
Email: mmengis@bakerlaw.com

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

* *Admitted pro hac vice*

/s/ Phillip J. Strach* (Lead Counsel)
phillip.strach@nelsonmullins.com
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Telephone: (919) 329-3800
Facsimile: (919) 329-3799

|  |  |
|---|---|
|  | */s/ John C. Walsh* |
|  | John C. Walsh (Louisiana Bar Roll No. 24903) |
|  | john@scwllp.com |
|  | **SHOWS, CALI & WALSH, L.L.P.** |
|  | P.O. Box 4046 |
|  | Baton Rouge, LA 70821 |
|  | Telephone: (225) 346-1461 |
|  | Facsimile: (225) 346-5561 |
|  |  |
|  | *Counsel for Defendant R. Kyle Ardoin* |
|  | *\*Admitted Pro Hac Vice* |
|  |  |
|  | Jeff Landry |
|  | Louisiana Attorney General |
|  |  |
|  | */s/Angelique Duhon Freel* |
| Jason B. Torchinsky (DC 976033)* | Elizabeth B. Murrill (LSBA No. 20685) |
| Phillip M. Gordon (DC 1531277)* | Shae McPhee (LSBA No. 38565) |
| Dallin B. Holt (VSB 97330)* | Morgan Brungard (CO Bar No. 50265)* |
| Holtzman Vogel Baran | Angelique Duhon Freel (LSBA No. 28561) |
| Torchinsky & Josefiak, PLLC | Carey Tom Jones (LSBA No. 07474) |
| 15405 John Marshall Highway | Jeffrey M. Wale (LSBA No. 36070) |
| Haymarket, VA 20169 | Office of the Attorney General |
| (540) 341-8808 phone | Louisiana Department of Justice |
| (540) 341-8809 fax | 1885 N. Third St. |
| jtorchinsky@holtzmanvogel.com | Baton Rouge, LA 70804 |
| pgordon@holtzmanvogel.com | (225) 326-6000 phone |
| dholt@holtzmanvogel.com | (225) 326-6098 fax |
| *admitted pro hac vice | murrille@ag.louisiana.gov |
|  | freela@ag.louisiana.gov |
|  | walej@ag.louisiana.gov |
|  | jonescar@ag.louisiana.gov |
|  | mcphees@ag.louisiana.gov |
|  | brungardm@ag.louisiana.gov |
|  |  |
|  | *Counsel for the State of Louisiana* |