IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENÉ SOULÉ, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, and POWER COALITION FOR EQUITY AND JUSTICE,<br><br>        Plaintiffs,<br><br>   v.<br><br>KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana,<br><br>        Defendant. | Case No. 3:22-cv-00211-SDD-SDJ c/w |
| EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, and TRAMELLE HOWARD,<br><br>        Plaintiffs,<br><br>   v.<br><br>R. KYLE ARDOIN, in his official capacity as Louisiana Secretary of State,<br><br>        Defendant. | Case No. 3:22-cv-00214-SDD-SDJ |

**JOINT NOTICE OF PROPOSED REMEDIAL PLAN AND MEMORANDUM IN SUPPORT**

Pursuant to the Court's order dated June 17, 2022, *see* Rec. Doc. No. 206, Plaintiffs, by and though undersigned counsel, submit the joint remedial plan attached as Exhibit A (the "Remedial Plan").

1

Having found that Plaintiffs are likely to prove that Louisiana's enacted congressional plan violates Section 2 of the Voting Rights Act of 1965, *see generally* Rec. Doc. No. 173, the Court appropriately gave the Louisiana Legislature the first opportunity to cure the violation by adopting a lawful plan, *see id.* at 152. The Legislature failed to do so. Accordingly, this Court must now remedy the Section 2 violation by ordering a redistricting plan that complies with the Voting Rights Act and the U.S. Constitution. *See Connor v. Finch*, 431 U.S. 407, 415 (1977).

The Remedial Plan that Plaintiffs now submit complies with Section 2 and adheres to the state's districting principles and the requirements of the U.S. Constitution. It maintains the core of the illustrative Congressional District ("CD") 5 as it appeared in Anthony Fairfax's Illustrative Plan 2A. The adjustments made to CD 5 in the Remedial Plan have the effect of rendering the state's other Black-opportunity district, CD 2, more compact and superior in its preservation of political-subdivision boundaries than in Mr. Fairfax's Illustrative Plan 2A. The Remedial Plan also performs equal to or better than the state's enacted plan, House Bill 1 ("HB 1"), in its adherence to traditional and state redistricting criteria, including those embodied in Joint Rule No. 21, by ensuring that the districts are comparably or more compact, split fewer political subdivisions—including parishes and voting districts ("VTDs")—and better preserve communities of interest.

**I.      This Court must ensure that the Section 2 violation is properly remedied.**

The Court's preliminary-injunction order gave the Legislature until June 20, 2022, to enact a new map. *See* Rec. Doc. No. 173 at 2. The Legislative Intervenors waited seven days after the Court's order, until the eve of the extraordinary legislative session, to file a motion to extend that deadline to June 30. *See* Rec Doc. No. 188. In making this request, the Legislative Intervenors did not point to *any* efforts by legislators to take the preparatory steps needed to timely adopt a remedial plan. Nor could they: the Legislature neither scheduled nor held any committee hearings before the extraordinary session commenced, and bills proposing remedial plans were only pre-

2

filed by Republican lawmakers *after* the Legislative Intervenors filed their extension request. *See* Rec. Doc. No. 190 at 7–8. Meanwhile, public statements by legislators indicated that they had little intention of passing a compliant map. *See* Rec. Doc. No. 192 at 2 n.1.

After hearing from the Legislative Intervenors—Speaker of the Louisiana House of Representatives Clay Schexnayder and President of the Louisiana Senate Patrick Page Cortez—the Court properly denied their motion. *See* June 16 Hr'g Tr. 81–84. The Court noted that legislators had the ability to suspend rules to allow the process to move expeditiously and that there was ample public input from the legislative record in the previous redistricting session. *Id.* The Court further found the request for additional time to be "disingenuous" and "insincere" given the limited activity that had taken place in the House; for example, the Court noted that the House met for only 90 minutes on the first day of the extraordinary session and waited almost 48 hours to refer proposed maps to committee. *Id.* The Court also took judicial notice of the fact that the redistricting process took place in only six days in 1994 and that the Legislature passed a budget in only four days in 2017. *Id.*

Ultimately, the events of the extraordinary legislative session that occurred *after* the Court's June 16 ruling confirmed that the Legislature's failure to pass a remedial map was a matter of will, not time. Legislators were unable to reach consensus on a map and, on the fourth day of the five-day session, adjourned early without passing a remedial plan.[1]

Because the Legislature has not cured the Section 2 violation with a lawful map, it is "the unwelcome obligation" of this Court to fashion a remedy. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (plurality opinion) (quoting *Connor*, 431 U.S. at 415); *see also Miss. State Chapter,*

---

[1] *See* Greg LaRose, *Louisiana Legislature Adjourns Without Approving New Congressional Map*, La. Illuminator (June 18, 2022), https://lailluminator.com/2022/06/18/louisiana-legislature-adjourns-without-approving-new-map-for-congress-seats.

