## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, et al., | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| v. | Chief Judge Shelly D. Dick |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | Consolidated with Civil Action No. 3:22-cv-00214-SDD-SDJ |
| v. | |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' JOINT PROPOSED REMEDIAL PLAN

Plaintiffs' proposed remedy fails to satisfy governing legal standards and cannot be imposed on Louisiana's citizens. The remedy was obviously drawn with predominantly racial intent under the governing legal standard, as its districts' lines exhibit astounding precision in including majority-Black voting districts (VTDs) in majority-Black districts and excluding majority-white VTDs. Plaintiffs' expert, Mr. Fairfax, did not use anything like that level of precision in tracking other data, which he claimed at the liability phase caused the stark racial sorting of his plans. The plan is therefore presumptively unconstitutional and cannot supplement the enacted plan which is not even *alleged* to be unconstitutional. Further, the plan united areas overwhelmingly established on the legislative record to be distinct regions that do not belong in

the same district. It therefore fails to satisfy Section 2 under its own terms, and the plan intrudes far more on Louisiana redistricting policy than is necessary. The proposed remedial districts are not narrowly tailored because there is insufficient evidence that 50% Black voting-age population ("BVAP") floors are necessary to ensure equal electoral opportunity. These districts, like the rest of the plan, fall short of the legal mark.[1]

## LEGAL STANDARD

When crafting a judicial remedial plan, "equitable considerations demand a close scrutiny and mandate the fashioning of a near-optimal apportionment plan." *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985). *See also McGhee v. Granville Cnty., N.C.*, 860 F.2d 110, 115 (4th Cir. 1988). The remedial plan must remedy the Section 2 violation, but the plan should be "narrowly tailored" to the violation and "should not 'intrude on state policy any more than is necessary' to uphold the requirements of the Constitution." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1023 (8th Cir. 2006) (quoting *Upham v. Seaman*, 456 U.S. 37, 41–42 (1982) (per curiam)). *See also, e.g., United States v. City of Euclid*, 523 F. Supp. 2d 641, 644 (N.D. Ohio 2007); *United States v. Carleston Cnty.*, No. 2:01-cv-0155-23, 2003 WL 23525360, *1 (D.S.C. Aug. 14, 2003). For all the following reasons, Plaintiffs' proposed remedial plan fails this test.

## ARGUMENT

### A.    Race Predominated

Plaintiffs' proposed remedial districts were drawn with predominantly racial intent. The plan is therefore presumptively unconstitutional and cannot supplant the enacted plan. At the

---

[1] Defendants submit this joint brief assuming the validity of the Court's preliminary-injunction ruling for the sake of argument only. They continue to disagree respectfully with it and prosecute their appeal, as is their right. Any language assuming the validity of the ruling in this or any other remedial presentation must be understood as directed to the remedial proceeding *arguendo* and not as conceding liability in any way. Defendants deny liability and deny that any remedy is needed.

liability phase, this Court declined to apply constitutional scrutiny to Plaintiffs' illustrative proposals, reasoning "illustrative maps drawn by demographers for litigation are not state action and thus the Equal Protection Clause is not triggered." Doc. 173 at 114. But the Court recognized that "a Court-imposed or legislatively enacted map would be squarely subject to Equal Protection review." *Id.* Fifth Circuit precedent holds the same. *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1407–08 (5th Cir. 1996). At the remedy phase, then, this Court must apply constitutional scrutiny.

The question under that standard is whether "race was the predominant factor motivating" behind the "decision to place a significant number of voters within or without a particular district." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) (citation omitted). This standard is satisfied if "race was the criterion that…could not be compromised," *id.* at 798 (citation omitted; alterations accepted), which occurs when (1) a mapmaker "purposefully established a racial target," such as that "African-Americans should make up no less than a majority of the voting-age population," and (2) the racial target "had a direct and significant impact" on the district's "configuration." *Cooper v. Harris*, 137 S. Ct. 1455, 1468–69 (2017). Predominance can be shown through circumstantial or direct evidence. *Bethune-Hill*, 137 S. Ct. at 797. Because "the constitutional violation in racial gerrymandering cases stems from the racial purpose of state action, not its stark manifestation," a showing of predominance does not depend on a showing that district lines departed from traditional districting principles. *Id.* at 798 (quotation marks omitted). Overriding evidence of predominance includes "stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target." *Id.* at 800.

1.      The evidence of predominance here is undeniable. To begin, the "direct evidence" establishes beyond any doubt that Mr. Fairfax employed "an express racial target." *Id.* at 797, 800.

