# Exhibit D



# Transcript of Louisiana State House Redistricting Committee

**Date:** June 17, 2022
**Case:** Transcription Services

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

TRANSCRIPT OF VIDEO-RECORDED

TESTIMONY OF THE

LOUISIANA STATE HOUSE

REDISTRICTING COMMITTEE

JUNE 17, 2022

Job No.: 453585

Pages: 1 - 352

Transcribed by: Christian Naaden

1               P R O C E E D I N G S

2          MR. CHAIRMAN:  Members in public, I'm going to

3    call the committee on house and governmental affairs to

4    order. Today's Friday June the 17th. Please if you have

5    a cell phone, please silence it. If you'd like to give

6    testimony please fill out a card.

7          White for information, green is support, red

8    in opposition. Additionally on some housekeeping, all

9    the bills on the calendar today deal with

10   redistricting. Obviously that's why we're here. That's

11   for the call.

12         And we do have our committee clerk here, Mr.

13   Harrington, who if any of the members would like to

14   pull any of the maps up and -- and focus in on them, we

15   have that ability to be able to do that here today. So

16   you just have to let us know if you'd like to do that.

17   With that said, we're going to go ahead and call the

18   roll. Ms. Ammersbach, please read the roll.

19         CLERK:  Chairman Stefanski.

20         MR. CHAIRMAN:  Present.

21         CLERK:  Present. Vice Chairman Duplessis.

22         REP. DUPLESSIS:  Here.

1          CLERK:  Present. Representative Boyer.

2     Representative Wilford Carter.

3          REP. CARTER:  Present.

4          CLERK:  Present. Representative Deshotel.

5          REP. DESHOTEL:  Present.

6          CLERK:  Present. Representative Furnam.

7          REP. FURNAM:  Here.

8          CLERK:  Present. Representative Gadbury.

9          REP. GADBURY:  Here.

10          CLERK:  Present Representative Horton. Is she

11     here?

12          MR. CHAIRMAN:  She's here.

13          CLERK:  Present. Representative Ivy. Present.

14     Representative Jenkins.

15          REP. JENKINS:  Here.

16          CLERK:  Present. Representative Mike Johnson

17     here.

18          REP. JOHNSON:  Here.

19          CLERK:  Present Representative LaCombe.

20     Representative Lyons.

21          REP. LYONS:  Present.

22          CLERK:  Present Representative Magee.

1          REP. MAGEE:  Present.

2          CLERK:  Present Representative Newell.

3          REP. NEWELL:  Here.

4          CLERK:  Present Representative Thomas.

5          REP. THOMAS:  Here.

6          CLERK:  Present Representative White. 14

7    members.

8          MR. CHAIRMAN:  14 members in a quorum.

9    Members, additionally today a- --as we -- as we go

10   through this docket we -- I'm not going to put a time

11   limit on. I want to give everybody an opportunity to

12   say what they need to say. And -- and I know these are

13   -- these are important bills we're debating so I'm --

14   I'm not going to do a time limit.

15          However, I would ask that the members, you

16   know, you get one bite at the apple. So while you're on

17   the mic think about all your questions, choose those

18   questions wisely, because we are going to try to keep

19   this thing moving. But I don't -- I don't want to

20   stifle debate.

21          I don't want to encourage, rather I want to

22   encourage everyone to be able to say what they need to

1  say today and the public to be able to participate and

2  say what they need to say. With that said this morning

3  members, I'm going to start with HB2 by Speaker

4  Schexnayder. If you'd like to come to the table. Mr.

5  Speaker, whenever you're ready.

6         REP. SCHEXNAYDER:  Thank you, chairman. Thank

7  you members for being here today. I want to thank you

8  all for being here today, and I understand how

9  difficult this task is before you. I know that the

10 tensions are high. Just look on Facebook, look on

11 social media. I'm asking each one of you to look past

12 all of that.

13         I'm asking each one of you to listen intently,

14 and as you make your decisions remember why you were

15 elected. You were each elected to represent the people

16 of your district. That's your job. Your decisions and

17 your vote is yours alone to make. Members, I'm asking

18 that you continue to do what you have always done.

19         And that is to listen, that is to let the

20 democratic process work out, and allow any person who

21 wishes to speak have a voice. At the end of the day, if

22 you do that, you vote your conscience, you vote your

1  district, you have no one to apologize to and nothing

2  to apologize for. I filed this bill as a placeholder

3  bill, as an instrument to be used if needed, just like

4  we do in any other session. And with that, Mr.

5  Chairman, I don't plan to move this bill today.

6          MR. CHAIRMAN:  Okay. The speaker doesn't plan

7  to move this, members. So what I'm going to do is I am

8  going to read the cards though, because if -- if people

9  came here to testify I want to give everyone an

10  opportunity to -- to have a say. That's what -- that

11  was the point of giving us extra time. So the first

12  card I have in support is Mitchell Marmande.

13          REP. MAGEE:  [Inaudible]. Come on, man. It's a

14  [inaudible].

15          MR. CHAIRMAN:  Oh, I'm sorry. Well Tanner. I

16  should have let you read it, but I didn't recognize

17  Tanner, so I wouldn't have known it was him anyway. But

18  Mitchell, if you'd like to come down. Yes, sir.

19          REP. DESHOTEL:  You have a point of order.

20          MR. CHAIRMAN:  Hold on. State your point.

21          REP. DESHOTEL:  If it's not being moved why

22  are we taking testimony on it?

1       MR. CHAIRMAN:  Because I want to give the

2   public an opportunity to -- to, if they came here and

3   if they came here for this bill, I -- I want to be

4   transparent and give them an opportunity to talk. And

5   that includes all the cards, green, red, white,

6   anything we have.

7       REP. DESHOTEL:  All right. That would -- that

8   -- that would also mean we could ask questions of the

9   people that's testifying?

10      MR. CHAIRMAN:  Yes.

11      REP. DESHOTEL:  Okay.

12      MR. CHAIRMAN:  Yes, sir. All right. Yes sir,

13  whenever you're ready.

14      REP. MARMANDE:  Thank you, Mr. Chairman and

15  members of the committee. I'm here just as a

16  representative of my Bayou region. I'm from Houma,

17  Louisiana. I own a civil engineering firm in Houma,

18  Louisiana. My main focus of work is managing the

19  Morganza to the Gulf Hurricane Protection System.

20      I've done that for 15 years for the Terrebonne

21  Levee & Conservation District. I also serve as

22  president of the South Central Industrial Association

1    which represents about 200 member companies throughout

2    the Bayou region. In addition to that, I serve on the

3    board of a community bank.

4            And what I -- I -- I just want our voice

5    heard, you know, 10 years ago we were up here, members

6    of chamber of commerce and SCIA when redistricting was

7    occurring and -- and our main goal was to keep the

8    communities of Terrebonne and Lafourche together,

9    because we felt we had similar interests and we needed

10   the same voice in Congress.

11           And we fought and fought and obviously it

12   didn't turn out that way. We ended up with three

13   representatives across the coast of Louisiana, but it

14   ended up being one of the biggest blessings that we

15   could imagine. Unfortunately, since 2010 we have been

16   impacted by hurricanes Delta, Isaac, Ida, Laura, Zeta,

17   Barry, and probably a few that I'm leaving off.

18           And my principal responsibility is that

19   hurricane recovery effort for the Levee District. I

20   cannot emphasize enough how important it's been having

21   three representatives in Congress for us. I don't

22   believe our communities could have recovered as well as

1  we are recovering without that voice.

2          You know, it seems to me like the coastal

3  legislators do not look at district lines and they --

4  and we suffer the same -- the same perils, you know? I

5  mean, the west part of the state was impacted a few

6  years ago by Laura and Delta and last year Ida was

7  devastating to our particular region.

8          So, you know, the coastal economy that, you

9  know, that we work to protect is important for the

10  entire state. I think -- I think in the last few years

11  it's remarkable to see what type of federal investment

12  that we've had imparted upon us. I know for my project,

13  Morganza, which has been principally funded entirely by

14  the state and the local government for the last 15

15  years, for the first time in our history we received

16  $400 million of federal money.

17          And this is a massive system over a 98 mile

18  levee and floodgate system that protects Terrebonne and

19  Lafourche parishes. So I would urge you to support

20  House Build 2. I know that we're -- there's no action

21  on it today, but we have been truly blessed by our

22  representation across the state in the last 10 years.

1          And -- and it's just so -- I mean, we have

2     such a unique area with fisheries, with -- with the

3     industry that we have in our area. It is so important

4     to the economy of the entire state, and I think, you

5     know, the districts as they have been in -- in House

6     Build 2 protects that way for all -- all of the people

7     of South Louisiana. So I would urge that support.

8          MR. CHAIRMAN:  Thank you. We do have a

9     question. Mr. Pro Tem.

10         REP. MAGEE:  Thank you, Mr. Chairman, and

11    thank you for being here, Mr. Marmande. I -- I think

12    one of the incredible things is last -- when we did

13    redistricting the first time we didn't get a lot of

14    coastal voices here and I'm glad you're here to kind of

15    tell our story. You work on Morganza to the Gulf as

16    your primary purpose of civil engineering, is that fair

17    to say?

18         REP. MARMANDE:  Yes, sir.

19         REP. MAGEE:  And where is Morganza at?

20         REP. MARMANDE:  Morganza is I think in Pointe

21    Coupee Parish.

22         REP. MAGEE:  Okay. It's in Pointe Coupee

1  Parish so it's pretty -- it's somewhat in the interior

2  but our -- our alignment system goes all the way from

3  Morganza.

4         REP. MARMANDE:  Right. And Morganza is -- is

5  confusing and its name and that it actually -- it

6  actually entice -- entails the whole basin from the

7  West [inaudible] River from Morganza all the way to the

8  Gulf.

9         REP. MAGEE:  So there's a -- there's a

10  community of interest there between Morganza and

11  coastal Louisiana. Is that fair to say?

12         REP. MARMANDE:  Absolutely. I think what we're

13  doing on the Southern end actually protects the economy

14  of the whole state, not -- not just our area. It's

15  protecting our lives and property directly, but it's

16  protecting much more than that.

17         REP. MAGEE:  And realistically speaking,

18  congressional district six and one under this map have

19  sitting Congressman. Have you had the opportunity to

20  communicate with those congressmen? Have you found that

21  they have been responsive to all your -- the needs of

22  coastal Louisiana?

1          REP. MARMANDE:  So in my job, I mean, I have

2     direct contact with them. In fact, I'm just getting

3     back from Washington this past week. So, but yes, I

4     mean, I -- I can pick up the phone and call, and I

5     mean, you know, we don't have to call them after a

6     storm.

7          They're calling us to see what we need, which

8     is a pretty amazing thing to happen. And -- and -- and

9     there's no learning curve. Of course, you know,

10    representatives change, but -- but that -- that tie to

11    the coast, I think, is what -- is the most important

12    thing.

13         REP. MAGEE:  And -- and in the six years I've

14    been elected I know you and I have talked a lot and I

15    think you would agree with me that my main focus here

16    at the legislature has always been about coastal

17    protection levies. That's been the reason why I ran.

18         I talked to you when I first ran for office,

19    that was the whole reason why I was running. So that's

20    a pretty big deal in Terrebonne Parish and Lafourche

21    Parish, coast protection. Is that correct?

22         REP. MARMANDE:  I -- I think it's the -- the

1    number one issue in our area, you know?Certainly after

2    Ida it's even more to the forefront.

3              REP. MAGEE:  Thank you.

4              MR. CHAIRMAN:  Mr. Pro Tem for question,

5    Representative LaCombe.

6              REP. LACOMBE:  I just wanted to -- so in the

7    maps that I'm looking at on district, as we were

8    talking, we talked about Pointe Coupee, and I think the

9    speaker pro tem raised out the issue that, you know,

10   there's community interest between the Gulf and the

11   flood zones. And -- and I'm very familiar with the --

12   the Morganza structure because I live there.

13             REP. MARMANDE:  Right.

14             REP. LACOMBE:  And I represent Pointe Coupee

15   Parish. But in this map, Pointe Coupee Parish is not

16   based in the community interest with the zone, it's

17   actually based in the Monroe District.

18             So, you know, that's something that we had

19   talked about through redistricting because currently we

20   are represented by a congressmen out of capital region

21   area, but under this map on some of the other proposed

22   maps that have passed, Pointe Coupee was taken out.

1        So basically the top part of your structure

2   where the levee systems begin at the old river control

3   structure, both levees on the -- the Mississippi

4   Riverside and the [inaudible] side where the actual

5   structure starts and -- and the cove engineers

6   maintains, that entire structure now is not in the

7   congressional district of the coastal zone. Is that

8   correct?

9        REP. MARMANDE:  I -- I don't believe that it

10  is, but I'm not certain about that. Now that structure

11  is not a part of the Morganza to the Gulf System, per

12  se. That is a core --

13       REP. LACOMBE:  That's a core structure.

14       REP. MARMANDE:  A core structure.

15       REP. LACOMBE:  But levee start right there.

16       REP. MARMANDE:  For the levees. Yeah. You're

17  right.

18       REP. LACOMBE:  Protection levees that sit on

19  both sides are -- are there.

20       REP. MARMANDE:  That's the -- the edge of our

21  boundary.

22       REP. LACOMBE:  Yeah. So that's where it

1    starts, and that whole entire structure, and I say

2    structure but let's go the entire levee system on both

3    sides, the Mississippi River side and the [inaudible]

4    side come to a parallel from you, it -- it feeds up to

5    like a bottleneck. Correct?

6              REP. MARMANDE:  That's -- that's true.

7              REP. LACOMBE:  And so both levees are right

8    there in Point Coupee, but that Pointe Coupee is not in

9    the coastal zone congressional district. Correct?

10             REP. MARMANDE:  It is not.

11             REP. LACOMBE:  Okay. Thank you.

12             MR. CHAIRMAN:  Representative Deshotel.

13             REP. DESHOTEL:  So to -- to the same question,

14   I'm looking at all four maps and I don't see Pointe

15   Coupee in the coastal zone in any of the maps. Do --

16   have you reviewed any of these maps?

17             REP. MARMANDE:  I -- I have not reviewed --

18   reviewed them since yesterday, so I'm just going off of

19   memory, but I do not believe they are.

20             REP. DESHOTEL:  Okay. I'm just curious what --

21   where the question was going because I don't see them

22   in any -- any of the maps. Thank you.

1        MR. CHAIRMAN:  Well, he asked this question,

2    you -- you made your point. We're good. All right, that

3    clears all the questions today.  Thank you very much

4    for your testimony today.

5        REP. MARMANDE:  Thank you for your time.

6        MR. CHAIRMAN:  Representative Jenkins, I'm

7    sorry. Representative Jenkins. Representative Jenkins.

8    I apologize. Didn't see. [Inaudible].

9        REP. JENKINS:  Not -- not a problem, Mr.

10   Chairman. So and I do understand you have a focus about

11   the recovery on storms and -- and that's an important

12   issue to you, is that right?

13       REP. MARMANDE:  Absolutely.

14       REP. JENKINS:  But don't you think all of the

15   citizens of this state should have their voices heard

16   in Congress?

17       REP. MARMANDE:  Absolutely.

18       REP. JENKINS:  And do you think that this

19   particular map is allowing all of our citizens to have

20   their voices heard in Louisiana? Have you given any

21   thought to that?

22       REP. MARMANDE:  So -- so I'm certainly looking

1  at it from my point of view, which is what's better for

2  my community and all the people in my community. And so

3  I feel that that's the best thing for our region.

4            REP. JENKINS:  Yeah. So you -- you'll just

5  speak -- when -- when you look at this map, and your

6  support of this map is really just focused on your

7  region. That's basically what your testimony is -- is

8  [inaudible].

9            REP. MARMANDE:  Yeah. I'm -- I'm here on

10 behalf of my community.

11           REP. JENKINS:  All right. And you -- you do

12 understand that this particular map has been reviewed

13 by federal court and found not to -- to -- to meet the

14 requirements of the Voters Rights Act.

15           REP. MARMANDE:  I mean, you know, I -- I'm not

16 a lawyer or an attorney or do I ever want to be, I just

17 want to engineer flood protection for my community.

18           REP. JENKINS:  But you -- you are -- you're a

19 citizen and -- and --

20           REP. MARMANDE:  I'm -- I'm a citizen.

21           REP. JENKINS:  -- and you care about the other

22 citizens of the state of Louisiana.

1      REP. MARMANDE:  I'd like to think that I care

2  about everyone in this state.

3      REP. JENKINS:  And I believe you do. I'm not

4  challenging you on that. I'm just simply saying, just

5  as you are concerned about those particular concerns

6  about your -- your -- your particular area, you do

7  understand we got citizens throughout this state that

8  can say the same thing. We've got issues that we do not

9  feel our voice is being heard in Congress. Would you --

10  would you agree with that?

11      REP. MARMANDE:  I certainly understand that.

12      REP. JENKINS:  And I think you would want all

13  of our citizens to have their concerns, just as yours,

14  and their voice heard in Congress. Would you agree with

15  that?

16      REP. MARMANDE:  Yes, sir.

17      REP. JENKINS:  All right. Thank you, sir.

18      MR. CHAIRMAN:  Thanks, Representative Jenkins,

19  for your question. Representative Horton.

20      REP. HORTON:  Thank you, Mr. Chairman. Thank

21  you so much, sir, for coming here today. It's important

22  that our citizens weigh in on -- on -- on what we're

1   doing and -- and what we have done, because it's you

2   that we serve. Let me ask you, do you live in a diverse

3   community?

4            REP. MARMANDE:  I -- I would say Cajun people

5   are extremely diverse, so yes, we do live in a diverse

6   community. I don't know the demographics particularly.

7   But absolutely. I mean, I think -- I think Terrebonne

8   and Lafourche are two of the most diverse places in the

9   whole state of Louisiana.

10           REP. HORTON:  Okay. Thank you so much, sir. I

11  appreciate you.

12           MR. CHAIRMAN:  Thank your, Representative

13  Horton. All right. Now the board is clear. Thank you

14  very much, sir. I appreciate your testimony here.

15           REP. MARMANDE:  Thank you all.

16           MR. CHAIRMAN:  Also filling out a green card

17  and support Mary [inaudible] Labry. Susie Labry,

18  rather, and then also Jennifer Carrigman, filling out

19  both green cards and support and not wishing to speak.

20  Thank you much. Thank you both ladies for coming today.

21           Filling out a red card and opposition, not

22  wishing to speak, Jared Evans with Legal Defense Fund,

1    Terry Landry, Jr with SPLC Action Fund, and Sean Jache

2    Foster with SPLC Action Fund. All red cards in

3    opposition, not wishing to speak. That clears the

4    cards. The speaker has given me his indication.

5         Oh yeah, the email testimony. Let me read the

6    email testimony, I apologize. There are 19 emails in

7    support for HB2 and none in opposition. So 19 in

8    support. Additionally, the speaker has indicated to me

9    he would like to voluntarily defer this. So we're going

10   to leave this bill in committee.

11        And with that said, I'm going to move that HB2

12   be voluntarily deferred without objection. Next, we're

13   going to go to HB1 by my vice chair, Duplessis. Mr.

14   Harrington, you want to go ahead and bring up the map

15   just real quick while he's -- while he's introducing?

16   Good. Everybody's got a chance to look at it? Good

17   deal. We can take it down and focus on Mr. Duplessis.

18   Whenever you're ready.

19        REP. DUPLESSIS:  Thank you, Mr. Chairman, and

20   thank you to the committee. I think I would like to

21   start out by pointing out that when I drove up to the

22   Capitol this morning it was a little different. I think

1    we all noticed a lot of people were -- were off work

2    today.

3          This was our first celebrated work holiday of

4    Juneteenth on this Friday and I just wanted to just

5    acknowledge that point as we talk about this

6    congressional map and as we try to move forward as a

7    state in terms of how we go forward. I think we all

8    know why we're here. We're all here because this matter

9    is currently in litigation.

10          We met as a committee starting in the fall,

11   going across this state, going on a road show, hearing

12   from the various constituents throughout the state. We

13   started a redistricting process in February. This body

14   voted on a map, maps I should say, and then this body

15   then voted to override a gubernatorial veto.

16          Which was then followed by immediate

17   litigation that ensued, and currently the middle

18   district court of Louisiana, federal district court,

19   has held the current map that we -- we passed as a body

20   to not be compliant with the Voting Rights Act. House

21   Bill 1 is an opportunity for us to be in compliance

22   with the order of the court.

1          Just to begin my presentation, what I'd like

2    to do, just to be as -- as clear and as succinct as

3    possible, is I'm just going to read directly from the

4    order what the judge said in the order. Number one, I

5    just want to point out, at the outset of the order it

6    reads that the plaintiffs who brought this action are -

7    - are likely to succeed, to prevail on the merits of

8    their claims brought under section two of the Voting

9    Rights Act.

10          This was followed by granting a -- a

11    preliminary injunction, followed by stating that the

12    appropriate remedy in this context is a remedial

13    congressional redistricting plan that includes an

14    additional majority black congressional district.

15    Therefore, the court orders didn't ask, didn't suggest,

16    it orders the Louisiana legislature to enact a remedial

17    plan on or before June 20th.

18          The legislative leadership, Speaker

19    Schexnayder and Senator -- senate president Cortez

20    sought an extension of time, and that extension, that

21    request was denied on yesterday. Therefore we are under

22    a court order right now to adopt a remedial plan by the

1    20th of this month, and today is the 17th. And House

2    Bill 1 is that remedial plan.

3          Members, black voters in Louisiana have less

4    an opportunity to elect candidates of their choice

5    under the con -- the current congressional map. Because

6    of the way the district lines are drawn, candidates

7    preferred by black voters only have a chance in

8    district two. That's the district in which I reside,

9    one minority district.

10          And you've heard time and time again the math

11   equation that the people of this state, black people of

12   this state make a -- a third of this state yet we only

13   have one voice in Congress. This map is responsive to

14   everything that I heard on the road show and everything

15   that this committee heard on the road show.

16          I heard so many people talk about the need to

17   have a congressional district where they have an

18   opportunity to elect a candidate of their choice.

19   However, the current map only provides that opportunity

20   to voters that reside within the boundaries of district

21   two. District two in its current configuration and in

22   the map that the governor vetoed is one of the most

1    gerrymandered districts in the country.

2           It lumps black neighborhoods in New Orleans

3    with black neighborhoods in North Baton Rouge, while

4    picking up black areas in the middle along the way. In

5    this map, the minority community is sufficiently large

6    and geographically compact to constitute a majority in

7    district two and in district five.

8           And when I say map, I mean, the map that I'm

9    proposing today. The map that I'm proposing is more

10   compact than the current congressional map and the

11   speaker's map. Black voters have less an opportunity

12   than other members of the electorate to participate in

13   the political process and elect candidates of their

14   choice to Congress.

15          This map, preserves communities of interest to

16   the extent practical -- practical, and it breaks fewer

17   parishes and the current -- than the current speakers

18   map, excuse me. This map complies with section two of

19   the Voting Rights Act. It allows voters of colors in

20   district two and five to elect their candidate of

21   choice.

22          It meets the requirements of this session as

1  called by the governor, and most importantly it meets

2  the standards set forth by the middle district. I'm

3  happy to go through the map if you like, in terms of

4  the configurations and the nu- --numerical breakdowns,

5  but I'm also happy to take any questions that you might

6  have.

7           MR. CHAIRMAN:  Okay. Who -- Representative

8  Duplessis, I'm -- I'm not assuming that you drew this

9  map physically, you know, and so I don't want to ask

10 you questions about the -- the specific drawing of it.

11 Is -- is there someone here who drew the map that could

12 answer those questions?

13          REP. DUPLESSIS:  Yeah. Sitting with me is a

14 familiar face that you've all seen, Jared Evans, who is

15 a lawyer with the Legal Defense Fund, I'll let him

16 introduce himself and speak to that.

17          MR. CHAIRMAN:  Absolutely. And we do have a

18 card in support wishing to speak by Jared Evans with

19 Legal Defense Fund.

20          MR. EVANS:  Good morning, Mr. Chairman.

21          MR. CHAIRMAN:  Morning.

22          MR. EVANS:  I'm Jared Evans, Legal Defense

1   Fund.

2          MR. CHAIRMAN:  Okay. Do -- anything you'd like

3   to say before I ask you some questions, because I know

4   you filled out the card, you're just here to -- kind of

5   here to talk. Gotcha. Awesome.

6          MR. EVANS:  Please proceed.

7          MR. CHAIRMAN:  So I'm looking at the map and

8   geographically it's a -- it's a pretty, and

9   specifically I want to talk about district five, which

10  would be the new majority/minority district. Okay.

11  Geographically, it's -- it's a pretty long district.

12  Would you agree with me?

13         MR. EVANS:  Absolutely. Yes. Not -- not much

14  longer than the current district five.

15         MR. CHAIRMAN:  Gotcha. Yeah. No. And which I

16  don't disagree with, I'm -- I'm just -- just trying to

17  kind of figure out. So what was the, I guess, what was

18  the primary vote motivation for drawing district five?

19         MR. EVANS:  Mr. Chairman, when we drew this

20  map we looked at all of the testimony that we received

21  from the road show. The number one thing that they said

22  in Monroe is to please give us an opportunity to let

1   our candidate of choice to Congress.

2          The number one thing we heard in -- in

3   Alexandria was please give us an opportunity to let our

4   candidate choice to Congress. The number one thing we

5   heard here in Baton Rouge was please give us an

6   opportunity to let our candidate of choice to Congress.

7          And so what this map does is takes many of

8   those communities of interest, puts them together in a

9   district and gives those voters an opportunity to the

10  candidate of choice to Congress, because I've never

11  heard that before.

12         MR. CHAIRMAN:  Okay. So again though, what was

13  -- what was the prima- --mary motivation in drawing

14  district five?

15         MR. EVANS:  Mr. Chairman, there was no primary

16  motivation in drawing any of these districts. We took

17  several conv -- several factors into consideration.

18  Population deviation, one. All the districts had to be

19  equal in population, lowest deviation as possible. We

20  also took compactness into consideration.

21         This map is the most compact map that's been

22  considered by this -- by this legislature, this

1    session. We also took communities of interest into

2    consideration. This district is United by a very large

3    agricultural in- --in- --industry.

4         You also had many universities that people

5    from Monroe and Alexandria attend Southern University.

6    So I could keep going, Mr. Chairman, but there's --

7    there's many communities of interest in this district

8    that we took into consideration.

9         MR. CHAIRMAN:  Gotcha. So I guess what you're

10   telling me is that there was no motivation, primary

11   motivation, in drawing this, because that, I mean, that

12   was the question.

13        MR. EVANS:  There was no one primary

14   motivation in drawing any -- any district, Mr.

15   Chairman.

16        MR. CHAIRMAN:  Okay. Got it. Okay. So I want

17   to look at a couple things and I'm going to ask Mr.

18   Harrington to -- to pull up a couple areas. In -- in

19   your map it goes all the way from Ouachita Parish to

20   Tangipahoa Parish, correct?

21        MR. EVANS:  Yes, sir.

22        MR. CHAIRMAN:  In district five. And again,

1    like I said, all -- all of these questions are going to

2    be about district five for the -- for the -- for the

3    time. And so if -- if we focus in on Ouachita in -- in

4    particular, my question would really be why -- why did

5    you pick -- why did you pick Precinct 62?

6                REP. HARRINGTON:  Right there.

7                MR. CHAIRMAN:  And it's hard, I know it's hard

8    to see the -- the precincts on th- --that one. That's

9    actually why I have this map up because I think it's a

10   little bit easier if we can focus in on -- on the

11   precincts.

12               MR. EVANS:  Well, Mr. Chairman, in trying to

13   get any district to match the pop -- to get it under a

14   population deviation, it's all about precincts. Anytime

15   you add one precinct, you know, you got to lose another

16   one somewhere.

17               MR. CHAIRMAN:  I get it. I drew a bunch of

18   maps. I get it. I get it.

19               MR. EVANS:  You know exactly what I'm talking

20   about. So it's --

21               MR. CHAIRMAN:  100 percent.

22               MR. EVANS:  So any -- any specific precincts

1    you ask me about the answer is it was to make sure that

2    the deviation was -- was within as close to zero as

3    possible.

4              MR. CHAIRMAN:  Okay. why didn't you pick

5    Precinct 61?

6              MR. EVANS:  Mr. Chairman, I cannot tell you

7    anything about which specific precincts. I -- I don't

8    have the numbers in front of me.

9              MR. CHAIRMAN:  But you -- didn't you draw this

10   map?

11             MR. EVANS:  I'm not a map drawer, I'm -- I'm

12   an attorney. I'm not a demographer.

13             MR. CHAIRMAN:  Well, my question was

14   specifically to -- to Mr. Duplessis, is -- is there

15   someone here who can answer questions about why the map

16   was drawn and how it was drawn? And he said,

17   absolutely. I have Mr. Evans who's ready to answer

18   these questions. And so --

19             REP. DUPLESSIS:  Well -- well, if I -- if I

20   could Mr --

21             MR. CHAIRMAN:  Of course you can.

22             REP. DUPLESSIS:  -- Mr. Chair, while I do

1  understand the question and it's a -- it's a fair

2  question, I -- I think the level of specificity when we

3  are talking about, I don't know if -- was it like 4,000

4  precincts we may have across the state?

5          MR. CHAIRMAN:  It's actually 3,400 and change,

6  yes.

7          REP. DUPLESSIS:  Okay. But to ask the question

8  as to why one precinct in Ouachita was chosen over

9  another precinct in Ouachita, I -- I'm -- I'm -- I

10 would think it would be hard pressed for anyone unless

11 they were a demographer to answer that question. So

12 there is no demographer here who drew a map, so Mr.

13 Evans can speak.

14         MR. CHAIRMAN:  Who was the demographer that

15 drew the map?

16         REP. DUPLESSIS:  I don't -- I don't know the

17 name, Mr -- Mr. Chairman.

18         MR. CHAIRMAN:  Okay. So we don't know the

19 demographer who chose -- who drew the map, and there's

20 no one here who can answer questions about why specific

21 precincts were chosen? And let me -- let me frame it

22 this way, Mr. Vice Chair, I'm framing it this way

1    because I didn't pick Ouachita out of the blue.

2             I look at your map, I go there's some, looks

3    like fingers going into Ouachita, and I say, why did

4    they do it that way? Because I'm just curious, if you

5    had used the whole par- --parish of Ouachita, I

6    wouldn't ask you this question.

7             I'd be like, they chose Ouachita, it is what

8    it is, you know? But I'm not seeing that. I'm seeing

9    specific directions in a parish. And so that just leads

10   me to the question of why some and not others.

11            REP. DUPLESSIS:  Well, I think we could go

12   across the state and find split parishes. I think we

13   could look at --

14            MR. CHAIRMAN:  Well, they -- they're not all

15   split parishes. Yeah.

16            REP. DUPLESSIS:  We could -- we could look at

17   congressional district two and -- and ask why, the

18   current one, and ask why it's drawn the way that it's

19   drawn. Why -- why is Orleans split? Why as you go up to

20   river parishes, why are those parishes split? Why is

21   East Baton Rouge split pretty much in half? Why? You

22   know -- you know, it's really --

1            MR. CHAIRMAN:  We could, Mr. Vice Chair.

2            REP. DUPLESSIS: -- it's really -- it's really

3    challenging to -- to -- to meet the deviation criteria.

4            MR. CHAIRMAN:  I understand.

5            REP. DUPLESSIS:  -- or requirement without

6    splitting parishes. So th- --that's -- this is a

7    natural result of the criteria in which we have to

8    operate. And again, that's just my knowledge just as

9    being a member of this committee. I'm not a demographer

10           MR. CHAIRMAN:  I understand. And we --

11           REP. DUPLESSIS:  I don't know who drew this.

12           MR. CHAIRMAN:  -- we could ask all those

13   questions, Mr. Vice Chair, but we're on your bill --

14           REP. DUPLESSIS:  That's right.

15           MR. CHAIRMAN:  -- that you're asking us to

16   pass, and that we have to do our duty to our

17   constituents to deliberate. And so I have to ask these

18   questions about your map because people are going to

19   ask me, you know?

20           If you're asking me to support this bill, I'm

21   going to be asked, why did they do that to Ouachita.

22   I'm going to be asked that question, especially when I

1    go up to Ouachita. And so I -- it's -- it would be

2    logical that I would ask you that question about why.

3            REP. DUPLESSIS:  I -- I don't say it's not

4    logical. Yeah.

5            MR. CHAIRMAN:  Okay. And so let me throw

6    something out there. You know, so what I was going to

7    ask you is why not 61, 78, 34, 77 or 76. As you can see

8    on the board behind me, those are all neighboring

9    precincts, all very close to the one, 62 that was

10   chosen.

11           And when I look at those precincts, what I see

12   is that in Precinct 62 there's a 60% black population,

13   but in 61 right next to it there's a seven. And so I'd

14   like to know why one was chosen over the other. And --

15   but unfortunately it sounds like no one here can tell

16   me that, is that right?

17           REP. DUPLESSIS:  I can't tell you why that

18   specific precinct was chosen over another specific

19   precinct.

20           MR. CHAIRMAN:  Would it surprise you to know

21   that that precinct has a higher population of African-

22   Americans than the ones that were around it?

1          REP. DUPLESSIS:  No. It would not.

2          MR. CHAIRMAN:  Okay. Let's go to Alexandria.

3    Okay. So in Rapides Parish around Alexandria, it

4    appears Precinct C13 was selected. And again, why are

5    we here in Rapides? We're here in Rapides because I

6    look at your map and I go, that's odd. Why are they

7    dipping into a parish like that?

8          It -- it -- it doesn't make a lot of

9    geographic sense to me so I have to dig down and go,

10   let's figure out why the map drawer chose these. And so

11   again, Mr. Evans, why was C13 selected rather than the

12   neighboring precincts that are not in it?

13         MR. EVANS:  So what I can say to your

14   question, Mr. Chairman, is that when we are looking --

15   again, this map is responsive to what we heard from the

16   road show, and the voters who lived in the city of

17   Alexandria said they wanted to be in a

18   majority/minority district. They said that their rural

19   neighbors who live outside of the city limits vote

20   differently from them.

21         So what we did -- well, so in drawing this map

22   that's one of the things that we tried to do. We took

1    the communities that voted alike and tried to put them

2    in a district in -- in -- in this district.

3            MR. CHAIRMAN:  So it was a -- a city and kind

4    of rural issue, is that what you're saying, in this

5    particular case?

6            MR. EVANS:  You can put it that way. Yes, sir.

7            MR. CHAIRMAN:  Okay. All right. So C13, if you

8    look at it, looks like it has some pretty rural areas

9    next to it, right? But if I look at C13, I say, why not

10   N21, S6B or S6A? And when I look at those precincts, I

11   go C13 has a 65% black population, C37 has 16, C6A has

12   23, C6B has 36 and N21 has 10.

13           And so I can draw my own conclusion about why

14   that precinct, but I'll -- I'll -- you- --you've given

15   testimony and I'm not going to -- I'm not going to say

16   that it's wrong. I just -- it is -- it is surprising.

17   So then I look around and I go, well, he's made -- you

18   know, that is a logical argument, Mr. Evans, about

19   rural versus city. Okay?

20           I don't -- I can't terribly disagree that --

21   that I can see the map maker may have done that. But if

22   you look just south in some city areas, because I've

1    been around Alexandria and I've seen the city a little

2    bit, there's precincts such as C36, C31, C32, C33 and

3    C36. Do you know what kind of precincts those are?

4            MR. EVANS:  I do not, Mr. Chairman. What I can

5    tell you is that our goal was to have these districts

6    as equal in population as possible.

7            MR. CHAIRMAN:  Certainly.

8            MR. EVANS:  It is very, very hard to get -- to

9    get as close to zero as -- as possible.

10           MR. CHAIRMAN:  I agree with you. But if this

11   area was chosen because it was rural versus city, those

12   precincts that I have listed in the 30s are in the

13   municipality. So that argument doesn't seem like it

14   would stand up. Would you agree with me?

15           MR. EVANS:  When I said city limits, Mr -- Mr.

16   Chairman, that doesn't necessarily specifically mean

17   voters actually live within the city limits.

18           MR. CHAIRMAN:  What does it mean then?

19           MR. EVANS:  It means voters who live around

20   that area. The city limits that it -- that it's a

21   political subdivision, yes. But voters don't

22   necessarily have to live in a city to vote a certain

1    way. Just because you live in the city of Alexandria

2    doesn't mean you vote as -- as the same way as

3    everybody else. You live outside those city limits,

4    there's voting patterns back -- back and forth.

5            MR. CHAIRMAN:  Yeah. No. No. I -- I agree with

6    you. The people that live outside the city limits

7    versus the people that live in, look I'm from a rural

8    area, it is -- there is nothing but countryside around

9    where I live. I get it. People in the country on a big

10   piece of land vote differently than somebody who has to

11   live in the center of the city. I agree with you on

12   that.

13           But that's not what I'm pointing out. I'm

14   actually pointing out precincts that are in the

15   municipality of Alexandria and -- and right next to the

16   ones you selected, but you didn't select those. And so

17   you can't say we chose these because they're in the

18   city and these because they're not, when 36, 31, 32, 33

19   and 36 are all surrounding those.

20           And so what -- so again, what -- what is the

21   motivation for selecting the precincts that have been

22   selected other than making sure that the population is

1  exact? Because that's the overriding factor, right?

2  When we're -- when we're -- when we're redistricting we

3  have to make sure that number is as close to zero as

4  possible, especially for Congress. But there's several

5  other redistricting factors. Would you agree with me?

6          MR. EVANS:  Absolutely.

7          MR. CHAIRMAN:  Okay. So what other

8  redistricting factors were -- chose you to select C13

9  versus all of the other ones that I've listed, just

10  next to it, right there right next to those.

11          MR. EVANS:  Well, Mr. Chairman, I can only

12  tell you what I've already said [inaudible] drawing

13  these districts.

14          REP. DUPLESSIS:  Let -- let me speak to that,

15  Mr. Chairman, if you don't mind. I'm -- I think it's

16  important that we just kind of cut right to it. And

17  look, we -- we want to talk about pointing out what the

18  other factors are in all of various criteria were.

19  Let's -- let's be very clear that race is a factor.

20  Race is a clear factor, so much so that the judge made

21  it a part of her order in saying that a second majority

22  minority --

1          MR. CHAIRMAN:  She didn't say majority

2    minority. Did she?

3          REP. DUPLESSIS:  She said majority black,

4    right? Okay. However --

5          MR. CHAIRMAN:  Would you agree with me there's

6    a difference between majority/minority and -- and

7    majority black?

8          REP. DUPLESSIS:  Not necessarily. No. No. I

9    wouldn't.

10          MR. CHAIRMAN:  Can you be a minority and not

11    be black?

12          REP. DUPLESSIS:  You can, yeah. But -- but --

13    but let me -- let me get back to a conversation that

14    you and I had very early on in this process.

15          MR. CHAIRMAN:  Sure.

16          REP. DUPLESSIS:  And we talked about the

17    challenge of balancing Fourteenth Amendment equal

18    protection clause versus that of what we're required to

19    do under the Voting Rights Act, and the -- the -- the

20    tests that exists under -- under jingles. How do you go

21    in one direction by saying that you have to consider

22    race but then you have to go in another direction by

1   saying you- --you're not supposed to consider race.

2            MR. CHAIRMAN:  Extremely difficult.

3            REP. DUPLESSIS:  Very difficult. Right? So --

4   so I'm not going to sit at this table and say that, oh,

5   these precincts were just randomly selected because we

6   were just trying to meet a deviation standard, because

7   that would be false. Absolutely ha -- race absolutely

8   has a lot to do with this.

9            If it didn't, we wouldn't even be here right

10  now. This entire re-districting process and everyone

11  that's come to this table throughout this process, this

12  whole thing has gone down -- boiled down to race.

13  However, there's much more than race, Chairman

14  Stefanski. And what I want do is just read to you, if

15  you don't mind.

16           MR. CHAIRMAN:  And -- and -- and I just want

17  to comment on what you said. I -- I don't disagree with

18  anything that you said. I don't. I -- I don't. And --

19  and -- and Mr. Vice chair, what I'm trying to get is,

20  again, I go back to -- I go back to why I was elected -

21  -

22           REP. DUPLESSIS:  Yes.

1          MR. CHAIRMAN:  -- and why people sent me here

2     and they ask me to be deliberate and they ask me to ask

3     questions and they don't ask me to just take people's

4     word for it. And so this by no means -- hey, but if I

5     had asked you that question about these precincts and

6     you had gone, we chose those because of race. Mr.

7     Chairman, that's why we chose them.

8          My -- my line of questioning is going to stop.

9     But that's not the answer I got immediately. And -- and

10    you have clarified that it is a point, and I'm going to

11    come back to this after I let you finish your

12    statement, but I mean, that's what I'm asking. I'm

13    asking why in a parish that gets split and -- and the

14    geography looks odd to me. It just does.

15          And when I go home people are going to ask me

16    why -- why -- why is that the map? And I have to answer

17    why these areas look like that. I have to be able to

18    articulate why they do. And so the line of questioning

19    is specific on that. It's, I'm trying to figure out why

20    they look like they do. And -- and --

21          REP. DUPLESSIS:  I -- I welcome the questions.

22          MR. CHAIRMAN:  But I'm going to go ahead and

1    let you read what you need to read. Yes, sir.

2           REP. DUPLESSIS:  Yeah. I just -- I just want

3    to -- want to just -- just point this out. And this is

4    -- this is -- these are not my words. These are words

5    from the court, that to harmonize the conflicting

6    demands of Fourteenth Amendment and that of the Voting

7    Rights Act, the Supreme court has assumed that

8    compliance with the Voting Rights Act is a compelling

9    state interest for Fourteenth Amendment purposes.

10          And a state's consideration of race in making

11   a districting deci -- a districting decision is

12   narrowly tailored if the state has good reasons for

13   believing that its decision is necessary in order to

14   comply with the Voting Rights Act. So it -- it -- it's

15   a balance that we have to strike. And again, I wasn't

16   here in 2010 when congressional district two was drawn.

17          I don't think any of us were. Maybe a few

18   people in this body were here. But if you look at

19   congressional district two as it's drawn right now, I

20   think those questions could be raised. And that is the

21   same district that this body voted overwhelmingly to

22   pass out of this body right now. So I mean, if you look

1    at the way that that district is drawn, as I pointed

2    out, it's one of the most gerrymandered districts in

3    the -- in the country. Okay?

4            So I think this map puts us more on a path to

5    balancing race as a factor, but also communities of

6    interest and also all of the other criteria around

7    deviations, fewer split parishes, few- --fewer split

8    precincts, et cetera, the -- all of the goals that we

9    have to try to achieve in this redistricting balance.

10           MR. CHAIRMAN:  I respect that. Good deal.

11   Again, on -- on -- in Rapides, so these specific

12   precincts, again, I'll go back to like my original

13   question, why these precincts versus the ones that are

14   immediately bordering around it?

15           REP. DUPLESSIS:  What I -- what I will say,

16   and again I'm not trying to get into the head of the --

17   the map drawer here because I -- I -- I don't --

18           MR. CHAIRMAN:  And it would be nice if we had

19   him here, and I'm -- I'm not going to -- look, I -- I

20   didn't necessarily, on the maps that I presented I know

21   I didn't need the map drawer because I sat there and I

22   drew everything that I did. And I'm not -- I'm not

1    saying everyone else has to do that, but, you know,

2    it's tough for us as -- as -- as a committee to

3    evaluate everything, you know?

4            Especially whether we have a court order

5    saying you have to, okay? It -- it's -- it's very

6    difficult for me to be able to do my due diligence. And

7    I can't talk to the person who sat there and selected

8    these -- these.

9            It's -- it's, and I think you can respect

10   that, and so I mean, it's frustrating not to have

11   someone who can tell me why these precincts were picked

12   and why -- what -- and -- and ask me to vote on

13   something for the way our state's going to look for the

14   next 10 years. It's frustrating.   But I do -- I'm not

15   going to put you in a position to where you have to

16   answer a question that you can't, and I understand

17   that. And so I don't -- I don't want you to answer

18   anything you can't answer, and I'm not going to ask you

19   to.

20           REP. DUPLESSIS:  Well, again, I -- I -- I do

21   have 152 page order before me right here, and I do know

22   that --

1            MR. CHAIRMAN:  I have it too.

2            REP. DUPLESSIS:  -- that the demographer did

3    testify in court. If you like, I can probably find his

4    testimony in the order and we can speak to his

5    motivations. But what I do know is that --

6            MR. CHAIRMAN:  We can, but, you know, I read

7    this order yesterday too. I spent a considerable amount

8    of time reading the entire order, which is rather

9    voluminous. I believe around 140 pages.

10           REP. DUPLESSIS:  52.

11           MR. CHAIRMAN:  152. Okay. So I read it too.

12   And -- and the -- the questions I'm asking were not

13   immediately addressed in the -- in the record as it was

14   transcribed. It's possible -- in the order, rather.

15           It's possible if we pulled the -- the

16   transcripts from the -- from the court hearing, all of

17   my questions might have been answered. But

18   unfortunately I had to try to either work or be here

19   doing legislative business so I couldn't -- I couldn't

20   be in court those days.

21           REP. DUPLESSIS:  Again, it -- the -- we may

22   not be able to answer why a specific precinct was

1  chosen over another, but I do think that the intent was

2  clear, is that it was to try to achieve the

3  requirements on the Voting Rights Act.

4           That if you have an opportunity to draw a

5  district where voters of color, black voters in

6  particular, are compact enough you -- you ha -- you

7  have to draw it that way. That's what the law tells us

8  to do. And I believe that the demographer's efforts

9  were done in doing that. So that would explain the

10 justification of as to why every precinct was chosen.

11          Because if you can draw a map where -- that

12 voters, black voters in particular vote, minority

13 voters, can be drawn in a way where the district is

14 compact, that's what we're required to do.

15          MR. CHAIRMAN:  Would it -- would it shock you

16 to know that all of the precincts that I have listed,

17 especially around Rapides are all majority white?

18          REP. DUPLESSIS:  In terms of being included in

19 congressional district five?

20          MR. CHAIRMAN:  That are not included. All the

21 border precincts around the -- around what I've just

22 talked around are all majority white.

1          REP. DUPLESSIS:  It -- it would not shock me,

2    but one of the -- one of the pieces that go along with

3    that, Chairman, when you break down the race component,

4    is you have to also look at communities of interest.

5          And while those precincts might be majority

6    white, you have to look at voting patterns and how

7    those voters vote, and whether or not those precincts

8    that are made up of majority white voters would

9    actually vote for somebody black.

10         MR. CHAIRMAN:  I -- I agree. But -- but what

11   jumps off the page is that the pre -- some precincts

12   were selected just because they're majority black

13   versus the ones that are neighboring that are majority

14   --

15         REP. DUPLESSIS:  No. It -- it's not just

16   because they're majority black or because they're

17   majority white, it's because we have a history in this

18   nation that led to a Voting Rights Act, because people

19   vote certain ways.

20         MR. CHAIRMAN:  Do you have the voting analysis

21   for the precincts that I've listed?

22         REP. DUPLESSIS:  I will let Mr. Evan speak to

1    that.

2          MR. EVANS:  [Inaudible] Stefanski, that was

3    submitted to the court for trial and we encouraged the

4    legislature very early on in the process to get your

5    own racially polarized voting analysis done.

6          MR. CHAIRMAN:  Yes. You did. And we had that

7    conversation and I can -- I asked you, for months now

8    it must be, if you would provide me the detailed voting

9    analysis.

10         MR. EVANS:  And for months I've encouraged the

11   legislature to do their own analysis.

12         MR. CHAIRMAN:  Have you ever turned to -- have

13   you ever given me that?

14         MR. EVANS:  [Inaudible] to the court.

15         MR. CHAIRMAN:  But -- but ha- --has that ever

16   been provided?

17         MR. EVANS:  Racially polarizable analysis is

18   all through these 152 pages.

19         MR. CHAIRMAN:  Yes. But it has never been

20   provided to this committee and is in -- and still to

21   this day this committee has never been privy on any of

22   the maps that have been submitted, either filed by

1    members or ones that were submitted by the public of

2    the full date -- the full detailed voting analysis.

3            That -- that in my opinion we needed to fully

4    evaluate those plans. And as I sit here today, on this

5    map, do you have the full analysis to provide to this

6    committee,

7            MR. EVANS:  Mr. Chairman?

8            MR. CHAIRMAN:  Yes.

9            MR. EVANS:  Your lawyers, in the suit that you

10   enjoyed in, have the analysis?

11           MR. CHAIRMAN:  Me? My lawyers? Who's my

12   lawyer?

13           MR. EVANS:  The case we keep beating y'all in,

14   Mr. Chairman.

15           MR. CHAIRMAN:  I think you're mistaken on --

16   on who hired who. Okay. I think you're mistaken. And

17   secondly, the answer to that question of course is no,

18   you have never provided me that analysis.

19           And -- and if you, in my opinion, if this

20   committee is going to do a full and -- a full breakdown

21   and -- and thought process and -- and evaluation of

22   these plans, that's something that would be very

1    beneficial as I've continued to say.

2          All right, let's go to another area of the

3    state. I want to go to the -- the whole other end. I

4    want to go to -- I want to go down to Tangipahoa. So in

5    Tangipahoa, again, I've selected this area because it

6    seems like we're, again, picking and choosing on the

7    fringes of a district. Now, this one isn't so egregious

8    as the others, I would have to agree.

9          And this one -- this one, you know, it -- it -

10   - I can -- I can see some geographic breakdowns, but --

11   but again, my question's going to be why were 115B and

12   26, those two precincts around the Hammond area, why

13   were those selected?

14         MR. EVANS:  Mr. Chairman, we can look at any

15   single map and any single parish that is split, and

16   we're going to have the same issues. Again, we go back

17   to population deviation. There is no way to have every

18   parish hole in this state and have a map that has zero

19   deviation or as close to deviate -- zero deviation as

20   possible. So again, we took all the factors that I've

21   already listed into drawing this map and into

22   particular this district.

1          MR. CHAIRMAN:  Okay. So there -- there is in -

2    - I guess, what is your testimony to my question on why

3    these two specific precincts were selected? You gave me

4    a very holistic answer just now, but these two, 115B

5    and 26, why were those two selected?

6          REP. DUPLESSIS:  I -- I will give the same

7    answer that's been given with respect to Ouachita

8    parish and -- and Rapides Parish. Those two particular

9    precincts, if -- if -- if a demographer were here,

10   sitting here right now, he -- he, or she would be

11   better situated to answer that question, but I believe

12   that it was in an effort to be in compliance with the -

13   - the Voting Rights Act.

14         MR. CHAIRMAN:  Okay. I can accept that answer,

15   you know? And -- and the reason I'm pointing out those

16   two is you have neighboring precincts of precinct 27,

17   28, 117, and 119, and -- and I'm curious why those two

18   were chosen in conjunction with those, but I know what

19   my answer's going to be.

20         I appreciate your answer, Mr. Duplessis. We

21   can take down the map now, Mr. Harrington. And so I --

22   I -- I respect the effort that goes into drawing a map

1    and -- and I appreciate both of you answering my

2    questions, but again, when I have to go home to my

3    constituents and I have to answer why I voted for a

4    map, these are the things I need.

5           I need to know why geographically it looks

6    that way and why specifically these precincts were --

7    were chosen. I have to be able to articulate those

8    reasons to the people that elected me and sent me here.

9           And so, in -- in comparison, and also this

10   question, the conversation you, Mr. Evans, you and I

11   just had, I have to be able to say why it's necessary

12   to do that from a voting analysis standpoint. And when

13   -- and when I don't have all the information it -- it

14   is incredibly hard to do that.

15          And I'm not sitting here -- sitting here and

16   I'm not going to -- I'm not going to blame my vice

17   chair, and I'm not going to blame you, Mr. Evans. I'm

18   not blaming y'all for anything. I'm saying in order, in

19   my opinion, for this committee, and as chairman, for us

20   to have a full, robust analyzation of a map, not a

21   debate.

22          We can have a debate and we can talk about

1    legal, we could talk about court cases, we could talk

2    about jingles, we could talk about the Fourteenth

3    Amendment, we could talk about all that.

4          But in order for us to have a full analyzation

5    of your map and the geography that contain -- that is

6    contained within it, these are some of the questions

7    that I have to ask, because my constituents are asking

8    me. And -- and -- and -- and that's it, but I'll let

9    you respond. Mr. Evans.

10          REP. DUPLESSIS:  Oh no. Mr. Chairman, I -- I

11   fully understand your question, and that's an issue

12   that we currently have all across this state. When I do

13   voter protection work and get out the vote efforts in

14   St. Landry parish, I have to explain to voters why

15   their grandmother who lives two blocks over is in a

16   different congressional district than them.

17          When we had the special election for

18   congressional district two last year, people were

19   literally across the street from each other asking me

20   why their neighbor is voting and they aren't voting. So

21   while I understand your question, Mr -- Mr -- Mr.

22   Chairman, but it's an -- any -- any kind of map you

1    draw you're going to have that issue.

2              And you're picking up specific areas to -- to

3    ask us questions about, but we could do the same thing

4    on any map on any -- even in the current map. It's just

5    -- it's just an overall issue in drawing a map in a

6    state as diverse with as many parishes as possible to

7    try to get to zero deviation.

8              MR. CHAIRMAN:  But I'm asking you these

9    specific questions because I have pointed out in the

10   map, geographic concerns of mine. Additionally, this is

11   the new district, right? I mean, let's -- let's --

12   let's just put it out there, this would be the new

13   majority black district that would be in compliance

14   with the judge's order.

15             You're maintaining the one that currently

16   exists. This would be the new majority black district,

17   like -- like it says in the judge's order that she's

18   ordering us to do. And so I have to hyper focus on

19   this. I have to. I have to pick this one apart and ask

20   you these questions because i- --it's what I'm going to

21   be asked if this map would get implemented in the state

22   of Louisiana.

1          With that said, I'm going to move on. I've --

2    I've taken my extensive bite at the apple. I -- I'd

3    appreciate both of your answers, and Mr. Deshotel, you

4    -- Mr. Carter is the next question. Robbie Carter. I

5    mean, Wolf Carter, sorry. I'm losing my train of

6    thought.

7          REP. CARTER:  Thank you, Mr. Chairman. I -- we

8    got here because we had a special session dealing with

9    reapportionment because of the census. Is that right?

10          MR. EVANS:  That's correct.

11          REP. CARTER:  And I don't remember anybody

12    bringing in the demographers to testify during a

13    special session. We had to -- we had the speakers bill

14    and I asked the speaker, if you might recall, I asked

15    the speaker, what efforts did you make in order to

16    comply with the Voters Right Act?

17          And he said, this is my map. This is just my

18    map. He didn't make no effort based on his testimony. I

19    also asked the speaker, did he recall that the prior

20    session we passed a -- a -- a law setting forth the

21    criteria we would use to draw maps. And the speaker

22    said, I asked, did you do that? Did you follow that

1   criteria?

2          He said he'd like to think he did, but this is

3   his map. This is his repetition from him of what the

4   districts ought to look like. Okay? There was no

5   argument at the time about what precincts were white,

6   what precincts were black. Okay?

7          So all along the way I reminded, at every

8   opportunity I reminded the author, the -- the speaker,

9   I don't know if he wrote the map himself, I would

10  imagine a demographer was involved, do you think the

11  state hired demographers?

12         Have demos on payroll? Either the -- the

13  Republican party or the state of Louisiana or somebody

14  have demographers on board, do you -- would -- would

15  you imagine they -- they have those people?

16         MR. EVANS:  Yes.

17         REP. CARTER:  So if the -- if the chairman

18  wanted to talk to the demographer, he could talk to

19  one, would you think?

20         MR. EVANS:  Yes.

21         REP. CARTER:  Okay. Now I did not talk to the

22  -- and I'm going to tell you right now, I'm in favor of

1    the bill. So I'm not -- I kind of got the impression

2    from the chairman he's against the bill. He might not

3    be. That's just my impression I got.

4            But I'm -- I'm -- I'm being upfront that I'm

5    in favor of the bill and -- and I want to ask you some

6    questions to explain why I'm favor of the bill. More

7    important, I want the people of Louisiana to know why

8    we here and why we doing this. Why this bill is here.

9    So you recall the bill, we passed we set criteria.

10            The criteria was, as I recall, correct me if

11    I'm wrong, we'll try to keep community interest

12    together, as much as we can, try to keep parish

13    together as much as we can. We will try -- we will

14    comply. We said we will comply with the Voters Right

15    Act, section two of the Voters Right Act.

16            Now, we know we had a section four that

17    Supreme court throughout, and basically section four

18    required that the state present its map to the justice

19    department for pre-clearance. And had that been done we

20    know this map would not have been cleared because the -

21    - the judge just said it was illegal, right?

22            MR. EVANS:  Right.

1      REP. CARTER:  So we got away from the pre-

2  clearance, now we doing -- now we only dealing with

3  section two. Now, could you tell us what does section

4  two require? We understand about communities of

5  interest and we understand about parishes as -- as --

6  keep as whole as possible.

7      We shouldn't split precincts. Okay. So we try

8  not to. In fact, we -- I don't think this map splits

9  precincts. That's almost illegal to split precinct,

10  unless you got some very depth and boundary grounds,

11  like a lake or pond or canal. So -- so what does

12  section two require? Could somebody tell me that?

13      MR. EVANS:  It requires that if the minority

14  population is sufficiently large and geographically

15  compact to constitute a majority in a single member

16  district, and races -- racially polarized voting --

17  voting is present, then you are required to draw that

18  district.

19      REP. CARTER:  Okay. So first of all, the

20  challenge is to try to see if you can come up with such

21  a district. Now, I -- I asked the -- the -- the

22  speaker, and -- and I asked all along during the

1    process, during the special session, what effort's been

2    made? Nobody made any efforts. So one of the problems

3    that the state had when they had this map that went

4    before the judge, they never had any evidence that they

5    tried to do anything.

6            REP. SCHEXNAYDER:  Representative Carter, are

7    we going to talk about HB2 or I mean, HB1?

8            REP. CARTER:  HB2, I'm talking about HB1. Just

9    like you did, I'm talking about HB1 and HB2.

10           REP. SCHEXNAYDER:  I didn't talk about any

11   bill yet, Representative Carter, but I would -- I'd ask

12   you we move -- we have a lot -- we have a stack of

13   cards, can we please get to questions on this bill?

14           REP. CARTER:  I've been talking five minutes.

15   The -- the chairman talked over 35 minutes. I -- he had

16   his side, I'm saying my side.

17           REP. SCHEXNAYDER:  Right. But --

18           REP. CARTER:  It just takes -- if -- if you

19   would not interrupt me I -- I'm going to move on, but

20   it's important to see these maps.

21           REP. SCHEXNAYDER:  I'm not trying to

22   interrupt. You keep talking about the speakers bill.

1    We're not on the speakers bill. I'm asking you to leave

2    the questions --

3           REP. CARTER:  I'm telling you why this bill is

4    here. I started out by saying this is why this bill is

5    here. The -- the speaker bill was illegal, that's why

6    the bill is here.

7           REP. SCHEXNAYDER:  I'm asking you to move on

8    to this bill. Thank you.

9           REP. CARTER:  So isn't this bill for less

10   gerrymandered than -- than the bill we passed.

11          MR. EVANS:  Yes.

12          REP. CARTER:  In other words, it's more

13   compact.

14          MR. EVANS:  Correct.

15          REP. CARTER:  That's one of the requirements,

16   to be compact.

17          MR. EVANS:  Yes, sir.

18          REP. CARTER:  Is there -- is there something

19   illegal about seeking out black dis -- precincts or --

20   or population to try to get a district?

21          MR. EVANS:  If that's the sole reason for --

22   for -- for drawing a district, yes.

1          REP. CARTER:  So -- so the chairman kept on

2     saying about races. He's trying to say race was the

3     only reason we did this, and that would be something

4     they can use in their -- in their case. They're trying

5     to build a record for the case. Which is completely

6     incorrect because -- because race can be used if you

7     trying to achieve a state interest, is that right?

8          MR. EVANS:  It must be used.

9          REP. CARTER:  That's right. It must. So -- so

10     in order to achieve the interest of vote, section two

11     of the Voters Right Act, you have to consider race,

12     because that's what the act says. Now, how many -- how

13     many races, how many -- we talk about -- the judge said

14     black population.

15          Why you think she said black population, not

16     Latino population or Asian American population. Why --

17     why did she say black population?

18          MR. EVANS:  Because we have already shown a

19     multiple -- multiple ways that there are enough black

20     people in -- in the -- in our proposed map,

21     representative [inaudible] map, to constitute a

22     majority in a -- in a district.

1          REP. CARTER:  So you don't have enough

2    Oriental Asian Americans, you don't have enough Latino

3    Americans Louisianians in order to make a map that come

4    up with 700,000 people thereabouts?

5          MR. EVANS:  As we've shown, Representative

6    Carter, black people do constitute a -- a majority in

7    both district two and district five in -- in

8    [inaudible].

9          REP. CARTER:  Now -- now, I happen to live in

10   Lake Charles, Louisiana. I don't live in one of these

11   areas, either one of these two predominant black

12   districts going to be -- going to be created if we

13   successful at some point, or the court is successful,

14   but I support it because I have a -- a community of

15   interest. Okay.

16          So you talk about community interest, you're

17   not talking about just the few people in that district.

18   I have interest that -- that -- that -- that I don't

19   think my Congressman from my district even -- even

20   address or care about. Okay. But I do find that

21   Congressman Troy in New Orleans, Carter, does address

22   my concerns. Okay.

1         And so -- so we -- community of interest does

2    not have to be a one particular geographic area. It's

3    what your concern is about what you'd like the Congress

4    to address. Would that be correct?

5         MR. EVANS:  That's correct, Representative

6    Carter. And I cannot tell you how many of your

7    constituents have called me and my colleagues and want

8    to know why -- why they couldn't be in a district where

9    they had the opportunity to elect the minority person

10   to Congress?

11        REP. CARTER:  And when we came, went to Lake

12   Charles, we had a lot of people from Lake Charles

13   asking for another black congressional district.

14        MR. EVANS:  That's absolutely.

15        REP. CARTER:  Okay. And they knew there wasn't

16   going to be included more than likely, but they --

17   their interest would be served. So -- so first of all,

18   it's nothing wrong with dealing with race. So that's

19   what we supposed to be doing, trying to find if we got

20   enough black population to create addition. And we got

21   that. It's obvious.

22        We got 33, over 33% of the state. We got that.

1    The next question is, can this -- can this group vote

2    compact -- is compact. Is -- is it small enough a

3    group, it's not so gerrymandered to be snake-like, to

4    be outrageous, to offend the -- the -- the -- the

5    geographic layout of the state. And this map is the

6    most compact map that we've come up with.

7           REP. DUPLESSIS:  Yes. It's more compact than -

8    - it's more compact than the one that this body has

9    already.

10          REP. CARTER:  Okay. Certainly more compact

11   than one [inaudible] already passed.

12          MR. EVANS:  And Representative Carter, those

13   are not my words. Federal courts have found that

14   racially polarized voting pervades statewide election.

15          REP. CARTER:  So -- so the only reason why on

16   -- another thing you have to show, if I'm -- if I'm

17   correct, the only reason why you don't have a black

18   Congressman based upon the compactness you have, based

19   on the fact they tend to vote the same, is because

20   polarized voting, none -- non-black voting, would

21   prevent that black from getting elected.

22          REP. DUPLESSIS:  Correct.

1              MR. EVANS:  We've proven that.

2              REP. CARTER:  So that -- so -- so -- so -- so

3     you have to show that. If you don't show that you don't

4     -- you don't win. Okay. So this federal judge said it

5     is obvious from the pleadings and the -- and the record

6     that -- that the plaintiffs will win if they go to

7     trial. So that's -- that's the judge's basis of

8     stopping issuing the stay and ordering the state to do

9     it again.

10             REP. DUPLESSIS:  And if I -- if I may add

11    judge, just to add to that, the US fifth circuit court

12    of appeals in their ruling pointed out that the

13    defendants did not make a strong showing that they

14    would succeed on the merits with respect to the map.

15             REP. CARTER:  Before I got here I -- I was --

16    I made -- I was made aware and I looked at maps that

17    was -- efforts was made congressional reapportionment

18    and passed. There was a slash that was not accepted by

19    the fifth circuit. There was a Z with -- with -- with

20    dashes, I think, at one time, that was not accepted.

21    Okay.

22             This is neither a slash or -- or a Z. This is

1    as compacted as all the other areas of other districts

2    in the state. So this is quite an accomplishment. And

3    whoever the demographer is, he done a tremendous job,

4    and I see why the judge did what she did.

5           But now, if we don't do this, so basically

6    what the judge is saying, it gives us time to do it.

7    Now we already know the -- what the process is. If we

8    don't do it, then the judge is going to do it.

9           REP. DUPLESSIS:  That's correct.

10          REP. CARTER:  So I'd like to see us do it if

11   we can. Now, if we -- if we -- this map will result in

12   at least half the black population, almost half the

13   black population because in -- in -- in Caddo Parish,

14   large black population, Lafayette Parish, up in

15   Calcasieu Parish, and all over the state it's a large

16   black population but it's dispersed.

17          And you really cannot -- cannot get a compact

18   district. So this is the only one we can. So these

19   folks in this district five and district two, they will

20   be speaking for all blacks throughout the -- throughout

21   the state basically, that have the same interest.

22          MR. EVANS:  Just as our current Congressman

1   speaks for all black interest.

2          REP. CARTER:  Just like -- just as the

3   Congressman from other areas, just like the gentleman's

4   testified earlier, he have two congressmen, at least

5   two, and they do -- do well. Or three.

6          MR. EVANS:  Three.

7          REP. CARTER:  So -- so -- so -- so this would

8   give me who have a community interest with the people

9   in Baton Rouge and New Orleans, somebody speaking for

10  me.

11         REP. DUPLESSIS:  Yeah. That means you may have

12  two Congress people voting for the judge [inaudible]

13  Voting Rights Act.

14         REP. CARTER:  And if -- and I can let a

15  Congressman that listen to some of the things I want to

16  do, I might have this Congressman in section five,

17  section two and maybe three, two someday. So it's not

18  always, I'm just trying to point out it's not always

19  that easy to do. This is hard -- hard work.

20         And this was -- this was an effort made to do

21  this, and this took time and it cost money. Now,

22  really, we are spending a lot of money here in this

1    session to do nothing. We spent a lot of money last in

2    February knowing we were doing nothing. Everybody was

3    saying we were doing the wrong thing and they didn't

4    care.

5           The majority didn't care. So we're all hoping

6    the majority cares enough to not to continue to spend

7    money. What about this -- this district have you heard

8    that -- that you would criticize this plan, this --

9    this -- this house bill one? What does it do? What is

10   the -- what -- what have you heard that been the

11   biggest argument against it? Has it been it split up

12   too many parishes?

13          REP. DUPLESSIS:  Well, it splits -- it splits

14   fewer parishes than the map that the -- that we're

15   currently under, that was floated out of this body.

16          REP. CARTER:  Okay. So -- so -- so does it --

17   it's -- it's compact. Now -- now the problem, the issue

18   about the -- the -- the -- the precincts in -- in North

19   of Louisiana that's predominantly white and the next to

20   a precinct that's predominantly black that's in the

21   district and a predominant white one.

22          So not in the -- that seem to be the biggest

1    argument. We spent 30 minutes talking about that. That

2    is done. That -- that happened because communities of

3    interest --

4              REP. DUPLESSIS:  Communities of interest.

5              REP. CARTER:  -- it's a primary reason why

6    that happened.

7              REP. DUPLESSIS:  Yes, sir.

8              REP. CARTER:  And -- and basically what you're

9    saying is though people may live next to each other, a

10   short distant from each other, they have a different

11   way of looking at things. They tend to vote a different

12   way. And -- and -- and -- and they vote the people of

13   similar interest should have, and those people have

14   somebody to represent them with their same -- with that

15   interest.

16             With a sufficient amount of people their

17   community interest are [inaudible] representing them

18   right now. It is the other people, the predominant

19   black precincts, that don't have anybody representing

20   them. And that's what you're trying to resolve, that's

21   what the court is trying to resolve.

22             REP. DUPLESSIS:  Correct.

1             REP. CARTER:  Okay. That's all I have.

2             REP. CARTER:  Thank you.

3             MR. CHAIRMAN:  Thank you, Representative

4    Carter. For question, Representative Johnson.

5             REP. JOHNSON:  Thank you, Mr. Chairman. I was,

6    and I appreciate the chairman asking questions about

7    Rapides Parish, and I got to say, as a comment,

8    somewhat I'm offended that you indicated one of the

9    reasons why you split Rapides Parish in the manner that

10   you did is that at the road show you only heard

11   testimony that said that they wanted a second minority

12   district.

13            That they were unsatisfied with having the

14   parish whole. That's just incorrect. And if you're

15   making a record by saying that, that's just false. It's

16   false from the testimony that was given. Testimony that

17   was given that was contrary to that wasn't from people

18   that lived in Rapides Parish.

19            It was the group of people that followed us to

20   each one of the roadshow events that had nothing to do

21   with the area that they necessarily were testifying in.

22   So I just want that to be clear because I'm offended by

1    the fact that it implies that Rapides Parish falls into

2    this idea that you have to create a district with

3    minorities for a minority to be elected.

4           Because let me tell you about Rapides Parish,

5    maybe we're advanced, I guess we're going to be

6    penalized for being advanced, parish wide and in areas

7    where a majority of whites were registered, we've

8    elected two black mayors, a judge, a marshal, multiple

9    police jurors.

10          So it's insulting that we're doing this under

11   the guise that, and it's almost insulting to you too,

12   to say that the only way an African American can be

13   elected is if you make the -- make -- make it a

14   district where only African Americans can vote. That's

15   just -- I -- I don't -- that may be what the law is

16   interpreted, but in real life, that's not the case in

17   Rapides Parish.

18          And so I am offended that that was said, and I

19   don't think that's factual. I know we had plenty of

20   people testifying that they were concerned about

21   keeping Rapides Parish whole, and the map, as I

22   understand, the map is designed to primarily comply

1    with the judge. What the judge, what the appointed

2    federal judge in the district court ordered. Is that --

3    is that correct?

4            REP. DUPLESSIS:  That's why we're here today,

5    because the judge ordered us to do this.

6            REP. JOHNSON:  And does that -- do you have

7    any problem with that from the concept of separation of

8    powers?

9            REP. DUPLESSIS:  No.

10           REP. JOHNSON:  You don't.

11           REP. DUPLESSIS:  Why -- why would I?

12           REP. JOHNSON:  I don't know. I -- I -- I'm not

13   able to rule on court cases and I can understand she

14   could send it back and give us an opportunity, but I

15   mean, she also has the ability to draw the maps

16   herself. Does she not?

17           REP. DUPLESSIS:  Well, it looks like that's

18   what this body is trying to -- to do. We're trying to

19   empower her to do that. She -- she -- she, in her duty

20   and authority as a judge made a ruling under the law.

21           REP. JOHNSON:  Okay. In that case --

22           REP. DUPLESSIS:  That we're not in -- we're

1   not in compliance with the law.

2        REP. JOHNSON:  And she is not the final word

3   on the outcome of --

4        REP. DUPLESSIS:  As of right now she is,

5   because no other court has ruled on this.    REP.

6   JOHNSON:  Right.

7        REP. DUPLESSIS:  So as of now she is.

8        REP. JOHNSON:  But it is still pending. There

9   are appeals that are pending.

10       REP. DUPLESSIS:  There are -- there are always

11  appeals. You can appeal -- you can appeal until, you

12  know, eternity. But as of now we are under a court

13  order.

14       REP. JOHNSON:  So if we were to vote your map

15  in, and I guess that's the way you say, I don't know,

16  vote your map in, but your plan in, if we all approve

17  it and the fifth circuit comes in and says, nah, that's

18  not good, so we're going to be back here again in two

19  months to do another map?

20       REP. DUPLESSIS:  Quite possibly. But -- but --

21  but again, I think it's -- it's -- it's just

22  interesting how, you know, we -- we tend to pick and

1  choose when we think that something should or be final

2  or something isn't final because my -- my guess.

3         And may be I'm wrong, Representative Johnson,

4  but my guess is that if this district court judge that

5  we say this -- this not final step in the process had

6  upheld the speaker's map, I -- I think the sentiment

7  from this body might be a little different.

8         It wouldn't be such that, oh, the process

9  isn't over yet. It wouldn't be there's still more time

10  to see how the courts are going to rule. It would be

11  the judge has decided. The judge has made a ruling, and

12  we need to respect the law.

13         REP. JOHNSON:  Yes, sir. And that's your

14  opinion. I don't necessarily agree with that

15  speculation.

16         REP. DUPLESSIS:  Okay. Well, I have another

17  opinion with respect to your -- your -- your initial

18  comments about -- around you --

19         REP. JOHNSON:  Rapides Parish?

20         REP. DUPLESSIS:  Rapides Parish. Now, you and

21  I have had a lot of good conversations around Pineville

22  and re -- and respect the -- I respect the fact that

1    you all are an outlier. You all have elected a -- a --

2    a black man.

3              REP. JOHNSON:  72% white population.

4              REP. DUPLESSIS:  I understand that. And -- and

5    -- and you all are an outlier, so I know you get very

6    passionate on this issue.

7              REP. JOHNSON:  I do.

8              REP. DUPLESSIS:  But to suggest that a black

9    person, not just a black person, this is -- this is --

10   race is a component, but it's much bigger than race,

11   it's about communities of interest, that someone who

12   shares my interests and the interests of my community

13   could run in congressional district five and have a

14   legitimate chance of winning, that's not being fair.

15   That's not being honest and that -- and that's

16   insulting.

17             REP. JOHNSON:  What are your interests? How

18   are your interests different than my interests?

19             REP. DUPLESSIS:  My -- my interests would be

20   voting for an infrastructure bill. My interest would be

21   voting for the John Lewis Voting Rights Act. My

22   interest would be voting for the George Floyd Justice

1   Act. I don't think those votes are coming out of -- out

2   of Washington. Only one person --

3            REP. JOHNSON:  Is that -- is that racial or

4   political? I mean, because you can be a --

5            REP. DUPLESSIS:  Those are my interests.

6   That's what I'm saying. It's more than just race.

7            REP. JOHNSON:  I mean, I'm sitting next to

8   Jeremy LaCombe right here who is clearly a Caucasian

9   and he agrees with those same -- same things. So does

10  he have to be black to be --

11           REP. DUPLESSIS:  Let's not -- let's not --

12  let's not pull him into this.

13           REP. JOHNSON:  Well, I like him. I want to

14  bring him in.

15           REP. DUPLESSIS:  You asked me what my

16  interests were. You asked me what my interest were, and

17  I'm telling you right now what my interests are, and

18  it's more than just race. Okay? So if Jeremy LaCombe,

19  sorry Jeremy, we pulled you into this, if those are his

20  interests, thanks for making my point. If those are his

21  interests, give me the opportunity to vote for those

22  interests.

1          REP. JOHNSON:  You don't have the opportunity?

2          REP. DUPLESSIS:  Well, no. I'm saying me, I'm

3     speaking on behalf of black people in this state.

4          REP. JOHNSON:  Black people don't have the

5     opportunity?

6          REP. DUPLESSIS:  Not in your district.

7          REP. JOHNSON:  Would I have an opportunity in

8     your district?

9          REP. DUPLESSIS:  Well, I've said what I had to

10    say.

11         REP. JOHNSON:  Okay. But, well, let me go down

12    the list of questions, but I did want to correct the

13    Rapides. I have -- I have questions that I want to ask.

14         MR. CHAIRMAN:  We're -- we're going to ask --

15    we're going to ask and answer. Okay. If -- if - if --

16    if you would --

17         REP. JOHNSON:  I have questions.

18         MR. CHAIRMAN:  If he's asking the questions,

19    if there's -- and -- and again, if we need to direct to

20    who you're asking the question, either to Vice Chair

21    Duplessis or Mr. Evans, and I would ask that when the

22    question is directed to you, y'all answer the question

1    that's directed. Representative Johnson.

2            REP. JOHNSON:  So -- so my friend, Rep

3    Duplessis, you agree that racial gerrymanding --

4    gerrymandering is illegal.

5            REP. DUPLESSIS:  Yes.

6            REP. JOHNSON:  Can you tell me -- I was

7    looking at numbers. In your map, Ouachita Parish,

8    30,169 registered black voters are removed. That's 73

9    percent of the registered voters were removed to -- to

10   the district -- 5th congressional district. East Baton

11   Rouge Parish, 84,165 were removed.

12           Evangeline, 3,473 black voters were moved to

13   accommodate. Lafayette, 23,802 registered black voters.

14   Tangipahoa Parish, 6,410 African American black --

15   black voters. St. Martin, 3,549. All are large

16   percentages of the registered voters of those parishes.

17           The previous map only split two parishes. I

18   think yours splits eight. Isn't that the definition

19   based upon the race of racial gerrymanding [sic]?

20           REP. DUPLESSIS:  No, sir.

21           REP. JOHNSON:  What -- why? Why is that -- why

22   is that acceptable to remove those -- those --

1    particularly from one race to accomplish this map?

2              REP. DUPLESSIS:  Well again, we've talked

3    about it. This -- your question is very similar to the

4    questions that Chairman Stefanski [inaudible]

5              REP. JOHNSON:  I didn't understand his

6    question, so I wasn't -- it wasn't on purpose --

7              REP. DUPLESSIS:  Well -- I gathered from his

8    questioning, he wanted to -- to better understand why

9    certain precincts were included versus other precincts

10   not being included. Your questions were more to the

11   point of why were this number of black voters take --

12   take --

13             As -- as we've pointed out repeatedly, if you

14   look at the analysis in which we have to undertake for

15   the Voting Rights Act, if the map can be drawn in such

16   a way where minority voters, black voters in

17   particular, make up a large enough population, and the

18   district can be drawn in a compact fashion, we have a

19   requirement to do that.

20             So it's not just -- it's not just race.

21             REP. JOHNSON:  You could have taken those

22   30,000 black voters in Ouachita Parish -- keep that

1    parish whole, and have taken them from East Baton Rouge

2    Parish.

3          REP. DUPLESSIS:  I'm not saying it couldn't

4    have been done. Again, I'm not the demographer here.

5    But there are multiple of factors, compactness, split

6    parishes, split precincts, overall deviation, how a

7    precinct is drawn, how that might throw off another

8    district. You know, this is like a puzzle piece. You

9    make one change in one district and it has a ripple

10   effect.

11         REP. JOHNSON:  You and I laughed when we first

12   got our book. We got our yellow highlighters and I

13   said, I feel like we're back in law school.

14         REP. DUPLESSIS:  That's right.

15         REP. JOHNSON:  One of the things I highlighted

16   was where it talks about the Voting Rights Act under

17   section two. And it says clearly, I got it highlighted,

18   nothing in this section establishes a right to have

19   members of a protected class elected in numbers equal

20   to their proportion in the population.

21         MR. EVANS:  You are correct, Representative

22   Johnson. But in the court opinion, and the Supreme

1  Court has said, proportionality can be a factor that a

2  court can use in striking down a map.

3          REP. JOHNSON:  Okay. So I shouldn't have

4  highlighted that portion, is what you're telling me.

5          REP. DUPLESSIS:  No. I think he's just saying

6  there's just more to it. That's -- that's one piece.

7  That's just -- that's not the final piece.

8          REP. JOHNSON:  All right.

9          REP. DUPLESSIS:  Like the -- like the court

10 process.

11         MR. EVANS:  Representative Johnson, may I

12 address your first question.

13         REP. JOHNSON:  Well my first question I think

14 was more of a comment to your comment.

15         MR. EVANS:  Okay.

16         REP. JOHNSON:  But -- but yes. Certainly. Go

17 right ahead.

18         MR. EVANS:  You listed a lot of local offices.

19         REP. JOHNSON:  That's right.

20         MR. EVANS:  You listed mayor, and judge, and -

21 - and city council. With all due respect,

22 Representative Johnson, we're talking about congress

1   here. And in these 152 pages, when the court looked at

2   whether there is racially polarized voting in congress,

3   the court struck down that map.

4        REP. JOHNSON:  But you're look- --

5        MR. EVANS:  If you look at the rac- -- if you

6   look at the racial numbers of district -- every

7   district except district two, the share that the

8   minority choice candidate got in those races aligns

9   very closely with the minority population in those

10  districts.

11       Those aren't my words, Representative Johnson.

12  State and federal courts, judges appointed by democrat

13  and republican presidents have found that racially

14  polarized voting pervades state and regional elections

15  in this state.

16       REP. JOHNSON:  And -- and my -- my response

17  was an immediate response to any implication that the

18  people in Rapides Parish were too racist to elect a

19  black candidate. And I showed you examples where that

20  absolutely is not true. So I wanted to clear that up.

21       And -- and you can say what you want. They can

22  only vote as they can.

1        MR. EVANS:  At the local level. Yes. Yes,

2   Representative --

3        REP. JOHNSON:  Where they are the majority

4   population, they're willing to vote for minorities to

5   be elected.

6        MR. EVANS:  At the local level. Yes,

7   Representative Johnson.

8        REP. JOHNSON:  Well I don't know that we've

9   had a significant number of African Americans even

10  attempt to run for congress in that district in the

11  past. So it may be the right person with the proper

12  qualifications, my parish apparently is willing to vote

13  for that.

14       So I -- I guess I'm just offended by the fact

15  that it's as though we're painted with a broad -- broad

16  brush, and that they're willing to vote for the person

17  based upon the content of their character and not the

18  pigmentation of their skin.

19       MR. EVANS:  Well --

20       REP. DUPLESSIS:  Well just -- just to -- just

21  to again further -- I think it's important to point

22  out, Rep. Johnson, that just because you are a person

1  of color, just because you are a, you know, a -- a

2  minority has been -- whatever the case might be. I

3  can't speak to how things are in your hometown because

4  I'm not from there. We -- we've talked about that.

5         But a -- a -- a person of color, a black

6  candidate, is not always the candidate of choice for

7  black voters. And that needs to be very -- that needs

8  to be made very, very clear. You can be a candidate,

9  you can be black, but that doesn't make you necessarily

10 a candidate of choice for certain communities of

11 interest.

12        REP. JOHNSON:  Okay. I thought that's what you

13 were saying earlier that you had to draw a black

14 district because only blacks -- I mean it just -- it's

15 almost preposterous that only -- you can only be

16 elected if you're black by a black district. That's

17 degrading to the blacks.

18        MR. EVANS:  We agree with you, Representative

19 Johnson. That's why we're here.

20        REP. JOHNSON:  By splitting Rapides Parish in

21 half, what do you do to the community interest of my

22 parish?

1        REP. DUPLESSIS:  I'm sorry?

2        REP. JOHNSON:  What -- by splitting the -- the

3    community of interest in Rapides Parish, what do you do

4    to my parish?

5        REP. DUPLESSIS:  Well East Baton Rouge is

6    split right now.

7        REP. JOHNSON:  Rapides Parish.

8        REP. DUPLESSIS:  Well we -- we have to -- we

9    have to -- look, we have six congressional districts

10   across this state. Six. And we have to do this in a way

11   where deviation is as low as possible. And we have to

12   get as close to zero as possible.

13       So you know, I mean we -- we -- we -- we are

14   what we are. And we've been under -- we are under a

15   court order right now by -- by -- by federal district

16   court to draw a map that has a second black

17   congressional district.

18       REP. JOHNSON:  Do you agree that the map does

19   split the community of interest of Rapides Parish?

20       REP. DUPLESSIS:  I -- I -- I'm not in a

21   position to agree or disagree with that.

22       REP. JOHNSON:  You -- you can't disagree that

1    it poli- -- it -- it splits political subdivisions.

2            REP. DUPLESSIS:  A political subdivision is

3    not a commu- -- doesn't mean it is a community of

4    interest.

5            REP. JOHNSON:  Separate question though. You

6    don't deny that it splits political subdivisions in the

7    parish --

8            REP. DUPLESSIS:  I don't -- I don't deny that.

9    No. But a political subdivision does not mean it's a

10   community of interest.

11           REP. JOHNSON:  Because I mean, our -- our

12   police juries, our school boards, share everything.

13   We'll have two congressmen, diminished influence with

14   those, for one parish --

15           REP. DUPLESSIS:  You know, it's funny you say

16   that. Because the first testimony in support of a bill

17   earlier today said that they had three congressmen

18   along the coast and talked about how great it was.

19           REP. JOHNSON:  I -- I -- I'm not that person.

20           REP. DUPLESSIS:  I'm just saying. I -- I heard

21   some testimony earlier that talked about how great it

22   was having three congresspeople representing them on

1    coastal issues. So I -- I -- I -- I -- we had the same

2    debate around the BESE maps, people saying well we

3    didn't have -- you know, having more than one BESE rep

4    was a bad thing. I don't see how having more

5    representation is a bad thing.

6              REP. JOHNSON:  Well we have six senators now

7    in Rapides Parish. Six. That's state -- on the state

8    level. Do you honestly want to tell me that that's best

9    for the parish to have a small percentage -- the small

10   percentage of the population of each elected official.

11   It hasn't worked that way thus far --

12             REP. DUPLESSIS:  That strengthens your

13   delegation. You have more voices --

14             REP. JOHNSON:  Unless you have very little --

15   doesn't work that way. Doesn't work that -- hasn't

16   worked that way in Rapides Parish. I don't think it's

17   worked -- we've been -- Rapides Parish has been split

18   before. It's not been a -- a helpful -- or hadn't been

19   a benefit to our influence in congress.

20             REP. DUPLESSIS:  Yeah.

21             REP. JOHNSON:  That's why I'm very much --

22   we're -- we're a whole parish right now. Splitting us

1    hurts the people of Rapides Parish. I understand that's

2    not your -- your -- your purpose. Your purpose is to

3    comply with the federal court judge.

4              But I'm elected in that parish. I'm elected in

5    the state. I care about both. But splitting my parish

6    to make the numbers fit when it can be done differently

7    perhaps, and -- and my opposition is not to a second

8    minority district. It is to having my parish split in

9    half and diminish the people, black and white, of

10   Rapides Parish voting power is a -- is a concern and a

11   problem.

12             And -- and we could spend days on that. And I

13   know that probably needs to be moved on. But --

14        REP. DUPLESSIS:  I would just -- I would just,

15   Rep. Johnson, I -- I mean I hear what you're saying in

16   terms of parishes being split. But, you know, as I look

17   at my -- my friend and roommate, Rep. Lavadain over

18   there who's from Rapides Parish, I -- I would -- I

19   would be willing to be and argue that the -- the people

20   -- there -- there are people in Rapides Parish who

21   don't feel represented right now in congress.

22        REP. JOHNSON:  I'm sure [inaudible]

1        REP. DUPLESSIS:  So -- so -- so if it requires

2    splitting that parish to give those people a voice in

3    congress, I -- I -- I don't know that that diminishes

4    the blacks, as you said. I don't know that that

5    diminishes them at all. I think it strengthens them.

6        REP. JOHNSON:  And you know, if I said the

7    blacks, I hate talking in terms like that. I hate

8    talking in -- I just like to talk in terms of people.

9    But those are the terms we're given.

10       I'm not always sure whether I'm supposed to

11   say minority, minority black, minor- -- you know, you

12   have to -- it's a real -- it's a real -- when it's not

13   your nature to separate you out, it -- it becomes a --

14   a -- a language I'm not comfortable to know exactly how

15   to say it.

16       REP. DUPLESSIS:  I -- I understand that. But I

17   think it's important for us to -- to -- to acknowledge

18   race. I think it's important given the history of this

19   country and given the current state of affairs right

20   now that we -- that we do see race, and that we

21   acknowledge it.

22       And that we don't try to paint everybody with

1   a broad brush and say, oh, I don't see color. We need

2   to see color. And we need to recognize color.

3          REP. JOHNSON:  So -- so the whole -- the whole

4   -- the whole dream of judging people on the content of

5   their character --

6          REP. DUPLESSIS:  I didn't say judge people by

7   their color --

8          REP. JOHNSON:  No. Or to deal with people --

9          REP. DUPLESSIS:  No.

10          REP. JOHNSON:  -- based upon the content of

11   their character rather than --

12          REP. DUPLESSIS:  I didn't say to judge people

13   based on color. I said to see color and to acknowledge

14   the differences and experiences that people have based

15   on color.

16          REP. JOHNSON:  I -- I don't -- I don't

17   disagree that it's important. I just -- I just -- I

18   would much rather vote for a person based upon the

19   content of their character, regardless of their color,

20   than based upon whether they're black, white, or --

21          REP. DUPLESSIS:  Well I -- I just -- again, we

22   could go back and forth. But I just said that you could

1  put a black person up, but that doesn't mean he's the

2  black person's community of choice. I mean candidate of

3  choice. So we're going to base -- we're going to make

4  decisions based on content of character. But we cannot

5  ignore race.

6        REP. JOHNSON:  With that way of thinking,

7  we're never going to be --

8        REP. DUPLESSIS:  Well I disagree.

9        REP. JOHNSON:  -- one society, are we.

10        MR. EVANS:  But we can, Rep. --

11        REP. JOHNSON:  I sure wish we could. I sure

12  wish that for my children and my grandchildren. And I

13  appreciate your passion. I appreciate what you're

14  doing. Appreciate the hard work you've put into this.

15        REP. DUPLESSIS:  Yes, sir. Thank you.

16        REP. JOHNSON:  And --

17        MR. CHAIRMAN:  Thank you, Representative

18  Johnson. Next we have Representative Jenkins.

19        REP. JENKINS:  All right. Thank you, Mr.

20  Chairman. You know, I came into the redistricting

21  session in February and in this session with a mindset

22  that we need to do what was right for our state. I

1   didn't come with any bitterness or anger.

2           I wanted to see if we as a legislative body

3   could come together and do what was right for our state

4   based upon the information from the census, based upon

5   the criteria that we had to follow to redistrict, and

6   sit down and try to come up with and do the right

7   thing.

8           And I -- I just hope that as we go through

9   this process, that all of us just keep that in mind. We

10  try to do what is right for the state of Louisiana. And

11  I want to kind of bring this back around as to -- to

12  why we're here now in this -- I call it a second

13  redistricting session.

14          Our body passed a instrument, which is now I

15  think HB -- HB2 by the speaker, out of the February

16  session. Isn't that right, Mr. Vice Chairman?

17          REP. DUPLESSIS:  That's correct.

18          REP. JENKINS:  And that instrument of course

19  was filed. It came through this committee. I don't

20  think there's too many people that changed on this

21  committee. It went to the floor. Went through both

22  chambers. It went into -- it was vetoed. The veto was

1    overwritten. And it went into law.

2            And at some point it was challenged in court.

3    And a federal judge took a look at that in federal

4    court. Isn't that right, Mr. Vice Chairman?

5            REP. DUPLESSIS:  Yes, sir.

6            REP. JENKINS:  Okay. So that was the process

7    that that instrument went through. And it made no

8    difference which side of the instrument you was on.

9    That instrument had a fair chance to go through the

10   process. And that's one of the things I'm trying to

11   find out and hope that will happen in this process.

12           If we have an instrument, let's give it a fair

13   chance, to go through the process. What I think I saw

14   in the February session, it's a lot of bills just did

15   not make it out. They did not have a cha- -- they did

16   not have a equal chance to go through the process.

17           But at this particular point we know that a

18   federal judge has taken a look at the instrument that

19   we passed. And Mr. Evans, the attorney, I understand

20   that both sides in court had an opportunity to present

21   their case. Isn't that right?

22           MR. EVANS:  We had a weeklong trial the second

1   week in May, Representative Jenkins.

2           REP. JENKINS:  And Mr. Evans, all of the

3   evidence was put before the judge. Isn't that correct?

4           MR. EVANS:  That's correct.

5           REP. JENKINS:  And we understand that the

6   judge has based -- has reviewed and based on that

7   evidence issued a ruling. Isn't that correct?

8           MR. EVANS:  That's -- that's correct,

9   Representative Jenkins.

10          REP. JENKINS:  And in essence, the judge felt

11  that the instrument we passed did not meet the

12  requirements of the Voting Rights Act. Isn't that

13  correct?

14          MR. EVANS:  Yes, sir.

15          REP. JENKINS:  All right. An instrument that

16  had an opportunity to go through the legislative

17  process, all the way through the executive branch's

18  objections, and to court, had a fair chance in court to

19  try to see if it would stand.

20          And the judge has looked at that and has

21  indicated that that particular instrument does not

22  stand. It needs -- we need to go back and take another

1   look at the process and try to come up with a new map.

2   Isn't that right, Mr. Vice Chairman?

3          REP. DUPLESSIS:  Yes, sir.

4          REP. JENKINS:  And if I understand the reading

5   of the ruling correctly, the district court

6   specifically said Louisiana can and should create a

7   second majority black seat.

8          REP. DUPLESSIS:  Yes.

9          REP. JENKINS:  So we're -- we're not just

10  talking about the voices of the people on the roadshow,

11  and I know that many of us was involved in the

12  roadshow, and what those desires were. We're talking

13  about now a ruling based on evidence that has been

14  reviewed by an unbiased judge. Isn't that correct, Mr.

15  Vice Chairman?

16         REP. DUPLESSIS:  Yeah. And not just a judge.

17  You also had the US 5th Circuit Court of Appeals that

18  said in their ruling that the defendants were -- did

19  not make a strong showing that they would succeed on

20  the merits. So it -- it -- we're talking about the one

21  judge order right now.

22         REP. JENKINS:  Correct.

1          REP. DUPLESSIS:  You are correct.

2          REP. JENKINS:  Right. And -- and I was going

3    to get to that and I'm glad that you brought that up.

4    Not only was that particular judge, an unbiased judge

5    took a look at it. Motions was filed because of a stay,

6    if I understand it correctly, with the 5th Circuit

7    Court of Appeals.

8          I understand a panel of judges that had been

9    appointed by a variety of presidents, both democrat and

10   republican, if I recall it, took a look at it, vacated

11   a stay, and also denied a stay, and said, legislature

12   go back and do your job --

13         REP. DUPLESSIS:  Right.

14         REP. JENKINS:  -- and try to come up with a

15   map that should meet the -- the requirements of the

16   Voting Rights Act. Is that correct?

17         REP. DUPLESSIS:  That's correct.

18         REP. JENKINS:  And I bring a -- you know, I'm

19   bringing this up so we won't lose sight as to why we're

20   here. We -- none of us ran back here to this particular

21   session voluntarily. We -- we've had a court

22   intervention both at the district court level and the

1    court of appeals level that said we need to come back

2    and -- and -- and try to create a map that meets the

3    requirements of the Voting Rights Act.

4              And that's what our job here is today. You

5    know, I come from a different area. Other members come

6    from a different area. But we -- we can't lose sight of

7    the fact, regardless of whatever you came from, you're

8    being requested to produce a map that creates a second

9    majority black district. Isn't that correct, Mr. Vice

10   Chairman?

11             REP. DUPLESSIS:  Yeah. I would just say, we're

12   not being requested, we're being ordered to do it --

13             REP. JENKINS:  We've been ordered to do so.

14   And so let's talk about the map here with HB1. First of

15   all, if I recall, HB1 was filed the first day of this

16   second special session. Am I correct?

17             REP. DUPLESSIS:  It was pre-filed a day prior.

18             REP. JENKINS:  Pre-filed a day -- and so it

19   was there on the first day.

20             REP. DUPLESSIS:  Yes, sir. It was read in on

21   the first day.

22             REP. JENKINS:  Had anyone in the committee

1    reached out to you to talk about a lot of the

2    particulars of the map?

3            REP. DUPLESSIS:  No.

4            REP. JENKINS:  And this body did not work at

5    all on it yesterday, which was Thursday. Isn't that

6    correct?

7            REP. DUPLESSIS:  That's correct.

8            REP. JENKINS:  And I think that was ample

9    opportunity that if there was some concerns about the

10   geography of the map, or -- or how the map was created,

11   or reaching out to someone who -- who may have been a

12   demographer involved with the map.

13           We had at least a whole day yesterday to try

14   to go into some of those issues. Am I right?

15           REP. DUPLESSIS:  That's correct.

16           MR. EVANS:  Well not just that, Representative

17   Jenkins. This -- the map being considered, HB1, it is

18   virtually identical to a similar bill that was heard by

19   this committee during the redistricting session. The

20   changes that were made were so incremental, primarily

21   just taking a few pre- -- precincts and making them

22   whole.

1          But all of the other substantive

2    considerations, communities of interest, parish --

3    parish splits, compactness, they're all the same.

4          REP. JENKINS:  That -- that's correct,

5    Attorney. I believe that would have been HB8 out of the

6    February redistricting session that we had --

7          MR. EVANS:  I believe -- I believe you're

8    correct, Representative Jenkins.

9          FEMALE:  [inaudible]

10         REP. JENKINS:  I think it may have been

11   Gaines, Representative -- I'm sorry, Representative

12   Gaines. But I looked at a previous map in the February

13   session that looks virtually identical to the map we're

14   talking about. And I believe that map came before the

15   committee, if I recall. It was vetted. Questions were

16   asked. Testimony was given. And information was shared

17   at that particular time.

18         So there's very little difference between what

19   we looked at back in February and what we're looking at

20   now. Am I correct in -- in -- in that statement? And if

21   I'm not, then help me with it.

22         REP. DUPLESSIS:  Yeah. I think this map does

1   have some differences. But yeah, a similar version of

2   this has been presented.

3              REP. JENKINS:  Right. And a lot of information

4   that may be -- that we might need to know about HB1, a

5   lot of that information was discussed when we looked at

6   all this back in the February session. Would I be

7   correct in saying that?

8              REP. DUPLESSIS:  Again, I can't speak on

9   behalf of any -- what anyone else has filed down to the

10  particular details. But yes, we have seen sim- -- a

11  similar version of this during -- during the

12  redistricting session.

13             REP. JENKINS:  Well we agree -- we agree that

14  it's just not all brand new. We're not just starting

15  from scratch on HB1 in this session.

16             REP. DUPLESSIS:  That is -- that is correct.

17             REP. JENKINS:  Okay. I looked at the numbers

18  on HB1. It looks like in district two it's 54 percent

19  black population and it district five it's 54 percent

20  black population. Am I right or wrong on that?

21             FEMALE:  [inaudible]

22             REP. DUPLESSIS:  52.

1              REP. JENKINS:  What is the numbers on it?

2              REP. DUPLESSIS:  Pulling them up now for you,

3    Representative Jenkins.

4              REP. JENKINS:  Okay. I may have round them up

5    or down one way or the other.

6              REP. DUPLESSIS:  Okay.

7              REP. JENKINS:  I'm talking about the overall

8    population. I'm not talking about --

9              REP. DUPLESSIS:  Yeah. Now the overall total

10   population --

11             REP. JENKINS:  Yeah. I'm talking about the

12   overall population --

13             REP. DUPLESSIS:  54.4 district two. 54 in

14   district five.

15             REP. JENKINS:  Right. I know -- I know the

16   voting age population --

17             REP. DUPLESSIS:  Voting age population is

18   slightly slower.

19             REP. JENKINS:  Slightly lower.

20             REP. DUPLESSIS:  52 --

21             REP. JENKINS:  Like I said, 52 and -- and

22   close to 51.

1      REP. DUPLESSIS:  Yes, sir.

2      REP. JENKINS:  So my -- I guess one of the

3  questions I'm asking is, do we -- do we feel that those

4  numbers are effective districts?

5      REP. DUPLESSIS:  I'll let Mr. Evans speak to

6  that. I do. But I'll let Mr. Evans speak to that

7  because I know that there's been analysis have been

8  performed on that.

9      MR. EVANS:  Yes, Representative Jenkins. The

10 minority choice candidate would be successful, or at

11 least have the opportunity to be successful in both

12 districts two and five.

13     REP. JENKINS:  Okay. And then HB1 once again,

14 as far as complying with the order from the order, is

15 it your opinion that HB1 complies with the court order?

16     REP. DUPLESSIS:  Yes.

17     MR. EVANS:  And -- and not just the court

18 order, the call of the session. We're here because the

19 governor called us here. And this map is compliant with

20 the governor's call.

21     REP. JENKINS:  Right. It would make no sense

22 to try to pass another instrument out of this body with

1  just one black congressional district. Am I correct

2  with that?

3          REP. DUPLESSIS:  Yeah. It -- it would not be

4  in compliance with the court.

5          REP. JENKINS:  And as far as HB1, is it your

6  opinion that it complies with the Voting Rights Act?

7          REP. DUPLESSIS:  Yes.

8          MR. EVANS:  Not just -- yes.

9  [talking over each other]

10          REP. JENKINS:  I'd like to ask from both of

11  you. We got a great author and we got a great legal

12  mind sitting at the table. And I'm just really trying

13  to get down to -- to the real points of what we are

14  trying to do.

15          And that's making sure that we are here to --

16  to follow what the court has asked us to do, after now,

17  after we've already given an instrument a chance -- a

18  majority has given an instrument a chance to go through

19  the entire process. And it brings us back here again.

20  So it's no reason for anybody to be upset, anybody to

21  be angry.

22          The instrument that's a majority of this body

1    wanted to move forward with went completely through the

2    process. And it came back. And we're here now to try to

3    come up with a new instrument.

4            So we need to start focusing on that, and

5    seeing how are we going to get an instrument out here

6    that meets the call and meets what the judge want to

7    see. We can't get another instrument out here with just

8    one black congressional district in it.

9            Now our task as a legislative body is subject

10   to a timeline by the federal court order. Is that

11   correct, Mr. Vice Chairman?

12           REP. DUPLESSIS:  Yes. We've been given until

13   June 20th.

14           REP. JENKINS:  And this body did no work at

15   all on yesterday, Thursday, in this effort. Is that

16   correct?

17           REP. DUPLESSIS:  That's correct.

18           REP. JENKINS:  And if I recall also, the

19   district court, I believe there was a request for

20   extensions, but the district court has not given us any

21   kind of extension on this case. Is that right?

22           REP. DUPLESSIS:  That's correct.

1          REP. JENKINS:  I want to go back to something

2     I -- I -- I was hearing you say a little bit earlier,

3     Mr. Vice Chairman. You know, we got six congressional

4     districts in this state. Is that right?

5          REP. DUPLESSIS:  Yes.

6          REP. JENKINS:  And only one of those districts

7     are now being represented by someone who's black. Is

8     that right?

9          REP. DUPLESSIS:  That's right.

10          REP. JENKINS:  All right. And we went through

11     the population. We all on this committee know what that

12     is. But one third of the population of this state is

13     black. Is that correct?

14          REP. DUPLESSIS:  Yes.

15          REP. JENKINS:  So if we have six congressional

16     districts, it would just seem that, only fair, that two

17     of those districts would be created in a way where a

18     black person would have an opportunity to be elected.

19     Would that be a fair statement for me to make?

20          MR. EVANS:  I -- I wouldn't say a black

21     person. I would say the black -- the candidate of

22     choice for black voters.

1          REP. JENKINS:  Okay. All right. And HB1, the

2     bill that you have filed, Mr. Vice Chairman. When I

3     looked at the bill, you know, I see it as coauthored by

4     every member of the black caucus in the House. Am I

5     correct?

6          REP. DUPLESSIS:  Yes.

7          REP. JENKINS:  And Louisi- -- the Louisiana

8     legislative black caucus mission is to represent the

9     interests of blacks throughout this state. Am I

10    correct?

11         REP. DUPLESSIS:  Yes.

12         REP. JENKINS:  You -- we have members of the

13    Louisiana legislative black caucus that represent

14    people from the north, the south, the east, and the

15    west, in our House districts. Am I right?

16         REP. DUPLESSIS:  Yes.

17         REP. JENKINS:  And every member of the

18    Louisiana legislative black caucus has coauthored this

19    -- this HB1 bill. Am I right?

20         REP. DUPLESSIS:  Yes.

21         REP. JENKINS:  Mr. Vice Chairman, do you think

22    having a diverse delegation in Washington would be

1     helpful to the state of Louisiana?

2              REP. DUPLESSIS:  Yes.

3              REP. JENKINS:  And I know it's not based upon

4     any kind of partisan situations, but you have democrats

5     and you have republicans, so matter -- no matter who's

6     in the -- what part is in the White House, you have

7     members of our delegation that would be a member of

8     that party, of that president, he or she, whoever he or

9     she may be. Am I right?

10             REP. DUPLESSIS:  Yes.

11             REP. JENKINS:  Okay. And you made mention of,

12    and I talked a little earlier about, you know, everyone

13    wants -- every citizen of our state wants to feel that

14    their voices are being heard. And that's the way I feel

15    about it. I -- I -- I really do. If you're black,

16    you're white, Latino, if you're male or female, I think

17    that every citizen of this state should have some fair

18    representation in congress.

19             You made mention of issues of interest,

20    especially to -- to -- to -- to -- to black people. I'm

21    just going to put it out there. You talked about the

22    John Lewis Voting Rights Act. Do you feel like the

1    delegation that we have there now is -- is -- is really

2    supportive of an interest like that?

3              REP. DUPLESSIS:  I would --

4              MR. EVANS:  When it came -- when it came up

5    for a vote in congress, we did not have a single member

6    of our conger- -- congressional delegation to support

7    it.

8              REP. JENKINS:  Okay. And do you -- what about

9    the George Floyd Justice in Policing Act?

10             MR. EVANS:  When it came up for a vote in

11   congress, we did not have a single member of our

12   conger- -- congressional delegation to support it.  And

13   I will say that that was after -- both of those bills

14   came up after Congressman Richmond had resigned, and

15   before Congressman Troy had been elected -- Congressman

16   Carter had been elected.

17             REP. JENKINS:  Okay. We could go on with

18   issues like equal pay and raising the -- the minimum

19   wage. And we can also go on to -- like the

20   infrastructure and job act. I mean we have a lot of

21   citizens in this state who would like their voices

22   heard on issues like that, that our delegation or the

1    majority of the delegation does not support.

2            And I -- and I -- I get it. I mean I

3    understand why they may not want to do it. We always

4    want to -- you know, we hear a lot from people saying,

5    well I got to vote my district vote, my district vote,

6    my district vote, my district vote --

7            MR. CHAIRMAN:  Representative Jenkins, I don't

8    want to cut you off, but can we -- can we bring it back

9    to the map, at least. I know this is all holistic. I

10   know it is. I'm not telling you you're not. I'm just

11   saying, can we -- can we try to bring it back to the --

12   this map.

13           REP. JENKINS:  Ab- -- absolutely --

14           MR. CHAIRMAN:  Yes, sir.

15           REP. JENKINS:  In fact, I was about to wrap

16   up. But we vote my district, vote my district, vote my

17   district, vote my district. But the point I'm simply

18   making is simply this. We need to make certain that we

19   have fair representation for all the citizens in the

20   state of Louisiana. Do you believe that HB1 will

21   accomplish that goal?

22           REP. DUPLESSIS:  Yes.

1          REP. JENKINS:  All right. Thank you, Mr.

2   Chairman.

3          MR. CHAIRMAN:  Thank you, Representative

4   Jenkins. Mr. Pro Tem, for a question.

5          REP. MAGEE:  Thank you, Mr. Spea- -- thank

6   you, Mr. Chairman. I appreciate everybody's work on

7   this. And my questions are more simple and basic. I'm

8   just trying to get a sense of the decisions that were

9   made and why they were made. And they may be stupid

10  questions. I'm not -- these are not planned questions

11  that anybody by any stretch of the imagination.

12         It -- my -- my curiosity is, it seems to me

13  that there's more black people in Shreveport than in

14  Monroe. Is that fair to say?

15         MR. EVANS:  Yes. Shreveport is a larger urban

16  area. Yes, sir.

17         REP. MAGEE:  And then there's more of a

18  compact black population in the city of Shreveport than

19  in Monroe.

20         MR. EVANS:  I can't testify to that, Mr.

21  [inaudible]

22         REP. MAGEE:  I -- I -- and I don't have

1    numbers. This is based off of my just -- my -- my

2    working knowledge of growing up in Louisiana. But yet

3    for some reason you all made the decision to make the

4    second minority district based out of -- somewhat based

5    out of Monroe versus Shreveport. And why was that

6    decision made?

7            Why not -- why not build it out -- out of one

8    of the larger minority districts in North Louisiana,

9    instead of one of the smaller minority districts in

10   Louisiana?

11           MR. EVANS:  Thank you for that question,

12   Representative Magee. And the simple answer is

13   compactness. We -- we tried. A bill was presented to

14   this legislature, two bills actually, that included

15   [inaudible] the city of Shreveport.

16           To Representative Jenkins' point, many of his

17   constituents were upset that they weren't included in -

18   - in the minority district that we were creating. And

19   so it was -- it was -- to make the bill more compact,

20   and which was a major principle for us, we chose

21   district five. Because it -- it would have split fewer

22   parishes to get our population deviation close to zero.

1          REP. MAGEE:  Okay. But Shreveport has a black

2    mayor, right?

3          MR. EVANS:  Yes. I think so.

4          REP. MAGEE:  I think Monroe doesn't.

5          MR. EVANS:  I'm not aware.

6          REP. MAGEE:  Okay. And I think the majority of

7    the council in Shreveport --

8          REP. DUPLESSIS:  They did -- they did. Mayor

9    Mayo was it? I know he's not the mayor anymore. But I

10   think he may have been mayor for about 20 years or so.

11         REP. MAGEE:  Right.

12         REP. DUPLESSIS:  Yeah.

13         REP. MAGEE:  But not currently, I don't think.

14         REP. DUPLESSIS:  No. Not currently.

15         REP. MAGEE:  I can't comment. I don't live up

16   there. I'm not -- I don't know. I'm just -- just -- my

17   interpretation of it. Okay. Now we have other maps in

18   Louisiana that we break up, that I think maybe we can

19   call them not political maps. We break up LDH into

20   regions. Isn't that correct?

21         REP. DUPLESSIS:  Yes.

22         REP. MAGEE:  We break up DOTD into regions.

1    Isn't that correct?

2              REP. DUPLESSIS:  Yes.

3              MR. EVANS:  Wildlife -- Wildlife and

4    Fisheries.

5              REP. MAGEE:  Wildlife and fisheries. Do any of

6    those maps have -- follow compared to the one you all

7    proposed? For example, does the Monroe region for

8    Wildlife and Fisheries, does it go down into St. Landry

9    Parish?

10             MR. EVANS:  Representative Magee, in drawing

11   this map and -- and preparing, we've looked at

12   political maps. We did not look at those -- at those

13   ones that you're referencing.

14             REP. MAGEE:  Okay. I -- it just seems to me

15   that those maps are probably based off of communities

16   of interest of some kind.

17             Because that's why they were probably

18   geographically formed, and for administrative, and

19   these -- saying that, you know, for Wildlife and

20   Fisheries that, you know, I don't know, Lafayette

21   region compared to the Minden region, probably have

22   similar Wildlife and Fishery issues, and so we're going

1    to group these people together so that they agents and

2    the -- and the staff [inaudible] work there can -- can

3    deal with the same issues. That's what it'd seem like

4    to me.

5            MR. EVANS:  I don't disagree with you,

6    Representative Magee. But what I can say is that when

7    courts look at issues dealing with redistricting, they

8    don't look at those types of maps. They look at

9    political maps.

10           REP. MAGEE:  I understand that. And I'm -- I'm

11   not trying to win a legal case right now. I'm trying to

12   ask questions about the map.

13           REP. DUPLESSIS:  And -- and I would just -- I

14   would add to that answer, Rep. Magee, that -- that's

15   probably a factor, the -- it's probably a factor. But I

16   would think that those decisions are made, when you

17   talk about administrative agencies, more from an

18   operational standpoint.

19           Just like that of say, you know, a -- a

20   business or some sort of franchise where you have

21   regions, just based on pure geography. Not so much

22   that, you know, we're going to look at communities of

1    interest per se. It's probably a factor.

2         But I would think when you're talking about

3    DOTD, Wildlife and Fisheries, LDH, that -- I would

4    think the -- the predominant factors there have to do

5    just more with, you know, regionalization and geography

6    from an operational standpoint. But it's probably a

7    factor. Yeah.

8         REP. MAGEE:  Okay. And look, you know, I don't

9    remember a whole lot from law school. It's -- it's been

10   some time. But I do remember one thing that my

11   constitutional law professor taught me, which was John

12   Devlin. And anybody who knows John Devlin, you know

13   he's not -- he's not a conservative.

14        But he always said, the Supreme Court is

15   right, not because they're right, they're right because

16   they're last. And that has stuck with me for 10 years.

17   One of the few quotes that I remember from law school.

18        And so I -- I don't know what's going to

19   happen in the legal case. I'm not going to be like

20   everybody else and try to tell everybody what's going

21   to happen. I think it's -- it's going to be played out

22   and a decision will be made. And once it's final, it's

1  final. And then I think that's [inaudible]

2          I do know that the 5th Circuit did say that --

3  and it really just said that the court's analysis

4  entirely -- is not entirely watertight. And it's

5  feasible that the defendants may actually win. So I

6  mean, I don't know what's going to happen. So I think

7  we're all here just speculating at this point.

8          Thank you. And that's all I have.

9          MR. ACTING CHAIRMAN:  Thank you, Speaker Pro

10  Tem. For a question, Representative Gadberry. Before we

11  get there, John Devlin was a really good constitutional

12  law professor. Representative Gadberry --

13          REP. GADBERRY:  Thank you, Mr. Acting

14  Chairman. First of all, you -- you indicated that you

15  did not draw the maps, you did not -- neither one of

16  you did. Do you know who did?

17          MR. EVANS:  Yes, sir. The demographer's name

18  is Tony Fairfax.

19          REP. GADBERRY:  Yes. Anthony Fairbanks [sic].

20  I pulled that out of the 152 page document you got in

21  front of you.

22          MR. EVANS:  That's correct.

1          REP. GADBERRY:  Because I read it, portions of

2     it this morning when I received a copy of it. In that

3     same -- same document on page seven, it says -- it goes

4     through what the judge I guess defines as the equal

5     protection clause, which forbids racial ger- --

6     gerrymandering, intentionally assigning citizens to a

7     district on the basis of race without sufficient

8     justification.

9          The Voting Rights Act bill pulls in the

10    opposite direction, as you indicated earlier, and in

11    fact often insists the district be created precisely on

12    race. So it's a tug of war. Who wins, is how you -- and

13    to me who wins is considering all the other factors.

14         REP. DUPLESSIS:  Correct.

15         REP. GADBERRY:  So being from district five,

16    Ouachita Parish, that's what I want to concentrate on

17    now. In your bill there's 387,046 people in six

18    parishes along I-10 corridor. Okay? I got those off the

19    numbers from your map, which is 50 percent of the total

20    population of that district as drawn.

21         30 percent of those are just in east and west

22    Baton Rouge Parish. So my question is, how is a person

1   from Ouachita Parish going to be able to run for

2   congress, when 50 percent of the people are in Baton

3   Rouge, and has nothing in common with the northern part

4   of the state?

5          North Louisiana loses again. If this map is

6   passed as is, my opinion is there will be one

7   congressman from northern Louisiana and the other five,

8   whether they're black, white, yellow, green, or blue, I

9   don't care, but five of them will be from south

10  Louisiana.

11         So that's one part on my -- do you have any --

12  well, you didn't draw the map, so you don't know --

13         REP. DUPLESSIS:  What -- was -- I was going to

14  wait until you got to your question.

15         REP. GADBERRY:  Yeah. My question is, why did

16  -- were the maps drawn that the majority of the

17  population is along the I-20 -- or I-10 corridor,

18  eliminating north Louisiana from having representation?

19         REP. DUPLESSIS:  So what I would like to do is

20  -- I was in my mind going to go to congressional

21  district two and make a similar I guess analysis on the

22  reality right now that people from Baton Rouge don't

1    feel like they can run in congressional district two

2    and be successful, currently.

3            And I would imagine that based on

4    congressional district five, not my map, but the

5    speaker's map, the map that this body adopted, that

6    people from East Feliciana, West Feliciana, St. Helena,

7    Tangipahoa, Pointe Coupee, might have some challenges

8    running in congressional district five as it is.

9            My point is that these are the challenges we

10   face when trying to draw these maps. And not -- and --

11   and -- and giving those people, whatever part of the

12   district you might be from, an opportunity to run and

13   be competitive.

14           So you -- you raise a -- a valid point. But

15   these are challenges that exist in every congressional

16   district.

17           MR. EVANS:  And to Representative Duplessis'

18   point, under the current configuration of district five

19   as it is now, there's many people in St. Landry and

20   Alexandria [inaudible] that they -- if they run, they

21   aren't successful.

22           REP. GADBERRY:  All right. Also -- I lost my

1    map here -- the other -- the other point I want to make

2    was -- or question I guess, is never in the past 40

3    years that I've been able to ascertain has Ouachita

4    Parish been split. It's always been whole. Now we come

5    up with Ouachita Parish being split.

6              And more particular, the map that was drawn

7    cuts out West Monroe, or reaches up in and gets the

8    city of West Monroe, typically. If you take a seven

9    mile radius from the city hall of West Monroe, you have

10   people -- another -- well I don't know if I said this

11   before, the population of West Monroe is roughly

12   13,000.

13             You have another 15 to 18,000 within a seven

14   mile radius of West Monroe that call themselves -- or

15   convey themselves as I live in West Monroe, when

16   actually they live in Ouachita Parish. Not the city

17   limits of West Monroe, but they -- all those people go

18   to West Monroe High School. There's one high school in

19   that area.

20             So the communities of -- of interest, the

21   community of interest has been dissected right there in

22   that area. And my question I guess is, could we dissect

1  something else? I mean if you'd have stopped at the

2  river, Ouachita River, you -- you wouldn't have

3  dissected West Monroe.

4           REP. DUPLESSIS:  Again, I -- I want -- I want

5  to speak to that again. And I know, you know, all these

6  communities of interest, that's what makes us what we

7  are, right? The differences, the unique attributes, and

8  those things that you know about your community that I

9  would never know, right?

10          But I -- again, I'm going back to some

11  testimony that I heard earlier. It would probably -- it

12  may play out differently, you know, if this map would

13  have become successful. But I remember hearing earlier

14  that they talked about how much they fought, and

15  fought, and fought the -- the -- the -- the breaking up

16  of some of those coastal parishes.

17          And -- and now how it's just been such a --

18  such a great thing. And they want to keep it that way

19  now. So I understand the hesitation. And I'm not

20  suggesting that it should be necessarily welcomed. But

21  it, you know, I'm just saying, it -- it -- for that --

22  for that community where they testified earlier, it

1    turned out to -- to -- to work.

2            And I -- and I just -- I think that we have a

3    responsibil- -- we have an obligation under the law to

4    -- to -- to come up with something that -- that meets

5    all the criteria and is compliant with the Voting

6    Rights Act. And that's all we're trying to do. We're

7    not -- no one's intentionally trying to split up your

8    [inaudible]

9            REP. GADBERRY:  Right. And -- and I think it's

10   still a possibility that that can be done.

11           REP. DUPLESSIS:  Mm-hmm.

12           REP. GADBERRY:  I just don't think this is the

13   map that's [inaudible] from -- from the district five

14   standpoint.

15           REP. DUPLESSIS:  I respect that.

16           REP. GADBERRY:  I -- because, you know, I just

17   think based on the population in district five, it's

18   all concentrated on that I-10 corridor. And it's going

19   to neglect the total from -- from [inaudible] Parish

20   north is going to be neglected with representation.

21           So I guess that's my -- my questions. But I

22   appreciate -- I mean I've -- I've -- I dug into these

1   maps back in October, November, January, February,

2   myself, drew them, trying to start out at a point, no

3   preconceived notion. Let's see what happens.

4          And I almost got to the point of two

5   districts. But I just couldn't quite get there, okay.

6   So I didn't present that map. Thank you, Mr. Chair.

7          MR. ACTING CHAIRMAN:  Thank you,

8   Representative Gadberry. For a question, Representative

9   Thomas.

10         REP. THOMAS:  Thank you, Mr. Acting Chair.

11  Let's see. Good afternoon. Had to check the time. I

12  have several different ways of asking you questions, or

13  several different categories that I'd like to ask you

14  questions.

15         The first thing is, many of our colleagues

16  have been talking about one third of the population

17  being black. There's absolutely -- actually not

18  correct. According to census numbers, which is what

19  everything that we're supposed to base our decisions

20  on, the number or the percent of blacks, according to

21  census numbers, is 31.17 percent. That's census

22  numbers.

1          If you multiply that times six, the result is

2    1.8702. It is not two. And that's why there is so much

3    difficulty, I believe, in drawing two minority

4    districts. Because it's not two. It's 1.8702.

5          MR. EVANS:  Representative Thomas,

6    respectfully, the middle district disagrees with you.

7    The middle district found that it can be done and it

8    should be done.

9          REP. THOMAS:  The middle district disagrees

10   with the math?

11         MR. EVANS:  The middle district found -- you -

12   - you said that it's -- it's hard and why it's so

13   complicated and difficult to draw two minority

14   districts. And what I'm saying is that the district

15   court dis- -- the middle district disagreed with you

16   and found that it can be done and should be done.

17   That's the whole [inaudible]

18         REP. THOMAS:  That was not the point. The

19   point is, numbers are numbers. And they are finite. And

20   they are not subject to being rounded. 31.17 percent is

21   a census number. That's not something that somebody

22   made up and pulled out of the air.  If you multiply

1    that times six, the product is 1.8702. It is not two.

2                REP. DUPLESSIS:  Can you tell me what the --

3    the -- the white population of the state is?

4                REP. THOMAS:  I did not look that up.

5                REP. DUPLESSIS:  Okay.

6                REP. THOMAS:  Because what --

7                REP. DUPLESSIS:  Well what I [inaudible]

8                REP. THOMAS:  Because what -- because --

9    excuse me. Because what a -- a lot of the conversation

10   has been is 33 percent of six is two. It is not 33

11   percent according to census numbers. And that's what

12   we're bound by, among other things, is census numbers.

13               REP. DUPLESSIS:  Well if I may respond to

14   that. If I may respond to that Representative Thomas.

15               REP. THOMAS:  Are you disagreeing that -- that

16   it -- that the number is 31.17 percent?

17               REP. DUPLESSIS:  Well I -- I -- I will say

18   that --

19               REP. THOMAS:  Yes or no.

20               REP. DUPLESSIS:  -- we know that there's an

21   undercount. We know that.

22               REP. THOMAS:  No, no, no, that -- that -- that

1    -- that -- that is not something that we have to take

2    into account --

3                REP. DUPLESSIS:  I don't -- I don't -- I don't

4    have the numbers in front of me at this moment, okay?

5    So -- so if -- let's -- let's go with your number.

6    Let's go with your number.

7                REP. THOMAS:  Well it's not my numbers. It's

8    census numbers.

9                REP. DUPLESSIS:  Well my -- yeah. What I have

10   right here is -- thank you, Representative Ivey. I have

11   a total population, total black, is 33.13 percent.

12               REP. THOMAS:  That is not census numbers. I

13   don't know where he got his numbers from.

14               REP. DUPLESSIS:  Well these --

15               REP. THOMAS:  That is not the census numbers.

16               REP. DUPLESSIS:  [inaudible] numbers.

17               MR. CHAIRMAN:  Let's just let each other talk.

18   [talking over each other]

19               REP. THOMAS:  Okay. All right. I'll go on to

20   my next --

21               REP. DUPLESSIS:  Well I -- I -- I haven't --

22               REP. THOMAS:  I'll go on to my next area.

1          REP. DUPLESSIS:  But we have 33 percent.

2          REP. THOMAS:  No. You have 31.17 percent.

3          REP. DUPLESSIS:  So you're telling the staff

4     that [inaudible]

5          REP. THOMAS:  Okay. Now --

6          MR. CHAIRMAN:  Mr. Vice Chair and

7     Representative Thomas. Let's -- let's just respect each

8     other. Let's ask and answer, okay? All right.

9     Representative Thomas, for your next question.

10         REP. THOMAS:  Okay. My next questions centers

11    around a statistical analysis that was done and

12    presented by an expert who was recognized as an expert

13    and in sworn testimony. His last name is Blunt.

14         In sworn testimony, in writing, he said that

15    he was hired to analyze and determine whether a race

16    blind redistricting process, following traditional

17    district criteria, would or would not be likely to

18    produce a plan with two majority minority districts

19    such as those submitted by Anthony Fairfax and William

20    Cooper, the expert witnesses for the plaintiffs.

21         To do so, he simulated a set of 10,000

22    possible Louisiana congressional district plans that

1  adhere as closely as possible to traditional

2  redistricting criteria. Are you familiar with this

3  testimony, with this sworn testimony?

4         MR. EVANS:  [inaudible]

5         REP. THOMAS:  His simulations did not take

6  race or partisanship into account. The simulations

7  allowed him to determine the number of minority

8  districts which would be likely to emerge from a map

9  drawing process that followed traditional criteria, but

10 did not draw districts predominantly on the basis of

11 race. That's his sworn testimony.

12        His result was after 10,000 simulations. And

13 none of the plans that emerged did black voting age

14 population exceed 45.47 percent, with a second minority

15 district not exceeding 42.24 percent.

16        He concluded therefore that race would need to

17 be a substantial consideration in drawing two black

18 districts. I believe that you -- you agreed with my

19 colleague, Representative Johnson, that you cannot draw

20 districts based on race because that is gerrymandering

21 --

22        REP. DUPLESSIS:  Solely --

1          REP. THOMAS:  -- and Representative --

2          REP. DUPLESSIS:  Solely -- solely based on

3     race.

4          REP. THOMAS:  Well the numbers don't support

5     that.

6          REP. DUPLESSIS:  Well we don't even agree on

7     the numbers, first of all. Because --

8          REP. THOMAS:  Wait -- excuse me. I'm reading -

9     - I'm reading sworn testimony.

10         MR. EVANS:  Representative Thomas, since

11    you're reading, what did the court say about that

12    witness? What did -- what did the court say about Dr.

13    Blunt? If I remember correctly, he was discredited as

14    non -- as non-reliable. Am I correct? What did the

15    court have to say about Dr. Blunt?

16         REP. THOMAS:  I'm reading sworn testimony. And

17    I'm asking the questions.

18         REP. DUPLESSIS:  Please proceed. Let's -- but

19    let's talk about Dr. Blunt though. You want to bring

20    [inaudible]

21         MR. CHAIRMAN:  Hold -- and I'm -- I'm going to

22    let you all continue. Members of the crowd, I please

1  ask that you, you know, we -- we keep the -- any kind

2  of outbursts, anything under control so that we can --

3  we can focus our attention on the -- on the questioner

4  and the answerer. And Mr. Evans, I'll let you continue

5  that line of statement because I cut you off. Okay.

6          Representative Thomas, on -- on your next

7  question.

8          REP. THOMAS:  Thank you. I'd like to ask Mr.

9  Evans, what percent of the black voting age population

10 makes it probable to elect a black?

11         MR. EVANS:  As I've told this committee

12 multiple times, Representative Thomas, there is no

13 magic number. You take a lot of factors into

14 consideration. You look at a number of previous races,

15 how the minority choice candidate has been successful,

16 has the minority choice candidate ran, does those

17 numbers match the racial makeup of a district.

18         So there is no magic one number. And the court

19 -- the court alluded to that.

20         REP. THOMAS:  Okay. I'll -- I will move now to

21 communities of interest. In sworn testimony, Mr.

22 Heffner, the expert --

1          REP. DUPLESSIS:  He has to run to the

2    bathroom, so I'll try my best to answer any questions

3    that you have for Mr. Evans.

4          REP. THOMAS:  Mr. Heffner, who is also a sworn

5    expert, testified in writing that communities of

6    interest are based on political issues, culture,

7    economics, occupation, religion, or local traditions.

8    He also testified that communities of interest is one

9    of seven traditional redistricting criteria.

10          I'd like for the map to be brought up. Can we

11    have the map of congressional district one, please.

12          MR. CHAIRMAN:  Under the bill we're

13    discussing, Representative Thomas?

14          REP. THOMAS:  Yes.

15          MR. CHAIRMAN:  Okay. So congressional district

16    one of -- of this bill, HB1.

17          REP. THOMAS:  It's okay. Okay, that's good.

18    That's good. Okay. This is the congressional district

19    that I live in. So I'm very familiar with Jefferson

20    Parish. And I'd like to point out that this map has

21    only a sliver of St. Tammany, which is unlike the

22    current map. But it also winds around and goes all the

1    way to Iberia Parish. You all see that? Okay.

2            So in looking at again census data, and in

3    having a conversation with my colleagues, I found out

4    that there's not a whole lot in common between

5    Jefferson Parish, Iberia, St. Mary. And I'd like to

6    point out some of those things, in terms of what is

7    considered to be communities of interest.

8            In terms of the economy, in Jefferson Parish,

9    our economy is based for the most part -- and remember

10   my source of information is census data -- our economy

11   is based on construction, retail trade, educational

12   services, healthcare and professional -- healthcare,

13   and professional scientific and technical services.

14           The educat- -- the economy in Iberia Parish is

15   based on their two sugar mills, sugar cane. They have

16   1,000 acres of crawfish pond, lots of agriculture, no

17   shopping malls, one Rouses, one Chick Fil A, three

18   McDonalds, one Burger King, two Wendy's, no steakhouse,

19   and one upscale restaurant that's about to close.

20           In terms of culture, events, and festivals,

21   let me start with Iberia Parish this time. They have

22   the Delcambre Shrimp Festival, Mardi Gras, but their

1   Mardi Gras is one street parade and a couple of balls.

2        They have the world championship gumbo

3   cookoff, holidays, the home and garden tour, and the

4   Delcambre Christmas boat parade, Lao New Year, the home

5   and garden tour, sugar cane festival. And it was

6   described to me that they have boucheries versus wine

7   tasting in Jefferson Parish. They have [inaudible] and

8   we have concerts.

9        In terms of Jefferson Parish, the events and

10  festivals, we have Mardi Gras, we have 12 crews with

11  street parades, balls, etc. We have Family Gras, the

12  Zurich Classic, Italian heritage festival, Jean Lafite

13  seafood festival, Uncle Sam Jam, international tarpon

14  rodeo, freedom fest, Gretna heritage festival, the

15  Bridge City gumbo festival, fall festivals and

16  Halloween, Christmas in Lafreniere Park.

17       I think just from some of these that I have

18  told you about, and our populations are very different,

19  the annual budget in Jefferson Parish is $581 million.

20  And Iberia, their budget, their governmental budget is

21  60,919,000, etc. Iberia Parish has more in common with

22  St. Martin Parish than with Jefferson Parish. And if

1    you notice up there, St. Martin Parish is not in

2    congressional district one.

3              One other aspect in terms of communities of

4    interest, the education level in Jefferson Parish, high

5    school graduates, 86.4 percent. In Iberia it's 81.9

6    percent. The bachelor's degree holders in Jefferson

7    Parish is 27.6 percent. And in Iberia Parish it's 15.3

8    percent. We are very different.

9              I believe that the map that we passed already,

10   act five, maintains traditional communities of

11   interest. Is there any comment that you might have

12   about those communities of interest?

13             REP. DUPLESSIS:  I would just say that --

14   look, I respect your opinion and everything you have to

15   say, but we're here because a federal judge has -- has

16   ruled that the map is unconstitutional.

17             REP. THOMAS:  So no comment about communities

18   of interest.

19             REP. DUPLESSIS:  The -- the judge has ruled

20   that the map is unconstitutional.

21             REP. THOMAS:  Okay. So no comment about

22   communities of interest. Okay. I get it. Heffner, the

1    expert that I'm talking about here, he evaluated the

2    four illustrative plans that were presented. And

3    concluded that all are based on the presumption that

4    blacks share the same interests and issues because of

5    their race. That was a conclusion that he -- that he

6    made in his sworn testimony.

7           I'd like to piggyback a little bit on

8    something that Representative Johnson brought up. I --

9    I attended all of the roadshows, every single one of

10   them. I sat there and I listened carefully. I agree

11   with him that there was a group of people who did

12   appear at all of the roadshows, not sure whether or not

13   they were from Louisiana even, but they all said very

14   much the same thing.

15          But when we listened to the citizens, some of

16   the citizens said that they would like to add a black

17   district. But others said leave it the way it is, that

18   they liked their representation. So in terms of the

19   public, and not organized groups possibly from out of

20   state, they said they had some differing opinions.

21          And I didn't keep a count of how many said we

22   want this representation, how many said we want to keep

1  it the way it is. I didn't keep a count of that. But I

2  would say that there were differing opinions.

3          Now let -- let -- let me ask a question that I

4  haven't heard anybody ask. What is -- what is the

5  female population of our state, roughly?

6          REP. DUPLESSIS:  I know it's the majority. I

7  have to pull it up. I don't --

8          REP. THOMAS:  Pro- -- probably somewhere

9  around 52 percent. I don't know an exact number on

10 that, which is unusual because usually I know exact

11 numbers. In our legislature, in the House, we have 20

12 percent of the population are female.

13         Do you think it's important or would it be

14 necessary to mandate that 52 percent of the legislature

15 of the House of Representatives should be female?

16         REP. DUPLESSIS:  I think it's important. The

17 question about mandate -- because I believe

18 representation is important. But I -- I -- I think

19 these are very two different comparisons when you talk

20 about gender versus race. The Voting Rights Act deals

21 with race, not gender.

22         REP. THOMAS:  I understand. But in -- when I

1    represent the citizens in my district, I don't

2    necessarily pay attention to whether they are male,

3    female, old, young, middle aged, black, white,

4    republican, democrat, no party. I represent the people

5    who elected me to house district 80, without regard to

6    their station, their race, their gender.

7              With that, Mr. Chairman, I'm finished.

8              REP. THOMAS:  Thank you, Representative

9    Thomas. Next, Representative Deshotel.

10             REP. DESHOTEL:  Thank you, Mr. Chairman. I

11   think first I'd like to -- I need to give a shout out

12   to our rep- -- our colleague, Representative Beullieu

13   [ph], who it's my understanding actually won that world

14   famous gumbo cookoff in Iberia Parish.

15             FEMALE:  [inaudible]

16             REP. DESHOTEL:  So -- so I just had to start -

17   - start with that one. But I think I'd like to -- to

18   maybe comment on something Representative Jenkins said.

19   You know, he said this body did not work at all

20   yesterday. And I'm going to have to disagree with him.

21             I actually worked yesterday. I worked on these

22   maps. I looked at these maps. I looked at the data.

1    Tried to understand, tried to prepare myself for -- for

2    this meeting. So to say we didn't work, I think is a,

3    you know, not -- not fair. Because really we -- we did

4    work.

5            And I'll tell you what else I did. I took a

6    lot of phone calls. I took a lot of phone calls from

7    constituents.in my parish. Because if you notice, this

8    map affects my parish. So I called some mayors, I

9    called police jury members, I called just citizens that

10   I -- I really trust. And then I got a lot of calls from

11   -- from citizens that I really didn't know.

12           And a lot of the comments I got was, hey, why

13   is this happening, why is this so fast, can we come to

14   Baton Rouge, how does this work, can we come to

15   testify. Got all this things happening that we have to

16   deal with. And -- and the consensus I got was that they

17   didn't feel they had enough time to come express their

18   opinions on this matter.

19           And I -- and I think the question for -- for

20   you is, is this the map that was filed, born [??] the

21   redistricting session.

22           REP. DUPLESSIS:  I did not file this map

1    during the redistricting session. I can't speak to what

2    anyone else filed during the redistricting session

3    except for I [inaudible] --

4            MR. CHAIRMAN:  Representative Duplessis, I

5    can't -- I don't [inaudible]

6            REP. DUPLESSIS:  Okay.

7            MR. CHAIRMAN:  Let me turn off and on

8    Representative Deshotel's mic.

9            REP. DUPLESSIS:  Okay.

10           MR. CHAIRMAN:  He's the culprit.

11           REP. DUPLESSIS:  What -- what -- what I --

12    what I can say --

13           MR. CHAIRMAN:  Representative Deshotel, why

14    don't you bump to the right, okay? All right.

15           REP. DUPLESSIS:  There were similar iterations

16    of this map that were offered as floor amendments

17    during the redistricting session. But I did not file

18    this exact map during the redistricting session.

19           REP. DESHOTEL:  We good. We good now.

20    Superman. How about now?

21           REP. DUPLESSIS:  Much better.

22           REP. DESHOTEL:  I knew you could do it.

1        REP. DUPLESSIS:  On the -- on the -- on the

2    question of time, I did not come up with the timetable.

3    I did not come up with that [inaudible] comment about

4    Rep. Jenkins, I -- I heard -- I interpreted what he

5    said, not as that we didn't work individually, but we

6    didn't work as a body, which is a true statement. We

7    did not work as a body. And we did not work in a manner

8    where -- where -- where instruments could move through

9    the process. We weren't here. There were no committee

10   meetings.

11       So despite all the work that I know you did

12   and the work that we all did in preparing for the day,

13   we didn't work as a body to move the instruments

14   forward, or any instrument forward.

15       REP. DESHOTEL:  But do you think it's

16   important that we did that work to prepare ourselves

17   for this meeting?

18       REP. DUPLESSIS:  That's always. Even when

19   we're not in session. But that's more of an individual

20   choice, as opposed to us as a body coming in and moving

21   instruments forward.

22       REP. DESHOTEL:  Right. No. I understand.

1          REP. DUPLESSIS:  And -- and in terms of the

2     dates, these were dates that were given by the court.

3     So I had no input or no say in that.

4          REP. DESHOTEL:  Yes, sir. So -- so this is not

5     the same map that was filed. And --

6          MR. EVANS:  Representative -- if I may,

7     Representative Deshotel. It is substantially similar to

8     a map that was voted down in this committee during the

9     redistricting session. Only things that were changed

10    were a few precincts were made whole to comply with the

11    redistricting principles that were passed by this body.

12         But all of the parish splits, compactness, all

13    those are the same. So the public has seen this -- this

14    map has been available online at least since early

15    February.

16         REP. DESHOTEL:  So all -- I'll have to

17    disagree with you. You just said that you -- you

18    changed the map and some of these precincts are

19    changed. Well those people did not see that map. But so

20    I guess the ques- -- the -- the next question is, so we

21    changed the map, so it's the remedial -- and this is

22    your words, remedial plan that the judge ordered us to

1    come up with.

2              REP. DUPLESSIS:  Yes.

3              REP. DESHOTEL:  Okay. So now I have a question

4    for -- for the Chairman. So I -- I read in The Advocate

5    yesterday that the judge threatened Speaker Schexnayder

6    with contempt of court because he filed a legislative

7    instrument. Is it -- I mean is that -- did I read that

8    right?

9              REP. DUPLESSIS:  I don't know what was

10   reported. I don't know -- I don't know how you define

11   threatened. I can't -- I can't say that's true or not

12   true. And I -- I don't know how you define threatened.

13   So I don't know what -- what was reported. So I'm not -

14   - I'm not [inaudible]

15             REP. DESHOTEL:  Okay. And that's fair enough.

16   And I think the question is, you know, you started out

17   your statement, your presentation, by saying the judge

18   ordered us to enact, ordered us to adopt a remedial

19   plan. House Bill 1 is the remedial plan.

20             REP. DUPLESSIS:  That I am presenting. It's

21   the remedial plan that -- that I am presenting.

22             REP. DESHOTEL:  So I guess this is my question

1    for the -- the Chairman. If the judge ordered us to

2    come up with a remedial plan, she threatened Speaker

3    Schexnayder, you know, I guess can hold him in contempt

4    of court because he filed a legislative instrument.

5            Does that mean if I don't vote for a map that

6    has two black congressional districts, that I could be

7    held in contempt of court?

8            MR. CHAIRMAN:  So first I'm going to say, I'm

9    not your lawyer. Which I was taught in first year law

10   school. Before I give anyone advice, they said always

11   say that. It is the Chair's opinion that we are elected

12   members of a body. Our Louisiana constitutional duty is

13   to represent your district in the best way you see fit.

14           I'm not going to tell you what a judge can and

15   can't do. But you acting -- you acting in an ability to

16   be able to represent your district and vote the way you

17   normally do according to the rules of this House, I

18   don't see how you can be held in contempt for doing

19   just that.

20           Let me mention something else. Again, not your

21   lawyer, but you have to read orders very literally.

22   Nowhere in the order does it say you cannot vote for a

1    map that doesn't contain this. And so I'm always very

2    literal. Again, I'm no one's lawyer. I'm just the chair

3    of a committee trying to manage this process,

4    Representative Deshotel.

5            REP. DESHOTEL:  Thank you. I -- I -- I

6    definitely appreciate it because I was getting a little

7    worried. You know, I've -- I've never been arrested.

8    I've never been even suspended from school. So I didn't

9    want to get arrested for contempt of court because I

10   didn't vote for a -- for -- for a specific plan. But I

11   appreciate it. Thank you.

12           REP. DUPLESSIS:  Thank you.

13           MR. CHAIRMAN:  Thank you, Representative

14   Deshotel. Representative Newell.

15           REP. NEWELL:  Good afternoon, Senator -- I

16   mean Representative Duplessis and Mr. Jared. I

17   appreciate you all being here.

18           One quick thing, I would like to say hello and

19   welcome to Ms. Kayla Cutno [ph]. She is a current law

20   student at The Southern University Law Center here in

21   Baton Rouge. And she was an intern at the law firm I

22   work at two summers ago. Welcome, Ms. Kayla, and I hope

1    you learned a lot from today's committee exchange.

2            Representative -- keep wanting to call you

3    Senator. I wonder why the Lord is keep putting that on

4    my mind. But if the maps that we have now, the old

5    maps, are presented to the court, if they're allowed to

6    stay, would it be fair to say that certain people in

7    this state would not have what we would consider fair

8    representation?

9            REP. DUPLESSIS:  I would -- I would say yes.

10   I'd say that would be a fair statement.

11           REP. NEWELL:  Would that -- would that be in

12   compliance with this court order that we've been

13   talking about all morning?

14           REP. DUPLESSIS:  It would -- it would not. It

15   would not be in compliance.

16           REP. NEWELL:  Okay. And just to go back right

17   quick, and I'm not asking you for an interpretation of

18   what the judge said, but what did the judge say

19   yesterday about the map that our speaker presented

20   yesterday in court, not in the 152 pages that said it

21   was wrong, what she said yesterday.

22           REP. DUPLESSIS:  Well this is -- what did she

1    say yesterday? Yesterday was a hearing on a motion for

2    an extension.

3              REP. NEWELL:  Yes. It was.

4              REP. DUPLESSIS:  So the -- the -- the question

5    of the -- the map was -- was not -- it was not the

6    primary question.

7              REP. NEWELL:  It was not --

8              REP. DUPLESSIS:  It was about whether or not

9    there would be an extension. But again, to your -- to

10   your question, what the order says is the court orders

11   the Louisiana legislature to enact a remedial plan that

12   includes a second majority black congressional

13   district.

14             REP. NEWELL:  And I'm going to answer my own

15   question. Because I was there and I heard what she

16   said. She said that the map did not comply with the

17   order. Even though I know the -- the --

18             REP. DUPLESSIS:  Right.

19             REP. NEWELL:  -- the reason we were there was

20   [inaudible]

21             REP. DUPLESSIS:  That's correct.

22             REP. NEWELL:  So given the history of this

1   state, would it be fair to say that those who do not

2   receive fair representation with the maps weren't

3   fairly counted and won't -- won't fairly be

4   represented.

5           REP. DUPLESSIS:  I would agree with that.

6           REP. NEWELL:  So we will be -- it's also fair

7   to imply that if those persons do need fair maps fail

8   to receive them, their voting power and influence would

9   be reduced.

10          REP. DUPLESSIS:  Correct.

11          REP. NEWELL:  Do you know to what extent their

12  voting powers and representation would be reduced?

13          REP. DUPLESSIS:  I mean, significantly.

14          REP. NEWELL:  And these are open. You all

15  could tag team this if you like.

16          REP. DUPLESSIS:  Okay.

17          REP. NEWELL:  Could it be opined from -- from

18  this body's current action, again just an opinion, not

19  asking you for your legal statement or just legal

20  representation, just your opinion.

21          If the current action and minorities don't

22  receive one third of the representation, will they have

1   less value in their votes, would their votes have less

2   value than others.

3          MR. EVANS:  What -- what -- what I can say to

4   your question, Representative Newell, is that what the

5   court has said is that it is guaranteed that in the

6   current map, which the Governor Edwards be told, the

7   minority choice candidate would be defeated without

8   question in five out of six congressional districts.

9          REP. NEWELL:  So, essentially, the black

10  voters in other parishes, their vote does count a

11  little bit less so or has less value than say my mine.

12  Thank you. Could it be inferred by this legislator's

13  actions in 2022 to limit the voting power, would it be

14  similar or would you opine it is similar to the three-

15  fifths compromise?

16         REP. DUPLESSIS:  I never quite thought about

17  it that way, but I would -- I would say yeah.

18         REP. NEWELL:  I did.

19         REP. DUPLESSIS:  Yeah.

20         REP. NEWELL:  Okay.

21         REP. DUPLESSIS:  Yeah. I would -- I would

22  agree.

1          REP. NEWELL:  Our whole discussion is not

2     about electing a black person to fill this

3     congressional seat, is it?

4          REP. DUPLESSIS:  Correct.

5          REP. NEWELL:  Is -- the purpose is to give

6     black voters an opportunity to vote their candidate of

7     choice. Am I correct in my understanding?

8          REP. DUPLESSIS:  That's right.

9          MR. EVANS:  Correct.

10          REP. DUPLESSIS:  I would say Rep if Herschel

11     Walker would run in and be my congressman, I wouldn't

12     vote for him.

13          REP. NEWELL:  Because that's not who you

14     choose.

15          REP. DUPLESSIS:  No. No, he doesn't represent

16     my interest.

17          REP. NEWELL:  He doesn't represent your

18     interests. Exactly.

19          MR. EVANS:  Representative Newell, we have

20     several examples of that in this -- in this -- in this

21     state.

22          REP. NEWELL:  In this very body we have --

1          MR. EVANS:  Senator Luneau.

2          REP. NEWELL:  Senator Luneau is exactly.

3          MR. EVANS:  He defeated a black man.

4          REP. NEWELL:  Yes he did. He -- he defeated a

5     black Republican in a 60 percent black district but it

6     gave those blacks, I've been called today, it gives

7     them an opportunity to vote in their candidate of

8     choice.

9          MR. EVANS:  Yes. The race of the candidate

10    does not matter. It's the interest they represent.

11         REP. NEWELL:  It's the interests that they

12    represent and do they represent the interests of the

13    voter. My colleague the other day told me that he was

14    voted -- and a white Republican voted in by crossover

15    vote meaning black Democrats voted him in office, one

16    of my colleagues here in the House of Representatives.

17         So, that means is gives -- we should open that

18    up to give more of our residents that opportunity, more

19    of our citizens in this state, the opportunity to vote

20    in their candidate of choice, even if it is a crossover

21    and we might get a moderate Republican, just like we

22    might just get a staunch Democrat in office.

1          And again that brings -- I appreciate my

2     colleagues who live in areas where they don't have to

3     talk about race or don't have to see race. They don't

4     have to see color but that does not -- across the state

5     -- that -- the theme does not go across all of our

6     state and it's good that you are in that District.

7          But our congressional districts are comprised

8     of our House districts and in Orleans Parish,

9     overwhelmingly on the local level, we have black

10    leaders. We have black female, black male leaders,

11    Democrats in our district. Jefferson Parish, we have a

12    mix of white and black Republican and Democratic

13    elected officials.

14         St. Tammany Parish, white Republicans. St.

15    Bernard Parish, white Republicans. They have that

16    opportunity to vote but when we come together in

17    District Two, we're the only district that has the

18    opportunity to vote in a black Democrat to Congress and

19    we're just trying to give another portion of our state

20    an opportunity -- an opportunity to vote in a black or

21    a Democratic candidate.

22         We're not forcing them to vote for anyone;

1  we're just opening up that opportunity. And being from

2  New Orleans, I never understood how a person could open

3  their mouth, and say that their vote didn't matter. I

4  never understood that, being from New Orleans, because

5  when I was born, we already had a black mayor.

6          We had -- we had a black police chief; we had

7  black people on the school board. There was a black

8  person representing me in the Senate and in the House

9  at the state level. So, I never understood a person not

10  believing that their vote mattered until I stepped foot

11  in this building and that is when my world came

12  crashing down on me in my 40s to understand that.

13         That was not something that I grew up as a

14  child thinking and I realize just how sheltered I had

15  been and I hope that we can, but listening to these

16  conversations, it's not going to happen, that we can

17  allow for all our kids across the state to just believe

18  that they have an opportunity, an opportunity to do

19  something else.

20         You can't be something if you don't see it. So

21  many of our children were limited to just thinking that

22  they could be teachers and doctors and lawyers because

1    that's what they saw. But I want all kids across the

2    state to believe that they can be contractors, state

3    representatives. That they could be attorneys.

4           That they can be anything that they want to be

5    because they can see it and they can relate to it as a

6    me. I want little black girls to think I can sit there.

7    I can be a state rep. I can be whatever it is I put my

8    mind to. But if we don't open the opportunities for

9    someone to be able to just use their constitutional

10   right of voting, we'll never get there.

11          And it is disheartening. And I don't -- I

12   don't know if the Judge knew what she was doing

13   intentionally or if this was just God's divine plan

14   that we're discussing a second congressional race, a

15   second congressional district on the eve of Juneteenth,

16   the day that this state -- the day that this nation is

17   recognizing Juneteenth, when the blacks finally got or

18   were told that they were free, finally told that they

19   could go out and be on their own, they were no longer

20   under the guise of -- directions of master.

21          They can be; they can be a whole man or woman.

22   And but still today, right now in 2022, on the eve of

1   Juneteenth, we are discussing the value of the black

2   vote and the value and counting the black people in

3   this -- this state. When George Floyd was killed --

4          MALE:  Murdered.

5          REP. NEWELL:  -- murdered. Thank you. Yes, he

6   -- that's what it was. He was murdered. When that

7   happened, I had some friends of mine, some white

8   friends that are very dear to me, call me and say,

9   "What can we do? What can I do? What can we do to help

10  this nation heal? What can we do to move this nation

11  forward?

12         What can we do to bring our communities

13  together?" They don't have the opportunity to do it. My

14  personal friends don't have the opportunity to do it

15  but the representatives, the people who represent them

16  in this body, what you can do is give us this second

17  congressional district. That's what you can do for me.

18         That is what can be done to give the people in

19  this state an opportunity and let them know that they

20  are heard. Let them know that the void -- the vote and

21  their voice matters every day, not just on Election

22  Day. Some of us count and I'm speaking us collectively

1   as a legislative body, some of us count in the black

2   people to know that our district is right.

3            But when it comes time to walk those

4   districts, the black neighborhood is not visited. The

5   black churches are not visited because they -- to some

6   of us, they don't matter and that is interesting and

7   frustrating all at the same time. And my colleague said

8   that Louisiana is going to lose.

9            He said, I forgot what context you said

10  Louisiana is going to lose with drawing this

11  Congressional map. When Louisiana lost in 2013 when

12  preclearance was done away with. That is the day we

13  lost and we lost more than I could have ever imagined

14  when that was deemed unconstitutional for certain

15  jurisdictions to be -- to be covered by preclearance

16  and have certain restrictions.

17           That is the day Louisiana citizens lost. And

18  thank you for bringing this map again. Thank you for

19  sitting there for these past three hours listening to

20  this. Thank you, Jared, for being here and I'm glad

21  that you all keep winning in court and I can hope you

22  all continue to keep winning in court, because it's --

1    this fight is not going to end until we all come

2    together and realize that all of our citizens matter.

3         It doesn't matter what you look like; it

4    doesn't matter what your party looks like, but everyone

5    needs to have the opportunity. And hopefully that by

6    the time we come to redistricting next year, that the

7    black people who vote in this state, the young people

8    who are becoming of voting age in the next -- at the

9    end of this next 10 years, they believe that their vote

10   has value and that they can say, "My vote counts,"

11   because right now with the agenda that we're pushing,

12   with the maps that we have, with the arguments that

13   we're having right now over something that the court

14   said to do, our young people will continue to say that

15   they vote don't matter.

16        And you know what they're going to do?

17   Continue to leave this state and go somewhere where

18   they do believe that they matter and where they have

19   opportunities. And that's all we want to give to our

20   citizens in Louisiana is opportunity. And with that Mr.

21   Chairman, I yield.

22        MR. CHAIRMAN:  Thank you, Ms. Newell.

1    Representative Farnum.

2            REP. FARNUM:  Thank you, Mr. Chairman So, I'm

3    sitting here looking at District 3. I live on -- on the

4    very western side of this state and I don't know how

5    many of you all are familiar with Star Wars. But -- but

6    my -- my newly formed district here kind of looks like

7    Jabba the Hutt with a baseball cap on.

8            And you know, it goes to the communities of

9    interest and we've always been a District 3 that takes

10   the top, you know, couple of parishes and spreads to

11   the east and then joins with the Lafayette area, which

12   goes along with Representative Thomas' testimony that

13   we have a lot more in common with St. Mary, you know,

14   St. Martin Parish, Iberia Parish than Jefferson Parish

15   does.

16           We -- our culture is basically the same all

17   the way across that region. We all enjoy the same

18   things. We -- we make our living off of oil and gas

19   related issues. We have a ton of industry in our area.

20   We have, you know, on-shore and offshore drilling

21   efforts or at least we used to.

22           And we have flat land farming and crawfish

1   industries across that region. And our congressmen that

2   we have today and have -- have always had in that area,

3   have to focus on those issues. Well, now with being

4   Beauregard, Allen, Evangeline and Rapides, and, you

5   know, a region that's so far out of touch with what we

6   deal with on the coastal areas that now the congressman

7   is going to be -- having to learn a whole new ball

8   game.

9           It just, you know, I received so many phone

10  calls over the time and talking at groups that keep us

11  in the Lafayette region. We have a joint -- kind of a

12  joint Chamber of Commerce, if you will, that deals with

13  the whole coastal area and the industries that it

14  supports. And to be whacked off of part of that and put

15  it into a region where we really hadn't had anything to

16  do with ever other than tourism.

17          You know, we go back and forth to each other's

18  areas and we enjoy each other's areas. So, that's the

19  part that I have the most heartburn with. And then I

20  sit here and listen to the testimony that all you want

21  is a candidate of choice, not necessarily a black

22  candidate and I guess going along those lines, it's

1    more of a belief of ideals and beliefs rather than --

2    than being a black candidate.

3          Did you -- would you agree with that?

4          REP. DUPLESSIS:  Well, when you look at the

5    totality, how you define a community of interest, race

6    is a factor but it's not the predominant factor.

7          REP. FURNAM:  Yeah.

8          REP. DUPLESSIS:  So, I would -- I would -- I

9    would generally agree with your -- with your question

10   if I'm understanding it properly.

11         REP. FURNAM:  So, I guess all the testimony

12   that both of you all have given and some of the reps

13   here have given is that you don't necessarily care if

14   it's a black candidate or not. It's a candidate of

15   choice that represents the -- the ideals that you

16   believe in and not the ones that somebody else believes

17   in.

18         So, going down that same path, wouldn't it

19   just be easier to say, "We want a Democrat or

20   Republican District?" Because that's basically what

21   you're saying is you want the beliefs to be represented

22   and not necessarily a skin color.

1          REP. DUPLESSIS:  I think in today's party --

2    party system that we have throughout this nation, that,

3    you know, I think it would be hard for me to disagree

4    with that. However, I'm not here to have a conversation

5    about party. I do think that interests are often

6    defined by what party someone may join or how they may

7    vote.

8          REP. FURNAM:  But isn't that exactly what

9    we're doing today? That's exactly what we're doing

10   today because if we had this conversation about party

11   affiliation, it would be illegal and Section 2 of the

12   Voting Rights wouldn't cover it, would it?

13         REP. DUPLESSIS:  No, I think probably much of

14   the resistance that we're getting from two black

15   districts -- for having two black districts has to do

16   with party.

17         REP. FURNAM:  And then that's illegal, isn't

18   it?

19         REP. DUPLESSIS:  That's why the judge struck

20   down the [inaudible]

21         REP. FURNAM:  Nothing in Section 2 of the

22   Voting Rights covers the -- the protection of a party

1    affiliation or a belief system.

2            REP. DUPLESSIS:  Well, you know, when I look

3    at the two party system, you know, I often wonder and I

4    mentioned that if Herschel Walker was running to be my

5    congressman, I wouldn't vote for him. But I look at the

6    -- the parties and I look at the lack of diversity of

7    one of those parties and I ask myself, "Why is that?"

8            REP. FURNAM:  So, at the end of the day, this

9    whole discussion isn't about black or white. It's about

10   party affiliation.

11           REP. DUPLESSIS:  No, it's about interests.

12           REP. FURNAM:  It's about interest, which turns

13   into a party affiliation.

14           REP. DUPLESSIS:  If you want to give it that

15   title, I'm saying it's about interest. So I'm just

16   asking that you don't put --

17           REP. FURNAM:  That's -- that's all I've heard

18   --

19           REP. DUPLESSIS:  I'm asking that you don't put

20   words in my mouth.

21           REP. FURNAM:  I've been -- I've been to all 10

22   --

1          REP. DUPLESSIS:  You're saying that's what you

2    heard but you didn't hear us say that one time.

3          REP. FURNAM:  -- let me finish. Let me finish.

4    I've been to all 10 of the redistricting meetings.

5          REP. DUPLESSIS:  So did I and I went to Lake

6    Charles.

7          REP. FURNAM:  Yeah, I did too.

8          REP. DUPLESSIS:  And I heard what the people

9    there said.

10         REP. FURNAM:  I have too.

11         REP. DUPLESSIS:  And they weren't paid

12   organizers.

13         REP. FURNAM:  I've heard them every single day

14   --

15         MR. CHAIRMAN:  Members. Members. Hey, Les and

16   Royce. Questions and answers. We've got to keep to the

17   core.

18         REP. FURNMA:  Okay. So, at the end of the day,

19   this -- this isn't about a black district. It's about a

20   party-affiliated district and -- and --

21         REP. DUPLESSIS:  It's about interests.

22         REP. FURNAM:  And it's exactly that and it's

1    party affiliation --

2              REP. DUPLESSIS:  And it's what the court has

3    ordered us to do.

4              MR. EVANS:  Representative Farnum, we are here

5    before --

6              REP. FURNAM:  Thank you. I rest.

7              MR. CHAIRMAN:  Representative Jenkins, you're

8    before but we -- I gave you a bite at the apple

9    already. We've got to get to some of these cards.

10   Representative Lyons is going to be our last question

11   for these two gentlemen. We're going to get to the

12   cards. We're going to try to get rolling.

13   Representative Lyons.

14             REP. LYONS:  Thank you, Mr. Chairman. And let

15   me go back right quick because I had to -- to make a

16   quick exit and come back, but I noticed that the

17   testimony and Representative Duplessis, you know, you

18   and I talked several times because we were on a road

19   show together. And you remember when we were in Lake

20   Charles talking about the testimony from a lady that

21   was there that had spoke.

22             REP. DUPLESSIS:  I remember distinctly.

1          REP. LYONS:  Do you remember when we were in

2     Monroe, we had a similar conversation. The ladies who

3     came from the community of Marlborough and talked about

4     the redistricting and some of them talked about having

5     to make that drive from I think it was Wilksboro or

6     some other area that they had to drive that far to get

7     there. You remember those conversations?

8          REP. DUPLESSIS:  Yes.

9          REP. LYONS:  And you remember the

10    conversations we had of the great turnout and work that

11    we had in Covington when we were in Covington. So, the

12    other day on the floor, I was speaking and I was

13    alluding to conversations that I had with people who

14    from around the state at a conference talked to me

15    about the -- the -- the redistricting process and the

16    thing that happened with that. Do you remember that?

17         REP. DUPLESSIS:  Mm-hmm.

18         REP. LYONS:  What I didn't tell you, is you

19    didn't know that one of the gentleman was from Rapides

20    Parish and he was talking particularly about the

21    redistricting process and he wanted to know exactly why

22    were they not considered into that particular process?

1    I didn't mention that -- that fact. You didn't know

2    that did, you know?

3              REP. DUPLESSIS:  No.

4              REP. LYONS:  So, and also what I want to, you

5    know, go back and -- and -- and I know you can attest

6    to this they're asking you, but you saw the turnout of

7    people we had here in this body when we had the -- the

8    sessions and we had the bills come before us from

9    different parts of the state. Did you not see that?

10             REP. DUPLESSIS:  I saw it.

11             REP. LYONS:  And did you notice the different,

12   as we refer to certain groups who are organizing to

13   come and do certain things, you saw too, as well, did

14   you?

15             REP. DUPLESSIS:  Yeah.

16             REP. LYONS:  So, it's safe to say that there

17   was a mixture of people from the communities that were

18   there, as well as people who were particular advocacy

19   groups promoting the whole process.

20             REP. DUPLESSIS:  Right.

21             REP. LYONS:  I just want to say that because

22   you were there with me, so we know that particularly,

1   it wasn't any groups going around the state, individual

2   person. As a matter of fact, I think the only person

3   that I may have seen in most of the places might have

4   been Jared. Might have been Jared. Is that right?

5          MR. EVANS:  Yeah. I was at three of them

6   [inaudible]

7          REP. LYONS:  That's correct. So, I saw you

8   there but I'm saying that we got an overwhelming amount

9   of community interest from people who we didn't know.

10  Didn't know where I was from, didn't know other places

11  were there, and most of them were people who were black

12  people, suffice to say, that were saying we're glad we

13  have the opportunity to come before us and give

14  testimony.

15         So, I was sitting here going through some of

16  the -- the -- the mail-in testimony. And I went back to

17  try to look at some of the viewing of the spots that we

18  talked about earlier, and there were people there and

19  it's on the record that gave their name from where they

20  were in the community.

21         So, the community had an opportunity to come

22  to all these venues and give out -- give input about

1    what they thought to happen with these particular

2    congressional maps. Is that correct in my assessment of

3    that?

4            REP. DUPLESSIS:  That's correct.

5            REP. LYONS:  Okay. And I want to put that on

6    the record to make sure that it wasn't just a

7    statement. It wasn't just an organized effort to do

8    what's right because people all over the community came

9    to us who wasn't for my district, who wasn't from

10   Jefferson Parish or other places.

11           They weren't from Orleans. You know, they came

12   from all over the state to talk about things that was

13   important to them. And be it known, some of them are

14   not really affected by this map that you have here now

15   because it didn't really affect the areas. Am I correct

16   in that?

17           REP. DUPLESSIS:  Right.

18           REP. LYONS:  But they wanted to have

19   representation that they could see and so what

20   happened, when we talk about the numbers and I stepped

21   out as my -- my colleague from Jefferson was speaking

22   about the numbers, and the value of them is that it's

1    impossible to put everybody in one place in this -- in

2    this state based upon the map and the numbers.

3              REP. DUPLESSIS:  Correct.

4              REP. LYONS:  It's impossible to do that. So,

5    she was talking to you, Jared, about a gentleman, I

6    think his name was Dr. Blunt, about something in the

7    testimony. Can you go back to that for me, please?

8    Because I wanted to understand the value of what you

9    were talking about. I had to step out.

10             MR. EVANS:  Absolutely. So, I'm reading

11   directly from the court opinion here, Representative

12   Lyons. The court considers Dr. Blunt to be well

13   qualified by education and experience in the tendered

14   field of expertise. However, Dr. Blunt has no

15   experience, skill, training or specialized knowledge in

16   the simulation analysis methodology that he employed to

17   reach his conclusions.

18             He testified that he had never attempted a

19   simulation analysis before this case and has never

20   published on the topic, taught or even taken a course

21   on it. Dr. Blunt's simulation analysis is not best

22   described -- is best described as novice. He testified

1   that he downloaded publicly available code, and wrote

2   the instructions to execute the underlying algorithm.

3           Several times in response to questions about

4   his analysis, Dr. Blunt admitted that he was limited in

5   his ability to go under the hood of the code he was

6   using to program in parameters and would account for

7   certain redistricting criteria. Dr. Blunt conceded the

8   importance of including all the relevant redistricting

9   criteria variables into his simulations.

10          However, he testified that he was only able to

11  account for population equality, contiguity,

12  compactness, and minimization of parish splits.

13  Admittedly, his simulations were performed without

14  regard to minimizing precinct splits, without regard to

15  respecting communities of interest, without regard for

16  incumbency protection or even the criteria considered

17  paramount by defendants' core retention.

18          In short, the simulations ran by Dr. Blunt did

19  not incorporate the traditional redistricting

20  principles required by law. Accordingly, he his

21  opinions merit little weight.

22          REP. LYONS:  So, he said he had I think it was

1    10,000 he ran. Is that correct?

2              MR. EVANS:  Something like that.

3              REP. LYONS:  So, that was just based on

4    numbers. He was doing -- he's a number g he was doing.

5    He was a numbers guy and so I want to make sure because

6    I'm like -- we had a hard time drawing these maps so

7    how did somebody come up with 10,000 simulations was

8    kind of like beyond me.

9              But I wanted to make sure I get the value of

10   what that meant going to that piece. And thank you very

11   much for answering that and for clearing that up for

12   me. I really appreciate that. That's all the questions

13   I have, Mr. Chairman.

14             MR. CHAIRMAN:  Thank you, Representative

15   Lyons. All right. Gentlemen, we've had everybody who --

16   get an opportunity to ask you all questions. I'm going

17   to go to the cards. And what I'm going to ask the

18   committee is also let's get through the cards. I'm

19   going to ask the people that testify if you wouldn't

20   mind hanging around just in case the members have

21   questions for you after.

22             I think that would be the quickest way that we

1   can get through and everybody can get an opportunity to

2   speak. So, members, if you do have a question for these

3   people who come up, these citizens, I'd ask that you

4   just please hold off and -- and we can try to call them

5   up after. I'm going to start with the cards in support

6   who wish to speak. First up, I have Cynthia Young. I'll

7   also invite up Terry Landry, Jr., from the SPLC Action

8   Fund, and also Lady Carlson. I'll invite you three up

9   to the table if you'd like to come. Yes, ma'am,

10  whenever you're ready.

11          REP. YOUNG:  Okay. Good afternoon. My name is

12  Cynthia Young and I am the President and Founder of

13  Right for Victory. Right for Victory, we are a

14  nonprofit organization and we work to address voter

15  apathy and joblessness in communities of color. My work

16  focuses specifically in East and West Baton Rouge

17  Parish.

18          I'll be brief because I did give testimony at

19  the road show. I participated in a couple of the road

20  show meetings but I just want to -- I am in support of

21  House Bill 1 and I just don't want us to lose focus of

22  why we are here today. We are here today because the

1    judge ordered that we pass a bill that supports a map

2    that gives a second majority black district.

3              So, that's why we're here today. So, I'm in

4    support of that. I know I've been doing this work, we

5    do get out the vote work. I've been doing this work for

6    over 10 years, even before I started this organization

7    two years ago. And I know when I'm out there speaking

8    to the citizens, speaking to voters, I'm hearing the

9    same thing. I've been hearing the same thing for the

10   past 10 years since I've been doing this work that I do

11   not have a candidate that I want to vote for.

12             There is not a candidate that I would like to

13   vote for and that's why a lot of people that we are

14   talking to, they don't want to vote. It's not that, you

15   know, yes they say, "My vote don't matter; my vote

16   doesn't count." But the reason they're not voting based

17   on my experiences out here in the community talking to

18   these voters, talking to these residents, is because

19   there is not a candidate on the ballot that represents

20   what they stand, that represents their values, that

21   represents what's important to them.

22             So, you know, I will wrap it up. I'll be brief

1    because I know other people are here to give testimony,

2    but let's not lose sight why we are in this special

3    session. We are in this special session because the

4    judge ordered to pass a map that represents a majority

5    black district, a second majority black district. So,

6    that's all I have for today.

7              So, I just hope that we do what's right. And I

8    will end with one of my favorite quotes by Dr. Martin

9    Luther King, Jr. The time is always right to do what's

10   right. Thank you.

11             MR. CHAIRMAN:  Thank you. Mr. Landry?

12             REP. LANDRY:  Good afternoon, Chairman. Terry

13   Landry, Jr. on behalf of the Southern Poverty Law

14   Center Action Fund. I will also try to be brief but I

15   felt that it was important for me to speak here in

16   front of you all today. I understand the tough job that

17   you have, but this is really a simple matter. If you

18   believe that African Americans should have equal and

19   proportionate representation, you should absolutely

20   vote in favor of this bill.

21             If you believe that it's okay for African

22   Americans to be underrepresented on the congressional

1  level, then vote it down. And that's what it boils down

2  to. Like representative Newell mentioned earlier, today

3  is the first day in our state's history where we

4  celebrate Juneteenth. June 19, 1865 is when the last of

5  the enslaved people were told they were free.

6     And here we are on June 17, 2022 and African-

7  Americans are here still fighting for freedom and

8  equality. Even if Representative Thomas you say the

9  number is 30 percent, it's still underrepresented

10  because we only get 16 percent of representation in

11  Congress, which is unjust and unfair. And I disagree

12  with that number. I think the accurate number is 33.1

13  and we should have two minority districts.

14     Black people in this state love Louisiana just

15  as much as anyone else and sometimes we have to love it

16  just a little bit harder because it doesn't always love

17  us back. So today, I ask that you stand on the right

18  side of history. You all as lawmakers that you ask

19  citizens of this state to comply with laws and court

20  decisions every day.

21     We sit in these committees and we've

22  constantly heard that hey, the circuit has struck that

1   particular ruling down and we must comply with that

2   ruling, but yet we're arguing as to whether a judge --

3   judge's order whether or not this body has to comply

4   with it. So, if this body does not comply with rulings

5   and laws made by -- by the judicial branch, why should

6   the other citizens abide and comply with laws that you

7   all make?

8           So, in conclusion again, I ask for your

9   favorable support of this -- of this legislation and

10  have HB1 reported favorably.

11          MR. CHAIRMAN:  Thank you, sir. Ms. Carlson?

12          REP. CARLSON:  My name is Lady Carlson and I

13  grew up with my grandmother, who taught me that your

14  vote is your voice. And she also said, and this was in

15  the 50s and the 60s, she also said that if blacks don't

16  get a vote -- the vote, that we'll never have a voice.

17  It seems to me that this legislature is intent on

18  continuing the tradition of disallowing a large number

19  of residents the right to vote for the candidate of

20  their choice.

21          We've heard over and over and over again about

22  how much we must comply with the Constitution. And that

1  we're here -- I'm here to say that if you respect the

2  Constitution, then the right thing to do is to create a

3  second black district. Your vote is your voice. There

4  was a man named James Brown, who had a song one time

5  and he said, "We as blacks are not asking you to give

6  us a hand up. We're asking you to open the door and

7  we'll do for ourselves."

8          I'm here to say support this bill because it

9  is the right thing to do. We want our voices heard just

10 as much as any other group wants their voice heard. We

11 can say that given the numbers, I don't know what, but

12 if you want to follow the Constitution, then this bill

13 should be voted out -- out of here and it should pass.

14         I thank you for your time.

15         MR. CHAIRMAN:  Thank you, Ms. Carlson. Thank

16 you to all three of you. Next up, we'll invite

17 Representative Tammy Phelps. If Representative Phelps.

18 Ms. Michiko Yancey and also Devante Lewis, all three of

19 you, I'll invite you up.

20         REP. PHELPS:  Thank you, Mr. Chairman. I'll be

21 brief. I was just a disturbed by the testimony of how

22 the bill began hearing -- I think I came back to this

1   session just looking for us to complete a map and then

2   today's committee hearing just to hear the -- the map

3   itself. And most of the questions started off with what

4   was the reason for this precinct? What was the

5   motivation for this and why all of this?

6           And it took me back to we're here, obviously

7   for a court order of a passage of a map that was not in

8   compliance, and all the things were stated earlier, the

9   motivation, none of those things were presented to us

10  when we only had one map. Initially when we came for

11  the original redistricting session, I communicated with

12  my constituents and I'm agreeing with you every time,

13  Mr. Chairman that I have a voice to go back and talk to

14  my constituents about.

15          And the questions that I ask in all of my

16  committees is that I am accurate enough to go back and

17  give that information and also validate my vote. But we

18  were not given an explanation of why there was only one

19  map that made it out of this committee time and time

20  again in the first session.

21          Not one time were we given -- we talked about

22  who was demographer. All of the questions that were

1    asked today about this particular map, we're not -- we

2    were not given the opportunity or answers for that

3    during the last session and that leads to me -- me to

4    believe that's why we're here today with a map that's

5    not in compliance.

6           We do change the rules a lot and I guess with

7    all that being said, I'm asking that we not change the

8    rules and it should not matter just because we're

9    trying to what it appears now and I would like to go

10   back to your comments, Representative Carter, it

11   appears that this is not the map that the committee

12   wants.

13          We want -- it appears that this legislative

14   body wants the courts to order it, and that's fine. But

15   let's be respectful to the intent of those who did put

16   in the effort to bring a map again and all the ones

17   that were voted down previously. All of the questions

18   that were asked of communities of interest and why this

19   and this splits in my parish and my district.

20          You all didn't say this. This was not said.

21   Let me clarify and clear this up. It was not stated

22   when these maps were brought forth before when they

1   were all voted down. So, we had ample time to vet all

2   of the maps that were presented. But I was not able to

3   go back home or prepare my constituents to say, "Hey,

4   we have an opportunity to vote on the speaker's map."

5          Because when I came in over those years and

6   over the year that we were preparing, yes, we had

7   meetings with the committee. There wasn't a lot of

8   questions because there was one direction that was

9   given. We had to come and see a map of our district.

10  The entire map of the state was not presented to us

11  until the day before when the session began and when it

12  was filed.

13         So, someone else other than the Speaker's

14  bill, there were a lot of bills put forth and

15  opportunities were given that were did not even make it

16  out of this committee. So, when we talk about those

17  things, we could have vetted all of this what we're

18  doing today on those other maps that were presented.

19         The motivation -- what jumps off the page, I

20  just wasn't ready to hear that -- just a part of the --

21  of this body, and the people that we all represent.

22  Because at the end of the day, I don't really harp on

1    that is what I vote my district. I keep my district in

2    mind when I make votes for the state of Louisiana,

3    because we're not an isolated district and all of us

4    have similarities and interest, populations of --

5    communities of interest in some way or the other,

6    because we are all humans.

7            We're all Louisianans. We didn't choose

8    whether -- what color we are. We don't choose the color

9    of our blood. I think it's all the same, but when will

10   this body just begin to see, well I can't say fairness,

11   because [inaudible] that only comes once a year.

12   Equality or may be equitable. We don't even meet the

13   criteria of equity.

14           Equality, we're still working on it, but I

15   guess I'm urging this body to do what's right and all

16   the people, thank you. Someone mentioned, I don't think

17   it was Rep. Lyons about there was no advocate bodies

18   from out of the state, and I was taking offense to that

19   too with the comments from Rep Thomas.

20           Because a lot of those young people were from

21   the area that I do represent across the north and the

22   south, the east and the west, where those organizations

1   share the love of Louisiana and they're all conjoined

2   together. That's why they were able to share that same

3   message in their community and people showed up from

4   each community.

5           So, I took offense to someone being paid from

6   out of state to come and talk about maps for -- for

7   Louisiana because we're better than that. But thank you

8   for your time, and again, I just hope again, if we're

9   not here to vote on the map, let's just say that. Let's

10  not continue to waste our time and it may not be in

11  your interest of the -- the map that you want. But

12  let's just be honest.

13          And if we have to continue to talk about the

14  color of our skin, and race, thank you, Representative

15  Duplessis for mentioning that, it seems for some

16  reason, it's an uncomfortable situation. I don't know

17  if it should be at this point but it is.

18          And maybe that's where they mean when we have

19  more conversations and understanding what's important

20  to the Representative House District 3 and I'm going to

21  use Rep. Furman for an example. And I learned what's

22  most important in his district and then maybe we can

1  all see how that would be better for the advancement

2  for the state of Louisiana. Thank you.

3       MR. CHAIRMAN:  Thank you, Representative

4  Phelps. Mr. Yancey?

5       REP. YANCEY:  Yeah. Well good afternoon

6  everyone. This is a real honor to be here and, you

7  know, to have this conversation but one thing that I've

8  listened to and understood that everybody is not

9  comfortable with making a change. Going to the road

10 shows, I went to them.

11      I didn't go to all of them, but I tuned in

12 and, you know, even with Iberia Parish, when the guys

13 was there talking about they like it has been 57 years

14 that we've been at it this way. And I like it this way.

15 Fifty-seven years, you don't want to change to allow

16 other folks have a piece of the pie? Is that what

17 you're saying?

18      You know, I'm a former incarcerated person and

19 I got my voting rights back now. And guess what? I go -

20 - I go to the polls and I make sure that I vote. But,

21 you know, really this is really civics that we took an

22 eighth grade now. We understand how the governing body

1    and how everything goes, but we've just come out of

2    legislative session that you made new laws.

3            And I have to follow those laws; you have to

4    follow those laws. And you go, if you break a law, you

5    go before who? A judge. So, now we got a judge telling

6    Louisiana what you're doing is not right. And my God as

7    -- as red-blooded Americans, you're not going to agree

8    with the judge and when I listened at Representative

9    Thomas about all this and numbers and everything. The

10   judge said do it and that's what's got to be done.

11           I know you don't like it. All the stuff that

12   goes on, I don't like it. But at some point, we have to

13   understand that we live in a democracy that when the

14   federal judge tells the states what to do, then that's

15   what you do. And it was, you know, when -- I found it

16   kind of funny when I read the statement from Judge

17   Shelly Dick when she said if you don't do it, I'll do

18   it myself. How did we get ourselves into that?

19           Are we really that divided? Are we really that

20   divided with black and white? And the answer is yes, we

21   are, because everybody wants to keep their little part

22   of the pie nobody else gets a pie, gets a slice of the

1   pie. You know, we understand what packing and cracking

2   and all these things with the road show.

3          So, now the Fed said that in fact, the

4   legislative tried to do this from the very beginning to

5   give a two minority district and everybody rejected it.

6   Now, the federal judge said by God, you're going to do

7   it or either I'll do it. And then I read yesterday late

8   on an email or something came out that, you know, maybe

9   we should just wait and let it go to the United States

10  Supreme Court.

11         You would rather fight than give us a piece of

12  the pie. You're going to keep all the chicken on your

13  plate. You just give us the gravy. I am saying today

14  you need to stand up, do what's right, make sure you

15  follow the law. What did the federal judge say? The

16  federal judge said do it, it's not fair and we already

17  knew it wasn't fair from the beginning. Thank God that

18  the judge said that.

19         I respect everybody on this -- on this

20  committee. I don't know everyone here but I'm down here

21  during the session every day, because I want to be a

22  part of the community to learn and I've seen several

1    you Representatives in different committees that you

2    vote against stuff that may affect people like me or

3    people that we're trying to help and get back into

4    society.

5          But this time, you have an opportunity to be

6    counted and stand on the right side of history. Where

7    will you stand on the side of history after this? You

8    just remember, the history books will be written in

9    your name will either be on the left or it will be on

10   the right. And sometimes when you do these things in

11   the Bible it says, you workers of iniquity.

12         So, thank you for allowing me to speak and I

13   pray that you do the right thing. Don't let it be

14   about, you know, this other stuff. Do the right thing

15   in America. Thank you.

16         MR. CHAIRMAN:  Thank you, Mr. Yancey.

17         REP. DUPLESSIS:  Devante Lewis?

18         REP. LEWIS:  Thank you, Mr. Vice Chair,

19   Devante Lewis, Louisiana Budget Project. And -- and I'm

20   not going to belabor the point because I think we know

21   the vote. We know why we are here. This weekend, or

22   this week, excuse me, the beginning of the week, I

1   spent a lot of time in Memphis.

2           And I was at the Civil Rights Museum just

3   about two days ago and just as you were entering the

4   floor, I was walking through an exhibit and I got right

5   in front of a picture and it was Bull Connor who said,

6   "Damn the law. We make our own law down here."

7           And that's exactly what I saw in my ear -- in

8   my headphones when you gaveled it on the House floor,

9   basically saying we're not going to comply. We make our

10  own law in Louisiana. And what we are here to do today

11  is simply do what is fair and just and right.

12          Representative Johnson, I heard you talk a lot

13  about what offended you in Rapides Parish and I'm going

14  to tell you a story about what has offended me in my

15  life. As I've studied and done everything right as

16  everyone's told and got an education, I've realized

17  there's not a single right as a black person I have

18  that a court didn't have to give to me. A court had to

19  free me from being a slave.

20          A court had to free me and said, "Oh, you can

21  be separate but equal," and then had to undo that. A

22  court had to grant fair housing. A court had to

1   desegregate schools. And now a court is having to say

2   you should be seen in redistricting because you are

3   one-third of the population and you should be

4   represented correctly.

5          That's why we are upset, because nothing has

6   been equal for us. Nothing has ever been right for us.

7   It's always been we're resisted until the court tells

8   me I've got to give it to you. I'll hold on to it as

9   long as I got because I don't have to give it to you

10  until somebody else says it.

11         That is the challenge we are faced with. When

12  we think about this veto override, this Governor's been

13  governor seven and a half years. A lot of bills, he's

14  vetoed, a lot of bills most of this body didn't like

15  that he vetoed. But there's only been one -- one that

16  was overturned. And that was one that specifically had

17  to deal with race because that's what the Governor said

18  when he vetoed this bill.

19         We found the votes to override the Governor,

20  not on trans issues, not on gun rights, not on

21  budgetary policy, but on giving black people in

22  Louisiana a fair and just representation. That's when

1    we decided to stand up to the Governor and being an

2    equal branch of government as it was said on the House

3    floor.

4            And then after you did it, you cheered, you

5    clapped, you laughed, you high-fived each other. I sat

6    right there and I thought about that 139 year history I

7    told you a few months ago. I thought about my great,

8    great grandmother, who was a slave and got freed. I

9    thought about my -- my great-grandmother who grew up

10   under Jim Crow, my grandmother grew up in segregated

11   Lake Charles, went to First Ward Colored School.

12           I thought about my mom who I said was five

13   years old before Calcasieu Parish desegregated itself.

14   And in those cheers, I saw the same things, the same

15   things they talked about. This is what we're here for

16   and we can be very clear about it.

17           We don't have to do the same violence of the

18   sixties to still be doing it. Coretta Scott King said

19   something very empowering that we need to talk about

20   policy violence and how we use policy as violence.

21           You may not have to sic a dog on me or spray

22   me with the water hose or have the -- the National

1    Guard with a Confederate flag on their -- on their

2    helmet beat me, because you can do it through policy.

3    You can do it through policy. And it doesn't take a

4    white sheet because it can be a white tie, a blue tie,

5    a red tie.

6           And so we have a choice today. I saw the

7    Speaker tweet about vote your conscience and if your

8    conscience doesn't allow you to see everyone equally

9    and -- and deserve fair representation, then that's

10   your conscience. But if you believe in the tenets that

11   we talk about, about we are brothers and sisters, we're

12   all children under God, then your conscience should

13   call you to do what is right and what is fair and what

14   is just.

15          And that is just to see us -- just to see us.

16   That's what we're asking for. We're not telling you go

17   pick a candidate. We're saying see us and value us the

18   same way that you value every other community of

19   interest, every other item. And so with that Mr. Vice

20   Chair, that is why I support HB1 and that's what I'm

21   calling on you to do.

22          Don't make the courts do it. Finally say to

1    Black Louisianans, we will as a body value you because

2    we want to, not because a court demanded us to. Thank

3    you.

4            REP. DUPLESSIS:  Thank you, Mr. Lewis. Thank

5    you. I have one more card. I have several more cards in

6    favor but only one that's present and would like to

7    speak. Edgar Cage, Together Louisiana.

8            REP. CAGE:  Good afternoon, Vice Chair and

9    Committee. My name is Edgar Cage and I'm with Together

10   Louisiana. You know, as Yogi Bara said, it's deja vu

11   all over again. We've been through this; we've heard

12   everything, and it's kind of obvious to some of us in

13   the public after being a part of this process during

14   the special redistricting session, the road shows, the

15   court hearings, and now.

16           It's very obvious how this thing is going to

17   go. And as the speakers before me have so eloquently

18   said, we need to change. This is not the right thing.

19   We've heard from the census; we heard from the road

20   shows; we heard from the redistricting session and now

21   we hear from a federal judge what we have to do.

22           But, you know, in this process today as it

1   started, we always want to ask for [inaudible] to find

2   a reason not to do something as opposed to doing

3   something. We asked earlier -- the committee asked

4   earlier why can you -- how can you prove what

5   information you have to justify that the second

6   district that those people of -- black people will have

7   the opportunity to elect a candidate of their choice?

8           We want to produce the racial polarizing

9   voting analysis. You know, and I can tell you this:  If

10  it had been produced, you would not have accepted it

11  because it wouldn't say what you want it to say. You've

12  already come to a conclusion, which is wrong. But if

13  you want to -- to be that, then that's fine.

14          And we never asked for this under any other

15  bill or any other situation. Only those ones that we

16  could not -- we didn't want to support. And also, you

17  want to talk about communities of interest. How can you

18  go back to your districts and say why you -- you voted

19  for a certain -- a certain map that maybe split a town,

20  a community or whatever your community of interest is.

21          But the thing that -- I think the biggest

22  question to ask is, how can you go back to your

1    district and say, you defied a federal judge in

2    ordering you to do something -- to do something? And,

3    you know, as Mr. Lewis said earlier about Bull Connor,

4    it reminds me of the desegregation of University of

5    Alabama where George Wallace stood in the door and

6    said, "Segregation today, segregation tomorrow,

7    segregation forever."

8            But the U.S. Attorney General came and he

9    said, "Well, Mr. Wallace, Governor Wallace, we will

10   integrate the University of Alabama today," and that

11   did happen. So, my point because it was a federal court

12   order that did this, my point is, we're in the same

13   position. We are in the same position, and I know many

14   of you don't want to go back to your districts and say

15   and have a record to show why you voted for a second

16   minority majority district.

17           But, you know something ladies and gentlemen,

18   if you do nothing, which sounds like what you're going

19   to do, not get it out, it's going to be on your record

20   anyway, because a judge has done the work that you

21   should have done before. And as Representative Phelps

22   said, it's almost a waste of time. I mean, we went

1    through the redistricting, nothing happened.

2            We're here now this week and Representative

3    Thomas, I'm organization Together Louisiana --

4    Louisiana. Not Texas, not Arkansas, not New York.

5    Louisiana. And I will be -- I'll tell you guys my age,

6    I will be 73 years old in October. I live here. My

7    license has always been here.

8            My roots have been here, but I'm here fighting

9    for the people in my community who don't have a voice,

10   who haven't had a voice and who don't have proper

11   representation. And I don't know what your position is

12   on Jim Crow but this is a Jim Crow type bill we're

13   discussing. We don't approve and move favorable on HB1,

14   and get that before the judge, then I know how you

15   would have voted 50 years ago on Jim Crow.

16           And it doesn't take a hood, it doesn't take a

17   cap to see where your -- it's going to take your vote

18   today. So, ladies and gentlemen, I hope that your heart

19   is touched by the pleas and the begging of a

20   substantial portion of the people of Louisiana, the 33

21   percent -- 33 percent of the people who need some field

22   representation, who have been left out in the past that

1    -- take a moment and pray and let God come in.

2              Let your Creator come in and I think if you

3    clear all the clutter out that may be there, God will

4    speak to you. God will touch your heart. And God don't

5    care if you're a D, an R, an I, a Q or whatever else.

6    You're a human being and we're all here -- we're all

7    here as human beings, as one -- one race, the human

8    race.

9              But we have to treat each other equally and

10   because we haven't, that's why a federal judge has to

11   step in and make sure this happens like everything else

12   has happened in this state, not necessarily out the

13   goodness of people's heart but because the federal

14   government has protected and know that everyone should

15   have representation and everyone should be treated as a

16   full citizen, not only in this country but in this

17   state. So, thank you.

18             REP. DUPLESSIS:  Thank you, Mr. Cage. I'll

19   look to Chair -- if you wouldn't mind -- and I'm going

20   to say this because before I got in the Chair, Mr.

21   Cage, the Chair had asked that we try to limit

22   questions but Rep. Ivey, if you have a quick question,

1    a very quick question for Mr. Cage.

2             REP. IVEY:  Thank you, Mr. Vice Chair. I've

3    asked zero questions so far and -- and this is -- this

4    is going to be a brief-ish statement. First of all, I

5    understand your -- your passions and the motivations

6    behind those passions and -- and can appreciate them. I

7    got married kind of young and I'm a very literal logic

8    kind of driven individual.

9             My wife was more on the other end of the

10   spectrum on the emotional end and it took me quite a

11   while, about five years before I understood that a lot

12   of our disagreements and issues came because I was

13   offended by the actual literal words that she used. And

14   I didn't look at the spirit of what she was trying to

15   communicate.

16            And I believe that some of your comments,

17   where I understand the spirit of what you were trying

18   to communicate, some of the language that you used to

19   communicate it, can -- can be offensive. And so I want

20   to just take a pause. You know, this is obviously a

21   very sensitive subject matter and I recognize that some

22   of my colleagues, this will have the absolute opposite

1    intent.

2          And so this is one of those things that I

3    learned about communication. It's really important. And

4    so I'm trying to appreciate testimony and all that from

5    the perspective of the spirit of what people try to

6    say, extending to them some grace. And that the -- the

7    nature of this situation, the kind of the pressure of

8    this specific environment.

9          And so just wanted to clear that for your

10   benefit, if you -- if you acknowledge because how

11   members vote on any bill, right, it's impossible to

12   judge. And look, and I know my colleagues have voted

13   against my bill so many times but I can't impugn any

14   specific intent because many of these issues are so

15   complicated and multifaceted. And so, I would not

16   impugn that this specific vote on this specific bill,

17   you also failed to acknowledge that there are other

18   bills. I'm not going to be offended by that. That also

19   could work.

20          REP. CAGE:  [inaudible] called on your bill

21   too, sir.

22          REP. IVEY:  Okay. And so, but you said if we

1    don't pass this bill, that's what you said, it means

2    this. And so I'd like to give you the opportunity to

3    maybe provide some clarification on that.

4              REP. CAGE:  Yeah. And I appreciate that. And

5    my intent is never to offend anybody. But my intent

6    also is a speak from my heart -- to speak -- to speak

7    how I feel.

8              REP. IVEY:  That gets me in trouble sometimes

9    too, sir.

10             REP. CAGE:  Thank God there's other testimony

11   today I'm assuming that's from the heart. Another

12   question but it's not to offend. But, you know, we have

13   to, as I said, we have to call it as it is and as I see

14   it. And I'm not saying that you should, whether you

15   vote on something or not, that's -- that's your

16   prerogative.

17             And that's between as I said, you and your

18   constituents, or either -- either your Maker or your

19   God. That's on you and your heart because you'll be the

20   one as been said earlier, who history will judge on how

21   you vote. And your Creator will judge on what's in your

22   heart and why you voted that way.

1        But I'm -- I'll apologize if anything I said

2    offended anyone. That wasn't my intent. But if it

3    agitated you a little bit and made you want to think a

4    little bit, then, you know, so be it.

5        REP. IVEY:  All right. Thank you.

6        MR. CHAIRMAN:  Thank you, Representative Ivey.

7    Thank you, sir. Also filling out a green card and

8    willing to provide information if needed, Ashley

9    Shelton from the Power Coalition, Trivia Carey, Shondra

10   Shae Foster, Michelle Charles, green card in support

11   not wishing to speak. Scott Tippet, Claire Stevenson

12   from the Governor's Office, and Adam Eichmann from the

13   Governor's Office.

14       Next, I'm going to go to the white cards for

15   information. I'm assuming these were filled out because

16   they're -- they're neutral, but Rick Allen from the

17   City of Leesville. Mr. Allen? Yes, sir. Whenever you're

18   ready.

19       REP. ALLEN:  Thank you, Mr. Chair and -- and

20   members. I am the mayor of the City of Leesville and

21   also, chairman of Fort Polk Progress. I serve on the

22   Governor's Military Advisory Board and District D Vice

1   President of the LMA. What all of that means is I'm

2   really good at getting jobs that don't pay nothing.

3           I thank you for providing me with an

4   opportunity to address you today regarding Vernon

5   Parish as a community of interest. During this --

6   during this time, I've been -- I've been educated I'm

7   going to say, and as chairman of Fort Polk Progress, a

8   nonprofit organization that's solely dedicated on the

9   healthy, robust relationship between the community and

10  the largest army base inside of Louisiana and that

11  relationship that we have between Fort Polk and the

12  community and our congressional delegation is crucial

13  to military funding across the state.

14          Our Army community children go to school and

15  the current map would be split, Fort Polk from

16  Leesville and my City of Leesville would actually be

17  divided as well. I'm not here to be in support of any

18  bill or any map. I just want to make sure that we

19  understand what splitting Vernon Parish and -- and

20  splitting Fort Polk from Leesville would do to our

21  community.

22          So, the kids that currently live on Fort Polk

1  would go to school in a different congressional

2  district. The City of -- well, Vernon Parish sold an

3  additional 47,000 acres to the federal government,

4  which means that the federal government owns over 50

5  percent of our Parish.

6          In order for us to be able to do that, when we

7  lost that tax revenue, the federal government agreed to

8  furnish impact aid to help us educate -- help our

9  education system educate the military students and all

10  the other students in our Parish. So, having Fort Polk

11  in one congressional district, and our --and our kids

12  attend school in another congressional district could

13  be problematic for Vernon Parish and our military kids.

14          It's very well known that -- that Fort Polk is

15  the largest economic generator in Vernon Parish and

16  also the largest employer in the state of Louisiana,

17  second to only the state. The recent impact -- economic

18  impact study showed that $1.4 billion dollars is

19  inserted into Louisiana's economy from Fort Polk alone,

20  over $9.6 billion dollars in military federal funding

21  into Louisiana's economy, as a total.

22          It includes all the bases across Louisiana. As

1   you know, there's current talk of a BRAC, which is a

2   base realignment and closure and the federal government

3   is talking about that. And one of the ways that we're

4   scored is -- is by community relationship to our bases

5   across the state. Forty percent of the people that are

6   stationed at Fort Polk live off-base; they live in our

7   community.

8           And so they would work in one congressional

9   district and live in another. We, the Parish -- Vernon

10  Parish, has the largest intergovernmental services

11  agreement with Fort Polk in the world. The City of

12  Leesville holds the largest intergovernmental service

13  agreement in the world, saving the military operations

14  over $100 million dollars over a five-year period and

15  we're very proud of that.

16          And that has to do with the relationship that

17  we built with our military partners. And we were able

18  to accomplishment that thanks to our congressional

19  delegation. I do not envy any of you sitting on this

20  panel that has to make this decision but I -- but I'll

21  pledge this to you. I will pray for you. I will pray

22  that you have peace about the decision you end up

1    making, and with that Mr. Chairman, I yield.

2            MR. CHAIRMAN:  I appreciate it. Thank you.

3    Next up, we're going to -- I'm going to invite Mr.

4    Frankie Hyres.

5            Whenever you're ready, Mr. Hyers.

6            MR. HYERS:  Good afternoon. Frankie Hyers from

7    Jefferson Parish. I think this is the eighth trip for

8    redistricting from as far as Jefferson Parish to Lake

9    Charles; right? Covington. Been here a few times now

10   for you all.

11           MR. CHAIRMAN:  Mr. Hyers, if you could pull

12   the mike a little bit closer, just -- we won't be able

13   to hear you.

14           MR. HYERS:  Contrary to what Mr. Duplessis had

15   to say at the last meeting, I was not afforded the time

16   to come here. Nobody afforded me that. I paid to come

17   here and I pay to go to every meeting. It cost me

18   dearly, and at 4-something dollars a gallon, it cost me

19   a bit to get here.

20           I was sure that nothing would come of all

21   those meetings other than to see a supermajority

22   protect and -- and ensure and secure and, if anything,

1    promote his majority further. So I am not surprised to

2    find us here in a special session.

3           Adherence to the spirit and intent of our

4    Constitution was so important to our Founding Fathers

5    that one of the first acts of the first Congress in

6    1789 was to pass the verbiage for the Oath of

7    Affirmation of Office in compliance with Article Six of

8    our Constitution.

9           Everyone here swore that oath; right? But if

10   you don't comprehend the document, it gets a little

11   perfunctory; doesn't it? Representatives and direct

12   taxes shall be apportioned among the several states,

13   according to their respective numbers.

14          At the time of our first enumeration, Virginia

15   was the largest state with 630,000 people followed by

16   Massachusetts at 475,000 and Pennsylvania at 432,000.

17   Baton Rouge and Jefferson Parish both exceed the

18   latter.

19          We'd be the lar- -- second and third largest

20   states. Orleans Parish would be the fourth or fifth

21   largest state of the union, certainly to be afforded

22   the republican form guaranteed under Article Four that

1    each of you swore to support and defend.

2            But if you don't comprehend the document or

3    what republican form means, you might just, you know,

4    pay it lip service. So why are we here? It's history;

5    right? That's what Mr. Duplessis said. It's the history

6    of this nation that brought us here today.

7            We abandoned some principles at the first

8    enumeration. Jefferson began with explaining what that

9    bill -- what the -- what the Constitution says. The

10   construct would reduce the distribution of power so

11   that none of us could argue about how it got done.

12           Because if we could argue about how we're

13   going to do this, one of us is going to feel like they

14   got the worst of it, and we don't have domestic

15   tranquility. It's been 180 years next Saturday. June

16   25th, 1842, John Tyler signs, promotes an Apportionment

17   Act that betrays the Constitution.

18           That act did away with that large voting and

19   made it so that we have to have contiguous districts.

20   And it's only because of that that we -- we're here

21   right now. On every question of its construction, let's

22   bring ourselves back to when -- and adopt the spirit in

1    which it was manifested; all right?

2          In questions of power then let no more be

3    heard about a confidence of man or woman but bind them

4    down from mischief by the chains of the Constitution.

5    But if you don't comprehend what those words say or

6    mean, then you just wave to your friends.

7          What are the chains of Constitution? Right?

8    Everybody up here -- nobody -- Mr. Vernon Parish,

9    nobody wants to see their parish split up. Jefferson

10   Parish has 11 representatives. Only seven of them serve

11   Jefferson Parish exclusively. There's no reason why the

12   largest of parishes should ever suffer to virtual

13   representation.

14          The bill for apportioning, without explaining

15   any principle at all which would show it's confirming

16   to the Constitution, thereby forcing Mr. Jefferson to

17   experiment to find any principle by which it could have

18   been formed.

19          They allowed for two ratios to be applied.

20   Oregon gets a ratio of 706,000 people per

21   representative. Jefferson Parish's budget? 770 million.

22   Check your numbers. Numbers matter, some of this

1    matters, but the principles matter more than who. All

2    of you are term limited. This is your chance.

3         Establish some principles for representation;

4    right? Establish some guide for future apportionment.

5    That's what was done at the first enumeration. At that

6    first enumeration, the law that ended up being passed -

7    - forgive me one second -- reads as such.

8         House of Representatives shall be composed of

9    members elected agreeably to a ratio of one member for

10   every 33,000 persons in each state computed according

11   to the rule prescribed by the Constitution.

12        Translated to the parish, that would have

13   meant that if we want to determine that we're going to

14   have 51 members -- that's putting the cart before the

15   horse, by the way -- then each parish would have one.

16   None would have more than one until they reach a

17   certain ratio and that would have been around 90,000.

18        Terrebonne would have be- -- would have been

19   with one representative. We wouldn't have had a second

20   representative until Ouachita. Ouachita? I don't -- I'm

21   sorry if I -- Ouachita. I'm sorry. Forgive -- forgive

22   me for -- for messing that one up.

1          The interesting thing about Ouachita in North

2    Louisiana, you don't have the population to support two

3    representatives. You just don't. Look. Black people

4    aren't the minority of -- of Louisiana. That's your

5    census report. 15 -- 15 parishes gained population. 15

6    parishes make up three million citizens of Louisiana.

7    15 parishes.

8          The top three parishes are bigger than those

9    first few states that formed this union. There's no

10   reason why those first six parishes shouldn't be the

11   home of those resident -- of those representatives.

12         Now, when you look at this map and you looked

13   at every -- the -- the last 45 parishes are all losing

14   population. You're getting evacuated. That's the

15   minority. Rural Louisiana is the minority. Black people

16   aren't the minority.

17         But Bla- -- if Black people live in every

18   parish, how are they not going to end up being

19   disenfranchised? And we could play the games between 31

20   and 33. It doesn't matter. You got no principles upon

21   which to guide for this so you end up, as Jefferson put

22   it, in a scramble, a vendue.

1              It re- -- it reduces us to a -- a -- a -- a

2     concoction. It reduces us to hot blood and a complete,

3     utter loss of the thing if we're not careful. 180 years

4     ago next Saturday, this got put in motion. What you're

5     facing today is a pendulum that's been going back from

6     secession to abolition, Jim Crow, Reconstruction.

7              We had the Robert Barons, we had suffrage,

8     prohibition, its repeal. In the span of 1913 to 1922,

9     we passed five amendments. You think you're doing

10    something special? This is going to the court because

11    you all can't figure it out. You got to establish some

12    principles.

13             There's no principles applied. How is it that

14    Oregon gets one representative for every 706,000 but

15    we've got to suffer to 776,000? Does anybody have any

16    idea how many ratios are applied through the method of

17    equal proportions? Anybody care?

18             Remember that Constitution you swore to uphold

19    and defend? It would have provided that we wouldn't be

20    doing this right now. We could all be somewhere else

21    having a beer. Lunch. Doing anything.

22             So what are we going to do about it? How has

1  to begin to matter more to you all than who. Maybe it's

2  them where who -- how has to matter more than who.

3  You're just a reflection of our neglect and

4  opportunism.

5          So the north and the west of Louisiana, you

6  know, I just was at the parish council meeting. Seems

7  that north and west Louisiana, they have two districts

8  for the Public Service Commission, came up in one of

9  our meetings, Public Service Commission maps.

10          North and -- and west Louisiana, you own the

11  Public Service Commission. You only share one parish

12  that's split between the two of you. Meanwhile

13  Districts 2 -- 1, 2 and 3, you want to talk about a

14  concocted map, I've got two Public Service

15  Commissioners serving both Orleans and Jefferson

16  Parish.

17          So I'm pretty sure District 2, where Baton

18  Rouge lies, you get to make all the decisions when it

19  comes to my energy bill. I don't think Jefferson Parish

20  or Orleans got a shot. Secure the blessings of liberty

21  to ourselves and to our posterity.

22          Anybody want to take a stab at liberty, what

1    it means in that context? It ain't freedom. It ain't

2    begging and pleading for rights or what's fair or

3    equitable. Bind them down from mischief by the chains

4    of a constitution.

5            A lot of mischief and I don't fault anybody

6    for engaging in as much mischief as you can get away

7    with. I don't fault sharks for being sharks. North

8    Louisiana, hold onto that grip of that power as long as

9    you possibly can. But when it comes crashing down, my

10   God, will that weight punish you.

11           You could reestablish some principles simply.

12   Base two of the representatives out of Orleans and --

13   and east Baton Rouge and you've got your two minority

14   districts; don't you? I mean, don't you? What's a

15   minority? What's a minority; right?

16           It's not about minorities. It's about Black,

17   or is it about party? Because I'm pretty sure both your

18   parties are losing. I'm getting ready to run for no

19   party and I think I'll win against any of y'all.

20           The parties are being evacuated. So it's not

21   about party. We don't care about party. What we care

22   about is principles and we lack for it at every level

1    of government because we're too busy trying to keep

2    track of y'all. If I wanted to figure out -- if I want

3    to be an educated voter and pay attention to these

4    maps, I've got to figure out how you drew these maps.

5           Then I've got to figure out who's running for

6    president, who's running for Senate, both Senates. I've

7    got a House of Representatives, I've got a governor,

8    I've got a state Senator, I've got a state Rep, I've

9    got state councilpersons, mayor.

10          What's [inaudible] I don't -- I ran out of

11   fingers. How am I supposed to be an engaged, informed

12   voter and do this responsibly when you tax me out of

13   the -- the -- the possibility of it? You present no

14   principles. You argue like sixth graders.

15          It's like going into hi- -- elementary school

16   coming into these meetings. Bunch of sixth graders.

17   Let's elevate the discourse. What do you say; huh?

18   Anybody want to talk about the principles of

19   apportionment, what it means to actually have a

20   principled representative body. Anyone?

21          I thank you for your time. I don't hold much

22   hope. I'm pretty sure this is going to a court. And

1   that was an arbitrarily appointed court. Even the

2   Supreme Court we settled for today, arbitrarily

3   appointed by a House, arbitrarily seated. How has got

4   to matter more than who.

5           MR. CHAIRMAN:  Thank you, Mr. Hyers. Next,

6   members, we're going to go to the red cards in

7   opposition wishing to speak. Jennifer Carrigan?

8           MS. CARRIGAN:  I'll waive.

9           MR. CHAIRMAN:  She waives. Okay. Patrick

10  Miller? Mr. Miller? I'll also invite up, if

11  Representative Emerson is in the anteroom, she's next,

12  and then Representative Mark Wright, you're after her.

13  You can -- so you can wait until Representative Emerson

14  comes up. Yes, sir.

15          MR. MILLER:  I want to thank the committee for

16  meeting today and the opportunity to speak. In May, I

17  just graduated from Louisiana Tech University. I got my

18  Bachelors of Science in Economics and I am now

19  attending Louisiana State University studying to get my

20  MBA.

21          I originally am from Franklinton which is in

22  the Fifth Congressional District as it is now and I

1    went to high school in Mandeville, Louisiana and I have

2    lived in Louisiana my entire life. When I was in North

3    Louisiana, it's a completely different culture. It's a

4    completely different set of people and area what --

5    what I was used to in Mandeville.

6             And I came to really enjoy North Louisiana. I

7    came to really enjoy Ruston and I came to really

8    realize the people of North Louisiana and how special

9    they are and how we don't advocate for them as much as

10   we should.

11            Many of the proposed maps would make Baton

12   Rouge the population center of a new district. That

13   would shift away from our current configuration and

14   most likely divide representation for Monroe and

15   Alexandria.

16            In fact, under the maps proposed, the Fifth

17   District would have more residents from East Baton

18   Rouge Parish than Ouachita and Rapides Parishes

19   combined. This is not only the place where the numbers

20   actually shift from north to south under their maps.

21   The Fifth District would have more residents in

22   Lafayette Parish than Rapides.

1        The voting population from Lafayette Parish

2   would nearly be equal to the one in Ouachita as well.

3   This is a shift away from the voices and constituents

4   in North Louisiana and Monroe and West Monroe and

5   Lincoln Parish and parishes surrounding the Mississippi

6   Delta to Southern Louisiana.

7        The maps proposed would divide the seats of

8   Monroe, Alexandria, Lafayette, Baton Rouge and New

9   Orleans. The only major population center in our state

10  that the maps don't split up are Shreveport, Bossier

11  and Lake Charles.

12       But it's not just major cities that this map

13  would split up. The map also splits up Slidell from

14  Covington, Pineville from Alexandria, Ville Platte from

15  Mamou, Breaux Bridge from Saint Martinville, New Iberia

16  from Delcambre, and Zachary from Central as well.

17       This is very important because as one state

18  and as the future, you know, I -- I plan to live my

19  entire life in Louisiana. I've, you know, studied in

20  Louisiana my entire life and I -- I'm making a

21  sacrifice in my career, most likely, to stay in this

22  state because I love my home and I love the people who

1  call Louisiana home.

2        And I think that it's extremely important that

3  we understand that everyone in this state needs a voice

4  but we also have to understand that we can't split our

5  communities up. You know, being a resident of St.

6  Tammany Parish myself, I do not want to see my parish

7  split up. I do not want to see my parish torn apart. We

8  need representation in North Louisiana. We need

9  representation around this state and I want to thank

10 you very much for your time.

11       MR. CHAIRMAN:  Thank you. Representative

12 Emerson.

13       REP. EMERSON:  Thank you, Mr. Chairman.

14 Members. I'll be -- be very brief. I know everybody's

15 had a long day here and appreciate all the debate back

16 and forth. Today, obviously, you know I'm one of your

17 colleagues but I'm here as the representative from

18 District 39 as well as a resident of Carencro and

19 Lafayette Parish.

20       Specifically, this map -- and -- and I really

21 just want to focus on my home area here because it

22 splits Lafayette Parish apart. And yesterday, our

1    mayor-president, Josh Guillory, spoke in the Senate

2    Committee on a -- a -- I think the exact same map. I

3    know it was amended a little bit but basically the

4    exact same map.

5         And I don't think he's able to be here today

6    so I did just want to kind of reiterate some of the

7    things that he was saying about splitting apart our

8    parish. It's -- Lafayette Parish has longtime been the

9    anchor for this Congressional district.

10        Of course, you all know the very well-defined

11   area and region of Acadiana. Lafayette, again, has been

12   the heart of Acadiana. Our morning show is called Good

13   Morning Acadiana and it's located in Lafayette. So I

14   think separating our parish is a very -- is a very

15   difficult thing. I think that's a very well-defined

16   community of interest.

17        And this example might be a little bit silly

18   to some of y'all, but it was really apparent to me

19   because last night, I was eating at Prejean's

20   restaurant, which is located in Carencro, in my

21   hometown, where I live, where my family lives.

22        And a lot of you probably know Prejean's

1    restaurant off of I-49. And it's owned by a guy name

2    Boudreaux. His last name is Boudreaux. And so when I

3    think about Boudreaux who owns Prejean's being in the

4    same Congressional district as the great people of

5    Morehouse Parish, while I love them and I love the

6    people of Tensas and Madison and Ouachita and everybody

7    else, I don't think it's the same community of interest

8    as Mr. Boudreaux from Prejean's.

9            So that's really all I wanted to point out

10   here. Splitting apart Lafayette Parish, again, it's a

11   parish that's been in that district as a whole for a

12   very long time. The parish that I live in, that I grew

13   up in, and the town and community that I live in and

14   grew up in. And I think it's very important to keep

15   that community of interest together.

16           MR. CHAIRMAN:  Thank you, Representative

17   Emerson. Thank both of you for your testimony. I'll

18   invite Representative Mark Wright and Representative

19   Owens up. Whenever you're ready, gentlemen.

20           REP. WRIGHT:  Thank you, Mr. Chair, members.

21   I'm here today to represent District 77, Covington, St.

22   Tammany Parish, the North Shore. Contrary to what has

1    been said in the media by judges and elected

2    representatives, like, I actually think this is not

3    enough time to take a look at something like that.

4              That's why I decided to forsake my day and

5    come here and wait and be able to testify. Normally, we

6    have a lot of people that come here from St. Tammany

7    Parish to, you know, sort of voice opinions and all but

8    as you saw, Mr. Miller, you know, and Ms. Carrigan are

9    the only two that are here.

10             I think a lot of people have no clue what's

11   going on. And so even waiting one day, I think, is not

12   enough. That's for other people to decide. I -- I

13   wanted to be on this committee a long time ago, did a

14   lot of lobbying. I -- I envy you all.

15             So I'm not here to tell you what the map

16   should look like. I'm just here to tell you that

17   putting St. Tammany Parish in a district anchored by

18   East Baton Rouge does not work. First off, St. Tammany,

19   particularly West St. Tammany where I represent, I

20   mean, I -- I'd argue that half the families commute

21   across the causeway to work in Metairie and New

22   Orleans.

1        When Hurricane Katrina hit, a vast majority of

2   people moved to our area; right? We share the lake.

3   We're part of Metro New Orleans. There's no doubt about

4   that. And that goes for the North Shore for that

5   matter.

6        In fact, the -- the term North Shore is based

7   in the North Shore Lake Pontchartrain because we all --

8   we share that common basis. You know, heck. I -- I grew

9   up in Metairie and moved right over and, you know, I

10  feel like that's just one same community; right?

11       Whereas if we go with this map, St. Tammany

12  would be sort of second to East Baton Rouge and the

13  Baton Rouge metro area. In fact, with this map, quite

14  frankly, I think the Baton Rouge metro area,

15  particularly median market, benefits the most, because

16  I think you're going to have like four districts

17  anchored in Baton Rouge.

18       So everybody's going to be advertising when

19  they run their campaign in Baton Rouge. And that's a

20  bit of a joke, but it's just true. Like, it's -- it's

21  all based in Baton Rouge. I'm not sure that's healthy,

22  quite frankly. So I'm here to tell you, just as a

1    representative, about some of those facts, about, you

2    know, this community of interest fact that we talked

3    about.

4          St. Tammany's been in the First Congressional

5    District I think about 50 years and, you know, that's a

6    good bit of tradition. Obviously, we like our

7    congressman, Minority Leader Scalise. You can't always

8    control who represents you. I get that.

9          But that interest, that common interest,

10   everything from, as I mentioned, that community of

11   people commuting, living, working, it -- it's also

12   related to some incredibly serious issues. I mean, we

13   built the -- the great wall over there near Saint

14   Bernard and New Orleans East for flood protection.

15         Well, a part of that actually causes flooding

16   in Mandeville. A lot of people don't realize that but

17   we get a lot of flooding in Lake Pontchartrain because

18   the water comes through Lake -- Lake -- now goes

19   through Lake Pontchartrain and comes in and we've got

20   to deal with that issue.

21         And I think people on the South Shore

22   understand that and they want to help out. And it's

1    good to have the same congressman and congressional

2    staff from that area. So I'm just here to say -- I'll -

3    - I'll close up.

4           I'm here to say it -- I don't know what the

5    map should look like or what the bill should look like.

6    That's your job and -- and I don't envy you on that. I

7    am waiting to see what I have to vote on. I'm just

8    saying, if I get this bill, I have to vote against it.

9           There's just no doubt in my mind, if I'm going

10   to represent my area, that I would not be able to

11   support this. I'm fairly confident. And I'm not here to

12   speak for the delegation. I'm fairly confident St.

13   Tammany delegation and perhaps the whole North Shore

14   would agree too. Thanks.

15          MR. CHAIRMAN:  Representative Owens.

16          REP. OWENS:  Thank you, Mr. Chairman and

17   members. I'm going to keep this very brief because I

18   know everybody's been here a long time today. I come

19   here today as resident of Slidell and the

20   representative for District 76 which encompasses the

21   majority of the Slidell area and as the area that's

22   actually going to be split up by this map.

1          St. Tammany really is a very homogenous

2     community. We -- you know, on the east side and the

3     west side, we all have, you know, a lot of similar

4     interests and we share a lot of the same interests with

5     -- with Jefferson Parish as well.

6          A lot of our people from St. Tammany actually

7     are people who originally lived in Jefferson, have

8     moved over across the lake and -- and they still -- a

9     lot of people still send their kids there to -- for

10    school.

11         They -- we commute there for -- for jobs. They

12    have businesses they own in Jefferson. And then vice

13    versa too. Like, we travel across the St. Tammany to go

14    to work and a lot of people live in Slidell and have a

15    business over in Mandeville or Covington or some of the

16    other areas in town.

17         So it's -- to split these up at this time, I

18    just -- there's too much common interest there on both

19    sides of the lake to -- for us to -- to -- to do this

20    at this point. I just don't see how that's going to

21    benefit us. And our parish has almost doubled in size

22    in the past 20 years and, like I said, you know, this

1    is -- a lot of these people have -- have migrated over.

2            So that -- that being said, we've worked the

3    past three years -- this is one of the real reasons why

4    I'm testifying today with -- with the congressional

5    delegation, especially with Congressman Scalise, CPRA,

6    the St. Tammany Levee Board, the Corps and we're

7    working on basically $4 billion -- that's billion with

8    a B -- of levee -- and -- and water projects that are

9    coming down the next couple years.

10           So we don't want to jeopardize that at this

11   point if these maps change and we split up St. Tammany.

12   All of a sudden, we're part of East Baton Rouge Parish.

13   Then all of a sudden I -- it's -- you know, we -- we --

14   we get to the weeds with all that. And we really don't

15   want to put that in jeopardy. We want to continue on

16   our path going forward and as the bill is written right

17   now, ask that you don't support it as written. Thank

18   you.

19           MR. CHAIRMAN:  Thank you, Representative. And

20   Representative Wright, we do have a question for you if

21   you wouldn't mind hanging out. We're going to get

22   through all of them and -- and we might have a member

1    who -- who wants to call you up and ask you a question.

2    Next up, present and would like to speak, Chris

3    Canulette?

4            MR. CANULETTE:  Close. Canulette. Thank you.

5            MR. CHAIRMAN:  I apologize. Yeah. Please, sir.

6    And then Deborah Randolph as well. Okay. And -- and Ms.

7    Susie LaBrie. Ma'am, you can come up as well. Yes, sir.

8    Whenever you're ready.

9            MR. CANULETTE:  Yeah. Thank -- I'd like to

10   thank y'all. First of all, I'd like to thank you for

11   your time and your -- and your families' time. I truly

12   understand what you're going through because I am a

13   councilman from District 8, St. Tammany Parish.

14           The -- you know, the ones that suffer the most

15   are our families because we're here doing these things.

16   And like y'all, we're doing reapportionment also. I'm

17   here about the map. Everything else, that's -- that's

18   y'all's game. And it's a tough game.

19           The map is -- is -- to me, it's detrimental to

20   St. Tammany Parish. We -- we truly, really are more of

21   a coastal parish, whether we like to believe it or not,

22   especially down. The fact of the matter is this.

1          When a lot of the money came out for the

2     projects, for the wetlands and -- and restoring the

3     coast, we got a boat dock and a launch and a landing

4     and a bayou 40 miles from the gulf. Not much help.

5          The fact of the matter is this. When you leave

6     the [inaudible] end at the coast of St. Tammany, you

7     hit no land until you get to the Gulf of Mexico. It

8     used to be all marsh. It's all gone. We desperately

9     need your help and that's why I think we should

10    definitely be realigned with the coastal. It's like our

11    representatives are talking and I feel it's just

12    detrimental to St. Tammany.

13         And thank you for your time and your service,

14    all of y'all. I know you don't get a lot of love and

15    appreciation. You get a lot of ridicule and I feel your

16    pain and wish you all nothing but good luck.

17         MR. CHAIRMAN:  Thank you, sir. Ms. LaBrie.

18         MS. LABRIE:  Yes. I have a friend named Burt

19    Kelly [ph] who couldn't make it today and he asked me

20    to read his testimony and also want to add mine. First

21    of all, I'm Susie LaBrie representing myself.

22         I do think this is more of an urban versus

1    rural situation covered under race. So anyway, I want

2    to get onto Burt's letter and this is exactly what he

3    has said. So this is his testimony here. I had it set

4    up.

5            A letter -- he was sending this letter to the

6    Senate Governmental Affairs Committee too and it -- and

7    he's in District 29, Senate District 2. I believe

8    that's across the river. That's Senator Price's

9    district. And I believe Barry Ivey is the

10   representative over there. I don't know.

11           Be it known that I had observed most of

12   yesterday's committee meeting via the Internet. I want

13   to convey my thoughts and concerns on the subject that

14   I listened to. I listened to both sides of the debate

15   and I have been in the position to employ both blacks

16   and whites as well as have been employed by both blacks

17   and whites.

18           I have served both publicly as a school bus

19   driver. I worked alongside both in my military service

20   and in the private sector holding the same job title. I

21   have friends and acquaintance likewise, what I know and

22   convey.

1        But what is law of jurisdiction doing and the

2    judge or court have on dictating to a legislative body

3    on how -- this is -- this is expanding back and forth.

4    Let's see. I had this. By what law of jurisdiction does

5    a judge or court have on dictating to a legislative

6    body on how, what and timeframe to make the laws.

7        It seems to me that this major overstep of

8    separation of powers. I feel the amendment proposing in

9    House Bill 1 may appease both sides but in the long run

10   will cause greater confusion as stated by the Senator

11   on the panel.

12       That was also apparent yesterday in the short

13   term. It was all because of trying to push something

14   through to avoid being in contempt of court. Imagine

15   that. A whole state and all its citizen being in

16   contempt of court simply because they're trying to be

17   fair and doing what is best in their state and citizens

18   at will to be a lasting decision for decades in less

19   than six days.

20       I heard many times that House Bill 1 is not

21   solely about race but I didn't hear from those who

22   proclaim that what other things were except the

1    statistics of voter tendencies that were tied to a

2    race.

3              I did hear some argument about economics and

4    of potential divisions on manners that affect both all

5    blacks and whites at various industries and as

6    neighbors and coworkers. My concern is being as both

7    black and whites live in areas of agricultural,

8    fishing, rural and other economic areas as well as of

9    cultural -- cultural cohesions.

10             Quartering up areas like these with no

11   economic considerations is harmful to the state and all

12   of its citizens. No one will have true representation

13   based on what really matters. The growth of both

14   individual and their surrounding community. The

15   Internet is of a larger or more wealthy well -- we'll

16   cancel out the last within a given district instead of

17   that district being represented as it should be based

18   on life, liberty and the pursuit of happiness.

19             I feel like constructing a district boundary

20   based on race is the complete reverse of what the 14th

21   Constitutional Amendment was all about. No one grew be

22   discriminated or given special privileges based on a

1    pigment of their skin.

2            To do otherwise, I believe that we are

3    reverting back to the ways of decades and centuries ago

4    and driving a wedge that took years of protests,

5    legislation, litigation, blood and lives to remove. To

6    illustrate my concerns further, imagine if we were to

7    go far as to have Black states and white states.

8            Unbelievable it sounds, but we are laying a

9    footstone to what one day could come the reality by

10   passing House Bill 1. Would you be able to say this can

11   happen from a district but not from a state? I'm

12   requesting that House Bill 1 not pass. Burt Kelly.

13   Thank you.

14           MR. CHAIRMAN:  Thank you very much. Ms. LaBrie

15   I always say LaBrie. I apologize. Ms. LaBrie Thank you

16   very much.

17           MS. LABRIE:  Both is correct.

18           MR. CHAIRMAN:  Okay.

19           MS. LABRIE:  You've been doing good with that

20   one.

21           MR. CHAIRMAN:  Yes, ma'am. Thank you very much

22   for your testimony. I appreciate it.

1          MS. LABRIE:   Thank you too. Appreciate you

2     having us to speak.

3          MR. CHAIRMAN:   Yes, ma'am. Also filling out a

4     red card in opposition not wishing to speak, Julie

5     Sandifer, Dale Clary and Janine Gotro [ph]. Members, is

6     that clear? Is all the cards by Mr. Vice Chair back up

7     to the table? Or actually, Representative Thomas, did

8     you want Representative Wright to come back.

9          REP. THOMAS:   [inaudible]

10         MR. CHAIRMAN:   You okay? Okay. And for that

11    matter, members, was there anybody that you want to

12    invite up to ask additional questions? Representative

13    Ivey, did you? No. Okay. Absolutely. And I'm going to

14    put Representative Ivey on. He has a motion.

15         REP. IVEY:   Mr. Chairman, I'd like to take up

16    an amendment before closing.

17         MR. CHAIRMAN:   Yeah. Absolutely. Now's the

18    proper time. We're going to go ahead and take up

19    Amendment Set 1. Do you want to have Ms. Smith read it

20    in or are you [inaudible]

21         REP. IVEY:   That'd be --

22         MR. CHAIRMAN:   [inaudible]

1          REP. IVEY:  That'd be great.

2          MR. CHAIRMAN:  Okay. Ms. Smith. You're good.

3          MS. SMITH:  Thank you, Mr. Chairman. This is

4     Amendment Set 16. It is available online and it adds a

5     Section 6 at the end of the bill providing for

6     applicability of the bill.

7          MR. CHAIRMAN:  All right. Representative Ivey,

8     on your amendment.

9          REP. IVEY:  Sure. You know, there was a lot of

10    debate yesterday and in the end, there was amendments

11    that were offered. One of the amendments, and

12    specifically I think by Senator Foil, provided some

13    effectiveness language.

14         Obviously, we understand where the current

15    state of the lawsuit is and it is, you know, ba- --

16    still with the ruling of the lower court where the

17    injunction is still in order which has necessitated

18    this special session where we are supposed to produce a

19    second map with a second majority -- Black majority-

20    minority district by June 20th.

21         And so understanding that there is a lot of

22    litigation still pending and -- and only God knows how

1   it's going to end, and so to be fair, to -- to kind of

2   both sides perspectives, I -- I thought this was a

3   reasonable amendment in that we don't know the timing

4   of those decisions, whether or not a map that we end up

5   producing and passing will be the one used in the

6   upcoming Fall congressional election or imposed upon us

7   potentially by the federal judge if we do not enact a

8   map.

9          Depending on the timing of the Fifth Circuit

10  Court of Appeal, that may or may not come, that relief

11  for the defendants may or may not come. If -- if it

12  does not, then, you know, we're -- we're left with

13  either a map we pick or the one that the judge picks.

14  And either way, I believe it would be fair that whoever

15  ultimately prevails, whichever side, and this will be

16  probably appealed all the way to the Supreme Court.

17         And but whatever the final judgment is on the

18  case, if it is in favor of the defense, then Act 5 of

19  the 2022 first extraordinary session will become law

20  again where we will not have to come back into session

21  and try to repass another map. You know, so if -- and

22  if the -- the plaintiffs prevail, well then the map

1   that we pass or the one maybe imposed upon us will be

2   the map that we -- that we're stuck with.

3          MR. CHAIRMAN:  Mr. Vice Chair, since you're a

4   member of the committee, you can obviously question Mr.

5   Ivey if you have any.

6          REP. DUPLESSIS:  I had an opportunity to talk

7   to him prior to his amendment being offered and I'm not

8   going to object.

9          MR. CHAIRMAN:  Representative Thomas, you have

10  a question on the amendment? Hold on. Let me add you.

11  All right. Both you and Representative Ivey, you're on.

12         REP. THOMAS:  Thank you, Mr. Chairman.

13  Representative Ivey, does this -- is this amendment

14  identical word-for-word from what Senator Foil

15  submitted yesterday and that committee passed?

16         REP. IVEY:  I actually asked staff that

17  question and it's my understanding that it is not

18  identical language but the effectual nature of the

19  language is identical. The effect of the what will

20  happen is the same.

21         The -- the Senate drafts things differently

22  than we do and so, you know, we showed certainly

1   deference to staff. I actually was able to preview a

2   version of this. I will be adding this amendment to my

3   own legislation as well that I want to be bringing. And

4   so I've had the conversation. I -- I believe personally

5   the language looks good and will accomplish exactly

6   what the intended pur- -- my intended statement.

7        REP. THOMAS:  So do you know what the exact

8   differences are?

9        REP. IVEY:  I haven't compared. We can ask

10   staff to maybe provide some clarification on that.

11        REP. THOMAS:  I -- I -- I would like that

12   clarification please.

13        MR. CHAIRMAN:  Okay. Let's put Ms. Smith on.

14        MS. SMITH:  Just one moment. I need to locate

15   -- should I just read them out?

16        MR. CHAIRMAN:  Yeah. Why don't you just point

17   them out? You can -- you can point line by line --

18        MS. SMITH:  Okay.

19        MR. CHAIRMAN:  -- the differences if it's

20   easier.

21        MS. SMITH:  Okay. So I believe that the

22   amendment, the Senate amendment that has been referred

1  to, Senate Amendment 15, in that amendment, it provides

2  that the plan adopted by the act would lose any

3  effectiveness whatsoever if any court so empowered

4  reverses, vacates or stays the decision, the relevant

5  decision of the court before us.

6          In any such case, Act 5 of the 2022 session

7  will become again effective. The language before the

8  committee right now that we worked on in Amendment

9  Number 16 provides a similar mechanism that if a final

10 unappealable judgment by a federal court in the

11 relevant cases does not declare the congressional plan

12 enacted by Act 5 to be in violation of Section 2 of the

13 Voting Rights Act, the following shall occur.

14          The provisions of this act shall cease to be

15 effective. So that would mean that this bill would be -

16 - cease to be effective. R.S. 18:1276 as enacted by Act

17 Number 5 and the provisions of Act Number 5 that are

18 repealed by this bill would be reenacted and the

19 provisions of this section shall not reduce the term of

20 a representative of the U.S. Congress.

21          MR. CHAIRMAN:  Ms. Smith, what's the

22 substantive effect of the differences? Maybe --

1          MS. SMITH:  They're the same.

2          MR. CHAIRMAN:  -- if you can just summarize.

3          MS. SMITH:  As far as --

4          MR. CHAIRMAN:  It's basically the same?

5          MS. SMITH:  As far as staff is --

6          REP. THOMAS:  So nothing substantive?

7          MR. CHAIRMAN:  No. According to --

8          MS. SMITH:  Okay. So in -- in staff's opinion,

9   it has the same effect. In addition, it also answers

10  the question of what happens to the people who are

11  elected in the meantime.

12          REP. THOMAS:  Okay. Thank you. Thank you, Mr.

13  Chair.

14          MR. CHAIRMAN:  For a question on the

15  [inaudible] Representative Carter.

16          REP. CARTER:  Okay. Thank you, Mr. Chairman.

17  From what I understand, the amendment, what it would do

18  is that if -- if a court did not stay the election,

19  i.e. the Supreme Court of the United States, did not

20  stay the election that is scheduled for qualifying in

21  July and the election in November.

22          If it's not stayed and -- and -- and a course

1    of candidates are elected pursuant to whatever map we

2    pass out of this session or whatever map the judge

3    impose, then if the Supreme Court did not issue that

4    stay and these people were elected and -- and then the

5    Supreme Court -- when the case is ultimately tried in

6    both the district court and the -- and the -- the Fifth

7    Circuit and then the Supreme Court.

8              And ultimately, the Supreme Court will say,

9    well. The map that we pass during the last session, the

10   -- the reapportionment session is okay. It doesn't

11   violate Section 2. Then -- then this map, whatever map

12   that the judge come up with, or this map I guess, would

13   no longer have an effect and we go back to the -- the -

14   - the map we passed in the special session.

15             And -- and -- and -- and those people that got

16   elected through -- during the process, they will

17   continue to hold office and -- and they will not limit

18   their term. So they got elected in November. If there's

19   no stay, then it -- then -- then -- then they will

20   serve for two years. But then the -- the map would

21   revert back to the -- the speaker map that we passed

22   during the -- during the February -- during the

1   February reapportionment session; is that right?

2           MR. CHAIRMAN:  Is that a question for

3   Representative Ivey?

4           REP. IVEY:  Yeah. That is correct.

5           REP. CARTER:  Okay.

6           REP. IVEY:  Yes. No one -- whoever -- if -- if

7   this map or any one of the maps we pass, if we add this

8   language to all of them, passes and there's no judicial

9   and -- a timely judicial intervention in favor of the

10  defense, then what -- a map, one of the ones we select

11  if we pass it, will be the law up and until a final

12  judgment. If that final judgment is in favor of the

13  defense --

14          REP. CARTER:  Yeah.

15          REP. IVEY:  -- it will revert back to Act 5.

16  If it's not, then the map that we pass will ma- -- be

17  maintained as the law of the land. And anyone elected

18  under the -- these conditions would remain in office

19  until a reelection.

20          REP. CARTER:  The end of the term.

21          REP. IVEY:  Yes.

22          REP. CARTER:  Right. Well, my problem with

1  this is that it -- it would take away from the

2  legislature the opportunity to come back and do another

3  map. Either --

4         REP. IVEY:  Well, nothing would take away from

5  our opportunity. We always have that opportunity.

6  However, what -- what I think would be more prudent is

7  not -- is to put us in a position where we don't have

8  to come back. And now it depends on who prevails;

9  right? In this case, if the -- the plaintiffs do not

10 prevail, it may be more favorable to, you know, have --

11 try to have to come back. But what's -- what's going to

12 be different on that second go-around?

13        REP. CARTER:  If -- if -- if -- if -- if the -

14 - if the Fifth Circuit or the United States Supreme

15 Court feel that the defendant has a -- the defendants

16 have a legitimate argument that ought to be considered,

17 they would issue a stay. They would issue a stay long

18 before July qualifying time. The Supreme Court would

19 issue a stay, would have a hearing and -- and would

20 either vacate whatever the judge in the lower court had

21 done and -- and then -- then will be --

22        REP. IVEY:  Yeah.

1          REP. CARTER:  [inaudible]

2          REP. IVEY:  I recognize that.

3          REP. CARTER:  This amendment is not even --

4   it's not -- what I'm saying, the amendment's not

5   necessary. The -- the amendment doesn't do [inaudible]

6          REP. IVEY:  I think you just made my point

7   that it is necessary because if the Fifth Circuit Court

8   of Appeals st- -- stays the lower court's injunction,

9   what would happen is if we pass this map without this

10  language, this becomes the law of the land, period.

11         And the -- the -- the Fifth Circuit Court of

12  Appeals ruling is irrelevant because this becomes the

13  law of the land. Without language to qualify the

14  effectiveness or nature of a bill that we pass this

15  session, then it -- it -- it's the -- the law of the

16  land. And so this is language to provide that and

17  delineate between --

18         REP. CARTER:  Well --

19         REP. IVEY:  -- the different potential

20  outcomes.

21         REP. CARTER:  Let me -- the Firth Circuit

22  already said -- the Fifth Circuit has already said that

1    they didn't think the Senate would prevail. They

2    already said that. Now -- now, the only -- the only --

3             REP. IVEY:  It was an administrative stay and

4    they did not --

5             REP. CARTER:  Right.

6             REP. IVEY:  -- rule in favor of the defense --

7             REP. CARTER:  They -- they -- they --

8             REP. IVEY:  -- because they didn't --

9             REP. CARTER:  If the Fifth -- well, let me --

10   let -- let me -- if the Fifth Circuit thought there was

11   a chance that the Senate might prevail, they would have

12   -- they would have continued the stay and had a

13   hearing, a -- a more -- more detailed and waited -- and

14   ordered the trial court to stay. They didn't do that.

15            Now, I don't know of a application. I'm sure

16   application being made to the United States Supreme

17   Court and if the United States Supreme Court feels,

18   when they receive these documents that I'm sure will be

19   pretty quickly, they could issue a stay. So if they

20   felt that the defendant might prevail, the Supreme

21   Court could issue a stay.

22            So we don't need this -- they issue a stay,

1    they issue a stay, then we go on as -- as we are now.

2    We won't -- we won't have the -- the --

3              REP. IVEY:  And --

4              REP. CARTER:  -- House Bill 1 if we pass -- if

5    we pass House Bill 1, House Bill 1 would be stayed

6    because of the Supreme Court stay. They would decide

7    what -- which one would go. You don't have to have this

8    amendment.

9              REP. IVEY:  But you can't stay enacted

10   legislation. If we enact legislation this special

11   session, it cannot be stayed by the Supreme Court. We

12   have produced and created a new map with effective

13   dates on that map. And if we're going to comply with

14   the lower court's order, then the enacted map that we

15   create will have to have an effective date for the

16   upcoming Fall election.

17             And so I'd like to remind you, Representative

18   Carter, that the author of the bill has not objected to

19   this motion and I believe that we all recognize it's a

20   long shot getting anything out of here. I -- I -- I --

21   I would imagine that it would be a lot more of a

22   challenge to get any legislation out of here without

1    such language.

2            REP. CARTER:  So we would go two years and

3    then we would reimplement the statute that we -- we

4    said we pa- -- passed during the -- during the special

5    session.

6            REP. IVEY:  Only if it -- the final judgment,

7    the court finds in favor of the defense.

8            REP. CARTER:  And we couldn't in two years

9    pass another bill if we want to [inaudible]

10           REP. IVEY:  We still can. You can come back

11   and we can author legislation. It's always in order.

12           REP. CARTER:  That's right.

13           REP. IVEY:  We don't need a special session

14   for it.

15           REP. CARTER:  That's right. We don't -- all we

16   can pa- -- pass, a -- a rea- -- reapportion bill any

17   time we wanted to.

18           REP. IVEY:  Exactly.

19           REP. CARTER:  If we did -- if -- if the

20   Supreme Court said that -- that what we did was -- was

21   -- was incorrect, then we can pass a bill. We can have

22   a special session or we can have a regular session and

1    pass the bill. We've got two years because these people

2    are going to be in office for two years. So why -- we

3    don't need this amendment. This amendment is a --

4          REP. IVEY:  Well, logic says that --

5          REP. CARTER:  If this -- if this --

6          REP. IVEY:  -- if -- if -- if we don't -- we

7    have to have language that delineates the

8    effectiveness. Even if we don't say we revert back to

9    the current map, we have to have language that would

10   qualify, that if some -- if the defense prevails,

11   right, why would we pass a map that adds a second

12   majority-minority district; okay? And I've authored a

13   map myself and -- and so I think everybody understands

14   how I feel on the situation.

15          But why -- in deference to both sides, the

16   plaintiff and the defense, if someone prevails and

17   final judgment is rendered in favor of the defense, why

18   should -- if we try our best to comply with the lower

19   court's order to pass a map this special session with a

20   second majority-minority district, why would we feel

21   it's fair to impose that map for another 10 years if

22   the defense prevails?

1           REP. CARTER:  Not 10 years. Two years.

2           REP. IVEY:  Well, I'm sorry.

3           REP. CARTER:  Two years. [inaudible]

4           REP. IVEY:  Well, you're saying the effect --

5    so is this map -- Representative Duplessis, is this map

6    only effective for two years? It's not. You don't --

7    you have no expiration date on this map?

8           REP. DUPLESSIS:  No.

9           REP. IVEY:  Okay. Therefore, if we passed your

10   legislation as it's currently drafted, this becomes the

11   law of the land until the next redistricting cycle?

12          REP. DUPLESSIS:  The next -- until we're

13   required --

14          REP. IVEY:  Unt- -- until we re- --

15   redistrict.

16          MR. CHAIRMAN:  All right. Representative

17   Carter, Representative Ivey, you all finish your

18   thoughts on this. I feel like you both [inaudible]

19          REP. IVEY:  I'm -- I'm done. Thank you.

20          MR. CHAIRMAN:  Representative Carter, any

21   final thoughts?

22          REP. CARTER:  Yeah. My -- my point is, all I'm

1    trying to -- trying to point out is if this map is --

2    if it's passed, if it was to pass and if the Supreme

3    Court had a problem with it or if the Supreme Court,

4    for whatever reasons, maybe not even the map, said that

5    the -- the defendant should win, for whatever reason,

6    that means the old map was okay, then these people

7    elected is only elected for two years.

8            And so we can come back and -- and re- -- and

9    do a -- do another map, the same map or another map.

10   This prevents us from doing anything because the map

11   would automatically take effect and -- and my -- my

12   concern is that the -- the legislature can change the

13   map within two years. You don't have to wait 10 years

14   to change a map if the court says it's -- it's --

15   something is wrong with it. That's what I'm saying.

16           MR. CHAIRMAN:  And yeah. You've made your --

17   you've made your point.

18           REP. CARTER:  You've got two years.

19           REP. IVEY:  And -- and --

20           REP. CARTER:  You've got two years. Then you

21   can change the map. Two years.

22           MR. CHAIRMAN:  Okay. Y'all both have made your

1    points on that issue. We're going to move on.

2    Representative [inaudible] Magee's got a question.

3              REP. MAGEE:  Yeah. Thank you, Mr. Chairman. I

4    just want to be clear though. I've heard it said a lot

5    of times, and Representative Carter just said it, that

6    the Fifth Circuit made some sort of intention about

7    what it plans during the merits of the case and the

8    Fifth Circuit was extremely clear on its intention on

9    the merit case and said, that said, neither the

10   Plaintiff's arguments nor the district court's analysis

11   is entirely water tight, meaning they're not -- I read

12   that as, we don't really care for both arguments

13   completely.

14             And it's feasible that the merits panel

15   conducting a less-rushed examination of the record, in

16   light of differently framed arguments, may well side

17   with the defendants. So I don't know where we're

18   getting this -- this -- we keep saying this out loud

19   that the Fifth Circuit has announced an intention to

20   support the plaintiffs' position but they've clearly

21   said that the defendants may win in the Fifth Circuit.

22   So I -- I just want to be clear on the record that the

1    -- it's still up in the air in the Fifth Circuit in

2    contradiction to what Representative Carter just said.

3            MR. CHAIRMAN:  Thank you [inaudible]

4            REP. CARTER:  [inaudible] I was following

5    [inaudible]

6            MR. CHAIRMAN:  I think I'm going to let

7    Representative Jenkins go next. I think we -- we've --

8    we've gotten a lot of arguments out on this.

9    Representative Jenkins on the amendment.

10           REP. CARTER:  [inaudible]

11           MR. CHAIRMAN:  Representative Jenkins.

12   Representative Jenkins. Representative Carter, hey. Let

13   -- let's -- I will recognize you again if you would

14   like to. Just please, please wait until you're

15   recognized. Representative Jenkins.

16           REP. JENKINS:  All right. Thank you, Mr.

17   Chairman. I -- I don't see a big problem with the

18   amendment. It's not in any way adverse to the -- the

19   district court's ruling. I -- I just want to be sure

20   that it's -- it's not adverse in any kind of way, is

21   it, to the district court's ruling?

22           REP. IVEY:  I personally don't interpret it

1    that way.

2              REP. JENKINS:  Okay. And -- and Rep.

3    Duplessis, you okay with this amendment?

4              REP. DUPLESSIS:  Look, I'm -- I'm -- I'm fine

5    with it for purposes of, you know, trying -- I -- look.

6    We're under a tight timeline.

7              REP. JENKINS:  All right.

8              REP. DUPLESSIS:  We're under a very tight

9    timeline. I personally don't really see the point of

10   it. However, I'm not going to object to it.

11             REP. JENKINS:  All right. Thank you, Mr.

12   Chairman.

13             MR. CHAIRMAN:  Thank you, Representative

14   Jenkins. Okay. Finally. Representative Ivey is going to

15   offer up Amendment Set 16; is there any objection? See.

16             REP. CARTER:  I object.

17             MR. CHAIRMAN:  Okay. There is an objection. We

18   will vote on this. A vote yes is to adopt Amendment Set

19   16. A vote no is to not. And so Madam Secretary, please

20   call the roll.

21             MADAM SECRETARY:  Chairman Stefanski?

22             MR. CHAIRMAN:  Yes.

1           MADAM SECRETARY:  Yes. Vice Chairman

2    Duplessis?

3           REP. DUPLESSIS:  Yes.

4           MADAM SECRETARY:  Yes. Representative

5    Bourriaque? Representative Wilford Carter?

6           REP. WILFORD CARTER:  No.

7           MADAM SECRETARY:  No. Representative Deshotel?

8           REP. DESHOTEL:  Yes.

9           MADAM SECRETARY:  Yes. Representative Farnum?

10   Representative Gadberry?

11          REP. GADBERRY:  Yes.

12          MADAM SECRETARY:  Yes. Representative Horton?

13          REP. HORTON:  Yes.

14          MADAM SECRETARY:  Yes. Representative Ivey?

15          REP. IVEY:  Yes.

16          MADAM SECRETARY:  Yes. Representative Jenkins?

17          REP. JENKINS:  Yes.

18          MADAM SECRETARY:  Yes. Representative Mike

19   Johnson?

20          REP. MIKE JOHNSON:  Yes.

21          MADAM SECRETARY:  Yes. Representative LaCombe?

22          REP. LACOMBE:  Yes.

1          MADAM SECRETARY:  Yes. Representative Lyons?

2          REP. LYONS:  Yes.

3          MADAM SECRETARY:  Yes. Representative Magee?

4          REP. MAGEE:  Yes.

5          MADAM SECRETARY:  Yes. Representative Newell?

6          REP. NEWELL:  No.

7          MADAM SECRETARY:  No. Representative Thomas?

8          REP. THOMAS:  Yes.

9          MADAM SECRETARY:  Yes. Representative White?

10   12 yays, 2 nays.

11          MR. CHAIRMAN:  12 yays, 2 nays and the

12   amendment is adopted. Okay. Representative Ivey,

13   another question on the bill. Representative Ivey.

14          REP. IVEY:  Yes. Thank you, Mr. Chairman. At

15   the appropriate time, I would like to move the bill as

16   amended and this is going to be my final closing

17   remarks before Rep- -- Vice Chair Duplessis closes.

18          I -- I'd like for everyone to take a moment

19   and -- and reflect on like why we're here and what the

20   purpose is. At the committee level, and as a -- a new -

21   - new legis- -- legislator a few years ago, you know, I

22   -- we take the job so seriously sometimes, I think we

1  fail to put in proper context what the committee role

2  is in the legislative process.

3          And as I appreciate what that context is for

4  us today as it pertains to attempting to comply with

5  the -- the lower federal court, you know, we have to

6  decide, you know, in committee to kill or not to kill.

7          I don't think that's really the issue though

8  that we should be considering. I don't think there's

9  anything so offensive before us that it warrants such

10  punitive action to prevent us from having a floor

11  debate on the issue.

12          I think it's imperative we have a floor

13  debate. I believe one of the failures of our efforts in

14  the special session was that we did not have a floor

15  debate on the issue. I think that -- and -- and -- and

16  I -- I shared -- through the process I supported many

17  maps that I would not vote for on the floor.

18          And I will -- I've already told Representative

19  Duplessis and Senator Fields, I can't support their

20  maps on final passage because of some of the issues

21  that I've -- I have with them. That said, I -- I have

22  worked to produce maps that I could support. And -- and

1    that's why I have some alternatives.

2           But -- but I do believe that under every --

3    every circumstance, I would have voter for the

4    speaker's map to get to the floor. I would have voted -

5    - I'm voting -- going to support your map getting the

6    floor, mine, and any other map to get to the floor for

7    debate.

8           There is no chance that a map is just going to

9    accidentally slip through a crack. We understand the

10   challenge that we're up against. And to not allow the

11   institution, not this -- we're just a part of the body

12   on the floor.

13          I believe this committee owes -- the

14   institution owes our colleagues on the House floor who

15   cannot participate in this line of questioning and

16   offering, you know, statements on all the people who

17   come and present testimony, I believe we owe it to them

18   to -- to have an opportunity to debate the issue on the

19   floor. Again, I've already stated I can't support it on

20   final passage in its current posture. However, I do ask

21   that we move as amended, Mr. Chairman.

22          MR. CHAIRMAN:  Thank you, Representative Ivey.

1    But some housekeeping before. Lost in my desire to --

2    to end the debate on the amendment, Mr. Hurd had filled

3    out a white card and I do want to give him an

4    opportunity.

5            I don't want to -- if you'd like to make some

6    comments, it might be moot at this point. I understand

7    that. But if you'd like to give some comm- -- comments,

8    I'd invite you up next to Mr. Duplessis. It's a white

9    card, Representative Duplessis. I don't think you need

10   to -- need to leave.

11           MR. HURD:  I'll -- I think with the comment

12   from staff in reading it, it did not mention how it

13   would deal with the stay as the -- as it was fleshed

14   out --

15           MR. CHAIRMAN:  Well, please, if you're going

16   to -- if you're going to -- yeah. Come -- come to the

17   mike, sir, if -- if -- if you do want to give some --

18           MR. HURD:  My name's Paul Hurd. I'm from

19   Ouachita. Ouachita Parish. We're somewhere near Little

20   Rock if -- in case you're wondering. The question I had

21   was, the -- the amendment -- I'm in support of the

22   concept of the amendment. I just wanted to make clear

1    that it -- one version that I saw yesterday only would

2    go into effect if it was ultimately determined on the

3    merits that the old district was proper.

4            All right. This amendment that -- that -- that

5    will deal with this problem in having this in limbo

6    right now needs to deal with if it's either held on the

7    merits, be it the old existing plan, is held on the

8    merits to be legal or if the stay that prevents it from

9    going forward is lifted so that it -- there's no

10   federal impediment.

11           And I think -- though I wasn't sure about the

12   initial reading, I think ultimately the explanation and

13   the record and this -- and this committee makes it

14   clear that the committee intends for that language to

15   be sufficient, that should the stay against its use be

16   lifted and it would therefore be enacted law that was

17   not otherwise stayed in the federal system that the old

18   district would prevail and this district would not. And

19   that was my concern and the speed at which we were

20   moving.

21           MR. CHAIRMAN:  Oh. Certainly. I understand.

22   Sta- -- staff is indicating yes to your -- to your

1    explanation.

2              MR. HURD:  Thank you for your time.

3              MR. CHAIRMAN:  Yes, sir. Also, members, on

4    HB1, we received 12 e-mails in opposition which will be

5    in the record. Vice Chair Duplessis to close.

6              REP. DUPLESSIS:  Thank you, Chairman. Thank

7    you, Committee. I think we've been at this now since 10

8    -- 10 a.m. and I just want to let the committee know

9    just how much I -- I -- I respect each and -- each and

10   every one of you.

11             We all come to this process with different

12   life experiences, different perspective -- perspectives

13   and -- and certainly different goals in terms of our --

14   our futures and thinking about consequential votes like

15   this and what they may mean.

16             This has been a particularly difficult day for

17   me certainly because this bill was -- was scheduled but

18   -- but -- but not so much. Not so much because of the

19   bills. I think everybody kind of came to the table

20   knowing where they were going to be.

21             So we just -- I think we went through a whole

22   year, quite honestly, of -- of -- of work with

1    everybody knowing where they were going to be. Road

2    shows, testimony, bills introduced, debates. I don't

3    know if it changed a single mind. I don't know if it

4    changed a single heart.

5            But this day was particularly difficult for me

6    because at this very moment, I was scheduled to be at

7    an event giving a keynote address in my district for an

8    event that I've been looking forward to for many years

9    now.

10           I was -- I was going to be giving the keynote

11   address at the -- basically the grand reopening of A.P.

12   Tureaud Civil Rights Park which is in the heart of my

13   district in the Seventh Ward.

14           And the event began at two p.m. and, you know,

15   I think about that and I think about the irony that I'm

16   here today presenting this bill because I think about

17   Alexander Pierre Tureaud and -- and -- and who he --

18   who he was, for those of you all who don't know him or

19   don't know of his life.

20           But he -- he had -- there's a monument that

21   was placed of him in -- in 1997 and -- and I would

22   assume that anybody who has a monument after them has

1    done something with their life that someone else

2    considers significant.

3              He is a native New Orleanian, was a native New

4    Orleanian, who -- who attended Howard Law School and

5    graduated in 1925. I'm also a graduate of Howard Law

6    School. And I learned and studied about his life and

7    the contributions that he made to this state, to this

8    nation.

9              Before you had a Jared Evans representing the

10   Legal Defense Fund, you had Alexander Pierre Tureaud

11   who was local counsel for NAACP for pretty much all

12   civil rights cases throughout the south. So when

13   Thurgood Marshall came to take on cases, to fight

14   desegre- -- to fight segregation, it was A.P. Tureaud

15   who was the local counsel who led -- led on those

16   cases.

17             There were only four Black lawyers in the

18   state of Louisiana when A.P. Tureaud came home in the

19   '30s to -- to be an attorney in this state. He filed 13

20   lawsuits against LSU. He filed lawsuits for equal pay

21   so that Black teachers could make the same as their

22   white -- white teachers.

1        He filed numerous, countless voter -- voter

2   rights lawsuits. I just encourage all of y'all to look

3   him up one day. Right now, they're -- they're

4   celebrating the refurbishment of his monument because

5   it was vandalized over the years and the park was in

6   disrepair. And I really wanted to be there today.

7        And I can't be there today but, you know, I

8   think about the fact that when A.P. Tureaud ran for

9   congress, he was a -- I can't remember if it was in the

10  '40s or the '50s. I think about the fights that he

11  fought and the fact that at time -- that time, we had

12  no representation.

13       We didn't even have Congressional District 2.

14  But he still ran. And believe it or not, he ran as a

15  Republican. Things were a little different then. But so

16  many things are still the same and, you know, fast

17  forward. We're in 2022 and each of us before we -- or

18  the moment we became representatives, we all put our

19  hands up and we -- we -- we swore an oath to uphold the

20  Constitution.

21       But a Constitutional decision has been made

22  and with all of the debate that we've had today, all of

1  the discussion, all of the perspectives, Representative

2  Thomas and I talking about whether it's 31 percent or

3  33 percent.

4         We're under a court order right now. There's

5  not a whole lot of room for interpretation as far as

6  I'm concerned, or at least as far as the judge is

7  concerned. Whether it's 31 percent, whether it's 33

8  percent, what we do know is that it's 57 percent for

9  whites in this state, but they make up 83 percent of

10 Congress.

11        Is that fair? Is that just? Whether it's 31

12 percent or 33 percent. We got some real work to do in

13 this state. I'm -- like I said at the beginning, I -- I

14 think that everybody came here with their mind made up

15 on what they were going to do and I don't think anyone

16 said it better than Mr. Lewis earlier when he really

17 pointed out the fact that any progress we've made in

18 this state has always been ordered by a court.

19        And we have an opportunity to do something

20 different. We have an opportunity for our children to

21 say, we didn't -- we didn't have to be forced to do it.

22 We have to be forced to do the right thing because we

1    know what the right thing is. So I don't think there's

2    a whole lot more I can say that hasn't already been

3    said.

4           I -- I ask that you, you know, do what you

5    have to do. The motion has been made to -- to report

6    the bill favorably as amended. I think what we've

7    presented, what I've presented with HB1 complies with

8    what we've been ordered to do. And as a lawyer, as an

9    officer of the court, I'm going to do what I'm told to

10   do by a court.

11          I'm not going to tell a federal district court

12   to say, well. Let's just wait and see what the

13   appellate court says. We don't get to pick and choose

14   when we want to follow the law. We talk about law and

15   order all day in this building. We can't pick and

16   choose when we want to follow the law.

17          And right now, the law says two Black

18   districts, whether we like it or not, whether it makes

19   our community look a little different, maybe we could

20   use some of that in Louisiana. Because what I can tell

21   you is that one thing I took away from this road show

22   for certain is that despite the fact that we didn't

1   lose anybody in congress, we are losing young people.

2          And this vote today and this process is going

3   to send a message. Are we going to be a state of the

4   past or are we going to be a state of the future? And

5   anybody coming up here talking about we need to keep

6   things the way that they are and we don't need to

7   change nothing, that means you like things the way that

8   they are. You like being last in everything good and

9   first in everything bad. With that, I -- I ask for your

10  favorable passage.

11         MR. CHAIRMAN:  All right. Members,

12  Representative Ivey has moved that report House Bill 1

13  as amended; is there any objection?

14         FEMALE:  I object.

15         MR. CHAIRMAN:  There is an objection. Members,

16  a vote yes is to report as amended. A vote no means the

17  bill remains in committee. With that said, Ms.

18  Omersbach [ph] will call the roll.

19         MADAM SECRETARY:  Chairman Stefanski?

20         MR. CHAIRMAN:  No.

21         MADAM SECRETARY:  No. Vice Chairman Duplessis?

22         REP. DUPLESSIS:  Yes.

```
1              MADAM SECRETARY:  Yes. Representative
2   Bourriaque? Representative Wilford Carter?
3              REP. WILFORD CARTER:  Yes.
4              MADAM SECRETARY:  Yes. Representative
5   Deshotel?
6              REP. DESHOTEL:  No.
7              MADAM SECRETARY:  No. Representative Farnum?
8              REP. FARNUM:  No.
9              MADAM SECRETARY:  No. Representative Gadberry?
10             REP. GADBERRY:  No.
11             MADAM SECRETARY:  No. Representative Horton?
12             REP. HORTON:  No.
13             MADAM SECRETARY:  No. Representative Ivey?
14             REP. IVEY:  Yes.
15             MADAM SECRETARY:  Yes. Representative Jenkins?
16             REP. JENKINS:  Yes.
17             MADAM SECRETARY:  Yes. Representative Mike
18  Johnson?
19             REP. MIKE JOHNSON:  No.
20             MADAM SECRETARY:  No. Representative LaCombe?
21             REP. LACOMBE:  Yes.
22             MADAM SECRETARY:  Yes. Representative Lyons?
```

1              REP. LYONS:  Yes.

2              MADAM SECRETARY:  Yes. Representative Magee?

3              REP. MAGEE:  No.

4              MADAM SECRETARY:  No. Representative Newell?

5              REP. NEWELL:  Yes.

6              MADAM SECRETARY:  Yes. Representative Thomas?

7              REP. THOMAS:  No.

8              MADAM SECRETARY:  No. Representative White? 7

9     yays, 8 nays.

10             MR. CHAIRMAN:  7 yays, 8 nays and the bill

11    remains in committee. Thank you, Mr. Vice Chair.

12             REP. DUPLESSIS:  Thank you.

13             MR. CHAIRMAN:  Next up. Representative Ivey,

14    HB3. Representative Ivey, what bill do you want to

15    start with?

16             REP. IVEY:  HB4.

17             MR. CHAIRMAN:  We're going to start with HB4,

18    Members, 4.

19             REP. IVEY:  I'm going to -- you can talk about

20    my deferral for three.

21             MR. CHAIRMAN:  Members, housekeeping, HB3 is

22    going to be deferred. My plan is to put that on a

1   committee meeting tomorrow. Three is going to be

2   deferred. My plan is to have that ready to go tomorrow

3   for a committee meeting as well as probably HB2. Just

4   for -- for today, that's what my mindset is.

5            We're going to see how the rest of the day

6   progresses, though. So we are going to start with HB4

7   by Representative Ivey. Whenever you're ready,

8   Representative.

9            REP. IVEY:  Chair, do you want me to display

10  the maps on the screen? Do you want me to display the

11  maps on the screen?

12           MR. CHAIRMAN:  John, why don't you cue up his

13  initial map.

14           REP. IVEY:  And before I get going, I -- I'd

15  like to just -- because -- before anybody gets too

16  confused, I do have two amendment sets for two

17  different maps for this, therefore, illustrative

18  purposes. So don't -- don't feel you're going to have

19  to, you know, decide to vote on that or not. So they're

20  -- they're for illustrative purposes. I just need one

21  more minute.

22           MR. CHAIRMAN:  No. No. No. Like I said, why

1  don't we -- we're going to wait on -- Mr. Harrington's

2  going to cue it up. Well, whenever that map's up, we'll

3  pop it up just so everybody can get a look at it and

4  the public can.

5          Additionally, housekeeping [inaudible] on HB3,

6  again, I'll formally make a motion to defer that. Is

7  there any objection to deferring HB3? Seeing no

8  objection, HB3 is deferred. There were two emails --

9          CLERK:  They said, no stand [inaudible].

10         MR. CHAIRMAN:  Yeah. Two emails on both three

11  and four, they're in your folders, Members, they're not

12  for or against. So I -- I guess they're white emails

13  and then one in opposition. So those would be -- those

14  two would be considered white cards --

15         REP. IVEY:  For which bill was there an

16  opposition?

17         MR. CHAIRMAN:  Not -- there is an opposition

18  on HB3.

19         REP. IVEY:  Three, but not four; correct?

20         MR. CHAIRMAN:  Three, but not four. Yes, sir.

21         REP. IVEY:  Okay. So that's a little indicator

22  there.

1          MR. CHAIRMAN:  Whenever you're ready,

2     Representative Ivey.

3          REP. IVEY:  All right. Just literally one

4     second, closing windows.

5          MR. CHAIRMAN:  Let's let him -- as a point of

6     order, let's let him present the bill before you --

7          REP. IVEY:  Yeah.

8          MR. CHAIRMAN:  It's a point of order

9     Representative Thomas reporting order.

10         REP. THOMAS:  I -- I just want to know if

11    that's the map that we're going to be discussing? Is

12    that the one with his amendments?

13         MR. CHAIRMAN:  Thi- -- this is. This is HB4,

14    the map that is up right now.

15         REP. THOMAS:  With his amendments or not?

16         MR. CHAIRMAN:  Well, he's -- I'm going to

17    defer to the author whether or not he wants to adopt

18    those amendments --

19         REP. THOMAS:  Oh, okay. Okay.

20         MR. CHAIRMAN:  -- but for the purposes of what

21    the discussion -- where he's going to start, this is

22    the map.

1          REP. THOMAS:  Okay. So -- so that's with the

2    original?

3          MR. CHAIRMAN:  That's the original on HB4.

4          REP. THOMAS:  Okay. Thanks.

5          MR. CHAIRMAN:  Yes, Representative. Thank you.

6    All right.

7          REP. IVEY:  And -- and just to provide

8    clarification, Representative Thomas, I have no

9    intentions of moving the amended -- the amendments.

10   Those are for illustrative purposes only.

11         REP. THOMAS:  So this [inaudible]?

12         REP. IVEY:  This is the map. Yes, ma'am. All

13   right. Am I ready, Mr. Pro Tem, whenever?

14         MR. CHAIRMAN:  Yes. Go ahead.

15         REP. IVEY:  Okay. Thank you. Thank you,

16   Members. I know it's been a long day. I -- I'd say I'm

17   going to try to be brief and I will, but it -- it's a

18   lot of ground to cover. So I will begin. I want to

19   start by reminding everyone what my votes were on HB1,

20   which became Act 5 in the first special session of this

21   year.

22         I voted and supported HB1. I voted to overturn

1    the veto and to provide clarity in case there's anyone

2    who may misunderstand why my -- why I supported that

3    and also I am bringing these maps, I'd like to provide

4    some clarification.

5           I -- I am aware of how that map was produced

6    and while, you know, accusations, and of course, that's

7    what the courts will decide, have been made as far as,

8    you know -- you know, different biases or whatever. The

9    fact is the map is the status quo. That's what the map

10   is.

11          The speaker -- the -- the chairman, all they -

12   - malapportionment is the first and preeminent

13   responsibility of redistricting and -- and the

14   standards by -- that the federal government requires

15   upon us for malapportionment is -- is much more

16   difficult than what we have to do with every other map

17   and if you haven't had to try to draw one where you're

18   getting numbers like literally into the, you know,

19   teens, it's tremendously different than when you're

20   given the -- you know, the grace of a plus or minus,

21   you know, 2 1/2 or 5 percent.

22          It's -- it's -- the difference is night and

1    day. And so I'm not opposed to a second majority-

2    minority district, but up until I had to make efforts

3    this -- you know, for -- in preparation of this special

4    session, I had not seen a map that I could support.

5    Obviously, one of the major issues I have with the maps

6    that were before -- that -- Representative Duplessis'

7    map and Senator Phil's [ph] map is how it dramatically

8    cha- -- alters multiple current Congressional district

9    makeups.

10             These are substantive moves. When you relegate

11   Congressional District 6 to the Florida parishes, you

12   wholly disrupt the constituency and the issues, the

13   economics and these other factors that play a -- a

14   critical role to all of Louisiana in our representation

15   in Congress.

16             And so while I'm not opposed to a second

17   majority-minority district, I believe it is incumbent

18   upon myself to ensure that -- that we do it in the most

19   practicable, responsible and least disruptive manner

20   possible and that is the approach that I took when

21   trying to draw this map.

22             So what -- what is the issue before us today?

1    It is to specific- -- specifically and sole exclusively

2    to attempt to pass a Congressional map that adds a

3    second majority-minority district by June 20th. That is

4    the court's order. Why are we here is because Act 5 of

5    the 2022 Special Se- -- First Special Session was

6    challenged in federal court on the basis of violating

7    Section 2 of the Voting Rights Act.

8           The Court found in favor of the plaintiff and

9    ordered an injunction and has required that the

10   Legislature draw a map that adds a second black

11   majority-minority district by June 20th. I personally

12   didn't appreciate that qualifying language, because we

13   can still comply with Voting Rights Act when there is a

14   -- when groups of minorities vote in blocks, enough to

15   provide for that opportunity district, which is what

16   this is about.

17          And so it really made the -- the challenge of

18   creating a second majority-minority district more

19   difficult. And so that said, the defendants have

20   appealed that -- the rul- -- the defendants have

21   appealed the ruling and the injunction to the Fifth

22   Circuit Court of Appeals. The Fifth Circuit Court of

1   Appeals issued an administrative stay on the lower

2   court's injunction, then days later vacated that stay.

3         And so we're still waiting for appeal. Where

4   we are right now is still having to address the court

5   order to draw a second black majority-minority district

6   in just days. Absent timely Judicial intervention in

7   favor of the defense a Congressional map with a second

8   black minority- -- minority-majority district will be

9   implemented for the upcoming Congressional election in

10  the fall.

11        It will be through one of the two following

12  processes, the Legislative process or the Judicial

13  process. Now, I asked staff earlier about the -- has

14  the Legislature ever failed to adhere to a court order

15  to -- you know, dealing with the Voting Rights Act. Of

16  course, we've had much -- much opportunity to -- to do

17  that.

18        And this is what I was told. So PAR has a --

19  this came from PAR's website, it's an important bit of

20  history. In 1971, the question of was legal free

21  districting came down on Louisiana very hard and PAR

22  was there to step in. So it talks about the '60s Voting

1   Rights Act and then it says, later when Louis- -- when

2   Louisiana Legislature drew its new maps after the 1970s

3   Census, it continued the same pattern, the 1 person-1

4   vote principle was not the Louisiana way.

5           So in 1971, U.S. District Judge E. Gordon West

6   ordered a new set of maps. The Legislature went back to

7   the drawing board and the U.S. Justice Department

8   rejected the gerrymandered plan. It was getting to be

9   mid-year when the election scheduled for the fall. So

10  that left Judge West in a difficult place.

11          He was about to let all state Senators and

12  Representatives run at large statewide. That's what he

13  was about to do. When the judge had lunch one day with

14  the then president at the time, Ed Steimel, wa- -- was

15  there and of- -- Ed Steimel was there to offer to help.

16  Be careful what you ask for, Steimel or PAR became the

17  special master for that 1971 redistricting session.

18          It was a landmark event. It brought a new

19  approach to redistricting back by the force of federal

20  law and PAR was given only 30 days to pull it off. It

21  conducted hearings and consulted with Legislators. So

22  this was the 1970s. I was born in 1979. So I mean, I'm

1    a child of the '70s, I guess, but '79.

2           And so I have drawn numerous maps, I've gone

3    through that process. I have drawn many of these maps

4    on my laptop while sitting in the bed at 3:00 a.m. And

5    so my point is the technology that we have, the

6    advantage that we have today, the fact that we've ma- -

7    - especially us and -- and the committee level have

8    discussed these issues, debated these issues.

9           We have tremendous familiarity and we are

10   obviously -- have been put up against a very difficult

11   timeline. That said, in 1971, in a -- in a day where

12   technology didn't exist to any level, PAR was able to

13   facilitate within 30 days, the map process, the

14   printing, the production of all that is just -- it was

15   cut and paste literally.

16          And so I -- I believe we have tremendous

17   advantage, we've got technology we're going to be able

18   to -- to discuss these things. We get information

19   timely. So while it is extremely difficult to comply

20   with this task, I believe that it's absolutely

21   possible. And so that's -- I'm -- I'm going to get off

22   of that, but that pro- -- that's the only instance

1    where the Legislature failed to do it and then PAR

2    stepped in.

3              So the question before us is are we going to

4    give it our best effort to try? I stated yes- -- two

5    days ago on the floor I recognize the probability of

6    failure is far greater than the probability of success,

7    but I believe we owe it to ourselves as -- as a

8    representative in this institution and we owe it to our

9    constituents to try and that's what I hope I'm -- I'm

10   doing today.

11             I respect everyone's decision. I'm not going

12   to be upset one way or another, vote your heart and --

13   and -- and -- and it'll be what it'll be, but one way

14   or another, absent Judicial intervention, there will be

15   a second majority-minority map impo- -- you know,

16   brought for this upcoming fall election, again, without

17   timely Judicial intervention. So --

18             REP. MAGEE:  All right. We have a question

19   from Representative --

20             REP. IVEY:  Wait -- wait, I'm not done, I'm

21   sorry.

22             REP. MAGEE:  Oh, sorry.

1          REP. IVEY:  I'm sorry.

2          REP. MAGEE:  You can't pause that long,

3   Representative Ivey.

4          REP. IVEY:  I know. I know. Look, I've -- I've

5   got a lot of notes here; okay? So let's see -- okay. I

6   -- I want to point this out as well, sometimes, you

7   know, espe- -- especially serving on committee I know

8   all of you can testify to this personally, sometimes

9   you -- you -- you're up in testimony, you're hearing it

10  and someone makes a very compelling case on an issue

11  you really don't necessary -- were expecting to agree

12  with and you're like, wow, that -- that's inter- --

13         I mean, I kind of agree with that. And then

14  the other side comes and they offer some points and

15  you're like, wow, that -- that kind of sounds like it -

16  - it's right too. And so just because you have people

17  who may vote the same way on the same issue does not

18  mean necessarily that we are doing it all for the same

19  reasons.

20         I've got four children and, you know, when an

21  event happens at the house, you know, when they were

22  little, what happened, oh my God, you're going to get

1   four completely different perspectives and that --

2   that's what we're here to do is offer our perspectives

3   and assimilate that and try to make the best decision

4   we can, but I will say that there is a lot of testimony

5   from some of my colleagues and advocates for a second

6   majority-minority district that I absolutely disagree

7   with and take issue on.

8          And I'm not here today and I did not question

9   point-for-point on what those issues were, but I will

10  tell you that I can wholeheartedly support the plans

11  that I've produced, okay, and still -- and -- and not

12  be in full agreement with all of the perspective and

13  testimony and, you know, impassioned presentations that

14  we've seen.

15         That's not what my support of the right -- you

16  know, what I believe is the right thing to do at this

17  time means. And so I -- I didn't want to go without

18  qualifying some of the, you know, statements that have

19  been made, are -- are, you know, I dis- -- disa- --

20  fully disagree with. And so this map, my approach --

21  let me try to find --

22         I'm -- I'm finding it, sorry. Yeah. No. No.

1  No. So what was my approach; right? You know, racial

2  gerrymandering, it -- it ca- -- this is a long day, so

3  I'm trying to, you know, cover some of the ground that

4  was already covered. That way to kind of preemptively

5  address it on my -- my bill, racial gerrymandering;

6  right?

7        And we've had the great discussions about what

8  is, what isn't and -- and the fact is we've been

9  ordered by a court to produce that. So the map that I

10 start- -- this -- this map started from was the current

11 Congressional map. My approach was to be as least

12 disruptive as possible. In my initial effort, it was

13 just to simply try to bring about more competitive

14 districts.

15       So when I was working on this in February, you

16 know, March, I was -- my goal -- I didn't believe it

17 was actually possible to get a map in a position that I

18 could support that actually achieved a second majority-

19 minority district. And so my -- my -- my effort was

20 just to try to get something more competitive.

21       Well, that just -- I kind of left it in that

22 current posture and then we were required to, you know,

1    be here for this session. And so I picked it back up

2    and the -- the efforts after that were to actually be

3    able to get to that second majority-minority district.

4    And so racial gerrymandering, I'd like to pull up --

5    this is -- this is Cooper v. Harris, it was decided by

6    the United States Supreme Court on May 22, 2017.

7              The issues are very similar, but they provide

8    great clarification on racial gerrymandering in maps

9    drawn by the -- the -- this state. Okay. I'm just going

10   to read you some of the language and hopefully this

11   puts to rest some of the concerns that were mentioned

12   earlier in the HB1. It says -- this is in the opinion.

13             The Constitution entrusts states with the job

14   of designing Congressional districts, but it also

15   imposes an important constraint. A state may not use

16   race as the predominant factor in drawing district

17   lines unless it has a compelling reason. In this case,

18   a three-judge district court ruled that North Carolina

19   officials violated that bar when they created two

20   districts whose voting age population were majority

21   black.

22             Applying a differential standard of review to

1    the factual findings underlying that decision we

2    affirm. Now, it says, the Equal Protection Clause of

3    the 14th Amendment limits racial gerrymandering in

4    Legislative districting plans. It prevents a state in

5    the absence of "sufficient justification" from

6    "separating its citizens into different voting

7    districts on the basis of race."

8              When a voter sues the state officials for

9    drawing such race-based lines, our decisions call for a

10   two-step analysis. First, the plaintiff must prove that

11   race was the predominant factor motivating the

12   Legislature's decision to place a significant number of

13   voters within or without a particular district, and

14   that was Miller v. Johnson.

15             That entails demonstrating that the

16   Legislature "subordinated" other factors like

17   compactness, respect for political subdivisions,

18   partisan advantage, what have you to "racial

19   considerations." Second, if racial considerations

20   predominated over others, the design of the district

21   must withstand strict scrut- -- scrutiny.

22             The burden thus shifts to the state to prove

1    that its race-based sorting of voters serves a

2    "compelling interest" and is "narrowly tailored" to

3    that end. This court has long assumed that one

4    compelling interest is complying with operative

5    provisions of the Voting Rights Act of 1965, as

6    amended.

7          We're here today as a result of compliance

8    with the Voting Rights Act, at least as it has been

9    ruled up thus to, you know, this point. That is A, as

10   it says on the second provision under strict scrutiny,

11   that it's a compelling interest. The compelling

12   interest is a federal court order. That's the

13   compelling interest.

14         And so obviously -- and there's -- I -- I

15   won't read other -- other supreme court opinions on

16   this, but one of them basically says that, you know, we

17   -- of course we see race when we redistrict just like

18   we see economic factors and we see all these other

19   communities of interest. We see all of them; right?

20         And the question becomes down whether or not

21   it is the predominant factor and of course, the only

22   provisions where it's not or is acceptable is when it

1  meets those tests and the second one being the state

2  has a compelling interest and I believe we -- this --

3  we are here and -- and that we achieved that.

4          And so Members, you -- you can see the map,

5  you -- you can put it up there, you can get your own

6  copies, but that's -- that's what I believe this map

7  accomplishes. You know, with regard to compactness,

8  with regard to all these other things, I've authored

9  two other maps, now, neither one of them provide or

10 meet that standard for a second majority-minority

11 district, but if you look at them, those maps score off

12 the charts, particularly, I think it's --

13         I'll tell you, it's on the amendment set --

14 yeah. Amendment Set 13, we -- when we were in

15 committee, there was a young man who I met on the road

16 show and had multiple engagements with, Mr. James

17 Henry. He produced multiple maps and map 3, which he

18 produced is what the Amendment 13 is.

19         It had the highest scoring for compactness for

20 everything else. It even complied with at least on days

21 redistrictings, you know, algorithms, it -- it had 100

22 percent for mi- -- minority voting.

1        Now, the -- the problem is ins- -- we -- we

2    didn't produce anything that made me -- other

3    standards, you know, on whatever algorithms that might

4    be out there that, you know, redistricting people use,

5    but we're required now to a much higher standard to get

6    to that second majority-minority.

7        But that map, if you look at it on Amendment

8    13, is -- it's a -- it's a beautiful map. It -- it --

9    it really makes a lot of sense and well, we would never

10   be able to pass it in this institution and look, every

11   one of you know it. Why? Because it's so disruptive to

12   what -- where we are now. That's -- and that's the

13   challenge, but it's a perfect map.

14       And so, you know, as you look at the -- you

15   know, some of the fingers and things like that that go

16   off there, obviously, we know why those -- those are

17   there, but if you -- if you just ignore those few

18   deviations and you look at the map as a whole, I

19   believe what you'll find is it makes sense.

20       It makes sense under the conditions that we're

21   required to consider this map in and I tried to not be

22   injurious to any current Congressional district. An

1   example -- I'm going to use Garret Graves as an example

2   and I've not spoken to Garret about any of the maps and

3   -- or any Congressman about any of the maps this whole

4   time.

5           But I will say, you know, someone like

6   Congressman Graves has spent a lot of time on issues

7   that -- that deal with the coast and he is a tremendous

8   asset to all of Louisiana, not just the coastal area

9   near -- near his district, but to all of Louisiana's

10  coastal parishes. He is probably one of the strongest

11  champions we've got, rea- -- really sleeves rolled up

12  working on these issues.

13          And to relegate him to the Florida parishes --

14  or I say him, relegate District 6 to the Florida

15  parishes, I believe, would do -- do a tremendous

16  disservice to our state and by being too disruptive,

17  members or incumbents who have tenure and experience in

18  addressing the issues that affect their constituencies

19  will no longer be able to serve on -- or represent

20  those issues, because the -- their new district may be

21  so different that those issues don't affect their new

22  constituency.

1          And so we lose the time, the experience and

2    the tenure and it -- it does a disservice to all of us

3    no matter where we live in the -- you know, in the

4    state or what our racial makeup is or -- or really, the

5    other communities of interest. So that's why I brought

6    this map and -- and I ask for your consideration and

7    I'm happy to take any questions.

8          REP. MAGEE:  Was that a pause or are you

9    ready?

10         REP. IVEY:  I'm ready, thank you.

11         REP. MAGEE:   Representative Carter?

12         REP. CARTER:  Thank you, Mr. Speaker Pro Tem.

13   You -- are you familiar with the -- the Fifth Circuit's

14   ruling in -- in the prior attempts to get a -- a second

15   district in Louisiana, say --

16         REP. IVEY:  What decade, was that in the '90s?

17         REP. CARTER:  No. That was in the '90s, yes.

18   [inaudible]

19         REP. IVEY:  So you had [inaudible]?

20         REP. CARTER:  '90s and the 2000s. Yeah.

21         REP. IVEY:  When we had [inaudible] in the

22   '90s?

1          REP. CARTER:  No. No. No. This is [inaudible].

2     No. And -- and actually, there was -- there was a map

3     that was drawn, they call it the -- the -- the -- the -

4     - the slash from Freeport to Baton Rouge, remember that

5     now?

6          REP. IVEY:  I'm familiar -- well, I mean, I

7     was probably only 10 or 12, but yeah --

8          REP. CARTER:  Oh, yeah. Okay.

9          REP. IVEY:  -- [inaudible] talking about.

10          REP. CARTER:  But that was -- that was the

11     slash and then there was the Z with splashes.

12          REP. IVEY:  Correct.

13          REP. CARTER:  And that was presented and the

14     Fifth Circuit turned both of those down. The Fifth

15     Circuit said neither one -- and it passed the

16     Legislation, by the way. Both of these maps passed the

17     Legislature --

18          REP. IVEY:  Sure.

19          REP. CARTER:  -- and it created a second black

20     district; okay?

21          REP. IVEY:  Mm-hmm.

22          REP. CARTER:  But this map here is far more

1    gerrymandered than the slash or the Z and the dash. I

2    mean, I'm just looking at this map, while -- while

3    gerrymandering -- and gerrymandering -- the United

4    States Supreme Court has pretty much stepped away from

5    gerrymandering in -- in some cases in regions --

6    regions and states by the Supreme Court rulings --

7              REP. IVEY:  Mm-hmm.

8              REP. CARTER:  -- but -- but -- but we know the

9    Fifth Circuit has a problem with -- with real

10   gerrymandering the districts.

11             REP. IVEY:  The 1990 Fifth Circuit is still

12   the same one [inaudible]?

13             REP. CARTER:  No. No. No. That's 2000. This --

14   this happened --

15             REP. IVEY:  Twenty years ago.

16             REP. CARTER:  -- the -- the -- the slash and

17   the dash happened in -- slash and the dash, that --

18   that's in the past 15, 20 years.

19             REP. IVEY:  Mm-hmm.

20             REP. CARTER:  But anyway, this map got so many

21   tentacles to it.

22             REP. IVEY:  Yeah. But it does comply with the

1    court order, does it not? I mean, you don't think --

2    I'm not --

3              REP. CARTER:  Well --

4              REP. IVEY:  -- it's a rhetorical question.

5              REP. CARTER:  -- well, it does create another

6    minority district --

7              REP. IVEY:  It does.

8              REP. CARTER:  -- it does create another --

9    another district, but -- but my concern -- that's just

10   me speaking now. My concern is that the map ought to be

11   -- ought to -- ought to be reasonably compacted,

12   because -- because one of the -- when you -- when you

13   look at the jurisprudence upon this issue, it's not

14   just the judge has got to look at whether or not the --

15   it -- it complies when it's talking about Section 2.

16             And -- and what we said to -- to ourselves

17   when we passed the -- the -- the law that's set forth,

18   the criteria on reapportioning maps, compactness was

19   one of them and -- and -- and this map is not at all

20   comp- -- compacted. So do you -- do you think the Fifth

21   Circuit is going to -- if we vote this map, it's going

22   to improve this map with all of these tentacles coming

1    out of it?

2              REP. IVEY:  Okay. Well, I -- I don't believe

3    the Fifth Cir- -- Circuit, absence some lawsuit, will

4    have -- has anything to say about this map that we're

5    trying -- that I'm trying to move --

6              REP. CARTER:  Pass the Legislature. Yeah.

7              REP. IVEY:  -- to help comply with the federal

8    court's deci- -- current ruling.

9              REP. CARTER:  Well -- well, it doesn't make

10   an- -- does- -- doesn't do any good for the -- the 3- -

11   - 33 percent of black people in the state of Louisiana

12   to have a map that -- that complies in one way and --

13   and -- and violates the law in another way and -- and I

14   think this map would have a problem. I mean, that's --

15   that's just me speaking. I don't know what other people

16   will -- will --

17             REP. IVEY:  Well, you've been -- you've been

18   known to be wrong before, so it's okay.

19             REP. CARTER:  I've been known to be wrong

20   before, but not often. And I -- as to the law and --

21   and I looked very closely at Fifth Circuit's rulings

22   and -- and -- and district court rulings, I don't know

1   if this map will survive the district court because --

2   because of all the tentacles and -- and it -- and it --

3   and it -- and it -- it probably splits up more -- how

4   many parishes this map splits up. Communities of

5   interest --

6              REP. IVEY:  You're -- you're -- you're making

7   the -- you're -- I -- I feel that some of what you're

8   stating is actually supporting some of my colleagues

9   who have -- who opposed Representative Duplessis' map -

10  -

11             REP. CARTER:  Yeah. Well --

12             REP. IVEY:  -- because you're splitting things

13  up.

14             REP. CARTER:  -- except -- except I think

15  Duplessis had a -- a map that was compacted and -- and

16  -- and -- and this map is not compact.

17             REP. IVEY:  I won't -- I'm not going to argue

18  whether or not his is more compact or not, because it -

19  - it clearly is, however -- however, in the totality of

20  circumstances, which I -- I will tell you after reading

21  multiple supreme court opinions, is extremely critical.

22             You can't take one statement out of any, you

1    know, opinion and -- and -- and use that as the guiding

2    light for an entire, you know, map. It is the totality

3    of circumstances, which I won't get into. That's the

4    judge's ruling.

5             REP. CARTER:  And I agree with you -- I agree

6    with -- I agree on that. Right.

7             REP. IVEY:  And -- and so if you look at the

8    current map, and I'm just going to hold it up there,

9    this is the -- this -- when I say current map, this is

10   the current -- the map that current Congress people are

11   under; right?

12            REP. CARTER:  Uh-huh.

13            REP. IVEY:  I -- I basically took from there

14   and as far -- it goes from literally in the northeast

15   corner and from East Carroll all the way including

16   Rapides and Washington Parish. It's a sprawling

17   district right now, because --

18            REP. CARTER:  [inaudible]

19            REP. IVEY:  -- the district -- District 5,

20   which becomes the second majority-minority district. So

21   if you look at District 5 --

22            REP. CARTER:  Uh-huh.

1          REP. IVEY:  ¬-- what you find out, that

2     District 5 becomes a lot more compact than it currently

3     is, than the map that -- th- -- that has been in effect

4     for a decade and it actually gets more compact and

5     because we -- we tie in the Bat- -- some Baton Rouge

6     population where you have a lot more population

7     density.

8          And so from a compactness perspective -- so --

9     so if you think about it, I'm making the second

10    majority-minority -- black majority-minority district

11    more compact at the expense of other districts. And so

12    from my perspective, your perspective --

13          REP. CARTER:  Mm-hmm.

14          REP. IVEY:  -- should be more favorable to

15    that in that, you know, the -- the -- you know, it --

16    it provides a -- a real opportunity for that district.

17          REP. CARTER:  Well -- well -- well -- well, my

18    concern is getting the [inaudible] --

19          REP. IVEY:  Are you going to be voting a no on

20    my bill? I'm just curious?

21          REP. CARTER:  I might very well, because

22    getting a -- but to me, getting a -- getting a -- a map

1  out with a -- with -- with another majority district

2  does not guarantee it complies with other elements of -

3  - of -- of the -- of the law.

4          REP. IVEY:  Well, what's being challenged

5  right now --

6          REP. CARTER:  It has to comply --

7          REP. IVEY:  -- is still debatable in the

8  courts and it's being argued in court whether or not we

9  have complied or not. And so I don't -- I don't want to

10 have the debate on that when -- I -- I mean, it will

11 meet the standard that the -- the -- the federal judge

12 has imposed upon us to produce a set -- you know, I've

13 acted in absolute good faith.

14         I believe this map will pass those scrutiny, I

15 sincerely do. This is not a pig in a poke, I haven't

16 tried to produce something where opposition to this and

17 opponents of a second majority-minority district could

18 use to exploit. I've not done that. I think all of you

19 all know me, I don't operate like that.

20         I do absolutely believe that this map is -- is

21 a -- a -- a -- a very reasonable and [inaudible]

22 possible map.

1          REP. CARTER:  Well, I think the map is too

2     gerrymandering, that's all I've got to say.

3          REP. IVEY:  Okay.

4          REP. CARTER:  I think it's too gerrymandering.

5          REP. IVEY:  It's been racially gerrymandered -

6     -

7          REP. CARTER:  Yeah. It --

8          REP. IVEY:  -- it has been.

9          REP. CARTER:  -- it doesn't have -- you don't

10    -- you don't have to achieve a -- a second minority-

11    majority district by such gerr- -- gerrymandering as

12    been shown --

13         REP. IVEY:  Right.

14         REP. CARTER:  -- by HB1, but it didn't pass,

15    like you said.

16         REP. IVEY:  I -- I -- and I understand that.

17         REP. CARTER:  So you doing this -- I know your

18    effort is -- is -- is -- is -- is to try to achieve

19    what the federal court told you to achieve, but we may

20    achieve the -- the -- that objective by creating

21    another problem and I think -- I think we're all

22    creating another problem with this map and -- and

1    [inaudible] --

2            REP. IVEY:  I guarantee you no matter what map

3    passes, if your favorite map passes, there will be a

4    lawsuit and it will be challenged --

5            REP. CARTER:  Yeah. I agree.

6            REP. IVEY:  -- you know this --

7            REP. CARTER:  Right.

8            REP. IVEY:  -- and then it'll be up to both

9    sides to argue that before the courts.

10           REP. CARTER:  Uh-huh.

11           REP. IVEY:  So we're not trying to prevent

12   lawsuits or challenges, we know they're going to exist

13   --

14           REP. CARTER:  Uh-huh.

15           REP. IVEY:  ¬-- no matter what. The difference

16   is if the -- I mean, I don't know about -- and again, I

17   understand strategy and advocates for the second --

18   second black majority-minority district --

19           REP. CARTER:  Uh-huh.

20           REP. IVEY:  ¬-- okay, strategically may favor

21   the -- the map that you had or someone imposed by The

22   Court. I don't know if a map imposed by The Court can

1    be challenged by The Court, you know, for -- I don't

2    know. And so -- but for myself, I'm trying to pass a

3    map. I'm trying to pass a map.

4         I already discussed maps that don't even add a

5    second majority-minority district, the ones that I

6    passed out in my amendment sets.

7         REP. CARTER:  Mm-hmm.

8         REP. IVEY:  They don't even achieve that and

9    they look beautiful. They -- I mean, they -- they

10   really make a lot of sense and they have a snowball's

11   chance in hell in passing in this Legislature, because

12   we have to balance this all with politics as well. And

13   so I am trying to appeal broadly to my colleagues who

14   many do not believe we need to or should be doing this,

15   right --

16        REP. CARTER:  Uh-huh.

17        REP. IVEY:  ¬-- who -- who may have a

18   deference to simply, you know, make The Court do it and

19   hopefully win -- win in court. I'm trying to present an

20   option for them that they can sincerely and -- and

21   objectively scrutinize to determine --

22        REP. CARTER:  Well --

```
1              REP. IVEY:  -- if this map makes sense for

2    them.

3              REP. CARTER:  -- I just stated it's not -- and

4    I -- and I close, sometimes you can appear to be doing

5    what The Court ordered you to do, but in the way that

6    would end up being defeating to the cause. If -- if

7    this map passes this Legislature, I think it's a very

8    good chance that we'll be -- be reeled back with the

9    amendment that we're going to put on this map, the same

10   -- same [inaudible] put on the oth- -- other bill.

11             We'll be in a real good chance of being back

12   here with the old map, because -- because I don't know

13   -- I don't know if this map would pass the muster of

14   what I've seen come out of the Fifth Circuit --

15             REP. IVEY:  Yeah. And I don't know if you know

16   what --

17             REP. CARTER:  -- that's all I'm saying and I -

18   - and I've seen every map --

19             REP. IVEY:  ¬-- what any map would do and --

20             REP. CARTER:  -- I've seen every map come out

21   of the Fifth Circuit in the past 25 years and I've read

22   every map that come out of it and this map here would
```

1    not pass the -- the muster of the old Fifth -- Fifth

2    Circuit, maybe -- maybe it'd pass the new Fifth

3    Circuit, I have no idea, but -- but it doesn't look --

4    it doesn't look like a map that the Fifth Circuit would

5    approve, that's all I'm saying.

6            REP. IVEY:  I appreciate your perspective. I

7    mean, if you ignore the -- the fingers, right, that

8    come off of the -- the Fifth District --

9            REP. CARTER:  Yeah.

10           REP. IVEY:  -- which is the racial, you know,

11   components --

12           REP. CARTER:  I understand.

13           REP. IVEY:  -- then it -- it still looks like

14   a good -- it looks like a good map, we're -- and we're

15   being required to -- and it is accepta- -- I have to

16   believe that The Court, when they have -- in the case

17   that I -- I read, when they identified the acceptance

18   of racial-based, you know, districting with the caveat

19   that it had a -- what was the word where it'd be

20   basically necessary, then I have to believe that when a

21   map would fall out of maybe some more ideal, you know,

22   shape or whatever, that when the shape that kind of

1    falls out of that is based on trying to comply with a

2    federal order, it -- it would be -- it would be --

3         That's a meaningful element in that it would

4    be okay. So anyway, I'm happy to answer any more

5    questions.

6         REP. MAGEE:  Well, you lost your question

7    person. So we're going to go to the next one,

8    Representative Thomas.

9         REP. THOMAS:  Thank you, Mr. Speaker Pro Tem.

10   Representative Ivey, I'm very glad that you

11   acknowledged that this is racially gerrymandered,

12   because I have many of the same questions about the

13   fingers and the compactness and so forth. So I'll move

14   on to my next issue and that is what percent do you

15   believe it requires in black voting age population to

16   make it probable to elect a black?

17        REP. IVEY:  Well, it's not about the

18   probability to elect a black candidate. The minority --

19   the Voting Rights Act isn't about a specific race, it's

20   about minority populations and different states have

21   different par- -- you know, different minorities are

22   their predominant minorities, like in Florida, the

1   predominant minority group is -- is Hispanic. And so --

2          REP. THOMAS:  Okay. You're -- you're -- you're

3   lea- --

4          REP. IVEY:  -- well, let -- let --

5          REP. THOMAS:  -- you're leaving the point and

6   -- and I really --

7          REP. IVEY:  -- but no, I'm -- I'm trying to

8   provide clarification.

9          REP. THOMAS:  -- in -- in the interest of

10  time, I really would like to focus you.

11         REP. IVEY:  Okay.

12         REP. THOMAS:  And so my question stands, what

13  percent is it to make it an opportunity to elect a

14  black? I'll use that word instead of probable --

15         REP. IVEY:  But not -- not to elect a black,

16  it's to elect a candidate of the minority's choice.

17         REP. THOMAS:  No. No. No. That's not -- that's

18  not the -- that's not the ruling.

19         REP. IVEY:  No.

20         REP. THOMAS:  We -- we -- we are supposed to

21  draw -- well, all right.

22         REP. IVEY:  I've been very, very detailed in

1    my language. You -- you said elect a black candidate,

2    it's to -- I know your intention was to -- to elect

3    where my -- a black minority district can elect a

4    candidate of their choice.

5              REP. THOMAS:  Yes. That's -- that's fine --

6              REP. IVEY:  That -- I know that you --

7              REP. THOMAS:  -- if you want to phrase it that

8    way, that's -- that's fine. Okay.

9              REP. IVEY:  Yes.

10             REP. THOMAS:  So my question is what percent

11   does it require of black voting age population?

12             REP. IVEY:  As I appreciate the ruling -- or -

13   - or the order, specifically when they caveated that it

14   must be a black majority-minority district, to -- to

15   constitute a "black majority-minority district," I

16   believe that standard is -- is clearly a 50 percent

17   plus 1 population of black --

18             REP. THOMAS:  Did you read that in the order?

19             REP. IVEY:  It's -- it's just -- it's what it

20   said, it's kind of self-evident.

21             REP. THOMAS:  Okay.

22             REP. IVEY:  I didn't read the 150 pages --

1    pages, ma'am.

2              REP. THOMAS:  Let me see if I can rephrase

3    that.

4              REP. IVEY:  It's been the standard on numerous

5    other cases.

6              REP. THOMAS:  I thought the standard was 55

7    percent and that there is jurisprudence to support

8    that.

9              REP. IVEY:  Again, there's so much out there.

10   You may have absolutely read something like that. I

11   have read other documents in CSL and others that lead

12   me to conclude otherwise.

13             REP. THOMAS:  Okay. Because in my analysis of

14   House Bill 4, I came up with a black voting age

15   population in Congressional District 2, as you have

16   drawn it, 50.201 percent.

17             REP. IVEY:  Correct.

18             REP. THOMAS:  And Congressional District 5 is

19   50.176 percent. Do you agree with those numbers?

20             REP. IVEY:  I mean, whatever -- whatever's in

21   the file and those are -- I mean, I didn't look at them

22   all, but those sound about right, the 50.-something

1    percent is what it --

2            REP. THOMAS:  I am really hard-pressed to see

3    how that would work to elect a candidate of their

4    choice.

5            REP. IVEY:  It -- it's not to elect, it's to

6    provide the opportunity to elect --

7            REP. THOMAS:  Okay. To -- well, all right. I

8    will use your words --

9            REP. IVEY:  Yes.

10           REP. THOMAS:  -- to provide the opportunity to

11   elect a candidate of --

12           REP. IVEY:  Yes.

13           REP. THOMAS:  -- of -- of black people's

14   choice.

15           REP. IVEY:  Correct.

16           REP. THOMAS:  Thank you, Mr. Speaker Pro Tem.

17           REP. IVEY:  And -- and just for --

18           REP. MAGEE:  You're welcome.

19           REP. IVEY:  -- further clarification on that,

20   the -- the requirement of the Voting Rights Act doesn't

21   provide that minorities get to elect a candidate of

22   their choice, it is only about opportunity. And -- and

1    so as I appreciate the order by the federal judge for

2    our case specifically, majority-minor- -- mi- -- black

3    majority-minority district is what was ordered.

4            Now, whether or not there's jurisprudence on

5    what constitutes a "opportunity district," if that

6    threshold may be 55, maybe that's the case, but it's my

7    appreciation on what the order is, it's -- it's to have

8    a "black majority-minority district" and that's by

9    population -- black voting age population.

10           REP. THOMAS:  Okay.  I -- I -- sorry, I -- I

11   gave up my mike, but -- but I would like to ask it, do

12   you think that there might be -- if -- if this map were

13   to be approved, do you think it's likely that we could

14   end up with six white Congress people?

15           REP. IVEY:  I do not, because if you look at

16   District 2, which is the -- you know, the current

17   majority-minority district, what you'll find is that

18   the -- the other minorities and also whites in that

19   district do not -- they vote enough in block to not

20   prevent minorities in that district from being able to

21   elect a candidate of their choice.

22           And so that's -- that's -- you know,

1    obviously, if you're from a political spectrum, you

2    know, New Orleans, which is really the core of District

3    2 is a far more liberal or progressive population of

4    individuals compared to other parts of the state and as

5    a result, that -- there's a lot more alignment between

6    white and black and other races who live and reside in

7    New Orleans.

8            REP. THOMAS:  Okay. So what you're saying is

9    there's a lot of crossover vote?

10           REP. IVEY:  In that district, which --

11           REP. THOMAS:  I totally agree.

12           REP. IVEY:  Okay.

13           REP. THOMAS:  Thank you. Thank you, Mr.

14    Speaker Pro Tem.

15           REP. MAGEE:  You're welcome. Representative

16    Deshotel.

17           REP. DESHOTEL:  Thank you, Mr. Speaker Pro

18    Tem. Thank you, Rep Ivey. I know you've spent many

19    hours drawing this map. You probably know the question

20    that I'm about to ask you, because I've been very

21    consistent throughout this whole process on the

22    questions I asked and I -- I normally ask questions

1   consider- -- concerning my -- my -- my district in my

2   home parish.

3          So I -- I don't know if the staff could --

4   could bring up Avoyelles Parish and somehow we could

5   look at -- at Avoyelles. Can you zoom in just a little

6   bit more? I'm just trying to -- I -- I live on the blue

7   lines right up north -- a little bit north, somewhere

8   right there. I'm just trying to figure out which

9   Congressional district --

10          REP. IVEY:  What -- what precinct is it? I'm

11   trying to zoom in myself.

12          REP. DESHOTEL:  Let's see, I didn't see the

13   different colors.

14          REP. IVEY:  [inaudible] stuff. Which one?

15   Which precinct?

16          REP. DESHOTEL:  I'm -- I'm looking at it. This

17   is -- use one of the current ones you can read as a

18   reference.

19          REP. IVEY:  244A?

20          REP. DESHOTEL:  Yeah. 22C. So I'm actually --

21          REP. IVEY:  Okay. You're in --

22          REP. DESHOTEL:  Okay.

1    REP. IVEY:  -- you're actually in the Con- --

2  Congressional District 4.

3    REP. DESHOTEL:  Four. Okay.

4    REP. IVEY:  Yeah.

5    REP. DESHOTEL:  So can -- can you --

6    REP. IVEY:  Are you running for Congress? I

7  mean --

8    REP. DESHOTEL:  Well, I -- I'm thinking about

9  it after looking at your maps. I mean, that -- that's

10  going to -- I mean, I may support this map now.

11    REP. IVEY:  Yeah. Well -- so if -- if you're

12  looking for a new level of insanity, look, the Congress

13  is for you; you know?

14    REP. DESHOTEL:  So I -- I guess I'm -- I guess

15  the point I'm trying to make, if you want to zoom out

16  just a little bit, it looks like you've got my parish

17  pretty -- pretty split up in -- in some different

18  communities. So I'm just curious, what was -- what was

19  the logic in -- in --

20    REP. IVEY:  Sure. Zoom in. Zoom back out.

21  Okay. So were you here for my -- when I read the

22  supreme court ruling concerning racial gerrymandering

1    [inaudible]?

2         REP. DESHOTEL:  I did, but I'll be honest with

3    you, I kind of zoned out a little bit.

4         REP. IVEY:  I understand, people do with those

5    things sometimes, it's okay.

6         REP. DESHOTEL:  So --

7         REP. IVEY:  I'm used to it. I'm not offended.

8    But no, so first of all, I -- I -- I went on a road

9    show, I've been a part of all the committee hearings

10   that you all have, all the testimony.

11        If you haven't attempted to draw a map,

12   particularly a Congressional map, the smaller the

13   district the easier it is and also the less you care

14   about some other region of the state, but when you're

15   dealing with a map that has six districts and what the

16   -- and you're having to address what the current makeup

17   is of those districts, what the current lines are as

18   part of the political, you know, necessity, you ha- --

19   you just -- you can't ignore that, because too much

20   change too soon for a lot of people can --

21        First of all, change is usually, you know,

22   responded to in -- with reservation, but specifically,

1    dramatic change is going to be met with, you know, a

2    lot of heavy objection. And so my efforts were to make

3    the fewest, slightest, you know, manipulations to the

4    current districts in order to achieve compliance with

5    this.

6             And so why -- like I don't know the area on 99

7    percent of the state; right? And look, I'm absolutely

8    willing -- if -- if you have more insight, any member

9    here, anyone that in -- during this process, if someone

10   has more insight where trying to flip a few things

11   around or even like if you say hey, Barry, look, if you

12   could make my parish whole in this district, right, and

13   maybe swap out with --

14            You know, figure if you can get it somewhere

15   else, look, I'm willing to at least try. That's all I

16   can do is try and I -- I -- I'm asking for the

17   opportunity. So if there's any specific elements that

18   you are aware of where communities of interest would be

19   better represented by either together or maybe making

20   that split different, I'm happy to make as much

21   combination as I can.

22            REP. DESHOTEL:  And -- and --

1          REP. IVEY:  But getting to the small precinct

2     things here or there is much easier than well, we can't

3     bust out any of my free parishes. I mean, that gets a

4     little more difficult.

5          REP. DESHOTEL:  Right. I understand. And I

6     only represent one parish. So I'm very hypersensitive

7     of that parish and -- and how it -- it -- it looks.

8          REP. IVEY:  And you should. Yeah.

9          REP. DESHOTEL:  So I -- I think -- so if we're

10    going to maybe start changing this now, I mean, how

11    much time do we have to be able to work these little

12    details out?

13         REP. IVEY:  Well -- well, first of all, I'm

14    not -- I'm not trying to change the map and I would say

15    that, again, I -- I give it my best effort. Can't do

16    that in committee, number one and number two, we all

17    are aware that if we fail to move a bill out of

18    committee today and the Senate does the same, well,

19    then we're just -- it's -- we're just -- it's time to

20    sani da [ph].

21         And so there's no threat that we're going to

22    pass a map, right, without, you know, significant

1   scrutiny by everyone. And so the reality is, you know,

2   this committee has, in its -- its hands right now --

3   again, I know what -- if the Senate's ruled or not on -

4   - you know, it's like watching the game, you know,

5   what's going on in the other chamber, but if -- if this

6   -- if our committee decides to not -- not to do it,

7   then it's okay.

8            I mean, I'm not going to be mad. Look, The

9   Court will do it. Whether or not it's -- it's

10  significant will depend on when appellate court may or

11  may not rule in favor of the defense, that's

12  [inaudible].

13           REP. DESHOTEL:  And look, I agree with you and

14  I agree with all of this, but one thing I -- I need to

15  make very clear is, you know, I think we have a lot of

16  people here talking about numbers and percentages and

17  all those things, I kind of look past that. I'm looking

18  at people and I'm looking at communities and I'm

19  looking at the people who voted for me and put me in

20  office.

21           So it's not about numbers for me, it's about

22  people. So these lines are very, very important to me -

1    -

2              REP. IVEY:  Yeah.

3              REP. DESHOTEL:  -- and they're way more

4    important than any number.

5              REP. IVEY:  I --

6              REP. DESHOTEL:  So I think if we're going to

7    get a map right and we're going to make -- you know, if

8    we have this different map we need to make, we're going

9    to take some ti- -- it's going to take some time to

10   create a map that, you know, affects different commu- -

11   - that every community is -- is, I guess, communities

12   of interest or -- or --

13             REP. IVEY:  Of course. I -- I will -- I will -

14   - first of all, I absolutely respect what you're saying

15   and -- and your concern over your district and -- and

16   how it's that -- it's -- it's the reason why I can't

17   support HB1 because of what it does to the Sixth

18   Congressional District.

19             REP. DESHOTEL:  Right.

20             REP. IVEY:  It's -- it's so -- so much of a

21   substantive change on -- on representation. I would --

22   I would suggest that for the people who are in District

1    4, the -- the type and nature and quality of the

2    representation that they will receive is in line with

3    the representation that they are currently receiving.

4              The issues are, in large, very similar, okay,

5    between District -- current District 4 and current

6    District 5.

7              If you look at the -- the -- the population in

8    the new District 5, what you'll find is that is -- you

9    know, there's a lot -- a larger element of black

10   minorities in that population and I don't believe,

11   again, currently they're being represented by someone

12   from a political perspective that I think they would --

13   they would determine whether they like Julia or not or

14   thinks he's doing a great job or not, but it may not be

15   the candidate of their choice.

16             And so for them, for that population, in your

17   parish specifically, to be able to be in that

18   "majority-minority opportunity population," I believe

19   it -- it would -- they would not be opposed to that,

20   specifically, the -- you know, again, I don't know all

21   the details in there, you know, but again, broadly

22   speaking with that -- that population likely being

1    significant amounts of majority-minority repres- --

2    representation.

3            Here's the other thing, I believe that it

4    would be very difficult for the -- a candidate of the

5    black minority's choice in that district to get

6    elected. It would be extremely competitive. When you

7    look at the day's redistricting tool, okay, which gives

8    these different partisan leans and stuff like that in

9    an analysis and I don't even fool with that until --

10   because I don't care.

11           But it -- it's -- when I done, I look at it.

12   It -- it leaves that one blank. It doesn't -- it

13   doesn't lean left or right from a political perspective

14   and at the end of the day, I think what -- what indivi-

15   -- anybody would want and desire, all of us would like

16   to, you know, have the opportunity to elect a candidate

17   of our choice.

18           Which one of us would not -- would not really

19   desire to be able to do that? Being in the majority of

20   the current Congressional district, I -- I can re- -- I

21   -- I can have some empathy for people who feel

22   disenfranchised, because the -- they know they'll never

1  be able to elect a candidate of their choice, it's just

2  not politically going to happen.

3           And so I can -- I can empathize with people

4  who -- who feel like that and understand why -- like

5  which of us -- again, if -- in urban areas, we have a

6  lot more local races of more significance, but if

7  you're in rural Louisiana and you're a minority and --

8  and -- and your politics is far left, what's the point

9  of voting; right?

10          Why would they even, right -- why would they,

11 right, unless they had some distinct significant civic

12 -- you know, understanding of civic -- their civic

13 responsibility. I think most people would just give up.

14 And so this only affords them the opportunity to engage

15 maybe in a different way they haven't before.

16          REP. DESHOTEL:  And I -- you know, I -- I

17 appreciate that. I'm not going to belabor the point,

18 but, you know, just one -- one last point is I -- I

19 think when you think -- when you talk about rural

20 Louisiana -- and -- and look, I have no scientific data

21 to back this up, but --

22          REP. IVEY:  I do. So --

1      REP. DESHOTEL:  -- you will have more -- well,

2   no, but what I'm about to tell you is I don't think

3   you're going to see that far left rural person, in my

4   opinion.

5           REP. IVEY:  And you probably don't.

6           REP. DESHOTEL:  So --

7           REP. IVEY:  They're more middle of the road.

8           REP. DESHOTEL:  -- so it's more middle of the

9   road. So I -- I mean --

10          REP. IVEY:  The -- the community of interest

11  being rural and country is more --

12          REP. DESHOTEL:  I think that's the community

13  of interest, that's my point.

14          REP. IVEY:  Absolutely, I -- I agree.

15          REP. DESHOTEL:  Thank you. I appreciate you.

16          REP. IVEY:  Thank you.

17          REP. MAGEE:   Representative Johnson.

18          REP. JOHNSON:  Representative Ivey, looking at

19  your map, of course, it -- it -- it splits Rapides

20  also, but it looks like it splits off -- I also see --

21  I've looked at these maps so much I'm starting to see

22  various animals like I'm looking at clouds. But the one

1    that has the [inaudible] --

2              REP. IVEY:  You realize that the next words

3    that come out of your mouth are probably going to label

4    this throughout the rest of, you know, history. So be

5    careful please what you choose.

6              REP. JOHNSON:  I kid you. I don't know what --

7    and -- and I was just talking to Representative LaCombe

8    --

9              REP. IVEY:  Well, we've got slashes and Zs and

10   --

11             REP. JOHNSON:  Yeah. But this kind of has a

12   flash kind of thing to it. Did you look to see if it

13   were possible to keep Rapides Parish whole? Because I

14   know --

15             REP. IVEY:  To get --

16             REP. JOHNSON:  -- that most of what you've

17   taken out is mostly rural for District 5.

18             REP. IVEY:  Right. I can tell you that -- I

19   can't tell you how many hours I've spent --

20             REP. JOHNSON:  It's not impossible.

21             REP. IVEY:  -- looking at redistricting maps

22   and playing with maps bo- -- and so I feel I have a

1   level of familiar- -- familiarity from a -- a strategic

2   per- -- point of view on what's achievable --

3           REP. JOHNSON:  Right.

4           REP. IVEY:  -- and I -- I can say that -- I

5   mean, look at the number, it's 50.-something black

6   voting age population.

7           REP. JOHNSON:  Right.

8           REP. IVEY:  And so one of two things have to

9   occur and this is a push-pull dynamic and if you look

10  at the -- the data on the -- the chart I gave you, I'll

11  -- I'll show you --

12          REP. JOHNSON:  Right.

13          REP. IVEY:  ¬-- in a minute, but if we lose

14  that population, we'll dip below the 50 percent --

15          REP. JOHNSON:  Okay.

16          REP. IVEY:  -- and to make it up somewhere

17  else will only cause more of that extension and more --

18  and just -- and -- and really, compactness starts to

19  suffer significantly, because where are you going to

20  get that population? You can't get it from Baton Rouge,

21  it's all gone. You're not going to get it in Livingston

22  Parish, because it doesn't exist.

1          And -- and so where can you get it? I would --

2    and -- and here's a distinct difference between this

3    map and -- and HB3, HB3 -- I'm sorry, yeah, HB3. HB3

4    was based off of Senator Fields SB9 in the first

5    special session. It -- it never got completed, because

6    it -- it still had some reasonable malapportionment

7    with it.

8          However -- however, after I completed this

9    map, I began to look at all the other maps that I might

10   see --

11         REP. JOHNSON:  Mm-hmm.

12         REP. IVEY:  -- and try to compare. When I saw

13   his, I was like, where'd -- where'd that come -- that's

14   -- that's a pretty reasonable looking map. Now,

15   politically, one of the major, in which is the reason I

16   did not select that map to bring instead of this one,

17   was that it split Lafayette Parish.

18         And so these are the tradeoffs, you know, you

19   -- you have to make in this process. There's no perfect

20   map --

21         REP. JOHNSON:  Oh, so you didn't -- you didn't

22   split Lafayette -- you didn't have any problem

1  splitting Rapides, but you didn't want to split

2  Lafayette?

3          REP. IVEY:  Well, Lafayette being in the -- in

4  the heart --

5          REP. JOHNSON:  You've got relatives in

6  Lafayette?

7          REP. IVEY:  No. Being in the heart of Acadiana

8  I didn't feel --

9          REP. JOHNSON:  But we're in the heart of sinla

10 [ph].

11         REP. IVEY:  -- and -- and --

12         REP. JOHNSON:  I understand.

13         REP. IVEY:  Yeah.

14         REP. JOHNSON:  What's this -- what, is this

15 just a gratuity [inaudible] for us to put up in our --

16         REP. IVEY:  Okay. So -- so I -- I want to --

17         REP. JOHNSON:  -- [inaudible]?

18         REP. IVEY:  -- I want --

19         REP. JOHNSON:  Well, I mean, wait, I want to -

20 - I want to just --

21         REP. IVEY:  No. No.

22         REP. JOHNSON:  -- just quick -- quick answer,

1    does this have anything to do with your map?

2              REP. IVEY:  It -- it ha- -- what it does is it

3    --

4              REP. JOHNSON:  Yes or no comment?

5              REP. IVEY:  Yes.

6              REP. JOHNSON:  Okay.

7              REP. IVEY:  It demonstrates the challenge and

8    if you look at the data --

9              REP. JOHNSON:  Okay.

10             REP. IVEY:  -- Members, on the challenge -- in

11   testimony, the gentleman, I forget his name but the one

12   who likes to sing when he testifies [inaudible] --

13             REP. JOHNSON:  Ted Newt [ph] -- Ted Newt.

14             MR. CHAIRMAN:  Mr. Hire [ph].

15             REP. IVEY:  Yes. Mr. Hire. He -- he made a

16   very, very good point, the community of interest -- and

17   I wrote it down, I'm sorry --

18             REP. JOHNSON:  I -- I may be [inaudible].

19             REP. IVEY:  -- but what he said was, rural

20   Louisiana is a community of interest. Now, if you look

21   at this map that you have before you, I want to point

22   out a couple elements and the- -- these numbers are

1    kind of shocking and unless you do the analysis, it's

2    just not possible to understand that the -- the -- the

3    actual difficulty of drawing these maps under any --

4    under any circumstances.

5            So you'll see on the sidebar in the legend

6    there, zero, one, two, three, four, five, six, seven,

7    eight, nine --

8            REP. JOHNSON:  Right.

9            REP. IVEY:  -- if you start at nine, okay, the

10   -- the -- you've got East Baton Rouge Paris and

11   Jefferson Parish. Those two parishes are the largest

12   populated parishes and repre- -- and -- and the

13   population between them is between 8.2 and 9.8 percent.

14   I'm sorry, excuse me, 9.5 to 9.8 percent of the state's

15   population is in 2 parishes each. And so 9.-something -

16   - 9.5. So that's -- that's like 2- --

17           REP. JOHNSON:  Twenty percent.

18           REP. IVEY:  -- it's 19.3 percent in 2

19   parishes. And then if you take it to the next level and

20   at 8.2 percent, you have Orleans Parish. So add that.

21   So that's what the purple is and then you see Orleans

22   in the dark green. So you've got three parishes that

1    combined are 27.5 percent of the state's population --

2            REP. JOHNSON:  Mm-hmm.

3            REP. IVEY:  -- in 3 parishes that are

4    relatively close to each other. And then if you go

5    further and -- to the next tier, you've got 3 parishes

6    between 5.1 and 5.7 percent and that's represented by

7    number 5 in the purple, which are St. Tammany and

8    Lafayette and Caddo. Those are the three.

9            And then -- so look at the -- look at the

10   distribution of population and then if you go to the

11   next step further, 4.7 percent you have Livingston --

12   wait, I'm sorry, 4.7 is red, that's -- that's Cameron;

13   right? Or Calcasieu? Which -- which one is that?

14   Calcasieu -- Calcasieu Parish. And then next you have

15   one at 4.7, that's Livingston.

16           I'm sorry, two at the 3.1 to 3.4, it's

17   Livingston and Ouachita. And then it gets interesting,

18   so if you get down to 2 percent or less --

19           REP. JOHNSON:  Yeah.

20           REP. IVEY:  -- just add up the -- the number

21   2, the blue, the -- the orange and the green and that's

22   -- that represents -- so again, between 0.1 percent to

1   2.9 percent represents 45 percent of the state. How

2   many parishes is that? That's 55 parishes. Oh,

3   actually, excuse me, 55 -- 60 -- 55 parishes represent

4   between 0.1 to 1.8 percent. I've got different data

5   here.

6          REP. JOHNSON:  [inaudible]

7          REP. IVEY:  So 55 parishes rep- -- that --

8   that's just -- it's -- it's -- it's kind of mind

9   boggling and this map kind of begins to show you --

10         REP. JOHNSON:  Okay.

11         REP. IVEY:  -- how that population is spread

12  out. And so rural Louisiana is what's making it

13  difficult to draw maps in general, but also,

14  particularly when we're trying to add a second

15  majority-minority district, because without urban

16  population, you're never going to get there, because

17  where minority populations live, if you look at the

18  distribution throughout the state, they're -- they're

19  kind of in rural Louisiana kind of scattered about. And

20  so every time you have to add a precinct to get to the

21  -- a minority precinct --

22         REP. JOHNSON:  Mm-hmm.

1          REP. IVEY:  -- you're going to actually go

2    upside down, because that pre- -- the one that's

3    adjacent may be -- have a lot more white population.

4          REP. JOHNSON:  All right.

5          REP. IVEY:  And so it -- it -- it's extremely

6    difficult to do.

7          REP. JOHNSON:  Okay. The -- your -- your --

8    your 2 amendments, which I find those intriguing, 13

9    and 15, you don't have any intention of doing anything

10   with those, do you?

11         REP. JOHNSON:  Not today. If everybody wants

12   to, you know, look at those -- and look, if -- if you

13   want to really upset the apple cart, okay, look, take

14   ser- --

15         REP. JOHNSON:  I don't --

16         REP. IVEY:  -- but look, neither one of those

17   comply with this court order, but I wanted to -- I

18   wanted to bring them out --

19         REP. JOHNSON:  Whoa -- whoa, what do you mean

20   they don't comply?

21         REP. IVEY:  Neither one --

22         REP. JOHNSON:  They don't create two --

1          REP. IVEY:  -- neither one of them create a

2    majority-minority district.

3          REP. JOHNSON:  All right. Okay. I thought you

4    had figured out a way to do that --

5          REP. IVEY:  Oh, no.

6          REP. JOHNSON:  -- and that's what I was going

7    to ask you if that --

8          REP. IVEY:  No. Unless people have a lot more

9    babies I can't do that. But --

10          REP. JOHNSON:  Well --

11          REP. IVEY:  -- well -- and -- and the point of

12    that --

13          REP. JOHNSON:  -- we've only got -- we've only

14    got until Monday. So I don't think that's going to

15    happen.

16          REP. IVEY:  I know. Well, the point of the --

17    the point of that map --

18          REP. JOHNSON:  I mean, we can try --

19          REP. IVEY:  Yeah. The point of that -- I'm

20    sure people are out there trying right now.

21          REP. JOHNSON:  Okay. Well --

22          REP. IVEY:  But the point of the map was to --

1  to show that --

2           REP. JOHNSON:  -- I don't have any more

3  questions.

4           REP. IVEY:  -- we can have maps that are

5  genuinely more ideal, more compact, score off the

6  charts and genuinely represent communities of interest

7  at more significant numbers than any other map that

8  we've genuinely entertained and those maps would never

9  pass this institution.

10          REP. JOHNSON:  Okay. Thank you. I don't have

11 any more questions.

12          MR. CHAIRMAN:  Okay. Representative Jenkins.

13          REP. JENKINS:  All right. Thank you, Mr.

14 Chair. Do -- do you intend to run both of your bills

15 today or just -- just one?

16          REP. IVEY:  No. Only doing 4, deferred 3.

17          MR. CHAIRMAN:  We -- and -- and Representative

18 Jenkins, we already deferred HB3.

19          REP. JENKINS:  Oh, I -- I -- I was out of the

20 room.

21          MR. CHAIRMAN:  Okay.

22          REP. JENKINS:  All right.

1          REP. IVEY:  In deference to the day and all

2     that, you know -- and -- and again, I believe that

3     between the two maps I believe that if I'm -- if I'm

4     trying to get more consensus among my colleagues on the

5     -- on -- you know, on the right who really don't even

6     believe we should be here and do this today, I believe

7     that more consensus may be found with this map than

8     with the other, because when you -- when you break up

9     Acadiana and -- and bring the fifth down to Acadiana as

10    -- and Lafayette, I believe you start losing more --

11    more -- more members.

12          REP. JENKINS:  You'll get better voting age

13    population for blacks than your other map.

14          REP. IVEY:  Yeah. But -- and again, I -- I

15    recognize that, but -- but the -- the requirement -- I

16    believe this one absolutely complies. And Members, I

17    want to point something else out and of course, there's

18    not a lot of people here at the moment and they may --

19    probably are listening on the other side.

20          So what are the different eventualities,

21    right, as -- as the litigation goes through the --

22    through the process? We can choose to do nothing and

1    the -- you know, Judge Dick will absolutely impose a

2    map, whether it's this one, the one -- HB1 or some

3    other version. Something's going to get imposed.

4            Now, maybe the defendants will be able to get

5    an appeal or stay on the injunction in time, maybe they

6    won't. Ultimately, an -- a stay on the injunction still

7    doesn't deal with this issue or doesn't conclude the

8    matter. And so I -- I don't believe that -- that the --

9    it'd be unlikely that we'll get a complete ruling on

10   the -- on the issue at the --

11           Again, and then that gets appealed anyway. No

12   matter who wins it's -- it's going to get appealed all

13   the way. And so two scenarios, if you -- if you favor

14   the defendant's argument, this map is not a bad map.

15           Here's why, it complies with the federal court

16   order today, but if the defense prevails in -- in final

17   judgment, then to revert back to, you know, the current

18   map would be less significant of an event for those who

19   may have been elected to Congress under this map. You

20   know, they should -- instead of, example, juxtaposing

21   it with Representative Duplessis' bill, if -- if --

22           Let's just assume that that map was passed

1    under the conditions -- you know, if -- if -- whoever

2    prevails in the end it'll revert back or not. And so

3    let's say Congressman Graves wins in that district that

4    is drawn, for two years, he's under -- has a completely

5    different constituency largely that he's serving.

6              And so -- and if the defense prevails, then we

7    have to go back to Act 5 from that map, it -- it really

8    -- it -- it's tossing massive amounts of, you know,

9    swing-in in the -- in the geography of the dif- --

10   districts. This map has the minimal impact on that

11   shift.

12             REP. JENKINS:  Well, I -- I -- I just simply -

13   -

14             REP. IVEY:  [inaudible] it may be more

15   favorable as far as my colleagues are concerned --

16             REP. JENKINS:  I understand.

17             REP. IVEY:  -- trying to get that [inaudible].

18             REP. JENKINS:  I understand. I mean, I -- I

19   just simply commend you for having the political

20   courage to try to do a map with two black districts.

21             REP. IVEY:  Is this a political job? I didn't

22   know.

1           REP. JENKINS:  Yeah. It's very, very

2   political. Very political. Thank you, Mr. Chairman.

3           REP. IVEY:  I would definitely [inaudible].

4           MR. CHAIRMAN:  Thank you. Let's -- I know your

5   -- your button is pushed, Representative Carter, but I

6   -- I'm sticking to my one bite at the apple, I'm going

7   to let you come back again and -- and finish your line

8   of questioning, but I want to get to the cards; okay?

9   First card, Amber Thomas [ph]. I think it's Thomas.

10  Yes, ma'am. Present, in support, would like to speak.

11  Also, Davante Lewis with Louisiana Budget Pro- --

12  Project, in support, would not wish to speak. And

13  whenever you're ready, ma'am.

14          REP. AMBER THOMAS:  Good afternoon. Thank you,

15  Chairman, the committee. My name is Amber Thomas and

16  first, I would like to start off with in 2021, a black

17  man was endorsed by the Republican Party to run for

18  Congressional District 2.

19          During this campaign, it was said by

20  Republican leadership that his -- that this candidate

21  was hostile to the interest of the party, a black

22  conservative man and those recorded words by that

1    particular leader will forever be burned in my mind. In

2    Louisiana, as of June 1, 2022, you have 21,780

3    registered black Republicans.

4              Of other party registered Republicans, you

5    have 199,304. Since we have thousands of black

6    Republican and other party voters who may believe in

7    conservative values just like many black people do, why

8    are we limiting the push to run more black Republican

9    candidates since this is where we are in present-day

10   Louisiana?

11             You cannot stunt growth of population decline

12   and population growth. Sooner or later we will have to

13   accept that Louisiana is changing. While the party is

14   only getting out -- why is the party not getting out

15   into the urban community and actually canvassing? Why

16   do we not have an effective push during the Census of

17   2020?

18             So what you're telling me and other black

19   Republican and conservative voters is that as a party,

20   we would rather have black people there for photo ops

21   and not to actually run for elected positions.

22             With having over 100,000 registered

1    independents and black Republicans, this is the message

2    that we're sending to other minorities who would

3    benefit from actually having a second Congressional

4    district where that would not stop Republicans winning,

5    but it would definitely show what party wants it more.

6            So instead of having all of these galas and

7    brunches and conventions as a party, we will do no work

8    if we were to have a second minority district, just

9    nothing? Are we really going to say we're not equipped

10   as a party? Then we should just really say that and end

11   this today. Is our Republican leadership that bad that

12   they will never be able to campaign in a second

13   majority-minority district?

14           Then just say that. Let us be honest that

15   maybe our party is so old that we're not equipped to

16   actually face a changing America. Any questions?

17           MR. CHAIRMAN:  Yes, ma'am.

18           REP. AMBER THOMAS:  Yes.

19           MR. CHAIRMAN:  I believe there is,

20   Representative Carter.

21           REP. AMBER THOMAS:  Yes.

22           REP. CARTER:  No. I -- I got [inaudible].

1          MR. CHAIRMAN:  Oh, you -- oh, I'm sorry, did

2     you --

3          REP. CARTER:  I got a -- a question

4     [inaudible].

5          MR. CHAIRMAN:  Okay.

6          REP. CARTER:  All right.

7          REP. AMBER THOMAS:  Okay. Any questions?

8          MR. CHAIRMAN:  I don't see any others.

9          REP. AMBER THOMAS:  All right. Thank you.

10         MR. CHAIRMAN:  Thank you very much. We have a

11    couple of more green cards and then we'll get to the

12    red cards. We have Edgar Cage with Together Louisiana,

13    is -- although I do not wish to speak, I am present and

14    support. And Lady Carlson from Together Louisiana,

15    although I do not wish to speak, I am present and in

16    support. I believe that's all the green cards. And we

17    have Mary, I've heard it three different ways today.

18         REP. LABRIE:  Labrie [ph].

19         MR. CHAIRMAN:  I thought I knew that it was

20    Labrie. I'm going to try that again.

21         REP. LABRIE:  That's it.

22         MR. CHAIRMAN:  Susie [ph] Labrie who is --

1    although I do not wish to speak, I'm present and in

2    opposition. And I don't have any other cards. I do have

3    Representative Carter who's now gone. Represen- -- you

4    have the -- oh here, let me turn [inaudible].

5          MR. CHAIRMAN:  All right. We're going to

6    invite Representative Ivey back up to the table just so

7    we can close out. And Representative Ivey,

8    Representative Carter has a question for you.

9          REP. CARTER:  Representative Ivey -- thank you

10   -- thank you, Mr. Chairman. Representative Ivey, I -- I

11   think this -- this bill sort of gives us an opportunity

12   to define what is a minority-ma- -- majority-minority

13   district. It seems that you think 50 percent --

14   anything over 50 percent is -- is a majority-minority

15   district.

16         REP. IVEY:  That -- it's not what I think.

17         REP. CARTER:  Okay. I'm -- I'm just -- the

18   bill does.

19         REP. IVEY:  What I think -- well, what I think

20   is -- so a majority-minority district is a district,

21   okay, where minorities that -- you know, the

22   significant minorities in that di- -- the mi- -- that

1    minority class have the opportunity to elect a

2    candidate of their choice.

3              REP. CARTER:  Right.

4              REP. IVEY:  That said, that's not what The

5    Court ordered us.

6              REP. CARTER:  Right.

7              REP. IVEY:  And so we're not able to take into

8    account other minority groups or white population that

9    may vote in a -- a political alignment with black

10   minorities.

11             REP. CARTER:  I understand.

12             REP. IVEY:  We're required to create a black

13   majority-minority district. We've got 50 percent plus -

14   - over 50 percent black voting age population. I

15   believe that absolutely creates --

16             REP. CARTER:  Okay.

17             REP. IVEY:  -- a district --

18             REP. CARTER:  Okay.

19             REP. IVEY:  -- that is majority-minority.

20             REP. CARTER:  Okay. When these districts --

21   when these courts hear arguments and expert -- ex- --

22   witnesses on these districts as to what is a minority -

1  - majority-minority district, they take into account

2  very different studies --

3         REP. IVEY:  But that's only when you're trying

4  to combine multiple minority groups or use white

5  population as a part of that majority. This map only

6  exclusively uses the black voting age population in its

7  minority-majority calculation.

8         REP. CARTER:  But when the -- when the judge

9  says creating a -- a minority -- when you create a ma-

10  -- this district at 51.3 percent, in my opinion, it is

11  -- it does not meet the -- the criteria that the judge

12  has set, because it's not a minority district; okay?

13         Really, when you look at all the studies and

14  all the -- all the different tests you take to

15  determine the likelihood or probability of a -- of a --

16  a majority elec- -- selecting the person of their

17  choice, this would not be one of the districts, in my

18  opinion. This -- this district is not two minority-

19  majority districts, that's -- that's the way I look at

20  it and I'm just -- I'm just saying just because it's 50

21  percent or 51 percent, that -- that doesn't make it.

22         That's -- that's -- it'd probably take at

1   least 53 percent to have a minority-majority district -

2   - 53, 54 percent, not -- not -- not -- not --

3   Representative Carter, I think he got about 60 percent

4   presently in his district, registered voters I think --

5   or 59, something like that, but he would go to 54

6   percent -- I think 53.-something percent in -- in your

7   plan.

8           That would probably be a -- a -- a minority --

9   a majority-minority district, but the other District 5,

10  that's an opportunity district. That's really not a --

11  that's really not a ma- -- ma- -- ma- -- majority-

12  minority district. That's not --

13          REP. IVEY:  Can you tell me, what was the

14  number -- the standard that you said [inaudible]?

15          REP. CARTER:  Well -- well, it -- it was based

16  on studies, it's not -- the -- the House Bill 1 --

17          REP. IVEY:  But what number did you use, 50

18  what?

19          REP. CARTER:  I'd say about 53, 54 percent.

20          REP. IVEY:  Okay. So --

21          REP. CARTER:  Fifty-four percent.

22          REP. IVEY:  -- HB1 only has --

1          REP. CARTER:  Probably 54 percent.

2          REP. IVEY:  -- 51.4 percent. And so that map

3    is not a -- a [inaudible] --

4          REP. CARTER:  I don't think it -- I don't

5    think it's -- it -- it's a majority-minority district.

6          REP. IVEY:  Okay.

7          REP. CARTER:  It -- it's not just -- it's not

8    just the over 50 percent thing, it's -- it's -- it's

9    based on studies and tests and -- and formulas and --

10   and all kinds of different -- different ways to

11   determine voting patterns and to create -- have an

12   opportunity to create a district -- elect a person of

13   your choice.

14         REP. IVEY:  So you agree that the judge --

15         REP. CARTER:  So it's just based on --

16         REP. IVEY:  -- shouldn't have made us do this

17   in six days?

18         REP. CARTER:  Well, I think we should've done

19   it in the first place in February. I don't think the

20   judge should've made us do anything. I think we

21   should've done it, it's the right thing to do. And when

22   you -- when you -- what you -- when you talk about a

1   minority district, you're not talking about 51 percent,

2   because the way you guys --

3           REP. IVEY:  [inaudible] majority-minor- --

4   it's not majority-minority, to be clear, it's -- this

5   is a black majority-minority district in the sense that

6   the judge required that and the fact that there is no

7   analysis that needs to be done to determine that black

8   people make up over 50 percent --

9           REP. CARTER:  Okay.

10          REP. IVEY:  -- of the voting age population in

11  this.

12          REP. CARTER:  Oh, okay. You have to read the

13  entire 152-page opinion to understand --

14          REP. IVEY:  I was busy working on a map

15  [inaudible].

16          REP. CARTER:  -- to understand -- well -- well

17  -- well -- well, I'm going to tell you -- and to -- to

18  understand what the judge is talking about and when she

19  say a -- a minority -- a -- a -- a black minority, this

20  district, you have to read the whole 152 pages. You

21  can't read the -- the -- the -- the beginning and the

22  ending and say you've got a 51 percent district and

1    it's a -- it's a black minority district, it's not.

2             REP. IVEY:  What -- what --

3             REP. CARTER:  And just -- so all I'm saying is

4    -- for the record, all I'm saying is as I read the

5    judge's -- the judge's decision, the whole 152 pages of

6    it, and as I look at your map, it does not create two

7    minority-majority districts, it does not. It creates a

8    major- -- a possible minority-majority district and an

9    opportunity district.

10            And so that's -- then it's -- then it's

11   gerrymandered so bad. So those things combined I can't

12   vote for it --

13            REP. IVEY:  Well --

14            REP. CARTER:  -- and I -- and I don't want to

15   -- I don't get the impression that I'm against -- I'm -

16   - I'm not against having -- of course I -- I support

17   having two minority districts, but this is not one of

18   them. This -- this is sort of like a -- like a -- a pig

19   in a poke. This -- this is like --

20            REP. IVEY:  I -- you used my language, I said

21   it wasn't a pig in a poke.

22            REP. CARTER:  -- it's -- it's like -- it's

1   like saying you've got something but you really don't

2   have it and -- and you're setting -- you're -- you're

3   setting it up for failure and if you're going to have a

4   real minority-majority district, you're going to have

5   to have close to 4- -- 54 percent and -- and -- and --

6   because that's based on studies and experts. That's not

7   based on just something come out [inaudible].

8          MR. CHAIRMAN:  Okay. You made that point,

9   Representative Carter.

10         REP. CARTER:  All right. All right. That's all

11  I have.

12         MR. CHAIRMAN:  You made that point. Yes, sir.

13  All right. All right. Representative Ivey, I'm going to

14  let you close.

15         REP. IVEY:  Thank you, Mr. Chair. Members, I

16  appreciate your time and attention on this matter. I

17  believe -- and again, our constituents, we owe it to

18  them to at least try and again, I will respect any and

19  all of your decisions and how you have to process the

20  information yourself, you know, in your own belief

21  system.

22         This morning I was thinking about what I was

1    going to say and I was reminded of a meeting that we

2    had at LSU last term about -- you know, it was probably

3    I guess '18 or so and it was with LSU students and

4    Steve Carter kind of, you know, coor- -- coordinated

5    that and one of the questions that I was asked in the

6    small group of students was, would I support a second

7    minor- -- majority-minority district.

8            Now, I'm going to be honest, this was before

9    redistricting and it was even on my radar and I -- I --

10   I understood what it meant, but I had no bearings on

11   the significance or complications and difficulty of

12   doing that and what I said was this, I'm going to let

13   the data drive my decision.

14           You know, I -- I -- I don't want to force

15   anything that doesn't have some resemblance of, you

16   know, making -- making sense. And so, again, absent

17   during the regular session, a bill that I felt I could

18   support I -- I was -- I was and still am confident in

19   my votes for HB1, which is Act 5 and the veto override.

20           I have done exhaustive research on

21   jurisprudence on this issue. The fact is that it is so

22   detailed and we never know what a -- a supreme court

1  justice ultimately may rule on, what little details and

2  I'm not going to pretend to have a clue that I can do

3  that. I could make strong arguments on both sides.

4          I can make strong arguments on both sides. But

5  I do know how the map was drawn. I -- I do put a lot of

6  -- of faith in the incredibility in our speaker in his

7  process that he used to draw the map. Now, while it may

8  not have -- made any efforts whatsoever to improve

9  competitiveness for major- -- for minorities, the fact

10 is his map was the status quo and our number one

11 objective for redistricting is to, you know, fix

12 malapportionment and he did that.

13          It was a check in a box. There was no

14 malintent in that process whatsoever. Now, here's the

15 reality, and this is rhetorical, what actual

16 involvement have any one of us had in the construction

17 of any map that we've passed; right?

18          Very little. You know, with -- again, with the

19 exception of maybe a few members, you know, trying to

20 maybe fli- -- flip a few -- few precincts and things

21 like that.

22          Largely, the dye was cast on most of the bills

1    from the beginning. I know Representative Thomas worked

2    with certain members to try to address some things and

3    -- and were able to come up, you know, with some

4    amendments and stuff, but it's -- it's just very few

5    members had -- have actively engaged, at any level, on

6    any specific map, particularly the Congressional map.

7            And so with that said, I tried to show da- --

8    great deference to the individuals who've put in the

9    work and not question every little decision and every

10   little thing.

11           And so with this, Members, what -- what I'm

12   asking is that we keep alive the opportunity. There's a

13   lot of time between here and the floor.

14           That's tongue-in-cheek, but -- but there's

15   time. And so there's some things that can be addressed

16   that maybe they -- they can't and maybe ultimately you

17   can't support it and I can -- and I can appreciate

18   that, but I do believe that what happened in the

19   redistricting session -- and I -- I'm -- I'm not going

20   to fault anybody or -- or -- or im- -- impugn any

21   nefarious intent on the decisions, but the fact is we

22   didn't get any instruments that would improve majority-

1   minority representation out on the Congressional map.

2          And so no debate was had on the floor to allow

3   the opportunity for all of us elec- -- not just me, but

4   every elected official regardless of the side of the

5   issue you're on to have the opportunity to debate that

6   issue on the floor.

7          This instrument, as did HB1 and 2, provide

8   that opportunity, if we -- if we move this and -- and

9   that's all I'm asking.

10         You -- you know, you may -- you may have your

11  mind made up and I can respect and appreciate it, but I

12  do believe it's imperative that we get an instrument to

13  the House floor so that it can be fully debated not

14  only to attempt to comply with the federal court order,

15  but to also, you know, do everything we can, because if

16  we fail, and the probability is great, the federal

17  judge is going to impose a map.

18         And so, you know -- and to conclude, since

19  everybody's here and -- and Representative Carter

20  doesn't like my map, I recognize why he doesn't like

21  it, it's not as favorable as the other map, but one of

22  the primary objectives, and I told you in my approach,

1    was to be as least disruptive geographically to the

2    current Congressional districts.

3            If the defendants are a prevail, you know, in

4    the end, if we are -- if we have to use this map

5    because the appellate courts don't intervene in time in

6    their -- defendant's favor, the political shift from a

7    map like HB1 could mean -- be dramatically impactful to

8    our constituencies as a whole.

9            So like I said, if Garret Graves has to go

10   from Flor- -- from where he is now to the Florida

11   parishes and then back to, you know, where he is now,

12   that -- that is -- that is significant and -- and it --

13   it affects the people in those -- those districts. And

14   so I believe this is the least painful shifting for

15   everybody under the current status quo and it

16   absolutely complies with the -- the federal

17   requirement. Thank you.

18           MR. CHAIRMAN:  Okay. Members, that's his

19   close. That ends the debate, we've read the cards.

20   Emails, did I read the emails? I read the emails

21   already. Representative --

22           REP. IVEY:  And -- and at the appropriate

1    time, I'd like to move favorable -- favorable.

2            MR. CHAIRMAN:  Representative Ivey is going to

3    move that we report House bill favorable. Is there an

4    objection? There is an objection. A vote yes is to move

5    the bill to the floor favorable, a vote no means the

6    bill remains in committee. Ms. Ammersbach will call the

7    roll.

8            CLERK:  Chairman Stefanski.

9            MR. CHAIRMAN:  No.

10           CLERK:  No. Vice-Chairman Duplessis.

11           REP. DUPLESSIS:  Yes.

12           CLERK:  Yes. Representative Beaullieu.

13   Representative Wilford Carter.

14           REP. CARTER:  No.

15           CLERK:  No. Representative Deshotel.

16           REP. DESHOTEL:  No.

17           CLERK:  No. Representative Farnum.

18           REP. FARNUM:  No.

19           CLERK:  No. Representative Gadberry.

20           REP. GADBERRY:  No.

21           CLERK:  No. Representative Horton.

22           REP. HORTON:  No.

1          CLERK:  No. Representative Ivey.

2          REP. IVEY:  Yes.

3          CLERK:  Yes. Representative Jenkins.

4          REP. JENKINS:  Yes.

5          CLERK:  Yes. Representative Mike Johnson.

6          REP. JOHNSON:  No.

7          CLERK:  No. Representative LaCombe.

8          REP. LACOMBE:  Yes.

9          CLERK:  Yes. Representative Lyons.

10         REP. LYONS:  Yes.

11         CLERK:  Yes. Representative Magee.

12         REP. MAGEE:  No.

13         CLERK:  No. Representative Newell.

14         REP. NEWELL:  Yes.

15         CLERK:  Yes. Representative Thomas.

16         REP. THOMAS:  No.

17         CLERK:  No. Representative White. Six yays,

18    nine nays.

19         MR. CHAIRMAN:  Six yays, nine nays and the

20    bill stays in committee. Thank you.

21         REP. IVEY:  Thank you, Mr. Chairman and

22    members for your time and attention.

1          MR. CHAIRMAN:  Thank you. Members, that clears

2    the agenda for today. Representative Farnum makes a mo-

3    -- motion that we adjourn without objection.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                CERTIFICATE OF TRANSCRIBER

2        I, Chris Naaden, a transcriber, hereby declare

3   under penalty of perjury that to the best of my ability

4   from the audio recordings and supporting information;

5   and that I am neither counsel for, related to, nor

6   employed by any of the parties to this case and have no

7   interest, financial or otherwise, in its outcome, the

8   above 351 pages contain a full, true and correct

9   transcription of the tape-recording that I received

10   regarding the event listed on the caption on page 1.

11

12        I further declare that I have no interest in

13   the event of the action.

14

15   _____

16        June 23, 2022

17        Chris Naaden

18

19   (453585, 2. House Committee June 17)

20

21

22

## A

**ab**
110:13

**abandoned**
205:7

**abide**
176:6

**ability**
2:15, 73:15,
144:15, 170:5,
352:3

**able**
2:15, 4:22,
5:1, 42:17,
45:6, 46:22,
53:7, 53:11,
73:13, 119:1,
121:3, 144:16,
154:9, 170:10,
180:2, 182:2,
201:6, 202:17,
203:12, 217:5,
219:5, 222:10,
230:10, 235:1,
275:12, 275:17,
280:3, 284:10,
285:19, 305:20,
311:11, 314:17,
315:19, 316:1,
330:4, 334:12,
337:7, 346:3

**abolition**
209:6

**above**
352:8

**absence**
281:5, 290:3

**absent**
273:6, 276:14,
344:16

**absolute**
196:22, 294:13

**absolutely**
11:12, 16:13,
16:17, 19:7,
25:17, 26:13,
30:17, 39:6,

41:7, 64:14,
83:20, 110:13,
124:17, 169:10,
174:19, 231:13,
231:17, 275:20,
278:6, 294:20,
303:10, 310:7,
313:14, 317:14,
329:16, 330:1,
337:15, 348:16

**acadiana**
217:11, 217:12,
217:13, 321:7,
329:9

**accept**
52:14, 333:13

**accepta**
299:15

**acceptable**
79:22, 282:22

**acceptance**
299:17

**accepted**
66:18, 66:20,
192:10

**accidentally**
254:9

**accommodate**
79:13

**accomplish**
80:1, 110:21,
235:5

**accomplishes**
283:7

**accomplishment**
67:2, 202:18

**according**
124:18, 124:20,
126:11, 144:17,
204:13, 207:10,
237:7

**accordingly**
170:20

**account**
127:2, 129:6,
170:6, 170:11,
337:8, 338:1

**accurate**
175:12, 178:16

**accusations**
270:6

**achievable**
319:2

**achieve**
44:9, 47:2,
62:7, 62:10,
295:10, 295:18,
295:19, 295:20,
297:8, 310:4

**achieved**
279:18, 283:3

**acknowledge**
21:5, 90:17,
90:21, 91:13,
197:10, 197:17

**acknowledged**
300:11

**acquaintance**
227:21

**acres**
133:16, 201:3

**across**
8:13, 9:22,
21:11, 31:4,
32:12, 54:12,
54:19, 86:10,
152:4, 152:5,
153:17, 154:1,
158:17, 159:1,
181:21, 200:13,
201:22, 202:5,
219:21, 223:8,
223:13, 227:8

**act**
17:14, 21:20,
22:9, 24:19,
40:19, 43:7,
43:8, 43:14,
47:3, 48:18,
52:13, 56:16,
58:15, 62:11,
62:12, 68:13,
76:21, 77:1,
80:15, 81:16,
95:12, 97:16,
98:3, 104:6,
108:22, 109:9,

109:20, 118:9,
123:6, 135:10,
137:20, 205:17,
205:18, 233:18,
236:2, 236:6,
236:12, 236:13,
236:14, 236:16,
236:17, 239:15,
269:20, 272:4,
272:7, 272:13,
273:15, 274:1,
282:5, 282:8,
300:19, 304:20,
331:7, 344:19

**acted**
294:13

**acting**
117:9, 117:13,
124:7, 124:10,
144:15

**action**
9:20, 20:1,
20:2, 22:6,
148:18, 148:21,
172:7, 174:14,
253:10, 352:13

**actions**
149:13

**actively**
346:5

**acts**
204:5

**actual**
14:4, 196:13,
323:3, 345:15

**actually**
11:5, 11:6,
11:13, 13:17,
29:9, 31:5,
37:17, 38:14,
48:9, 112:14,
117:5, 121:16,
124:17, 138:13,
138:21, 200:16,
212:19, 214:20,
219:2, 221:15,
222:22, 223:6,
231:7, 234:16,

235:1, 279:17,
279:18, 280:2,
287:2, 291:8,
293:4, 307:20,
308:1, 325:3,
326:1, 333:15,
333:21, 334:3,
334:16
**adam**
199:12
**add**
29:15, 66:10,
66:11, 115:14,
136:16, 226:20,
234:10, 239:7,
297:4, 323:20,
324:20, 325:14,
325:20
**adding**
235:2
**addition**
8:2, 64:20,
237:9
**additional**
22:14, 201:3,
231:12
**additionally**
2:8, 4:9, 20:8,
55:10, 267:5
**address**
63:20, 63:21,
64:4, 82:12,
172:14, 200:4,
258:7, 258:11,
273:4, 279:5,
309:16, 346:2
**addressed**
46:13, 346:15
**addressing**
285:18
**adds**
232:4, 245:11,
272:2, 272:10
**adhere**
129:1, 273:14
**adherence**
204:3
**adjacent**
326:3

**adjourn**
351:3
**administrative**
114:18, 115:17,
242:3, 273:1
**admitted**
170:4
**admittedly**
170:13
**adopt**
22:22, 143:18,
205:22, 250:18,
268:17
**adopted**
120:5, 236:2,
252:12
**advanced**
72:5, 72:6
**advancement**
183:1
**advantage**
275:6, 275:17,
281:18
**adverse**
249:18, 249:20
**advertising**
220:18
**advice**
144:10
**advisory**
199:22
**advocacy**
166:18
**advocate**
143:4, 181:17,
214:9
**advocates**
278:5, 296:17
**affairs**
2:3, 90:19,
227:6
**affect**
168:15, 186:2,
229:4, 285:18,
285:21
**affected**
168:14
**affects**
139:8, 313:10,

348:13
**affiliation**
161:11, 162:1,
162:10, 162:13,
164:1
**affirm**
281:2
**affirmation**
204:7
**afforded**
203:15, 203:16,
204:21
**affords**
316:14
**african**
34:21, 72:12,
72:14, 79:14,
84:9, 174:18,
174:21, 175:6
**after**
12:5, 13:1,
42:11, 104:16,
104:17, 109:13,
109:14, 129:12,
171:21, 172:5,
186:7, 189:4,
191:13, 213:12,
258:22, 274:2,
280:2, 291:20,
308:9, 320:8
**afternoon**
124:11, 145:15,
172:11, 174:12,
183:5, 191:8,
203:6, 332:14
**again**
23:10, 27:12,
28:22, 33:8,
35:4, 35:11,
35:15, 38:20,
41:20, 43:15,
44:11, 44:12,
44:16, 45:20,
46:21, 51:5,
51:6, 51:11,
51:16, 51:20,
53:2, 66:9,
74:18, 74:21,

78:19, 80:2,
81:4, 84:21,
91:21, 101:8,
103:13, 104:19,
119:5, 122:4,
122:5, 122:10,
133:2, 144:20,
145:2, 147:9,
148:18, 152:1,
156:18, 176:8,
176:21, 178:20,
179:16, 182:8,
191:11, 217:11,
218:10, 233:20,
236:7, 249:13,
254:19, 267:6,
276:16, 296:16,
303:9, 311:15,
312:3, 314:11,
314:20, 314:21,
316:5, 324:22,
329:2, 329:14,
330:11, 332:7,
335:20, 343:17,
343:18, 344:16,
345:18
**against**
58:2, 69:11,
186:2, 197:13,
211:19, 222:8,
254:10, 256:15,
259:20, 267:12,
275:10, 342:15,
342:16
**age**
102:16, 102:17,
129:13, 131:9,
157:8, 194:5,
280:20, 300:15,
302:11, 303:14,
305:9, 319:6,
329:12, 337:14,
338:6, 341:10
**aged**
138:3
**agencies**
115:17
**agenda**
157:11, 351:2

agents
115:1
agitated
199:3
ago
8:5, 9:6,
145:22, 173:7,
187:3, 189:7,
194:15, 209:4,
219:13, 230:3,
252:21, 276:5,
288:15
agree
12:15, 18:10,
18:14, 26:12,
37:10, 37:14,
38:5, 38:11,
39:5, 40:5,
48:10, 51:8,
75:14, 79:3,
85:18, 86:18,
86:21, 101:13,
130:6, 136:10,
148:5, 149:22,
160:3, 160:9,
184:7, 222:14,
277:11, 277:13,
292:5, 292:6,
296:5, 303:19,
306:11, 312:13,
312:14, 317:14,
340:14
agreeably
207:9
agreed
129:18, 201:7
agreeing
178:12
agreement
202:11, 202:13,
278:12
agrees
77:9
agricultural
28:3, 229:7
agriculture
133:16
ahead
2:17, 20:14,

42:22, 82:17,
231:18, 269:14
aid
201:8
ain't
211:1
air
125:22, 249:1
alabama
193:5, 193:10
alexander
258:17, 259:10
alexandria
27:3, 28:5,
35:2, 35:3,
35:17, 37:1,
38:1, 38:15,
120:20, 214:15,
215:8, 215:14
algorithm
170:2
algorithms
283:21, 284:3
alignment
11:2, 306:5,
337:9
aligns
83:8
alike
36:1
alive
346:12
allen
159:4, 199:16,
199:17, 199:19
allow
5:20, 153:17,
183:15, 190:8,
254:10, 347:2
allowed
129:7, 146:5,
206:19
allowing
16:19, 186:12
allows
24:19
alluded
131:19

alluding
165:13
almost
59:9, 67:12,
72:11, 85:15,
124:4, 193:22,
223:21
alone
5:17, 201:19
along
24:4, 48:2,
57:7, 59:22,
87:18, 118:18,
119:17, 158:12,
159:22
alongside
227:19
already
39:12, 51:21,
62:18, 65:9,
65:11, 67:7,
104:17, 135:9,
153:5, 164:9,
185:16, 192:12,
241:22, 242:2,
253:18, 254:19,
262:2, 279:4,
297:4, 328:18,
348:21
also
7:8, 7:21,
19:16, 19:18,
25:5, 27:20,
28:1, 28:4,
44:5, 44:6,
48:4, 53:9,
56:19, 73:15,
96:17, 97:11,
105:18, 109:19,
120:22, 132:4,
132:8, 132:22,
148:6, 166:4,
171:18, 172:7,
172:8, 174:14,
176:14, 176:15,
177:18, 187:17,
192:16, 197:17,
197:18, 198:6,

199:7, 199:21,
201:16, 213:10,
215:13, 216:4,
221:11, 225:16,
226:20, 228:12,
231:3, 237:9,
257:3, 259:5,
270:3, 280:14,
305:18, 309:13,
317:20, 325:13,
332:11, 347:15
alternatives
254:1
alters
271:8
although
335:13, 335:15,
336:1
always
5:18, 12:16,
68:18, 74:10,
85:6, 90:10,
110:3, 116:14,
121:4, 141:18,
144:10, 145:1,
158:9, 159:2,
174:9, 175:16,
188:7, 192:1,
194:7, 221:7,
230:15, 240:5,
244:11, 261:18
amazing
12:8
amber
332:9, 332:14,
332:15, 334:18,
334:21, 335:7,
335:9
amended
217:3, 252:16,
254:21, 262:6,
263:13, 263:16,
269:9, 282:6
amendment
40:17, 43:6,
43:9, 54:3,
228:8, 229:21,
231:16, 231:19,

232:4, 232:8,
233:3, 234:7,
234:10, 234:13,
235:2, 235:22,
236:1, 236:8,
237:17, 241:3,
241:5, 243:8,
245:3, 249:9,
249:18, 250:3,
250:15, 250:18,
252:12, 255:2,
255:21, 255:22,
256:4, 266:16,
281:3, 283:13,
283:14, 283:18,
284:7, 297:6,
298:9

**amendment's**
241:4

**amendments**
140:16, 209:9,
232:10, 232:11,
268:12, 268:15,
268:18, 269:9,
326:8, 346:4

**america**
186:15, 334:16

**american**
62:16, 72:12,
79:14

**americans**
34:22, 63:2,
63:3, 72:14,
84:9, 174:18,
174:22, 175:7,
184:7

**ammersbach**
2:18, 349:6

**among**
126:12, 204:12,
329:4

**amount**
46:7, 70:16,
167:8

**amounts**
315:1, 331:8

**ample**
99:8, 180:1

**analysis**
48:20, 49:5,
49:9, 49:11,
49:17, 50:2,
50:5, 50:10,
50:18, 53:12,
80:14, 103:7,
117:3, 119:21,
128:11, 169:16,
169:19, 169:21,
170:4, 192:9,
248:10, 281:10,
303:13, 315:9,
323:1, 341:7

**analyzation**
53:20, 54:4

**analyze**
128:15

**anchor**
217:9

**anchored**
219:17, 220:17

**anger**
93:1

**angry**
104:21

**animals**
317:22

**announced**
248:19

**annual**
134:19

**another**
29:15, 31:9,
34:18, 40:22,
47:1, 51:2,
64:13, 65:16,
74:19, 75:16,
81:7, 95:22,
103:22, 105:7,
121:10, 121:13,
152:19, 198:11,
201:12, 202:9,
233:21, 240:2,
244:9, 245:21,
247:9, 252:13,
276:12, 276:14,
289:5, 289:8,

289:9, 290:13,
294:1, 295:21,
295:22

**answer**
25:12, 30:1,
30:15, 30:17,
31:11, 31:20,
42:9, 42:16,
45:16, 45:17,
45:18, 46:22,
50:17, 52:4,
52:7, 52:11,
52:14, 52:20,
53:3, 78:15,
78:22, 112:12,
115:14, 128:8,
132:2, 147:14,
184:20, 300:4,
321:22

**answer's**
52:19

**answered**
46:17

**answerer**
131:4

**answering**
53:1, 171:11

**answers**
56:3, 163:16,
179:2, 237:9

**anteroom**
213:11

**anthony**
117:19, 128:19

**any**
2:13, 2:14,
5:20, 6:4,
15:15, 15:16,
15:22, 16:20,
25:5, 27:16,
28:14, 29:13,
29:22, 43:17,
49:21, 51:14,
51:15, 54:22,
55:4, 60:2,
60:4, 60:10,
73:7, 83:17,
93:1, 101:9,

105:20, 108:4,
111:11, 114:5,
119:11, 131:1,
132:2, 135:11,
141:14, 167:1,
177:10, 192:14,
192:15, 197:11,
197:13, 200:17,
200:18, 202:19,
206:15, 206:17,
209:15, 211:19,
234:5, 236:2,
236:3, 236:6,
239:7, 243:22,
244:16, 246:20,
249:18, 249:20,
250:15, 254:6,
261:17, 263:13,
267:7, 275:12,
284:22, 285:2,
285:3, 286:7,
290:10, 291:22,
298:19, 300:4,
310:8, 310:17,
311:3, 313:4,
320:22, 323:3,
323:4, 326:9,
328:2, 328:7,
328:11, 334:16,
335:7, 335:8,
336:2, 343:18,
345:8, 345:16,
345:17, 346:5,
346:6, 346:20,
346:22, 352:6

**anybody**
56:11, 70:19,
104:20, 111:11,
116:12, 137:4,
198:5, 209:15,
209:17, 210:22,
211:5, 212:18,
231:11, 258:22,
263:1, 263:5,
266:15, 315:15,
346:20

**anymore**
113:9

**anyone**
31:10, 98:22,
101:9, 140:2,
144:10, 152:22,
175:15, 199:2,
212:20, 239:17,
261:15, 270:1,
310:9
**anything**
7:6, 26:2,
30:7, 41:18,
45:18, 53:18,
60:5, 131:2,
154:4, 159:15,
199:1, 203:22,
209:21, 243:20,
247:10, 253:9,
284:2, 290:4,
322:1, 326:9,
336:14, 340:20,
344:15
**anytime**
29:14
**anyway**
6:17, 193:20,
227:1, 288:20,
300:4, 330:11
**apart**
55:19, 216:7,
216:22, 217:7,
218:10
**apathy**
172:15
**apologize**
6:1, 6:2, 16:8,
20:6, 199:1,
225:5, 230:15
**apparent**
217:18, 228:12
**apparently**
84:12
**appeal**
74:11, 233:10,
273:3, 297:13,
330:5
**appealed**
233:16, 272:20,
272:21, 330:11,

330:12
**appeals**
66:12, 74:9,
74:11, 96:17,
97:7, 98:1,
241:8, 241:12,
272:22, 273:1
**appear**
136:12, 298:4
**appears**
35:4, 179:9,
179:11, 179:13
**appease**
228:9
**appellate**
262:13, 312:10,
348:5
**apple**
4:16, 56:2,
164:8, 326:13,
332:6
**applicability**
232:6
**application**
242:15, 242:16
**applied**
206:19, 209:13,
209:16
**applying**
280:22
**appointed**
73:1, 83:12,
97:9, 213:1,
213:3
**apportioned**
204:12
**apportioning**
206:14
**apportionment**
205:16, 207:4,
212:19
**appreciate**
19:11, 19:14,
52:20, 53:1,
56:3, 71:6,
92:13, 92:14,
111:6, 123:22,
145:6, 145:11,

145:17, 152:1,
171:12, 196:6,
197:4, 198:4,
203:2, 216:15,
230:22, 231:1,
253:3, 272:12,
299:6, 302:12,
305:1, 316:17,
317:15, 343:16,
346:17, 347:11
**appreciation**
226:15, 305:7
**approach**
271:20, 274:19,
278:20, 279:1,
279:11, 347:22
**appropriate**
22:12, 252:15,
348:22
**approve**
74:16, 194:13,
299:5
**approved**
305:13
**arbitrarily**
213:1, 213:2,
213:3
**area**
10:2, 10:3,
11:14, 13:1,
13:21, 18:6,
37:11, 37:20,
38:8, 51:2,
51:5, 51:12,
64:2, 71:21,
98:5, 98:6,
111:16, 121:19,
121:22, 127:22,
158:11, 158:19,
159:2, 159:13,
165:6, 181:21,
214:4, 216:21,
217:11, 220:2,
220:13, 220:14,
222:2, 222:10,
222:21, 285:8,
310:6
**areas**
24:4, 28:18,

36:8, 36:22,
42:17, 55:2,
63:11, 67:1,
68:3, 72:6,
152:2, 159:6,
159:18, 168:15,
223:16, 229:7,
229:8, 229:10,
316:5
**aren't**
54:20, 83:11,
120:21, 208:4,
208:16
**argue**
89:19, 205:11,
205:12, 212:14,
219:20, 291:17,
296:9
**argued**
294:8
**arguing**
176:2
**argument**
36:18, 37:13,
57:5, 69:11,
70:1, 229:3,
240:16, 330:14
**arguments**
157:12, 248:10,
248:12, 248:16,
249:8, 337:21,
345:3, 345:4
**arkansas**
194:4
**army**
200:10, 200:14
**around**
34:22, 35:3,
36:17, 37:1,
37:19, 38:8,
44:6, 44:14,
46:9, 47:17,
47:21, 47:22,
51:12, 75:18,
75:21, 88:2,
93:11, 128:11,
132:22, 137:9,
165:14, 167:1,

171:20, 207:17,
216:9, 310:11
**arrested**
145:7, 145:9
**article**
204:7, 204:22
**articulate**
42:18, 53:7
**ascertain**
121:3
**ashley**
199:8
**asian**
62:16, 63:2
**asked**
16:1, 33:21,
33:22, 42:5,
49:7, 55:21,
56:14, 56:19,
56:22, 59:21,
59:22, 77:15,
77:16, 100:16,
104:16, 179:1,
179:18, 192:3,
192:14, 195:21,
196:3, 226:19,
234:16, 273:13,
306:22, 344:5
**asking**
5:11, 5:13,
5:17, 33:15,
33:20, 42:12,
42:13, 46:12,
54:7, 54:19,
55:8, 61:1,
61:7, 64:13,
71:6, 78:18,
78:20, 103:3,
124:12, 130:17,
146:17, 148:19,
162:16, 162:19,
166:6, 177:5,
177:6, 179:7,
190:16, 310:16,
346:12, 347:9
**aspect**
135:3
**assessment**
168:2

**asset**
285:8
**assigning**
118:6
**assimilate**
278:3
**association**
7:22
**assume**
258:22, 330:22
**assumed**
43:7, 282:3
**assuming**
25:8, 198:11,
199:15
**attempt**
84:10, 272:2,
347:14
**attempted**
169:18, 309:11
**attempting**
253:4
**attempts**
286:14
**attend**
28:5, 201:12
**attended**
136:9, 259:4
**attending**
213:19
**attention**
131:3, 138:2,
212:3, 343:16,
350:22
**attest**
166:5
**attorney**
17:16, 30:12,
94:19, 100:5,
193:8, 259:19
**attorneys**
154:3
**attributes**
122:7
**audio**
352:4
**author**
57:8, 104:11,

243:18, 244:11,
268:17
**authored**
245:12, 283:8
**authority**
73:20
**automatically**
247:11
**available**
142:14, 170:1,
232:4
**avoid**
228:14
**avoyelles**
307:4, 307:5
**aware**
66:16, 113:5,
270:5, 310:18,
311:17
**away**
59:1, 156:12,
205:18, 211:6,
214:13, 215:3,
240:1, 240:4,
262:21, 288:4
**awesome**
26:5

**B**

**ba**
232:15
**babies**
327:9
**bachelor's**
135:6
**bachelors**
213:18
**back**
12:3, 38:4,
40:13, 41:20,
42:11, 44:12,
51:16, 73:14,
74:18, 81:13,
91:22, 93:11,
95:22, 97:12,
97:20, 98:1,
100:19, 101:6,
104:19, 105:2,

106:1, 110:8,
110:11, 122:10,
124:1, 146:16,
159:17, 164:15,
164:16, 166:5,
167:16, 169:7,
175:17, 177:22,
178:6, 178:13,
178:16, 179:10,
180:3, 183:19,
186:3, 192:18,
192:22, 193:14,
205:22, 209:5,
216:15, 228:3,
230:3, 231:6,
231:8, 233:20,
238:13, 238:21,
239:15, 240:2,
240:8, 240:11,
244:10, 245:8,
247:8, 274:6,
274:19, 280:1,
298:8, 298:11,
308:20, 316:21,
330:17, 331:2,
331:7, 332:7,
336:6, 348:11
**bad**
88:4, 88:5,
263:9, 330:14,
334:11, 342:11
**balance**
43:15, 44:9,
297:12
**balancing**
40:17, 44:5
**ball**
159:7
**ballot**
173:19
**balls**
134:1, 134:11
**bank**
8:3
**bar**
280:19
**bara**
191:10

barons
209:7
barry
8:17, 227:9,
310:11
base
92:3, 124:19,
200:10, 202:2,
211:12
baseball
158:7
based
13:16, 13:17,
56:18, 65:18,
79:19, 84:17,
91:10, 91:13,
91:14, 91:18,
91:20, 92:4,
93:4, 95:6,
96:13, 108:3,
112:1, 112:4,
114:15, 115:21,
120:3, 123:17,
129:20, 130:2,
132:6, 133:9,
133:11, 133:15,
136:3, 169:2,
171:3, 173:16,
220:6, 220:21,
229:13, 229:17,
229:20, 229:22,
300:1, 320:4,
339:15, 340:9,
340:15, 343:6,
343:7
bases
201:22, 202:4
basic
111:7
basically
14:1, 17:7,
58:17, 67:5,
67:21, 70:8,
158:16, 160:20,
187:9, 217:3,
224:7, 237:4,
258:11, 282:16,
292:13, 299:20

basin
11:6
basis
66:7, 118:7,
129:10, 220:8,
272:6, 281:7
bat
293:5
bathroom
132:2
baton
24:3, 27:5,
32:21, 68:9,
79:10, 81:1,
86:5, 118:22,
119:2, 119:22,
139:14, 145:21,
172:16, 204:17,
210:17, 211:13,
214:11, 214:17,
215:8, 219:18,
220:12, 220:13,
220:14, 220:17,
220:19, 220:21,
224:12, 287:4,
293:5, 319:20,
323:10
bayou
7:16, 8:2,
226:4
bearings
344:10
beat
190:2
beating
50:13
beaullieu
349:12
beauregard
159:4
beautiful
284:8, 297:9
became
260:18, 269:20,
274:16
become
122:13, 233:19,
236:7

becomes
90:13, 241:10,
241:12, 246:10,
282:20, 292:20,
293:2
becoming
157:8
bed
275:4
beer
209:21
before
5:9, 22:17,
26:3, 27:11,
45:21, 60:4,
66:15, 88:18,
95:3, 100:14,
109:15, 117:10,
121:11, 144:10,
164:5, 164:8,
166:8, 167:13,
169:19, 173:6,
179:22, 180:11,
184:5, 189:13,
191:17, 193:21,
194:14, 195:20,
196:11, 207:14,
231:16, 236:5,
236:7, 240:18,
252:17, 253:9,
255:1, 259:9,
260:17, 266:14,
266:15, 268:6,
271:6, 271:22,
276:3, 290:18,
290:20, 296:9,
316:15, 322:21,
344:8
began
177:22, 180:11,
205:8, 258:14,
320:9
begging
194:19, 211:2
begin
14:2, 22:1,
181:10, 210:1,
269:18

beginning
185:4, 185:17,
186:22, 261:13,
341:21, 346:1
begins
325:9
behalf
17:10, 78:3,
101:9, 174:13
behind
34:8, 196:6
being
5:7, 5:8, 6:21,
8:14, 10:11,
18:9, 33:9,
47:18, 58:4,
72:6, 76:14,
76:15, 80:10,
89:16, 98:8,
98:12, 99:17,
106:7, 108:14,
118:15, 121:5,
124:17, 125:20,
145:17, 153:1,
153:4, 156:20,
159:3, 160:2,
179:7, 182:5,
187:19, 189:1,
191:13, 195:6,
207:6, 208:18,
211:7, 211:20,
216:5, 218:3,
224:2, 228:14,
228:15, 229:6,
229:17, 234:7,
242:16, 263:8,
283:1, 285:16,
294:4, 294:8,
298:6, 298:11,
299:15, 305:20,
314:11, 314:22,
315:19, 317:11,
321:3, 321:7
beings
195:7
belabor
186:20, 316:17
belief
160:1, 162:1,

343:20

**beliefs**
160:1, 160:21

**believe**
8:22, 14:9,
15:19, 18:3,
46:9, 47:8,
52:11, 100:5,
100:7, 100:14,
105:19, 110:20,
125:3, 129:18,
135:9, 137:17,
153:17, 154:2,
157:9, 157:18,
160:16, 174:18,
174:21, 179:4,
190:10, 196:16,
225:21, 227:7,
227:9, 230:2,
233:14, 235:4,
235:21, 243:19,
253:13, 254:2,
254:13, 254:17,
260:14, 271:17,
275:16, 275:20,
276:7, 278:16,
279:16, 283:2,
283:6, 284:19,
285:15, 290:2,
294:14, 294:20,
297:14, 299:16,
299:20, 300:15,
302:16, 314:10,
314:18, 315:3,
329:2, 329:3,
329:6, 329:10,
329:16, 330:8,
333:6, 334:19,
335:16, 337:15,
343:17, 346:18,
347:12, 348:14

**believes**
160:16

**believing**
43:13, 153:10

**below**
319:14

**beneficial**
51:1

**benefit**
88:19, 197:10,
223:21, 334:3

**benefits**
220:15

**bernard**
152:15, 221:14

**bese**
88:2, 88:3

**best**
17:3, 88:8,
132:2, 144:13,
169:21, 169:22,
228:17, 245:18,
276:4, 278:3,
311:15, 352:3

**betrays**
205:17

**better**
17:1, 52:11,
80:8, 140:21,
182:7, 183:1,
261:16, 310:19,
329:12

**between**
11:10, 13:10,
40:6, 100:18,
133:4, 198:17,
200:9, 200:11,
208:19, 210:12,
241:17, 306:5,
314:5, 320:2,
323:13, 324:6,
324:22, 325:4,
329:3, 346:13

**beullieu**
138:12

**beyond**
171:8

**biases**
270:8

**bible**
186:11

**big**
12:20, 38:9,
249:17

**bigger**
76:10, 208:8

**biggest**
8:14, 69:11,
69:22, 192:21

**billion**
201:18, 201:20,
224:7

**bills**
2:9, 4:13,
94:14, 109:13,
112:14, 166:8,
180:14, 188:13,
188:14, 197:18,
257:19, 258:2,
328:14, 345:22

**bind**
206:3, 211:3

**bit**
29:10, 37:2,
106:2, 136:7,
149:11, 175:16,
199:3, 199:4,
203:12, 203:19,
217:3, 217:17,
220:20, 221:6,
273:19, 307:6,
307:7, 308:16,
309:3

**bite**
4:16, 56:2,
164:8, 332:6

**bitterness**
93:1

**bla**
208:17

**blacks**
67:20, 85:14,
85:17, 90:4,
90:7, 107:9,
124:20, 136:4,
151:6, 154:17,
176:15, 177:5,
227:15, 227:16,
229:5, 329:13

**blame**
53:16, 53:17

**blaming**
53:18

**blank**
315:12

**blessed**
9:21

**blessings**
8:14, 210:20

**blind**
128:16

**block**
305:19

**blocks**
54:15, 272:14

**blood**
181:9, 209:2,
230:5

**blue**
32:1, 119:8,
190:4, 307:6,
324:21

**blunt**
128:13, 130:13,
130:15, 130:19,
169:6, 169:12,
169:14, 170:4,
170:7, 170:18

**blunt's**
169:21

**bo**
318:22

**board**
8:3, 19:13,
34:8, 57:14,
153:7, 199:22,
224:6, 274:7

**boards**
87:12

**boat**
134:4, 226:3

**bodies**
181:17

**body**
21:13, 21:14,
21:19, 43:18,
43:21, 43:22,
65:8, 69:15,
73:18, 75:7,
93:2, 93:14,
99:4, 103:22,
104:22, 105:9,
105:14, 120:5,

138:19, 141:6,
141:7, 141:13,
141:20, 142:11,
144:12, 150:22,
155:16, 156:1,
166:7, 176:3,
176:4, 179:14,
180:21, 181:10,
181:15, 183:22,
188:14, 191:1,
212:20, 228:2,
228:6, 254:11
**body's**
148:18
**boggling**
325:9
**boiled**
41:12
**boils**
175:1
**book**
81:12
**books**
186:8
**border**
47:21
**bordering**
44:14
**born**
139:20, 153:5,
274:22
**bossier**
215:10
**both**
14:3, 14:19,
15:2, 15:7,
19:19, 19:20,
53:1, 56:3,
63:7, 89:5,
93:21, 94:20,
97:9, 97:22,
103:11, 104:10,
109:13, 160:12,
204:17, 210:15,
211:17, 212:6,
218:17, 223:18,
227:14, 227:15,
227:16, 227:18,

227:19, 228:9,
229:4, 229:6,
229:13, 230:17,
233:2, 234:11,
238:6, 245:15,
246:18, 247:22,
248:12, 267:10,
287:14, 287:16,
296:8, 328:14,
345:3, 345:4
**bottleneck**
15:5
**boucheries**
134:6
**boudreaux**
218:2, 218:3,
218:8
**bound**
126:12
**boundaries**
23:20
**boundary**
14:21, 59:10,
229:19
**bourriaque**
251:5, 264:2
**box**
345:13
**boyer**
3:1
**brac**
202:1
**branch**
176:5, 189:2
**branch's**
95:17
**brand**
101:14
**break**
48:3, 113:18,
113:19, 113:22,
184:4, 329:8
**breakdown**
50:20
**breakdowns**
25:4, 51:10
**breaking**
122:15

**breaks**
24:16
**breaux**
215:15
**bridge**
134:15, 215:15
**brief**
172:18, 173:22,
174:14, 177:21,
216:14, 222:17,
269:17
**brief-ish**
196:4
**bring**
20:14, 77:14,
93:11, 97:18,
110:8, 110:11,
130:19, 155:12,
179:16, 205:22,
279:13, 307:4,
320:16, 326:18,
329:9
**bringing**
56:12, 97:19,
156:18, 235:3,
270:3
**brings**
104:19, 152:1
**broad**
84:15, 91:1
**broadly**
297:13, 314:21
**brothers**
190:11
**brought**
22:6, 22:8,
97:3, 132:10,
136:8, 179:22,
205:6, 274:18,
276:16, 286:5
**brown**
177:4
**brunches**
334:7
**brush**
84:16, 91:1
**budget**
134:19, 134:20,

186:19, 206:21,
332:11
**budgetary**
188:21
**build**
9:20, 10:6,
62:5, 112:7
**building**
153:11, 262:15
**built**
202:17, 221:13
**bull**
187:5, 193:3
**bump**
140:14
**bunch**
29:17, 212:16
**burden**
281:22
**burger**
133:18
**burned**
333:1
**burt**
226:18, 230:12
**burt's**
227:2
**bus**
227:18
**business**
46:19, 115:20,
223:15
**businesses**
223:12
**bust**
311:3
**busy**
212:1, 341:14
**button**
332:5

---
**C**
---

**c6a**
36:11
**c6b**
36:12
**ca**
279:2

caddo
67:13, 324:8
cage
191:7, 191:8,
191:9, 195:18,
195:21, 196:1,
197:20, 198:4,
198:10, 335:12
cajun
19:4
calcasieu
67:15, 189:13,
324:13, 324:14
calculation
338:7
calendar
2:9
call
2:3, 2:11,
2:17, 12:4,
12:5, 93:12,
103:18, 103:20,
105:6, 113:19,
121:14, 146:2,
155:8, 172:4,
190:13, 198:13,
216:1, 225:1,
250:20, 263:18,
281:9, 287:3,
349:6
called
25:1, 64:7,
103:19, 139:8,
139:9, 151:6,
197:20, 217:12
calling
12:7, 190:21
calls
139:6, 139:10,
159:10
came
6:9, 7:2, 7:3,
64:11, 92:20,
93:19, 98:7,
100:14, 105:2,
109:4, 109:10,
109:14, 153:11,
165:3, 168:8,

168:11, 177:22,
178:10, 180:5,
185:8, 193:8,
196:12, 210:8,
214:6, 214:7,
226:1, 257:19,
259:13, 259:18,
261:14, 273:19,
273:21, 303:14
cameron
324:12
campaign
220:19, 332:19,
334:12
can't
34:17, 36:20,
38:17, 45:7,
45:16, 45:18,
85:3, 86:22,
98:6, 101:8,
105:7, 111:20,
113:15, 140:1,
140:5, 143:11,
144:15, 153:20,
181:10, 197:13,
209:11, 216:4,
221:7, 243:9,
253:19, 254:19,
260:7, 260:9,
262:15, 277:2,
291:22, 309:19,
311:2, 311:15,
313:16, 318:19,
319:20, 327:9,
341:21, 342:11,
346:16, 346:17
canal
59:11
cancel
229:16
candidate
23:18, 24:20,
27:1, 27:4,
27:6, 27:10,
83:8, 83:19,
85:6, 85:8,
85:10, 92:2,
103:10, 106:21,

131:15, 131:16,
149:7, 150:6,
151:7, 151:9,
151:20, 152:21,
159:21, 159:22,
160:2, 160:14,
173:11, 173:12,
173:19, 176:19,
190:17, 192:7,
300:18, 301:16,
302:1, 302:4,
304:3, 304:11,
304:21, 305:21,
314:15, 315:4,
315:16, 316:1,
332:20, 337:2
candidates
23:4, 23:6,
24:13, 238:1,
333:9
cane
133:15, 134:5
cannot
8:20, 30:6,
64:6, 67:17,
92:4, 129:19,
144:22, 243:11,
254:15, 333:11
canulette
225:3, 225:4,
225:9
canvassing
333:15
cap
158:7, 194:17
capital
13:20
capitol
20:22
caption
352:10
card
2:6, 6:12,
19:16, 19:21,
25:18, 26:4,
191:5, 199:7,
199:10, 231:4,
255:3, 255:9,

332:9
cards
6:8, 7:5,
19:19, 20:2,
20:4, 60:13,
164:9, 164:12,
171:17, 171:18,
172:5, 191:5,
199:14, 213:6,
231:6, 267:14,
332:8, 335:11,
335:12, 335:16,
336:2, 348:19
care
17:21, 18:1,
63:20, 69:4,
69:5, 89:5,
119:9, 160:13,
195:5, 209:17,
211:21, 248:12,
309:13, 315:10
career
215:21
careful
209:3, 274:16,
318:5
carefully
136:10
carencro
216:18, 217:20
cares
69:6
carey
199:9
carlson
172:8, 176:11,
176:12, 177:15,
335:14
carolina
280:18
carrigan
213:7, 213:8,
219:8
carrigman
19:18
carroll
292:15
cart
207:14, 326:13

**case**
36:5, 50:13,
62:4, 62:5,
72:16, 73:21,
85:2, 94:21,
105:21, 115:11,
116:19, 169:19,
171:20, 233:18,
236:6, 238:5,
240:9, 248:7,
248:9, 255:20,
270:1, 277:10,
280:17, 299:16,
305:2, 305:6,
352:6
**cases**
54:1, 73:13,
236:11, 259:12,
259:13, 259:16,
288:5, 303:5
**cast**
345:22
**categories**
124:13
**caucasian**
77:8
**caucus**
107:4, 107:8,
107:13, 107:18
**cause**
228:10, 298:6,
319:17
**causes**
221:15
**causeway**
219:21
**caveat**
299:18
**caveated**
302:13
**cease**
236:14, 236:16
**celebrate**
175:4
**celebrated**
21:3
**celebrating**
260:4

**cell**
2:5
**census**
56:9, 93:4,
124:18, 124:21,
125:21, 126:11,
126:12, 127:8,
127:12, 127:15,
133:2, 133:10,
191:19, 208:5,
274:3, 333:16
**center**
38:11, 145:20,
174:14, 214:12,
215:9
**centers**
128:10
**central**
7:22, 215:16
**centuries**
230:3
**certain**
14:10, 37:22,
48:19, 80:9,
85:10, 110:18,
146:6, 156:14,
156:16, 166:12,
166:13, 170:7,
192:19, 207:17,
262:22, 346:2
**certainly**
13:1, 16:22,
18:11, 37:7,
65:10, 82:16,
204:21, 234:22,
256:21, 257:13,
257:17
**certificate**
352:1
**cetera**
44:8
**cha**
94:15, 271:8
**chains**
206:4, 206:7,
211:3
**chair**
20:13, 30:22,

31:22, 33:1,
33:13, 41:19,
53:17, 78:20,
124:6, 124:10,
128:6, 145:2,
186:18, 190:20,
191:8, 195:19,
195:20, 195:21,
196:2, 199:19,
218:20, 231:6,
234:3, 237:13,
252:17, 257:5,
265:11, 266:9,
328:14, 343:15
**chair's**
144:11
**challenge**
40:17, 59:20,
188:11, 243:22,
254:10, 272:17,
284:13, 322:7,
322:10
**challenged**
94:2, 272:6,
294:4, 296:4,
297:1
**challenges**
120:7, 120:9,
120:15, 296:12
**challenging**
18:4, 33:3
**chamber**
8:6, 159:12,
312:5
**chambers**
93:22
**champions**
285:11
**championship**
134:2
**chance**
20:16, 23:7,
76:14, 94:9,
94:13, 94:16,
95:18, 104:17,
104:18, 207:2,
242:11, 254:8,
297:11, 298:8,

298:11
**change**
12:10, 31:5,
81:9, 179:6,
179:7, 183:9,
183:15, 191:18,
224:11, 247:12,
247:14, 247:21,
263:7, 309:20,
309:21, 310:1,
311:14, 313:21
**changed**
93:20, 142:9,
142:18, 142:19,
142:21, 258:3,
258:4
**changes**
99:20
**changing**
311:14, 333:13,
334:16
**character**
84:17, 91:5,
91:11, 91:19,
92:4
**charles**
63:10, 64:12,
163:6, 164:20,
189:11, 199:10,
203:9, 215:11
**chart**
319:10
**charts**
283:12, 328:6
**check**
124:11, 206:22,
345:13
**cheered**
189:4
**cheers**
189:14
**chick**
133:17
**chicken**
185:12
**chief**
153:6
**child**
153:14, 275:1

| | | | |
|---|---|---|---|
| **children**<br>92:12, 153:21,<br>190:12, 200:14,<br>261:20, 277:20<br>**choice**<br>23:4, 23:18,<br>24:14, 24:21,<br>27:1, 27:4,<br>27:6, 27:10,<br>83:8, 85:6,<br>85:10, 92:2,<br>92:3, 103:10,<br>106:22, 131:15,<br>131:16, 141:20,<br>149:7, 150:7,<br>151:8, 151:20,<br>159:21, 160:15,<br>176:20, 190:6,<br>192:7, 301:16,<br>302:4, 304:4,<br>304:14, 304:22,<br>305:21, 314:15,<br>315:5, 315:17,<br>316:1, 337:2,<br>338:17, 340:13<br>**choose**<br>4:17, 75:1,<br>150:14, 181:7,<br>181:8, 262:13,<br>262:16, 318:5,<br>329:22<br>**choosing**<br>51:6<br>**chose**<br>31:19, 32:7,<br>35:10, 38:17,<br>39:8, 42:6,<br>42:7, 112:20<br>**chosen**<br>31:8, 31:21,<br>34:10, 34:14,<br>34:18, 37:11,<br>47:1, 47:10,<br>52:18, 53:7<br>**chris**<br>225:2, 352:2,<br>352:17<br>**christian**<br>1:22 | **christmas**<br>134:4, 134:16<br>**churches**<br>156:5<br>**cir**<br>290:3<br>**circuit**<br>66:11, 66:19,<br>74:17, 96:17,<br>97:6, 117:2,<br>175:22, 233:9,<br>238:7, 240:14,<br>241:7, 241:11,<br>241:21, 241:22,<br>242:10, 248:6,<br>248:8, 248:19,<br>248:21, 249:1,<br>272:22, 287:14,<br>287:15, 288:9,<br>288:11, 289:21,<br>290:3, 298:14,<br>298:21, 299:2,<br>299:3, 299:4<br>**circuit's**<br>286:13, 290:21<br>**circumstance**<br>254:3<br>**circumstances**<br>291:20, 292:3,<br>323:4<br>**cities**<br>215:12<br>**citizen**<br>17:19, 17:20,<br>108:13, 108:17,<br>195:16, 228:15<br>**citizens**<br>16:15, 16:19,<br>17:22, 18:7,<br>18:13, 18:22,<br>109:21, 110:19,<br>118:6, 136:15,<br>136:16, 138:1,<br>139:9, 139:11,<br>151:19, 156:17,<br>157:2, 157:20,<br>172:3, 173:8,<br>175:19, 176:6, | 208:6, 228:17,<br>229:12, 281:6<br>**city**<br>35:16, 35:19,<br>36:3, 36:19,<br>36:22, 37:1,<br>37:11, 37:15,<br>37:17, 37:20,<br>37:22, 38:1,<br>38:3, 38:6,<br>38:11, 38:18,<br>82:21, 111:18,<br>112:15, 121:8,<br>121:9, 121:16,<br>134:15, 199:17,<br>199:20, 200:16,<br>201:2, 202:11<br>**civic**<br>316:11, 316:12<br>**civics**<br>183:21<br>**civil**<br>7:17, 10:16,<br>187:2, 258:12,<br>259:12<br>**claims**<br>22:8<br>**claire**<br>199:11<br>**clapped**<br>189:5<br>**clarification**<br>198:3, 235:10,<br>235:12, 269:8,<br>270:4, 280:8,<br>301:8, 304:19<br>**clarified**<br>42:10<br>**clarify**<br>179:21<br>**clarity**<br>270:1<br>**clary**<br>231:5<br>**class**<br>81:19, 337:1<br>**classic**<br>134:12 | **clause**<br>40:18, 118:5,<br>281:2<br>**clear**<br>19:13, 22:2,<br>39:19, 39:20,<br>47:2, 71:22,<br>83:20, 85:8,<br>179:21, 189:16,<br>195:3, 197:9,<br>231:6, 248:4,<br>248:8, 248:22,<br>255:22, 256:14,<br>312:15, 341:4<br>**clearance**<br>59:2<br>**cleared**<br>58:20<br>**clearing**<br>171:11<br>**clearly**<br>77:8, 81:17,<br>248:20, 291:19,<br>302:16<br>**clears**<br>16:3, 20:3,<br>351:1<br>**clerk**<br>2:12, 2:19,<br>2:21, 3:1, 3:4,<br>3:6, 3:8, 3:10,<br>3:13, 3:16,<br>3:19, 3:22, 4:2,<br>4:4, 4:6, 267:9,<br>349:8, 349:10,<br>349:12, 349:15,<br>349:17, 349:19,<br>349:21, 350:1,<br>350:3, 350:5,<br>350:7, 350:9,<br>350:11, 350:13,<br>350:15, 350:17<br>**close**<br>30:2, 34:9,<br>37:9, 39:3,<br>51:19, 86:12,<br>102:22, 112:22,<br>133:19, 222:3, |

225:4, 257:5,
298:4, 324:4,
336:7, 343:5,
343:14, 348:19
**closely**
83:9, 129:1,
290:21
**closer**
203:12
**closes**
252:17
**closing**
231:16, 252:16,
268:4
**closure**
202:2
**clouds**
317:22
**clue**
219:10, 345:2
**clutter**
195:3
**coalition**
199:9
**coast**
8:13, 12:11,
12:21, 87:18,
226:3, 226:6,
285:7
**coastal**
9:2, 9:8,
10:14, 11:11,
11:22, 12:16,
14:7, 15:9,
15:15, 88:1,
122:16, 159:6,
159:13, 225:21,
226:10, 285:8,
285:10
**coauthored**
107:3, 107:18
**code**
170:1, 170:5
**cohesions**
229:9
**colleague**
129:19, 138:12,
151:13, 156:7,

168:21
**colleagues**
64:7, 124:15,
133:3, 151:16,
152:2, 196:22,
197:12, 216:17,
254:14, 278:5,
291:8, 297:13,
329:4, 331:15
**collectively**
155:22
**color**
47:5, 85:1,
85:5, 91:1,
91:2, 91:7,
91:13, 91:15,
91:19, 152:4,
160:22, 172:15,
181:8, 182:14
**colored**
189:11
**colors**
24:19, 307:13
**combination**
310:21
**combine**
338:4
**combined**
214:19, 324:1,
342:11
**come**
5:4, 6:13,
6:18, 15:4,
41:11, 42:11,
59:20, 63:3,
65:6, 93:1,
93:3, 93:6,
96:1, 97:14,
98:1, 98:5,
105:3, 121:4,
123:4, 139:13,
139:14, 139:17,
141:2, 141:3,
143:1, 144:2,
152:16, 157:1,
157:6, 164:16,
166:8, 166:13,
167:13, 167:21,

171:7, 172:3,
172:9, 180:9,
182:6, 184:1,
192:12, 195:1,
195:2, 203:16,
203:20, 219:5,
219:6, 222:18,
225:7, 230:9,
231:8, 233:10,
233:11, 233:20,
238:12, 240:2,
240:8, 240:11,
244:10, 247:8,
254:17, 255:16,
257:11, 298:14,
298:20, 298:22,
299:8, 318:3,
320:13, 332:7,
343:7, 346:3
**comes**
74:17, 156:3,
181:11, 210:19,
211:9, 213:14,
221:18, 221:19,
277:14
**comfortable**
90:14, 183:9
**coming**
18:21, 19:20,
77:1, 141:20,
212:16, 224:9,
263:5, 289:22
**comm**
255:7
**commend**
331:19
**comment**
41:17, 71:7,
82:14, 113:15,
135:11, 135:17,
135:21, 138:18,
141:3, 255:11,
322:4
**comments**
75:18, 139:12,
179:10, 181:19,
196:16, 255:6,
255:7

**commerce**
8:6, 159:12
**commission**
210:8, 210:9,
210:11
**commissioners**
210:15
**committee**
1:9, 2:3, 2:12,
7:15, 20:10,
20:20, 21:10,
23:15, 33:9,
45:2, 49:20,
49:21, 50:6,
50:20, 53:19,
93:19, 93:21,
98:22, 99:19,
100:15, 106:11,
131:11, 141:9,
142:8, 145:3,
146:1, 171:18,
178:2, 178:19,
179:11, 180:7,
180:16, 185:20,
191:9, 192:3,
213:15, 217:2,
219:13, 227:6,
227:12, 234:4,
234:15, 236:8,
252:20, 253:1,
253:6, 254:13,
256:13, 256:14,
257:7, 257:8,
263:17, 265:11,
266:1, 266:3,
275:7, 277:7,
283:15, 309:9,
311:16, 311:18,
312:2, 312:6,
332:15, 349:6,
350:20, 352:19
**committees**
175:21, 178:16,
186:1
**common**
119:3, 133:4,
134:21, 158:13,
220:8, 221:9,

223:18

**commu**
87:3, 313:10

**communicate**
11:20, 196:15,
196:18, 196:19

**communicated**
178:11

**communication**
197:3

**communities**
8:8, 8:22,
24:15, 27:8,
28:1, 28:7,
36:1, 44:5,
48:4, 59:4,
70:2, 70:4,
76:11, 85:10,
100:2, 114:15,
115:22, 121:20,
122:6, 131:21,
132:5, 132:8,
133:7, 135:3,
135:10, 135:12,
135:17, 135:22,
155:12, 158:8,
166:17, 170:15,
172:15, 179:18,
181:5, 192:17,
216:5, 282:19,
286:5, 291:4,
308:18, 310:18,
312:18, 313:11,
328:6

**community**
8:3, 11:10,
13:10, 13:16,
17:2, 17:10,
17:17, 19:3,
19:6, 24:5,
58:11, 63:14,
63:16, 64:1,
68:8, 70:17,
76:12, 85:21,
86:3, 86:19,
87:3, 87:10,
92:2, 121:21,
122:8, 122:22,

160:5, 165:3,
167:9, 167:20,
167:21, 168:8,
173:17, 182:3,
182:4, 185:22,
190:18, 192:20,
194:9, 200:5,
200:9, 200:12,
200:14, 200:21,
202:4, 202:7,
217:16, 218:7,
218:13, 218:15,
220:10, 221:2,
221:10, 223:2,
229:14, 262:19,
313:11, 317:10,
317:12, 322:16,
322:20, 333:15

**commute**
219:20, 223:11

**commuting**
221:11

**comp**
289:20

**compact**
24:6, 24:10,
27:21, 47:6,
47:14, 59:15,
61:13, 61:16,
65:2, 65:6,
65:7, 65:8,
65:10, 67:17,
69:17, 80:18,
111:18, 112:19,
291:16, 291:18,
293:2, 293:4,
293:11, 328:5

**compacted**
67:1, 289:11,
289:20, 291:15

**compactness**
27:20, 65:18,
81:5, 100:3,
112:13, 142:12,
170:12, 281:17,
283:7, 283:19,
289:18, 293:8,
300:13, 319:18

**companies**
8:1

**compare**
320:12

**compared**
114:6, 114:21,
235:9, 306:4

**comparison**
53:9

**comparisons**
137:19

**compelling**
43:8, 277:10,
280:17, 282:2,
282:4, 282:11,
282:13, 283:2

**competitive**
120:13, 279:13,
279:20, 315:6

**competitiveness**
345:9

**complete**
178:1, 209:2,
229:20, 330:9

**completed**
320:5, 320:8

**completely**
62:5, 105:1,
214:3, 214:4,
248:13, 278:1,
331:4

**compliance**
21:21, 43:8,
52:12, 55:13,
74:1, 104:4,
146:12, 146:15,
178:8, 179:5,
204:7, 282:7,
310:4

**compliant**
21:20, 103:19,
123:5

**complicated**
125:13, 197:15

**complications**
344:11

**complied**
283:20, 294:9

**complies**
24:18, 103:15,
104:6, 262:7,
289:15, 290:12,
294:2, 329:16,
330:15, 348:16

**comply**
43:14, 56:16,
58:14, 72:22,
89:3, 142:10,
147:16, 175:19,
176:1, 176:3,
176:4, 176:6,
176:22, 187:9,
243:13, 245:18,
253:4, 272:13,
275:19, 288:22,
290:7, 294:6,
300:1, 326:17,
326:20, 347:14

**complying**
103:14, 282:4

**component**
48:3, 76:10

**components**
299:11

**composed**
207:8

**comprehend**
204:10, 205:2,
206:5

**comprised**
152:7

**compromise**
149:15

**computed**
207:10

**con**
23:5, 308:1

**conceded**
170:7

**concentrate**
118:16

**concentrated**
123:18

**concept**
73:7, 255:22

**concern**
64:3, 89:10,

229:6, 247:12,
256:19, 289:9,
289:10, 293:18,
313:15
**concerned**
18:5, 72:20,
261:6, 261:7,
331:15
**concerning**
307:1, 308:22
**concerns**
18:5, 18:13,
55:10, 63:22,
99:9, 227:13,
230:6, 280:11
**concerts**
134:8
**conclude**
303:12, 330:7,
347:18
**concluded**
129:16, 136:3
**conclusion**
36:13, 136:5,
176:8, 192:12
**conclusions**
169:17
**concocted**
210:14
**concoction**
209:2
**conditions**
239:18, 284:20,
331:1
**conducted**
274:21
**conducting**
248:15
**confederate**
190:1
**conference**
165:14
**confidence**
206:3
**confident**
222:11, 222:12,
344:18
**configuration**
23:21, 120:18,

214:13
**configurations**
25:4
**confirming**
206:15
**conflicting**
43:5
**confused**
266:16
**confusing**
11:5
**confusion**
228:10
**conger**
109:6, 109:12
**congress**
8:10, 8:21,
16:16, 18:9,
18:14, 23:13,
24:14, 27:1,
27:4, 27:6,
27:10, 39:4,
64:3, 64:10,
68:12, 82:22,
83:2, 84:10,
88:19, 89:21,
90:3, 108:18,
109:5, 109:11,
119:2, 152:18,
175:11, 204:5,
236:20, 260:9,
261:10, 263:1,
271:15, 292:10,
305:14, 308:6,
308:12, 330:19
**congressional**
11:18, 14:7,
15:9, 21:6,
22:13, 22:14,
23:5, 23:17,
24:10, 32:17,
43:16, 43:19,
47:19, 54:16,
54:18, 64:13,
66:17, 76:13,
79:10, 86:9,
86:17, 104:1,
105:8, 106:3,

106:15, 109:6,
109:12, 119:20,
120:1, 120:4,
120:8, 120:15,
128:22, 132:11,
132:15, 132:18,
135:2, 144:6,
147:12, 149:8,
150:3, 152:7,
154:14, 154:15,
155:17, 156:11,
168:2, 174:22,
200:12, 201:1,
201:11, 201:12,
202:8, 202:18,
213:22, 217:9,
218:4, 221:4,
222:1, 224:4,
233:6, 236:11,
260:13, 271:8,
271:11, 272:2,
273:7, 273:9,
279:11, 280:14,
284:22, 303:15,
303:18, 307:9,
308:2, 309:12,
313:18, 315:20,
332:18, 334:3,
346:6, 347:1,
348:2
**congressman**
11:19, 63:19,
63:21, 65:18,
67:22, 68:3,
68:15, 68:16,
109:14, 109:15,
119:7, 150:11,
159:6, 162:5,
221:7, 222:1,
224:5, 285:3,
285:6, 331:3
**congressmen**
11:20, 13:20,
68:4, 87:13,
87:17, 159:1
**congresspeople**
87:22
**conjoined**
182:1

**conjunction**
52:18
**connor**
187:5, 193:3
**conscience**
5:22, 190:7,
190:8, 190:10,
190:12
**consensus**
139:16, 329:4,
329:7
**consequential**
257:14
**conservation**
7:21
**conservative**
116:13, 332:22,
333:7, 333:19
**consider**
40:21, 41:1,
62:11, 146:7,
284:21, 307:1
**considerable**
46:7
**consideration**
27:17, 27:20,
28:2, 28:8,
43:10, 129:17,
131:14, 286:6
**considerations**
100:2, 229:11,
281:19
**considered**
27:22, 99:17,
133:7, 165:22,
170:16, 240:16,
267:14
**considering**
118:13, 253:8
**considers**
169:12, 259:2
**consistent**
306:21
**constantly**
175:22
**constituencies**
285:18, 348:8
**constituency**
271:12, 285:22,

331:5
**constituents**
21:12, 33:17,
53:3, 54:7,
64:7, 112:17,
139:7, 178:12,
178:14, 180:3,
198:18, 215:3,
276:9, 343:17
**constitute**
24:6, 59:15,
62:21, 63:6,
302:15
**constitutes**
305:5
**constitution**
176:22, 177:2,
177:12, 204:4,
204:8, 205:9,
205:17, 206:4,
206:7, 206:16,
207:11, 209:18,
211:4, 260:20,
280:13
**constitutional**
116:11, 117:11,
144:12, 154:9,
229:21, 260:21
**constraint**
280:15
**construct**
205:10
**constructing**
229:19
**construction**
133:11, 205:21,
345:16
**consulted**
274:21
**contact**
12:2
**contain**
54:5, 145:1,
352:8
**contained**
54:6
**contempt**
143:6, 144:3,

144:7, 144:18,
145:9, 228:14,
228:16
**content**
84:17, 91:4,
91:10, 91:19,
92:4
**context**
22:12, 156:9,
211:1, 253:1,
253:3
**contiguity**
170:11
**contiguous**
205:19
**continue**
5:18, 69:6,
130:22, 131:4,
156:22, 157:14,
157:17, 182:10,
182:13, 224:15,
238:17
**continued**
51:1, 242:12,
274:3
**continuing**
176:18
**contractors**
154:2
**contradiction**
249:2
**contrary**
71:17, 203:14,
218:22
**contributions**
259:7
**control**
14:2, 131:2,
221:8
**conv**
27:17
**conventions**
334:7
**conversation**
40:13, 49:7,
53:10, 126:9,
133:3, 161:4,
161:10, 165:2,

183:7, 235:4
**conversations**
75:21, 153:16,
165:7, 165:10,
165:13, 182:19
**convey**
121:15, 227:13,
227:22
**cookoff**
134:3, 138:14
**cooper**
128:20, 280:5
**coor**
344:4
**coordinated**
344:4
**copies**
283:6
**copy**
118:2
**core**
14:12, 14:13,
14:14, 163:17,
170:17, 306:2
**coretta**
189:18
**corner**
292:15
**corps**
224:6
**correct**
12:21, 14:8,
15:5, 15:9,
28:20, 56:10,
58:10, 61:14,
64:4, 64:5,
65:17, 65:22,
67:9, 70:22,
73:3, 78:12,
81:21, 93:17,
95:3, 95:4,
95:7, 95:8,
95:13, 96:14,
96:22, 97:1,
97:16, 97:17,
98:9, 98:16,
99:6, 99:7,
99:15, 100:4,

100:8, 100:20,
101:7, 101:16,
104:1, 105:11,
105:16, 105:17,
105:22, 106:13,
107:5, 107:10,
113:20, 114:1,
117:22, 118:14,
124:18, 130:14,
147:21, 148:10,
150:4, 150:7,
150:9, 167:7,
168:2, 168:4,
168:15, 169:3,
171:1, 230:17,
239:4, 267:19,
287:12, 303:17,
304:15, 352:8
**correctly**
96:5, 97:6,
130:13, 188:4
**corridor**
118:18, 119:17,
123:18
**cortez**
22:19
**cost**
68:21, 203:17,
203:18
**could**
7:8, 8:15,
8:22, 25:11,
28:6, 30:20,
32:11, 32:13,
32:16, 33:1,
33:12, 43:20,
54:1, 54:2,
54:3, 55:3,
57:18, 59:3,
59:12, 73:14,
76:13, 80:21,
89:12, 91:22,
92:11, 93:3,
109:17, 121:22,
140:22, 141:8,
144:6, 148:15,
148:17, 149:12,
153:2, 153:22,

154:3, 154:19,
156:13, 168:19,
180:17, 192:16,
197:19, 201:12,
203:11, 205:11,
205:12, 206:17,
208:19, 209:20,
211:11, 230:9,
242:19, 242:21,
253:22, 259:21,
262:19, 271:4,
279:18, 294:17,
305:13, 307:3,
307:4, 310:12,
344:17, 345:3,
348:7

**couldn't**
46:19, 64:8,
81:3, 124:5,
226:19, 244:8

**council**
82:21, 113:7,
210:6

**councilman**
225:13

**councilpersons**
212:9

**counsel**
259:11, 259:15,
352:5

**count**
136:21, 137:1,
149:10, 155:22,
156:1, 173:16

**counted**
148:3, 186:6

**counting**
155:2

**countless**
260:1

**country**
24:1, 38:9,
44:3, 90:19,
195:16, 317:11

**countryside**
38:8

**counts**
157:10

**coupee**
10:21, 10:22,
13:8, 13:14,
13:15, 13:22,
15:8, 15:15,
120:7

**couple**
28:17, 28:18,
134:1, 158:10,
172:19, 224:9,
322:22, 335:11

**courage**
331:20

**course**
12:9, 30:21,
50:17, 93:18,
169:20, 217:10,
237:22, 270:6,
273:16, 282:17,
282:21, 313:13,
317:19, 329:17,
342:16

**court's**
117:3, 241:8,
243:14, 245:19,
248:10, 249:19,
249:21, 272:4,
273:2, 290:8

**courts**
65:13, 75:10,
83:12, 115:7,
179:14, 190:22,
270:7, 294:8,
296:9, 337:21,
348:5

**cove**
14:5

**cover**
161:12, 269:18,
279:3

**covered**
156:15, 227:1,
279:4

**covers**
161:22

**covington**
165:11, 203:9,
215:14, 218:21,

223:15

**coworkers**
229:6

**cpra**
224:5

**crack**
254:9

**cracking**
185:1

**crashing**
153:12, 211:9

**crawfish**
133:16, 158:22

**create**
64:20, 72:2,
96:6, 98:2,
177:2, 243:15,
289:5, 289:8,
313:10, 326:22,
327:1, 337:12,
338:9, 340:11,
340:12, 342:6

**created**
63:12, 99:10,
106:17, 118:11,
243:12, 280:19,
287:19

**creates**
98:8, 337:15,
342:7

**creating**
112:18, 272:18,
295:20, 295:22,
338:9

**creator**
195:2, 198:21

**crews**
134:10

**criteria**
33:3, 33:7,
39:18, 44:6,
56:21, 57:1,
58:9, 58:10,
93:5, 123:5,
128:17, 129:2,
129:9, 132:9,
170:7, 170:9,
170:16, 181:13,

289:18, 338:11

**critical**
271:14, 291:21

**criticize**
69:8

**crossover**
151:14, 151:20,
306:9

**crow**
189:10, 194:12,
194:15, 209:6

**crowd**
130:22

**crucial**
200:12

**csl**
303:11

**cue**
266:12, 267:2

**culprit**
140:10

**cultural**
229:9

**culture**
132:6, 133:20,
158:16, 214:3

**curiosity**
111:12

**curious**
15:20, 32:4,
52:17, 293:20,
308:18

**current**
21:19, 23:5,
23:19, 23:21,
24:10, 24:17,
26:14, 32:18,
55:4, 67:22,
90:19, 120:18,
132:22, 145:19,
148:18, 148:21,
149:6, 200:15,
202:1, 214:13,
232:14, 245:9,
254:20, 271:8,
279:10, 279:22,
284:22, 290:8,
292:8, 292:9,

292:10, 305:16,
307:17, 309:16,
309:17, 310:4,
314:5, 315:20,
330:17, 348:2,
348:15

**currently**
13:19, 21:9,
21:17, 54:12,
55:15, 69:15,
113:13, 113:14,
120:2, 200:22,
246:10, 293:2,
314:3, 314:11

**curve**
12:9

**cut**
39:16, 110:8,
131:5, 275:15

**cutno**
145:19

**cuts**
121:7

**cycle**
246:11

**cynthia**
172:6, 172:12

**D**

**da**
311:20, 346:7

**dale**
231:5

**dark**
323:22

**dash**
288:1, 288:17

**dashes**
66:20

**data**
133:2, 133:10,
138:22, 316:20,
319:10, 322:8,
325:4, 344:13

**date**
50:2, 243:15,
246:7

**dates**
142:2, 243:13

**davante**
332:11

**day**
5:21, 49:21,
98:15, 98:17,
98:18, 98:19,
98:21, 99:13,
141:12, 151:13,
154:16, 155:21,
155:22, 156:12,
156:17, 162:8,
163:13, 163:18,
165:12, 175:3,
175:20, 180:11,
180:22, 185:21,
216:15, 219:4,
219:11, 230:9,
257:16, 258:5,
260:3, 262:15,
266:5, 269:16,
271:1, 274:13,
275:11, 279:2,
315:14, 329:1

**day's**
315:7

**days**
46:20, 89:12,
187:3, 228:19,
273:2, 273:6,
274:20, 275:13,
276:5, 283:20,
340:17

**deal**
2:9, 12:20,
20:17, 44:10,
91:8, 115:3,
139:16, 159:6,
188:17, 221:20,
255:13, 256:5,
256:6, 285:7,
330:7

**dealing**
56:8, 59:2,
64:18, 115:7,
273:15, 309:15

**deals**
137:20, 159:12

**dear**
155:8

**dearly**
203:18

**debatable**
294:7

**debate**
4:20, 53:21,
53:22, 88:2,
216:15, 227:14,
232:10, 253:11,
253:13, 253:15,
254:7, 254:18,
255:2, 260:22,
294:10, 347:2,
347:5, 348:19

**debated**
275:8, 347:13

**debates**
258:2

**debating**
4:13

**deborah**
225:6

**decade**
286:16, 293:4

**decades**
228:18, 230:3

**deci**
43:11, 290:8

**decide**
219:12, 243:6,
253:6, 266:19,
270:7

**decided**
75:11, 189:1,
219:4, 280:5

**decides**
312:6

**decision**
43:11, 43:13,
112:3, 112:6,
116:22, 202:20,
202:22, 228:18,
236:4, 236:5,
260:21, 276:11,
278:3, 281:1,
281:12, 342:5,
344:13, 346:9

**decisions**
5:14, 5:16,

**dearly**
92:4, 111:8,
115:16, 124:19,
175:20, 210:18,
233:4, 281:9,
343:19, 346:21

**declare**
236:11, 352:2,
352:12

**decline**
333:11

**dedicated**
200:8

**deemed**
156:14

**defeated**
149:7, 151:3,
151:4

**defeating**
298:6

**defend**
205:1, 209:19

**defendant**
240:15, 242:20,
247:5

**defendant's**
330:14, 348:6

**defendants**
66:13, 96:18,
117:5, 170:17,
233:11, 240:15,
248:17, 248:21,
272:19, 272:20,
330:4, 348:3

**defense**
19:22, 25:15,
25:19, 25:22,
233:18, 239:10,
239:13, 242:6,
244:7, 245:10,
245:16, 245:17,
245:22, 259:10,
273:7, 312:11,
330:16, 331:6

**defer**
20:9, 267:6,
268:17

**deference**
235:1, 245:15,

297:18, 329:1,
346:8
**deferral**
265:20
**deferred**
20:12, 265:22,
266:2, 267:8,
328:16, 328:18
**deferring**
267:7
**defied**
193:1
**define**
143:10, 143:12,
160:5, 336:12
**defined**
161:6
**defines**
118:4
**definitely**
145:6, 226:10,
332:3, 334:5
**definition**
79:18
**degrading**
85:17
**degree**
135:6
**deja**
191:10
**delcambre**
133:22, 134:4,
215:16
**delegation**
88:13, 107:22,
108:7, 109:1,
109:6, 109:12,
109:22, 110:1,
200:12, 202:19,
222:12, 222:13,
224:5
**deliberate**
33:17, 42:2
**delineate**
241:17
**delineates**
245:7
**delta**
8:16, 9:6,

215:6
**demanded**
191:2
**demands**
43:6
**democracy**
184:13
**democrat**
83:12, 97:9,
138:4, 151:22,
152:18, 160:19
**democratic**
5:20, 152:12,
152:21
**democrats**
108:4, 151:15,
152:11
**demographer**
30:12, 31:11,
31:12, 31:14,
31:19, 33:9,
46:2, 52:9,
57:10, 57:18,
67:3, 81:4,
99:12, 178:22
**demographer's**
47:8, 117:17
**demographers**
56:12, 57:11,
57:14
**demographics**
19:6
**demonstrates**
322:7
**demonstrating**
281:15
**demos**
57:12
**denied**
22:21, 97:11
**density**
293:7
**deny**
87:6, 87:8
**department**
58:17, 274:7
**depend**
312:10

**depending**
233:9
**depends**
240:8
**depth**
59:10
**described**
134:6, 169:22
**desegre**
259:14
**desegregate**
188:1
**desegregated**
189:13
**desegregation**
193:4
**deserve**
190:9
**deshotel**
3:4, 3:5, 6:19,
6:21, 7:7, 7:11,
15:12, 15:13,
15:20, 56:3,
138:9, 138:10,
138:16, 140:13,
140:19, 140:22,
141:15, 141:22,
142:4, 142:7,
142:16, 143:3,
143:15, 143:22,
145:4, 145:5,
145:14, 251:7,
251:8, 264:5,
264:6, 306:16,
306:17, 307:12,
307:16, 307:20,
307:22, 308:3,
308:5, 308:8,
308:14, 309:2,
309:6, 310:22,
311:5, 311:9,
312:13, 313:3,
313:6, 313:19,
316:16, 317:1,
317:6, 317:8,
317:12, 317:15,
349:15, 349:16
**deshotel's**
140:8

**design**
281:20
**designed**
72:22
**designing**
280:14
**desire**
255:1, 315:15,
315:19
**desires**
96:12
**desperately**
226:8
**despite**
141:11, 262:22
**detailed**
49:8, 50:2,
242:13, 301:22,
344:22
**details**
101:10, 311:12,
314:21, 345:1
**determine**
128:15, 129:7,
207:13, 297:21,
314:13, 338:15,
340:11, 341:7
**determined**
256:2
**detrimental**
225:19, 226:12
**devante**
177:18, 186:17,
186:19
**devastating**
9:7
**deviate**
51:19
**deviation**
27:18, 27:19,
29:14, 30:2,
33:3, 41:6,
51:17, 51:19,
55:7, 81:6,
86:11, 112:22
**deviations**
44:7, 284:18
**devlin**
116:12, 117:11

| | | | |
|---|---|---|---|
| di | differing | 41:17, 86:21, | disruptive |
| 336:22 | 136:20, 137:2 | 86:22, 91:17, | 271:19, 279:12, |
| dick | difficult | 92:8, 115:5, | 284:11, 285:16, |
| 184:17, 330:1 | 5:9, 41:2, | 138:20, 142:17, | 348:1 |
| dictating | 41:3, 45:6, | 161:3, 175:11, | dissect |
| 228:2, 228:5 | 125:13, 217:15, | 278:6, 278:20 | 121:22 |
| dif | 257:16, 258:5, | disagreed | dissected |
| 331:9 | 270:16, 272:19, | 125:15 | 121:21, 122:3 |
| difference | 274:10, 275:10, | disagreeing | disservice |
| 40:6, 94:8, | 275:19, 311:4, | 126:15 | 285:16, 286:2 |
| 100:18, 270:22, | 315:4, 325:13, | disagreements | distant |
| 296:15, 320:2 | 326:6 | 196:12 | 70:10 |
| differences | difficulty | disagrees | distinct |
| 91:14, 101:1, | 125:5, 323:3, | 125:6, 125:9 | 316:11, 320:2 |
| 122:7, 235:8, | 344:11 | disallowing | distinctly |
| 235:19, 236:22 | dig | 176:18 | 164:22 |
| different | 35:9 | discourse | distribution |
| 20:22, 54:16, | diligence | 212:17 | 205:10, 324:14, |
| 70:10, 70:11, | 45:6 | discredited | 325:18 |
| 75:7, 76:18, | diminish | 130:13 | districting |
| 98:5, 98:6, | 89:9 | discriminated | 43:11, 273:21, |
| 124:12, 124:13, | diminished | 229:22 | 281:4, 299:18 |
| 134:18, 135:8, | 87:13 | discuss | districts |
| 137:19, 166:9, | diminishes | 275:18 | 10:5, 24:1, |
| 166:11, 186:1, | 90:3, 90:5 | discussed | 27:16, 27:18, |
| 201:1, 214:3, | dip | 101:5, 275:8, | 37:5, 39:13, |
| 214:4, 240:12, | 319:14 | 297:4 | 44:2, 57:4, |
| 241:19, 257:11, | dipping | discussing | 63:12, 67:1, |
| 257:12, 257:13, | 35:7 | 132:13, 154:14, | 83:10, 86:9, |
| 260:15, 261:20, | direct | 155:1, 194:13, | 103:4, 103:12, |
| 262:19, 266:17, | 12:2, 78:19, | 268:11 | 106:4, 106:6, |
| 270:8, 270:19, | 204:11 | discussion | 106:16, 106:17, |
| 278:1, 281:6, | directed | 150:1, 162:9, | 107:15, 112:8, |
| 285:21, 300:20, | 78:22, 79:1 | 261:1, 268:21 | 112:9, 124:5, |
| 300:21, 307:13, | direction | discussions | 125:4, 125:14, |
| 308:17, 310:20, | 40:21, 40:22, | 279:7 | 128:18, 129:8, |
| 313:8, 313:10, | 118:10, 180:8 | disenfranchised | 129:10, 129:18, |
| 315:8, 316:15, | directions | 208:19, 315:22 | 129:20, 144:6, |
| 325:4, 329:20, | 32:9, 154:20 | disheartening | 149:8, 152:7, |
| 331:5, 335:17, | directly | 154:11 | 152:8, 156:4, |
| 338:2, 338:14, | 11:15, 22:3, | dispersed | 161:15, 175:13, |
| 340:10 | 169:11 | 67:16 | 192:18, 193:14, |
| differential | dis | display | 205:19, 210:7, |
| 280:22 | 61:19, 125:15, | 266:9, 266:10 | 210:13, 211:14, |
| differently | 278:19 | disrepair | 220:16, 262:18, |
| 35:20, 38:10, | disa | 260:6 | 279:14, 280:14, |
| 89:6, 122:12, | 278:19 | disrupt | 280:20, 281:7, |
| 234:21, 248:16 | disagree | 271:12 | 288:10, 293:11, |
| | 26:16, 36:20, | | |

309:15, 309:17,
310:4, 331:10,
331:20, 337:20,
337:22, 338:17,
338:19, 342:7,
342:17, 348:2,
348:13
**disturbed**
177:21
**diverse**
19:2, 19:5,
19:8, 55:6,
107:22
**diversity**
162:6
**divide**
214:14, 215:7
**divided**
184:19, 184:20,
200:17
**divine**
154:13
**divisions**
229:4
**dock**
226:3
**docket**
4:10
**doctors**
153:22
**document**
117:20, 118:3,
204:10, 205:2
**documents**
242:18, 303:11
**dog**
189:21
**doing**
11:13, 19:1,
46:19, 47:9,
58:8, 59:2,
64:19, 69:2,
69:3, 72:10,
92:14, 144:18,
154:12, 161:9,
171:4, 173:4,
173:5, 173:10,
180:18, 184:6,

189:18, 192:2,
209:9, 209:20,
209:21, 225:15,
225:16, 228:1,
228:17, 230:19,
247:10, 276:10,
277:18, 295:17,
297:14, 298:4,
314:14, 326:9,
328:16, 344:12
**dollars**
201:18, 201:20,
202:14, 203:18
**domestic**
205:14
**done**
5:18, 7:20,
19:1, 36:21,
47:9, 49:5,
58:19, 67:3,
70:2, 81:4,
89:6, 123:10,
125:7, 125:8,
125:16, 128:11,
155:18, 156:12,
184:10, 187:15,
193:20, 193:21,
205:11, 207:5,
240:21, 246:19,
259:1, 276:20,
294:18, 315:11,
340:18, 340:21,
341:7, 344:20
**door**
177:6, 193:5
**dotd**
113:22, 116:3
**doubled**
223:21
**doubt**
220:3, 222:9
**down**
6:18, 20:17,
35:9, 41:12,
48:3, 51:4,
52:21, 78:11,
82:2, 83:3,
93:6, 101:9,

102:5, 104:13,
114:8, 142:8,
153:12, 160:18,
161:20, 175:1,
176:1, 179:17,
180:1, 185:20,
187:6, 206:4,
211:3, 211:9,
224:9, 225:22,
273:21, 282:20,
287:14, 322:17,
324:18, 326:2,
329:9
**downloaded**
170:1
**dr**
130:12, 130:15,
130:19, 169:6,
169:12, 169:14,
169:21, 170:4,
170:7, 170:18,
174:8
**drafted**
246:10
**drafts**
234:21
**dramatic**
310:1
**dramatically**
271:7, 348:7
**draw**
30:9, 36:13,
47:4, 47:7,
47:11, 55:1,
56:21, 59:17,
73:15, 85:13,
86:16, 117:15,
119:12, 120:10,
125:13, 129:10,
129:19, 270:17,
271:21, 272:10,
273:5, 301:21,
309:11, 325:13,
345:7
**drawer**
30:11, 35:10,
44:17, 44:21
**drawing**
25:10, 26:18,

27:13, 27:16,
28:11, 28:14,
35:21, 39:12,
51:21, 52:22,
55:5, 61:22,
114:10, 125:3,
129:9, 129:17,
156:10, 171:6,
274:7, 280:16,
281:9, 306:19,
323:3
**drawn**
23:6, 30:16,
32:18, 32:19,
43:16, 43:19,
44:1, 47:13,
80:15, 80:18,
81:7, 118:20,
119:16, 121:6,
275:2, 275:3,
280:9, 287:3,
303:16, 331:4,
345:5
**dream**
91:4
**drew**
25:8, 25:11,
26:19, 29:17,
31:12, 31:15,
31:19, 33:11,
44:22, 124:2,
212:4, 274:2
**drilling**
158:20
**drive**
165:5, 165:6,
344:13
**driven**
196:8
**driver**
227:19
**driving**
230:4
**drove**
20:21
**due**
45:6, 82:21
**dug**
123:22

**during**
56:12, 59:22,
60:1, 99:19,
101:11, 140:1,
140:2, 140:17,
140:18, 142:8,
179:3, 185:21,
191:13, 200:5,
200:6, 238:9,
238:16, 238:22,
244:4, 248:7,
310:9, 332:19,
333:16, 344:17
**duty**
33:16, 73:19,
144:12
**dye**
345:22
**dynamic**
319:9

**E**

**e-mails**
257:4
**each**
5:11, 5:13,
5:15, 54:19,
70:9, 70:10,
71:20, 88:10,
104:9, 127:17,
127:18, 128:7,
159:17, 159:18,
182:4, 189:5,
195:9, 205:1,
207:10, 207:15,
257:9, 260:17,
323:15, 324:4
**ear**
187:7
**earlier**
68:4, 85:13,
87:17, 87:21,
106:2, 108:12,
118:10, 122:11,
122:13, 122:22,
167:18, 175:2,
178:8, 192:3,
192:4, 193:3,

198:20, 261:16,
273:13, 280:12
**early**
40:14, 49:4,
142:14
**easier**
29:10, 160:19,
235:20, 309:13,
311:2
**east**
32:21, 79:10,
81:1, 86:5,
107:14, 118:21,
120:6, 158:11,
172:16, 181:22,
211:13, 214:17,
219:18, 220:12,
221:14, 223:2,
224:12, 292:15,
323:10
**easy**
68:19
**eating**
217:19
**economic**
201:15, 201:17,
229:8, 229:11,
282:18
**economics**
132:7, 213:18,
229:3, 271:13
**economy**
9:8, 10:4,
11:13, 133:8,
133:9, 133:10,
133:14, 201:19,
201:21
**ed**
274:14, 274:15
**edgar**
191:7, 191:9,
335:12
**edge**
14:20
**educat**
133:14
**educate**
201:8, 201:9

**educated**
200:6, 212:3
**education**
135:4, 169:13,
187:16, 201:9
**educational**
133:11
**edwards**
149:6
**effect**
81:10, 234:19,
236:22, 237:9,
238:13, 246:4,
247:11, 256:2,
293:3
**effective**
103:4, 236:7,
236:15, 236:16,
243:12, 243:15,
246:6, 333:16
**effectiveness**
232:13, 236:3,
241:14, 245:8
**effectual**
234:18
**effort**
8:19, 52:12,
52:22, 56:18,
68:20, 105:15,
168:7, 179:16,
276:4, 279:12,
279:19, 295:18,
311:15
**effort's**
60:1
**efforts**
47:8, 54:13,
56:15, 60:2,
66:17, 158:21,
253:13, 271:2,
280:2, 310:2,
345:8
**egregious**
51:7
**eichmann**
199:12
**eight**
79:18, 323:7

**eighth**
183:22, 203:7
**either**
46:18, 49:22,
57:12, 63:11,
78:20, 185:7,
186:9, 198:18,
233:13, 233:14,
240:3, 240:20,
256:6, 310:19
**elec**
338:16, 347:3
**elect**
23:4, 23:18,
24:13, 24:20,
64:9, 83:18,
131:10, 192:7,
300:16, 300:18,
301:13, 301:15,
301:16, 302:1,
302:2, 302:3,
304:3, 304:5,
304:6, 304:11,
304:21, 305:21,
315:16, 316:1,
337:1, 340:12
**elected**
5:15, 12:14,
41:20, 53:8,
65:21, 72:3,
72:8, 72:13,
76:1, 81:19,
84:5, 85:16,
88:10, 89:4,
106:18, 109:15,
109:16, 138:5,
144:11, 152:13,
207:9, 219:1,
237:11, 238:1,
238:4, 238:16,
238:18, 239:17,
247:7, 315:6,
330:19, 333:21,
347:4
**electing**
150:2
**election**
54:17, 65:14,

155:21, 233:6,
237:18, 237:20,
237:21, 243:16,
273:9, 274:9,
276:16

**elections**
83:14

**electorate**
24:12

**element**
300:3, 314:9

**elementary**
212:15

**elements**
294:2, 310:17,
322:22

**elevate**
212:17

**eliminating**
119:18

**eloquently**
191:17

**else**
38:3, 45:1,
101:9, 116:20,
122:1, 139:5,
140:2, 144:20,
153:19, 160:16,
175:15, 180:13,
184:22, 188:10,
195:5, 195:11,
209:20, 218:7,
225:17, 259:1,
283:20, 310:15,
319:17, 329:17

**email**
20:5, 20:6,
185:8

**emails**
20:6, 267:8,
267:10, 267:12,
348:20

**emerge**
129:8

**emerged**
129:13

**emerson**
213:11, 213:13,

216:12, 216:13,
218:17

**emotional**
196:10

**empathize**
316:3

**empathy**
315:21

**emphasize**
8:20

**employ**
227:15

**employed**
169:16, 227:16,
352:6

**employer**
201:16

**empower**
73:19

**empowered**
236:3

**empowering**
189:19

**enact**
22:16, 143:18,
147:11, 233:7,
243:10

**enacted**
236:12, 236:16,
243:9, 243:14,
256:16

**encompasses**
222:20

**encourage**
4:21, 4:22,
260:2

**encouraged**
49:3, 49:10

**end**
5:21, 11:13,
51:3, 157:1,
157:9, 162:8,
163:18, 174:8,
180:22, 196:9,
196:10, 202:22,
208:18, 208:21,
226:6, 232:5,
232:10, 233:1,

233:4, 239:20,
255:2, 282:3,
298:6, 305:14,
315:14, 331:2,
334:10, 348:4

**ended**
8:12, 8:14,
207:6

**ending**
341:22

**endorsed**
332:17

**ends**
348:19

**energy**
210:19

**engage**
316:14

**engaged**
212:11, 346:5

**engagements**
283:16

**engaging**
211:6

**engineer**
17:17

**engineering**
7:17, 10:16

**engineers**
14:5

**enjoy**
158:17, 159:18,
214:6, 214:7

**enjoyed**
50:10

**enough**
8:20, 47:6,
62:19, 63:1,
63:2, 64:20,
65:2, 69:6,
80:17, 139:17,
143:15, 178:16,
219:3, 219:12,
272:14, 305:19

**enslaved**
175:5

**ensued**
21:17

**ensure**
203:22, 271:18

**entails**
11:6, 281:15

**entering**
187:3

**entertained**
328:8

**entice**
11:6

**entire**
9:10, 10:4,
14:6, 15:1,
15:2, 41:10,
46:8, 104:19,
180:10, 214:2,
215:19, 215:20,
292:2, 341:13

**entirely**
9:13, 117:4,
248:11

**entrusts**
280:13

**enumeration**
204:14, 205:8,
207:5, 207:6

**environment**
197:8

**envy**
202:19, 219:14,
222:6

**equal**
27:19, 37:6,
40:17, 81:19,
94:16, 109:18,
118:4, 174:18,
187:21, 188:6,
189:2, 209:17,
215:2, 259:20,
281:2

**equality**
170:11, 175:8,
181:12, 181:14

**equally**
190:8, 195:9

**equation**
23:11

**equipped**
334:9, 334:15

equitable
181:12, 211:3
equity
181:13
espe
277:7
especially
33:22, 39:4,
45:4, 47:17,
108:20, 224:5,
225:22, 275:7,
277:7
essence
95:10
essentially
149:9
establish
207:3, 207:4,
209:11
establishes
81:18
et
44:8
etc
134:11, 134:21
eternity
74:12
evacuated
208:14, 211:20
evaluate
45:3, 50:4
evaluated
136:1
evaluation
50:21
evan
48:22
evangeline
79:12, 159:4
eve
154:15, 154:22
even
13:2, 41:9,
55:4, 63:19,
84:9, 130:6,
136:13, 141:18,
145:8, 147:17,
151:20, 169:20,

170:16, 173:6,
175:8, 180:15,
181:12, 183:12,
213:1, 219:11,
241:3, 245:8,
247:4, 260:13,
283:20, 297:4,
297:8, 310:11,
315:9, 316:10,
329:5, 344:9
event
258:7, 258:8,
258:14, 274:18,
277:21, 330:18,
352:10, 352:13
events
71:20, 133:20,
134:9
eventualities
329:20
ever
17:16, 49:12,
49:13, 49:15,
156:13, 159:16,
188:6, 206:12,
273:14
every
47:10, 51:17,
57:7, 83:6,
107:4, 107:17,
108:13, 108:17,
120:15, 136:9,
155:21, 163:13,
175:20, 178:12,
185:21, 190:18,
190:19, 203:17,
205:21, 207:10,
208:13, 208:17,
209:14, 211:22,
254:2, 254:3,
257:10, 270:16,
284:10, 298:18,
298:20, 298:22,
313:11, 325:20,
346:9, 347:4
everybody
4:11, 38:3,
69:2, 90:22,

116:20, 169:1,
171:15, 172:1,
183:8, 184:21,
185:5, 185:19,
206:8, 218:6,
245:13, 257:19,
258:1, 261:14,
267:3, 326:11,
348:15
everybody's
20:16, 111:6,
216:14, 220:18,
222:18, 347:19
everyone
4:22, 6:9,
18:2, 41:10,
45:1, 108:12,
157:4, 183:6,
185:20, 190:8,
195:14, 195:15,
204:9, 216:3,
252:18, 269:19,
312:1
everyone's
187:16, 276:11
everything
23:14, 44:22,
45:3, 87:12,
124:19, 135:14,
184:1, 184:9,
187:15, 191:12,
195:11, 221:10,
225:17, 263:8,
263:9, 283:20,
347:15
evidence
60:4, 95:3,
95:7, 96:13
ex
337:21
exact
39:1, 137:9,
137:10, 140:18,
217:2, 217:4,
235:7
exactly
29:19, 90:14,
150:18, 151:2,

161:8, 161:9,
163:22, 165:21,
187:7, 227:2,
235:5, 244:18
examination
248:15
example
114:7, 182:21,
217:17, 285:1,
330:20
examples
83:19, 150:20
exceed
129:14, 204:17
exceeding
129:15
except
83:7, 140:3,
228:22, 291:14
exception
345:19
exchange
146:1
exclusively
206:11, 272:1,
338:6
excuse
24:18, 126:9,
130:8, 186:22,
323:14, 325:3
execute
170:2
executive
95:17
exhaustive
344:20
exhibit
187:4
exist
120:15, 275:12,
296:12, 319:22
existing
256:7
exists
40:20, 55:16
exit
164:16
expanding
228:3

expecting
277:11
expense
293:11
experience
169:13, 169:15,
285:17, 286:1
experiences
91:14, 173:17,
257:12
experiment
206:17
expert
128:12, 128:20,
131:22, 132:5,
136:1, 337:21
expertise
169:14
experts
343:6
expiration
246:7
explain
47:9, 54:14,
58:6
explaining
205:8, 206:14
explanation
178:18, 256:12,
257:1
exploit
294:18
express
139:17
extending
197:6
extension
22:20, 105:21,
147:2, 147:9,
319:17
extensions
105:20
extensive
56:2
extent
24:16, 148:11
extra
6:11

extraordinary
233:19
extremely
19:5, 41:2,
216:2, 248:8,
275:19, 291:21,
315:6, 326:5

**F**

face
25:14, 120:10,
334:16
facebook
5:10
faced
188:11
facilitate
275:13
facing
209:5
fact
12:2, 59:8,
65:19, 72:1,
75:22, 84:14,
98:7, 110:15,
118:11, 166:1,
167:2, 185:3,
214:16, 220:6,
220:13, 221:2,
225:22, 226:5,
260:8, 260:11,
261:17, 262:22,
270:9, 275:6,
279:8, 341:6,
344:21, 345:9,
346:21
factor
39:1, 39:19,
39:20, 44:5,
82:1, 115:15,
116:1, 116:7,
160:6, 280:16,
281:11, 282:21
factors
27:17, 39:5,
39:8, 39:18,
51:20, 81:5,
116:4, 118:13,

131:13, 271:13,
281:16, 282:18
facts
221:1
factual
72:19, 281:1
fail
148:7, 253:1,
311:17, 347:16
failed
197:17, 273:14,
276:1
failure
276:6, 343:3
failures
253:13
fair
10:16, 11:11,
31:1, 76:14,
94:9, 94:12,
95:18, 106:16,
106:19, 108:17,
110:19, 111:14,
139:3, 143:15,
146:6, 146:7,
146:10, 148:1,
148:2, 148:6,
148:7, 185:16,
185:17, 187:11,
187:22, 188:22,
190:9, 190:13,
211:2, 228:17,
233:1, 233:14,
245:21, 261:11
fairbanks
117:19
fairfax
117:18, 128:19
fairly
148:3, 222:11,
222:12
fairness
181:10
faith
294:13, 345:6
fall
21:10, 134:15,
233:6, 243:16,

273:10, 274:9,
276:16, 299:21
falls
72:1, 300:1
false
41:7, 71:15,
71:16
familiar
13:11, 25:14,
129:2, 132:19,
158:5, 286:13,
287:6, 319:1
familiarity
275:9, 319:1
families
219:20, 225:11,
225:15
family
134:11, 217:21
famous
138:14
far
88:11, 103:14,
104:5, 159:5,
165:6, 196:3,
203:8, 230:7,
237:3, 237:5,
261:5, 261:6,
270:7, 276:6,
287:22, 292:14,
306:3, 316:8,
317:3, 331:15
farming
158:22
farnum
158:1, 158:2,
164:4, 251:9,
264:7, 264:8,
349:17, 349:18,
351:2
fashion
80:18
fast
139:13, 260:16
fathers
204:4
fault
211:5, 211:7,

346:20

**favor**
57:22, 58:5,
58:6, 174:20,
191:6, 233:18,
239:9, 239:12,
242:6, 244:7,
245:17, 272:8,
273:7, 296:20,
312:11, 330:13,
348:6

**favorable**
176:9, 194:13,
240:10, 263:10,
293:14, 331:15,
347:21, 349:1,
349:3, 349:5

**favorably**
176:10, 262:6

**favorite**
174:8, 296:3

**feasible**
117:5, 248:14

**february**
21:13, 69:2,
92:21, 93:15,
94:14, 100:6,
100:12, 100:19,
101:6, 124:1,
142:15, 238:22,
239:1, 279:15,
340:19

**fed**
185:3

**federal**
9:11, 9:16,
17:13, 21:18,
65:13, 66:4,
73:2, 83:12,
86:15, 89:3,
94:3, 94:18,
105:10, 135:15,
184:14, 185:6,
185:15, 185:16,
191:21, 193:1,
193:11, 195:10,
195:13, 201:3,
201:4, 201:7,

201:20, 202:2,
233:7, 236:10,
253:5, 256:10,
256:17, 262:11,
270:14, 272:6,
274:19, 282:12,
290:7, 294:11,
295:19, 300:2,
305:1, 330:15,
347:14, 347:16,
348:16

**feeds**
15:4

**feel**
17:3, 18:9,
81:13, 89:21,
103:3, 108:13,
108:14, 108:22,
120:1, 139:17,
198:7, 205:13,
220:10, 226:11,
226:15, 228:8,
229:19, 240:15,
245:14, 245:20,
246:18, 266:18,
291:7, 315:21,
316:4, 318:22,
321:8

**feels**
242:17

**feliciana**
120:6

**felt**
8:9, 95:10,
174:15, 242:20,
344:17

**female**
100:9, 101:21,
108:16, 137:5,
137:12, 137:15,
138:3, 138:15,
152:10, 263:14

**fest**
134:14

**festival**
133:22, 134:5,
134:12, 134:13,
134:14, 134:15

**festivals**
133:20, 134:10,
134:15

**few**
8:17, 9:5,
9:10, 43:17,
44:7, 63:17,
99:21, 116:17,
142:10, 189:7,
203:9, 208:9,
252:21, 284:17,
310:10, 345:19,
345:20, 346:4

**fewer**
24:16, 44:7,
69:14, 112:21

**fewest**
310:3

**field**
169:14, 194:21

**fields**
253:19, 320:4

**fifth**
66:11, 66:19,
74:17, 204:20,
213:22, 214:16,
214:21, 233:9,
238:6, 240:14,
241:7, 241:11,
241:22, 242:9,
242:10, 248:6,
248:8, 248:19,
248:21, 249:1,
272:21, 272:22,
286:13, 287:14,
288:9, 288:11,
289:20, 290:3,
290:21, 298:14,
298:21, 299:1,
299:2, 299:4,
299:8, 329:9

**fifths**
149:15

**fifty-four**
339:21

**fifty-seven**
183:15

**fight**
157:1, 185:11,

259:13, 259:14

**fighting**
175:7, 194:8

**fights**
260:10

**figure**
26:17, 35:10,
42:19, 209:11,
212:2, 212:4,
212:5, 307:8,
310:14

**figured**
327:4

**fil**
133:17

**file**
139:22, 140:17,
303:21

**filed**
6:2, 49:22,
93:19, 97:5,
98:15, 101:9,
107:2, 139:20,
140:2, 142:5,
143:6, 144:4,
180:12, 259:19,
259:20, 260:1

**fill**
2:6, 150:2

**filled**
26:4, 199:15,
255:2

**filling**
19:16, 19:18,
19:21, 199:7,
231:3

**final**
74:2, 75:1,
75:2, 75:5,
82:7, 116:22,
117:1, 233:17,
236:9, 239:11,
239:12, 244:6,
245:17, 246:21,
252:16, 253:20,
254:20, 330:16

**finally**
154:17, 154:18,

190:22, 250:14
**financial**
352:7
**find**
32:12, 46:3,
63:20, 64:19,
94:11, 192:1,
204:2, 206:17,
278:21, 284:19,
293:1, 305:17,
314:8, 326:8
**finding**
278:22
**findings**
281:1
**finds**
244:7
**fine**
179:14, 192:13,
250:4, 302:5,
302:8
**fingers**
32:3, 212:11,
284:15, 299:7,
300:13
**finish**
42:11, 163:3,
246:17, 332:7
**finished**
138:7
**finite**
125:19
**firm**
7:17, 145:21
**first**
6:11, 9:15,
10:13, 12:18,
21:3, 59:19,
64:17, 81:11,
82:12, 82:13,
87:16, 98:14,
98:15, 98:19,
98:21, 117:14,
124:15, 130:7,
138:11, 144:8,
144:9, 172:6,
175:3, 178:20,
189:11, 196:4,

204:5, 204:14,
205:7, 207:5,
207:6, 208:9,
208:10, 219:18,
221:4, 225:10,
226:20, 233:19,
263:9, 269:20,
270:12, 272:5,
281:10, 309:8,
309:21, 311:13,
313:14, 320:4,
332:9, 332:16,
340:19
**firth**
241:21
**fisheries**
10:2, 114:4,
114:5, 114:8,
114:20, 116:3
**fishery**
114:22
**fishing**
229:8
**fit**
89:6, 144:13
**five**
24:7, 24:20,
26:9, 26:14,
26:18, 27:14,
28:22, 29:2,
47:19, 60:14,
63:7, 67:19,
68:16, 76:13,
101:19, 102:14,
103:12, 112:21,
118:15, 119:7,
119:9, 120:4,
120:8, 120:18,
123:13, 123:17,
135:10, 149:8,
189:12, 196:11,
209:9, 323:6
**five-year**
202:14
**fix**
345:11
**flag**
190:1

**flash**
318:12
**flat**
158:22
**fleshed**
255:13
**fli**
345:20
**flip**
310:10, 345:20
**floated**
69:15
**flood**
13:11, 17:17,
221:14
**floodgate**
9:18
**flooding**
221:15, 221:17
**floor**
93:21, 140:16,
165:12, 187:4,
187:8, 189:3,
253:10, 253:12,
253:14, 253:17,
254:4, 254:6,
254:12, 254:14,
254:19, 276:5,
346:13, 347:2,
347:6, 347:13,
349:5
**flor**
348:10
**florida**
271:11, 285:13,
285:14, 300:22,
348:10
**floyd**
76:22, 109:9,
155:3
**focus**
2:14, 7:18,
12:15, 16:10,
20:17, 29:3,
29:10, 55:18,
131:3, 159:3,
172:21, 216:21,
301:10

**focused**
17:6
**focuses**
172:16
**focusing**
105:4
**foil**
232:12, 234:14
**folders**
267:11
**folks**
67:19, 183:16
**follow**
56:22, 93:5,
104:16, 114:6,
177:12, 184:3,
184:4, 185:15,
262:14, 262:16
**followed**
21:16, 22:10,
22:11, 71:19,
129:9, 204:15
**following**
128:16, 236:13,
249:4, 273:11
**fool**
315:9
**foot**
153:10
**footstone**
230:9
**forbids**
118:5
**force**
274:19, 344:14
**forced**
261:21, 261:22
**forcing**
152:22, 206:16
**forefront**
13:2
**forever**
193:7, 333:1
**forget**
322:11
**forgive**
207:7, 207:21
**forgot**
156:9

**form**
204:22, 205:3
**formally**
267:6
**formed**
114:18, 158:6,
206:18, 208:9
**former**
183:18
**formulas**
340:9
**forsake**
219:4
**fort**
199:21, 200:7,
200:11, 200:15,
200:20, 200:22,
201:10, 201:14,
201:19, 202:6,
202:11
**forth**
25:2, 38:4,
56:20, 91:22,
159:17, 179:22,
180:14, 216:16,
228:3, 289:17,
300:13
**forty**
202:5
**forward**
21:6, 21:7,
105:1, 141:14,
141:21, 155:11,
224:16, 256:9,
258:8, 260:17
**foster**
20:2, 199:10
**fought**
8:11, 122:14,
122:15, 260:11
**found**
11:20, 17:13,
65:13, 83:13,
125:7, 125:11,
125:16, 133:3,
184:15, 188:19,
272:8, 329:7
**founder**
172:12

**founding**
204:4
**four**
15:14, 58:16,
58:17, 136:2,
204:22, 220:16,
259:17, 267:11,
267:19, 267:20,
277:20, 278:1,
308:3, 323:6
**fourteenth**
40:17, 43:6,
43:9, 54:2
**fourth**
204:20
**frame**
31:21
**framed**
248:16
**framing**
31:22
**franchise**
115:20
**frankie**
203:4, 203:6
**franklinton**
213:21
**frankly**
220:14, 220:22
**free**
154:18, 175:5,
187:19, 187:20,
273:20, 311:3
**freed**
189:8
**freedom**
134:14, 175:7,
211:1
**freeport**
287:4
**friday**
2:4, 21:4
**friend**
79:2, 89:17,
226:18
**friends**
155:7, 155:8,
155:14, 206:6,

227:21
**fringes**
51:7
**front**
30:8, 117:21,
127:4, 174:16,
187:5
**frustrating**
45:10, 45:14,
156:7
**full**
50:2, 50:5,
50:20, 53:20,
54:4, 195:16,
278:12, 352:8
**fully**
50:3, 54:11,
278:20, 347:13
**fund**
19:22, 20:1,
20:2, 25:15,
25:19, 26:1,
172:8, 174:14,
259:10
**funded**
9:13
**funding**
200:13, 201:20
**funny**
87:15, 184:16
**furman**
182:21
**furnam**
3:6, 3:7,
160:7, 160:11,
161:8, 161:17,
161:21, 162:8,
162:12, 162:17,
162:21, 163:3,
163:7, 163:10,
163:13, 163:22,
164:6
**furnish**
201:8
**furnma**
163:18
**further**
84:21, 204:1,

230:6, 304:19,
324:5, 324:11,
352:12
**future**
207:4, 215:18,
263:4
**futures**
257:14

**G**

**gadberry**
117:10, 117:12,
117:13, 117:19,
118:1, 118:15,
119:15, 120:22,
123:9, 123:12,
123:16, 124:8,
251:10, 251:11,
264:9, 264:10,
349:19, 349:20
**gadbury**
3:8, 3:9
**gained**
208:5
**gaines**
100:11, 100:12
**galas**
334:6
**gallon**
203:18
**game**
159:8, 225:18,
312:4
**games**
208:19
**garden**
134:3, 134:5
**garret**
285:1, 285:2,
348:9
**gas**
158:18
**gathered**
80:7
**gave**
52:3, 151:6,
164:8, 167:19,
305:11, 319:10

gaveled
187:8
gender
137:20, 137:21,
138:6
general
193:8, 325:13
generally
160:9
generator
201:15
gentleman
165:19, 169:5,
322:11
gentleman's
68:3
gentlemen
164:11, 171:15,
193:17, 194:18,
218:19
genuinely
328:5, 328:6,
328:8
geographic
35:9, 51:10,
55:10, 64:2,
65:5
geographically
24:6, 26:8,
26:11, 53:5,
59:14, 114:18,
348:1
geography
42:14, 54:5,
99:10, 115:21,
116:5, 331:9
george
76:22, 109:9,
155:3, 193:5
ger
118:5
gerr
295:11
gerrymandered
24:1, 44:2,
61:10, 65:3,
274:8, 288:1,
295:5, 300:11,

342:11
gerrymandering
79:4, 118:6,
129:20, 279:2,
279:5, 280:4,
280:8, 281:3,
288:3, 288:5,
288:10, 295:2,
295:4, 295:11,
308:22
gerrymanding
79:3, 79:19
getting
12:2, 65:21,
145:6, 161:14,
200:2, 208:14,
211:18, 243:20,
248:18, 254:5,
270:18, 274:8,
293:18, 293:22,
311:1, 333:14
girls
154:6
give
2:5, 4:11, 6:9,
7:1, 7:4, 26:22,
27:3, 27:5,
52:6, 68:8,
73:14, 77:21,
90:2, 94:12,
138:11, 144:10,
150:5, 151:18,
152:19, 155:16,
155:18, 157:19,
162:14, 167:13,
167:22, 172:18,
174:1, 177:5,
178:17, 185:5,
185:11, 185:13,
187:18, 188:8,
188:9, 198:2,
255:3, 255:7,
255:17, 276:4,
311:15, 316:13
given
16:20, 20:4,
36:14, 49:13,
52:7, 71:16,

71:17, 90:9,
90:18, 90:19,
100:16, 104:17,
104:18, 105:12,
105:20, 142:2,
147:22, 160:12,
160:13, 177:11,
178:18, 178:21,
179:2, 180:9,
180:15, 229:16,
229:22, 270:20,
274:20
gives
27:9, 67:6,
151:6, 151:17,
173:2, 315:7,
336:11
giving
6:11, 120:11,
188:21, 258:7,
258:10
glad
10:14, 97:3,
156:20, 167:12,
300:10
go-around
240:12
goal
8:7, 37:5,
110:21, 279:16
goals
44:8, 257:13
god
184:6, 185:6,
185:17, 190:12,
195:1, 195:3,
195:4, 198:10,
198:19, 211:10,
232:22, 277:22
god's
154:13
goes
11:2, 28:19,
52:22, 118:3,
132:22, 158:8,
158:12, 184:1,
184:12, 220:4,
221:18, 292:14,

329:21
gone
41:12, 42:6,
226:8, 275:2,
319:21, 336:3
good
16:2, 20:16,
25:20, 43:12,
44:10, 74:18,
75:21, 117:11,
124:11, 132:17,
132:18, 140:19,
145:15, 152:6,
172:11, 174:12,
183:5, 191:8,
200:2, 203:6,
217:12, 221:6,
222:1, 226:16,
230:19, 232:2,
235:5, 263:8,
290:10, 294:13,
298:8, 298:11,
299:14, 322:16,
332:14
goodness
195:13
gordon
274:5
gotcha
26:5, 26:15,
28:9
gotro
231:5
gotten
249:8
governing
183:22
government
9:14, 189:2,
195:14, 201:3,
201:4, 201:7,
202:2, 212:1,
270:14
governmental
2:3, 134:20,
227:6
governor
23:22, 25:1,

103:19, 149:6,
188:13, 188:17,
188:19, 189:1,
193:9, 212:7
**governor's**
103:20, 188:12,
199:12, 199:13,
199:22
**grace**
197:6, 270:20
**grade**
183:22
**graders**
212:14, 212:16
**graduate**
259:5
**graduated**
213:17, 259:5
**graduates**
135:5
**grand**
258:11
**grandchildren**
92:12
**grandmother**
54:15, 176:13,
189:8, 189:10
**grant**
187:22
**granting**
22:10
**gras**
133:22, 134:1,
134:10, 134:11
**gratuity**
321:15
**graves**
285:1, 285:6,
331:3, 348:9
**gravy**
185:13
**great**
87:18, 87:21,
104:11, 122:18,
165:10, 189:7,
189:8, 218:4,
221:13, 232:1,
279:7, 280:8,

314:14, 346:8,
347:16
**great-grandmother**
189:9
**greater**
228:10, 276:6
**green**
2:7, 7:5,
19:16, 19:19,
119:8, 199:7,
199:10, 323:22,
324:21, 335:11,
335:16
**gretna**
134:14
**grew**
153:13, 176:13,
189:9, 189:10,
218:12, 218:14,
220:8, 229:21
**grip**
211:8
**ground**
269:18, 279:3
**grounds**
59:10
**group**
65:1, 65:3,
71:19, 115:1,
136:11, 177:10,
301:1, 344:6
**groups**
136:19, 159:10,
166:12, 166:19,
167:1, 272:14,
337:8, 338:4
**growing**
112:2
**growth**
229:13, 333:11,
333:12
**guarantee**
294:2, 296:2
**guaranteed**
149:5, 204:22
**guard**
190:1
**gubernatorial**
21:15

**guess**
26:17, 28:9,
52:2, 72:5,
74:15, 75:2,
75:4, 84:14,
103:2, 118:4,
119:21, 121:2,
121:22, 123:21,
142:20, 143:22,
144:3, 159:22,
160:11, 179:6,
181:15, 183:19,
238:12, 267:12,
275:1, 308:14,
313:11, 344:3
**guide**
207:4, 208:21
**guiding**
292:1
**guillory**
217:1
**guise**
72:11, 154:20
**gulf**
7:19, 10:15,
11:8, 13:10,
14:11, 226:4,
226:7
**gumbo**
134:2, 134:15,
138:14
**gun**
188:20
**guy**
171:5, 218:1
**guys**
183:12, 194:5,
341:2

| H |
|---|

**ha**
41:7, 47:6,
49:15, 309:18,
322:2
**half**
32:21, 67:12,
85:21, 89:9,
188:13, 219:20

**hall**
121:9
**halloween**
134:16
**hammond**
51:12
**hand**
177:6
**hands**
260:19, 312:2
**hanging**
171:20, 224:21
**happen**
12:8, 63:9,
94:11, 116:19,
116:21, 117:6,
153:16, 168:1,
193:11, 230:11,
234:20, 241:9,
316:2, 327:15
**happened**
70:2, 70:6,
155:7, 165:16,
168:20, 194:1,
195:12, 277:22,
288:14, 288:17,
346:18
**happening**
139:13, 139:15
**happens**
124:3, 195:11,
237:10, 277:21
**happiness**
229:18
**happy**
25:3, 25:5,
286:7, 300:4,
310:20
**hard**
29:7, 31:10,
37:8, 53:14,
68:19, 92:14,
125:12, 161:3,
171:6, 273:21
**hard-pressed**
304:2
**harder**
175:16

**harmful**
229:11
**harmonize**
43:5
**harp**
180:22
**harrington**
2:13, 20:14,
28:18, 29:6,
52:21
**harrington's**
267:1
**harris**
280:5
**hate**
90:7
**hb**
93:15
**hb1**
20:13, 60:7,
60:8, 60:9,
98:14, 98:15,
99:17, 101:4,
101:15, 101:18,
103:13, 103:15,
104:5, 107:1,
107:19, 110:20,
132:16, 176:10,
190:20, 194:13,
257:4, 262:7,
269:19, 269:22,
280:12, 295:14,
313:17, 330:2,
339:22, 344:19,
347:7, 348:7
**hb2**
5:3, 20:7,
20:11, 60:7,
60:8, 60:9,
93:15, 266:3
**hb3**
265:14, 265:21,
267:5, 267:7,
267:8, 267:18,
320:3, 328:18
**hb4**
265:16, 265:17,
266:6, 268:13,

269:3
**hb8**
100:5
**head**
44:16
**headphones**
187:8
**heal**
155:10
**healthcare**
133:12
**healthy**
200:9, 220:21
**hear**
89:15, 110:4,
163:2, 178:2,
180:20, 191:21,
203:13, 228:21,
229:3, 337:21
**heard**
8:5, 16:15,
16:20, 18:9,
18:14, 23:10,
23:14, 23:15,
23:16, 27:2,
27:5, 27:11,
35:15, 69:7,
69:10, 71:10,
87:20, 99:18,
108:14, 109:22,
122:11, 137:4,
141:4, 147:15,
155:20, 162:17,
163:2, 163:8,
163:13, 175:22,
176:21, 177:9,
177:10, 187:12,
191:11, 191:19,
191:20, 206:3,
228:20, 248:4,
335:17
**hearing**
21:11, 46:16,
106:2, 122:13,
147:1, 173:8,
173:9, 177:22,
178:2, 240:19,
242:13, 277:9

**hearings**
191:15, 274:21,
309:9
**heart**
194:18, 195:4,
195:13, 198:6,
198:11, 198:19,
198:22, 217:12,
258:4, 258:12,
276:12, 321:4,
321:7, 321:9
**heartburn**
159:19
**heavy**
310:2
**heck**
220:8
**heffner**
131:22, 132:4,
135:22
**held**
21:19, 144:7,
144:18, 256:6,
256:7
**helena**
120:6
**hell**
297:11
**hello**
145:18
**helmet**
190:2
**help**
100:21, 155:9,
186:3, 201:8,
221:22, 226:4,
226:9, 274:15,
290:7
**helpful**
88:18, 108:1
**henry**
283:17
**here's**
315:3, 320:2,
330:15, 345:14
**hereby**
352:2
**heritage**
134:12, 134:14

**herschel**
150:10, 162:4
**herself**
73:16
**hesitation**
122:19
**hey**
42:4, 139:12,
163:15, 175:22,
249:12, 310:11
**hi**
212:15
**high**
5:10, 121:18,
135:4, 214:1
**high-fived**
189:5
**higher**
34:21, 284:5
**highest**
283:19
**highlighted**
81:15, 81:17,
82:4
**highlighters**
81:12
**himself**
25:16, 57:9
**hire**
322:14, 322:15
**hired**
50:16, 57:11,
128:15
**hispanic**
301:1
**history**
9:15, 48:17,
90:18, 147:22,
175:3, 175:18,
186:6, 186:7,
186:8, 189:6,
198:20, 205:4,
205:5, 273:20,
318:4
**hit**
220:1, 226:7
**hold**
6:20, 130:21,

144:3, 172:4,
188:8, 211:8,
212:21, 234:10,
238:17, 292:8
**holders**
135:6
**holding**
227:20
**holds**
202:12
**hole**
51:18
**holiday**
21:3
**holidays**
134:3
**holistic**
52:4, 110:9
**home**
42:15, 53:2,
134:3, 134:4,
180:3, 208:11,
215:22, 216:1,
216:21, 259:18,
307:2
**hometown**
85:3, 217:21
**homogenous**
223:1
**honest**
76:15, 182:12,
309:2, 334:14,
344:8
**honestly**
88:8, 257:22
**honor**
183:6
**hood**
170:5, 194:16
**hope**
93:8, 94:11,
145:22, 153:15,
156:21, 174:7,
182:8, 194:18,
212:22, 276:9
**hopefully**
157:5, 280:10,
297:19

**hoping**
69:5
**horse**
207:15
**horton**
3:10, 18:19,
18:20, 19:10,
19:13, 251:12,
251:13, 264:11,
264:12, 349:21,
349:22
**hose**
189:22
**hostile**
332:21
**hot**
209:2
**houma**
7:16, 7:17
**hours**
156:19, 306:19,
318:19
**house**
1:8, 2:3, 9:20,
10:5, 21:20,
23:1, 69:9,
107:4, 107:15,
108:6, 137:11,
137:15, 138:5,
143:19, 144:17,
151:16, 152:8,
153:8, 172:21,
182:20, 187:8,
189:2, 207:8,
212:7, 213:3,
228:9, 228:20,
230:10, 230:12,
243:4, 243:5,
254:14, 263:12,
277:21, 303:14,
339:16, 347:13,
349:3, 352:19
**housekeeping**
2:8, 255:1,
265:21, 267:5
**housing**
187:22
**howard**
259:4, 259:5

**however**
4:15, 23:19,
40:4, 41:13,
161:4, 169:14,
170:10, 240:6,
250:10, 254:20,
291:19, 320:8
**huh**
212:17
**human**
195:6, 195:7
**humans**
181:6
**hurd**
255:2, 255:11,
255:18, 257:2
**hurricane**
7:19, 8:19,
220:1
**hurricanes**
8:16
**hurts**
89:1
**hutt**
158:7
**hyers**
203:5, 203:6,
203:11, 203:14,
213:5
**hyper**
55:18
**hypersensitive**
311:6
**hyres**
203:4

---

### I

**iberia**
133:1, 133:5,
133:14, 133:21,
134:20, 134:21,
135:5, 135:7,
138:14, 158:14,
183:12, 215:15
**ida**
8:16, 9:6, 13:2
**idea**
72:2, 209:16,

299:3
**ideal**
299:21, 328:5
**ideals**
160:1, 160:15
**identical**
99:18, 100:13,
234:14, 234:18,
234:19
**identified**
299:17
**ignore**
92:5, 284:17,
299:7, 309:19
**illegal**
58:21, 59:9,
61:5, 61:19,
79:4, 161:11,
161:17
**illustrate**
230:6
**illustrative**
136:2, 266:17,
266:20, 269:10
**im**
346:20
**imagination**
111:11
**imagine**
8:15, 57:10,
57:15, 120:3,
228:14, 230:6,
243:21
**imagined**
156:13
**immediate**
21:16, 83:17
**immediately**
42:9, 44:14,
46:13
**impact**
201:8, 201:17,
201:18, 331:10
**impacted**
8:16, 9:5
**impactful**
348:7
**imparted**
9:12

impassioned
278:13
impediment
256:10
imperative
253:12, 347:12
implemented
55:21, 273:9
implication
83:17
implies
72:1
imply
148:7
impo
276:15
importance
170:8
important
4:13, 8:20,
9:9, 10:3,
12:11, 16:11,
18:21, 39:16,
58:7, 60:20,
84:21, 90:17,
90:18, 91:17,
137:13, 137:16,
137:18, 141:16,
168:13, 173:21,
174:15, 182:19,
182:22, 197:3,
204:4, 215:17,
216:2, 218:14,
273:19, 280:15,
312:22, 313:4
importantly
25:1
impose
238:3, 245:21,
330:1, 347:17
imposed
233:6, 234:1,
294:12, 296:21,
296:22, 330:3
imposes
280:15
impossible
169:1, 169:4,

197:11, 318:20
impression
58:1, 58:3,
342:15
improve
289:22, 345:8,
346:22
impugn
197:13, 197:16,
346:20
incarcerated
183:18
included
47:18, 47:20,
64:16, 80:9,
80:10, 112:14,
112:17
includes
7:5, 22:13,
147:12, 201:22
including
170:8, 292:15
incorporate
170:19
incorrect
62:6, 71:14,
244:21
incredibility
345:6
incredible
10:12
incredibly
53:14, 221:12
incremental
99:20
incumbency
170:16
incumbent
271:17
incumbents
285:17
independents
334:1
indicated
20:8, 71:8,
95:21, 117:14,
118:10
indicating
256:22

indication
20:4
indicator
267:21
indivi
315:14
individual
141:19, 167:1,
196:8, 229:14
individually
141:5
individuals
306:4, 346:8
industrial
7:22
industries
159:1, 159:13,
229:5
industry
10:3, 158:19
inferred
149:12
influence
87:13, 88:19,
148:8
information
2:7, 53:13,
93:4, 100:16,
101:3, 101:5,
133:10, 178:17,
192:5, 199:8,
199:15, 275:18,
343:20, 352:4
informed
212:11
infrastructure
76:20, 109:20
iniquity
186:11
initial
75:17, 256:12,
266:13, 279:12
initially
178:10
injunction
22:11, 232:17,
241:8, 272:9,
272:21, 273:2,

330:5, 330:6
injurious
284:22
input
142:3, 167:22
ins
284:1
insanity
308:12
inserted
201:19
inside
200:10
insight
310:8, 310:10
insists
118:11
instance
275:22
instead
112:9, 229:16,
301:14, 320:16,
330:20, 334:6
institution
254:11, 254:14,
276:8, 284:10,
328:9
instructions
170:2
instrument
6:3, 93:14,
93:18, 94:7,
94:8, 94:9,
94:12, 94:18,
95:11, 95:15,
95:21, 103:22,
104:17, 104:18,
104:22, 105:3,
105:5, 105:7,
141:14, 143:7,
144:4, 347:7,
347:12
instruments
141:8, 141:13,
141:21, 346:22
insulting
72:10, 72:11,
76:16

| | | | |
|---|---|---|---|
| **integrate** 193:10 | 114:16, 116:1, 121:20, 121:21, 122:6, 131:21, 132:6, 132:8, 133:7, 135:4, 135:11, 135:12, 135:18, 135:22, 150:16, 151:10, 158:9, 160:5, 162:12, 162:15, 167:9, 170:15, 179:18, 181:4, 181:5, 182:11, 190:19, 192:17, 192:20, 200:5, 217:16, 218:7, 218:15, 221:2, 221:9, 223:18, 282:2, 282:4, 282:11, 282:12, 282:13, 282:19, 283:2, 286:5, 291:5, 301:9, 310:18, 313:12, 317:10, 317:13, 322:16, 322:20, 328:6, 332:21, 352:7, 352:12 | **international** 134:13 | **issue** 13:1, 13:9, 16:12, 36:4, 54:11, 55:1, 55:5, 69:17, 76:6, 221:20, 238:3, 240:17, 240:19, 242:19, 242:21, 242:22, 243:1, 248:1, 253:7, 253:11, 253:15, 254:18, 271:22, 277:10, 277:17, 278:7, 289:13, 300:14, 330:7, 330:10, 344:21, 347:5, 347:6 |
| **intend** 328:14 | | **internet** 227:12, 229:15 | |
| **intended** 235:6 | | **interpret** 249:22 | |
| **intends** 256:14 | | **interpretation** 113:17, 146:17, 261:5 | |
| **intent** 47:1, 176:17, 179:15, 197:1, 197:14, 198:5, 199:2, 204:3, 346:21 | | **interpreted** 72:16, 141:4 | |
| | | **interrupt** 60:19, 60:22 | |
| | | **intervene** 348:5 | **issued** 95:7, 273:1 |
| **intention** 248:6, 248:8, 248:19, 302:2, 326:9 | | **intervention** 97:22, 239:9, 273:6, 276:14, 276:17 | **issues** 18:8, 51:16, 88:1, 99:14, 108:19, 109:18, 109:22, 114:22, 115:3, 115:7, 132:6, 136:4, 158:19, 159:3, 188:20, 196:12, 197:14, 221:12, 253:20, 271:5, 271:12, 275:8, 278:9, 280:7, 285:6, 285:12, 285:18, 285:20, 285:21, 314:4 |
| **intentionally** 118:6, 123:7, 154:13 | | **intriguing** 326:8 | |
| **intentions** 269:9 | | **introduce** 25:16 | |
| **intently** 5:13 | | **introduced** 258:2 | |
| **inter** 277:12 | | **introducing** 20:15 | |
| **interest** 11:10, 13:10, 13:16, 24:15, 27:8, 28:1, 28:7, 43:9, 44:6, 48:4, 58:11, 59:5, 62:7, 62:10, 63:15, 63:16, 63:18, 64:1, 64:17, 67:21, 68:1, 68:8, 70:3, 70:4, 70:13, 70:15, 70:17, 76:11, 76:20, 76:22, 77:16, 85:11, 85:21, 86:3, 86:19, 87:4, 87:10, 100:2, 108:19, 109:2, | **interesting** 74:22, 156:6, 208:1, 324:17 | **investment** 9:11 | |
| | **interests** 8:9, 76:12, 76:17, 76:18, 76:19, 77:5, 77:16, 77:17, 77:20, 77:21, 77:22, 107:9, 136:4, 150:18, 151:11, 151:12, 161:5, 162:11, 163:21, 223:4 | **invite** 172:7, 172:8, 177:16, 177:19, 203:3, 213:10, 218:18, 231:12, 255:8, 336:6 | **issuing** 66:8 |
| | | **involved** 57:10, 96:11, 99:12 | **it'd** 115:3, 299:2, 299:19, 330:9, 338:22 |
| | | **involvement** 345:16 | |
| | | **irony** 258:15 | **it'll** 276:13, 296:8, 331:2 |
| | **intergovernmental** 202:10, 202:12 | **irrelevant** 241:12 | |
| | **interior** 11:1 | **isaac** 8:16 | **italian** 134:12 |
| | **intern** 145:21 | **isolated** 181:3 | **item** 190:19 |

**iterations**
140:15
**itself**
178:3, 189:13
**ivy**
3:13
**i'm**
222:11

| J |

**jabba**
158:7
**jache**
20:1
**jam**
134:13
**james**
177:4, 283:16
**janine**
231:5
**january**
124:1
**jared**
19:22, 25:14,
25:18, 25:22,
145:16, 156:20,
167:4, 169:5,
259:9
**jean**
134:12
**jefferson**
132:19, 133:5,
133:8, 134:7,
134:9, 134:19,
134:22, 135:4,
135:6, 152:11,
158:14, 168:10,
168:21, 203:7,
203:8, 204:17,
205:8, 206:9,
206:11, 206:16,
206:21, 208:21,
210:15, 210:19,
223:5, 223:7,
223:12, 323:11
**jennifer**
19:18, 213:7
**jeopardize**
224:10

**jeopardy**
224:15
**jeremy**
77:8, 77:18,
77:19
**jim**
189:10, 194:12,
194:15, 209:6
**jingles**
40:20, 54:2
**job**
1:20, 5:16,
12:1, 67:3,
97:12, 98:4,
109:20, 174:16,
222:6, 227:20,
252:22, 280:13,
314:14, 331:21
**joblessness**
172:15
**jobs**
200:2, 223:11
**john**
76:21, 108:22,
116:11, 116:12,
117:11, 205:16,
266:12
**join**
161:6
**joins**
158:11
**joint**
159:11, 159:12
**joke**
220:20
**josh**
217:1
**jr**
20:1, 172:7,
174:9, 174:13
**judge**
22:4, 39:20,
58:21, 60:4,
62:13, 66:4,
66:11, 67:4,
67:6, 67:8,
68:12, 72:8,
73:1, 73:2,

73:5, 73:20,
75:4, 75:11,
82:20, 89:3,
91:6, 91:12,
94:3, 94:18,
95:3, 95:6,
95:10, 95:20,
96:14, 96:16,
96:21, 97:4,
105:6, 118:4,
135:15, 135:19,
142:22, 143:5,
143:17, 144:1,
144:14, 146:18,
154:12, 161:19,
173:1, 174:4,
176:2, 184:5,
184:8, 184:10,
184:14, 184:16,
185:6, 185:15,
185:16, 185:18,
191:21, 193:1,
193:20, 194:14,
195:10, 197:12,
198:20, 198:21,
228:2, 228:5,
233:7, 233:13,
238:2, 238:12,
240:20, 261:6,
274:5, 274:10,
274:13, 289:14,
294:11, 305:1,
330:1, 338:8,
338:11, 340:14,
340:20, 341:6,
341:18, 347:17
**judge's**
55:14, 55:17,
66:7, 176:3,
292:4, 342:5
**judges**
83:12, 97:8,
219:1
**judging**
91:4
**judgment**
233:17, 236:10,
239:12, 244:6,

245:17, 330:17
**judicial**
176:5, 239:8,
239:9, 273:6,
273:12, 276:14,
276:17
**julia**
314:13
**julie**
231:4
**july**
237:21, 240:18
**jumps**
48:11, 180:19
**june**
1:10, 2:4,
22:17, 105:13,
175:4, 175:6,
205:15, 232:20,
272:3, 272:11,
333:2, 352:16,
352:19
**juneteenth**
21:4, 154:15,
154:17, 155:1,
175:4
**juries**
87:12
**jurisdiction**
228:1, 228:4
**jurisdictions**
156:15
**jurisprudence**
289:13, 303:7,
305:4, 344:21
**jurors**
72:9
**jury**
139:9
**justice**
58:18, 76:22,
109:9, 274:7,
345:1
**justification**
47:10, 118:8,
281:5
**justify**
192:5

**juxtaposing**
330:20

### K

**katrina**
220:1
**kayla**
145:19, 145:22
**keep**
4:18, 8:7,
28:6, 50:13,
58:11, 58:12,
59:6, 60:22,
80:22, 93:9,
122:18, 131:1,
136:21, 136:22,
137:1, 146:2,
146:3, 156:21,
156:22, 159:10,
163:16, 181:1,
184:21, 185:12,
212:1, 218:14,
222:17, 248:18,
263:5, 318:13,
346:12
**keeping**
72:21
**kelly**
226:19, 230:12
**kept**
62:1
**keynote**
258:7, 258:10
**kid**
318:6
**kids**
153:17, 154:1,
200:22, 201:11,
201:13, 223:9
**kill**
253:6
**killed**
155:3
**kind**
10:14, 26:4,
26:17, 36:3,
37:3, 39:16,
54:22, 58:1,

93:11, 105:21,
108:4, 114:16,
131:1, 158:6,
159:11, 171:8,
184:16, 191:12,
196:7, 196:8,
197:7, 217:6,
233:1, 249:20,
257:19, 277:13,
277:15, 279:4,
279:21, 299:22,
302:20, 309:3,
312:17, 318:11,
318:12, 323:1,
325:8, 325:9,
325:19, 344:4
**kinds**
340:10
**king**
133:18, 174:9,
189:18
**knew**
64:15, 140:22,
154:12, 185:17,
335:19
**knowing**
69:2, 257:20,
258:1
**knowledge**
33:8, 112:2,
169:15
**known**
6:17, 168:13,
201:14, 227:11,
290:18, 290:19
**knows**
116:12, 232:22

### L

**label**
318:3
**labrie**
225:7, 226:17,
226:18, 226:21,
230:14, 230:15,
230:17, 230:19,
231:1, 335:18,
335:20, 335:21,

335:22
**labry**
19:17
**lack**
162:6, 211:22
**lacombe**
3:19, 13:5,
13:6, 13:14,
14:13, 14:15,
14:18, 14:22,
15:7, 15:11,
77:8, 77:18,
251:21, 251:22,
264:20, 264:21,
318:7, 350:7,
350:8
**ladies**
19:20, 165:2,
193:17, 194:18
**lady**
164:20, 172:8,
176:12, 335:14
**lafayette**
67:14, 79:13,
114:20, 158:11,
159:11, 214:22,
215:1, 215:8,
216:19, 216:22,
217:8, 217:11,
217:13, 218:10,
320:17, 320:22,
321:2, 321:3,
321:6, 324:8,
329:10
**lafite**
134:12
**lafourche**
8:8, 9:19,
12:20, 19:8
**lafreniere**
134:16
**lake**
59:11, 63:10,
64:11, 64:12,
163:5, 164:19,
189:11, 203:8,
215:11, 220:2,
220:7, 221:17,

221:18, 221:19,
223:8, 223:19
**land**
38:10, 158:22,
226:7, 239:17,
241:10, 241:13,
241:16, 246:11
**landing**
226:3
**landmark**
274:18
**landry**
20:1, 54:14,
114:8, 120:19,
172:7, 174:11,
174:12, 174:13
**language**
90:14, 196:18,
232:13, 234:18,
234:19, 235:5,
236:7, 239:8,
241:10, 241:13,
241:16, 244:1,
245:7, 245:9,
256:14, 272:12,
280:10, 302:1,
342:20
**lao**
134:4
**laptop**
275:4
**lar**
204:19
**large**
24:5, 28:2,
59:14, 67:14,
67:15, 79:15,
80:17, 176:18,
205:18, 274:12,
314:4
**largely**
331:5, 345:22
**larger**
111:15, 112:8,
229:15, 314:9
**largest**
200:10, 201:15,
201:16, 202:10,

202:12, 204:15,
204:19, 204:21,
206:12, 323:11
**last**
9:6, 9:10,
9:14, 9:22,
10:12, 54:18,
69:1, 116:16,
128:13, 164:10,
175:4, 179:3,
203:15, 208:13,
217:19, 218:2,
229:16, 238:9,
263:8, 316:18,
344:2
**lasting**
228:18
**late**
185:7
**later**
273:2, 274:1,
333:12
**latino**
62:16, 63:2,
108:16
**latter**
204:18
**laughed**
81:11, 189:5
**launch**
226:3
**laura**
8:16, 9:6
**lavadain**
89:17
**law**
47:7, 56:20,
72:15, 73:20,
74:1, 75:12,
81:13, 94:1,
116:9, 116:11,
116:17, 117:12,
123:3, 144:9,
145:19, 145:20,
145:21, 170:20,
174:13, 184:4,
185:15, 187:6,
187:10, 207:6,

228:1, 228:4,
233:19, 239:11,
239:17, 241:10,
241:13, 241:15,
246:11, 256:16,
259:4, 259:5,
262:14, 262:16,
262:17, 274:20,
289:17, 290:13,
290:20, 294:3
**lawmakers**
175:18
**laws**
175:19, 176:5,
176:6, 184:2,
184:3, 184:4,
228:6
**lawsuit**
232:15, 290:3,
296:4
**lawsuits**
259:20, 260:2,
296:12
**lawyer**
17:16, 25:15,
50:12, 144:9,
144:21, 145:2,
262:8
**lawyers**
50:9, 50:11,
153:22, 259:17
**laying**
230:8
**layout**
65:5
**ldh**
113:19, 116:3
**lea**
301:3
**lead**
303:11
**leader**
221:7, 333:1
**leaders**
152:10
**leadership**
22:18, 332:20,
334:11

**leads**
32:9, 179:3
**lean**
315:13
**leans**
315:8
**learn**
159:7, 185:22
**learned**
146:1, 182:21,
197:3, 259:6
**learning**
12:9
**least**
67:12, 68:4,
99:13, 103:11,
110:9, 142:14,
158:21, 261:6,
271:19, 279:11,
282:8, 283:20,
310:15, 339:1,
343:18, 348:1,
348:14
**leave**
20:10, 61:1,
136:17, 157:17,
226:5, 255:10
**leaves**
315:12
**leaving**
8:17, 301:5
**led**
48:18, 259:15
**leesville**
199:17, 199:20,
200:16, 200:20,
202:12
**left**
186:9, 194:22,
233:12, 274:10,
279:21, 315:13,
316:8, 317:3
**legal**
19:22, 25:15,
25:19, 25:22,
54:1, 104:11,
115:11, 116:19,
148:19, 256:8,

259:10, 273:20
**legend**
323:5
**legis**
252:21
**legislation**
176:9, 230:5,
235:3, 243:10,
243:22, 244:11,
246:10, 287:16
**legislative**
22:18, 46:19,
93:2, 95:16,
105:9, 107:8,
107:13, 107:18,
143:6, 144:4,
156:1, 179:13,
184:2, 185:4,
228:2, 228:5,
253:2, 273:12,
281:4
**legislator**
252:21
**legislator's**
149:12
**legislators**
9:3, 274:21
**legislature**
12:16, 22:16,
27:22, 49:4,
49:11, 97:11,
112:14, 137:11,
137:14, 147:11,
176:17, 240:2,
247:12, 272:10,
273:14, 274:2,
274:6, 276:1,
281:16, 287:17,
290:6, 297:11,
298:7
**legislature's**
281:12
**legitimate**
76:14, 240:16
**les**
163:15
**less**
23:3, 24:11,

61:9, 149:1,
149:11, 228:18,
309:13, 324:18,
330:18
**less-rushed**
248:15
**let's**
15:2, 35:2,
35:10, 39:19,
51:2, 55:11,
55:12, 77:11,
77:12, 94:12,
98:14, 124:3,
124:11, 127:5,
127:6, 127:17,
128:7, 128:8,
130:18, 130:19,
171:18, 174:2,
179:15, 182:9,
182:12, 205:21,
212:17, 228:4,
235:13, 249:13,
262:12, 268:5,
268:6, 277:5,
307:12, 330:22,
331:3, 332:4
**letter**
227:2, 227:5
**levee**
7:21, 8:19,
9:18, 14:2,
14:15, 15:2,
224:6, 224:8
**levees**
14:3, 14:16,
14:18, 15:7
**level**
31:2, 84:1,
84:6, 88:8,
97:22, 98:1,
135:4, 152:9,
153:9, 175:1,
211:22, 252:20,
275:7, 275:12,
308:12, 319:1,
323:19, 346:5
**levies**
12:17

**lewis**
76:21, 108:22,
177:18, 186:17,
186:18, 186:19,
191:4, 193:3,
261:16, 332:11
**liberal**
306:3
**liberty**
210:20, 210:22,
229:18
**license**
194:7
**lies**
210:18
**life**
72:16, 187:15,
214:2, 215:19,
215:20, 229:18,
257:12, 258:19,
259:1, 259:6
**lifted**
256:9, 256:16
**light**
248:16, 292:2
**liked**
136:18
**likelihood**
338:15
**likely**
22:7, 64:16,
128:17, 129:8,
214:14, 215:21,
305:13, 314:22
**likes**
322:12
**likewise**
227:21
**limbo**
256:5
**limit**
4:11, 4:14,
149:13, 195:21,
238:17
**limited**
153:21, 170:4,
207:2
**limiting**
333:8

**limits**
35:19, 37:15,
37:17, 37:20,
38:3, 38:6,
121:17, 281:3
**lincoln**
215:5
**line**
42:8, 42:18,
131:5, 235:17,
254:15, 314:2,
332:7
**lines**
9:3, 23:6,
159:22, 280:17,
281:9, 307:7,
309:17, 312:22
**lip**
205:4
**list**
78:12
**listed**
37:12, 39:9,
47:16, 48:21,
51:21, 82:18,
82:20, 352:10
**listen**
5:13, 5:19,
68:15, 159:20
**listened**
136:10, 136:15,
183:8, 184:8,
227:14
**listening**
153:15, 156:19,
329:19
**literal**
145:2, 196:7,
196:13
**literally**
54:19, 144:21,
268:3, 270:18,
275:15, 292:14
**litigation**
21:9, 21:17,
230:5, 232:22,
329:21
**little**
20:22, 29:10,

37:1, 75:7,
88:14, 100:18,
106:2, 108:12,
136:7, 145:6,
149:11, 154:6,
170:21, 175:16,
184:21, 199:3,
199:4, 203:12,
204:10, 217:3,
217:17, 255:19,
260:15, 262:19,
267:21, 277:22,
307:5, 307:7,
308:16, 309:3,
311:4, 311:11,
345:1, 345:18,
346:9, 346:10
**live**
13:12, 19:2,
19:5, 35:19,
37:17, 37:19,
37:22, 38:1,
38:3, 38:6,
38:7, 38:9,
38:11, 63:9,
63:10, 70:9,
113:15, 121:15,
121:16, 132:19,
152:2, 158:3,
184:13, 194:6,
200:22, 202:6,
202:9, 208:17,
215:18, 217:21,
218:12, 218:13,
223:14, 229:7,
286:3, 306:6,
307:6, 325:17
**lived**
35:16, 71:18,
214:2, 223:7
**lives**
11:15, 54:15,
217:21, 230:5
**living**
158:18, 221:11
**livingston**
319:21, 324:11,
324:15, 324:17

**lma**
200:1
**lobbying**
219:14
**local**
9:14, 82:18,
84:1, 84:6,
132:7, 152:9,
259:11, 259:15,
316:6
**locate**
235:14
**located**
217:13, 217:20
**logic**
196:7, 245:4,
308:19
**logical**
34:2, 34:4,
36:18
**long**
26:11, 188:9,
211:8, 216:15,
218:12, 219:13,
222:18, 228:9,
240:17, 243:20,
269:16, 277:2,
279:2, 282:3
**longer**
26:14, 154:19,
238:13, 285:19
**longtime**
217:8
**looked**
26:20, 66:16,
83:1, 95:20,
100:12, 100:19,
101:5, 101:17,
107:3, 114:11,
138:22, 208:12,
290:21, 317:21
**looking**
13:7, 15:14,
16:22, 26:7,
35:14, 70:11,
79:7, 100:19,
133:2, 158:3,
178:1, 258:8,

288:2, 307:16,
308:9, 308:12,
312:17, 312:18,
312:19, 317:18,
317:22, 318:21,
320:14
**looks**
32:2, 36:8,
42:14, 53:5,
73:17, 100:13,
101:18, 157:4,
158:6, 235:5,
299:13, 299:14,
308:16, 311:7,
317:20
**lord**
146:3
**lose**
29:15, 97:19,
98:6, 156:8,
156:10, 172:21,
174:2, 236:2,
263:1, 286:1,
319:13
**loses**
119:5
**losing**
56:5, 208:13,
211:18, 263:1,
329:10
**loss**
209:3
**lost**
120:22, 156:11,
156:13, 156:17,
201:7, 255:1,
300:6
**lot**
10:13, 12:14,
21:1, 35:8,
41:8, 60:12,
64:12, 68:22,
69:1, 75:21,
82:18, 94:14,
99:1, 101:3,
101:5, 109:20,
110:4, 116:9,
126:9, 131:13,

133:4, 139:6,
139:10, 139:12,
146:1, 158:13,
173:13, 179:6,
180:7, 180:14,
181:20, 187:1,
187:12, 188:13,
188:14, 196:11,
211:5, 217:22,
219:6, 219:10,
219:14, 221:16,
221:17, 223:3,
223:4, 223:6,
223:9, 223:14,
224:1, 226:1,
226:14, 226:15,
232:9, 232:21,
243:21, 248:4,
249:8, 261:5,
262:2, 269:18,
277:5, 278:4,
284:9, 285:6,
293:2, 293:6,
297:10, 306:5,
306:9, 309:20,
310:2, 312:15,
314:9, 316:6,
326:3, 327:8,
329:18, 345:5,
346:13
**lots**
133:16
**loud**
248:18
**louis**
274:1
**louisi**
107:7
**louisiana's**
201:19, 201:21,
285:9
**louisianans**
181:7, 191:1
**louisianians**
63:3
**love**
175:14, 175:15,
175:16, 182:1,

215:22, 218:5,
226:14
**low**
86:11
**lower**
102:19, 232:16,
240:20, 241:8,
243:14, 245:18,
253:5, 273:1
**lowest**
27:19
**lsu**
259:20, 344:2,
344:3
**luck**
226:16
**lumps**
24:2
**lunch**
209:21, 274:13
**luneau**
151:1, 151:2
**luther**
174:9
**lyons**
3:20, 3:21,
164:10, 164:13,
164:14, 165:1,
165:9, 165:18,
166:4, 166:11,
166:16, 166:21,
167:7, 168:5,
168:18, 169:4,
169:12, 170:22,
171:3, 171:15,
181:17, 252:1,
252:2, 264:22,
265:1, 350:9,
350:10

_____M_____

**ma**
239:16, 275:6,
338:9, 339:11
**ma'am**
172:9, 225:7,
230:21, 231:3,
269:12, 303:1,

332:10, 332:13,
334:17
**mad**
312:8
**madam**
250:19, 250:21,
251:1, 251:4,
251:7, 251:9,
251:12, 251:14,
251:16, 251:18,
251:21, 252:1,
252:3, 252:5,
252:7, 252:9,
263:19, 263:21,
264:1, 264:4,
264:7, 264:9,
264:11, 264:13,
264:15, 264:17,
264:20, 264:22,
265:2, 265:4,
265:6, 265:8
**made**
16:2, 36:17,
39:20, 48:8,
60:2, 66:16,
66:17, 68:20,
73:20, 75:11,
85:8, 94:7,
99:20, 108:11,
108:19, 111:9,
112:3, 112:6,
115:16, 116:22,
125:22, 136:6,
142:10, 176:5,
178:19, 184:2,
199:3, 205:19,
241:6, 242:16,
247:16, 247:17,
247:22, 248:6,
259:7, 260:21,
261:14, 261:17,
262:5, 270:7,
272:17, 278:19,
284:2, 322:15,
340:16, 340:20,
343:8, 343:12,
345:8, 347:11
**madison**
218:6

**magee**
3:22, 4:1,
6:13, 10:10,
10:19, 10:22,
11:9, 11:17,
12:13, 13:3,
111:5, 111:17,
111:22, 112:12,
113:1, 113:4,
113:6, 113:11,
113:13, 113:15,
113:22, 114:5,
114:10, 114:14,
115:6, 115:10,
115:14, 116:8,
248:3, 252:3,
252:4, 265:2,
265:3, 276:18,
276:22, 277:2,
286:8, 286:11,
300:6, 304:18,
306:15, 317:17,
350:11, 350:12
**magee's**
248:2
**magic**
131:13, 131:18
**mail-in**
167:16
**main**
7:18, 8:7,
12:15
**maintained**
239:17
**maintaining**
55:15
**maintains**
14:6, 135:10
**major**
112:20, 215:9,
215:12, 228:7,
271:5, 320:15,
342:8, 345:9
**majority**
22:14, 24:6,
26:10, 35:18,
39:21, 40:1,
40:3, 40:6,

40:7, 47:17,
47:22, 48:5,
48:8, 48:12,
48:13, 48:16,
48:17, 55:13,
55:16, 59:15,
62:22, 63:6,
69:5, 69:6,
72:7, 84:3,
96:7, 98:9,
104:18, 104:22,
110:1, 113:6,
119:16, 128:18,
137:6, 147:12,
173:2, 174:4,
174:5, 193:16,
204:1, 220:1,
222:21, 232:19,
271:1, 279:18,
280:20, 294:1,
295:11, 315:19,
338:5, 338:16,
338:19, 339:11,
346:22
**majority-minor**
305:2, 341:3
**majority-minority**
245:12, 245:20,
271:17, 272:3,
272:11, 272:18,
273:5, 276:15,
278:6, 280:3,
283:10, 284:6,
292:20, 293:10,
294:17, 296:18,
297:5, 302:14,
302:15, 305:3,
305:8, 305:17,
314:18, 315:1,
325:15, 327:2,
334:13, 336:12,
336:14, 336:20,
337:13, 337:19,
338:1, 339:9,
340:5, 341:4,
341:5, 344:7
**make**
5:14, 5:17,

23:12, 30:1,
35:8, 39:3,
56:15, 56:18,
63:3, 66:13,
72:13, 80:17,
81:9, 85:9,
89:6, 92:3,
94:15, 96:19,
103:21, 106:19,
110:18, 112:3,
112:19, 119:21,
121:1, 158:18,
164:15, 165:5,
168:6, 171:5,
171:9, 176:7,
180:15, 181:2,
183:20, 185:14,
187:6, 187:9,
190:22, 195:11,
200:18, 202:20,
208:6, 210:18,
214:11, 226:19,
228:6, 255:5,
255:22, 259:21,
261:9, 267:6,
271:2, 278:3,
290:9, 297:10,
297:18, 300:16,
301:13, 308:15,
310:2, 310:12,
310:20, 312:15,
313:7, 313:8,
319:16, 320:19,
338:21, 341:8,
345:3, 345:4
**maker**
36:21, 198:18
**makes**
122:6, 131:10,
256:13, 262:18,
277:10, 284:9,
284:19, 284:20,
298:1, 351:2
**makeup**
131:17, 286:4,
309:16
**makeups**
271:9

**making**
38:22, 43:10,
71:15, 77:20,
99:21, 104:15,
110:18, 183:9,
203:1, 215:20,
291:6, 293:9,
310:19, 325:12,
344:16
**malapportionment**
270:12, 270:15,
320:6, 345:12
**male**
108:16, 138:2,
152:10, 155:4
**malintent**
345:14
**malls**
133:17
**mamou**
215:15
**man**
6:13, 76:2,
151:3, 154:21,
177:4, 206:3,
283:15, 332:17,
332:22
**manage**
145:3
**managing**
7:18
**mandate**
137:14, 137:17
**mandeville**
214:1, 214:5,
221:16, 223:15
**manifested**
206:1
**manipulations**
310:3
**manner**
71:9, 141:7,
271:19
**manners**
229:4
**many**
23:16, 27:7,
28:4, 28:7,

55:6, 62:12,
62:13, 64:6,
69:12, 93:20,
96:11, 112:16,
120:19, 124:15,
136:21, 136:22,
153:21, 158:5,
159:9, 193:13,
197:13, 197:14,
209:16, 214:11,
228:20, 253:16,
258:8, 260:16,
275:3, 288:20,
291:4, 297:14,
300:12, 306:18,
318:19, 325:2,
333:7
**map's**
267:2
**maps**
2:14, 13:7,
13:22, 15:14,
15:15, 15:16,
15:22, 21:14,
29:18, 44:20,
49:22, 56:21,
60:20, 66:16,
73:15, 88:2,
113:17, 113:19,
114:6, 114:12,
114:15, 115:8,
115:9, 117:15,
119:16, 120:10,
124:1, 138:22,
146:4, 146:5,
148:2, 148:7,
157:12, 168:2,
171:6, 179:22,
180:2, 180:18,
182:6, 210:9,
212:4, 214:11,
214:16, 214:20,
215:7, 215:10,
224:11, 239:7,
253:17, 253:20,
253:22, 266:10,
266:11, 266:17,
270:3, 271:5,

274:2, 274:6,
275:2, 275:3,
280:8, 283:9,
283:11, 283:17,
285:2, 285:3,
287:16, 289:18,
297:4, 308:9,
317:21, 318:21,
318:22, 320:9,
323:3, 325:13,
328:4, 328:8,
329:3
**march**
279:16
**mardi**
133:22, 134:1,
134:10
**mark**
213:12, 218:18
**market**
220:15
**marlborough**
165:3
**marmande**
6:12, 7:14,
10:11, 10:18,
10:20, 11:4,
11:12, 12:1,
12:22, 13:13,
14:9, 14:14,
14:16, 14:20,
15:6, 15:10,
15:17, 16:5,
16:13, 16:17,
16:22, 17:9,
17:15, 17:20,
18:1, 18:11,
18:16, 19:4,
19:15
**married**
196:7
**marsh**
226:8
**marshal**
72:8
**marshall**
259:13
**martin**
79:15, 134:22,

135:1, 158:14,
174:8
**martinville**
215:15
**mary**
19:17, 133:5,
158:13, 335:17
**massachusetts**
204:16
**massive**
9:17, 331:8
**master**
154:20, 274:17
**match**
29:13, 131:17
**math**
23:10, 125:10
**matter**
21:8, 108:5,
139:18, 151:10,
153:3, 156:6,
157:2, 157:3,
157:4, 157:15,
157:18, 167:2,
173:15, 174:17,
179:8, 196:21,
206:22, 207:1,
208:20, 210:1,
210:2, 213:4,
220:5, 225:22,
226:5, 231:11,
286:3, 296:2,
296:15, 330:8,
330:12, 343:16
**mattered**
153:10
**matters**
155:21, 207:1,
229:13
**maybe**
43:17, 68:17,
72:5, 113:18,
138:18, 182:18,
182:22, 185:8,
192:19, 198:3,
210:1, 234:1,
235:10, 236:22,
247:4, 262:19,

299:2, 299:21, 305:6, 310:13, 310:19, 311:10, 316:15, 330:4, 330:5, 334:15, 345:19, 345:20, 346:16

**mayo**
113:9

**mayor**
82:20, 113:2, 113:8, 113:9, 113:10, 153:5, 199:20, 212:9

**mayor-president**
217:1

**mayors**
72:8, 139:8

**mba**
213:20

**mcdonalds**
133:18

**mean**
7:8, 9:5, 10:1, 12:1, 12:4, 12:5, 17:15, 19:7, 24:8, 28:11, 37:16, 37:18, 38:2, 42:12, 43:22, 45:10, 55:11, 56:5, 60:7, 73:15, 77:4, 77:7, 85:14, 86:13, 87:3, 87:9, 87:11, 89:15, 92:1, 92:2, 109:20, 110:2, 117:6, 122:1, 123:22, 143:7, 144:5, 145:16, 148:13, 182:18, 193:22, 206:6, 211:14, 219:20, 221:12, 236:15, 257:15, 274:22, 277:13, 277:18, 287:6,

288:2, 289:1, 290:14, 294:10, 296:16, 297:9, 299:7, 303:20, 303:21, 308:7, 308:9, 308:10, 311:3, 311:10, 312:8, 317:9, 319:5, 321:19, 326:19, 327:18, 331:18, 348:7

**meaning**
151:15, 248:11

**meaningful**
300:3

**means**
37:19, 42:4, 68:11, 151:17, 198:1, 200:1, 201:4, 205:3, 211:1, 212:19, 247:6, 263:7, 263:16, 278:17, 349:5

**meant**
171:10, 207:13, 344:10

**meantime**
237:11

**meanwhile**
210:12

**mechanism**
236:9

**media**
5:11, 219:1

**median**
220:15

**meet**
17:13, 33:3, 41:6, 95:11, 97:15, 181:12, 283:10, 294:11, 338:11

**meeting**
139:2, 141:17, 203:15, 203:17, 210:6, 213:16, 227:12, 266:1,

266:3, 344:1

**meetings**
141:10, 163:4, 172:20, 180:7, 203:21, 210:9, 212:16

**meets**
24:22, 25:1, 98:2, 105:6, 123:4, 283:1

**member**
8:1, 33:9, 59:15, 107:4, 107:17, 108:7, 109:5, 109:11, 207:9, 224:22, 234:4, 310:8

**members**
2:2, 2:13, 4:7, 4:8, 4:9, 4:15, 5:3, 5:7, 5:17, 6:7, 7:15, 8:5, 23:3, 24:12, 50:1, 81:19, 98:5, 107:12, 108:7, 130:22, 139:9, 144:12, 163:15, 171:20, 172:2, 197:11, 199:20, 207:9, 207:14, 213:6, 216:14, 218:20, 222:17, 231:5, 231:11, 257:3, 263:11, 263:15, 265:18, 265:21, 267:11, 269:16, 283:4, 285:17, 322:10, 329:11, 329:16, 343:15, 345:19, 346:2, 346:5, 346:11, 348:18, 350:22, 351:1

**memory**
15:19

**memphis**
187:1

**mention**
108:11, 108:19, 144:20, 166:1, 255:12

**mentioned**
162:4, 175:2, 181:16, 221:10, 280:11

**mentioning**
182:15

**merit**
170:21, 248:9

**merits**
22:7, 66:14, 96:20, 248:7, 248:14, 256:3, 256:7, 256:8

**message**
182:3, 263:3, 334:1

**messing**
207:22

**met**
21:10, 283:15, 310:1

**metairie**
219:21, 220:9

**method**
209:16

**methodology**
169:16

**metro**
220:3, 220:13, 220:14

**mexico**
226:7

**mi**
283:22, 305:2, 336:22

**mic**
4:17, 140:8

**michelle**
199:10

**michiko**
177:18

**mid-year**
274:9

**middle**
21:17, 24:4,

25:2, 125:6,
125:7, 125:9,
125:11, 125:15,
138:3, 317:7,
317:8

**might**
25:5, 46:17,
48:5, 56:14,
58:2, 68:16,
75:7, 81:7,
85:2, 101:4,
120:7, 120:12,
135:11, 151:21,
151:22, 167:3,
167:4, 205:3,
217:17, 224:22,
242:11, 242:20,
255:6, 284:3,
293:21, 305:12,
320:9

**migrated**
224:1

**mike**
3:16, 203:12,
251:18, 251:20,
255:17, 264:17,
264:19, 305:11,
350:5

**mile**
9:17, 121:9,
121:14

**miles**
226:4

**military**
199:22, 200:13,
201:9, 201:13,
201:20, 202:13,
202:17, 227:19

**miller**
213:10, 213:15,
219:8, 281:14

**million**
9:16, 134:19,
202:14, 206:21,
208:6

**mills**
133:15

**mind**
39:15, 41:15,

93:9, 104:12,
119:20, 146:4,
154:8, 171:20,
181:2, 195:19,
222:9, 224:21,
258:3, 261:14,
325:8, 333:1,
347:11

**minden**
114:21

**mindset**
92:21, 266:4

**mine**
55:10, 149:11,
155:7, 226:20,
254:6

**minimal**
331:10

**minimization**
170:12

**minimizing**
170:14

**minimum**
109:18

**minor**
90:11, 344:7

**minorities**
72:3, 84:4,
148:21, 211:16,
272:14, 300:21,
300:22, 304:21,
305:18, 305:20,
314:10, 334:2,
336:21, 336:22,
337:10, 345:9

**minority**
23:9, 24:5,
26:10, 35:18,
39:22, 40:2,
40:6, 40:10,
47:12, 59:13,
64:9, 71:11,
72:3, 80:16,
83:8, 83:9,
85:2, 89:8,
90:11, 103:10,
112:4, 112:8,
112:9, 112:18,

125:3, 125:13,
128:18, 129:7,
129:14, 131:15,
131:16, 149:7,
175:13, 185:5,
193:16, 208:4,
208:15, 208:16,
211:13, 211:15,
221:7, 232:20,
271:2, 273:8,
279:19, 283:22,
289:6, 295:10,
300:18, 300:20,
301:1, 302:3,
316:7, 325:17,
325:21, 334:8,
337:1, 337:8,
337:22, 338:4,
338:9, 338:12,
338:18, 339:8,
339:12, 341:1,
341:19, 342:1,
342:17, 347:1

**minority's**
301:16, 315:5

**minority-ma**
336:12

**minority-majority**
273:8, 338:7,
339:1, 342:7,
342:8, 343:4

**minus**
270:20

**minute**
266:21, 319:13

**minutes**
60:14, 60:15,
70:1

**mischief**
206:4, 211:3,
211:5, 211:6

**mission**
107:8

**mississippi**
14:3, 15:3,
215:5

**mistaken**
50:15, 50:16

**misunderstand**
270:2

**mitchell**
6:12, 6:18

**mix**
152:12

**mixture**
166:17

**mm-hmm**
123:11, 165:17,
287:21, 288:7,
288:19, 293:13,
297:7, 320:11,
324:2, 325:22

**mo**
351:2

**moderate**
151:21

**mom**
189:12

**moment**
127:4, 195:1,
235:14, 252:18,
258:6, 260:18,
329:18

**monday**
327:14

**money**
9:16, 68:21,
68:22, 69:1,
69:7, 226:1

**monroe**
13:17, 26:22,
28:5, 111:14,
111:19, 112:5,
113:4, 114:7,
121:7, 121:8,
121:9, 121:11,
121:14, 121:15,
121:17, 121:18,
122:3, 165:2,
214:14, 215:4,
215:8

**month**
23:1

**months**
49:7, 49:10,
74:19, 189:7

**monument**
258:20, 258:22,
260:4
**moot**
255:6
**more**
11:16, 13:2,
24:9, 41:13,
44:4, 58:6,
61:12, 64:16,
65:7, 65:8,
65:10, 75:9,
77:6, 77:18,
80:10, 82:6,
82:14, 88:3,
88:4, 88:13,
111:7, 111:13,
111:17, 112:19,
115:17, 116:5,
121:6, 134:21,
141:19, 151:18,
156:13, 158:13,
160:1, 182:19,
191:5, 196:9,
206:2, 207:1,
207:16, 210:1,
210:2, 213:4,
214:17, 214:21,
225:20, 226:22,
229:15, 240:6,
240:10, 242:13,
243:21, 262:2,
266:21, 270:15,
272:18, 279:13,
279:20, 287:22,
291:3, 291:18,
293:2, 293:4,
293:6, 293:11,
293:14, 299:21,
300:4, 306:3,
306:5, 307:6,
310:8, 310:10,
311:4, 313:3,
316:6, 317:1,
317:7, 317:8,
317:11, 319:17,
326:3, 327:8,
328:2, 328:5,

328:7, 328:11,
329:4, 329:7,
329:10, 329:11,
331:14, 333:8,
334:5, 335:11
**morehouse**
218:5
**morganza**
7:19, 9:13,
10:15, 10:19,
10:20, 11:3,
11:4, 11:7,
11:10, 13:12,
14:11
**morning**
5:2, 20:22,
25:20, 25:21,
118:2, 146:13,
217:12, 217:13,
343:22
**most**
12:11, 19:8,
23:22, 25:1,
27:21, 44:2,
65:6, 133:9,
159:19, 167:3,
167:11, 178:3,
182:22, 188:14,
214:14, 215:21,
220:15, 225:14,
227:11, 271:18,
316:13, 318:16,
345:22
**mostly**
318:17
**motion**
147:1, 209:4,
231:14, 243:19,
262:5, 267:6,
351:3
**motions**
97:5
**motivating**
281:11
**motivation**
26:18, 27:13,
27:16, 28:10,
28:11, 28:14,

38:21, 178:5,
178:9, 180:19
**motivations**
46:5, 196:5
**mouth**
153:3, 162:20,
318:3
**move**
6:5, 6:7,
20:11, 21:6,
56:1, 60:12,
60:19, 61:7,
105:1, 131:20,
141:8, 141:13,
155:10, 194:13,
248:1, 252:15,
254:21, 290:5,
300:13, 311:17,
347:8, 349:1,
349:3, 349:4
**moved**
6:21, 79:12,
89:13, 220:2,
220:9, 223:8,
263:12
**moves**
271:10
**moving**
4:19, 141:20,
256:20, 269:9
**much**
11:16, 16:3,
18:21, 19:10,
19:14, 19:20,
26:13, 32:21,
39:20, 41:13,
58:12, 58:13,
76:10, 88:21,
91:18, 115:21,
122:14, 125:2,
136:14, 140:21,
161:13, 171:11,
175:15, 176:22,
177:10, 211:6,
212:21, 214:9,
216:10, 223:18,
226:4, 230:14,
230:16, 230:21,

257:9, 257:18,
259:11, 270:15,
273:16, 284:5,
288:4, 303:9,
309:19, 310:20,
311:2, 311:11,
313:20, 317:21,
335:10
**multifaceted**
197:15
**multiple**
62:19, 72:8,
81:5, 131:12,
271:8, 283:16,
283:17, 291:21,
338:4
**multiply**
125:1, 125:22
**municipality**
37:13, 38:15
**murdered**
155:4, 155:5,
155:6
**museum**
187:2
**must**
49:8, 62:8,
62:9, 176:1,
176:22, 281:10,
281:21, 302:14
**muster**
298:13, 299:1
**myself**
124:2, 139:1,
162:7, 184:18,
216:6, 226:21,
245:13, 271:18,
297:2, 307:11

---

**N**

**naacp**
259:11
**naaden**
1:22, 352:2,
352:17
**nah**
74:17
**name**
11:5, 31:17,

117:17, 128:13,
167:19, 169:6,
172:11, 176:12,
186:9, 191:9,
218:1, 218:2,
322:11, 332:15
**name's**
255:18
**named**
177:4, 226:18
**narrowly**
43:12, 282:2
**nation**
48:18, 154:16,
155:10, 161:2,
205:6, 259:8
**national**
189:22
**native**
259:3
**natural**
33:7
**nature**
90:13, 197:7,
234:18, 241:14,
314:1
**nays**
252:10, 252:11,
265:9, 265:10,
350:18, 350:19
**near**
221:13, 255:19,
285:9
**nearly**
215:2
**necessarily**
37:16, 37:22,
40:8, 44:20,
71:21, 75:14,
85:9, 122:20,
138:2, 159:21,
160:13, 160:22,
195:12, 277:18
**necessary**
43:13, 53:11,
137:14, 241:5,
241:7, 277:11,
299:20

**necessitated**
232:17
**necessity**
309:18
**need**
4:12, 4:22,
5:2, 12:7,
23:16, 43:1,
44:21, 53:4,
53:5, 75:12,
78:19, 91:1,
91:2, 92:22,
95:22, 98:1,
101:4, 105:4,
110:18, 129:16,
138:11, 148:7,
185:14, 189:19,
191:18, 194:21,
216:8, 226:9,
235:14, 242:22,
244:13, 245:3,
255:9, 255:10,
263:5, 263:6,
266:20, 297:14,
312:14, 313:8
**needed**
6:3, 8:9, 50:3,
199:8
**needs**
11:21, 85:7,
89:13, 95:22,
157:5, 216:3,
256:6, 341:7
**nefarious**
346:21
**neglect**
123:19, 210:3
**neglected**
123:20
**neighbor**
54:20
**neighborhood**
156:4
**neighborhoods**
24:2, 24:3
**neighboring**
34:8, 35:12,
48:13, 52:16

**neighbors**
35:19, 229:6
**neither**
66:22, 117:15,
248:9, 283:9,
287:15, 326:16,
326:21, 327:1,
352:5
**neutral**
199:16
**never**
27:10, 49:19,
49:21, 50:18,
60:4, 92:7,
121:2, 122:9,
145:7, 145:8,
149:16, 153:2,
153:4, 153:9,
154:10, 169:18,
169:19, 176:16,
192:14, 198:5,
284:9, 315:22,
320:5, 325:16,
328:8, 334:12,
344:22
**new**
24:2, 26:10,
55:11, 55:12,
55:16, 63:21,
68:9, 96:1,
101:14, 105:3,
134:4, 153:2,
153:4, 159:7,
184:2, 194:4,
214:12, 215:8,
215:15, 219:21,
220:3, 221:14,
243:12, 252:20,
252:21, 259:3,
274:2, 274:6,
274:18, 285:20,
285:21, 299:2,
306:2, 306:7,
308:12, 314:8
**newell**
4:2, 4:3,
145:14, 145:15,
146:11, 146:16,

147:3, 147:7,
147:14, 147:19,
147:22, 148:6,
148:11, 148:14,
148:17, 149:4,
149:9, 149:18,
149:20, 150:1,
150:5, 150:13,
150:17, 150:19,
150:22, 151:2,
151:4, 151:11,
155:5, 157:22,
175:2, 252:5,
252:6, 265:4,
265:5, 350:13,
350:14
**newly**
158:6
**newt**
322:13
**next**
20:12, 34:13,
36:9, 38:15,
39:10, 45:14,
56:4, 65:1,
69:19, 70:9,
77:7, 92:18,
127:20, 127:22,
128:9, 128:10,
131:6, 138:9,
142:20, 157:6,
157:8, 157:9,
177:16, 199:14,
203:3, 205:15,
209:4, 213:5,
213:11, 224:9,
225:2, 246:11,
246:12, 249:7,
255:8, 265:13,
300:7, 300:14,
318:2, 323:19,
324:5, 324:11,
324:14
**nice**
44:18
**night**
217:19, 270:22
**nine**
323:7, 323:9,

350:18, 350:19
**nobody**
60:2, 184:22,
203:16, 206:8,
206:9
**non**
130:14
**non-black**
65:20
**non-reliable**
130:14
**none**
20:7, 65:20,
97:20, 129:13,
178:9, 205:11,
207:16
**nonprofit**
172:14, 200:8
**normally**
144:17, 219:5,
306:22
**north**
24:3, 69:18,
107:14, 112:8,
119:5, 119:18,
123:20, 181:21,
208:1, 210:5,
210:7, 210:10,
211:7, 214:2,
214:6, 214:8,
214:20, 215:4,
216:8, 218:22,
220:4, 220:6,
220:7, 222:13,
280:18, 307:7
**northeast**
292:14
**northern**
119:3, 119:7
**notes**
277:5
**nothing**
6:1, 38:8,
64:18, 69:1,
69:2, 71:20,
81:18, 119:3,
161:21, 188:5,
188:6, 193:18,

194:1, 200:2,
203:20, 226:16,
237:6, 240:4,
263:7, 329:22,
334:9
**notice**
135:1, 139:7,
166:11
**noticed**
21:1, 164:16
**notion**
124:3
**november**
124:1, 237:21,
238:18
**novice**
169:22
**now's**
231:17
**nowhere**
144:22
**nu**
25:4
**number**
13:1, 22:4,
26:21, 27:2,
27:4, 39:3,
80:11, 84:9,
124:20, 125:21,
126:16, 127:5,
127:6, 129:7,
131:13, 131:14,
131:18, 137:9,
171:4, 175:9,
175:12, 176:18,
236:9, 236:17,
281:12, 311:16,
313:4, 319:5,
324:7, 324:20,
339:14, 339:17,
345:10
**numbers**
30:8, 79:7,
81:19, 83:6,
89:6, 101:17,
102:1, 103:4,
112:1, 118:19,
124:18, 124:21,

124:22, 125:19,
126:11, 126:12,
127:4, 127:7,
127:8, 127:12,
127:13, 127:15,
127:16, 130:4,
130:7, 131:17,
137:11, 168:20,
168:22, 169:2,
171:4, 171:5,
177:11, 184:9,
204:13, 206:22,
214:19, 270:18,
303:19, 312:16,
312:21, 322:22,
328:7
**numerous**
260:1, 275:2,
303:4

### O

**oath**
204:6, 204:9,
260:19
**object**
234:8, 250:10,
250:16, 263:14
**objected**
243:18
**objection**
20:12, 250:15,
250:17, 263:13,
263:15, 267:7,
267:8, 310:2,
349:4, 351:3
**objections**
95:18
**objective**
295:20, 345:11
**objectively**
297:21
**objectives**
347:22
**obligation**
123:3
**observed**
227:11
**obvious**
64:21, 66:5,

191:12, 191:16
**obviously**
2:10, 8:11,
178:6, 196:20,
216:16, 221:6,
232:14, 234:4,
271:5, 275:10,
282:14, 284:16,
306:1
**occupation**
132:7
**occur**
236:13, 319:9
**occurring**
8:7
**october**
124:1, 194:6
**odd**
35:6, 42:14
**off-base**
202:6
**offend**
65:4, 198:5,
198:12
**offended**
71:8, 71:22,
72:18, 84:14,
187:13, 187:14,
196:13, 197:18,
199:2, 309:7
**offense**
181:18, 182:5
**offensive**
196:19, 253:9
**offer**
250:15, 274:15,
277:14, 278:2
**offered**
140:16, 232:11,
234:7
**offering**
254:16
**office**
12:18, 151:15,
151:22, 199:12,
199:13, 204:7,
238:17, 239:18,
245:2, 312:20

officer
262:9
offices
82:18
official
88:10, 347:4
officials
152:13, 280:19,
281:8
offshore
158:20
often
118:11, 161:5,
162:3, 290:20
oh
6:15, 20:5,
41:4, 54:10,
75:8, 91:1,
256:21, 268:19,
276:22, 277:22,
287:8, 320:21,
325:2, 327:5,
328:19, 335:1,
336:4, 341:12
oil
158:18
old
14:2, 138:3,
146:4, 189:13,
194:6, 247:6,
256:3, 256:7,
256:17, 298:12,
299:1, 334:15
omersbach
263:18
on-shore
158:20
once
103:13, 116:22,
181:11
one's
123:7, 145:2
one-third
188:3
ones
34:22, 38:16,
39:9, 44:13,
48:13, 50:1,

114:13, 160:16,
179:16, 192:15,
225:14, 239:10,
297:5, 307:17
online
142:14, 232:4
only
23:7, 23:12,
23:19, 39:11,
59:2, 62:3,
65:15, 65:17,
67:18, 71:10,
72:12, 72:14,
77:2, 79:17,
83:22, 85:14,
85:15, 97:4,
106:6, 106:16,
132:21, 142:9,
152:17, 167:2,
170:10, 175:10,
178:10, 178:18,
181:11, 188:15,
191:6, 192:15,
195:16, 201:17,
205:20, 206:10,
210:11, 214:19,
215:9, 219:9,
232:22, 242:2,
244:6, 246:6,
247:7, 256:1,
259:17, 269:10,
274:20, 275:22,
282:21, 287:7,
304:22, 311:6,
316:14, 319:17,
327:13, 328:16,
333:14, 338:3,
338:5, 339:22,
347:14
open
148:14, 151:17,
153:2, 154:8,
177:6
opening
153:1
operate
33:8, 294:19
operational
115:18, 116:6

operations
202:13
operative
282:4
opine
149:14
opined
148:17
opinion
50:3, 50:19,
53:19, 75:14,
75:17, 81:22,
103:15, 104:6,
119:6, 135:14,
144:11, 148:18,
148:20, 169:11,
237:8, 280:12,
292:1, 317:4,
338:10, 338:18,
341:13
opinions
136:20, 137:2,
139:18, 170:21,
219:7, 282:15,
291:21
opponents
294:17
opportunism
210:4
opportunities
154:8, 157:19,
180:15
opportunity
4:11, 6:10,
7:2, 7:4, 11:19,
21:21, 23:4,
23:18, 23:19,
24:11, 26:22,
27:3, 27:6,
27:9, 47:4,
57:8, 64:9,
73:14, 77:21,
78:1, 78:5,
78:7, 94:20,
95:16, 99:9,
103:11, 106:18,
120:12, 150:6,
151:7, 151:18,

151:19, 152:16,
152:18, 152:20,
153:1, 153:18,
155:13, 155:14,
155:19, 157:5,
157:20, 167:13,
167:21, 171:16,
172:1, 179:2,
180:4, 186:5,
192:7, 198:2,
200:4, 213:16,
234:6, 240:2,
240:5, 254:18,
255:4, 261:19,
261:20, 272:15,
273:16, 293:16,
301:13, 304:6,
304:10, 304:22,
305:5, 310:17,
314:18, 315:16,
316:14, 336:11,
337:1, 339:10,
340:12, 342:9,
346:12, 347:3,
347:5, 347:8
opposed
141:20, 192:2,
271:1, 271:16,
291:9, 314:19
opposite
118:10, 196:22
opposition
2:8, 19:21,
20:3, 20:7,
89:7, 213:7,
231:4, 257:4,
267:13, 267:16,
267:17, 294:16,
336:2
ops
333:20
option
297:20
orange
324:21
order
2:4, 6:19,
21:22, 22:4,

22:5, 22:22,
39:21, 43:13,
45:4, 45:21,
46:4, 46:7,
46:8, 46:14,
53:18, 54:4,
55:14, 55:17,
56:15, 62:10,
63:3, 74:13,
86:15, 96:21,
103:14, 103:15,
103:18, 105:10,
144:22, 146:12,
147:10, 147:17,
176:3, 178:7,
179:14, 193:12,
201:6, 232:17,
243:14, 244:11,
245:19, 261:4,
262:15, 268:6,
268:8, 268:9,
272:4, 273:5,
273:14, 282:12,
289:1, 300:2,
302:13, 302:18,
305:1, 305:7,
310:4, 326:17,
330:16, 347:14

**ordered**
73:2, 73:5,
98:12, 98:13,
142:22, 143:18,
144:1, 164:3,
173:1, 174:4,
242:14, 261:18,
262:8, 272:9,
274:6, 279:9,
298:5, 305:3,
337:5

**ordering**
55:18, 66:8,
193:2

**orders**
22:15, 22:16,
144:21, 147:10

**oregon**
206:20, 209:14

**organization**
172:14, 173:6,

194:3, 200:8

**organizations**
181:22

**organized**
136:19, 168:7

**organizers**
163:12

**organizing**
166:12

**oriental**
63:2

**original**
44:12, 178:11,
269:2, 269:3

**originally**
213:21, 223:7

**orleanian**
259:3, 259:4

**orleans**
24:2, 32:19,
63:21, 68:9,
152:8, 153:2,
153:4, 168:11,
204:20, 210:15,
210:20, 211:12,
215:9, 219:22,
220:3, 221:14,
306:2, 306:7,
323:20, 323:21

**oth**
298:10

**other's**
159:17, 159:18

**others**
32:10, 51:8,
136:17, 149:2,
281:20, 303:11,
335:8

**otherwise**
230:2, 256:17,
303:12, 352:7

**ouachita**
28:19, 29:3,
31:8, 31:9,
32:1, 32:3,
32:5, 32:7,
33:21, 34:1,
52:7, 79:7,

80:22, 118:16,
119:1, 121:3,
121:5, 121:16,
122:2, 207:20,
207:21, 208:1,
214:18, 215:2,
218:6, 255:19,
324:17

**ought**
57:4, 240:16,
289:10, 289:11

**ourselves**
141:16, 177:7,
184:18, 205:22,
210:21, 276:7,
289:16

**outbursts**
131:2

**outcome**
74:3, 352:7

**outcomes**
241:20

**outlier**
76:1, 76:5

**outrageous**
65:4

**outset**
22:5

**outside**
35:19, 38:3,
38:6

**over**
9:17, 31:8,
34:14, 34:18,
47:1, 54:15,
60:15, 64:22,
67:15, 75:9,
89:17, 104:9,
127:18, 157:13,
159:10, 168:8,
168:12, 173:6,
176:21, 180:5,
180:6, 191:11,
201:4, 201:20,
202:14, 220:9,
221:13, 223:8,
223:15, 224:1,
227:10, 260:5,

281:20, 313:15,
333:22, 336:14,
337:14, 340:8,
341:8

**overall**
55:5, 81:6,
102:7, 102:9,
102:12

**override**
21:15, 188:12,
188:19, 344:19

**overriding**
39:1

**overstep**
228:7

**overturn**
269:22

**overturned**
188:16

**overwhelming**
167:8

**overwhelmingly**
43:21, 152:9

**overwritten**
94:1

**owe**
254:17, 276:7,
276:8, 343:17

**owens**
218:19, 222:15,
222:16

**owes**
254:13, 254:14

**own**
7:17, 36:13,
49:5, 49:11,
147:14, 154:19,
187:6, 187:10,
210:10, 223:12,
235:3, 283:5,
343:20

**owned**
218:1

**owns**
201:4, 218:3

**P**

**pa**
244:4, 244:16

packing
185:1
page
45:21, 48:11,
117:20, 118:3,
180:19, 341:13,
352:10
pages
1:21, 46:9,
49:18, 83:1,
146:20, 302:22,
303:1, 341:20,
342:5, 352:8
paid
163:11, 182:5,
203:16
pain
226:16
painful
348:14
paint
90:22
painted
84:15
panel
97:8, 202:20,
228:11, 248:14
par
32:5, 273:18,
273:21, 274:16,
274:20, 275:12,
276:1, 300:21
par's
273:19
parade
134:1, 134:4
parades
134:11
parallel
15:4
parameters
170:6
paramount
170:17
paris
323:10
parish's
206:21

parishes
9:19, 24:17,
32:12, 32:15,
32:20, 33:6,
44:7, 55:6,
59:5, 69:12,
69:14, 79:16,
79:17, 81:6,
89:16, 112:22,
118:18, 122:16,
149:10, 158:10,
206:12, 208:5,
208:6, 208:7,
208:8, 208:10,
208:13, 214:18,
215:5, 271:11,
285:10, 285:13,
285:15, 291:4,
311:3, 323:11,
323:12, 323:15,
323:19, 323:22,
324:3, 324:5,
325:2, 325:3,
325:7, 348:11
park
134:16, 258:12,
260:5
part
9:5, 14:1,
14:11, 39:21,
108:6, 119:3,
119:11, 120:11,
133:9, 159:14,
159:19, 180:20,
184:21, 185:22,
191:13, 220:3,
221:15, 224:12,
254:11, 309:9,
309:18, 338:5
participate
5:1, 24:12,
254:15
participated
172:19
particular
9:7, 16:19,
17:12, 18:5,
18:6, 29:4,

36:5, 47:6,
47:12, 51:22,
52:8, 64:2,
80:17, 94:17,
95:21, 97:4,
97:20, 100:17,
101:10, 121:6,
165:22, 166:18,
168:1, 176:1,
179:1, 281:13,
333:1
particularly
19:6, 80:1,
165:20, 166:22,
219:19, 220:15,
257:16, 258:5,
283:12, 309:12,
325:14, 346:6
particulars
99:2
parties
162:6, 162:7,
211:18, 211:20,
352:6
partisan
108:4, 281:18,
315:8
partisanship
129:6
partners
202:17
parts
166:9, 306:4
party
57:13, 108:8,
138:4, 157:4,
161:1, 161:2,
161:5, 161:6,
161:10, 161:16,
161:22, 162:3,
162:10, 162:13,
164:1, 211:17,
211:19, 211:21,
332:17, 332:21,
333:4, 333:6,
333:13, 333:14,
333:19, 334:5,
334:7, 334:10,

334:15
party-affiliated
163:20
pass
33:16, 43:22,
103:22, 173:1,
174:4, 177:13,
198:1, 204:6,
230:12, 234:1,
238:2, 238:9,
239:7, 239:11,
239:16, 241:9,
241:14, 243:4,
243:5, 244:9,
244:16, 244:21,
245:1, 245:11,
245:19, 247:2,
272:2, 284:10,
290:6, 294:14,
295:14, 297:2,
297:3, 298:13,
299:1, 299:2,
311:22, 328:9
passage
178:7, 253:20,
254:20, 263:10
passed
13:22, 21:19,
56:20, 58:9,
61:10, 65:11,
66:18, 93:14,
94:19, 95:11,
119:6, 135:9,
142:11, 207:6,
209:9, 234:15,
238:14, 238:21,
244:4, 246:9,
247:2, 287:15,
287:16, 289:17,
297:6, 330:22,
345:17
passes
239:8, 296:3,
298:7
passing
230:10, 233:5,
297:11
passion
92:13

passionate
76:6
passions
196:5, 196:6
past
5:11, 12:3,
84:11, 121:2,
156:19, 173:10,
194:22, 223:22,
224:3, 263:4,
288:18, 298:21,
312:17
paste
275:15
path
44:4, 160:18,
224:16
patrick
213:9
pattern
274:3
patterns
38:4, 48:6,
340:11
paul
255:18
pause
196:20, 277:2,
286:8
pay
109:18, 138:2,
200:2, 203:17,
205:4, 212:3,
259:20
payroll
57:12
peace
202:22
penalized
72:6
penalty
352:3
pending
74:8, 74:9,
232:22
pendulum
209:5
pennsylvania
204:16

people's
42:3, 195:13,
304:13
percent
29:21, 79:9,
101:18, 101:19,
118:19, 118:21,
119:2, 124:20,
124:21, 125:20,
126:10, 126:11,
126:16, 127:11,
128:1, 128:2,
129:14, 129:15,
131:9, 135:5,
135:6, 135:7,
135:8, 137:9,
137:12, 137:14,
151:5, 175:9,
175:10, 194:21,
201:5, 202:5,
261:2, 261:3,
261:7, 261:8,
261:9, 261:12,
270:21, 283:22,
290:11, 300:14,
301:13, 302:10,
302:16, 303:7,
303:16, 303:19,
304:1, 310:7,
319:14, 323:13,
323:14, 323:17,
323:18, 323:20,
324:1, 324:6,
324:11, 324:18,
324:22, 325:1,
325:4, 336:13,
336:14, 337:13,
337:14, 338:10,
338:21, 339:1,
339:2, 339:3,
339:6, 339:19,
339:21, 340:1,
340:2, 340:8,
341:1, 341:8,
341:22, 343:5
percentage
88:9, 88:10
percentages
79:16, 312:16

perfect
284:13, 320:19
performed
103:8, 170:13
perfunctory
204:11
perhaps
89:7, 222:13
perils
9:4
period
202:14, 241:10
perjury
352:3
person
5:20, 45:7,
64:9, 76:9,
77:2, 84:11,
84:16, 84:22,
85:5, 87:19,
91:18, 92:1,
106:18, 106:21,
118:22, 150:2,
153:2, 153:8,
153:9, 167:2,
183:18, 187:17,
300:7, 317:3,
338:16, 340:12
person's
92:2
person-1
274:3
personal
155:14
personally
235:4, 249:22,
250:9, 272:11,
277:8
persons
148:7, 207:10
perspective
197:5, 257:12,
278:12, 293:8,
293:12, 299:6,
314:12, 315:13
perspectives
233:2, 257:12,
261:1, 278:1,

278:2
pertains
253:4
pervades
65:14, 83:14
ph
138:13, 145:19,
226:19, 231:5,
263:18, 271:7,
311:20, 321:10,
322:13, 322:14,
332:9, 335:18,
335:22
phelps
177:17, 177:20,
183:4, 193:21
phil's
271:7
phone
2:5, 12:4,
139:6, 159:9
photo
333:20
phrase
302:7
physically
25:9
pick
12:4, 29:5,
30:4, 32:1,
55:19, 74:22,
190:17, 233:13,
262:13, 262:15
picked
45:11, 280:1
picking
24:4, 51:6,
55:2
picks
233:13
picture
187:5
pie
183:16, 184:22,
185:1, 185:12
piece
38:10, 81:8,
82:6, 82:7,

171:10, 183:16,
185:11
**pieces**
48:2
**pierre**
258:17, 259:10
**pig**
294:15, 342:18,
342:21
**piggyback**
136:7
**pigment**
230:1
**pigmentation**
84:18
**pineville**
75:21, 215:14
**place**
169:1, 214:19,
274:10, 281:12,
340:19
**placed**
258:21
**placeholder**
6:2
**places**
19:8, 167:3,
167:10, 168:10
**plaintiff**
245:16, 272:8,
281:10
**plaintiff's**
248:10
**plaintiffs**
22:6, 66:6,
128:20, 233:22,
240:9, 248:20
**plan**
6:5, 6:6,
22:13, 22:17,
22:22, 23:2,
69:8, 74:16,
128:18, 142:22,
143:19, 143:21,
144:2, 145:10,
147:11, 154:13,
215:18, 236:2,
236:11, 256:7,

265:22, 266:2,
274:8, 339:7
**planned**
111:10
**plans**
50:4, 50:22,
128:22, 129:13,
136:2, 248:7,
278:10, 281:4
**plate**
185:13
**platte**
215:14
**play**
122:12, 208:19,
271:13
**played**
116:21
**playing**
318:22
**pleading**
211:2
**pleadings**
66:5
**pleas**
194:19
**please**
2:4, 2:5, 2:6,
2:18, 26:6,
26:22, 27:3,
27:5, 60:13,
130:18, 130:22,
132:11, 169:7,
172:4, 225:5,
235:12, 249:14,
250:19, 255:15,
318:5
**pledge**
202:21
**plenty**
72:19
**plus**
270:20, 302:17,
337:13
**point**
6:11, 6:19,
6:20, 15:8,
16:2, 17:1,

21:5, 22:5,
42:10, 43:3,
63:13, 68:18,
77:20, 80:11,
84:21, 94:2,
94:17, 110:17,
112:16, 117:7,
120:9, 120:14,
120:18, 121:1,
124:2, 124:4,
125:18, 125:19,
132:20, 133:6,
182:17, 184:12,
186:20, 193:11,
193:12, 218:9,
223:20, 224:11,
235:16, 235:17,
241:6, 246:22,
247:1, 247:17,
250:9, 255:6,
268:5, 268:8,
275:5, 277:6,
282:9, 301:5,
308:15, 316:8,
316:17, 316:18,
317:13, 319:2,
322:16, 322:21,
327:11, 327:16,
327:17, 327:19,
327:22, 329:17,
343:8, 343:12
**point-for-point**
278:9
**pointe**
10:20, 10:22,
13:8, 13:14,
13:15, 13:22,
15:8, 15:14,
120:7
**pointed**
44:1, 55:9,
66:12, 80:13,
261:17
**pointing**
20:21, 38:13,
38:14, 39:17,
52:15
**points**
104:13, 248:1,

277:14
**poke**
294:15, 342:19,
342:21
**polarizable**
49:17
**polarized**
49:5, 59:16,
65:14, 65:20,
83:2, 83:14
**polarizing**
192:8
**poli**
87:1
**police**
72:9, 87:12,
139:9, 153:6
**policing**
109:9
**policy**
188:21, 189:20,
190:2, 190:3
**political**
24:13, 37:21,
77:4, 87:1,
87:2, 87:6,
87:9, 113:19,
114:12, 115:9,
132:6, 281:17,
306:1, 309:18,
314:12, 315:13,
331:19, 331:21,
332:2, 337:9,
348:6
**politically**
316:2, 320:15
**politics**
297:12, 316:8
**polk**
199:21, 200:7,
200:11, 200:15,
200:20, 200:22,
201:10, 201:14,
201:19, 202:6,
202:11
**polls**
183:20
**pond**
59:11, 133:16

**pontchartrain**
220:7, 221:17,
221:19
**pop**
29:13, 267:3
**populated**
323:12
**population**
27:18, 27:19,
29:14, 34:12,
34:21, 36:11,
37:6, 38:22,
51:17, 59:14,
61:20, 62:14,
62:15, 62:16,
62:17, 64:20,
67:12, 67:13,
67:14, 67:16,
76:3, 80:17,
81:20, 83:9,
84:4, 88:10,
101:19, 101:20,
102:8, 102:10,
102:12, 102:16,
102:17, 106:11,
106:12, 111:18,
112:22, 118:20,
119:17, 121:11,
123:17, 124:16,
126:3, 127:11,
129:14, 131:9,
137:5, 137:12,
170:11, 188:3,
208:2, 208:5,
208:14, 214:12,
215:1, 215:9,
280:20, 293:6,
300:15, 302:11,
302:17, 303:15,
305:9, 306:3,
314:7, 314:10,
314:16, 314:18,
314:22, 319:6,
319:14, 319:20,
323:13, 323:15,
324:1, 324:10,
325:11, 325:16,
326:3, 329:13,

333:11, 333:12,
337:8, 337:14,
338:5, 338:6,
341:10
**populations**
134:18, 181:4,
300:20, 325:17
**portion**
82:4, 152:19,
194:20
**portions**
118:1
**position**
45:15, 86:21,
193:13, 194:11,
227:15, 240:7,
248:20, 279:17
**positions**
333:21
**possibility**
123:10, 212:13
**possible**
22:3, 27:19,
30:3, 37:6,
37:9, 39:4,
46:14, 46:15,
51:20, 55:6,
59:6, 86:11,
86:12, 128:22,
129:1, 271:20,
275:21, 279:12,
279:17, 294:22,
318:13, 323:2,
342:8
**possibly**
74:20, 136:19,
211:9
**posterity**
210:21
**posture**
254:20, 279:22
**potential**
229:4, 241:19
**potentially**
233:7
**poverty**
174:13
**power**
89:10, 148:8,

149:13, 199:9,
205:10, 206:2,
211:8
**powers**
73:8, 148:12,
228:8
**practicable**
271:19
**practical**
24:16
**pray**
186:13, 195:1,
202:21
**pre**
48:11, 59:1,
99:21, 326:2
**pre-clearance**
58:19
**pre-filed**
98:17, 98:18
**precinct**
29:5, 29:15,
30:5, 31:8,
31:9, 34:12,
34:18, 34:19,
34:21, 35:4,
36:14, 46:22,
47:10, 52:16,
59:9, 69:20,
81:7, 170:14,
178:4, 307:10,
307:15, 311:1,
325:20, 325:21
**precincts**
29:8, 29:11,
29:14, 29:22,
30:7, 31:4,
31:21, 34:9,
34:11, 35:12,
36:10, 37:2,
37:3, 37:12,
38:14, 38:21,
41:5, 42:5,
44:8, 44:12,
44:13, 45:11,
47:16, 47:21,
48:5, 48:7,
48:11, 48:21,

51:12, 52:3,
52:9, 52:16,
53:6, 57:5,
57:6, 59:7,
59:9, 61:19,
69:18, 70:19,
80:9, 81:6,
99:21, 142:10,
142:18, 345:20
**precisely**
118:11
**preclearance**
156:12, 156:15
**preconceived**
124:3
**predominant**
63:11, 69:21,
70:18, 116:4,
160:6, 280:16,
281:11, 282:21,
300:22, 301:1
**predominantly**
69:19, 69:20,
129:10
**predominated**
281:20
**preeminent**
270:12
**preemptively**
279:4
**preferred**
23:7
**prejean's**
217:19, 217:22,
218:3, 218:8
**preliminary**
22:11
**preparation**
271:3
**prepare**
139:1, 141:16,
180:3
**preparing**
114:11, 141:12,
180:6
**preposterous**
85:15
**prerogative**
198:16

**prescribed**
207:11
**present**
2:20, 2:21,
3:1, 3:3, 3:4,
3:5, 3:6, 3:8,
3:10, 3:13,
3:16, 3:19,
3:21, 3:22, 4:1,
4:2, 4:4, 4:6,
58:18, 59:17,
94:20, 124:6,
191:6, 212:13,
225:2, 254:17,
268:6, 297:19,
332:10, 335:13,
335:15, 336:1
**present-day**
333:9
**presentation**
22:1, 143:17
**presentations**
278:13
**presented**
44:20, 101:2,
112:13, 128:12,
136:2, 146:5,
146:19, 178:9,
180:2, 180:10,
180:18, 262:7,
287:13
**presenting**
143:20, 143:21,
258:16
**presently**
339:4
**preserves**
24:15
**president**
7:22, 22:19,
108:8, 172:12,
200:1, 212:6,
274:14
**presidents**
83:13, 97:9
**pressed**
31:10
**pressure**
197:7

**presumption**
136:3
**pretend**
345:2
**pretty**
11:1, 12:8,
12:20, 26:8,
26:11, 32:21,
36:8, 210:17,
211:17, 212:22,
242:19, 259:11,
288:4, 308:17,
320:14
**prevail**
22:7, 233:22,
240:10, 242:1,
242:11, 242:20,
256:18, 348:3
**prevails**
233:15, 240:8,
245:10, 245:16,
245:22, 330:16,
331:2, 331:6
**prevent**
65:21, 253:10,
296:11, 305:20
**prevents**
247:10, 256:8,
281:4
**preview**
235:1
**previous**
79:17, 100:12,
131:14
**previously**
179:17
**price's**
227:8
**prima**
27:13
**primarily**
72:22, 99:20
**primary**
10:16, 26:18,
27:15, 28:10,
28:13, 70:5,
147:6, 347:22
**principal**
8:18

**principally**
9:13
**principle**
112:20, 206:15,
206:17, 274:4
**principled**
212:20
**principles**
142:11, 170:20,
205:7, 207:1,
207:3, 208:20,
209:12, 209:13,
211:11, 211:22,
212:14, 212:18
**printing**
275:14
**prior**
56:19, 98:17,
234:7, 286:14
**private**
227:20
**privileges**
229:22
**privy**
49:21
**pro**
10:9, 13:4,
13:9, 111:4,
117:9, 137:8,
269:13, 275:22,
286:12, 300:9,
304:16, 306:14,
306:17, 332:11
**probability**
276:5, 276:6,
300:18, 338:15,
347:16
**probable**
131:10, 300:16,
301:14
**probably**
8:17, 46:3,
89:13, 114:15,
114:17, 114:21,
115:15, 116:1,
116:6, 122:11,
137:8, 161:13,
217:22, 233:16,

**266:3, 285:10,**
287:7, 291:3,
306:19, 317:5,
318:3, 329:19,
338:22, 339:8,
340:1, 344:2
**problem**
16:9, 69:17,
73:7, 89:11,
239:22, 247:3,
249:17, 256:5,
284:1, 288:9,
290:14, 295:21,
295:22, 320:22
**problematic**
201:13
**problems**
60:2
**proceed**
26:6, 130:18
**process**
5:20, 21:13,
24:13, 40:14,
41:10, 41:11,
49:4, 50:21,
60:1, 67:7,
75:5, 75:8,
82:10, 93:9,
94:6, 94:10,
94:11, 94:13,
94:16, 95:17,
96:1, 104:19,
105:2, 128:16,
129:9, 141:9,
145:3, 165:15,
165:21, 165:22,
166:19, 191:13,
191:22, 238:16,
253:2, 253:16,
257:11, 263:2,
273:12, 273:13,
275:3, 275:13,
306:21, 310:9,
320:19, 329:22,
343:19, 345:7,
345:14
**processes**
273:12

proclaim
228:22
produce
98:8, 128:18,
192:8, 232:18,
253:22, 279:9,
284:2, 294:12,
294:16
produced
192:10, 243:12,
270:5, 278:11,
283:17, 283:18
producing
233:5
product
126:1
production
275:14
professional
133:12, 133:13
professor
116:11, 117:12
program
170:6
progress
199:21, 200:7,
261:17
progresses
266:6
progressive
306:3
prohibition
209:8
project
9:12, 186:19,
332:12
projects
224:8, 226:2
promote
204:1
promotes
205:16
promoting
166:19
proper
84:11, 194:10,
231:18, 253:1,
256:3

properly
160:10
property
11:15
proportion
81:20
proportionality
82:1
proportionate
174:19
proportions
209:17
proposed
13:21, 62:20,
114:7, 214:11,
214:16, 215:7
proposing
24:9, 228:8
protect
9:9, 203:22
protected
81:19, 195:14
protecting
11:15, 11:16
protection
7:19, 12:17,
12:21, 14:18,
17:17, 40:18,
54:13, 118:5,
161:22, 170:16,
221:14, 281:2
protects
9:18, 10:6,
11:13
protests
230:4
proud
202:15
prove
192:4, 281:10,
281:22
proven
66:1
provide
49:8, 50:5,
198:3, 199:8,
235:10, 241:16,
269:7, 270:1,

270:3, 272:15,
280:7, 283:9,
301:8, 304:6,
304:10, 304:21,
347:7
provided
49:16, 49:20,
50:18, 209:19,
232:12
provides
23:19, 236:1,
236:9, 293:16
providing
200:3, 232:5
provision
282:10
provisions
236:14, 236:17,
236:19, 282:5,
282:22
prudent
240:6
public
2:2, 5:1, 7:2,
50:1, 136:19,
142:13, 191:13,
210:8, 210:9,
210:11, 210:14,
267:4
publicly
170:1, 227:18
published
169:20
pull
2:14, 28:18,
77:12, 137:7,
203:11, 274:20,
280:4
pulled
46:15, 77:19,
117:20, 125:22
pulling
102:2
pulls
118:9
punish
211:10
punitive
253:10

pur
235:6
pure
115:21
purple
323:21, 324:7
purpose
10:16, 80:6,
89:2, 150:5,
252:20
purposes
43:9, 250:5,
266:18, 266:20,
268:20, 269:10
pursuant
238:1
pursuit
229:18
push
228:13, 333:8,
333:16
push-pull
319:9
pushed
332:5
pushing
157:11
put
4:10, 36:1,
36:6, 45:15,
55:12, 92:1,
92:14, 95:3,
108:21, 154:7,
159:14, 162:16,
162:19, 168:5,
169:1, 179:15,
180:14, 208:21,
209:4, 224:15,
231:14, 235:13,
240:7, 253:1,
260:18, 265:22,
275:10, 283:5,
298:9, 298:10,
312:19, 321:15,
345:5, 346:8
puts
27:8, 44:4,
280:11

**putting**
146:3, 207:14,
219:17
**puzzle**
81:8

**Q**

**qualifications**
84:12
**qualified**
169:13
**qualify**
241:13, 245:10
**qualifying**
237:20, 240:18,
272:12, 278:18
**quality**
314:1
**quartering**
229:10
**ques**
142:20
**question**
10:9, 13:4,
15:13, 15:21,
16:1, 18:19,
28:12, 29:4,
30:13, 31:1,
31:2, 31:7,
31:11, 32:6,
32:10, 33:22,
34:2, 35:14,
42:5, 44:13,
45:16, 50:17,
52:2, 52:11,
53:10, 54:11,
54:21, 56:4,
65:1, 71:4,
78:20, 78:22,
80:3, 80:6,
82:12, 82:13,
87:5, 111:4,
112:11, 117:10,
118:22, 119:14,
119:15, 121:2,
121:22, 124:8,
128:9, 131:7,
137:3, 137:17,

139:19, 141:2,
142:20, 143:3,
143:16, 143:22,
147:4, 147:6,
147:10, 147:15,
149:4, 149:8,
160:9, 164:10,
172:2, 192:22,
195:22, 196:1,
198:12, 205:21,
224:20, 225:1,
234:4, 234:10,
234:17, 237:10,
237:14, 239:2,
248:2, 252:13,
255:20, 273:20,
276:3, 276:18,
278:8, 282:20,
289:4, 300:6,
301:12, 302:10,
306:19, 335:3,
336:8, 346:9
**question's**
51:11
**questioner**
131:3
**questioning**
42:8, 42:18,
80:8, 254:15,
332:8
**questions**
4:17, 4:18,
7:8, 16:3, 25:5,
25:10, 25:12,
26:3, 29:1,
30:15, 30:18,
31:20, 33:13,
33:18, 42:3,
42:21, 43:20,
46:12, 46:17,
53:2, 54:6,
55:3, 55:9,
55:20, 58:6,
60:13, 61:2,
71:6, 78:12,
78:13, 78:17,
78:18, 80:4,
80:10, 100:15,

103:3, 111:7,
111:10, 115:12,
123:21, 124:12,
124:14, 128:10,
130:17, 132:2,
163:16, 170:3,
171:12, 171:16,
171:21, 178:3,
178:15, 178:22,
179:17, 180:8,
195:22, 196:3,
206:2, 231:12,
286:7, 300:5,
300:12, 306:22,
328:3, 328:11,
334:16, 335:7,
344:5
**quick**
20:15, 145:18,
146:17, 164:15,
164:16, 195:22,
196:1, 321:22
**quickest**
171:22
**quickly**
242:19
**quite**
67:2, 74:20,
124:5, 149:16,
196:10, 220:13,
220:22, 257:22
**quo**
270:9, 345:10,
348:15
**quorum**
4:8
**quotes**
116:17, 174:8

**R**

**rac**
83:5
**race**
39:19, 39:20,
40:22, 41:1,
41:7, 41:12,
41:13, 42:6,
43:10, 44:5,

48:3, 62:2,
62:6, 62:11,
64:18, 76:10,
77:6, 77:18,
79:19, 80:1,
80:20, 90:18,
90:20, 92:5,
118:7, 118:12,
128:15, 129:6,
129:11, 129:16,
129:20, 130:3,
136:5, 137:20,
137:21, 138:6,
151:9, 152:3,
154:14, 160:5,
182:14, 188:17,
195:7, 195:8,
227:1, 228:21,
229:2, 229:20,
280:16, 281:7,
281:11, 282:17,
300:19
**race-based**
281:9, 282:1
**races**
59:16, 62:2,
62:13, 83:8,
131:14, 306:6,
316:6
**racial**
77:3, 79:3,
79:19, 83:6,
118:5, 131:17,
192:8, 279:1,
279:5, 280:4,
280:8, 281:3,
281:18, 281:19,
286:4, 299:10,
308:22
**racial-based**
299:18
**racially**
49:5, 49:17,
59:16, 65:14,
83:2, 83:13,
295:5, 300:11
**racist**
83:18

| | | | |
|---|---|---|---|
| **radar** | **ratios** | 266:7, 268:1, | 301:6, 301:10, |
| 344:9 | 206:19, 209:16 | 269:13, 286:9, | 304:2, 306:2, |
| **radius** | **re-districting** | 286:10, 332:13 | 315:18, 319:18, |
| 121:9, 121:14 | 41:10 | **real** | 326:13, 329:5, |
| **raise** | **rea** | 20:15, 72:16, | 331:7, 334:9, |
| 120:14 | 244:16, 285:11 | 90:12, 104:13, | 334:10, 338:13, |
| **raised** | **reach** | 183:6, 224:3, | 339:10, 339:11, |
| 13:9, 43:20 | 169:17, 207:16 | 261:12, 288:9, | 343:1 |
| **raising** | **reached** | 293:16, 298:11, | **reapportion** |
| 109:18 | 99:1 | 343:4 | 244:16 |
| **ran** | **reaches** | **realigned** | **reapportioning** |
| 12:17, 12:18, | 121:7 | 226:10 | 289:18 |
| 97:20, 131:16, | **reaching** | **realignment** | **reapportionment** |
| 170:18, 171:1, | 99:11 | 202:2 | 56:9, 66:17, |
| 212:10, 260:8, | **read** | **realistically** | 225:16, 238:10, |
| 260:14 | 2:18, 6:8, | 11:17 | 239:1 |
| **randolph** | 6:16, 20:5, | **reality** | **reason** |
| 225:6 | 22:3, 41:14, | 119:22, 230:9, | 12:17, 12:19, |
| **randomly** | 43:1, 46:6, | 312:1, 345:15 | 52:15, 61:21, |
| 41:5 | 46:11, 98:20, | **realize** | 62:3, 65:15, |
| **rapides** | 118:1, 143:4, | 153:14, 157:2, | 65:17, 70:5, |
| 35:3, 35:5, | 143:7, 144:21, | 214:8, 221:16, | 104:20, 112:3, |
| 44:11, 47:17, | 184:16, 185:7, | 318:2 | 147:19, 173:16, |
| 52:8, 71:7, | 226:20, 231:19, | **realized** | 178:4, 182:16, |
| 71:9, 71:18, | 235:15, 248:11, | 187:16 | 192:2, 206:11, |
| 72:1, 72:4, | 280:10, 282:15, | **really** | 208:10, 247:5, |
| 72:17, 72:21, | 298:21, 299:17, | 17:6, 29:4, | 280:17, 313:16, |
| 75:19, 75:20, | 302:18, 302:22, | 32:22, 33:2, | 320:15 |
| 78:13, 83:18, | 303:10, 303:11, | 67:17, 68:22, | **reasonable** |
| 85:20, 86:3, | 307:17, 308:21, | 104:12, 108:15, | 233:3, 294:21, |
| 86:7, 86:19, | 341:12, 341:20, | 109:1, 117:3, | 320:6, 320:14 |
| 88:7, 88:16, | 341:21, 342:4, | 117:11, 139:3, | **reasonably** |
| 88:17, 89:1, | 348:19, 348:20 | 139:10, 139:11, | 289:11 |
| 89:10, 89:18, | **reading** | 159:15, 168:14, | **reasons** |
| 89:20, 159:4, | 46:8, 96:4, | 168:15, 171:12, | 43:12, 53:8, |
| 165:19, 187:13, | 130:8, 130:9, | 174:17, 180:22, | 71:9, 224:3, |
| 214:18, 214:22, | 130:11, 130:16, | 183:21, 184:19, | 247:4, 277:19 |
| 292:16, 317:19, | 169:10, 255:12, | 197:3, 200:2, | **recall** |
| 318:13, 321:1 | 256:12, 291:20 | 214:6, 214:7, | 56:14, 56:19, |
| **rather** | **reads** | 216:20, 217:18, | 58:9, 58:10, |
| 4:21, 19:18, | 22:6, 207:7 | 218:9, 223:1, | 97:10, 98:15, |
| 35:11, 46:8, | **ready** | 224:14, 225:20, | 100:15, 105:18 |
| 46:14, 91:11, | 5:5, 7:13, | 229:13, 248:12, | **receive** |
| 91:18, 160:1, | 20:18, 30:17, | 250:9, 253:7, | 148:2, 148:8, |
| 185:11, 333:20 | 172:10, 180:20, | 260:6, 261:16, | 148:22, 242:18, |
| **ratio** | 199:18, 203:5, | 272:17, 277:11, | 314:2 |
| 206:20, 207:9, | 211:18, 218:19, | 284:9, 285:11, | **received** |
| 207:17 | 225:8, 266:2, | 286:4, 297:10, | 9:15, 26:20, |

118:2, 159:9,
257:4, 352:9
**receiving**
314:3
**recent**
201:17
**recognize**
6:16, 91:2,
196:21, 241:2,
243:19, 249:13,
276:5, 329:15,
347:20
**recognized**
128:12, 249:15
**recognizing**
154:17
**reconstruction**
209:6
**record**
46:13, 62:5,
66:5, 71:15,
167:19, 168:6,
193:15, 193:19,
248:15, 248:22,
256:13, 257:5,
342:4
**recorded**
332:22
**recordings**
352:4
**recovered**
8:22
**recovering**
9:1
**recovery**
8:19, 16:11
**red**
2:7, 7:5,
19:21, 20:2,
190:5, 213:6,
231:4, 324:12,
335:12
**red-blooded**
184:7
**redistrict**
93:5, 246:15,
282:17
**redistricting**
1:9, 2:10, 8:6,

10:13, 13:19,
21:13, 22:13,
39:2, 39:5,
39:8, 44:9,
92:20, 93:13,
99:19, 100:6,
101:12, 115:7,
128:16, 129:2,
132:9, 139:21,
140:1, 140:2,
140:17, 140:18,
142:9, 142:11,
157:6, 163:4,
165:4, 165:15,
165:21, 170:7,
170:8, 170:19,
178:11, 188:2,
191:14, 191:20,
194:1, 203:8,
246:11, 270:13,
274:17, 274:19,
284:4, 315:7,
318:21, 344:9,
345:11, 346:19
**redistrictings**
283:21
**reduce**
205:10, 236:19
**reduced**
148:9, 148:12
**reduces**
209:1, 209:2
**reelection**
239:19
**reeled**
298:8
**reenacted**
236:18
**reestablish**
211:11
**refer**
166:12
**reference**
307:18
**referencing**
114:13
**referred**
235:22

**reflect**
252:19
**reflection**
210:3
**refurbishment**
260:4
**regard**
138:5, 170:14,
170:15, 283:7,
283:8
**regarding**
200:4, 352:10
**regardless**
91:19, 98:7,
347:4
**region**
7:16, 8:2, 9:7,
13:20, 17:3,
17:7, 114:7,
114:21, 158:17,
159:1, 159:5,
159:11, 159:15,
217:11, 309:14
**regional**
83:14
**regionalization**
116:5
**regions**
113:20, 113:22,
115:21, 288:5,
288:6
**registered**
72:7, 79:8,
79:9, 79:13,
79:16, 333:3,
333:4, 333:22,
339:4
**regular**
244:22, 344:17
**reimplement**
244:3
**reiterate**
217:6
**rejected**
185:5, 274:8
**relate**
154:5
**related**
158:19, 221:12,

352:5
**relationship**
200:9, 200:11,
202:4, 202:16
**relatively**
324:4
**relatives**
321:5
**relegate**
271:10, 285:13,
285:14
**relevant**
170:8, 236:4,
236:11
**relief**
233:10
**religion**
132:7
**remain**
239:18
**remains**
263:17, 265:11,
349:6
**remarkable**
9:11
**remarks**
252:17
**remedial**
22:12, 22:16,
22:22, 23:2,
142:21, 142:22,
143:18, 143:19,
143:21, 144:2,
147:11
**remedy**
22:12
**remember**
5:14, 56:11,
116:9, 116:10,
116:17, 122:13,
130:13, 133:9,
164:19, 164:22,
165:1, 165:7,
165:9, 165:16,
186:8, 209:18,
260:9, 287:4
**remind**
243:17

reminded
57:7, 57:8,
344:1
reminding
269:19
reminds
193:4
remove
79:22, 230:5
removed
79:8, 79:9,
79:11
rendered
245:17
reopening
258:11
repass
233:21
repeal
209:8
repealed
236:18
repeatedly
80:13
repetition
57:3
rephrase
303:2
report
208:5, 262:5,
263:12, 263:16,
349:3
reported
143:10, 143:13,
176:10
reporting
268:9
repre
323:12
repres
315:1
represen
336:3
represent
5:15, 13:14,
70:14, 107:8,
107:13, 138:1,
138:4, 144:13,

144:16, 150:15,
150:17, 151:10,
151:12, 155:15,
180:21, 181:21,
218:21, 219:19,
222:10, 285:19,
311:6, 325:3,
328:6
representation
9:22, 88:5,
108:18, 110:19,
119:18, 123:20,
136:18, 136:22,
137:18, 146:8,
148:2, 148:12,
148:20, 148:22,
168:19, 174:19,
175:10, 188:22,
190:9, 194:11,
194:22, 195:15,
206:13, 207:3,
214:14, 216:8,
216:9, 229:12,
260:12, 271:14,
313:21, 314:2,
314:3, 315:2,
347:1
representatives
8:13, 8:21,
12:10, 137:15,
151:16, 154:3,
155:15, 186:1,
204:11, 206:10,
207:8, 208:3,
208:11, 211:12,
212:7, 219:2,
226:11, 260:18,
274:12
represented
13:20, 89:21,
106:7, 148:4,
160:21, 188:4,
229:17, 310:19,
314:11, 324:6
representing
70:17, 70:19,
87:22, 153:8,
226:21, 259:9

represents
8:1, 160:15,
173:19, 173:20,
173:21, 174:4,
221:8, 324:22,
325:1
reps
160:12
republican
57:13, 83:13,
97:10, 138:4,
151:5, 151:14,
151:21, 152:12,
160:20, 204:22,
205:3, 260:15,
332:17, 332:20,
333:6, 333:8,
333:19, 334:11
republicans
108:5, 152:14,
152:15, 333:3,
333:4, 334:1,
334:4
request
22:21, 105:19
requested
98:8, 98:12
requesting
230:12
require
59:4, 59:12,
302:11
required
40:18, 47:14,
58:18, 59:17,
170:20, 246:13,
272:9, 279:22,
284:5, 284:21,
299:15, 337:12,
341:6
requirement
33:5, 80:19,
304:20, 329:15,
348:17
requirements
17:14, 24:22,
47:3, 61:15,
95:12, 97:15,

98:3
requires
59:13, 90:1,
270:14, 300:15
research
344:20
resemblance
344:15
reservation
309:22
reside
23:8, 23:20,
306:6
resident
208:11, 216:5,
216:18, 222:19
residents
151:18, 173:18,
176:19, 214:17,
214:21
resigned
109:14
resistance
161:14
resisted
188:7
resolve
70:20, 70:21
respect
44:10, 45:9,
52:7, 52:22,
66:14, 75:12,
75:17, 75:22,
82:21, 123:15,
128:7, 135:14,
177:1, 185:19,
257:9, 276:11,
281:17, 313:14,
343:18, 347:11
respectful
179:15
respectfully
125:6
respecting
170:15
respective
204:13
respond
54:9, 126:13,

126:14
**responded**
309:22
**response**
83:16, 83:17,
170:3
**responsibil**
123:3
**responsibility**
8:18, 270:13,
316:13
**responsible**
271:19
**responsibly**
212:12
**responsive**
11:21, 23:13,
35:15
**rest**
164:6, 266:5,
280:11, 318:4
**restaurant**
133:19, 217:20,
218:1
**restoring**
226:2
**restrictions**
156:16
**result**
33:7, 67:11,
125:1, 129:12,
282:7, 306:5
**retail**
133:11
**retention**
170:17
**revenue**
201:7
**reverse**
229:20
**reverses**
236:4
**revert**
238:21, 239:15,
245:8, 330:17,
331:2
**reverting**
230:3

**review**
280:22
**reviewed**
15:16, 15:17,
15:18, 17:12,
95:6, 96:14
**rhetorical**
289:4, 345:15
**richmond**
109:14
**rick**
199:16
**ridicule**
226:15
**rights**
17:14, 21:20,
22:9, 24:19,
40:19, 43:7,
43:8, 43:14,
47:3, 48:18,
52:13, 68:13,
76:21, 80:15,
81:16, 95:12,
97:16, 98:3,
104:6, 108:22,
118:9, 123:6,
137:20, 161:12,
161:22, 183:19,
187:2, 188:20,
211:2, 236:13,
258:12, 259:12,
260:2, 272:7,
272:13, 273:15,
274:1, 282:5,
282:8, 300:19,
304:20
**ripple**
81:9
**river**
11:7, 14:2,
15:3, 32:20,
122:2, 227:8
**riverside**
14:4
**road**
21:11, 23:14,
23:15, 26:21,
35:16, 71:10,

164:18, 172:19,
183:9, 185:2,
191:14, 191:19,
258:1, 262:21,
283:15, 309:8,
317:7, 317:9
**roadshow**
71:20, 96:10,
96:12
**roadshows**
136:9, 136:12
**robbie**
56:4
**robert**
209:7
**robust**
53:20, 200:9
**rock**
255:20
**rodeo**
134:14
**role**
253:1, 271:14
**roll**
2:18, 250:20,
263:18, 349:7
**rolled**
285:11
**rolling**
164:12
**room**
261:5, 328:20
**roommate**
89:17
**roots**
194:8
**rouge**
24:3, 27:5,
32:21, 68:9,
79:11, 81:1,
86:5, 118:22,
119:3, 119:22,
139:14, 145:21,
172:16, 204:17,
210:18, 211:13,
214:12, 214:18,
215:8, 219:18,
220:12, 220:13,

220:14, 220:17,
220:19, 220:21,
224:12, 287:4,
293:5, 319:20,
323:10
**roughly**
121:11, 137:5
**round**
102:4
**rounded**
125:20
**rouses**
133:17
**royce**
163:16
**rul**
272:20
**rule**
73:13, 75:10,
207:11, 242:6,
312:11, 345:1
**ruled**
74:5, 135:16,
135:19, 280:18,
282:9, 312:3
**rules**
144:17, 179:6,
179:8
**ruling**
66:12, 73:20,
75:11, 95:7,
96:5, 96:13,
96:18, 176:1,
176:2, 232:16,
241:12, 249:19,
249:21, 272:21,
286:14, 290:8,
292:4, 301:18,
302:12, 308:22,
330:9
**rulings**
176:4, 288:6,
290:21, 290:22
**run**
76:13, 84:10,
119:1, 120:1,
120:12, 120:20,
132:1, 150:11,

211:18, 220:19,
228:9, 274:12,
328:14, 332:17,
333:8, 333:21
**running**
12:19, 120:8,
162:4, 212:5,
212:6, 308:6
**rural**
35:18, 36:4,
36:8, 36:19,
37:11, 38:7,
208:15, 227:1,
229:8, 316:7,
316:19, 317:3,
317:11, 318:17,
322:19, 325:12,
325:19
**ruston**
214:7

---
**S**
---

**s**
259:19, 260:10,
273:22, 275:1,
286:16, 286:17,
286:20, 286:22
**s6a**
36:10
**s6b**
36:10
**sacrifice**
215:21
**safe**
166:16
**saint**
215:15, 221:13
**sam**
134:13
**same**
8:10, 9:4,
15:13, 18:8,
38:2, 43:21,
51:16, 52:6,
55:3, 65:19,
67:21, 70:14,
77:9, 88:1,
100:3, 115:3,

118:3, 136:4,
136:14, 142:5,
142:13, 156:7,
158:16, 158:17,
160:18, 173:9,
181:9, 182:2,
189:14, 189:17,
190:18, 193:12,
193:13, 217:2,
217:4, 218:4,
218:7, 220:10,
222:1, 223:4,
227:20, 234:20,
237:1, 237:4,
237:9, 247:9,
259:21, 260:16,
274:3, 277:17,
277:18, 288:12,
298:9, 298:10,
300:12, 311:18
**sandifer**
231:5
**sani**
311:20
**sat**
44:21, 45:7,
136:10, 189:5
**saturday**
205:15, 209:4
**saving**
202:13
**saw**
94:13, 154:1,
166:6, 166:10,
166:13, 167:7,
187:7, 189:14,
190:6, 219:8,
256:1, 320:12
**saying**
18:4, 36:4,
39:21, 40:21,
41:1, 45:1,
45:5, 53:18,
60:16, 61:4,
62:2, 67:6,
69:3, 70:9,
71:15, 77:6,
78:2, 81:3,

82:5, 85:13,
87:20, 88:2,
89:15, 101:7,
110:4, 110:11,
114:19, 122:21,
125:14, 143:17,
160:21, 162:15,
163:1, 167:8,
167:12, 183:17,
185:13, 187:9,
190:17, 198:14,
217:7, 222:8,
241:4, 246:4,
247:15, 248:18,
298:17, 299:5,
306:8, 313:14,
338:20, 342:3,
342:4, 343:1
**says**
55:17, 62:12,
74:17, 81:17,
118:3, 147:10,
186:11, 188:10,
205:9, 245:4,
247:14, 262:13,
262:17, 274:1,
280:12, 281:2,
282:10, 282:16,
338:9
**sb9**
320:4
**scalise**
221:7, 224:5
**scattered**
325:19
**scenarios**
330:13
**scheduled**
237:20, 257:17,
258:6, 274:9
**schexnayder**
5:4, 5:6,
22:19, 60:6,
60:10, 60:17,
60:21, 61:7,
143:5, 144:3
**school**
81:13, 87:12,

116:9, 116:17,
121:18, 135:5,
144:10, 145:8,
153:7, 189:11,
200:14, 201:1,
201:12, 212:15,
214:1, 223:10,
227:18, 259:4,
259:6
**schools**
188:1
**scia**
8:6
**science**
213:18
**scientific**
133:13, 316:20
**score**
283:11, 328:5
**scored**
202:4
**scoring**
283:19
**scott**
189:18, 199:11
**scramble**
208:22
**scratch**
101:15
**screen**
266:10, 266:11
**scrut**
281:21
**scrutinize**
297:21
**scrutiny**
281:21, 282:10,
294:14, 312:1
**se**
14:12, 116:1,
272:5
**seafood**
134:13
**sean**
20:1
**seat**
96:7, 150:3
**seated**
213:3

**seats**
215:7
**secession**
209:6
**second**
39:21, 71:11,
86:16, 89:7,
93:12, 94:22,
96:7, 98:8,
98:16, 112:4,
129:14, 147:12,
154:14, 154:15,
155:16, 173:2,
174:5, 177:3,
192:5, 193:15,
201:17, 204:19,
207:7, 207:19,
220:12, 232:19,
240:12, 245:11,
245:20, 268:4,
271:1, 271:16,
272:3, 272:10,
272:18, 273:5,
273:7, 276:15,
278:5, 279:18,
280:3, 281:19,
282:10, 283:1,
283:10, 284:6,
286:14, 287:19,
292:20, 293:9,
294:17, 295:10,
296:17, 296:18,
297:5, 325:14,
334:3, 334:8,
334:12, 344:6
**secondly**
50:17
**secretary**
250:19, 250:21,
251:1, 251:4,
251:7, 251:9,
251:12, 251:14,
251:16, 251:18,
251:21, 252:1,
252:3, 252:5,
252:7, 252:9,
263:19, 263:21,
264:1, 264:4,

264:7, 264:9,
264:11, 264:13,
264:15, 264:17,
264:20, 264:22,
265:2, 265:4,
265:6, 265:8
**section**
22:8, 24:18,
58:15, 58:16,
58:17, 59:3,
59:12, 62:10,
68:16, 68:17,
81:17, 81:18,
161:11, 161:21,
232:5, 236:12,
236:19, 238:11,
272:7, 289:15
**sector**
227:20
**secure**
203:22, 210:20
**see**
9:11, 12:7,
15:14, 15:21,
16:8, 29:8,
34:7, 34:11,
36:21, 51:10,
59:20, 60:20,
67:4, 67:10,
75:10, 88:4,
90:20, 91:1,
91:2, 91:13,
93:2, 95:19,
105:7, 107:3,
124:3, 124:11,
133:1, 142:19,
144:13, 144:18,
152:3, 152:4,
153:20, 154:5,
166:9, 168:19,
180:9, 181:10,
183:1, 190:8,
190:15, 190:17,
194:17, 198:13,
203:21, 206:9,
216:6, 216:7,
222:7, 223:20,
228:4, 249:17,

250:9, 250:15,
262:12, 266:5,
277:5, 282:17,
282:18, 282:19,
283:4, 303:2,
304:2, 307:12,
317:3, 317:20,
317:21, 318:12,
320:10, 323:5,
323:21, 335:8
**seeing**
32:8, 105:5,
267:7
**seeking**
61:19
**seem**
37:13, 69:22,
106:16, 115:3
**seems**
9:2, 51:6,
111:12, 114:14,
176:17, 182:15,
210:6, 228:7,
336:13
**seen**
25:14, 37:1,
101:10, 142:13,
167:3, 185:22,
188:2, 271:4,
278:14, 298:14,
298:18, 298:20
**segregated**
189:10
**segregation**
193:6, 193:7,
259:14
**select**
38:16, 39:8,
239:10, 320:16
**selected**
35:4, 35:11,
38:16, 38:22,
41:5, 45:7,
48:12, 51:5,
51:13, 52:3,
52:5
**selecting**
38:21, 338:16

**self-evident**
302:20
**senate**
22:19, 153:8,
212:6, 217:1,
227:6, 227:7,
234:21, 235:22,
236:1, 242:1,
242:11, 311:18
**senate's**
312:3
**senates**
212:6
**senator**
22:19, 145:15,
146:3, 151:1,
151:2, 212:8,
227:8, 228:10,
232:12, 234:14,
253:19, 271:7,
320:4
**senators**
88:6, 274:11
**send**
73:14, 223:9,
263:3
**sending**
227:5, 334:2
**sense**
35:9, 103:21,
111:8, 284:9,
284:19, 284:20,
297:10, 298:1,
341:5, 344:16
**sensitive**
196:21
**sent**
42:1, 53:8
**sentiment**
75:6
**separate**
87:5, 90:13,
187:21
**separating**
217:14, 281:6
**separation**
73:7, 228:8
**ser**
326:14

**serious**
221:12
**seriously**
252:22
**serve**
7:21, 8:2,
19:2, 199:21,
206:10, 238:20,
285:19
**served**
64:17, 227:18
**serves**
282:1
**service**
202:12, 205:4,
210:8, 210:9,
210:11, 210:14,
226:13, 227:19
**services**
133:12, 133:13,
202:10
**serving**
210:15, 277:7,
331:5
**session**
6:4, 24:22,
28:1, 56:8,
56:13, 56:20,
60:1, 69:1,
92:21, 93:13,
93:16, 94:14,
97:21, 98:16,
99:19, 100:6,
100:13, 101:6,
101:12, 101:15,
103:18, 139:21,
140:1, 140:2,
140:17, 140:18,
141:19, 142:9,
174:3, 178:1,
178:11, 178:20,
179:3, 180:11,
184:2, 185:21,
191:14, 191:20,
204:2, 232:18,
233:19, 233:20,
236:6, 238:2,
238:9, 238:10,

238:14, 239:1,
241:15, 243:11,
244:5, 244:13,
244:22, 245:19,
253:14, 269:20,
271:4, 272:5,
274:17, 280:1,
320:5, 344:17,
346:19
**sessions**
166:8
**set**
25:2, 58:9,
128:21, 214:4,
227:3, 231:19,
232:4, 250:15,
250:18, 274:6,
283:13, 283:14,
289:17, 294:12,
338:12
**sets**
266:16, 297:6
**setting**
56:20, 343:2,
343:3
**settled**
213:2
**seven**
34:13, 118:3,
121:8, 121:13,
132:9, 188:13,
206:10, 323:6
**seventh**
258:13
**several**
27:17, 39:4,
124:12, 124:13,
150:20, 164:18,
170:3, 185:22,
191:5, 204:12
**shae**
199:10
**shall**
204:12, 207:8,
236:13, 236:14,
236:19
**shape**
299:22

**share**
83:7, 87:12,
136:4, 182:1,
182:2, 210:11,
220:2, 220:8,
223:4
**shared**
100:16, 253:16
**shares**
76:12
**sharks**
211:7
**sheet**
190:4
**shelly**
184:17
**sheltered**
153:14
**shelton**
199:9
**shift**
214:13, 214:20,
215:3, 331:11,
348:6
**shifting**
348:14
**shifts**
281:22
**shock**
47:15, 48:1
**shocking**
323:1
**shondra**
199:9
**shopping**
133:17
**shore**
218:22, 220:4,
220:6, 220:7,
221:21, 222:13
**short**
70:10, 170:18,
228:12
**shot**
210:20, 243:20
**should**
6:16, 16:15,
21:14, 70:13,

75:1, 96:6,
97:15, 108:17,
122:20, 125:8,
125:16, 137:15,
151:17, 174:18,
174:19, 175:13,
176:5, 177:13,
179:8, 182:17,
185:9, 188:2,
188:3, 190:12,
193:21, 195:14,
195:15, 198:14,
206:12, 214:10,
219:16, 222:5,
226:9, 229:17,
235:15, 245:18,
247:5, 253:8,
256:15, 293:14,
297:14, 311:8,
329:6, 330:20,
334:10
**should've**
340:18, 340:20,
340:21
**shouldn't**
59:7, 82:3,
208:10, 340:16
**shout**
138:11
**show**
21:11, 23:14,
23:15, 26:21,
35:16, 65:16,
66:3, 71:10,
164:19, 172:19,
172:20, 185:2,
193:15, 206:15,
217:12, 262:21,
283:16, 309:9,
319:11, 325:9,
328:1, 334:5,
346:7
**showed**
83:19, 182:3,
201:18, 234:22
**showing**
66:13, 96:19
**shown**
62:18, 63:5,

295:12

**shows**
183:10, 191:14,
191:20, 258:2

**shreveport**
111:13, 111:15,
111:18, 112:5,
112:15, 113:1,
113:7, 215:10

**shrimp**
133:22

**sic**
79:19, 117:19,
189:21

**side**
14:4, 15:3,
15:4, 60:16,
94:8, 158:4,
175:18, 186:6,
186:7, 223:2,
223:3, 233:15,
248:16, 277:14,
329:19, 347:4

**sidebar**
323:5

**sides**
14:19, 15:3,
94:20, 223:19,
227:14, 228:9,
233:2, 245:15,
296:9, 345:3,
345:4

**sight**
97:19, 98:6,
174:2

**signature-zrhbi**
352:14

**significance**
316:6, 344:11

**significant**
84:9, 259:2,
281:12, 311:22,
312:10, 315:1,
316:11, 328:7,
330:18, 336:22,
348:12

**significantly**
148:13, 319:19

**signs**
205:16

**silence**
2:5

**silly**
217:17

**sim**
101:10

**similar**
8:9, 70:13,
80:3, 99:18,
101:1, 101:11,
114:22, 119:21,
140:15, 142:7,
149:14, 165:2,
223:3, 236:9,
280:7, 314:4

**similarities**
181:4

**simple**
111:7, 112:12,
174:17

**simply**
18:4, 110:17,
110:18, 187:11,
211:11, 228:16,
279:13, 297:18,
331:12, 331:19

**simulated**
128:21

**simulation**
169:16, 169:19,
169:21

**simulations**
129:5, 129:6,
129:12, 170:9,
170:13, 170:18,
171:7

**since**
8:15, 15:18,
130:10, 142:14,
173:10, 234:3,
257:7, 333:5,
333:9, 347:18

**sincerely**
294:15, 297:20

**sing**
322:12

**single**
51:15, 59:15,
109:5, 109:11,
136:9, 163:13,
187:17, 258:3,
258:4

**sinla**
321:9

**sir**
6:18, 7:12,
10:18, 18:16,
18:17, 18:21,
19:10, 19:14,
28:21, 36:6,
43:1, 61:17,
70:7, 75:13,
79:20, 92:15,
94:5, 95:14,
96:3, 98:20,
103:1, 110:14,
111:16, 117:17,
142:4, 176:11,
197:21, 198:9,
199:7, 199:17,
213:14, 225:5,
225:7, 226:17,
255:17, 257:3,
267:20, 343:12

**sisters**
190:11

**sit**
14:18, 41:4,
50:4, 93:6,
154:6, 159:20,
175:21

**sitting**
11:19, 25:13,
52:10, 53:15,
77:7, 104:12,
156:19, 158:3,
167:15, 202:19,
275:4

**situated**
52:11

**situation**
182:16, 192:15,
197:7, 227:1,
245:14

**situations**
108:4

**six**
11:18, 12:13,
86:9, 86:10,
88:6, 88:7,
106:3, 106:15,
118:17, 125:1,
126:1, 126:10,
149:8, 204:7,
208:10, 228:19,
305:14, 309:15,
323:6, 340:17,
350:17, 350:19

**sixth**
212:14, 212:16,
313:17

**sixties**
189:18

**size**
223:21

**skill**
169:15

**skin**
84:18, 160:22,
182:14, 230:1

**slash**
66:18, 66:22,
287:4, 287:11,
288:1, 288:16,
288:17

**slashes**
318:9

**slave**
187:19, 189:8

**sleeves**
285:11

**slice**
184:22

**slidell**
215:13, 222:19,
222:21, 223:14

**slightest**
310:3

**slightly**
102:18, 102:19

**slip**
254:9

sliver
132:21
slower
102:18
small
65:2, 88:9,
311:1, 344:6
smaller
112:9, 309:12
smith
231:19, 232:2,
232:3, 235:13,
235:14, 235:18,
235:21, 236:21,
237:1, 237:3,
237:5, 237:8
snake-like
65:3
snowball's
297:10
social
5:11
society
92:9, 186:4
sold
201:2
sole
61:21, 272:1
solely
129:22, 130:2,
200:8, 228:21
somebody
38:10, 48:9,
57:13, 59:12,
68:9, 70:14,
125:21, 160:16,
171:7, 188:10
someday
68:17
somehow
307:4
someone
25:11, 30:15,
45:11, 76:11,
99:11, 106:7,
154:9, 161:6,
180:13, 181:16,
182:5, 245:16,

259:1, 277:10,
285:5, 296:21,
310:9, 314:11
something
13:18, 34:6,
45:13, 50:22,
61:18, 62:3,
75:1, 75:2,
106:1, 122:1,
123:4, 125:21,
127:1, 136:8,
138:18, 144:20,
153:13, 153:19,
153:20, 157:13,
169:6, 171:2,
185:8, 189:19,
192:2, 192:3,
193:2, 193:17,
198:15, 209:10,
219:3, 228:13,
247:15, 259:1,
261:19, 279:20,
294:16, 303:10,
303:22, 319:5,
323:15, 329:17,
339:5, 339:6,
343:1, 343:7
something's
330:3
sometimes
175:15, 186:10,
198:8, 252:22,
277:6, 277:8,
298:4, 309:5
somewhat
11:1, 71:8,
112:4
somewhere
29:16, 137:8,
157:17, 209:20,
255:19, 307:7,
310:14, 319:16
song
177:4
soon
309:20
sooner
333:12

sorry
6:15, 16:7,
56:5, 77:19,
86:1, 100:11,
207:21, 246:2,
276:21, 276:22,
277:1, 278:22,
305:10, 320:3,
322:17, 323:14,
324:12, 324:16,
335:1
sort
115:20, 219:7,
220:12, 248:6,
336:11, 342:18
sorting
282:1
sought
22:20
sound
303:22
sounds
34:15, 193:18,
230:8, 277:15
source
133:10
south
7:22, 10:7,
36:22, 107:14,
119:9, 181:22,
214:20, 221:21,
259:12
southern
11:13, 28:5,
145:20, 174:13,
215:6
span
209:8
spea
111:5
speak
5:21, 17:5,
19:19, 19:22,
20:3, 25:16,
25:18, 31:13,
39:14, 46:4,
48:22, 85:3,
101:8, 103:5,

103:6, 122:5,
140:1, 172:2,
172:6, 174:15,
186:12, 191:7,
195:4, 198:6,
199:11, 213:7,
213:16, 222:12,
225:2, 231:2,
231:4, 332:10,
332:12, 335:13,
335:15, 336:1
speaker
5:3, 5:5, 6:6,
13:9, 20:4,
20:8, 22:18,
56:14, 56:15,
56:19, 56:21,
57:8, 59:22,
61:5, 93:15,
117:9, 143:5,
144:2, 146:19,
190:7, 238:21,
270:11, 286:12,
300:9, 304:16,
306:14, 306:17,
345:6
speaker's
24:11, 75:6,
120:5, 180:4,
180:13, 254:4
speakers
24:17, 56:13,
60:22, 61:1,
191:17
speaking
11:17, 67:20,
68:9, 78:3,
155:22, 165:12,
168:21, 173:7,
173:8, 289:10,
290:15, 314:22
speaks
68:1
special
54:17, 56:8,
56:13, 60:1,
98:16, 174:2,
174:3, 191:14,

204:2, 209:10,
214:8, 229:22,
232:18, 238:14,
243:10, 244:4,
244:13, 244:22,
245:19, 253:14,
269:20, 271:3,
272:5, 274:17,
320:5

**specialized**
169:15

**specific**
25:10, 29:22,
30:7, 31:20,
32:9, 34:18,
42:19, 44:11,
46:22, 52:3,
55:2, 55:9,
145:10, 197:8,
197:14, 197:16,
272:1, 300:19,
310:17, 346:6

**specifically**
26:9, 30:14,
37:16, 53:6,
96:6, 172:16,
188:16, 216:20,
232:12, 272:1,
302:13, 305:2,
309:22, 314:17,
314:20

**specificity**
31:2

**spectrum**
196:10, 306:1

**speculating**
117:7

**speculation**
75:15

**speed**
256:19

**spend**
69:6, 89:12

**spending**
68:22

**spent**
46:7, 69:1,
70:1, 187:1,

285:6, 306:18,
318:19

**spirit**
196:14, 196:17,
197:5, 204:3,
205:22

**splashes**
287:11

**splc**
20:1, 20:2,
172:7

**split**
32:12, 32:15,
32:19, 32:20,
32:21, 42:13,
44:7, 51:15,
59:7, 59:9,
69:11, 71:9,
79:17, 81:5,
81:6, 86:6,
86:19, 88:17,
89:8, 89:16,
112:21, 121:4,
121:5, 123:7,
192:19, 200:15,
206:9, 210:12,
215:10, 215:13,
216:4, 216:7,
222:22, 223:17,
224:11, 308:17,
310:20, 320:17,
320:22, 321:1

**splits**
59:8, 69:13,
79:18, 87:1,
87:6, 100:3,
142:12, 170:12,
170:14, 179:19,
215:13, 216:22,
291:3, 291:4,
317:19, 317:20

**splitting**
33:6, 85:20,
86:2, 88:22,
89:5, 90:2,
200:19, 200:20,
217:7, 218:10,
291:12, 321:1

**spoke**
164:21, 217:1

**spoken**
285:2

**spots**
167:17

**sprawling**
292:16

**spray**
189:21

**spread**
325:11

**spreads**
158:10

**st**
54:14, 79:15,
114:8, 120:6,
120:19, 132:21,
133:5, 134:22,
135:1, 152:14,
158:13, 158:14,
216:5, 218:21,
219:6, 219:17,
219:18, 219:19,
220:11, 221:4,
222:12, 223:1,
223:6, 223:13,
224:6, 224:11,
225:13, 225:20,
226:6, 226:12,
241:8, 324:7

**sta**
256:22

**stab**
210:22

**stack**
60:12

**staff**
115:2, 128:3,
222:2, 234:16,
235:1, 235:10,
237:5, 255:12,
256:22, 273:13,
307:3

**staff's**
237:8

**stand**
37:14, 95:19,

95:22, 173:20,
175:17, 185:14,
186:6, 186:7,
189:1, 267:9

**standard**
41:6, 280:22,
283:10, 284:5,
294:11, 302:16,
303:4, 303:6,
339:14

**standards**
25:2, 270:14,
284:3

**standpoint**
53:12, 115:18,
116:6, 123:14

**stands**
301:12

**star**
158:5

**start**
5:3, 14:15,
20:21, 105:4,
124:2, 133:21,
138:16, 138:17,
172:5, 265:15,
265:17, 266:6,
268:21, 269:19,
279:10, 311:10,
323:9, 329:10,
332:16

**started**
21:13, 61:4,
143:16, 173:6,
178:3, 192:1,
279:10

**starting**
21:10, 101:14,
317:21

**starts**
14:5, 15:1,
319:18

**state's**
43:10, 45:13,
175:3, 323:14,
324:1

**stated**
178:8, 179:21,

228:10, 254:19,
276:4, 298:3
**statement**
42:12, 100:20,
106:19, 131:5,
141:6, 143:17,
146:10, 148:19,
168:7, 184:16,
196:4, 235:6,
291:22
**statements**
254:16, 278:18
**states**
184:14, 185:9,
204:12, 204:20,
208:9, 230:7,
237:19, 240:14,
242:16, 242:17,
280:6, 280:13,
288:4, 288:6,
300:20
**statewide**
65:14, 274:12
**stating**
22:11, 291:8
**station**
138:6
**stationed**
202:6
**statistical**
128:11
**statistics**
229:1
**status**
270:9, 345:10,
348:15
**statute**
244:3
**staunch**
151:22
**stay**
66:8, 97:5,
97:11, 146:6,
215:21, 237:18,
237:20, 238:4,
238:19, 240:17,
240:19, 242:3,
242:12, 242:14,

242:19, 242:21,
242:22, 243:1,
243:6, 243:9,
255:13, 256:8,
256:15, 273:1,
273:2, 330:5,
330:6
**stayed**
237:22, 243:5,
243:11, 256:17
**stays**
236:4, 241:8,
350:20
**steakhouse**
133:18
**stefanski**
2:19, 41:14,
49:2, 80:4,
250:21, 263:19,
349:8
**steimel**
274:14, 274:15,
274:16
**step**
75:5, 169:9,
195:11, 273:22,
324:11
**stepped**
153:10, 168:20,
276:2, 288:4
**steve**
344:4
**stevenson**
199:11
**sticking**
332:6
**stifle**
4:20
**still**
49:20, 74:8,
75:9, 123:10,
154:22, 175:7,
175:9, 181:14,
189:18, 223:8,
223:9, 232:16,
232:17, 232:22,
244:10, 249:1,
260:14, 260:16,

272:13, 273:3,
273:4, 278:11,
288:11, 294:7,
299:13, 320:6,
330:6, 344:18
**stood**
193:5
**stop**
42:8, 334:4
**stopped**
122:1
**stopping**
66:8
**storm**
12:6
**storms**
16:11
**story**
10:15, 187:14
**strategic**
319:1
**strategically**
296:20
**strategy**
296:17
**street**
54:19, 134:1,
134:11
**strengthens**
88:12, 90:5
**stretch**
111:11
**strict**
281:21, 282:10
**strike**
43:15
**striking**
82:2
**strong**
66:13, 96:19,
345:3, 345:4
**strongest**
285:10
**struck**
83:3, 161:19,
175:22
**structure**
13:12, 14:1,

14:3, 14:5,
14:6, 14:10,
14:13, 14:14,
15:1, 15:2
**stuck**
116:16, 234:2
**student**
145:20
**students**
201:9, 201:10,
344:3, 344:6
**studied**
187:15, 215:19,
259:6
**studies**
338:2, 338:13,
339:16, 340:9,
343:6
**study**
201:18
**studying**
213:19
**stuff**
184:11, 186:2,
186:14, 307:14,
315:8, 346:4
**stunt**
333:11
**stupid**
111:9
**subdivision**
37:21, 87:2,
87:9
**subdivisions**
87:1, 87:6,
281:17
**subject**
105:9, 125:20,
196:21, 227:13
**submitted**
49:3, 49:22,
50:1, 128:19,
234:15
**subordinated**
281:16
**substantial**
129:17, 194:20
**substantially**
142:7

substantive
100:1, 236:22,
237:6, 271:10,
313:21
succeed
22:7, 66:14,
96:19
success
276:6
successful
63:13, 103:10,
103:11, 120:2,
120:21, 122:13,
131:15
succinct
22:2
sudden
224:12, 224:13
sues
281:8
suffer
9:4, 206:12,
209:15, 225:14,
319:19
suffice
167:12
sufficient
70:16, 118:7,
256:15, 281:5
sufficiently
24:5, 59:14
suffrage
209:7
sugar
133:15, 134:5
suggest
22:15, 76:8,
313:22
suggesting
122:20
suit
50:9
summarize
237:2
summers
145:22
supermajority
203:21

superman
140:20
support
2:7, 6:12,
9:19, 10:7,
17:6, 19:17,
19:19, 20:7,
20:8, 25:18,
33:20, 63:14,
87:16, 109:6,
109:12, 110:1,
130:4, 172:5,
172:20, 173:4,
176:9, 177:8,
190:20, 192:16,
199:10, 200:17,
205:1, 208:2,
222:11, 224:17,
248:20, 253:19,
253:22, 254:5,
254:19, 255:21,
271:4, 278:10,
278:15, 279:18,
303:7, 308:10,
313:17, 332:10,
332:12, 335:14,
335:16, 342:16,
344:6, 344:18,
346:17
supported
253:16, 269:22,
270:2
supporting
291:8, 352:4
supportive
109:2
supports
159:14, 173:1
supposed
41:1, 64:19,
90:10, 124:19,
212:11, 232:18,
301:20
supreme
43:7, 58:17,
81:22, 116:14,
185:10, 213:2,
233:16, 237:19,

238:3, 238:5,
238:7, 238:8,
240:14, 240:18,
242:16, 242:17,
242:20, 243:6,
243:11, 244:20,
247:2, 247:3,
280:6, 282:15,
288:4, 288:6,
291:21, 308:22,
344:22
sure
30:1, 38:22,
39:3, 40:15,
89:22, 90:10,
92:11, 104:15,
136:12, 168:6,
171:5, 171:9,
183:20, 185:14,
195:11, 200:18,
203:20, 210:17,
211:17, 212:22,
220:21, 232:9,
242:15, 242:18,
249:19, 256:11,
287:18, 308:20,
327:20
surprise
34:20
surprised
204:1
surprising
36:16
surrounding
38:19, 215:5,
229:14
survive
291:1
susie
19:17, 225:7,
226:21, 335:22
suspended
145:8
swap
310:13
swing-in
331:9
swore
204:9, 205:1,

209:18, 260:19
sworn
128:13, 128:14,
129:3, 129:11,
130:9, 130:16,
131:21, 132:4,
136:6
system
7:19, 9:17,
9:18, 11:2,
14:11, 15:2,
161:2, 162:1,
162:3, 201:9,
256:17, 343:21
systems
14:2

T

table
5:4, 41:4,
41:11, 104:12,
172:9, 231:7,
257:19, 336:6
tag
148:15
tailored
43:12, 282:2
take
20:17, 25:5,
42:3, 52:21,
80:11, 80:12,
95:22, 121:8,
127:1, 129:5,
131:13, 190:3,
194:16, 194:17,
195:1, 196:20,
210:22, 219:3,
231:15, 231:18,
240:1, 240:4,
247:11, 252:18,
252:22, 259:13,
278:7, 286:7,
291:22, 313:9,
323:19, 326:13,
337:7, 338:1,
338:14, 338:22
taken
13:22, 56:2,

80:21, 81:1,
94:18, 169:20,
318:17
**takes**
27:7, 60:18,
158:9
**taking**
6:22, 99:21,
181:18
**talk**
7:4, 21:5,
23:16, 26:5,
26:9, 39:17,
45:7, 53:22,
54:1, 54:2,
54:3, 57:18,
57:21, 60:7,
60:10, 62:13,
63:16, 90:8,
98:14, 99:1,
115:17, 127:17,
130:19, 137:19,
152:3, 168:12,
168:20, 178:13,
180:16, 182:6,
182:13, 187:12,
189:19, 190:11,
192:17, 202:1,
210:13, 212:18,
234:6, 262:14,
265:19, 316:19,
340:22
**talked**
12:14, 12:18,
13:8, 13:19,
40:16, 47:22,
60:15, 80:2,
85:4, 87:18,
87:21, 108:12,
108:21, 122:14,
164:18, 165:3,
165:4, 165:14,
167:18, 178:21,
189:15, 221:2
**talking**
13:8, 29:19,
31:3, 60:8,
60:9, 60:14,

60:22, 63:17,
70:1, 82:22,
90:7, 90:8,
96:10, 96:12,
96:20, 100:14,
102:7, 102:8,
102:11, 104:9,
116:2, 124:16,
127:18, 136:1,
146:13, 159:10,
164:20, 165:20,
169:5, 169:9,
173:14, 173:17,
173:18, 183:13,
202:3, 226:11,
261:2, 263:5,
287:9, 289:15,
312:16, 318:7,
341:1, 341:18
**talks**
81:16, 273:22
**tammany**
132:21, 152:14,
216:6, 218:22,
219:6, 219:17,
219:18, 219:19,
220:11, 222:13,
223:1, 223:6,
223:13, 224:6,
224:11, 225:13,
225:20, 226:6,
226:12, 324:7
**tammany's**
221:4
**tammy**
177:17
**tangipahoa**
28:20, 51:4,
51:5, 79:14,
120:7
**tanner**
6:15, 6:17
**tape-recording**
352:9
**tarpon**
134:13
**task**
5:9, 105:9,

275:20
**tasting**
134:7
**taught**
116:11, 144:9,
169:20, 176:13
**tax**
201:7, 212:12
**taxes**
204:12
**teachers**
153:22, 259:21,
259:22
**team**
148:15
**tech**
213:17
**technical**
133:13
**technology**
275:5, 275:12,
275:17
**ted**
322:13
**teens**
270:19
**tell**
10:15, 30:6,
34:15, 34:17,
37:5, 39:12,
45:11, 57:22,
59:3, 59:12,
64:6, 72:4,
79:6, 88:8,
116:20, 126:2,
139:5, 144:14,
165:18, 187:14,
192:9, 194:5,
219:15, 219:16,
220:22, 262:11,
262:20, 278:10,
283:13, 291:20,
317:2, 318:18,
318:19, 339:13,
341:17
**telling**
28:10, 61:3,
77:17, 82:4,

110:10, 128:3,
184:5, 190:16,
333:18
**tells**
47:7, 184:14,
188:7
**tem**
10:9, 13:4,
13:9, 111:4,
117:10, 269:13,
286:12, 300:9,
304:16, 306:14,
306:18
**tend**
65:19, 70:11,
74:22
**tendencies**
229:1
**tendered**
169:13
**tenets**
190:10
**tensas**
218:6
**tensions**
5:10
**tentacles**
288:21, 289:22,
291:2
**tenure**
285:17, 286:2
**term**
207:2, 220:6,
228:13, 236:19,
238:18, 239:20,
344:2
**terms**
21:7, 25:3,
47:18, 89:16,
90:7, 90:8,
90:9, 133:6,
133:8, 133:20,
134:9, 135:3,
136:18, 142:1,
257:13
**terrebonne**
7:20, 8:8,
9:18, 12:20,

19:7, 207:18
**terribly**
36:20
**terry**
20:1, 172:7,
174:12
**testified**
68:4, 122:22,
132:5, 132:8,
169:18, 169:22,
170:10
**testifies**
322:12
**testify**
6:9, 46:3,
56:12, 111:20,
139:15, 171:19,
219:5, 277:8
**testifying**
7:9, 71:21,
72:20, 224:4
**testimony**
1:7, 2:6, 6:22,
16:4, 17:7,
19:14, 20:5,
20:6, 26:20,
36:15, 46:4,
52:2, 56:18,
71:11, 71:16,
87:16, 87:21,
100:16, 122:11,
128:13, 128:14,
129:3, 129:11,
130:9, 130:16,
131:21, 136:6,
158:12, 159:20,
160:11, 164:17,
164:20, 167:14,
167:16, 169:7,
172:18, 174:1,
177:21, 197:4,
198:10, 218:17,
226:20, 227:3,
230:22, 254:17,
258:2, 277:9,
278:4, 278:13,
309:10, 322:11
**tests**
40:20, 283:1,

338:14, 340:9
**texas**
194:4
**th**
2:4, 22:17,
23:1, 29:8,
33:6, 105:13,
205:16, 229:20,
232:20, 272:3,
272:11, 281:3,
293:3
**thanks**
18:18, 77:20,
202:18, 222:14,
269:4
**that'd**
231:21, 232:1
**theme**
152:5
**themselves**
121:14, 121:15
**thereabouts**
63:4
**thereby**
206:16
**therefore**
22:15, 22:21,
129:16, 246:9,
256:16, 266:17
**thi**
268:13
**thing**
4:19, 12:8,
12:12, 17:3,
18:8, 26:21,
27:2, 27:4,
41:12, 55:3,
65:16, 69:3,
88:4, 88:5,
93:7, 116:10,
122:18, 124:15,
136:14, 145:18,
165:16, 173:9,
177:2, 177:9,
183:7, 186:13,
186:14, 191:16,
191:18, 192:21,
208:1, 209:3,

217:15, 261:22,
262:1, 262:21,
278:16, 312:14,
315:3, 318:12,
340:8, 340:21,
346:10
**things**
10:12, 28:17,
35:22, 53:4,
68:15, 70:11,
77:9, 81:15,
85:3, 94:10,
122:8, 126:12,
133:6, 139:15,
142:9, 158:18,
166:13, 168:12,
178:8, 178:9,
180:17, 185:2,
186:10, 189:14,
189:15, 197:2,
217:7, 225:15,
228:22, 234:21,
260:15, 260:16,
263:6, 263:7,
275:18, 283:8,
284:15, 291:12,
309:5, 310:10,
311:2, 312:17,
319:8, 342:11,
345:20, 346:2,
346:15
**thinking**
92:6, 153:14,
153:21, 257:14,
308:8, 343:22
**thinks**
314:14
**third**
23:12, 106:12,
124:16, 148:22,
204:19
**thought**
16:21, 50:21,
56:6, 85:12,
149:16, 168:1,
189:6, 189:7,
189:9, 189:12,
233:2, 242:10,

303:6, 327:3,
335:19
**thoughts**
227:13, 246:18,
246:21
**thousands**
333:5
**threat**
311:21
**threatened**
143:5, 143:11,
143:12, 144:2
**three**
8:12, 8:21,
68:5, 68:6,
68:17, 87:17,
87:22, 133:17,
149:14, 156:19,
167:5, 172:8,
177:16, 177:18,
208:6, 208:8,
224:3, 265:20,
266:1, 267:10,
267:19, 267:20,
323:6, 323:22,
324:8, 335:17
**three-judge**
280:18
**threshold**
305:6
**through**
4:10, 13:19,
25:3, 49:18,
93:8, 93:19,
93:21, 94:7,
94:9, 94:13,
94:16, 95:16,
95:17, 104:18,
105:1, 106:10,
118:4, 141:8,
167:15, 171:18,
172:1, 187:4,
190:2, 190:3,
191:11, 194:1,
209:16, 221:18,
221:19, 224:22,
225:12, 228:14,
238:16, 253:16,

254:9, 257:21,
273:11, 275:3,
329:21, 329:22
**throughout**
8:1, 18:7,
21:12, 41:11,
58:17, 67:20,
107:9, 161:2,
259:12, 306:21,
318:4, 325:18
**throw**
34:5, 81:7
**thurgood**
259:13
**thursday**
99:5, 105:15
**ti**
313:9
**tie**
12:10, 190:4,
190:5, 293:5
**tied**
229:1
**tier**
324:5
**tight**
248:11, 250:6,
250:8
**time**
4:10, 4:14,
6:11, 9:15,
10:13, 16:5,
22:20, 23:10,
29:3, 46:8,
57:5, 66:20,
67:6, 68:21,
75:9, 100:17,
116:10, 124:11,
133:21, 139:17,
141:2, 156:3,
156:7, 157:6,
159:10, 163:2,
171:6, 174:9,
177:4, 177:14,
178:12, 178:19,
178:21, 180:1,
182:8, 182:10,
186:5, 187:1,

193:22, 200:6,
203:15, 204:14,
212:21, 216:10,
218:12, 219:3,
219:13, 222:18,
223:17, 225:11,
226:13, 231:18,
240:18, 244:17,
252:15, 257:2,
260:11, 274:14,
278:17, 285:4,
285:6, 286:1,
301:10, 311:11,
311:19, 313:9,
325:20, 330:5,
343:16, 346:13,
346:15, 348:5,
349:1, 350:22
**timeframe**
228:6
**timeline**
105:10, 250:6,
250:9, 275:11
**timely**
239:9, 273:6,
275:19, 276:17
**times**
125:1, 126:1,
131:12, 164:18,
170:3, 197:13,
203:9, 228:20,
248:5
**timetable**
141:2
**timing**
233:3, 233:9
**tippet**
199:11
**title**
162:15, 227:20
**today**
2:9, 2:15, 4:9,
5:1, 5:7, 5:8,
6:5, 9:21, 16:3,
16:4, 18:21,
19:20, 21:2,
23:1, 24:9,
50:4, 73:4,

87:17, 98:4,
151:6, 154:22,
159:2, 161:9,
161:10, 172:22,
173:3, 174:6,
174:16, 175:2,
175:17, 179:1,
179:4, 180:18,
185:13, 187:10,
190:6, 191:22,
193:6, 193:10,
194:18, 198:11,
200:4, 205:6,
209:5, 213:2,
213:16, 216:16,
217:5, 218:21,
222:18, 222:19,
224:4, 226:19,
253:4, 258:16,
260:6, 260:7,
260:22, 263:2,
266:4, 271:22,
275:6, 276:10,
278:8, 282:7,
311:18, 326:11,
328:15, 329:6,
330:16, 334:11,
335:17, 351:2
**today's**
2:4, 146:1,
161:1, 178:2
**together**
8:8, 27:8,
58:12, 58:13,
93:3, 115:1,
152:16, 155:13,
157:2, 164:19,
182:2, 191:7,
191:9, 194:3,
218:15, 310:19,
335:12, 335:14
**told**
131:11, 134:18,
149:6, 151:13,
154:18, 175:5,
187:16, 189:7,
253:18, 262:9,
273:18, 295:19,

347:22
**tomorrow**
193:6, 266:1,
266:2
**ton**
158:19
**tongue-in-cheek**
346:14
**tony**
117:18
**took**
27:16, 27:20,
28:1, 28:8,
35:22, 51:20,
68:21, 94:3,
97:5, 97:10,
139:5, 139:6,
178:6, 182:5,
183:21, 196:10,
230:4, 262:21,
271:20, 292:13
**tool**
315:7
**top**
14:1, 158:10,
208:8
**topic**
169:20
**torn**
216:7
**tossing**
331:8
**total**
102:9, 118:19,
123:19, 127:11,
201:21
**totality**
160:5, 291:19,
292:2
**totally**
306:11
**touch**
159:5, 195:4
**touched**
194:19
**tough**
45:2, 174:16,
225:18

**tour**
134:3, 134:5
**tourism**
159:16
**town**
192:19, 218:13,
223:16
**track**
212:2
**trade**
133:11
**tradeoffs**
320:18
**tradition**
176:18, 221:6
**traditional**
128:16, 129:1,
129:9, 132:9,
135:10, 170:19
**traditions**
132:7
**train**
56:5
**training**
169:15
**tranquility**
205:15
**trans**
188:20
**transcribed**
1:22, 46:14
**transcriber**
352:1, 352:2
**transcript**
1:6
**transcription**
352:9
**transcripts**
46:16
**translated**
207:12
**transparent**
7:4
**travel**
223:13
**treat**
195:9
**treated**
195:15

**tremendous**
67:3, 275:9,
275:16, 285:7,
285:15
**tremendously**
270:19
**trial**
49:3, 66:7,
94:22, 242:14
**tried**
35:22, 36:1,
60:5, 112:13,
139:1, 185:4,
238:5, 284:21,
294:16, 346:7
**trip**
203:7
**trivia**
199:9
**trouble**
198:8
**troy**
63:21, 109:15
**true**
15:6, 83:20,
141:6, 143:11,
143:12, 220:20,
229:12, 352:8
**truly**
9:21, 225:11,
225:20
**trust**
139:10
**try**
4:18, 21:6,
44:9, 46:18,
47:2, 55:7,
58:11, 58:12,
58:13, 59:7,
59:20, 61:20,
90:22, 93:6,
93:10, 95:19,
96:1, 97:14,
98:2, 99:13,
103:22, 105:2,
110:11, 116:20,
132:2, 164:12,
167:17, 172:4,

174:14, 195:21,
197:5, 233:21,
240:11, 245:18,
269:17, 270:17,
276:4, 276:9,
278:3, 278:21,
279:13, 279:20,
295:18, 310:15,
310:16, 320:12,
327:18, 331:20,
335:20, 343:18,
346:2
**trying**
26:16, 29:12,
41:6, 41:19,
42:19, 44:16,
60:21, 62:2,
62:4, 62:7,
64:19, 68:18,
70:20, 70:21,
73:18, 94:10,
104:12, 104:14,
111:8, 115:11,
120:10, 123:6,
123:7, 124:2,
145:3, 152:19,
179:9, 186:3,
196:14, 196:17,
197:4, 212:1,
228:13, 228:16,
247:1, 250:5,
271:21, 279:3,
290:5, 296:11,
297:2, 297:3,
297:13, 297:19,
300:1, 301:7,
307:6, 307:8,
307:11, 308:15,
310:10, 311:14,
325:14, 327:20,
329:4, 331:17,
338:3, 345:19
**tug**
118:12
**tuned**
183:11
**tureaud**
258:12, 258:17,

259:10, 259:14,
259:18, 260:8
**turn**
8:12, 140:7,
336:4
**turned**
49:12, 123:1,
287:14
**turnout**
165:10, 166:6
**turns**
162:12
**tweet**
190:7
**twenty**
288:15, 323:17
**two-step**
281:10
**tyler**
205:16
**type**
9:11, 194:12,
314:1
**types**
115:8
**typically**
121:8

U

**uh-huh**
292:12, 292:22,
296:10, 296:14,
296:19, 297:16
**ultimately**
233:15, 238:5,
238:8, 256:2,
256:12, 330:6,
345:1, 346:16
**unappealable**
236:10
**unbelievable**
230:8
**unbiased**
96:14, 97:4
**uncle**
134:13
**uncomfortable**
182:16

**unconstitutional**
135:16, 135:20,
156:14
**under**
11:18, 13:21,
22:8, 22:21,
23:5, 29:13,
40:19, 40:20,
69:15, 72:10,
73:20, 74:12,
81:16, 86:14,
120:18, 123:3,
131:2, 132:12,
154:20, 170:5,
189:10, 190:12,
192:14, 204:22,
214:16, 214:20,
227:1, 239:18,
250:6, 250:8,
254:2, 261:4,
282:10, 284:20,
292:11, 323:3,
323:4, 330:19,
331:1, 331:4,
348:15, 352:3
**undercount**
126:21
**underlying**
170:2, 281:1
**underrepresented**
174:22, 175:9
**understand**
5:8, 16:10,
17:12, 18:7,
18:11, 31:1,
33:4, 33:10,
45:16, 54:11,
54:21, 59:4,
59:5, 72:22,
73:13, 76:4,
80:5, 80:8,
89:1, 90:16,
94:19, 95:5,
96:4, 97:6,
97:8, 110:3,
115:10, 122:19,
137:22, 139:1,
141:22, 153:12,

169:8, 174:16,
183:22, 184:13,
185:1, 196:5,
196:17, 200:19,
216:3, 216:4,
221:22, 225:12,
232:14, 237:17,
254:9, 255:6,
256:21, 295:16,
296:17, 299:12,
309:4, 311:5,
316:4, 321:12,
323:2, 331:16,
331:18, 337:11,
341:13, 341:16,
341:18
**understanding**
138:13, 150:7,
160:10, 182:19,
232:21, 234:17,
316:12
**understands**
245:13
**understood**
153:2, 153:4,
153:9, 183:8,
196:11, 344:10
**undertake**
80:14
**undo**
187:21
**unfair**
175:11
**unfortunately**
8:15, 34:15,
46:18
**union**
204:21, 208:9
**unique**
10:2, 122:7
**united**
28:2, 185:9,
237:19, 240:14,
242:16, 242:17,
280:6, 288:3
**universities**
28:4
**university**
28:5, 145:20,

193:4, 193:10,
213:17, 213:19
**unjust**
175:11
**unless**
31:10, 59:10,
88:14, 280:17,
316:11, 323:1,
327:8
**unlike**
132:21
**unlikely**
330:9
**unsatisfied**
71:13
**unt**
246:14
**until**
74:11, 105:12,
119:14, 153:10,
157:1, 180:11,
188:7, 188:10,
207:16, 207:20,
213:13, 226:7,
239:11, 239:19,
246:11, 246:12,
246:14, 249:14,
271:2, 315:9,
327:14
**unusual**
137:10
**upcoming**
233:6, 243:16,
273:9, 276:16
**upfront**
58:4
**upheld**
75:6
**uphold**
209:18, 260:19
**upscale**
133:19
**upset**
104:20, 112:17,
188:5, 276:12,
326:13
**upside**
326:2

**urban**
111:15, 226:22,
316:5, 325:15,
333:15
**urge**
9:19, 10:7
**urging**
181:15
**use**
56:21, 62:4,
82:2, 154:9,
182:21, 189:20,
256:15, 262:20,
280:15, 284:4,
285:1, 292:1,
294:18, 301:14,
304:8, 307:17,
338:4, 339:17,
348:4
**uses**
338:6
**using**
170:6
**usually**
137:10, 309:21
**utter**
209:3

**V**

**vacate**
240:20
**vacated**
97:10, 273:2
**vacates**
236:4
**valid**
120:14
**validate**
178:17
**value**
149:1, 149:2,
149:11, 155:1,
155:2, 157:10,
168:22, 169:8,
171:9, 190:17,
190:18, 191:1
**values**
173:20, 333:7

**vandalized**
260:5
**variables**
170:9
**variety**
97:9
**various**
21:12, 39:18,
229:5, 317:22
**vast**
220:1
**vendue**
208:22
**venues**
167:22
**verbiage**
204:6
**vernon**
200:4, 200:19,
201:2, 201:13,
201:15, 202:9,
206:8
**versa**
223:13
**version**
101:1, 101:11,
235:2, 256:1,
330:3
**versus**
36:19, 37:11,
38:7, 39:9,
40:18, 44:13,
48:13, 80:9,
112:5, 134:6,
137:20, 226:22
**vet**
180:1
**veto**
21:15, 93:22,
188:12, 270:1,
344:19
**vetoed**
23:22, 93:22,
188:14, 188:15,
188:18
**vetted**
100:15, 180:17
**via**
227:12

**vice**
2:21, 20:13,
31:22, 33:1,
33:13, 41:19,
53:16, 78:20,
93:16, 94:4,
96:2, 96:15,
98:9, 105:11,
106:3, 107:2,
107:21, 128:6,
186:18, 190:19,
191:8, 196:2,
199:22, 223:12,
231:6, 234:3,
251:1, 252:17,
257:5, 263:21,
265:11
**vice-chairman**
349:10
**victory**
172:13
**video-recorded**
1:6
**view**
17:1, 319:2
**viewing**
167:17
**ville**
215:14
**violate**
238:11
**violated**
280:19
**violates**
290:13
**violating**
272:6
**violation**
236:12
**violence**
189:17, 189:20
**virginia**
204:14
**virtual**
206:12
**virtually**
99:18, 100:13
**visited**
156:4, 156:5

**voice**
5:21, 8:4,
8:10, 9:1, 18:9,
18:14, 23:13,
90:2, 155:21,
176:14, 176:16,
177:3, 177:10,
178:13, 194:9,
194:10, 216:3,
219:7
**voices**
10:14, 16:15,
16:20, 88:13,
96:10, 108:14,
109:21, 177:9,
215:3
**void**
155:20
**voluminous**
46:9
**voluntarily**
20:9, 20:12,
97:21
**vote**
5:17, 5:22,
26:18, 35:19,
37:22, 38:2,
38:10, 45:12,
47:12, 48:7,
48:9, 48:19,
54:13, 62:10,
65:1, 65:19,
70:11, 70:12,
72:14, 74:14,
74:16, 77:21,
83:22, 84:4,
84:12, 84:16,
91:18, 109:5,
109:10, 110:5,
110:6, 110:16,
110:17, 144:5,
144:16, 144:22,
145:10, 149:10,
150:6, 150:12,
151:7, 151:15,
151:19, 152:16,
152:18, 152:20,
152:22, 153:3,

153:10, 155:2,
155:20, 157:7,
157:9, 157:10,
157:15, 161:7,
162:5, 173:5,
173:11, 173:13,
173:14, 173:15,
174:20, 175:1,
176:14, 176:16,
176:19, 177:3,
178:17, 180:4,
181:1, 182:9,
183:20, 186:2,
186:21, 190:7,
194:17, 197:11,
197:16, 198:15,
198:21, 222:7,
222:8, 250:18,
250:19, 253:17,
263:2, 263:16,
266:19, 272:14,
274:4, 276:12,
277:17, 289:21,
305:19, 306:9,
337:9, 342:12,
349:4, 349:5
**voted**
21:14, 21:15,
36:1, 43:21,
53:3, 142:8,
151:14, 151:15,
177:13, 179:17,
180:1, 192:18,
193:15, 194:15,
197:12, 198:22,
254:4, 269:22,
312:19
**voter**
54:13, 151:13,
172:14, 212:3,
212:12, 229:1,
254:3, 260:1,
281:8
**voters**
17:14, 23:3,
23:7, 23:20,
24:11, 24:19,
27:9, 35:16,

37:17, 37:19,
37:21, 47:5,
47:12, 47:13,
48:7, 48:8,
54:14, 56:16,
58:14, 58:15,
62:11, 79:8,
79:9, 79:12,
79:13, 79:15,
79:16, 80:11,
80:16, 80:22,
85:7, 106:22,
149:10, 150:6,
173:8, 173:18,
281:13, 282:1,
333:6, 333:19,
339:4

**votes**
77:1, 149:1,
181:2, 188:19,
257:14, 269:19,
344:19

**voting**
21:20, 22:8,
24:19, 38:4,
40:19, 43:6,
43:8, 43:14,
47:3, 48:6,
48:18, 48:20,
49:5, 49:8,
50:2, 52:13,
53:12, 54:20,
59:16, 59:17,
65:14, 65:20,
68:12, 68:13,
76:20, 76:21,
76:22, 80:15,
81:16, 83:2,
83:14, 89:10,
95:12, 97:16,
98:3, 102:16,
102:17, 104:6,
108:22, 118:9,
123:5, 129:13,
131:9, 137:20,
148:8, 148:12,
149:13, 154:10,
157:8, 161:12,

161:22, 173:16,
183:19, 192:9,
205:18, 215:1,
236:13, 254:5,
272:7, 272:13,
273:15, 273:22,
280:20, 281:6,
282:5, 282:8,
283:22, 293:19,
300:15, 300:19,
302:11, 303:14,
304:20, 305:9,
316:9, 319:6,
329:12, 337:14,
338:6, 340:11,
341:10

**vu**
191:10

## W

**wa**
274:14

**wage**
109:19

**wait**
119:14, 130:8,
185:9, 213:13,
219:5, 247:13,
249:14, 262:12,
267:1, 276:20,
321:19, 324:12

**waited**
242:13

**waiting**
219:11, 222:7,
273:3

**waive**
213:8

**waives**
213:9

**walk**
156:3

**walker**
150:11, 162:4

**walking**
187:4

**wall**
221:13

**wallace**
193:5, 193:9

**wanted**
13:6, 21:4,
35:17, 57:18,
71:11, 80:8,
83:20, 93:2,
105:1, 165:21,
168:18, 169:8,
171:9, 197:9,
212:2, 218:9,
219:13, 244:17,
255:22, 260:6,
326:17, 326:18

**wanting**
146:2

**wants**
108:13, 177:10,
179:12, 179:14,
184:21, 206:9,
225:1, 268:17,
326:11, 334:5

**war**
118:12

**ward**
189:11, 258:13

**warrants**
253:9

**wars**
158:5

**washington**
12:3, 77:2,
107:22, 292:16

**waste**
182:10, 193:22

**watching**
312:4

**water**
189:22, 221:18,
224:8, 248:11

**watertight**
117:4

**wave**
206:6

**way**
8:12, 10:6,
11:2, 11:7,
23:6, 24:4,

28:19, 31:22,
32:4, 32:18,
36:6, 38:1,
38:2, 44:1,
45:13, 47:7,
47:13, 51:17,
53:6, 57:7,
70:11, 70:12,
72:12, 74:15,
80:16, 86:10,
88:11, 88:15,
88:16, 92:6,
95:17, 102:5,
106:17, 108:14,
122:18, 133:1,
136:17, 137:1,
144:13, 144:16,
149:17, 158:17,
171:22, 181:5,
183:14, 190:18,
198:22, 207:15,
233:14, 233:16,
249:18, 249:20,
250:1, 263:6,
263:7, 274:4,
276:12, 276:13,
277:17, 279:4,
287:16, 290:12,
290:13, 292:15,
298:5, 302:8,
313:3, 316:15,
327:4, 330:13,
338:19, 341:2

**ways**
48:19, 62:19,
124:12, 202:3,
230:3, 335:17,
340:10

**we'll**
58:11, 87:13,
154:10, 176:16,
177:7, 177:16,
229:15, 267:2,
298:8, 298:11,
319:14, 330:9,
335:11

**we've**
9:12, 18:8,

63:5, 65:6,
66:1, 72:7,
80:2, 80:13,
84:8, 85:4,
86:14, 88:17,
97:21, 98:13,
104:17, 105:12,
114:11, 146:12,
158:9, 163:16,
164:9, 171:15,
175:21, 176:21,
183:14, 184:1,
191:11, 191:19,
209:15, 221:19,
224:2, 245:1,
249:7, 249:8,
257:7, 260:22,
261:17, 262:6,
262:8, 273:16,
275:6, 275:17,
278:14, 279:7,
279:8, 285:11,
318:9, 327:13,
328:8, 337:13,
345:17, 348:19
**wealthy**
229:15
**website**
273:19
**wedge**
230:4
**weeds**
224:14
**week**
12:3, 95:1,
186:22, 194:2
**weekend**
186:21
**weeklong**
94:22
**weigh**
18:22
**weight**
170:21, 211:10
**welcome**
42:21, 145:19,
145:22, 304:18,
306:15

**welcomed**
122:20
**well-defined**
217:10, 217:15
**wendy's**
133:18
**went**
60:3, 64:11,
93:21, 93:22,
94:1, 94:7,
105:1, 106:10,
163:5, 167:16,
183:10, 189:11,
193:22, 214:1,
257:21, 274:6,
309:8
**weren't**
112:17, 141:9,
148:2, 163:11,
168:11
**west**
9:5, 11:7,
107:15, 118:21,
120:6, 121:7,
121:8, 121:9,
121:11, 121:14,
121:15, 121:17,
121:18, 122:3,
172:16, 181:22,
210:5, 210:7,
210:10, 215:4,
219:19, 223:3,
274:5, 274:10
**western**
158:4
**wetlands**
226:2
**whacked**
159:14
**whatever**
85:2, 98:7,
120:11, 154:7,
192:20, 195:5,
233:17, 238:1,
238:2, 238:11,
240:20, 247:4,
247:5, 270:8,
284:3, 299:22,

303:20
**whatever's**
303:20
**whatsoever**
236:3, 345:8,
345:14
**whenever**
5:5, 7:13,
20:18, 172:10,
199:17, 203:5,
218:19, 225:8,
266:7, 267:2,
268:1, 269:13,
332:13
**where'd**
320:13
**whereas**
220:11
**whether**
45:4, 48:7,
83:2, 90:10,
91:20, 119:8,
128:15, 136:12,
138:2, 147:8,
176:2, 176:3,
181:8, 198:14,
225:21, 233:4,
261:2, 261:7,
261:11, 262:18,
268:17, 282:20,
289:14, 291:18,
294:8, 305:4,
312:9, 314:13,
330:2
**whichever**
233:15
**white**
2:7, 4:6, 7:5,
47:17, 47:22,
48:6, 48:8,
48:17, 57:5,
69:19, 69:21,
76:3, 89:9,
91:20, 108:6,
108:16, 119:8,
126:3, 138:3,
151:14, 152:12,
152:14, 152:15,

155:7, 162:9,
184:20, 190:4,
199:14, 230:7,
252:9, 255:3,
255:8, 259:22,
265:8, 267:12,
267:14, 305:14,
306:6, 326:3,
337:8, 338:4,
350:17
**whites**
72:7, 227:16,
227:17, 229:5,
229:7, 261:9,
305:18
**who've**
346:8
**whoa**
326:19
**whoever**
67:3, 108:8,
233:14, 239:6,
331:1
**whole**
11:6, 11:14,
12:19, 15:1,
19:9, 32:5,
41:12, 51:3,
59:6, 71:14,
72:21, 81:1,
88:22, 91:3,
91:4, 99:13,
99:22, 116:9,
121:4, 125:17,
133:4, 142:10,
150:1, 154:21,
159:7, 159:13,
162:9, 166:19,
218:11, 222:13,
228:15, 257:21,
261:5, 262:2,
284:18, 285:3,
306:21, 310:12,
318:13, 341:20,
342:5, 348:8
**wholeheartedly**
278:10
**wholly**
271:12

**wide**
72:6
**wife**
196:9
**wildlife**
114:3, 114:5,
114:8, 114:19,
114:22, 116:3
**wilford**
3:2, 251:5,
251:6, 264:2,
264:3, 349:13
**wilksboro**
165:5
**william**
128:19
**willing**
84:4, 84:12,
84:16, 89:19,
199:4, 310:8,
310:15
**win**
66:4, 66:6,
115:11, 117:5,
211:19, 247:5,
248:21, 297:19
**windows**
268:4
**winds**
132:22
**wine**
134:6
**winning**
76:14, 156:21,
156:22, 334:4
**wins**
118:12, 118:13,
330:12, 331:3
**wisely**
4:18
**wish**
92:11, 92:12,
172:6, 226:16,
332:12, 335:13,
335:15, 336:1
**wishes**
5:21
**wishing**
19:19, 19:22,

20:3, 25:18,
199:11, 213:7,
231:4
**within**
23:20, 30:2,
37:17, 54:6,
121:13, 229:16,
247:13, 275:13,
281:13
**without**
9:1, 20:12,
33:5, 118:7,
138:5, 149:7,
170:13, 170:14,
170:15, 206:14,
241:9, 241:13,
243:22, 276:16,
278:17, 281:13,
311:22, 325:15,
351:3
**withstand**
281:21
**witness**
130:12
**witnesses**
128:20, 337:22
**wolf**
56:5
**woman**
154:21, 206:3
**won**
138:13
**wonder**
146:3, 162:3
**wondering**
255:20
**word**
42:4, 74:2,
299:19, 301:14
**word-for-word**
234:14
**words**
43:4, 61:12,
65:13, 83:11,
142:22, 162:20,
196:13, 206:5,
304:8, 318:2,
332:22

**work**
5:20, 7:18,
9:9, 10:15,
21:1, 21:3,
46:18, 54:13,
68:19, 88:15,
92:14, 99:4,
105:14, 111:6,
115:2, 123:1,
138:19, 139:2,
139:4, 139:14,
141:5, 141:6,
141:7, 141:11,
141:12, 141:13,
141:16, 145:22,
165:10, 172:14,
172:15, 173:4,
173:5, 173:10,
193:20, 197:19,
202:8, 219:18,
219:21, 223:14,
257:22, 261:12,
304:3, 311:11,
334:7, 346:9
**worked**
88:11, 88:16,
88:17, 138:21,
224:2, 227:19,
236:8, 253:22,
346:1
**workers**
186:11
**working**
112:2, 181:14,
221:11, 224:7,
279:15, 285:12,
341:14
**world**
134:2, 138:13,
153:11, 202:11,
202:13
**worried**
145:7
**worst**
205:14
**wouldn't**
6:17, 32:6,
40:9, 41:9,

75:8, 75:9,
106:20, 122:2,
150:11, 160:18,
161:12, 162:5,
171:19, 192:11,
195:19, 207:19,
209:19, 224:21
**wow**
277:12, 277:15
**wrap**
110:15, 173:22
**wright**
213:12, 218:18,
218:20, 224:20,
231:8
**writing**
128:14, 132:5
**written**
186:8, 224:16,
224:17
**wrong**
36:16, 58:11,
64:18, 69:3,
75:3, 101:20,
146:21, 192:12,
247:15, 290:18,
290:19
**wrote**
57:9, 170:1,
322:17

---
### Y

**y'all**
50:13, 53:18,
78:22, 211:19,
212:2, 217:18,
225:10, 225:16,
226:14, 247:22,
260:2
**y'all's**
225:18
**yancey**
177:18, 183:4,
183:5, 186:16
**yays**
252:10, 252:11,
265:9, 265:10,
350:17, 350:19

**yeah**
14:16, 14:22,
17:4, 17:9,
20:5, 25:13,
26:15, 32:15,
34:4, 38:5,
40:12, 43:2,
68:11, 88:20,
96:16, 98:11,
100:22, 101:1,
102:9, 102:11,
104:3, 113:12,
116:7, 119:15,
127:9, 149:17,
149:19, 149:21,
160:7, 163:7,
166:15, 167:5,
183:5, 198:4,
225:5, 225:9,
231:17, 235:16,
239:4, 239:14,
240:22, 246:22,
247:16, 248:3,
255:16, 267:10,
268:7, 278:22,
283:14, 286:20,
287:7, 287:8,
288:22, 290:6,
291:11, 295:7,
296:5, 298:15,
299:9, 307:20,
308:4, 308:11,
311:8, 313:2,
318:11, 320:3,
321:13, 324:19,
327:19, 329:14,
332:1
**year**
9:6, 54:18,
134:4, 144:9,
157:6, 180:6,
181:11, 189:6,
257:22, 269:21
**years**
7:20, 8:5, 9:6,
9:10, 9:15,
9:22, 12:13,
45:14, 113:10,

116:16, 121:3,
157:9, 173:6,
173:7, 173:10,
180:5, 183:13,
183:15, 188:13,
189:13, 194:6,
194:15, 196:11,
205:15, 209:3,
221:5, 223:22,
224:3, 224:9,
230:4, 238:20,
244:2, 244:8,
245:1, 245:2,
245:21, 246:1,
246:3, 246:6,
247:7, 247:13,
247:18, 247:20,
247:21, 252:21,
258:8, 260:5,
288:15, 288:18,
298:21, 331:4
**yellow**
81:12, 119:8
**yesterday**
15:18, 22:21,
46:7, 99:5,
99:13, 105:15,
138:20, 138:21,
143:5, 146:19,
146:20, 146:21,
147:1, 185:7,
216:22, 228:12,
232:10, 234:15,
256:1
**yesterday's**
227:12
**yield**
157:21, 203:1
**yogi**
191:10
**york**
194:4
**young**
138:3, 157:7,
157:14, 172:6,
172:11, 172:12,
181:20, 196:7,
263:1, 283:15

**yourself**
343:20

**Z**

**zachary**
215:16
**zero**
30:2, 37:9,
39:3, 51:18,
51:19, 55:7,
86:12, 112:22,
196:3, 323:6
**zeta**
8:16
**zone**
13:16, 14:7,
15:9, 15:15
**zoned**
309:3
**zones**
13:11
**zoom**
307:5, 307:11,
308:15, 308:20
**zs**
318:9
**zurich**
134:12

**$**

**$1.4**
201:18
**$100**
202:14
**$4**
224:7
**$400**
9:16
**$581**
134:19
**$9.6**
201:20

**0**

**0.1**
324:22, 325:4
**00**
275:4

**1**

**1,000**
133:16
**1.8**
325:4
**1.8702**
125:2, 125:4,
126:1
**10**
8:5, 9:22,
36:12, 45:14,
116:18, 118:18,
119:17, 123:18,
157:9, 162:21,
163:4, 173:6,
173:10, 245:21,
246:1, 247:13,
257:7, 257:8,
287:7
**10,000**
128:21, 129:12,
171:1, 171:7
**100**
29:21, 283:21
**100,000**
333:22
**11**
206:10
**115**
51:11, 52:4
**117**
52:17
**119**
52:17
**12**
134:10, 252:10,
252:11, 257:4,
287:7
**1276**
236:16
**13**
35:4, 35:11,
36:7, 36:9,
36:11, 39:8,
259:19, 283:14,
283:18, 284:8,
326:8

**13,000**
121:12
**139**
189:6
**14**
4:6, 4:8,
229:20, 281:3
**140**
46:9
**15**
7:20, 9:14,
121:13, 208:5,
208:7, 236:1,
288:18, 326:9
**15.3**
135:7
**150**
302:22
**152**
45:21, 46:11,
49:18, 83:1,
117:20, 146:20,
341:13, 341:20,
342:5
**16**
36:11, 175:10,
232:4, 236:9,
250:15, 250:19
**17**
1:10, 2:4,
23:1, 175:6,
352:19
**1789**
204:6
**18**
236:16, 344:3
**18,000**
121:13
**180**
205:15, 209:3
**1842**
205:16
**1865**
175:4
**19**
20:6, 20:7,
175:4
**19.3**
323:18

**1913**
209:8
**1922**
209:8
**1925**
259:5
**1965**
282:5
**1970**
274:2, 274:22
**1971**
273:20, 274:5,
274:17, 275:11
**1979**
274:22
**199,304**
333:5
**1990**
288:11
**1997**
258:21

────────── **2** ──────────

**2**
323:16
**2.9**
325:1
**20**
22:17, 23:1,
105:13, 113:10,
119:17, 137:11,
223:22, 232:20,
272:3, 272:11,
288:18
**200**
8:1
**2000**
286:20, 288:13
**2010**
8:15, 43:16
**2013**
156:11
**2017**
280:6
**2020**
333:17
**2021**
332:16

**2022**
1:10, 149:13,
154:22, 175:6,
233:19, 236:6,
260:17, 272:5,
333:2, 352:16
**21**
36:10, 36:12
**21,780**
333:2
**22**
280:6, 307:20
**23**
36:12, 352:16
**23,802**
79:13
**244**
307:19
**25**
205:16, 298:21
**26**
51:12, 52:5
**27**
52:16
**27.5**
324:1
**27.6**
135:7
**28**
52:17
**29**
227:7

────────── **3** ──────────

**3**
275:4, 290:10
**3,400**
31:5
**3,473**
79:12
**3,549**
79:15
**3.1**
324:16
**3.4**
324:16
**30**
37:12, 70:1,

118:21, 175:9,
259:19, 274:20,
275:13
**30,000**
80:22
**30,169**
79:8
**31**
37:2, 38:18,
208:19, 261:2,
261:7, 261:11
**31.17**
124:21, 125:20,
126:16, 128:2
**32**
37:2, 38:18
**33**
37:2, 38:18,
64:22, 126:10,
128:1, 194:20,
194:21, 208:20,
261:3, 261:7,
261:12, 290:11
**33,000**
207:10
**33.1**
175:12
**33.13**
127:11
**34**
34:7
**35**
60:15
**351**
352:8
**352**
1:21
**36**
36:12, 37:2,
37:3, 38:18,
38:19
**37**
36:11
**387,046**
118:17
**39**
216:18

────────── **4** ──────────

**4**
343:5

**4,000**
31:3
**4-something**
203:18
**4.7**
324:11, 324:12,
324:15
**40**
121:2, 153:12,
226:4, 260:10
**42.24**
129:15
**432,000**
204:16
**45**
208:13, 325:1
**45.47**
129:14
**453585**
1:20, 352:19
**47,000**
201:3
**475,000**
204:16
**49**
218:1

---
**5**
---

**5.1**
324:6
**5.7**
324:6
**50**
118:19, 119:2,
176:15, 194:15,
201:4, 221:5,
260:10, 302:16,
303:22, 319:5,
319:14, 336:13,
336:14, 337:13,
337:14, 338:20,
339:17, 340:8,
341:8
**50.176**
303:19
**50.201**
303:16
**51**
102:22, 207:14,

338:21, 341:1,
341:22
**51.3**
338:10
**51.4**
340:2
**52**
46:10, 101:22,
102:20, 102:21,
137:9, 137:14
**53**
339:1, 339:2,
339:6, 339:19
**54**
101:18, 101:19,
102:13, 339:2,
339:5, 339:19,
340:1, 343:5
**54.4**
102:13
**55**
303:6, 305:6,
325:2, 325:3,
325:7
**57**
183:13, 261:8
**59**
339:5
**5th**
79:10, 96:17,
97:6, 117:2

---
**6**
---

**6,410**
79:14
**60**
34:12, 151:5,
176:15, 273:22,
325:3, 339:3
**60,919,000**
134:21
**61**
30:5, 34:7,
34:13
**62**
29:5, 34:9,
34:12
**630,000**
204:15

**65**
36:11

---
**7**
---

**70**
275:1
**700,000**
63:4
**706,000**
206:20, 209:14
**72**
76:3
**73**
79:8, 194:6
**76**
34:7, 222:20
**77**
34:7, 218:21
**770**
206:21
**776,000**
209:15
**78**
34:7
**79**
275:1

---
**8**
---

**8.2**
323:13, 323:20
**80**
138:5
**81.9**
135:5
**83**
261:9
**84,165**
79:11
**86.4**
135:5

---
**9**
---

**9.5**
323:14, 323:16
**9.8**
323:13, 323:14
**90**
286:16, 286:17,

286:20, 286:22
**90,000**
207:17
**98**
9:17
**99**
310:6

---
**¬**
---

**¬-**
293:1, 296:15,
296:20, 297:17,
298:19, 319:13

---
**"**
---

**"damn**
187:6
**"hey**
180:3
**"my**
157:10, 173:15
**"oh**
187:20
**"segregation**
193:6
**"we**
160:19, 177:5
**"well**
193:9
**"what**
155:9
**"why**
162:7