IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

PRESS ROBINSON, EDGAR CAGE,
DOROTHY NAIRNE, EDWIN RENE
SOULE, ALICE WASHINGTON, CLEE
EARNEST LOWE, DAVANTE LEWIS,
MARTHA DAVIS, AMBROSE SIMS,
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
("NAACP") LOUISIANA STATE
CONFERENCE, AND POWER
COALITION FOR EQUITY AND
JUSTICE,

CIVIL ACTION
NO.  3:22-cv-00211-SDD-SDJ

Chief Judge Shelly D. Dick

Magistrate Judge Scott D.
Johnson

*Plaintiffs,*

v.

KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana,

*Defendant.*

EDWARD GALMON, SR., CIARA HART,
NORRIS HENDERSON, and TRAMELLE
HOWARD,

Consolidated with

CIVIL ACTION
NO. 3:22-cv-00214-SDD-SDJ

*Plaintiffs,*

v.

R. KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana,

*Defendant.*

**BRIEF *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

INTEREST OF THE *AMICI CURIAE* ..............................................................1

SUMMARY OF ARGUMENT...........................................................................1

ARGUMENT.......................................................................................................3

I.    FEDERAL CASELAW GUIDES HOW A COURT SHOULD REMEDY A CONGRESSIONAL REDISTRICTING PLAN'S VOTING RIGHTS ACT VIOLATION........................................................................................3

    A.    CURING THE VRA VIOLATION ...............................................5

    B.    AVOIDING THE EXCESSIVE AND UNJUSTIFIED USE OF RACE.......................7

    C.    COMPLYING WITH OTHER LEGAL REQUIREMENTS ..........................9

    D.    MINIMIZING NEEDLESS CHANGES.......................................9

II.    THE *AMICUS* MAP FULLY CURES THE VRA DEFECT, WHILE COMPLYING WITH ALL OTHER LEGAL REQUIREMENTS AND RESPECTING THE STATE'S LEGITIMATE POLICY CHOICES. ...............................10

    A.    THE *AMICUS* MAP FULLY CURES THE VRA VIOLATION IN THE ENACTED PLAN. ...............................16

    B.    THE *AMICUS* MAP IS NOT OVERLY RACE CONSCIOUS...................20

        1.    GENERAL CRITERIA ...............................22

        2.    GEOGRAPHIC COMPACTNESS....................22

        3.    RESPECT FOR POLITICAL SUBDIVISIONS ...............24

        4.    RESPECT FOR COMMUNITIES OF INTEREST ...............25

    C.    THE *AMICUS* MAP COMPLIES WITH ALL OTHER LEGAL REQUIREMENTS. ...............27

        1.    POPULATION EQUALITY ...............28

        2.    RACIAL FAIRNESS...............28

        3.    PARTISAN FAIRNESS ...............29

D.  The *Amicus* Map Minimizes Needless Changes to the Enacted Plan. ...............................................30

CONCLUSION ........................................................................31

ADDENDUM .......................................................................A-1

The *Amicus* Map—Statewide...............................................A-1

The *Amicus* Map's New Orleans-Based District 2 .......................A-2

The *Amicus* Map's Baton Rouge-Based District 6 .......................A-3

The *Amicus* Map's Congressional-District Components ...........................A-4

# TABLE OF AUTHORITIES

## CASES

*Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015) ..........................................8

*Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) ...................................................26

*Allen v. Milligan*, 143 S. Ct. 1487 (2023) ......................................................*passim*

*Ardoin v. Robinson*, 143 S. Ct. 2654 (2023) .......................................................2

*Baltimore Cty. Branch of the NAACP v. Baltimore Cty.*, No. 21-cv-3232,
    2022 WL 888419 (D. Md. Mar. 25, 2022) ........................................................6

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ...................................................5, 6, 8, 19

*Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178 (2017) ...........................................8

*Brown v. Plata*, 563 U.S. 493 (2011) ...............................................................3

*Bush v. Vera*, 517 U.S. 952 (1996) ................................................................22

*Carter v. Chapman*, 270 A.3d 444 (Pa. 2022) .......................................................29

*Cooper v. Harris*, 581 U.S. 285 (2017) .............................................................6, 8

*Essex v. Kobach*, 874 F. Supp. 2d 1069 (D. Kan. 2012) ..............................................30

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) .....................................................6

*Gaffney v. Cummings*, 412 U.S. 735 (1973) ........................................................30

*Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023 (5th Cir. 1982) ..........................................3

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ...................................................18, 19, 29

*Karcher v. Daggett*, 462 U.S. 725 (1983) ..........................................................28

*Louisiana v. United States*, 380 U.S. 145 (1965) .....................................................4

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ...............................7, 22

*Maestas v. Hall*, 274 P.3d 66 (N.M. 2012) ........................................................30

*Major v. Treen*, 574 F. Supp. 325 (E.D. La. 1983) ..............................................21, 22

*Miller v. Johnson*, 515 U.S. 900 (1995) .........................................................7, 8, 25

*Perry v. Perez*, 565 U.S. 388 (2012)................................................................9

*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022)..................................*passim*

*Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022) ................................2

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)..............................................29

*Shaw v. Reno*, 509 U.S. 630 (1993) ...................................................................7

*Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2023 WL 5691156 (N.D. Ala.
    Sept. 5, 2023).............................................................................................*passim*

*Terrebonne Par. Branch NAACP v. Edwards*, 399 F. Supp. 3d 608 (M.D.
    La. 2019) ................................................................................................26

*Upham v. Seamon*, 456 U.S. 37 (1982) (*per curiam*)........................................9

*Wisconsin Legis. v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022)
    (*per curiam*) ................................................................................................7

## Constitutional Provisions and Statutes

La. Const. art. I, § 3 ...............................................................................29, 30

52 U.S.C. § 10301(b) ........................................................................................5, 9

La. R.S. 18:1276...........................................................................................10

## Legislative Materials

S. Rep. No. 97-417 at 31, 97th Cong., 2d Sess. 26, *reprinted in* 1982 U.S.
    Code Cong. & Adm. News 177, 208 ...............................................................4

## Other Authorities

Amariah Becker, Moon Duchin, Dara Gold & Sam Hirsch, *Computational
    Redistricting and the Voting Rights Act*, 20 Election L.J. 407 (2021).......................19

U.S. Census Bureau, About [Metropolitan and Micropolitan],
    https://www.census.gov/programs-surveys/metro-micro/about.html
    (last revised Nov. 22, 2021)..............................................................26

U.S. Census Bureau, QuickFacts: Louisiana (2021), https://www.
    census.gov/quickfacts/LA (last visited Sept. 12, 2023)..................................29

