## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENE SOULE, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, AND POWER COALITION FOR EQUITY AND JUSTICE, | Civil Action No. 3:22-cv-00211-SDD-RLB |
| *Plaintiffs*, | |
| v. | |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant*. | |
| EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, TRAMELLE HOWARD, | Civil Action No. 3:22-cv-00214-SDD-RLB |
| *Plaintiffs*, | |
| v. | |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant*. | |

## PLAINTIFFS' JOINT PREHEARING BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 5

I.    The Remedial Plan provides Black voters an opportunity to elect their
      candidate of choice in an additional congressional district and respects
      traditional redistricting principles. ....................................................................... 5

      A.   The Remedial Plan will reliably provide Black voters with an opportunity
           to elect their candidate of choice in two congressional districts. ..................... 6

      B.   The Remedial Plan adheres to Louisiana's redistricting principles. ................. 8

II.   Defendants offer no valid objections to the Remedial Plan. ................................. 10

      A.   Race did not predominate in the Remedial Plan. ............................................. 11

      B.   Defendants' community of interest arguments are based on cherrypicked
           data points that bear no resemblance to Louisiana mapping criteria. ............. 16

      CONCLUSION........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan*,
  599 U.S. 1 (2023).............................................................................................................12, 16

*Connor v. Finch*,
  431 U.S. 407 (1977)................................................................................................................1

*LULAC v. Perry*,
  548 U.S. 399 (2006)..........................................................................................................15, 16

*Miller v. Johnson*,
  515 U.S. 900 (1995)..............................................................................................................16

*Miss. State Chapter Operation Push, Inc. v. Mabus*,
  932 F.2d 400 (5th Cir. 1991) ...................................................................................................5

*Singleton v. Allen*,
  No. 2:21-cv-1291-AMM, 2023 WL 5691156 (N.D. Ala. Sept. 5, 2023),
  *stay denied*, 2023 WL 6218394 (U.S. Sept. 26, 2023) .........................................................11

*United States v. Brown*,
  561 F.3d 420 (5th Cir. 2009) ...................................................................................................5

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017)...........................5

**Statutes & Rules**

Voting Rights Act of 1965 Section 2 ...............................................................1, 5, 6, 10, 11, 15, 19

Joint R. of the Louisiana Legislature No. 21 ...................................................................................8

Having found that Louisiana's enacted congressional plan likely violates Section 2 of the Voting Rights Act of 1965, *see generally* Rec. Doc. No. 173—and the Louisiana Legislature having forfeited its opportunity to adopt a lawful plan—this Court must now remedy the Section 2 violation by ordering a districting plan that complies with the Voting Rights Act and the U.S. Constitution. *See Connor v. Finch*, 431 U.S. 407, 415 (1977). Plaintiffs' proposal (the "Remedial Plan") does just that. It closely tracks an illustrative configuration of Congressional District ("CD") 5 that this Court has already found to satisfy all relevant legal requirements, reflecting only slight adjustments that better preserve political-subdivision boundaries and render the state's other Black-opportunity district, CD-2, more compact. It also performs equal to or better than the state's enacted plan in its adherence to traditional redistricting criteria by ensuring that the districts are comparably or more compact, split fewer political subdivisions, and better preserve communities of interest. And the Remedial Plan cures the enacted plan's violation of federal law, providing Black Louisianians an equal opportunity to elect their candidates of choice in a second congressional district.

Defendants cannot meaningfully dispute any of these elements, and they have failed to offer *any* alternative districting plan. Instead, they seek to turn back the clock and relitigate whether Plaintiffs are entitled to any remedy at all. But that question has already been settled—definitively, for purposes of the preliminary injunction—by this Court's thorough liability-phase ruling. The sole issue presently before this Court is whether Plaintiff's Remedial Plan is consistent with that ruling and cures the violation of federal law. It is and it does. The Court should order Louisiana's congressional elections to be conducted according to the Remedial Plan pending final judgment on the merits.

## BACKGROUND

Following a five-day hearing where this Court heard testimony from 21 witnesses and admitted 232 exhibits—including 14 expert reports—into the record, the Court ruled on June 6, 2022, that "Plaintiffs are substantially likely to prevail on the merits of their claims brought under Section 2 of the Voting Rights Act" and preliminarily enjoined Secretary of State Kyle Ardoin "from conducting any congressional elections under the map enacted by the Louisiana Legislature in H.B. 1." Rec. Doc. No. 173 at 2. In its order, the Court made several findings that remain controlling here.

*First*, the Court found that Louisiana's Black Voting Age Population ("BVAP") is sufficiently large and geographically compact to constitute a majority in a second majority-minority congressional district. *See id.* at 88–90. The Court explained, "[t]he relevant question is whether the [Black] population is sufficiently compact to make up a second majority-minority congressional district in a certain area of the state. The fact that Plaintiffs' illustrative maps feature districts with 50% + BVAP while scoring well on statistical measures of compactness is the best evidence of compactness." *Id.* at 96 (emphasis omitted). As the Court recognized, "Defendants did not meaningfully refute or challenge" this evidence. *Id.* at 92.

