UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENE SOULE, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, and POWER COALITION FOR EQUITY AND JUSTICE,<br><br>*Plaintiffs*,<br><br>v.<br><br>NANCY LANDRY, in her official capacity as Secretary of State for Louisiana,<br><br>*Defendant*. | Civil Action No. 3:22-cv-00211-SDD-RLB |
| EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, and TRAMELLE HOWARD,<br>*Plaintiffs*,<br><br>v.<br><br>NANCY LANDRY, in her official capacity as Secretary of State for Louisiana,<br><br>*Defendant*. | Civil Action No. 3:22-cv-00214-SDD-RLB |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY OF DAVID A. SWANSON, Ph.D.**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

LEGAL STANDARD ..................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    Dr. Swanson is not qualified to opine on communities of interest in the redistricting context. ............................................................................................................................... 2

    II.   Dr. Swanson's opinions and methodologies are unreliable. ............................................. 4

        A.   Dr. Swanson's methodology of Googling online maps to identify communities of interest is deeply flawed. ........................................................................................ 4

        B.   Dr. Swanson's use of a clustering algorithm to identify communities of interest is deeply flawed. ........................................................................................................ 7

CONCLUSION ............................................................................................................................. 11

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................................... 1, 2, 6, 11

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..................................................................................................... 1, 2, 8

*Haynes ex rel. Haynes v. Nat'l R.R. Passenger Corp.*,
  319 F. App'x 541 (9th Cir. 2009) ........................................................................................ 7

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................................ 1

*Madison v. Courtney*,
  No. 4:18-CV-00671-O, 2019 WL 8263428 (N.D. Tex. Jan. 26, 2019) ............................... 7

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir. 1998) (en banc) .............................................................................. 2

*Muñoz v. Orr*,
  200 F.3d 291 (5th Cir. 2000) .............................................................................................. 8

*Stragent, LLC v. Intel Corp.*,
  No. 6:11-CV-421, 2014 WL 1389304 (E.D. Tex. Mar. 6, 2014) ), order
  clarified, No. 6:11-CV-421, 2014 WL 12611339 (E.D. Tex. Mar. 12, 2014) .................... 8

**Other Authorities**

Fed. R. Evid. 701 ...................................................................................................................... 4

Fed. R. Evid. 702 .............................................................................................................. 1, 6, 7

## INTRODUCTION

Defendants' expert witness Dr. David A. Swanson is patently unqualified to provide expert testimony regarding communities of interest in Louisiana's congressional districts. Dr. Swanson has little more than a passing familiarity with the concepts and maps he advances in his reports, with communities of interest in Louisiana, or with redistricting generally. Rather than educate himself on the issues relevant to this case, Dr. Swanson's "expert" report is based on little more than a Google search and a novel and inappropriate "clustering" algorithm that is wholly divorced from the way Louisiana congressional districts are actually configured. As a result, the testimony he would offer is based on unreliable methodology that does not resemble the work of experts in the field of demographics or redistricting and, as such, does not meet the requirements of Federal Rule of Evidence 702. Plaintiffs respectfully request that the Court exclude the Expert Report of David A. Swanson, Ph.D., Sept. 15, 2023, Ex. 1 ("Swanson Rep."), the Supplemental Expert Report of David A. Swanson, Ph.D., Jan. 11, 2024, Ex. 2 ("Swanson Supp. Rep."),[1] and any testimony offered by Dr. Swanson at trial.

## LEGAL STANDARD

Expert testimony must be qualified, reliable, and relevant to be admissible. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Courts act as gatekeepers to ensure expert testimony meets these requirements and to evaluate whether there is an adequate fit between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). This gatekeeping obligation extends to all scientific, technical, or other specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999). Testimony must be grounded in

---

[1] Dr. Swanson's supplemental report applies the same analysis as his original report to the fifth illustrative map submitted by William Cooper and the fourth illustrative map submitted by Anthony Fairfax on December 22, 2023.