*Operation Push, Inc. v. Mabus*, 932 F.2d 400, 406 (5th Cir. 1991) ("Judicial authority to fashion a plan of reapportionment arises only after the state legislature is given an opportunity to enact a constitutionally acceptable plan and does not do so." (citing *White v. Weiser*, 412 U.S. 783, 794 (1973))); *Ramos v. Koebig*, 638 F.2d 838, 843 (5th Cir. Unit A 1981) ("[C]ircumstances will arise when, because of the imminence of upcoming elections or some other exigency, a district court will be required to order into effect its own plan.").

Having found a likely violation of federal law, the Court's "first and foremost obligation is to correct the Section 2 violation." *Veasey v. Abbott*, 830 F.3d 216, 269 (5th Cir. 2016) (en banc) (cleaned up), *cert. denied*, 137 S. Ct. 612 (2017). Indeed, "the Senate Report accompanying the 1982 amendments to § 2 of the Voting Rights Act . . . . describes the district court's remedial duty as follows": "The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *Miss. State Chapter*, 932 F.2d at 406 (quoting S. Rep. No. 97-417, at 31 (1982)); *see also United States v. Brown*, 561 F.3d 420, 435–38 (5th Cir. 2009) (district court did not abuse its discretion when it issued remedial order to remedy Section 2 violation after requesting that each party submit proposed remedy and considering testimony at two evidentiary hearings).

Any remedy "should be sufficiently tailored to the circumstances giving rise to the § 2 violation." *Brown*, 561 F.3d at 435. Because "relief in redistricting cases is fashioned in the light of well-known principles of equity," the Court "must undertake an equitable weighing process to select a fitting remedy for the legal violations it has identified, taking account of what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (per curiam) (cleaned up). Courts are "held to stricter standards" than state legislatures when

4

crafting a remedy to a voting rights violation. *Connor*, 431 U.S. at 414. Because federal courts "lack[] the political authoritativeness that the legislature can bring to the task," the Court should enact a remedial plan "circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.'" *Id.* at 415 (quoting from *Roman v. Sincock*, 377 U.S. 695, 710 (1964)).

The U.S. Supreme Court has instructed that, "[w]hen faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Abrams v. Johnson*, 521 U.S. 74, 79 (1997) (holding that district court properly declined to defer to precleared plan that used race as predominant factor). A judicially crafted remedy should also comply with the constitutional one-person, one-vote requirement and honor traditional redistricting principles like respecting the boundaries of political subdivisions, maintaining communities of interest, contiguity, compactness, and non-dilution of minority voting strength. *See generally, e.g.*, *LULAC v. Perry*, 457 F. Supp. 2d 716 (E.D. Tex. 2006) (three-judge court) (adhering to traditional redistricting principles while crafting remedy for Section 2 violation); *United States v. Charleston County*, Nos. 2:01-0155-23, 2:01-562-23, 2003 WL 23525360 (D.S.C. Aug. 14, 2003) (same).

The Remedial Plan complies with these standards because it remedies the Voting Rights Act violation this Court identified in its preliminary-injunction order and is otherwise guided by the traditional redistricting principles articulated by the Legislature in Joint Rule No. 21.

**II.     The Remedial Plan provides Black voters with an opportunity to elect their candidates of choice in an additional congressional district and respects traditional redistricting principles.**

Under the Remedial Plan, Black voters will have the opportunity to elect their candidates of choice in two of Louisiana's six congressional districts: CD 2 and CD 5. CD 5 is centered around Baton Rouge and the Delta Parishes; CD 2 is based in New Orleans and the River Parishes. The

5

Remedial Plan also adheres to the Legislature's policy objectives codified in Joint Rule No. 21. Indeed, in many instances, the Remedial Plan's compliance with these traditional redistricting principles is comparable to or even better than the enacted plan. *See infra* Tables 1–3.