Mr. Fairfax's remedial plan is but a slight variation on his previously submitted Illustrative Plan 2A, and it maintains majority-Black district CD5 in precisely the form presented in that plan. Doc. 225-1 ¶¶ 10–14. Mr. Fairfax previously attested that he configured CD2 and CD5 in the illustrative plan to achieve 50% BVAP targets, 5/9 Tr. 208:2–4, 218:18–22, 206:25–207:4, 210:12–212:4, and this Court found that Mr. Fairfax used racial data as necessary to achieve the *Gingles* "numerosity" requirement. Doc. 173 at 36; *see also id.* at 31. This, on its own, compels a predominance finding under Supreme Court precedent. *See Cooper*, 137 S. Ct. at 1469 (holding that lower court "could hardly have concluded anything but" predominance where mapmaker attested to intent to draw a majority-minority district).

2.      And there is more. The remedial record shows "stark splits in the racial composition of populations moved into and out of" the majority-Black districts, which confirms predominance. *Bethune-Hill*, 137 S. Ct. at 800. Dr. Douglas Johnson, a demographic expert who has prepared hundreds of redistricting plans, examined the lines of Mr. Fairfax's remedial districts and discerned stark evidence of racial predominance. Ex. A, Johnson Rep. Dr. Johnson focused on nine Parishes that the proposed remedy map divides in CD2 or CD5: Ascension, East Baton Rouge, Iberia, Jefferson, Lafayette, Orleans, Ouachita, Rapides, and Tangipahoa. Johnson Rep. ¶ 9. Dr. Johnson examined the number of VTDs in each parish, the number of parish VTDs with Black majorities of Voting Age Population (VAP) using the "percentage any part Black" data from the 2020 Census, and the number of VTDs that were drawn into or out of CD2 or CD5. *Id.* ¶ 12. Dr. Johnson also prepared thematic maps showing the BVAP percentage of each VTD with the congressional district lines overlaid. *Id.*

This analysis shows that Mr. Fairfax employed a surgical focus on race. In four of the examined parishes, *every single* majority-Black VTD was drawn into a majority-minority district,

and in *each* examined parish the overriding majority of majority-Black VTDs were drawn into majority-minority districts. *Id.* ¶ 45. On the whole, more than 96% of majority-Black VTDs in the examined parishes were drawn into CD2 or CD5. *Id.* ¶ 13. Further, although only 33.1% of the VTDs in these split parishes are majority-Black (444 of 1,341), 59.6% of the VTDs from these split parishes assigned to CD2 are majority-Black, and 69.8% of the VTDs from these split parishes assigned to CD5 are majority-Black. *Id.* ¶ 46. These stark splits were essential to achieve the 50% BVAP target in both CD2 and CD5: without the majority-Back VTDs from split parishes, each district would fall below 40% BVAP. *Id.* ¶¶ 47–48.

Dr. Johnson's report shows with meticulous detail how precise Mr. Fairfax was in segregating the races. For example, Dr. Johnson demonstrates that the line dividing Ouachita between majority-white CD4 and majority-Black CD5 tracks the Black population inerrantly:



*Id.* ¶ 15. Dr. Johnson shows similar precision in every split examined. "The visual depictions of racial sorting . . . are telling." *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 146 (E.D. Va. 2018) (three-judge court).

So are the raw numbers. Dr. Johnson finds that "every VTD that is 40% Black or higher is drawn into CD5. There is almost a perfect match between the racial demographics of the VTDs and where the district line is drawn." *Id.* ¶ 18. Dr. Johnson shows the same predominant racial line-drawing in every over parish examined, where nearly all the 40%-plus Black VAP VTDs are drawn into the majority-Black district, a number far higher than the overall total Parish VTDs drawn into that district:

| Parish | Majority-Black District | % of Parish VTDs over 40% drawn into majority-Black district | % of total Parish VTDs drawn into majority-Black district |
|---|---|---|---|
| Rapides | CD5 | ~100% (all but one VTD) | 46.1% |
| Lafayette | CD5 | 100% | 40.9% |
| Iberia | CD2 | 80% | 48.6% |
| Jefferson | CD2 | 100% | 40.9% |
| Orleans | CD2 | 98.9% | 73.3% |
| Ascension | CD2 | 100% | 28.1% |
| East Baton Rouge | CD5 | 94.7% | 53.5% |
| Tangipahoa | CD5 | 57.9% | 24.7% |

*Id.* at ¶ 21, 23-25, 26-28, 29-32, 33-35, 36-38, 39-41, 42-44. All of this amounts to "substantial evidence that race was the predominant factor in the manner that VTDs, cities, and other places were split between" majority-white and majority-Black districts. *Bethune-Hill*, 326 F. Supp. 3d at 147. That type of racial sorting does not happen by accident; it happens when a map-maker "purposefully established a racial target" and the target has a "direct and significant impact" on lines. *Cooper*, 137 S. Ct. at 1469.