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* Michael Mislove, Lisa J. Fauci, Robert Lipton, and Nicholas Mattei are professors of mathematics and computer science at Louisiana State University and Tulane University.  This Court has twice granted *amici* leave to file briefs in this case, both in support of neither party, to show that computational redistricting—using high-performance computers to help draw maps that attempt to optimize multiple redistricting criteria—could produce a map that fully remedies any violation of Section 2 of the Voting Rights Act (VRA), 52 U.S.C. § 10301, while simultaneously complying with all other legal requirements and traditional redistricting principles (Rec. Doc. Nos. 96, 97, 210, 220).  At this stage in the litigation, *amici* believe the Court should consider using the map they previously offered this Court, which was created with the assistance of computational redistricting—the "*Amicus* Map"—to remedy the VRA violation before the 2024 election cycle.  *Amici* are aware that the Court has scheduled an evidentiary hearing for October 3 to 5 to consider a proposed remedy, and counsel for *amici* stand ready to participate in that evidentiary hearing in any capacity that the Court might find helpful.[1]

## SUMMARY OF ARGUMENT

*Amici* previously presented this Court with an "*Amicus* Map" that illustrates how computational redistricting could help cure a VRA defect while ensuring that racial considerations do not predominate and simultaneously leaving intact, to the extent possible, the State's plan and the legislative policy judgments that it embodies.  In its

---

[1] No parties oppose the filing of this *amicus* brief, which is not in support of any party.

June 6, 2022 preliminary-injunction Ruling and Order, this Court expressly commended the *Amicus* Map's usefulness for remedial purposes. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 856 & n.441 (M.D. La. 2022).

Since *amici* first presented their map to this Court (Rec. Doc. No. 97), the Supreme Court stayed these proceedings, reaffirmed the long-standing test for VRA Section 2 violations in *Allen v. Milligan*, 143 S. Ct. 1487 (2023), and then vacated the stay. *See Ardoin v. Robinson*, 143 S. Ct. 2654 (2023) (dismissing writ of certiorari as improvidently granted and vacating stay). At this point in the proceedings, this Court is tasked with "ensur[ing] that a proposed remedial districting plan completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." *Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2023 WL 5691156, at *44 (N.D. Ala. Sept. 5, 2023) (three-judge court) (internal quotations omitted). Fundamentally, this Court must ensure that any remedial map put in place for the 2024 elections will provide Black voters with "equality of opportunity" to achieve electoral success in two congressional districts. *Id.* at *50 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994)).

Now more than ever, the *Amicus* Map presents the Court with an excellent way to cure the VRA violation, while mitigating concerns raised by both sides. Specifically, the *Amicus* Map contains two districts—one in the New Orleans area, the other in the Baton Rouge area—that are both likely to elect candidates preferred by Black voters even though neither district is majority Black. Both districts, like all six districts in the *Amicus* Map, are contiguous, geographically compact, respectful of political subdivisions

such as parishes and municipalities, and respectful of communities of interest. The *Amicus* Map adheres to the "one person, one vote" doctrine more closely than any congressional plan in Louisiana history. And it is fair to all Louisianans, regardless of party, region, or race. In short, the *Amicus* Map complies with the VRA while not being excessively race conscious and while respecting the State's legitimate policy choices. It is therefore an excellent option to serve as a Court-ordered remedial redistricting plan.

ARGUMENT

## I.  Federal Caselaw Guides How a Court Should Remedy a Congressional Redistricting Plan's Voting Rights Act Violation.

Now that this Court is in a remedial posture, tasked with designing and implementing equitable relief, "the scope of [the] district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (internal quotation marks omitted). That said, the Court "must tailor the scope of injunctive relief to fit the nature and extent of the . . . violation established." *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1041 (5th Cir. 1982). Following a finding of liability under Section 2 of the Voting Rights Act, the Court must determine whether a proposed remedial map, "in combination with the [State's] racial facts and history," completely corrects, or "fails to correct," the adjudicated violation of Section 2. *Singleton*, 2023 WL 5691156, at *4, *44 (citations omitted).

The VRA's legislative history endorses this broad, flexible approach. In the Senate Report accompanying the 1982 amendments to Section 2, the Senate Judiciary Committee relied on "[t]he basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated," and explained that a remedial court

3

should "exercise its traditional equitable powers to fashion . . . relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S. REP. NO. 97-417 at 31, 97th Cong., 2d Sess. 26, *reprinted in* 1982 U.S. CODE CONG. & ADM. NEWS 177, 208. That committee cited the seminal Supreme Court decision about racially discriminatory voting laws—*Louisiana v. United States*, 380 U.S. 145 (1965)—in which the Supreme Court explained that, upon finding such discrimination, federal courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Id.* at 154.

In evaluating proposed remedies for a VRA violation, a court may choose from among the plans submitted by litigants, *amici*, or other interested parties, or it may draw its own remedial map, sometimes with the help of a special master. *See* Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 GEO. WASH. L. REV. 1131, 1148–50 (2005). In all cases, when a federal court imposes a remedial map to cure a VRA violation, four constraints apply. *First*, the remedial map must fully cure the VRA violation in the challenged districting plan. *Second*, in curing the VRA violation, the court must avoid the excessive and unjustified use of race and racial data. *Third*, the remedial map must comply with all other federal and state legal requirements. And *fourth*, the court must avoid making changes to the plan that are unrelated to compliance with those first three constraints.

A.     Curing the VRA Violation

Like the "illustrative" plans that Plaintiffs presented in the liability phase, a valid remedial map must contain at least one additional district (compared to the challenged plan) in which members of the plaintiffs' minority group have the potential to elect a representative of their choice.  But unlike Plaintiffs' liability-phase illustrative plan—which must comply with the requirement of *Bartlett v. Strickland*, 556 U.S. 1 (2009), that members of the plaintiffs' minority group constitute a majority of the voting-age population in the additional district—in a ***remedial*** plan, members of the plaintiffs' minority group need not constitute a majority of the voting-age population in the additional district.  Rather, the additional district must be one in which plaintiffs' minority group has a fair opportunity to elect its preferred representative.  After all, the harm unlawfully inflicted on plaintiffs is not that they reside in a district with the "wrong" demographic composition, but rather that they reside and vote in a district where they will be deprived the "opportunity . . . to elect representatives of their choice," 52 U.S.C. § 10301(b), as their preferred candidates will routinely lose to nonminority voters' preferred candidates.

The Supreme Court explained this distinction in *Bartlett v. Strickland*.  The plurality there held, on the one hand, that VRA ***plaintiffs*** must show that their minority group is sufficiently large and geographically compact to constitute a literal, numerical majority in an additional, reasonably configured district.  But it further held that VRA ***defendants*** can prevail by pointing to what the Court called "crossover" districts.  In a crossover district, minority adults, though outnumbered, can elect their preferred

candidates with limited, but predictable, crossover support from other voters. *Compare Strickland*, 556 U.S. at 12–14, 18–19, 26 (plurality op.) (requiring plaintiffs to meet the 50% threshold to satisfy the first prong of the *Gingles* test), *with id.* at 23–24 (encouraging defendants to rely on "crossover voting patterns and . . . effective crossover districts"); *see also Cooper v. Harris*, 581 U.S. 285, 305 (2017) (explaining that the VRA can "be *satisfied by* crossover districts"); *Baltimore Cty. Branch of the NAACP v. Baltimore Cty.*, No. 21-cv-3232-LKG, 2022 WL 888419, at *1– 6 (D. Md. Mar. 25, 2022) (approving defendant's proposed remedial plan, with a reconfigured district in which Black voters would not constitute a numerical majority but would have an opportunity to elect a representative of their choice); *Fusilier v. Landry*, 963 F.3d 447, 456 n.7 (5th Cir. 2020) (distinguishing district court's remedial map from plaintiffs' "*Gingles* step one" map).