The Court's finding that Plaintiffs' illustrative maps were sufficiently compact was also informed by a visual inspection and analysis of traditional districting principles. *Id.* at 99. The Court found that the illustrative plans were "visually more compact" than the enacted plan and respected political subdivisions and communities of interest. *Id.* at 99–100. Recognizing that there is no universally agreed upon definition of "communities of interest," the Court found that "Plaintiffs' maps split locally relevant areas less often than the enacted map," and their plans "consider and preserve communities of interest to a practical extent." *Id.* at 100, 102–03.

2

*Second*, the Court rejected Defendants' arguments that Plaintiffs' illustrative maps represented racial gerrymanders. *See id.* at 106–19. The Court evaluated Louisiana congressional maps from the 1990s that were deemed unlawful, and it found that Plaintiffs' illustrative maps were fundamentally different. *Id.* at 106–10. It concluded, "There is *no factual evidence* that race predominated in the creation of the illustrative maps in this case. Defendants' purported evidence of racial predomin[ance] amounts to nothing more than their misconstruing any mention of race by Plaintiffs' expert witnesses as evidence of racial predomin[ance]." *Id.* at 116 (emphasis in original). In fact, "Plaintiffs' expert witnesses William Cooper and Anthony Fairfax explicitly and credibly testified that they did not allow race to predominate over traditional districting principles as they developed their illustrative plans." *Id.* "[I]f Plaintiffs' experts engaged in race-predominant map drawing," the Court explained, "their illustrative plans would surely betray this imbalanced approach by being significantly less compact, by disregarding communities of interest, or some other flaw. But the Court found that Plaintiffs' plans outperformed the enacted plan on every relevant criteria." *Id.* at 118.

The Court explicitly rejected Defendants' accusation that Plaintiffs' illustrative maps "pick up areas of BVAP with 'surgical precision' and unite far-flung areas with little in common." *Id.* It noted that "including East Baton Rouge Parish and the Delta Parishes in the same district" is not the "cardinal sin" that Defendants make it out to be. *Id.* at 110. Instead, the Court found that the testimony of citizen witnesses including Christopher Tyson "contributed meaningfully to an understanding of communities of interest." *Id.* at 101. Mr. Tyson's testimony, in turn, "illustrated a historical link that gives rise to enduring connections between Baton Rouge and the Delta region." *Id.* at 38.

*Third*, the Court found that "Black voters in Louisiana are politically cohesive," *id.* at 123, and that "White voters consistently bloc vote to defeat the candidates of choice of Black voters," *id.* at 124. Crediting the analysis of Plaintiffs' experts Dr. Max Palmer and Dr. Lisa Handley, the Court concluded, "Plaintiffs' illustrative districts would not be opportunity districts in name only but would actually perform to allow Black voters a genuine opportunity to elect the candidate of their choice." *Id.*

*Fourth*, the Court found "that Plaintiffs have established that they are substantially likely to prevail in showing that the totality of the circumstances weighs in their favor." *Id.* at 127; *see also id.* at 127–41 (analyzing evidence of VRA Senate Factors and proportionality, and finding the most important factors "weigh[] heavily in favor of Plaintiffs").

Based on these findings, the Court "preliminarily enjoin[ed] Secretary Ardoin from conducting any congressional elections under the map enacted by the Louisiana Legislature in H.B. 1," and ordered that a proper remedy must include an additional majority-Black congressional district. *Id.* at 2. The Court provided the Legislature an opportunity to enact a new congressional map this is compliant with federal law, noting that judicial adoption of a remedial map would "become[] necessary only if the Legislature fails to adopt its own remedial map." *Id.* at 151–52. The Legislature failed to do so. The Court then invited Plaintiffs and Defendants to propose a remedial map. *See* Rec. Doc. No. 206. Again, Defendants failed to do so. On June 22, 2022, Plaintiffs submitted a proposed map drawn by Anthony Fairfax, the same map-drawer deemed credible at the liability-phase hearing, that was adapted with minimal changes from one of the illustrative plans he had previously submitted. *See* Rec. Doc. No. 225.

The preliminary injunction was stayed for a full year pending the Supreme Court's resolution of a parallel matter out of Alabama. *See* Rec. Doc. Nos. 227, 239. When proceedings

resumed, Plaintiffs were offered a choice between renewing their request that the Court enter the Remedial Plan proposed in June 2022, or postponing the rescheduled remedial hearing and submitting a new proposed plan. Wary of Defendants' consistent efforts to delay these proceedings, including their efforts to delay the entry of any remedy, Plaintiffs chose the option that left the least room for more obstruction and opted to proceed with the Court's hearing on the Remedial Plan. *See* Rec. Doc. No. 274. Defendants again have not proposed a remedial map, and in the three-plus months since the Supreme Court stay was lifted the Legislature has taken no steps to adopt a complaint plan. Thus, the only proposed remedial map before the Court is the Remedial Plan prepared by Mr. Fairfax and submitted by Plaintiffs.