1

the relevant methods and procedures and must be more than unsupported speculation or subjective belief. *Daubert*, 509 U.S. at 590. The proponent of an expert's testimony bears the burden of establishing the reliability of the expert's testimony. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). A court may exclude "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

Courts apply a "five-factor, non-exclusive, flexible test" to determine reliability under *Daubert*: (1) whether the theory has been tested; (2) whether it has been subject to peer review and publication; (3) its known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) the degree to which the theory has been generally accepted in the scientific community. *Moore*, 151 F.3d at 275. The proffered testimony of Dr. Swanson fails each and every element of this test, and then some.

## ARGUMENT

The Court should exclude Dr. Swanson's reports and testimony. He is not qualified to opine on communities of interest in Louisiana, and the methodologies presented in his reports are unreliable.

**I.    Dr. Swanson is not qualified to opine on communities of interest in the redistricting context.**

First and foremost, Dr. Swanson lacks the knowledge, skill, experience, training, or education to testify reliably about communities of interest in the context of Louisiana redistricting. Dr. Swanson claims that his field of expertise is in demography, but, by his own account, he only knows "something about the field" of redistricting. Deposition of David A. Swanson, Ph.D., Sept. 22, 2023, Ex. 3 ("Swanson Dep. Tr.") 19:7–17. He has not taught any courses nor published any peer-reviewed articles on redistricting. *Id.* 19:25–20:8. Dr. Swanson admits that his expertise is not in the "discrete area of redistricting," and he is unfamiliar with the methodology of redistricting

2

scholars in analyzing communities of interest. *Id.* 37:3–38:2 ("Again, I'm not able to speak to what [redistricting scholars] generally use[.]").

Not only does Dr. Swanson lack expertise in redistricting, but he also lacks the ability to produce or verify the results of the figures in his own report. In fact, Dr. Swanson only has a "basic understanding of GIS and mapping" and lacks the skillset to generate many of the maps and analyses that appear in his own expert reports. *Id.* 24:10–25:6. In fact, many figures in Dr. Swanson's report were prepared by Thomas Bryan of Bryan GeoDemographics, who was also responsible for gathering much of the underlying data. *Id.* 22:4–23:7, 25:20–25. Dr. Swanson lacks the expertise to verify the accuracy of analyses provided by Bryan GeoDemographics, and the only validation he could conduct was to "look[] at the maps and mak[e] sure they looked reasonably consistent." *Id.* 23:8–25:11 ("I would have had to teach myself or go through a lot of coursework with GIS in order to [verify the accuracy of analyses].").

Notably, Defendants previously offered Mr. Bryan as an expert in this case. In its order granting Plaintiffs' motion for preliminary injunction, this Court found that Mr. Bryan's methodology was "poorly supported," his conclusions were "unsupported by the facts and data in this case and thus wholly unreliable," and his analysis "lacked rigor and thoroughness, which further undermines the reliability of his opinions." ECF No. 173, 92–94. This Court accordingly gave "very little weight to Bryan's analysis and conclusions." *Id.* at 94. Defendants have elected not to disclose Mr. Bryan as a witness they intend to call at trial; they should not be permitted to launder Mr. Bryan's discredited approach through *another* witness who is unable to answer questions about Mr. Bryan's processes.

3

Dr. Swanson is not qualified by knowledge, skill, experience, training, or education to provide the opinions in his report. He has at most a rudimentary understanding of the analyses and maps in his own expert report and cannot serve as a reliable witness on these matters.[2]

## II.     Dr. Swanson's opinions and methodologies are unreliable.

### A.  Dr. Swanson's methodology of Googling online maps to identify communities of interest is deeply flawed.

Dr. Swanson's report presents a series of Louisiana regional maps that he offers to identify the communities of interest that map-drawers must prioritize when drawing congressional districts. *See* Swanson Rep. at 25–29. Dr. Swanson did not create these maps based on his own expert familiarity with the state; nor did he extract them from peer-reviewed or redistricting-related literature; nor did he perform a comprehensive survey of all Louisiana regional maps and select the ones that were most probative of redistricting criteria. Instead, he resorted to the go-to method of non-experts in every field: "A Google search." Swanson Dep. Tr. 121:19–23. Dr. Swanson copied into his report the first four maps that popped up from his search, *id.* 121:24–122:2, without any effort to determine whether the maps were drawn by relevant (or reliable) sources, without any analysis of whether the maps he chose were consistent with other efforts to identify communities of interest that are relevant to congressional districting, and without any consideration of how Google's algorithm could be influenced by the nature or contents of the search results or his own search history or location.