    **A. The Remedial Plan adheres to the state's redistricting principles.**

By adhering to neutral redistricting criteria—in particular those enumerated by the Legislature in Joint Rule No. 21—the Remedial Plan reflects "the legislative policies underlying" HB 1. *Abrams*, 521 U.S. at 79. Indeed, overall, the Remedial Plan respects the state's traditional boundaries (specifically parishes, census places like cities, landmarks, and communities of interest) *better* than HB 1. And the Remedial Plan splits no VTDs and splits fewer or comparable census places and landmarks. *See infra* Tables 1–3.

As described in his affidavit accompanying the Remedial Plan, Mr. Fairfax maintained the configuration of CD 5 from his Illustrative Plan 2A, which included the Delta Parishes in the north and Baton Rouge in the south. *See* Ex. A. ¶ 11; Rec. Doc. No. 173 at 109. At the preliminary-injunction hearing and in his expert report, Mr. Fairfax explained his process for drawing this and his other illustrative plans:

> Fairfax testified that he started with the enacted plan as a baseline. . . . Fairfax testified that he looked at equal population, contiguity, compactness, splits, communities of interest, and fracking when drawing his maps. Consideration of Legislature's Joint Rule 21 was paramount in his process, but his overall strategy was to balance all of the relevant districting principles without allowing any single factor to predominate.

Rec. Doc. No. 173 at 31. Having heard this testimony, the Court concluded that Mr. Fairfax's

> thirty years of experience in preparing redistricting plans make him well-qualified, in the Court's view, and his report and supplemental reports are extremely thorough and methodologically sound. . . . The Court credits in particular Fairfax's testimony where he discussed how race contributed to the illustrative plans that he drew. Fairfax did not deny that he used his mapping software to assess the location of [Black voting-age population] in Louisiana initially, but he was adamant and credible in his testimony that race did not predominate in his mapping process.

6

> Rather, he testified that he only considered race to the extent necessary to test for numerosity and compactness as required by *Gingles I*.

*Id.* at 98–99. Mr. Fairfax "explicitly and credibly testified that [he] did not allow race to predominate over traditional districting principles as [he] developed [his] illustrative plans." *Id.* at 116. As for "identifying communities of interests and considering them in [his] illustrative maps," Mr. Fairfax "used census places and landmark areas to gauge how often his maps split communities of interest, as well as socioeconomic data and roadshow testimony from community members for insight into local ideas about communities of interest." *Id.* at 101; *see also id.* at 34–36 (describing Mr. Fairfax's use of socioeconomic data). Ultimately, the Court concluded that "the illustrative plans developed by [Mr. Fairfax] satisfy the reasonable compactness requirement of *Gingles I*," *id.* at 106—a conclusion further supported by his affidavit accompanying this motion, which confirms that the Remedial Plan satisfies traditional redistricting principles.

**Compactness.** As a consequence of Louisiana's natural geography—specifically, because the district stretches along the state's eastern border, which follows the Mississippi River—CD 5 is less compact than other districts in both the Remedial Plan and HB 1. Ex. A. ¶ 11.[2] Nevertheless, the Remedial Plan's CD 5 is comparable in its geographic compactness to HB 1's CD 5 and *more* compact than HB 1's CD 2. *See infra* Tables 2–3. The Remedial Plan's CD 2 is likewise significantly more compact than HB 1's CD 2. *See id.*

**Parish Splits.** "[T]here is no more fundamental unit of societal organization in the history of Louisiana than the parish." *Hays v. Louisiana*, 839 F. Supp. 1188, 1200 (W.D. La. 1993) (three-judge court), *vacated on other grounds*, 512 U.S. 1230 (1994). While the Remedial Plan splits four

---

[2] Because the Remedial Plan's CD 5 contains less than half the population of HB 1's CD 5—as Defendants' "own expert Dr. Hood testified, core retention does not trump the Voting Rights Act," Rec. Doc. No. 173 at 105—it is appropriate to compare the Remedial Plan's CD 5 with all of the districts in HB 1, Ex. A ¶ 16.