3.      Mr. Fairfax cannot credibly pin this stark racial sorting on other demographics. The Court previously believed Mr. Fairfax's testimony that other demographics, like education and "risk factors" (e.g., "low income, communication barriers, number of persons per room in the house, lack of health insurance, and others"), actually drove the line drawing. *E.g.*, Doc. 173 at 35–36. Dr. Johnson debunks that theory—or, at a minimum, shows that "those factors were

subordinated to racial objectives," *Miller v. Johnson*, 515 U.S. 900, 919 (1995). Dr. Johnson shows

that in every parish analyzed, Mr. Fairfax's lines have little correlation to that data. Johnson Rep.

¶¶ 15–45. For example, there is nothing surgical about this demographic map from Mr. Fairfax

depicting education levels throughout Ouachita:



*Id.* ¶ 16. There is no credibility in Mr. Fairfax's assertions that he was tracking demographic data,

when his lines track racial data with precision and demographic data hardly at all. *See Bush v.*

*Vera*, 517 U.S. 952, 970 (1996); *Bethune-Hill*, 326 F. Supp. 3d at 160.

    4.    This evidence compels a finding of racial predominance. Importantly, the Court

owes Plaintiffs no deference on this question. Although a court must "exercise extraordinary

caution in adjudicating claims that a *State* has drawn district lines on the basis of race," that is

because of "the sensitive nature of redistricting and the presumption of good faith that must be

accorded legislative enactments." *Miller*, 515 U.S. at 916. Mr. Fairfax is no legislature, his work

enjoys no presumption of good faith, and this Court is duty-bound to scrutinize Plaintiffs' work in

an impartial and robust manner.

    The evidence directs the Court to conclude that imposing Mr. Fairfax's plan would work a

profound constitutional violation on the rights of millions of Louisiana voters. "Under the Equal

Protection Clause, districting maps that sort voters on the basis of race 'are by their very nature odious.'" *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (citation omitted). It would be profoundly wrong for this Court to impose such a plan "no matter what the consequences of race-blind districting would be." *Gonzalez v. City of Aurora, Illinois*, 535 F.3d 594, 600 (7th Cir. 2008). This is particularly problematic at this *provisional* phase, where the Court does not enjoy the benefit of a full record, and the parties have not had a fulsome opportunity for discovery and trial. To read Section 2 as compelling the replacement of a plan *not challenged under the Constitution* with a plan that is the product of *stark racial sorting* would render Section 2 unconstitutional as applied. Just as "Congress does not enforce a constitutional right by changing what the right is," *City of Boerne v. Flores*, 521 U.S. 507, 508 (1997), it would be an absurd result to read that statute as enforcing these Amendments *by compelling states to violate them*. "Racial classifications are antithetical to the Fourteenth Amendment, whose central purpose was to eliminate racial discrimination emanating from official sources in the States." *Shaw v. Hunt*, 517 U.S. 899, 907 (1996). In all events, Plaintiffs' plan cannot satisfy strict scrutiny for reasons explained below.

### B.    The Proposed Remedy Does Not Satisfy Section 2

Plaintiffs' proposed remedy does not satisfy the Section 2 compactness requirement. "[T]here is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*). A district is not a §2 remedy when "the only common index" between the combined territories "is race." *Id.* at 435. Thus, "the § 2 compactness inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'"

*Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (citation omitted). Plaintiffs' proposed remedy does not satisfy this standard.

1.     As an initial matter, the clear fact that race was the predominant factor behind the configuration of CD2 and CD5 confirms that the proposed remedy does not satisfy Section 2. A court must not choose as a "remedy" a plan in which racial goals "predominate over other traditional and neutral districting principles, principles which were a valid expression of legislative policy." *Abrams*, 521 U.S. at 88. This alone defeats the proposal.

2.     The remedial record, which incorporates the legislative record,[2] further confirms that the proposed remedy is not viable. Like the illustrative plans at the liability phase, the remedy combines "farflung segments of a racial group with disparate interests." *LULAC*, 548 U.S. at 433.

To begin, Plaintiffs' proposed remedial plan combines territory in and around Baton Rouge with the Delta Parishes on the northeastern border of Louisiana, 180 miles away. The legislative record shows that these communities have nothing in common but race. Members of the public from the Delta Parishes have appeared before the Legislature and spoken of the agricultural, rural nature of CD5 as maintained in the enacted plan:

> Louisiana's fifth congressional district is comprised of nothing but communities of the same interest. We are comprised of agriculture in Northeast Louisiana, soybeans, cotton, corn. And the central Louisiana of our district it's timber and the Florida parishes it's cattle and strawberries, peaches.
>
> The fifth congressional district…is one of the largest exporters of agriculture. And we are the largest district that runs parallel to the Mississippi River prime for economic development and economic growth. Our now Congresswoman Julia Letlow sits on the appropriations committee up in Washington, DC, a very powerful committee in Washington, DC.