Courts continue to reaffirm "the undisputed premise that under Section Two, a remedial district need not be majority-Black." *Singleton*, 2023 WL 5691156, at *29. Indeed, the Fifth Circuit in this very case has already recognized that crossover districts create meaningful electoral opportunities for minority citizens: "If a minority group can . . . elect its preferred candidates, it does not matter whether that ability accrues in a majority-minority or a performing crossover district." *Robinson v. Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022); *see also id.* at 225 (affirming this Court's consideration of crossover voting "to answer the right question: whether black voters' preferred candidates could *win* the proposed district"). As explained immediately below, the availability of effective crossover districts can make it easier for a court to remedy a VRA violation without running afoul of the Equal Protection Clause.

### B.    Avoiding the Excessive and Unjustified Use of Race

Compliance with the VRA obviously requires both awareness and active consideration of race and racial data.  Indeed, as Chief Justice Roberts has recently reaffirmed, "[t]he contention that mapmakers must be entirely 'blind' to race has no footing in our § 2 case law."  *Allen v. Milligan*, 143 S. Ct. at 1512 (plurality op.); *see id.* at 1518 (Kavanaugh, J., concurring) (explaining that courts properly may "account for the race of voters so as to prevent the cracking or packing—whether intentional or not—of large and geographically compact minority populations"); *see also*, *e.g.*, *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  But if the consideration of race in redistricting is excessive and unjustified, it can violate the Equal Protection Clause under a line of Supreme Court "racial gerrymandering" precedents that commenced with *Shaw v. Reno*, 509 U.S. 630 (1993).  Redistricters—including federal district courts at the remedial phase of a voting-rights suit—therefore must walk a fine line between paying too little attention to race and violating the VRA and paying too much attention to race and violating the Constitution.

The caselaw articulating the racial-gerrymandering doctrine identifies three potential triggers for subjecting a district to strict scrutiny.  *First*, some Justices have suggested, although the Court has never held, that intentionally creating a particular number of majority-minority districts is, by itself, presumptively unconstitutional.  *See*, *e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 517 (2006) (Scalia, J., joined by Roberts, C.J, and Thomas & Alito, JJ., concurring in judgment in part and dissenting in part); *cf. Wisconsin Legis. v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245,

1247, 1249 (2022) (*per curiam*).    *Second*, the Supreme Court has held that it is presumptively unconstitutional for a State to draw districts to "maintain a particular numerical minority percentage" or to meet arbitrary or "mechanical racial targets." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 267, 273–75 (2015); *see Cooper*, 581 U.S. Ct. at 299–301; *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 190, 194–96 (2017).    And *third*, over the last few decades, the Court has repeatedly held districts presumptively unconstitutional if they subordinate traditional nonracial districting principles—such as contiguity, compactness, respect for political subdivisions, and respect for communities of interest—to racial considerations.    *See, e.g., Miller*, 515 U.S. at 916.

As the *Bartlett v. Strickland* plurality recognized, "crossover districts" where Black adults lack a numerical majority but nonetheless have the potential to elect representatives of their choice may be less vulnerable to claims of racial gerrymandering. *Strickland*, 556 U.S. at 23.    These districts can enhance "minority voting strength" while "diminish[ing] the significance and influence of race" and "encouraging minority and majority voters to work together" toward common goals.    *Id.*    The Court found that these districts "can lead to less racial isolation."    *Id.*    Moreover, these districts (by definition) are not the product of intentionally creating a particular number of majority-minority districts or of drawing districts to maintain an arbitrary numerical minority percentage or meet a mechanical racial target.    Rather, crossover districts are the product of applying traditional districting principles while considering race where necessary to

afford all members of the electorate an equal "opportunity . . . to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

## C.    Complying with Other Legal Requirements

A remedial redistricting plan not only must cure the VRA violation while avoiding excessive and unjustified race-consciousness, but also must comply with all other federal and state legal requirements.  The list of applicable requirements here is brief:  population equality, compliance with the VRA as to racial and ethnic groups other than the plaintiffs', and (although it is no longer an independently justiciable issue in federal court) the avoidance of excessive partisanship or political skew.  Consideration for these legal mandates can be incorporated into the algorithmic instructions used in computational redistricting.  *Cf. Allen v. Milligan*, 143 S. Ct. at 1513 n.8 (acknowledging the potential relevance of "algorithmic mapmaking" in VRA cases); Br. for Computational Redistricting Experts as *Amici Curiae* 34–35, *Allen v. Milligan* (discussing the use of legal criteria in algorithmic mapmaking), *cited in* 143 S. Ct. at 1513–14.

## D.    Minimizing Needless Changes

Finally, in a remedial redistricting proceeding, a federal court should minimize needless changes to a state legislature's enacted plan.  Principles of federalism and judicial restraint counsel that a federal district court should not modify or "intrude upon state policy any more than necessary" to "cure any constitutional or statutory defect." *Upham v. Seamon*, 456 U.S. 37, 41–43 (1982) (*per curiam*) (internal quotation marks omitted); *see Perry v. Perez*, 565 U.S. 388, 393 (2012) ("[A] district court should take guidance from the State's recently enacted plan in drafting an interim plan.").  Tailoring

modifications to a map to avoid needless changes is yet another task to which computational redistricting is particularly well suited.

## II.    The *Amicus* Map Fully Cures the VRA Defect, While Complying with All Other Legal Requirements and Respecting the State's Legitimate Policy Choices.

The *Amicus* Map satisfies each of the four elements just outlined.

As shown below, the *Amicus* Map (1) contains two Black crossover districts—one based in New Orleans, the other in Baton Rouge—that can elect congressional candidates preferred by Black voters and therefore fully cures the VRA violation in the Louisiana Legislature's 2022 congressional plan, LA. R.S. 18:1276 ("the Enacted Plan"); (2) avoids being overly race-conscious by not intentionally creating majority-minority districts or attempting to hit racial targets; (3) complies with all other federal and state legal requirements; and (4) otherwise leaves intact the Enacted Plan and the legislative policy judgments that it embodies.  Specifically, the *Amicus* Map has the following features:

- The *Amicus* Map's six districts—and specifically its two Black crossover districts—are geographically compact (*see* color figure below) and thus have excellent compactness scores.

- The *Amicus* Map splits only seven parishes and only two municipalities within a single parish.

- The *Amicus* Map does ***not*** split any of Louisiana's 3,000-plus election precincts.