**ARGUMENT**

I. **The Remedial Plan provides Black voters an opportunity to elect their candidate of choice in an additional congressional district and respects traditional redistricting principles.**

Having found a likely violation of federal law, the Court's "first and foremost obligation is to correct the Section 2 violation." *Veasey v. Abbott*, 830 F.3d 216, 269 (5th Cir. 2016) (en banc) (cleaned up), *cert. denied*, 137 S. Ct. 612 (2017). As the Fifth Circuit has explained, "The court should exercise its traditional equitable powers to fashion the relief so that it *completely remedies the prior dilution of minority voting strength* and *fully provides equal opportunity for minority citizens* to participate and to elect candidates of their choice." *Miss. State Chapter Operation Push, Inc. v. Mabus*, 932 F.2d 400, 406 (5th Cir. 1991) (quoting S. Rep. No. 97-417, at 31 (1982)) (emphases added); *see also United States v. Brown*, 561 F.3d 420, 435–38 (5th Cir. 2009) (holding district court did not abuse its discretion in fashioning a remedial order upon considering remedies proposed by parties and testimony at two evidentiary hearings). Because the Remedial Plan—the only party proposal before the Court—completely remedies the Section 2 violation, the Court should order its interim adoption.

A. **The Remedial Plan will reliably provide Black voters with an opportunity to elect their candidate of choice in two congressional districts.**

The Remedial Plan will remedy the Section 2 violation by providing Black voters with an opportunity to elect their candidates of choice in two of Louisiana's six districts: CD-2, which is based in New Orleans and the River Parishes, and CD-5, which is centered around Baton Rouge and the Delta Parishes. *See* Palmer Rep., Ex. A; Rec. Doc. No. 225-2 ("Handley Rep.").

At the liability-phase hearing, Defendants stipulated to Plaintiffs' tender of Dr. Max Palmer as an expert in redistricting with an emphasis in racially polarized voting and data analysis. *See* Rec. Doc. No. 173 at 51. The Court credited Dr. Palmer's opinions and conclusions, "finding that his methods were sound and reliable," and his "testimony was clear and straightforward, raising no issues that would cause the Court to question his credibility." *Id.* at 121. To analyze the Remedial Plan, Dr. Palmer applied precinct-level election results from the 2012–2020 general elections to the proposed boundaries of CD-2 and CD-5. Palmer Rep. ¶¶ 3–6. He found that the Black-preferred candidates would almost always have won in both districts. *Id.* ¶ 7. Specifically, Dr. Palmer found that Black-preferred candidates would have prevailed in 17 out of 18 election contests in proposed CD-2, with an average vote share of 64%, and in 15 out of 18 elections in proposed CD-5, with an average vote share of 57%. *Id.* ¶¶ 7–8. This shows that both CD-2 and CD-5 in the Remedial Plan will reliably provide Black voters the opportunity to elect their preferred candidates. *Id.* ¶ 9.

The Court also accepted Dr. Handley at the liability-phase hearing as an expert in redistricting with an emphasis in racially polarized voting, crediting her testimony as "thorough, careful, well-supported by data, facts and soundly reasoned." Rec. Doc. No. 173 at 121. Dr. Handley's analysis also demonstrates that Black-preferred candidates will generally be able to win elections in both CD-5 and CD-2 in the Remedial Plan. Upon reviewing recompiled election results

6

from 16 past statewide elections (including, most recently, the November 2022 election for U.S. Senate), Dr. Handley concluded that Black-preferred candidates in the Remedial Plan's CD-5 are likely to win or advance to the runoff 86.7% of the time, and are likely to win in two-candidate contests 77.8% of the time. Handley Rep. at Table 1. In the Remedial Plan's CD-2, Dr. Handley found that the Black-preferred candidate is likely to win 100% of the time.[1] *See id.* Dr. Handley also conducted a racial bloc voting analysis of the voting patterns in the Remedial Plan's CD-5 and found that voting in that geographic area is consistently and markedly polarized. Handley Suppl. Rep., Ex. B at 1.

Dr. Handley also conducted an analysis showing that, under these circumstances, the area of Remedial CD-5 would need to be majority-Black in order to provide a reasonable opportunity for Black voters to elect their candidates of choice. *See* Handley Rep. at 2–7. As Dr. Handley's analysis shows, if the Remedial Plan's CD-5 had a BVAP of 45%, the Black-preferred candidate would win only three out of the 13 analyzed contests (23%), but if its BVAP were 50%, then the Black-preferred candidate would win seven out of the 13 contests (54%). *Id.* at 7. As this Court has previously noted, Dr. Handley's analysis "inherently" accounts for white crossover voting and demonstrates that white crossover voting is not sufficient to "swing the election for the Black-preferred candidate." Rec. Doc. No. 173 at 126; *see also* Handley Rep. at 4–5.