The four maps that Dr. Swanson identifies were created by the Louisiana Regional Folklore Program; an apparent advertiser in Smithsonian magazine seeking to lure tourists; the Louisiana

---

[2] Nor is Dr. Swanson qualified to testify about Louisiana communities of interest as a lay witness. *See* Fed. R. Evid. 701. He has never lived in Louisiana or visited Louisiana for more than three or four days at a time. Swanson Dep. Tr. 17:13–15, 18:13–15.

Department of Culture, Recreation, and Tourism (purporting to depict "Folklife Regions"); and the Louisiana Economic Development Agency, respectively. Swanson Rep. 25–29. Dr. Swanson did not know when any of these maps were created, how they were created, or why they were created. Swanson Dep. Tr. 123:4–124:16 (disclaiming knowledge of Louisiana Regional Folklore Program map); *id.* 124:24–127:8 (disclaiming knowledge of Smithsonian advertisement); 127:9–129:10 (disclaiming knowledge of Louisiana Department of Culture, Recreation, and Tourism map); *id.* 129:11–131:13 (disclaiming knowledge of Louisiana Economic Development Agency map). Notably, Dr. Swanson conceded that, to his understanding, none of the four maps were drawn to identify communities of interest for redistricting purposes, and there was no indication that any of the maps reflected communities that are likely to have similar legislative concerns and who might benefit from cohesive representation. *Id.* 124:7–16; 125:19–126:3; 128:6–16; 130:10–18.

Instead, the maps appear to reflect no more than the organizational agendas of their creators. Two of the maps—the tourist advertisement in Smithsonian Magazine and the map generated by the Louisiana Department of Culture, Recreation, and Tourism—appear to be directed at the potential interests of *out-of-state* tourists rather than the interests of Louisianians. The map generated by the Louisiana Economic Development Agency, in turn, does not purport to identify regions based on shared economic development criteria; rather, the report simply highlights that economic investments have been made in every corner of the state.[3] Two of the maps that Dr. Swanson identifies reference folklore or folklife, but they do not address the interests of State citizens relevant to legislative concerns. And Dr. Swanson ignores *another* online map of

---

[3] *See* La. 2022 Annual Report at 46–47, La. Econ. Dev., https://www.opportunitylouisiana.gov/wp-content/uploads/docs/23led103_led-annualreport2022_single_all_pages_lowres.pdf?sfvrsn=c9dab805_0 (last accessed Jan. 15, 2024).

5

"Louisiana Folk Regions" that shows the Delta Parishes connected to Baton Rouge[4]—the very connection that Dr. Swanson's analysis purports to reject. The maps Dr. Swanson found are patently not a reliable basis for identifying communities of interest relevant to redistricting.

Ultimately, even if the maps Dr. Swanson relies upon were a relevant, reliable basis for identifying Louisiana communities of interest, none of the maps that Dr. Swanson presents offers a tenable basis for redistricting. While Louisiana's congressional map must be comprised of six equally populated districts, each of the maps in Dr. Swanson's report contains either five or eight regions, none of which are drawn to be equally populated. As a result, it is inevitable that *any* congressional map in Louisiana will divide regions Dr. Swanson contends should remain united and/or combine regions that Dr. Swanson contends are dissimilar.