7

parishes in CD 2 and five parishes in CD 5, *see infra* Table 2, HB 1 splits nine parishes in CD 2, two parishes in CD 5, and 11 parishes in CD 6.

**Preservation of Communities of Interest.** The Court previously concluded that "Plaintiffs made a strong showing that their maps respect [communities of interest] and even unite communities of interest that are not drawn together in the enacted map." Rec. Doc. No. 173 at 103. Indeed, extensive testimony on the communities of interest in the area that "stretches from Louisiana's northern border down to Baton Rouge and Lafayette" was introduced at the preliminary-injunction hearing and credited by the Court. *Id.* at 31. The Remedial Plan, like the illustrative plans, better maintains communities of interest in both CD 5 (including the communities in and around East Baton Rouge and the Delta Parishes) and CD 2 (including New Orleans and the River Parishes). *See* Ex. C at 184:14–190:23 (testimony of Charles Cravins discussing connections between St. Landry Parish and Baton Rouge); *id.* at 216:21–219:19 (testimony of Christopher Tyson discussing connections between Baton Rouge and Delta Parishes); Ex. D at 68:3–70:3 (testimony of Dr. Dorothy Nairne discussing connections between New Orleans and River Parishes); *id.* at 202:24-203:7 (testimony of Ashley Shelton discussing the communities of Baton Rouge); *see also* Ex. C at 49:23–50:9 (testimony of Michael McClanahan discussing the distinctions between New Orleans and Baton Rouge)[3].

**Other Criteria.** As outlined in the charts below, the Remedial Plan performs well across a range of traditional redistricting criteria.

---

[3] The Remedial Plan also avoids grouping dissimilar communities in the same districts. *See* Ex. D at 202:1–16, 202:24–203:7 (testimony of Ashley Shelton discussing differences between North and South Baton Rouge); Ex. C. at 206:23–207:2 (testimony of Mr. Cravins discussing lack of connections between St. Landry Parish and Shreveport and New Orleans); *id.* at 220:5–13; 223:4–10 (testimony of Mr. Tyson discussing differences between New Orleans and Baton Rouge); Ex. D at 66:15–23 (testimony of Dr. Nairne discussing lack of connections between her community and her district).

8

Table 1: Comparison of Remedial Plan and HB 1[4]

| Criteria | Remedial Plan | HB1 Plan |
|---|---|---|
| Population Deviation[5] | **61** | 65 |
| Contiguity | Y | Y |
| Parish Splits | **11** | 15 |
| VTD Splits | 0 | 0 |
| COI Census Places Splits | **27** | 32 |
| COI Landmark Splits | 58 | 58 |
| Compactness (mean) Roeck, Polsby-Popper, Convex Hull | **.40, .20, 70** | .37, .14, and .62 |
| Fracking (Total Pieces) | **12** | 17 |

Table 2: Remedial Plan Redistricting Criteria

| District | Contiguity | Pop. Dev. | Compactness (R-PP-CH) | Parish Splits | VTD Splits | COI Splits Places | COI Landmark Splits | Fracking (pieces) |
|---|---|---|---|---|---|---|---|---|
| 1 | Y | 3 | 0.37  0.22  0.72 | 3 | 0 | 7 | 27 | 4 |
| 2 | Y | 27 | 0.27  0.17  0.66 | 4 | 0 | 11 | 26 | 4 |
| 3 | Y | -34 | 0.48  0.21  0.75 | 4 | 0 | 9 | 30 | 0 |
| 4 | Y | -26 | 0.56  0.28  0.84 | 2 | 0 | 6 | 37 | 0 |
| 5 | Y | 27 | 0.34  0.10  0.56 | 5 | 0 | 13 | 33 | 4 |
| 6 | Y | 18 | 0.36  0.21  0.74 | 4 | 0 | 6 | 11 | 0 |