---

[2] Transcripts of the proceedings from the 2022 Second Extraordinary Session are attached as Exs. B through L.

Ex. B, Tr. 6/16/22 Senate Committee at 177:6-21; *see also id.* at 178:4-5 ("We are a very rural district."); *id*. at 183:7-8 ("[W]e are an agriculture state and much of that comes from the fifth district."); *id*. at 183:20-184:1 ("Congresswoman Letlow has been an advocate for higher education. She's been an…advocate for agriculture and she's been an advocate for all the people of the fifth congressional district."); *id*. at 190:13-16 ("We are the agricultural district of Louisiana…nearly 50 percent of all agricultural sales from Louisiana comes from the fifth district."); Ex. C, Tr. 6/17/22 Senate Committee at 32:6-7, 32:16-19 (stating that LaSalle Parish "belongs in District 5" as a rural, farming, agriculture kind of a parish.").

Life-long residents of the district, public officials, and business leaders requested that CD5 maintain its current configuration and opposed plans that combined their region with urban areas like Baton Rouge. Tr. 6/16/22 Senate Committee at 179:5-17 ("[W]e are the agriculture district, but we don't have similarities with East Baton Rouge Parish."); *id*. at 184:2-5 (urging the Legislature "to keep the fifth district the way it is"); *id*. at 181:2-6 (explaining that concentrating the district in Baton Rouge would bring our voices away."); *id*. at 183:4-6 (opposing a plan that "minimizes the importance of agriculture in our state."); Tr. 6/17/22 Senate Committee at 40:18-41:2 (disagreeing that the Delta Parishes and parishes like St. Landry should be joined because "any good farmer will tell you that…there's no sugar cane north of -- of Rapides Parish."); *id*. at 38:10-16 (opposing a map that "would make Baton Rouge the population center," "shifting away from our current configuration" and "dividing the representation from Monroe and Alexandria."); *see also id.* at 32:6-7.

These concerns reiterated what the Legislature heard throughout the roadshows. *See e.g.*, PR-38 at 50:24-51:1, 51:15-15 ("[I]n North Louisiana, particularly Northeast Louisiana, we're not getting the resources the South gets," and recognizing that "rural concerns are not the same as

urban or suburban concerns"); PR-41 at 64:9-66:7 (requesting preservation of CD5 as a "rural" and "agricultural" district). The enacted plan maintained the Delta region's rural communities as the "backbone" of CD5 to ensure "that their shared agriculture economies have a strong advocate in congress who can provide the focus and develop the expertise needed to effectively represent and advocate for the agricultural needs of our state." PR-54 at 8:23-11:3. Plaintiffs' plan does not.

3.      In the quest to increase the BVAP for CD5, Plaintiffs' remedial plan divides Rapides, Ouachita, and Lafayette Parishes and their surrounding areas, Ex. M, Hood Rep. at Figs. 2, 4, 8, in blatant disregard of the Legislature's stated goals and extensive public testimony supporting preservation of these areas. *See* Joint Rule 21(H).

First, Plaintiffs' proposed remedial plan divides communities of interest in Rapides Parish. During the 2022 Second Extraordinary Session, residents of Rapides Parish spoke of the common "geography, commerce, culture, and character" shared within the parish and highlighted the importance of the agricultural and timber sectors to the area. Tr. 6/17/22 Senate Committee at 39:9-20; Tr. 6/16/22 Senate Committee at 190:13-16. They also explained how Alexandria and the surrounding areas—including Pineville, Ball, and Pollock (in Grant Parish)—are a community of interest. Tr. 6/16/22 Senate Committee at 188:19-22, 189:2-16, 191:12-13, 193:7-194:6; Tr. 6/17/22 Senate Committee at 46:1-14. They opposed "cutting into these communities of interest," Tr. 6/16/22 Senate Committee at 191:10-19, 190:1-6, by dividing Rapides Parish and the Alexandria area between CD3 and CD5. Tr. 6/17/22 Senate Committee at 39:16-19 ("[T]o place a big swath of Rapides Parish in the 3rd Congressional District with Lake Charles and Lafayette is problematic for us relative to those communities of interest"); *see also* Tr. 6/17/22 Senate Committee at Tr. 47:1-2. These concerned citizens warned of the impact of dividing Rapides. *See* Tr. 6/16/22 Senate Committee at 190:22-191:7; *see also* Tr. 6/17/22 Senate Committee at 41:17-

21 (stating that a proposal nearly identical to Plaintiffs' would "pit cities against the rural areas" and "rural interests such as agriculture and broadband and that access plays second fiddle to the urban interests.").

Plaintiffs ignored this testimony in drafting their remedial plan, which not only splits Rapides Parish, but also splits the cities of Alexandria and Pineville, between CD3 and CD5. Hood Rep. at 10, Fig. 4.