- The *Amicus* Map's Black crossover districts do ***not*** split a single parish or municipality that was not already split in the Enacted Plan.

- The *Amicus* Map's New Orleans district contains the entire city and all parts of the New Orleans metropolitan area to the city's east and south.

- The *Amicus* Map's Baton Rouge district contains the entire city and 8½ of the 10 parishes in the Baton Rouge metropolitan area.

- The *Amicus* Map has a lower population deviation (0.008%) than any congressional plan in Louisiana history.

- The *Amicus* Map leaves the vast majority of Louisianans—more than 3 million residents—in their current congressional district.

- The *Amicus* Map does not pair any incumbent Representatives in the same district.

As the Supreme Court reiterated in *Allen v. Milligan*, a district court's task is not "to conduct a 'beauty contest[]' between plaintiffs' maps and the State's." 143 S. Ct. at 1505. *Amici*, likewise, do not favor "endless 'beauty contests.'" *Singleton*, 2023 WL 5691156, at *56. With that said, and without conceding the validity of any criticisms of Plaintiffs' illustrative or remedial plans (as set forth in the Fifth Circuit's stay ruling and the Defendants' briefing), the *Amicus* Map differs from Plaintiffs' plans in the following ways:

- The *Amicus* Map does ***not*** contain any district that "stretches from Louisiana's northern border down to Baton Rouge and Lafayette." *Robinson*, 37 F.4th at 217.

- The *Amicus* Map's Black crossover districts do ***not*** extend to "the delta parishes of northeast Louisiana" or "combine[] rural populations in

northern Louisiana with urban populations in Baton Rouge," 180 miles away. *Id.* at 218, 221, 224; *see also* Rec. Doc. No. 226, at p. 9.

- The *Amicus* Map's Baton Rouge district does *not* have "small tendrils that jut into parts of central Louisiana." *Robinson*, 37 F.4th at 218.

- The *Amicus* Map does *not* divide Black neighborhoods from other parts of Baton Rouge or Lafayette, *see id.* at 220–21, as both cities are kept wholly intact.

- The *Amicus* Map does *not* separate LaSalle Parish from its neighboring "rural, farming" parishes. Rec. Doc. No. 226, at p. 10.

- The *Amicus* Map does *not* "divide[] communities of interest in Rapides Parish," *id.* at 11, which is kept wholly intact.

- The *Amicus* Map does *not* "place a big swath of Rapides Parish in . . . [a] district with Lake Charles and Lafayette," *id.*, as each of the three has its own district.

- The *Amicus* Map does *not* separate "Alexandria and the surrounding areas—including Pineville, Ball, and Pollock (in Grant Parish)" or "split[] the cities of Alexandria and Pineville" between two districts. *Id.* at 11–12.

- The *Amicus* Map does *not* "divide representation for Monroe and Alexandria." *Id.* at 12.

- The *Amicus* Map does *not* "split[] Ouachita Parish" or its cities of "Monroe [and] West Monroe," nor does it separate West Monroe from "Brownsville

12

and Claiborne, [which] view themselves as 'one community of interest.'" *Id.* (citation omitted).

- The *Amicus* Map does ***not*** "split[] Lafayette Parish, including the cities of Lafayette and Scott, between [two districts]," *id.* at 13, nor does it "cleave[] the northern part of Lafayette . . . from the rest of the city," Appellants' Supp. Br. at 36, *Robinson*, 37 F.4th 208 (Doc. No. 260).

- The *Amicus* Map does ***not*** "destroy[] the community of interest of Fort Polk [now Fort Johnson] and its surrounding areas in Vernon Parish," including the city of Leesville, nor does it place the Fort in a different district "from Barksdale Air Force Base."  Rec. Doc. No. 226, at p. 13–14.

- The *Amicus* Map does ***not*** "split" St. Tammany Parish, cut "Mandeville and Lewisburg, in half," or put them "in a district anchored by East Baton Rouge."  *Id.* at 15.

- The *Amicus* Map's Black crossover districts do ***not*** "span[] long distances," *Robinson*, 37 F.4th at 221, as both districts focus on geographically compact, densely populated metropolitan areas.

The *Amicus* Map is also visually compact—its districts do not contain "any 'tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find' them sufficiently compact." *Allen v. Milligan*, 143 S. Ct. at 1504 (citation omitted).  This can be seen in the color version of the map, as well as color blowups of the New Orleans- and Baton Rouge-based districts (Districts 2 and 6, respectively), which can be found alongside a legal description of all six districts in the

Addendum to this brief.  *See Robinson*, 37 F.4th at 218, 222 (assessing compactness after "examin[ing] the shape of proposed districts" and concluding that plaintiffs had showed that their districts were sufficiently compact).

A matching pair of color maps showing both the Legislature's 2022 Enacted Plan (with its majority-Black District 2 in green) and the *Amicus* Map (with its Districts 2 and 6 in green and blue, respectively) can be found on the next page of the brief.[2]  Tellingly, of the 12 districts portrayed in these two maps, only one stands out as bizarrely misshapen: the Enacted Plan's majority-Black District 2 (shown in green in the first map), which snakes from the Black neighborhoods of New Orleans to those of Baton Rouge.

---

[2] *Amici* have previously provided comma-delimited block-equivalency files and a set of shapefiles for the *Amicus* Map to counsel for all parties in these consolidated cases so that they can more easily analyze the map themselves.  *Amici* would be happy to supply the same files to the Court upon its request.

## The Enacted Plan



## The *Amicus* Map



*Amici* offer their map as a potential remedial plan for the Court to adopt. As discussed below, it meets all the criteria for a federal court-imposed remedial plan.

## A.    The Amicus Map Fully Cures the VRA Violation in the Enacted Plan

The *Amicus* Map fully cures the Enacted Plan's VRA violation by including two crossover districts in which Black voters have a fair opportunity to elect their candidates of choice—the New Orleans-based District 2 and the Baton Rouge-based District 6. The effectiveness of both Black crossover districts is evident from the precinct-level results of recent statewide elections, which correlate tightly with congressional-election results. *See* Rec. Doc. No. 97, at 19–22.

The following Table One shows the 19 most recent statewide elections in which one candidate is estimated to have received at least 85 percent of the Black vote. This list includes every Democratic candidate who received more than one-third of the statewide vote since 2011. The columns in Table One show the month and year of the election, with a "p" indicating a primary election; the office being filled; the Black-preferred candidate's surname (or surnames, for a presidential and vice-presidential ticket), with italics indicating a Black candidate; the statewide estimated percentage support that this candidate received from Black voters and from non-Hispanic white voters; and a list of the congressional districts (by district number) that the candidate carried in the Enacted Plan and in the *Amicus* Map. The elections are listed in order by the candidate's estimated level of statewide Black support, starting with President Obama, who was preferred by more than 95 percent of all Louisiana Black voters. In 8 of the 19 elections in Table One the candidates preferred by Black voters were white.