---

[1] As Dr. Handley explained in her initial report, Effective Score #1 indicates the percent of statewide election contests that the Black-preferred would have won or advanced to a runoff based on votes cast in the different congressional districts analyzed. Effective Score #2 reports the percent of two-candidate statewide elections that the Black-preferred candidate would have won. In her initial report, Dr. Handley analyzed 15 statewide racially polarized elections, including nine two-candidate elections in which the Black-preferred candidate would have won. In her supplemental report, Dr. Handley revised the effectiveness scores by including the November 2022 U.S. Senate election and excluding one of the nine contests originally included in Effectiveness Score #2.

In sum, the performance analyses conducted by Dr. Palmer and Dr. Handley demonstrate that the Remedial Plan remedies the likely vote dilution by affording Black voters an additional, meaningful opportunity to elect their preferred candidates. Defendants have not proffered any alternative remedial plan and have provided no expert testimony disputing the conclusions reached by Dr. Palmer and Dr. Handley.

**B.    The Remedial Plan adheres to Louisiana's redistricting principles.**

Plaintiffs have further established that the vote dilution of the enacted map can be cured in accordance with traditional districting principles. As described in his affidavit accompanying the Remedial Plan, Mr. Fairfax maintained the configuration of CD-5 from his Illustrative Plan 2A, which included the Delta Parishes in the north and Baton Rouge in the south. Mr. Fairfax modified the district to account for population equality and better adhere to traditional redistricting criteria. *See* Rec. Doc. No. 225-1 ¶¶ 3, 10–12 ("Fairfax Rep."). Mr. Fairfax also made minor revisions to CD-2, including revisions to take account of testimony from the preliminary injunction hearing regarding communities of interest in the River Parishes and Assumption Parish in CD-2 and to increase the district's compactness. Under the Remedial Plan, both CD-2 and CD-5 are majority-Black districts, with 51.26% BVAP and 51.98% BVAP respectively. Fairfax Rep. at Table 4.

The end result is a Remedial Plan that performs as well as or better than the Enacted Plan on race-neutral criteria and the Louisiana Legislature's policy objectives codified in Joint Rule No. 21. In particular:

**Compactness.** The Remedial Plan is more compact on the whole than the Enacted Plan. Remedial CD-5 follows the Mississippi River and is comparable in geographic compactness to Enacted CD-5. Remedial CD-2, meanwhile, is significantly more compact than Enacted CD-2. *See* Fairfax Rep. at Table 1, Table 2.

**Parish Splits.** The Remedial Plan splits fewer parishes plan-wide in CD-2 and modestly more parishes in CD-5 compared to the Enacted Plan, HB 1. The Remedial Plan splits four parishes in CD-2 and five parishes in CD-5. In contrast, HB 1 splits nine parishes in CD-2 and two parishes in CD-5. Fairfax Rep. at Table 3. Plan-wide, the Remedial Plan has 11 parish splits, compared to 15 in the HB 1 plan. *Id.* at Table 1.

**Preservation of Communities of Interest.** The Court previously concluded that "Plaintiffs made a strong showing that their [illustrative] maps respect [communities of interest] and even unite communities of interest that are not drawn together in the enacted map." Rec. Doc. No. 173 at 103. The Remedial Plan likewise maintains communities of interest in both CD-5 (including the communities in and around East Baton Rouge and the Delta Parishes) and CD-2 (including New Orleans and the River Parishes). *See* Ex. F at 184:14–190:23 (testimony of Charles Cravins discussing connections between St. Landry Parish and Baton Rouge); *id.* at 216:21–219:19 (testimony of Christopher Tyson discussing connections between Baton Rouge and Delta Parishes); *id.* at 68:3–70:3 (testimony of Dr. Dorothy Nairne discussing connections between New Orleans and River Parishes); *id.* at 202:24-203:7 (testimony of Ashley Shelton discussing the communities of Baton Rouge). The Remedial Plan also puts the state's two distinct metropolitan centers, New Orleans and Baton Rouge, into two separate districts. *See id.* at 49:23–50:9 (testimony of Michael McClanahan discussing the distinctions between New Orleans and Baton Rouge); *id.* at 220:2-223:14 (testimony of Christopher Tyson distinguishing between the interests of Black voters in Baton Rouge and New Orleans).

**Other Redistricting Criteria.** As outlined in the chart below, the Remedial Plan performs as well as or better than HB 1 across a range of other traditional redistricting criteria:

| Table 1: Comparison of Remedial Plan and HB 1 | | |
|---|---|---|
| **Criteria** | **Remedial Plan** | **HB1 Plan** |
| Population Deviation | **61** | 65 |
| Contiguity | Y | Y |
| VTD Splits | 0 | 0 |
| COI Census Places Splits | **27** | 32 |
| COI Landmark Splits | 58 | 58 |
| Compactness (mean) Roeck, Polsby-Popper, Convex Hull | **.40, .20, 70** | .37, .14, and .62 |
| Fracking (Total Pieces) | **12** | 17 |

At bottom, the Remedial Plan fully and fairly remedies the Section 2 violation with a second congressional district in which Black voters have the opportunity to elect their candidates of choice in a plan that adheres to traditional redistricting principles as well as or better than the enacted congressional map.