Dr. Swanson's methodology completely fails the Rule 702 test. *See Daubert*, 509 U.S. at 593–95. The reliability of Googling for regional maps and then selecting an arbitrary number that appear at the top of the search results, with unidentified search terms on a computer with an unknown location and unknown search history, has not been tested, has not been subject to peer review, has not been published, does not have an identifiable error rate, does not reflect the existence and maintenance of standards and controls, and is not generally accepted in the political science community. *See, e.g.*, *Madison v. Courtney*, No. 4:18-CV-00671-O, 2019 WL 8263428, at *3 (N.D. Tex. Jan. 26, 2019) (disqualifying an expert who "merely ran a Google search" and pasted the results without any explanation for how his expertise guided his conclusions); *Haynes ex rel. Haynes v. Nat'l R.R. Passenger Corp.*, 319 F. App'x 541, 543 (9th Cir. 2009) (finding that

---

[4] *See* La. Folk Regions, ResearchGate, https://www.researchgate.net/figure/Map-showing-Louisianas-main-folk-regions-and-nine-cultural-subregions-Image-source_fig4_337225536 (last accessed Jan. 15, 2024).

a Google search, which would "ordinarily be a basis for little more than lay speculation," cannot provide the basis for expert opinion).

As observed by Dr. Jonathan Rodden, a professor of political science at Stanford University with extensive redistricting experience, Dr. Swanson's approach is "deeply flawed," "cannot possibly serve as a reliable guide," "cannot generate useful conclusions," is "arbitrary and discretionary," and is "untenable." Expert Report of Dr. Jonathan Rodden ("Rodden Rep.") at 2–3, 6–15, Ex. 4. Dr. Swanson's own explanation for how he chose the regional maps for his report confirms there was no application of expertise: "[T]hose are the ones I found pretty quickly," he explained, "so I used them." Swanson Dep. Tr. 93:3–7. Any layperson could conduct this type of cursory online search; Dr. Swanson's approach reflects no "expert" methodology and comes with no assurances of reliability. Because Dr. Swanson's opinions on communities of interest in Louisiana fail the requirements of Rule 702, they should be excluded.

### B. Dr. Swanson's use of a clustering algorithm to identify communities of interest is deeply flawed.

Dr. Swanson next attempts to distinguish disparate communities of interest in Louisiana through his novel and inappropriate use of a clustering algorithm, but he makes several errors that deviate from the normal rigor and practice of redistricting scholars. Swanson Rep. at 33–35. Dr. Swanson is no expert in cluster analysis. He possesses only a "basic understanding" of the cluster analysis he employs and has never published any research—let alone peer-reviewed papers—relating to the use of cluster analysis to evaluate redistricting maps. Swanson Dep. Tr. 20:9–25. To conduct his analysis, Dr. Swanson chose 14 of the 97 parish-level variables tracked by the U.S. Census Bureau and split all 64 parishes in Louisiana into two clusters based on the extent to which they share characteristics associated with the 14 selected variables. Swanson Rep. at 34–37; Swanson Dep. Tr. 61:5–18. As Dr. Rodden explained, "[w]ithout a principled and rigorous way of

7

deciding which variables to include, [Dr. Swanson's] approach is arbitrary and without meaning." Rodden Rep. at 19. Dr. Swanson also failed to conduct any robustness checks to test the validity of his conclusions. *Id.* 36:6–8 ("So you just accepted the results of the cluster analysis? A: Yes."). Though he recognized that the variables vary in terms of their importance, Dr. Swanson did not weigh any of the variables. Swanson Dep. Tr. 70:9–4. This arbitrary approach cannot be found reliable. *Stragent, LLC v. Intel Corp.*, No. 6:11-CV-421, 2014 WL 1389304, at *4 (E.D. Tex. Mar. 6, 2014), order clarified, No. 6:11-CV-421, 2014 WL 12611339 (E.D. Tex. Mar. 12, 2014).

Dr. Swanson repeated his cluster analysis exercise with 12 variables, 9 variables, and 7 variables, each time arbitrarily dropping variables. Swanson Rep. at 38–39. The 14-variable and 12-variable results are identical, and the 9-variable and 7-variable results are identical, indicating that the employment variables and migration variables that Dr. Swanson chose to omit in the lower-numbered exercise were not important to the clusters and likely highly correlated with other variables. Swanson Rep. at 54–62. Dr. Swanson did not implement any robustness checks before running his cluster analysis to identify these or any other correlated variables. Swanson Dep. Tr. 88:7-15.