Table 3: HB 1 Redistricting Criteria

| District | Contiguity | Pop. Dev. | Compactness (R-PP-CH) | Parish Splits | VTD Splits | COI Splits Places | COI Landmark Splits | Fracking (pieces) |
|---|---|---|---|---|---|---|---|---|
| 1 | Y | -25 | 0.50  0.16  0.71 | 5 | 0 | 14 | 15 | 4 |
| 2 | Y | 24 | 0.18  0.06  0.38 | 9 | 0 | 17 | 31 | 5 |
| 3 | Y | -18 | 0.37  0.29  0.79 | 2 | 0 | 5 | 30 | 0 |
| 4 | Y | 40 | 0.33  0.16  0.61 | 1 | 0 | 3 | 28 | 0 |
| 5 | Y | -16 | 0.37  0.12  0.60 | 2 | 0 | 3 | 40 | 4 |
| 6 | Y | -6 | 0.45  0.07  0.64 | 11 | 0 | 19 | 14 | 4 |

---

[4] These tables can be found in Exhibit A.
[5] No precincts are split in the remedial plan, HB1, or the state's prior congressional plan. Keeping precincts whole—an articulated policy preference as adopted in Joint Rule No. 21—results in minor population deviations between districts.

In short, the Remedial Plan adheres to traditional redistricting principles to the same degree as or better than the enacted congressional map—particularly those criteria the Legislature adopted in Joint Rule No. 21.

**B. The Remedial Plan will reliably provide Black voters with an opportunity to elect their candidates of choice in two congressional districts.**

The Remedial Plan will remedy the Section 2 violation by providing Black voters with an opportunity to elect their candidates of choice in an additional congressional district. As Dr. Lisa Handley's analysis demonstrates, Black-preferred candidates will generally be able to win elections in both CD 5 and CD 2 in the Remedial Plan. *See generally* Ex. B. Dr. Handley performed a functional analysis by looking at recompiled results from 15 past elections within the boundaries of the districts in the Remedial Plan.[6] She found that the Black-preferred candidate in the Remedial Plan's CD 5 is likely to win or advance to the runoff 86.7% of the time, and is likely to win in two-candidate contests 77.8% of the time. *See id.* at Table 1. In the Remedial Plan's CD 2, Dr. Handley found that the Black-preferred candidate is likely to win 100% of the time. *See id.* at Table 1.

The Remedial Plan's CD 5 has a Black voting-age population ("BVAP") of 51.98%, *see* Ex. A at 20, and, as such, is a majority-Black district, consistent with the Court's preliminary-injunction order, *see* Rec. Doc. No. 173 at 2. Although it is not the case that a district drawn to remedy a Section 2 violation must *always* be a majority-minority district, *see Bartlett v. Strickland*, 556 U.S. 1, 23 (2009) (plurality opinion), Dr. Handley has also conducted an analysis showing that, under these circumstances, it is necessary for CD 5 to be a majority-Black district for the Black-preferred candidate to have an opportunity to win. *See* Ex. B at 2–7. First, Dr. Handley

---

[6] This analysis was conducted using the same methodology that Dr. Handley used for similar effectiveness evaluations in previous reports in this matter. *See, e.g.*, Rec. Doc. No. 41-3 at 2–45. The Court previously "credit[ed] the testimony and conclusions of Dr. [] Handley." Rec. Doc. No. 173 at 121.

conducted a racial bloc voting analysis of the voting patterns in the Remedial Plan's CD 5 and found that the voting in that geographic area is consistently and starkly polarized. *See id.* App. A.[7] Dr. Handley then conducted an additional analysis using the results of her racially polarized voting analysis to calculate the percentage of the vote that each Black-preferred candidate would receive in 13 of the 15 analyzed elections[8] if the BVAP of the district were 55%, 50%, 45% and 40%. *See id.* at 5–6. A comparison of the vote share that the Black-preferred candidate would receive in each of these scenarios makes clear that the Black-preferred candidate would only prevail the majority of the time if the BVAP for a congressional district in this area is at least 50%. *See id.* If the Remedial Map for CD 5 had a BVAP of 45%, then the Black-preferred candidate would win only three out of the 13 analyzed contests but if its BVAP were 50%, then the Black-preferred candidate would win seven out of the 13 contests. Accordingly, while the Remedial Plan's CD 5 would be an opportunity district as required by Section 2, it would still be a competitive district.

Dr. Handley's performance analysis of the Remedial Plan's CD 5 demonstrates that a majority-Black district is needed to provide Black Louisianians with an opportunity to elect their candidates of choice and thus remedy the dilution of their electoral strength. With a BVAP of 51.98%, the Remedial Plan's CD 5 provides that opportunity.