Second, Plaintiffs' remedial plan disregards communities of interest in Ouachita Parish. Just two weeks ago, members of the public explained how West Monroe and its surrounding areas, including Brownsville and Claiborne, view themselves as "one community of interest." Tr. 6/16/22 Senate Committee at 186:6-22; *see also id*. at 184:18-22; 187:5-19 ("We are one, we are a whole, we are very family oriented, community based, and we all support each other."). They opposed proposals that divided these communities and transferred representation away from North Louisiana. Tr. 6/16/22 Senate Committee at 185:1-15; *see also* Tr. 6/17/22 Senate Committee at 214:11-15 (opposing proposals that would "make Baton Rouge the population center of a new district" because they "would shift away from our current configuration and most likely divide representation for Monroe and Alexandria."); Tr. 6/17/22 Senate Committee at 216:7-8.

Yet Plaintiffs' remedial plan splits Ouachita Parish between CD4 and CD5. Hood Rep. at 8, Fig. 2. Within the parish, Monroe, West Monroe, and Brownsville are also split between the two districts. Hood Rep. at 8, Fig. 2.

Finally, members of the public and members of the Legislature advocated for Lafayette to remain in one district—as it is in the enacted plan—and opposed proposals that divided the parish and the cities of Lafayette and Scott. *See* Hood Rep. at 13-14, Figs. 7 & 8. During the 2022 Extraordinary Session, the Mayor-President of Lafayette Parish and others spoke of the shared

culture and community of the parish. Tr. 6/16/22 Senate Committee at 134:17-135:7 ("We share culture, we share values, our heritage is unique...We're majority Catholic, Cajun and Creole roots, Cajun zydeco music, our economies, our – the spirit of our economy, the spirit of our initiatives on tourism is very, very closely related, specifically in our parish."); Ex. D, Tr. 6/17/22 House Committee at 217:10-16 (explaining that Lafayette is "the heart of Acadiana" and a "very well-defined community of interest."); Tr. 6/16/22 Senate Committee at 141:1-5 (Scott City Councilman); *id.* at 133:16-134:2; Tr. 6/17/22 House Committee at 218:10-15 ("I[t]'s very important to keep that community of interest together.").

They opposed plans that separated the northern part of Lafayette from the rest of the parish. Tr. 6/16/22 Senate Committee at 135:16-136:2; Tr. 6/17/22 Senate Committee at 77:21-78:1, 109:19-110:7. These requests were nothing new. During the roadshows, community leaders and residents formed an Acadiana-Southwest Louisiana "Super Region" requesting preservation of CD3 with Lafayette and Lake Charles in the same district. PR-40 at 56:21-59:10, 73:19-74:20. The Legislature heeded these calls in preserving CD3 and keeping Lafayette whole in the enacted plan. PR-54 at 11:3-12:8.

Plaintiffs disregarded this evidence. Their proposed remedial plan splits Lafayette Parish, including the cities of Lafayette and Scott, between CD3 and CD5. Hood Rep. at 14, Fig. 8.

4.     Beyond CD5, the remedial plan disrupts important communities of interest across the state in contravention of the extensive evidence in the legislative record. Two communities are relevant here.

First, Plaintiffs' proposed remedial plan destroys the community of interest of Fort Polk and its surrounding areas in Vernon Parish. Members of these communities, including the Mayor of Leesville, repeatedly spoke of the importance of Fort Polk remaining in same district as the rest

of Vernon Parish because of the strong connection between the base and the surrounding community. Tr. 6/16/22 Senate Committee at 143:3-159:12; *see also id*. at 43:2-21, 46:18-47:6.

Fort Polk owns fifty percent of Vernon Parish, Tr. 6/16/22 Senate at 146:18-147:1, is the largest economic generator in Vernon Parish, and the second largest employer in the whole state of Louisiana. *Id*. at 148:4-7. Forty percent of the Fort Polk military lives off base in the community. *Id*. at 150:6-18. Congress appropriates federal funds to the local school districts in Vernon Parish attended by military children through "Impact Aid." *Id*. at 144:3-146:4; *see also id*. at 146:9-17. Leesville has "the largest intergovernmental service agreement in the world with Fort Polk" that provides the community with millions of dollars to continue to provide services to the base. *Id*. at 152:9-153:2. A recent economic impact study showed there is no other parish that is as dependent on a nearby military installation as Vernon Parish is to Fort Polk. *Id*. at 148:8-13.