16

TABLE ONE

| Month and Year | Office(s) | Candidate(s) Preferred by Black Voters | Estimated Support for Candidate(s) | | Enacted Plan Districts Carried by Black-Preferred Candidate(s) | *Amicus* Map Districts Carried by Black-Preferred Candidate(s) |
|---|---|---|---|---|---|---|
| | | | Black Voters | White Voters | | |
| 11/12 | President/VP | *Obama*/Biden | 95 | 12 | 2 | 2, 6 |
| 12/14 | U.S. Senator | Landrieu | 95 | 17 | 2 | 2, 6 |
| 11/15 | Governor | J.B. Edwards | 95 | 37 | 2, 3, 4, 5, 6 | 2, 4, 5, 6 |
| 11/19 | Governor | J.B. Edwards | 95 | 28 | 2 | 2, 6 |
| 11/16 | President/VP | Clinton/Kaine | 94 | 12 | 2 | 2, 6 |
| 12/16 | U.S. Senator | Campbell | 94 | 14 | 2 | 2, 6 |
| 11/19 | Sec'y of State | *Collins-Greenup* | 93 | 15 | 2 | 2, 6 |
| 11/15 | Lt. Governor | *Holden* | 93 | 22 | 2 | 2, 6 |
| 11/14p | U.S. Senator | Landrieu | 92 | 20 | 2 | 2, 6 |
| 10/19p | Governor | J.B. Edwards | 92 | 27 | 1, 2, 3, 4, 5, 6 | 2, 3, 4, 6 |
| 11/20 | President/VP | Biden/*Harris* | 91 | 14 | 2 | 2, 6 |
| 10/15p | Sec'y of State | *Tyson* | 91 | 16 | 2 | 2 |
| 10/19p | Treasurer | *D. Edwards* | 91 | 12 | 2 | 2 |
| 12/18 | Sec'y of State | *Collins-Greenup* | 90 | 14 | 2 | 2, 6 |
| 10/19p | Att'y General | *Jackson* | 90 | 11 | 2 | 2 |
| 11/17 | Treasurer | *D. Edwards* | 90 | 19 | 2 | 2 |
| 10/19p | Lt. Governor | *Jones* | 89 | 10 | 2 | 2 |
| 10/19p | Sec'y of State | *Collins-Greenup* | 88 | 12 | 2 | 2, 6 |
| 10/15p | Governor | J.B. Edwards | 85 | 21 | 2, 4, 5, 6 | 2, 4, 5, 6 |

Table One shows that, under the Enacted Plan, every Black-preferred candidate carried District 2; but none of the candidates, other than Governor Edwards, carried any of the other five districts. By contrast, under the *Amicus* Map, the Black-preferred candidate would have prevailed not only in the New Orleans-based District 2 in ***all 19 elections*** but also in the Baton Rouge-based District 6 in ***14 of the 19 elections***, including the 11 elections in which the candidate attracted the strongest levels of Black support. It is telling that each of the last three Democratic presidential tickets lost statewide by

nearly 20 points but handily carried the *Amicus* Map's District 2 ***and*** District 6.  In four of the five elections in Table One in which the Black-preferred candidate failed to carry the *Amicus* Map's District 6, the candidate was severely underfunded, received less than 38 percent of the vote statewide, and thus lost in a landslide—a circumstance that would be highly unlikely in a ***congressional*** election confined to District 6, which in this map is a competitive district likely to attract strong, well-funded candidates.

In any event, the mere fact that Black-preferred statewide candidates have occasionally failed to carry District 6 does not prevent it from fully curing the VRA violation here.  "The law does not require that a remedial district guarantee Black voters' electoral success." *Singleton*, 2023 WL 5691156, at *50.  As the Supreme Court has explained, the Act's "ultimate right … is equality of opportunity, not a guarantee of electoral success." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).  "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at 1017.

Table One also demonstrates one of the two main reasons why the *Amicus* Map's Districts 2 and 6 are effective for Black voters even though their voting-age populations are not majority-Black:  Although white voters are cohesive in voting against Black-preferred candidates, they are not as cohesive as Black voters are in supporting those same candidates.  On average in these contests, Black voters statewide split about 92 to 8 percent, while white voters split about 85 to 15 percent in the opposite direction.  Beyond this greater cohesion of Black voters, there is also the fact that Louisiana voters who identify as neither Black nor white, including substantial numbers of Latino and

Asian-American citizens, consistently vote for Black-preferred candidates. The latter point is especially salient in the *Amicus* Map's New Orleans-based District 2, where 10 percent of all registered voters identify as neither white nor Black.[3]

The Supreme Court has expressly encouraged the creation of crossover districts like the *Amicus* Map's Districts 2 and 6, which foster cross-racial coalition-building. *See Strickland*, 556 U.S. at 23–24. "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics." *De Grandy*, 512 U.S. at 1020.

The dilution of minority voting strength caused by the Enacted Plan's "packing" Black voters into District 2 (and cracking them elsewhere) is cured by the *Amicus* Map, which harnessed computational redistricting to foster equal electoral opportunity for Black voters by performing real-time calculations to account for precinct-level returns from recent elections as districts were generated and evaluated. *See generally* Amariah Becker, Moon Duchin, Dara Gold & Sam Hirsch, *Computational Redistricting and the Voting Rights Act*, 20 ELECTION L.J. 407 (2021).

---

[3] In November 2020, in the *Amicus* Map's Baton Rouge-based District 6, Joe Biden and Kamala Harris won the Black vote by about 92 percentage points (*i.e.*, about 96% to 4% among major-party voters) and won the non-Black minority vote by about 70 points, but lost the white vote by about 79 points. In the *Amicus* Map's New Orleans-based District 2, they won the Black vote by about 93 percentage points and won the non-Black minority vote by about 61 points, but lost the white vote by about 30 points.

## B.    The *Amicus* Map Is Not Overly Race Conscious

As explained above (*see supra* Part I-B), the excessive and unjustified consideration of race and racial data could possibly render a district invalid under the Equal Protection Clause if the mapmaker (i) intentionally created a particular number of majority-Black districts without evaluating the necessity for majority-Black districts; (ii) drew districts to maintain a particular numerical minority percentage or to meet arbitrary or mechanical racial targets; or (iii) allowed race to predominate over traditional nonracial districting principles such as contiguity, compactness, respect for political subdivisions, and respect for communities of interest.  Creating a map—like the *Amicus* Map—with the assistance of computational redistricting can aid in curing a VRA violation without engaging in any of these types of excessive race-consciousness.  This is because computational redistricting uses precinct-specific election returns to evaluate actual electoral opportunity for Black voters rather than just relying on raw demographic data.  By creating a map with the assistance of computational redistricting, *amici* and their experts avoided the pitfalls associated with potential racial gerrymanders.

*First*, *amici* and their expert team did not simply set out to create two majority-Black districts.  This is apparent from the simple fact that the number of majority-Black districts in the *Amicus* Map is zero.