## II.    Defendants offer no valid objections to the Remedial Plan.

As the Court has remarked, "[t]his case has been extensively litigated," such that "[t]he *only remaining issue* is the selection of a [remedial] congressional districting map," which the Court recognized as "a limited inquiry." Rec. Doc. No. 267 at 1–2 (emphasis added). Many of the issues that Defendants seek to challenge now—such as whether the configuration of proposed CD-5 is a racial gerrymander, fails to protect a community of interest, or is insufficiently compact— have already been resolved and are no longer subject to dispute in this Court. *See* Rec. Doc. No. 173 at 88–118. Notably, the three-judge panel adjudicating the parallel Section 2 challenge in

Alabama recently chastised defendants there for attempting the same rewind that Defendants have planned here. *See Singleton v. Allen*, Nos. 2:21-cv-1291-AMM, 2:21-cv-1530-AMM, 2023 WL 5691156, *9 (N.D. Ala. Sept. 5, 2023), *stay denied*, 2023 WL 6218394 (U.S. Sept. 26, 2023) ("We reiterated that the remedial proceedings would not relitigate the findings made in connection with the previous liability determination."); *id.* at *45 (emphasizing again that "it would be unprecedented for us to relitigate the Section Two violation during remedial proceedings"). Defendants' attempt to repackage their Section 2 *liability* arguments as an attack on Plaintiffs' proposed *Remedial* Plan falls outside the scope of these proceedings and has no bearing on the viability of that Plan.

Notably, Defendants' witnesses have nothing to say about whether the Remedial Plan cures the likely Section 2 violation by providing Black voters in Louisiana an equal opportunity to elect candidates of their choice—the primary question currently before the Court. Instead, their disputes with the Remedial Plan reflect little more than misplaced objections to the need to create an additional opportunity district in the first place.

### A.     Race did not predominate in the Remedial Plan.

Defendants advance the same refrain they harped on during the liability phase, insisting that race predominates in the Remedial Plan just like they insisted race predominated in the illustrative plans. This Court rejected that claim once with respect to the illustrative plans, and Defendants offer no evidence supporting a different result for the Remedial Plan.

As this Court observed, "[t]he Supreme Court explicitly acknowledges that some *consideration* of race is permissible in the context of the Voting Rights Act" and "lower courts have recognized the sound logic of this 'obvious' result." Rec. Doc. No. 173 at 111. The Supreme Court recently reaffirmed this principle, explaining that "for the last four decades, this Court and the lower federal courts . . . have authorized race-based redistricting as a remedy for state

districting maps that violate § 2." *Allen v. Milligan*, 599 U.S. 1, 41 (2023). Mr. Fairfax's prior testimony, expert report, and affidavit on the development of his Illustrative Plan 2A and the Remedial Plan demonstrate that it is squarely consistent with the well-established jurisprudence on racial predominance.

Mr. Fairfax maintained the configuration of CD-5 from his Illustrative Plan 2A, which included the Delta Parishes in the north and Baton Rouge in the south. *See* Fairfax Rep. ¶ 13. At the preliminary injunction hearing and in his original expert report, Mr. Fairfax explained that his process for drawing his illustrative plans was to "balance all of the relevant districting principles without allowing any single factor to predominate." Rec. Doc. No. 173 at 32. Mr. Fairfax explained that his illustrative maps took account of testimony during the Legislative redistricting hearings and a range of socioeconomic risk factors. The balance of factors included an initial consideration of race, but, as Mr. Fairfax testified, "he only considered race to the extent necessary to test for numerosity and compactness as required by *Gingles I.*" *Id.* at 99.

This Court credited Mr. Fairfax's testimony that race did not predominate in the creation of his illustrative maps. The Court noted in particular "Fairfax's testimony where he discussed how race contributed to the illustrative plans that he drew. Fairfax did not deny that he used his mapping software to assess the location of [the Black voting-age population] in Louisiana initially, but he was adamant and credible in his testimony that race did not predominate in his mapping process." *Id.* at 98–99. As the Court concluded, Mr. Fairfax "explicitly and credibly testified that [he] did not allow race to predominate over traditional districting principles as [he] developed [his] illustrative plans." *Id.* at 116. In contrast, the Court found Defendants' expert testimony on racial predominance not credible, according "little weight" to Dr. Thomas Bryan's and Dr. Christopher

Blunt's opinions that race predominated in Plaintiffs' illustrative plans because of their failure to account for traditional redistricting principles. *See id.* at 92–95.