As Dr. Rodden further explained, Dr. Swanson's "selection of variables also preordains certain outcomes." Rodden Rep. at 19. For example, Dr. Swanson included a variable for population per square mile in each iteration, Swanson Report at 37–39, producing clusters that necessarily separated cities from rural areas. Affirmatively choosing variables that assign urban areas and rural areas to different clusters is not reliable evidence that urban and rural areas do not share interests; instead, that result is simply an artifact of how Dr. Swanson designed his model. *See Joiner*, 522 U.S. at 146; *Muñoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (finding that an

8

expert's failure to consider other explanatory variables and verify data could render the testimony unreliable).

Dr. Swanson's foray into cluster analysis included other errors that would be immediately obvious to anyone familiar with redistricting. For example, his 9-variable and 7-variable iterations produced a cluster of five disconnected parishes from all across the state. *See* Swanson Rep. at 54–62; Rodden Rep. at 20–21. These results cannot provide any meaningful insights into Louisiana congressional districting, which requires equally populated and contiguous districts.

Dr. Swanson's cluster analysis is also faulty and unreliable in his choice to generate only two clusters for all 64 parishes in Louisiana, a state with six congressional districts. Swanson Rep. at 36. He reasoned that two clusters were sufficient because if two parishes are not "in the same cluster under the two-cluster option, then they will not be in the same cluster under any" other scenario. *Id*. But simple logic defies that reasoning. If ten parishes were ordered by population and divided into two clusters, the fifth and sixth largest parishes would be in different clusters; but if those same ten parishes were divided by population into *three* clusters, then the fifth and sixth largest parishes would be in the *same* cluster. Thus, Dr. Swanson failed to consider that parishes assigned to different clusters in his two-cluster analysis could reasonably be assigned to the same "cluster" or district in a congressional map composed of six equally populated and contiguous districts. Dr. Swanson did not test his results for any number of clusters other than two, even though he agreed that there may be more than two communities of interest in Louisiana. Swanson Dep. Tr. 59:16–22.

Furthermore, Dr. Swanson admits that cluster analysis is not routinely used by redistricting scholars. *Id*. 53:9–21. Though Dr. Swanson occasionally cites the academic work of other scholars, he uses cluster analysis in a manner that is *opposite* to that used by those scholars. Scholars have

9

used social and demographic data to find clusters of voters with *similar* characteristics—communities of interest that map drawers might attempt to keep together. *See, e.g.*, John Mollenkopf, Joseph Pereira, and Steven Romalewski, *"Communities of Interest" and City Council Districting in New York, 2012-2013* (February 2013), https://www.gc.cuny.edu/sites/default/files/2021-05/CUR-Communities-of-Interest-NY-2012-2013.pdf. Dr. Swanson, on the other hand, uses his analysis to justify keeping certain groups *apart* if they appear in different clusters. But Dr. Swanson offers no evidence or analysis showing that areas in different clusters should be part of different electoral districts. Dr. Swanson further departed from professional practices by limiting his analysis to only two clusters; by failing to consider other variables for inclusion in a methodical way; and by failing to properly consider geography or contiguity. *Id.*; Swanson Dep. Tr. 41:9–10. Because the clusters he generates are not contiguous, they cannot possibly be drawn into actual congressional districts. *Daubert* requires experts to employ the same intellectual rigor of experts in the relevant field. Dr. Swanson was unable to identify any reason to believe that his particular ad hoc clustering methodology satisfies this requirement.