\*   \*   \*

In closing, the Remedial Plan remedies the Section 2 violation the Court identified in its preliminary-injunction order because it will provide Black voters with the opportunity to elect candidates of their choice in an additional congressional district that adheres to both traditional

---

[7] This racially polarized voting analysis was also conducted using the same methodology that Dr. Handley employed earlier in this litigation. *See supra* note 5.

[8] As Dr. Handley's report explains, while Black voters almost always vote cohesively in this area of Louisiana, in two of the 15 contests included in her analysis Black voters did not have a clear candidate of choice. *See* Ex. B at 5. She therefore did not include those two contests in her subsequent analysis. *Id.*

11

redistricting principles and the State of Louisiana's articulated policy preferences. Indeed, the Remedial Plan in many instances *better* adheres to these principles than HB 1. The Remedial Plan's CD 5 will perform for Black-preferred candidates, while its CD 2 is more compact than HB 1's, better preserves traditional boundaries and communities of interest, and avoids placing the two distinct Black communities in Baton Rouge and New Orleans in a single congressional district.

Having properly given the Legislature the first opportunity to cure the violation of federal law and fulfill its legislative duties, it is now the necessary obligation of this Court to employ its equitable powers to fashion a proper remedy. The Remedial Plan does just that.

Dated: June 22, 2022

Respectfully submitted,

By:*/s/John Adcock*_____
   John Adcock
   Adcock Law LLC
   L.A. Bar No. 30372
   3110 Canal Street
   New Orleans, LA 70119
   Tel: (504) 233-3125
   Fax: (504) 308-1266
   jnadcock@gmail.com

Leah Aden (admitted *pro hac vice*)
Stuart Naifeh (admitted *pro hac vice*)
Kathryn Sadasivan (admitted *pro hac vice*)
Victoria Wenger (admitted *pro hac vice*)
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
laden@naacplef.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
vwenger@naacpldf.org

R. Jared Evans (admitted *pro hac vice*)
Sara Rohani (admitted *pro hac vice*)[†]
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Robert A. Atkins (admitted *pro hac vice*)
Yahonnes Cleary (admitted *pro hac vice*)
Jonathan H. Hurwitz (admitted *pro hac vice*)
Amitav Chakraborty (admitted *pro hac vice*)
Adam P. Savitt (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue Of The Americas, New York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
ratkins@paulweiss.com
ycleary@paulweiss.com
jhurwitz@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com

Nora Ahmed (admitted *pro hac vice*)
Stephanie Willis
LA. Bar No. 31384
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org
swillis@laaclu.org

Tracie Washington
LA. Bar No. 25925
Louisiana Justice Institute
Suite 132
3157 Gentilly Blvd
New Orleans LA, 70122
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

T. Alora Thomas (admitted *pro hac vice*)
Sophia Lin Lakin (admitted *pro hac vice*)
Samantha Osaki (admitted *pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
athomas@aclu.org
slakin@aclu.org
sosaki@aclu.org

Sarah Brannon (admitted *pro hac vice*)
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

† Admitted in California only. Practice limited to matters in United States federal courts.

*Counsel for the* Robinson *Plaintiffs*

By /s/ Darrel Papillion
Darrel J. Papillion (Bar Roll No. 23243)
Renee C. Crasto (Bar Roll No. 31657)
Jennifer Wise Moroux (Bar Roll No. 31368)
**WALTERS, PAPILLION,**
**THOMAS, CULLENS, LLC**
12345 Perkins Road, Building One
Baton Rouge, Louisiana 70810
Phone: (225) 236-3636
Fax: (225) 236-3650
Email: papillion@lawbr.net
Email: crasto@lawbr.net
Email: jmoroux@lawbr.net

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: akhanna@elias.law
Email: jhawley@elias.law

Lalitha D. Madduri*
Olivia N. Sedwick*
Jacob D. Shelly*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: lmadduri@elias.law
Email: osedwick@elias.law
Email: jshelly@elias.law

*Counsel for the* Galmon *Plaintiffs*

*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record, on this 22nd Day of June, 2022.

> By: /s/ *John Adcock*
> John Adcock
> Adcock Law LLC
> L.A. Bar No. 30372
> 3110 Canal Street
> New Orleans, LA 70119
> Tel: (504) 233-3125
> Fax: (504) 308-1266
> jnadcock@gmail.com