Dividing Fort Polk and Leesville between two different congressional districts puts this connection, and the accompanying support and funding they provide to each other, in jeopardy. *Id*. at 146:1-4, 151:11-17, 155:15-20, 154:11-22. Removing Fort Polk from CD4 also separates it from Barksdale Air Force Base, weakening the state's influence in Congress. *Id*. at 153:3-154:9. Maintaining both military installations in the same congressional district has given Louisiana "leverage historically" and "the opportunity to be on the influential committees that make a difference in terms of appropriations, and in terms of military policy..." *Id.* at 156:15-159:6. The Legislature understood the importance of keeping Barksdale and Fort Polk in the same district to allow Louisiana "to compete for vital funding that's essential to [the] state's economy," including a recent award of almost "a billion dollars in funding, which includes more military construction dollars for the air force and army than anywhere else in the world." PR-74 at 7:10-8:9; PR-55 at 36:8-15; PR-54 at 5:17-20; PR-69 at 12:4-16.

14

Not only are Fort Polk and Leesville divided between CD3 and CD 4 in Plaintiffs' proposed remedial plan, but Fort Polk itself is split. Hood Rep. Fig. 6. These divisions would destroy the "nexus" between the base and the parish and "could cause harm to the parish and to the army." Tr. 6/16/22 Senate Committee at 151:11-12; *see also id* at 148:14-149:14 (explaining the importance of the connection between a base and its surrounding community for Base Realignment and Closure ("BRAC") determinations).

Second, Plaintiffs' proposed remedial plan destroys communities of interest in St. Tammany Parish. Members of these communities advocated for the parish to remain whole and to remain in a district connected with Jefferson and Orleans. Tr. 6/16/22 Senate Committee at 169:6-12 (Parish President explaining that "St. Tammany is naturally included within the New Orleans economic region" and "whether it is our infrastructure projects, flood protection issues, our economic priorities, or our cultural way of life, our priorities in St. Tammany are united and stretch across our entire parish"); *id*. at 170:7-13, 171:7-16. They spoke of the shared interests between St. Tammany and Jefferson and Orleans on issues like flood protection, Tr. 6/17/22 House Committee at 220:1-10, 221:4-22, 223:1-224:9, and opposed maps that split the parish and grouped it with Baton Rouge. *Id*. at 220:11-22, 223:17-22, 224:10-18, 219:16-18 ("putting St. Tammany Parish in a district anchored by East Baton Rouge does not work."); *id*. at 226:9-12 (Councilman explaining that splitting St. Tammany would be "detrimental").

Yet that is exactly what Plaintiffs' proposed remedial map does by dividing St. Tammany, and Mandeville and Lewisburg, in half, with the northern part of the parish grouped with Baton Rouge in CD5 and the southern with CD1. Hood Rep. at 16, Fig. 10.

### C.    The Proposed Remedy Is Neither Narrowly Tailored Nor Shown to Remedy Any Putative Violation

Plaintiffs' proposed remedy is remarkable in that it has not been shown to be either narrowly tailored under Section 2 nor even to be a meaningful improvement over the enacted plan. The narrow-tailoring question is whether there are "'good reasons' to believe a [50]% BVAP floor [is] necessary to avoid liability under § [2]." *Bethune-Hill*, 137 S. Ct. at 802. To serve as an appropriate remedy for a putative violation, a proposed remedial district must "enhance the ability of minority voters to elect the candidates of their choice." *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018). Both of Plaintiffs' remedial districts, CD2 and CD5, fail both tests.

### 1.    CD2

There is no record evidence establishing that race-based maneuvers to achieve a 50% BVAP target in CD2 were narrowly tailored. *See Cooper*, 137 S. Ct. at 1470; *Bethune-Hill*, 326 F. Supp. 3d at 176–77. In particular, Plaintiffs offer no evidence at all that the BVAP of CD2 needs to fall above 50% in order to ensure that Black residents within its footprint have an equal opportunity to elect their preferred candidates. This is after Plaintiffs dropped the BVAP of CD2 down more than 7% so that the remedial version of CD2 rests at just above the 50% threshold. Doc. 225-1 at ¶20. Plaintiffs rely on the supplemental report of Dr. Handley to support their remedial plan, but Dr. Handley made no analysis to ascertain whether 50% BVAP is necessary or whether a lower target, with less race-based maneuvering, would suffice. *See* Doc. 225-2 at 3–9 (examining only whether a 50% BVAP target is necessary in CD5). However, Dr. Handley did testify that her analysis revealed that CD2 is likely more effective than CD5 possibly due to the fact that "voting was less polarized in District 2" than other districts. Handley Dep. at 11:4-18.[3]

---

[3] Attached as Ex. N is the deposition transcript of Dr. Handley. Because the deposition was taken earlier today, only a rough copy is available. The page numbers in the exhibit correspond to the pages in the top right hand corner of the deposition transcript.