*Second*, the *Amicus* Map's New Orleans-based District 2 and Baton Rouge-based District 6 obviously were not built to hit any arbitrary demographic threshold or target, such as being 50 percent or 55 percent Black in voting-age population, or VAP.  Table Two presents the relevant figures:

TABLE TWO

| Metric for Black Percentage | *Amicus* Map District 2 Greater New Orleans | *Amicus* Map District 6 Greater Baton Rouge |
|---|---|---|
| Voting-Age Population (2020) | 41.5 | 42.9 |
| Registered Voters (2021) | 42.4 | 44.2 |
| Total Population (2020) | 43.8 | 45.3 |

*Third*, Louisiana's traditional neutral districting principles—not race—predominated in crafting the *Amicus* Map generally and Districts 2 and 6 specifically. As discussed below, the *Amicus* Map fully complies with each of the six criteria the Louisiana Legislature adopted in Joint Rule No. 21 for congressional redistricting: (1) each district must be "composed of contiguous geography"; (2) the plan must "provide for single-member districts"; (3) each district must "have a population as nearly equal to the ideal district population as practicable"; (4) the plan must "be a whole plan which assigns all of the geography of the state"; (5) "[t]o the extent practicable, each district … [must] contain whole election precincts"; and (6) the plan must "respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable," although "this criterion is subordinate to and shall not be used to undermine the maintenance of communities of interest within the same district to the extent practicable." HCR 90, 2021 R.S. (effective June 11, 2021); *see also Major v. Treen*, 574 F. Supp. 325, 330–31 (E.D. La. 1983) (three-judge court) (listing traditional principles).

### 1. General Criteria

The *Amicus* Map easily complies with the first five criteria from Joint Rule No. 21: The Map is a whole plan that assigns all of Louisiana's geography to one of six single-member congressional districts, each of which is composed of contiguous geography and contains whole election precincts and has a population as nearly equal to the ideal district population as practicable (given adherence to the whole-precinct criterion).

### 2. Geographic Compactness

Although Joint Rule No. 21 does not expressly list geographic compactness as a criterion, it is a traditional redistricting principle in Louisiana and may be inferred from the Joint Rule's references to political subdivisions and communities of interest (discussed in more detail below). *See Major v. Treen*, 574 F. Supp. at 330–31, 353 n.34. And compactness is a prominent traditional redistricting principle in the Supreme Court's caselaw on racial gerrymandering. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. at 432–33; *Bush v. Vera*, 517 U.S. 952, 962 (1996) (plurality op.).

All six districts in the *Amicus* Map are geographically compact—and that is certainly true for Districts 2 and 6, as demonstrated by this color map:



©2021 CALIPER

When evaluating the compactness of a remedial map, the compactness of the Enacted Plan's districts may serve as a useful benchmark for comparison. Table Three reports three standard mathematical measures of district compactness for the Enacted Plan and the *Amicus* Map, breaking out the districts with larger Black populations (District 2 in both plans and District 6 in the latter plan). For each compactness measure, the scores range from a low near zero, for a dramatically bizarre shape, to a high of one, for a perfect circle. The Polsby-Popper measure focuses on a shape's jaggedness, which would penalize a district shaped like a gear; the Reock measure focuses on elongation, penalizing a district shaped like a string bean; and the Convex Hull measure focuses on concaveness, penalizing a district shaped like a crescent moon. Table Three shows that

23

the *Amicus* Map's districts are generally more compact than the Enacted Plan's—and this is especially true when one focuses on the districts with the greatest Black electoral opportunity. So it is clear that race did not predominate over the traditional redistricting principle of compactness in drawing the *Amicus* Map's Districts 2 and 6.

TABLE THREE

| Compactness Score (higher is better) | Enacted Plan: All Districts | *Amicus* Map: All Districts | Enacted Plan: District 2 | *Amicus* Map: Districts 2 & 6 |
|---|---|---|---|---|
| Average Polsby-Popper Compactness Score | 0.140 | 0.241 | 0.058 | 0.324 |
| Average Reock Compactness Score | 0.350 | 0.436 | 0.155 | 0.550 |
| Average Convex Hull Compactness Score | 0.621 | 0.738 | 0.383 | 0.767 |

### 3. Respect for Political Subdivisions

The *Amicus* Map is highly respectful of political subdivisions such as Louisiana's 64 parishes and 304 municipalities (cities, towns, and villages). Specifically, the *Amicus* Map splits only 7 parishes and 6 municipalities. And 4 of the 6 split municipalities are divided because a district line follows a parish line and the municipality thus falls into two parishes.[4]

By contrast, the Enacted Plan splits more than twice as many parishes (15) and more than three times as many municipalities (19). Most of those divisions—9 parish splits and 10 municipal splits—can be attributed to just one of the Enacted Plan's districts,

---

[4] The *Amicus* Map thus divides only two municipalities within a single parish (Hammond in Tangipahoa Parish and Lockport in Lafourche Parish). And the Enacted Plan also splits Hammond.

the bizarrely misshapen majority-Black District 2, which starts in eastern New Orleans and snakes its way to north Baton Rouge. Indeed, more political subdivisions are divided by this one district in the Enacted Plan than by all six districts combined in the *Amicus* Map.

Furthermore, while the Enacted Plan's majority-Black District 2 divides 9 of the 10 parishes it touches, the *Amicus* Map's Districts 2 and 6 divide only 4 of the 16 parishes they touch. There is not a single parish or municipality that is divided by the *Amicus* Map's District 2 or District 6 that was not already divided in the Enacted Plan. Thus, race did not predominate over respect for political subdivisions in the *Amicus* Map's districts.

### 4. Respect for Communities of Interest

The Supreme Court has also noted that a racial-gerrymandering claim can fail if districts were drawn to respect "communities defined by actual shared interests." *Miller*, 515 U.S. at 916. Often, a combination of respect for parishes (or counties) and municipalities, respect for precincts, and geographic compactness serves as a reasonable proxy for respecting communities of interest.

However, it can also be helpful to understand which parishes should sensibly "go together" in a given congressional district. Here, "metropolitan statistical areas," or MSAs, are helpful. "The United States Office of Management and Budget (OMB) delineates [MSAs] according to published standards that are applied to Census Bureau data. The general concept … is that of a core area containing a substantial population

nucleus, together with adjacent communities having a high degree of economic and social integration with that core."[5]

District 2 in the *Amicus* Map contains the core area of Louisiana's largest city, New Orleans, in its entirety, plus all parts of the New Orleans MSA that lie to the core's east or south, including all of Orleans, St. Bernard, and Plaquemines Parishes, and most of Jefferson Parish.  The district largely tracks area code 504.  The Jefferson Parish portion of District 2 covers the entire West Bank and the part of East Bank that abuts New Orleans; so it includes the parish seat, Gretna, the city of Westwego, and unincorporated places such as Marrero, Terrytown, Harvey, Estelle, and the bulk of Metairie.  District 2 thus encompasses every Jefferson Parish suburb that is linked to New Orleans in Louisiana Supreme Court District Seven.  *See Allen v. Louisiana*, 14 F.4th 366, 368 (5th Cir. 2021) (map).[6]  The *Amicus* Map's District 2 contains no territory outside the New Orleans MSA; and more than 88 percent of the remainder of the MSA's population resides in District 1, mostly in St. Tammany, Livingston, and northern Jefferson Parishes.