Nothing in Mr. Fairfax's limited modification of Illustrative Plan 2A to create Plaintiffs' proposed Remedial Plan affects this Court's finding that there was no racial predominance. Mr. Fairfax explains that he "prepare[d] a remedial congressional districting plan based on Illustrative Plan 2A that made the majority-Black districts more compact, minimized political boundary splits, particularly parishes, and incorporated testimony on communities of interest identified at the Preliminary Injunction hearing, specifically the community of interest among Assumption Parish and the other River Parishes." Ex. C ("Fairfax Rebuttal Rep.") ¶ 4. And, like Illustrative Plan 2A, the Remedial Plan matches or outperforms the enacted plan on all relevant traditional redistricting criteria. *See* Fairfax Rep. ¶¶ 17–19 (plan-level and district-level comparison of the Remedial Plan and the H.B. 1 plan using eight redistricting criteria); *id.* ¶ 21 ("the Remedial plan performs equal to or better than HB 1 Plan on eight of eight redistricting criteria"). It therefore remains true that there is "*no factual evidence* that race predominated" In the Remedial Plan. Rec. Doc. No. 173 at 116.

This time, Defendants offer the expert report of Dr. Douglas Johnson to support their argument that race predominates in the remedial plan. Dr. Johnson's expert testimony on similar issues has been repeatedly rejected by other courts, and his analysis in this case fails to account for all of the relevant factors and should be rejected as well. *First*, Dr. Johnson improperly focuses on only two of the six socioeconomic risk factors that Mr. Fairfax relies upon as part of his redistricting methodology to conclude that the Remedial Plan's parish splits follow race more closely than other redistricting criteria. As Mr. Fairfax states in his report, and will testify at the remedial hearing, the six factors together (along with other evidence he considered) provide "the

full picture" of CD-5, and, to a lesser extent, CD-2. *Id.* ¶ 11. *Second*, Mr. Fairfax's Remedial Plan incorporates numerous traditional redistricting principles beyond socioeconomic risk factors. As Mr. Fairfax explains, "The plan was designed using redistricting criteria such as equal population, compactness, minimizing political subdivisions, considering existing boundaries, and preserving communities of interest." Fairfax Rebuttal Rep. ¶ 20. Dr. Johnson offers no analysis whatsoever on the extent to which the Remedial Plan follows race more closely than it does those traditional redistricting principles. *Third*, Dr. Johnson's purported critique focuses only on the few parishes that Mr. Fairfax's map splits. As Mr. Fairfax will testify at the hearing, the Remedial Plan performs as well as or better than the Enacted Map on all of the State's traditional redistricting criteria, *see* Fairfax Rep. ¶ 17, including by splitting fewer parishes, voting districts, COI Census places, and cities overall. *See id.*; *see also* Fairfax Rebuttal Rep. ¶ 70. *Finally*, Dr. Johnson fails to account for the de minimis differences between Illustrative Plan 2A and his Remedial Plan, and he does not and cannot suggest that those changes somehow injected race into a plan in which race did not predominate. Indeed, Dr. Johnson's failure to grapple with the starting point of the Remedial Map as described in this Court's liability ruling demonstrates Defendants' improper attempt to relitigate liability issues anew. Regardless, that attempt fails.[2]

Defendants also offer the expert report of Mr. Sean Trende to repeat the refrain of racial predominance based on Remedial CD-5's connection of the Delta Parishes to Baton Rouge, which

---

[2] Dr. Johnson's other opinions are irrelevant to the remedial hearing. Dr. Johnson highlights the splits of two other parishes outside CD 2 and CD 5, Vernon and St. Tammany, arguing that the former closely follows racial lines and the latter is unexplained but does not appear to follow racial lines. As Mr. Fairfax will testify, the splits of these parishes were made to bring down the populations of CD 3 and CD 4 to an acceptable deviation. In any event, the parish splits of districts outside the two majority-minority districts are not relevant to the question whether race predominated in the Remedial Plan; neither CD 3 nor CD 4 would "benefit one way or another by including a few VTDs with only a several hundred people." Fairfax Rebuttal Rep. ¶ 68.

has already been rejected by this Court. *See* Rec. Doc. No. 173 at 110, 118. Mr. Trende opines that Remedial CD-5 combines Black residents of voting age from geographically distant population centers. But connecting population centers is a feature of the enacted map (and of all Louisiana congressional maps in modern history), as it is an inevitable requirement in a state where each population center is smaller than the necessary size for a congressional district. Whether centers are "geographically distant" is a subjective and ultimately meaningless observation in the abstract—rural areas like those in northeast Louisiana necessarily will have to be combined into a more geographically expansive district in order to reach the requisite population threshold.

While disclaiming any conclusions about racial gerrymandering, Mr. Trende also opines that proposed CD-5 shares certain size and compactness characteristics with two congressional districts that were found to be unlawful racial gerrymanders: Texas's 1994 version of CD-25, and Georgia's 1992 version of CD-11. But districts drawn in entirely different contexts—in different decades by different legislatures in different states with different population distributions—are especially poor comparators for the Remedial Plan, which was drawn to remedy Louisiana's violation of Section 2 based on contemporary facts about the state's demography established by extensive evidence and found by this Court.