Finally, Dr. Swanson's cluster analysis calls into question the Enacted Plan as much as it does Plaintiffs' illustrative plans. Dr. Swanson uses his cluster analysis to conclude that East Baton Rouge is, in his "judgmental likelihood," in a different grouping from East Carroll, Franklin, Madison, Morehouse, Richland, Tensas, and West Carroll. Swanson Dep. Tr. 90:23–91:12; Swanson Supp. Rep. at 30; Swanson Rep. at 41. The results of Dr. Swanson's cluster analysis rest on the notion that districts should not include parishes that are in different clusters, but this requirement—which in any event seemingly has no support in the academic literature or relevant legal authority—would defeat the Enacted Plan's CD 2, 4, 5, and 6, each of which contain parishes

10

in different clusters. *See* Rodden Rep. at 21. Indeed, it is not clear that any Louisiana map could sort congressional districts consistently with the clusters that Dr. Swanson manufactured. Once again, Dr. Swanson's methodology has not been tested, subject to peer review or publication, evaluated for a potential error rate, subject to standards and controls, or generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–95. Accordingly, Dr. Swanson's clustering analysis and related opinions should be excluded.

## CONCLUSION

The Court should exclude the proposed testimony and expert reports of Dr. David A. Swanson.

| | |
|---|---|
| Date: January 15, 2024 | Respectfully submitted, |
| J. E. Cullens, Jr.<br>Andrée Matherne Cullens<br>S. Layne Lee<br>WALTERS, THOMAS, CULLENS, LLC<br>12345 Perkins Road, Bldg. One<br>Baton Rouge, LA 70810<br>(225) 236-3636 | By: */s/Abha Khanna*<br>Abha Khanna (*admitted pro hac vice*)<br>ELIAS LAW GROUP LLP<br>1700 Seventh Ave. Suite 2100<br>Seattle, Washington 98101<br>(206) 656-0177<br>akhanna@elias.law<br><br>Daniel Cohen (*admitted pro hac vice*)<br>Qizhou Ge (*admitted pro hac vice*)<br>Jacob D. Shelly (*admitted pro hac vice*)<br>ELIAS LAW GROUP LLP<br>250 Massachusetts Ave, NW Suite 400<br>Washington, D.C. 20001<br>(202) 968-4490<br>dcohen@elias.law<br>age@elias.law<br>jshelly@elias.law<br><br>*Counsel for Galmon Plaintiffs* |
| | By: */s/Jonathan H. Hurwitz* |
| Stuart Naifeh (admitted *pro hac vice*)<br>Kathryn Sadasivan (admitted *pro hac vice*)<br>Victoria Wenger (admitted *pro hac vice*)<br>NAACP Legal Defense and Educational Fund, Inc.<br>40 Rector Street, 5th Floor<br>New York, NY 10006<br>Tel: (212) 965-2200<br>snaifeh@naacpldf.org<br>ksadasivan@naacpldf.org<br>vwenger@naacpldf.org<br><br>R. Jared Evans<br>I. Sara Rohani (admitted *pro hac vice*)<br>NAACP Legal Defense and Educational Fund, Inc.<br>700 14th Street N.W. Ste. 600<br>Washington, DC 20005 | Jonathan H. Hurwitz (admitted *pro hac vice*)<br>Robert A. Atkins (admitted *pro hac vice*)<br>Yahonnes Cleary (admitted *pro hac vice*)<br>Amitav Chakraborty (admitted *pro hac vice*)<br>Adam P. Savitt (admitted *pro hac vice*)<br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br>1285 Avenue of the Americas,<br>New York, NY 10019<br>Tel.: (212) 373-3000<br>Fax: (212) 757-3990<br>jhurwitz@paulweiss.com<br>ratkins@paulweiss.com<br>ycleary@paulweiss.com<br>achakraborty@paulweiss.com<br>asavitt@paulweiss.com |

Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Nora Ahmed (admitted *pro hac vice*)
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org

Tracie L. Washington
Louisiana Justice Institute
Suite 132
3157 Gentilly Blvd
New Orleans LA, 70122
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

John Adcock
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Tel: (504) 233-3125
jnadcock@gmail.com

Sophia Lin Lakin (admitted *pro hac vice*)
Dayton Campbell-Harris (admitted *pro hac*)**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org

Megan Keenan (admitted *pro hac vice*)
Sarah Brannon (admitted *pro hac vice*)**
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

T. Alora Thomas-Lundborg (admitted *pro hac vice*)
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
tthomaslundborg@law.harvard.edu

*Counsel for Robinson Plaintiffs*

**Practice is limited to federal court.*

13