This case, then, is like *Wisconsin Legislature*, where the narrow-tailoring inquiry was plainly unmet because both the court that adopted the plan and the party who presented it had "no . . . evidence or analysis" to justify the BVAP target selected. 142 S. Ct. at 1249; *see also Cooper v. Harris,* 137 S.Ct. 1455, 1459 (2017) (requiring a district-specific analysis to determine whether race predominated in the mapdrawers' choices). Nor is CD2 shown to be a meaningful improvement for voters within its footprint, who *already* were afforded an equal opportunity to elect their preferred candidates in a district *not alleged to be drawn with predominantly racial intent.*

### 2.    CD5

Plaintiffs also fail either to justify a 50% BVAP target in CD5 or to establish it as a viable Section 2 remedy. Plaintiffs rely on a percent-needed-to-win analysis performed by Dr. Lisa Handley, which purports to show that a district of 50% BVAP is needed to create a performing Section 2 district in the disparate regions at issue. *See* Doc. 225-2 at 3–9. But Dr. Handley's analysis is (a) unreliable and (b) if taken at face value, shows a BVAP under 50% will allow the Black-preferred candidate to win a majority of the two-candidate races Dr. Handley studies, which Dr. Handley defines as making the district "effective." Handley Dep. at 25:18-26:18. Dr. Handley also opined that when a district, such as CD5 and likely CD2 would elect the Black-preferred candidate with less than 50% BVAP this indicated that there is significant white crossover voting in the district. Handley Dep. at 21:18-24.

First, Dr. Handley's analysis is unreliable because it improperly excludes probative elections, relies heavily on elections that lack probative value, and fails to distinguish those having more value from those with less. Dr. Handley first wrongfully excludes from consideration two elections—U.S. Senate November 2020 and Attorney General October 2015—in which she

concluded the Black community was not cohesive around a single candidate, because there were two Black candidates. But, far from being *irrelevant*, these contests are probative of the highly relevant question of *Black cohesion*, which is an essential factor in assessing the percent needed to win—as Dr. Handley *acknowledges*, *see* Handley Rep. 225-2 at 6 (explaining that the analysis considers "the turnout rates of Black and white eligible voters and the degree of *Black cohesion* and white crossover voting for each of these candidates" (emphasis added)). Dr. Handley then further improperly excluded elections that lacked a Black candidate on the ballot, despite conceding that a white Democrat could be a Black-preferred candidate. Handley Dep. at 8:15-9:9. Accordingly, Dr. Handley discarded highly visible elections like the 2016 Presidential and 2015 and 2019 Gubernatorial elections, an exclusion she concedes could impact her analysis. Handley Dep. at 34:7-24. It is improper for an expert to discard *probative* data on the ground that it *hurts* the litigant who hired the expert.

Dr. Handley then included a series of odd-numbered year elections in which only state and local candidates, and not federal candidates, are on the ballot. But as Dr. Handley conceded at the liability phase, it is better to use more highly visible political races to calculate racial polarization in voting. 5/10 Tr. 68:16–21. Yet, in at least three of her off-year elections where she asserts a 50% BVAP district is needed in order for the Black-preferred candidate to prevail, including Nov. 2017 Treasurer (7.7% Black VAP turnout), Oct. 2015 Secretary of State (34.3% Black VAP turnout), and Oct. 2015 Lieut. Governor (34.3% Black VAP turnout), Black turnout was below 35%. *See* Handley Remedial Rep. at 8, Tbl. 2. By contrast, in the even-numbered year elections she considered, when the congressional elections at issue will occur, Black VAP turnout usually was much higher—58.8% in Nov. 2020 U.S. President and U.S. Senate, and 42.8% in Nov. 2018 Secretary of State. (The one exception, Dec. 2018 Secretary of State, had a 17.4% Black VAP

turnout, a turnout greater than the 17.0% non-Black VAP turnout in that race.) The result is that Dr. Handley is comparing apples to oranges in order to make her math work.

When one excludes the odd-numbered year elections, the total number of probative elections drops from 15 to four, as follows:

- U.S. President Nov. 2020, at 50% BVAP, **53.4**% support for b-p candidate

- U.S. Senate, Nov. 2020, at 50% BVAP, 25.0% support for b-p candidate[4]

- SOS Dec. 2018, at 50% BVAP, **55.9**% support for b-p candidate

- SOS Nov. 2018, at 50% BVAP, 29.7% support for b-p candidate

*See* Handley Remedial Rep. at 8, Tbl. 2.