District 6 in the *Amicus* Map is based in Louisiana's second-largest city, Baton Rouge, which is kept intact.  District 6 contains about 8½ of the 10 parishes that constitute

---

[5] *See* U.S. CENSUS BUREAU, ABOUT [METROPOLITAN AND MICROPOLITAN], https://www.census.gov/programs-surveys/metro-micro/about.html (last revised Nov. 22, 2021).

[6] Likewise, fully nested in the *Amicus* Map's District 2 are the entire populations of Jefferson Parish Council Districts 1 and 5; Jefferson Parish School Board Districts 1, 2, 3, and 6; Senate Districts 5, 7, and 8; and House Districts 80, 83, 84, 85, 87, 94, and 105.  *See Terrebonne Par. Branch NAACP v. Edwards*, 399 F. Supp. 3d 608, 616–17 (M.D. La. 2019) (adopting remedial map that respected communities of interest by following parish council and school-board district lines).

the Baton Rouge MSA, including the Parishes of East Baton Rouge and West Baton Rouge.[7]  More than 85 percent of District 6's residents live in the Baton Rouge MSA. And almost the entirety of area code 225 falls into this district.

The *Amicus* Map's other districts also follow natural communities and MSAs. District 3 contains almost all of Louisiana's Gulf Coast, stretching from Lafourche and Terrebonne Parishes west to the Texas border, and including the entire Lafayette MSA in between.  District 4 takes in western Louisiana, from Lake Charles through DeRidder and Fort Johnson (formerly Fort Polk), up to Shreveport and Bossier City (another intact MSA).  And District 5 is a heavily rural and agricultural district that also contains the entirety of the Monroe and Alexandria MSAs.

Overall, the *Amicus* Map is highly respectful of communities defined by actual shared interests.  This is no accident:  The algorithm used to help create the *Amicus* Map expressly considered a full hierarchy of socially meaningful geographic areas, from precincts to municipalities to parishes to MSAs.

## C.    The *Amicus* Map Complies with All Other Legal Requirements

Computational redistricting also helped ensure that the *Amicus* Map complies with all other federal and state legal requirements, including the "one person, one vote" population-equality doctrine, the prohibitions against racial and ethnic vote dilution

---

[7] The Baton Rouge metropolitan area's population is too large for one congressional district.  Livingston Parish, the one Baton Rouge MSA parish wholly excluded from the *Amicus* Map's District 6, has given each of the last three Democratic presidential tickets less than 15% of the total vote.

(aside from Plaintiffs' VRA claims regarding Black voters), and the constitutional limitations on partisanship that constrain court-ordered districting maps.

### 1.    Population Equality

The *Amicus* Map complies with the "one person, one vote" principle embodied in Article I, Section 2 of the U.S. Constitution. That provision does not require that congressional districts be drawn with "[p]recise mathematical equality," but does require a showing that population differences between districts that could have been, but were not, avoided "were necessary to achieve some legitimate state objective." *Karcher v. Daggett*, 462 U.S. 725, 730, 740 (1983).

The *Amicus* Map has a total deviation of less than 0.008% of the population of an ideal, or average, district—with a difference of only 61 persons between the Map's smallest and largest districts (776,257 residents in District 6 and 776,318 residents in District 4, respectively). The total population deviation in the *Amicus* Map is thus lower than that in the Enacted Plan (65 persons) or apparently (based on *amici*'s research) in any congressional plan in the history of Louisiana. Moreover, the *Amicus* Map's deviation is fully justified under the Louisiana Legislature's longstanding policy of keeping all 3,000-plus precincts fully intact when redrawing congressional lines.

### 2.    Racial Fairness

The *Amicus* Map does not unlawfully dilute the voting strength of any racial or ethnic group. As explained above (*see supra* Part II-A), the *Amicus* Map accounts for Louisiana's highly polarized voting patterns by including two congressional districts where Black voters can elect their preferred candidates and four districts where white

voters can do so. None of Louisiana's other (*i.e.*, nonwhite, non-Black) racial or ethnic groups, such as Latino or Asian-American citizens, is sufficiently large and geographically compact; and as noted earlier, these groups consistently support Black-preferred candidates. Regardless of whether one considers Black voters specifically or all minority voters collectively, a map in which two of six districts are effective is nondilutive, given that Louisiana's adult citizen population is about 62 percent white and 32 percent Black.[8] Therefore, there is no racial or ethnic group that would have a viable claim against the *Amicus* Map under the VRA. *See De Grandy*, 512 U.S. at 1006–22. And for similar reasons, no viable claim of racial vote dilution could be lodged against the *Amicus* Map under the Fourteenth or Fifteenth Amendment to the United States Constitution, U.S. CONST. amends. XIV–XV, or under the Louisiana Constitution's prohibition against racially discriminatory laws, LA. CONST. art. I, § 3.

### 3.    Partisan Fairness

Although the Supreme Court has held that partisan-gerrymandering claims are no longer justiciable in federal court, it has also concluded that extreme partisan gerrymanders are "incompatible with democratic principles" and violate the Federal Constitution. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (quotation marks omitted); *see id.* at 2514–15 (Kagan, J., dissenting). A court adopting a remedial congressional redistricting plan therefore should avoid any map that is excessively partisan. *See, e.g., Carter v. Chapman*, 270 A.3d 444, 470 (Pa. 2022) (adopting a remedial

---

[8] U.S. CENSUS BUREAU, QUICKFACTS: LOUISIANA (2021), https://www.census.gov/quickfacts/LA (last visited Sept. 12, 2023).

congressional plan that reflected "statewide partisan preferences" (internal quotation marks omitted)); *Maestas v. Hall*, 274 P.3d 66, 80 (N.M. 2012) (court-ordered plan should "avoid … political advantage to one political party and disadvantage to the other"); *Essex v. Kobach*, 874 F. Supp. 2d 1069, 1090–91 (D. Kan. 2012) (rejecting proposed maps that "appear to be motivated in part by political considerations that do not merit consideration by the Court"); *see also Gaffney v. Cummings*, 412 U.S. 735, 736, 752 (1973) (approving a plan intended to "achieve 'political fairness' between the political parties"). And this is especially true here in Louisiana, where the state constitution expressly forbids arbitrary, capricious, and unreasonable discrimination based on "political ideas or affiliations." LA. CONST. art. I, § 3.

The *Amicus* Map easily satisfies any reasonable standard for partisan fairness. In a state where the last four Democratic presidential candidates all received between 38 and 41 percent of the total vote and their Republican counterparts all received between 57 and 59 percent, it is eminently reasonable for a six-district plan to contain two districts that lean Democratic and four districts that lean Republican.