Besides, the faulty comparison that Defendants urge the Court to indulge contradicts their own argument—CD-5 in the Remedial Plan is nothing like the gerrymanders from Texas or Georgia. Notably, CD-5 is significantly more compact than Defendants' proposed comparators. *See* Rodden Rep. at 23-24, Ex. D. And the Supreme Court recognized other infirmities with the Texas and Georgia districts that are not present here. In *LULAC v. Perry*, 548 U.S. 399 (2006), the Supreme Court recognized that the "Latino communities at the opposite ends of District 25 have divergent needs and interests, owing to differences in socioeconomic status, education,

employment, health, and other characteristics." *Id.* at 424 (cleaned up). Here, the Court has already found that the Black community in proposed CD-5 comprises a cohesive community with shared interests. *See, e.g.*, Rec. Doc. No. 173 at 38, 118. In *Miller v. Johnson*, 515 U.S. 900 (1995), the Supreme Court deemed the challenged district unlawful because "evidence of the General Assembly's intent to racially gerrymander the Eleventh District is overwhelming [from the legislative process], and practically stipulated by the parties involved." *Id.* at 910. Again, there is no basis for drawing a similar conclusion from the Remedial Plan here.

Even Mr. Trende's own limited analysis does not support the conclusion that Defendants seek. The compactness of districts in the Remedial Plan—including CD-2 and CD-5—are comparable to or better than the compactness of analogous districts in the enacted plan and all Louisiana districting configurations from recent history, and *much better* than the districts challenged in *LULAC* and *Miller. See* Rodden Rep. at 23-24. While the Court is not required to "conduct a 'beauty contest'" between Plaintiffs' maps and the State's, *Allen*, 599 U.S. at 21, there can be no doubt that the Remedial Plan would win the crown. There is simply no basis for inferring, contrary to all evidence, that the Remedial Plan generally or its majority-Black districts specifically are racial gerrymanders.

### B. Defendants' community of interest arguments are based on cherrypicked data points that bear no resemblance to Louisiana mapping criteria.

Defendants have also previewed that they intend to challenge the Remedial Plan's compactness and preservation of communities of interest. Once again, for purposes of these proceedings, these issues are no longer subject to debate. As this Court found at the liability phase when it analyzed illustrative maps that closely resemble the Remedial Plan—indeed, that the Remedial Plan *improves* upon—Plaintiffs' mapdrawers "demonstrated, without dispute, that in terms of the objective measures of compactness, the congressional districts in the illustrative plans

are demonstrably superior to the enacted plan." Rec. Doc. 173 at 92. Likewise, the Court found that the illustrative plans appropriately "consider and preserve communities of interest." *Id.* at 103.

In their belated attempt to relitigate these conclusive findings on communities of interest, defendants have solicited the testimony of Dr. David Swanson and Dr. Henry Robertson. Neither witness's approach is persuasive. Dr. Swanson culled a handful of Louisiana "regional maps" from a cursory internet search (including a couple of tourist maps necessarily aimed at *nonresidents*) and deduced that the Remedial Plan must be faulty because it does not track the regions identified in his online maps. But the maps that Dr. Swanson found are entirely unfit to serve as redistricting guides—they are internally inconsistent, do not clearly reflect communities that warrant common congressional representation, and are compiled without any regard to the Constitution's equal-population requirement for congressional districting. It is no wonder, then, that *no* Louisiana districting map has ever tracked Dr. Swanson's proposed regions. And if anything, the Remedial Map does a *better job* than the enacted plan at tracking the regions that Dr. Swanson identifies. *See* Rodden Rep. at 11-15.

Dr. Swanson also experiments with cluster analysis, a technique that has rarely been used to identify communities of interest for redistricting, to support his hypothesis that East Carroll and surrounding parishes do not belong in the same community of interest as East Baton Rouge. After criticizing Mr. Fairfax's communities-of-interest analysis as employing "subjective judgment and also ad hoc elements," Dr. Swanson chose 14 census variables through his own subjective, ad hoc process to partition Louisiana into two clusters. Those cherrypicked variables reverse-engineered a finding that would necessarily assign urban East Baton Rouge to a different "cluster" than rural parishes in northeastern Louisiana. Dr. Swanson did not test other variables that track the historical, cultural, and demographic similarities that unite the communities in Remedial Plan CD-

5, and he did not explore configurations of more than two clusters. But perhaps Dr. Swanson's most striking oversight was that his cluster analysis altogether ignored the actual geography of the state, let alone the contiguity required for redistricting. His analysis "clusters" parishes randomly scattered across the state based on a tightly restricted, subjective set of variables. This analysis cannot support any useful conclusions, and certainly none relevant to redistricting. *See* Rodden Rep. at 18-21.

Dr. Robertson's analysis fares no better, oversimplifying the culture and history of Louisiana's regions and parishes in order to narrowly define communities of interest as five particular geographic areas. At the outset, while Dr. Robertson asserts that his methodologies are "commonly accepted practices in the complex history/geography academic field," he fails to cite any sources that his practices are commonly accepted and instead relies on conclusory descriptions such as "adoption of sound theory" and "careful, non-emotional historical interpretation." In line with that omission, Dr. Robertson presents a modified version of the "first effective settlement" theory to argue that the dominant culture of a state and its regions is largely determined by the first "effective" settlers—citing a Wikipedia article as support. The theory has been widely disputed by other scholars because it presumes a unified cultural and social experience among these settlers and disregards diversity within that group, the relevant experiences of other groups, and subsequent developments. *See* Martin Rep. Ex. E at 50. Defendants have cited no precedent in which a Court has relied upon any such analysis to identify communities of interest in the context of redistricting.