In this scenario, assuming that CD5 is drawn to 50% BVAP, a white-bloc voting majority defeats a Black-preferred candidate in *none* of Dr. Handley's 4 probative even-numbered year elections. In two of the races, the Black-preferred candidate prevailed, and in the other two, the Black community did not have a candidate of choice. If CD5 is drawn to 45% BVAP, then a white-bloc voting majority defeats the Black-preferred candidate in only *one* of four elections—the November 2020 presidential election—and only by razor-thin margin (49.6% vote for the Black-preferred candidate). This, of course, strongly suggests that CD5 could be drawn to some value between 45 and 50% BVAP and the Black-preferred candidate would prevail in that race, too. Dr. Handley conceded this point in her deposition today, when she admitted that a district with 46% BVAP would be equally as likely to be effective as a district at 50% BVAP. Handley Dep. at 43:24-44:3 (conceding such a district would "win the same [for Black-preferred candidates] as if it were 50 percent").

---

[4] As Dr. Handley notes in her Report, for this election there were more than two Black candidates, and the Black vote was split between the two, making the Black vote non-cohesive. Handley Dep. at 32:10-14.

The point is that nothing in Dr. Handley's analysis negates Dr. Handley's liability-stage concession that a district drawn under 50% BVAP could still provide the Black community an opportunity to elect their candidate of choice. 5/10 Tr. 63:1–12. Nor does her remedial report explain that two of Plaintiffs' other experts, Dr. Palmer and Dr. Lichtman, concluded that it was likely that minorities in districts nearly identical to Plaintiffs' remedial map could elect their candidate of choice in districts with below 50% BVAP. Consistent with his report, Dr. Lichtman testified at the PI hearing that Black candidates of choice could win CD2 or CD5 with a BVAP "[i]n the 40 percent range." 5/10 Tr. 156:23-157:3; Doc. 169-107, at p 62. Dr. Palmer came to the same conclusion: that based on Table 4 of his report, CD2 and CD5 could be drawn below 50% BVAP and still be likely to elect Black-preferred candidates. Doc. 169-106, at p 11; 5/10 Tr. 268:6-9. Similarly, the Amicus also found that Black candidates of choice could likely win in a New Orleans-based district with 41.5% BVAP (in 19 out of 19 key statewide elections) and a Baton Rouge-based district with 42.9% BVAP (in 14 out of 19 key statewide elections). Amicus Curiae Br., Doc. 220, at 22-24, 26-27. Dr. Handley simply proves that the remedial map plainly "ramped up" the necessary BVAP of CD5 from 40-46% to 51.98%, in clear contravention of *Cooper v. Harris*. 137 S. Ct. at 147.

## CONCLUSION

For the foregoing reasons, the Court should reject Plaintiffs' remedial plan.

/s/ Michael W. Mengis

Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

/s/ Patrick T. Lewis

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Erika Dackin Prouty*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

\* *Admitted pro hac vice*

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

/s/ *John C. Walsh*
John C. Walsh, LA Bar Roll No. 24903
**SHOWS, CALL & WALSH, L.L.P**
Batton Rouge, LA 70821
Ph: (225) 383-1461
Fax: (225) 346-5561
john@scwllp.com

/s/ Phillip J. Strach
Phillip J. Strach*
phillip.strach@nelsonmullins.com
    *Lead Counsel for Secretary Ardoin*
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Ph: (919) 329-3800

\* admitted *pro hac vice*

*Counsel for Defendant R. Kyle Ardoin, in his official capacity as Secretary of State of Louisiana*

                                        Jeff Landry
                                        Louisiana Attorney General

Jason B. Torchinsky (DC 976033)*        */s/Angelique Duhon Freel*
Phillip M. Gordon (DC 1531277)*         Elizabeth B. Murrill (LSBA No. 20685)
Dallin B. Holt (VSB 97330)*             Shae McPhee (LSBA No. 38565)
Holtzman Vogel Baran                    Morgan Brungard (CO Bar No. 50265)*
Torchinsky & Josefiak, PLLC             Angelique Duhon Freel (LSBA No. 28561)
15405 John Marshall Highway             Carey Tom Jones (LSBA No. 07474)
Haymarket, VA 20169                     Jeffrey M. Wale (LSBA No. 36070)
(540) 341-8808 phone                    Office of the Attorney General
(540) 341-8809 fax                      Louisiana Department of Justice
jtorchinsky@holtzmanvogel.com           1885 N. Third St.
pgordon@holtzmanvogel.com               Baton Rouge, LA 70804
dholt@holtzmanvogel.com                 (225) 326-6000 phone
*admitted pro hac vice                  (225) 326-6098 fax
                                        murrille@ag.louisiana.gov
                                        freela@ag.louisiana.gov
                                        walej@ag.louisiana.gov
                                        jonescar@ag.louisiana.gov
                                        mcphees@ag.louisiana.gov
                                        brungardm@ag.louisiana.gov

                                        *Counsel for Defendant, State of Louisiana*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 27, 2022, this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system. Copies of the filing are available on the Court's system.

/s/ *Patrick T. Lewis*
_____
Patrick T. Lewis *(admitted pro hac vice)*
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

124109.000001 4859-0342-0454