### D.    The *Amicus* Map Minimizes Needless Changes to the Enacted Plan

As explained above (*see supra* Part I-D), when ordering a remedial redistricting plan, a federal district court should avoid modifying or intruding on state policy except where doing so is necessary to address a constitutional or statutory defect.

The *Amicus* Map readily satisfies this standard. Though it makes adjustments to comply with the VRA, the *Amicus* Map otherwise leaves untouched much of the Enacted Plan, and the legitimate legislative policy choices undergirding it. As already noted, the

*Amicus* Map is highly respectful of the traditional redistricting criteria that the Louisiana Legislature expressly adopted in 2021, including population equality, contiguity, parish integrity, municipal integrity, and maintenance of communities of interest.

Furthermore, the *Amicus* Map keeps the vast majority of Louisianans—more than 3 million residents—in their current congressional district in the Enacted Plan, with their current Representative. Not surprisingly, District 6 and its neighbor, District 1, retain less of their prior cores than do the other districts. But even District 6 retains more than 57 percent of its constituents. And the New Orleans-based District 2 retains nearly two-thirds of its constituents. In the western part of the state, where the impact of replacing one minority district with two is muted, Districts 3, 4, and 5 each keep almost three-quarters of their constituents in the same district as under the Enacted Plan.

Significantly, none of the *Amicus* Map's districts contains the residences of more than one U.S. Representative. So, like the Enacted Plan, the *Amicus* Map would avoid pitting two sitting Members of Congress against each other in the 2024 elections.

## CONCLUSION

*Amici curiae* offer this brief, and their *Amicus* Map, not in support of either party, but rather as a public service to assist the Court. Given the need for the Court to adopt a remedial plan in advance of the 2024 elections, and given the complexity of vindicating minority citizens' rights under the VRA while avoiding excessive race-consciousness and complying with all other federal and state legal requirements, as well as respecting the legitimate policy choices that the Louisiana Legislature embedded in the Enacted Plan,

*amici* believe that their *Amicus* Map, generated with the assistance of computational redistricting, can serve as the basis for this Court's remedial order.

Counsel for *amici* stand ready, should the Court so request, to participate in the upcoming evidentiary hearing in any capacity that might be helpful to the Court.

Dated: September 15, 2022      Respectfully submitted,

**JENNER & BLOCK LLP**      **BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.**

 

                                                 */s/ Judy Y. Barrasso*

Sam Hirsch*                                        Judy Y. Barrasso (La. Bar No. 2814)
Jessica Ring Amunson*              Mithun B. Kamath (La. Bar No. 35504)
JENNER & BLOCK LLP                BARRASSO USDIN KUPPERMAN
1099 New York Avenue, NW,             FREEMAN & SARVER, L.L.C.
  Suite 900                                      909 Poydras Street, Suite 2350
Washington, D.C. 20001              New Orleans, LA 70112
(202) 639-6000                                Tel: (504) 589-9700
shirsch@jenner.com                     Fax: (504) 589-9701
jamunson@jenner.com                  jbarrasso@barrassousdin.com
                                              mkamath@barrassousdin.com

*\* Pro hac vice*

                                              *Counsel for Amici*

ADDENDUM

## The *Amicus* Map—Statewide



©2021 CALIPER

The *Amicus* Map's New Orleans-Based District 2



©2021 CALIPER

The *Amicus* Map's Baton Rouge-Based District 6



### The *Amicus* Map's Congressional-District Components

The *Amicus* Map divides the State of Louisiana into six congressional districts:

District 1 is composed of Precincts 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 25, 26, 27, 33, 35, 41, 72, 76, 77, and 78 of Ascension Parish; Precincts 1, 1-H, 1-K, 2, 2-H, 2-K, 3-H, 3-K, 4-H, 4-K, 5-H, 5-K, 6-H, 6-KA, 6-KB, 7, 7-H, 7-KA, 7-KB, 8-H, 8-K, 9-H, 9-K, 10-K, 11-K, 12-K, 13-KA, 13-KB, 14-K, 15-K, 16-K, 17-K, 18-K, 19-K, 20-K, 21-K, 22-K, 23-K, 24-K, 25-K, 26-K, 27-K, 28-K, 29-K, 30-K, 31-K, 33-K, 34-K, 35-K, 51, 52, 53, 54, 55, 56, 57, 104, 105, 108, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125A, 125B, 126, and 130 of Jefferson Parish; Precincts 8-1, 9-1, 9-2, 10-1, 10-2, and 10-15 of Lafourche Parish; Livingston Parish; St. Charles Parish; Precincts 4-13, 5-1, and 5-4 of St. John the Baptist Parish; St. Tammany Parish; Precincts 44, 70, 70A, 71, 72, 72A, 73, 74, 102, 104, 104A, 106, 106A, 108, 110, 112, 114, 116, 118, 120, 120A, 120B, 122, 122A, 122B, 124, 124A, 137, 137A, 137B, 137C, 137D, 139, 141, 141A, 143, 143A, 145, 147, 149, 149A, and 151 of Tangipahoa Parish; and Washington Parish.

District 2 is composed of the Precincts of Jefferson Parish that are not located in District 1; Orleans Parish; Plaquemines Parish; and St. Bernard Parish.

District 3 is composed of Acadia Parish; Precincts 260, 261, 262, 800, 801, 860S, and 861E of Calcasieu Parish; Cameron Parish; Iberia Parish; Jefferson Davis Parish; Lafayette Parish; the Precincts of Lafourche Parish that are not located in District 1; St. Martin Parish; St. Mary Parish; Terrebonne Parish; and Vermilion Parish.

District 4 is composed of Beauregard Parish; Bienville Parish; Bossier Parish; Caddo Parish; the Precincts of Calcasieu Parish that are not located in District 3;

Claiborne Parish; De Soto Parish; Red River Parish; Sabine Parish; the Precincts of Vernon Parish that are not located in District 5; and Webster Parish.

District 5 is composed of Allen Parish; Avoyelles Parish; Caldwell Parish; Catahoula Parish; Concordia Parish; East Carroll Parish; Evangeline Parish; Franklin Parish; Grant Parish; Jackson Parish; LaSalle Parish; Lincoln Parish; Madison Parish; Morehouse Parish; Natchitoches Parish; Ouachita Parish; Rapides Parish; Richland Parish; St. Landry Parish; Tensas Parish; Union Parish; Precincts 5-1A, 6-1, 6-3, 8-2, and 8-3 of Vernon Parish; West Carroll Parish; and Winn Parish.

District 6 is composed of the Precincts of Ascension Parish that are not located in District 1; Assumption Parish; East Baton Rouge Parish; East Feliciana Parish; Iberville Parish; Pointe Coupee Parish; St. Helena Parish; St. James Parish; the Precincts of St. John the Baptist Parish that are not located in District 1; the Precincts of Tangipahoa Parish that are not located in District 1; West Baton Rouge Parish; and West Feliciana Parish.

The precincts listed here are the precincts used by the Louisiana Legislature in Act 5 of the Veto Session of 2022 (the "Enacted Plan").