Dr. Robertson's analysis also greatly oversimplifies the range of cultures within Louisiana's regions. Baton Rouge, for example, is comprised of distinctive areas such as Scotlandville, Old South Baton Rouge, and Spanish Town, which all have unique cultural and

social histories. *See id.* at 49. Dr. Robertson himself cites several cultural influences that undermine his notion of a "first effective settlement" by a "French culture," including distinct contributions by Afro-Creoles, Zulu and Mardi Gras Indians, and German refugees. Nonetheless, Dr. Robertson asserts that Louisiana has exactly five communities of interest—defined geographically as Greater New Orleans, the Florida Parishes (Baton Rouge), Acadiana (Lafayette), Central Louisiana (Alexandria), and North Louisiana (Monroe)—and that the "individual histories and distinctive peoples in each region should preclude lumping two or more of these cities/regions in a single political district." Again citing Wikipedia, he borrows these definitions from a map developed by the University of Louisiana at Lafayette Center for Cultural and Eco-Tourism. Dr. Robertson asserts that these regions "need to be respected and left as much intact and in one district as possible because they help formulate much broader communities of interest," yet does not justify this proposition or explain why other approaches to communities of interest are invalid. Indeed, he cites no evidence that the Louisiana Legislature (or anyone else) considers the regions he identifies as appropriate guides to congressional redistricting, and he ignores the fact that Louisiana's congressional districts have long combined and cut across the regions shown in the tourism map that he claims should be the lodestar.

In sum, neither of Defendants' new experts' attempts to reimagine communities of interest in Louisiana undoes or undermines this Court's existing finding that CD-5's connection of the Delta Parishes with the Baton Rouge region appropriately combines and respects communities of interest.

*    *    *

Ultimately, this Court will find that little has changed since it enjoined the Enacted Plan as a likely violation of Section 2. The Remedial Plan, like the illustrative plan on which it is based,

provides Black voters an additional opportunity to elect a candidate of their choice consistent with traditional districting criteria and legislative policy. And Defendants' new "evidence" on racial predominance and communities of interest is simply more of the same myopic and methodologically unsound analyses that this Court rejected last year.

## CONCLUSION

For the foregoing reasons, the Court should order Louisiana's congressional elections to be conducted according to Plaintiffs' proposed Remedial Plan pending final judgment on the merits.

Date: September 29, 2023

Respectfully submitted,

J. E. Cullens, Jr.
Andrée Matherne Cullens
S. Layne Lee
WALTERS, THOMAS, CULLENS, LLC
12345 Perkins Road, Bldg. One
Baton Rouge, LA 70810
(225) 236-3636

By: */s/Abha Khanna*
Abha Khanna (*admitted pro hac vice*)
ELIAS LAW GROUP LLP
1700 Seventh Ave. Suite 2100
Seattle, Washington 98101
(206) 656-0177
akhanna@elias.law

Jacob D. Shelly (*admitted pro hac vice*)
Daniel Cohen (*admitted pro hac vice*)
Qizhou Ge (*admitted pro hac vice*)
ELIAS LAW GROUP LLP
250 Massachusetts Ave, NW Suite 400
Washington, D.C. 20001
(202) 968-4490
jshelly@elias.law
dcohen@elias.law
age@elias.law

*Counsel for Galmon Plaintiffs*

By: */s/Jonathan H. Hurwitz*

Leah Aden (admitted *pro hac vice*)
Stuart Naifeh (admitted *pro hac vice*)
Victoria Wenger (admitted *pro hac vice*)
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
laden@naacplef.org
snaifeh@naacpldf.org
vwenger@naacpldf.org

R. Jared Evans
I. Sara Rohani (admitted *pro hac vice*)
NAACP Legal Defense and Educational
Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005

Jonathan H. Hurwitz (admitted *pro hac vice*)
Robert A. Atkins (admitted *pro hac vice*)
Yahonnes Cleary (admitted *pro hac vice*)
Amitav Chakraborty (admitted *pro hac vice*)
Adam P. Savitt (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue Of The Americas, New
York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
jhurwitz@paulweiss.com
ratkins@paulweiss.com
ycleary@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com

21

Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Nora Ahmed
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org

Tracie L. Washington
Louisiana Justice Institute
Suite 132
3157 Gentilly Blvd
New Orleans LA, 70122
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

John Adcock
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Tel: (504) 233-3125
jnadcock@gmail.com

Sophia Lin Lakin
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org

Sarah Brannon
American Civil Liberties Union
Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

T. Alora Thomas-Lundborg
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
tthomaslundborg@law.harvard.edu

*Counsel for Robinson Plaintiffs*